# **EXHIBIT E**

Judgment Debtor Examination of Christopher Wilson - July 31, 2018

```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4       _____

 5    CASTEL S.A., a joint stock     )

 6    company (societe anonyme), a   )

 7    Luxembourg corporation,        )

 8            Plaintiff,             )

 9        vs.                        )  Case No:

10    AURORA IMAGING TECHNOLOGY,     )  2:17-cv-04198-DMG-KS

11    INC., a Delaware               )

12    corporation; and Does 1        )

13    through 10,                    )

14            Defendants.            )

15       _____)

16

17

18     JUDGMENT DEBTOR EXAMINATION OF CHRISTOPHER WILSON

19              LOS ANGELES, CALIFORNIA

20              TUESDAY, JULY 31, 2018

21

22

23

24

25    DORIEN SAITO, CSR 12568, CLR
```

```
 1                 UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4        _____

 5     CASTEL S.A., a joint stock    )

 6     company (societe anonyme), a  )

 7     Luxembourg corporation,       )

 8              Plaintiff,           )

 9          vs.                      )   Case No:

10     AURORA IMAGING TECHNOLOGY,     )   2:17-cv-04198-DMG-KS

11     INC., a Delaware              )

12     corporation; and Does 1       )

13     through 10,                   )

14              Defendants.          )

15        _____)

16

17

18          JUDGMENT DEBTOR EXAMINATION OF

19          CHRISTOPHER WILSON, taken on behalf

20          of PLAINTIFF, at 255 East Temple

21          Street, Attorneys Room, Los

22          Angeles, California 90012,

23          commencing at 10:24 a.m., Tuesday,

24          July 31, 2018, before DORIEN SAITO,

25          CSR 12568, CLR.
```

```
 1    A P P E A R A N C E S :

 2
        FOR PLAINTIFF:
 3
            VALLA & ASSOCIATES, INC., P.C.
 4          By:  LISA M. PARRISH, Attorney at Law
            333 Bush Street
 5          Suite 2020
            San Francisco, California  94104
 6          (415) 856-9001
            lisa.parrish@vallalaw.com
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                      I N D E X

2      W I T N E S S :

3      CHRISTOPHER WILSON                              PAGE

4         EXAMINATION BY MS. PARRISH                    5

5

6      INFORMATION REQUESTED:

7                        (NONE)

8

9      UNANSWERED QUESTIONS:

10                       (NONE)

11

12     E X H I B I T S :

13                    (NONE OFFERED)

14

15

16

17

18

19

20

21

22

23

24

25
```

Judgment Debtor Examination of Christopher Wilson - July 31, 2018

Page 5

1    LOS ANGELES, CALIFORNIA; TUESDAY, JULY 31, 2018

2                    10:24 A.M.

3                     -oOo-

4                      ***

5              CHRISTOPHER WILSON,

6    having previously been duly administered an oath,

7         was examined and testified as follows:

8                      ***

9                   EXAMINATION

10   BY MS. PARRISH,

11       Q.   You know, I won't give you the general

12   rules, all the admonitions.  You're an attorney.

13   You've been through these.

14       A.   I've sat in your seat.

15       Q.   You sat -- you sat in my seat.

16       A.   Yeah.

17       Q.   I will remind you that you are under oath.

18   You know, if you need a break, let me know, we can

19   take a break.  If there's a question pending, I just

20   request that you respond, and then we'll take a

21   break after.  Other than that, we can begin.

22           Will you state your full name for the

23   record.

24       A.   Christopher Aaron Wilson.

25       Q.   And I brought witness fees for you.  Just

```
 1      account ever as a -- as a signor.  So I don't -- I
 2      don't know if they put me on when they --
 3              When Lisa resigned, she -- when she
 4      resigned -- in fact, Lisa didn't have signatory
 5      authority anyways.  So I -- I don't know.  I have to
 6      check on who has signatory authority on that
 7      account.
 8          Q.    So currently there's an account open with
 9      nobody who is currently involved with AIT?
10          A.    I think they put me on, but I'm not sure of
11      that.  I never signed a signature card with the
12      bank, so I just don't know.
13          Q.    Okay.
14          A.    But there's no money in the bank.
15          Q.    Before other accounts were closed, did you
16      have signatory authority on other accounts?
17          A.    No.
18          Q.    So as CEO, you did not have signatory
19      authority to --
20          A.    There was one account, East West Bank,
21      years ago.  That was basically the account we
22      maintained proceeds from the sale that I had -- I
23      had authority on.  But once the sales proceeds were
24      disbursed, I mean, we let that account linger --
25      linger.  It -- I think it's still technically open,
```

1    but there's no assets in it.

2          Q.    Where is the East West Bank branch?

3          A.    East West Bank, I don't know if there's an

4    account in Southern -- there's a branch in Southern

5    California, and there's a branch in Boston.  I'm not

6    sure which one they used to open the account.  I

7    think Boston.

8          Q.    If you don't have signatory authority of

9    the Citizens Bank, do you know who does?

10         A.    Well, it used to be Steve James, and I

11   don't know if we ever changed that.

12         Q.    Did Steve James make any sort of

13   transactions dealing with this account after he --

14   his position with AIT ended?

15         A.    Well, after Steve left AIT, we continued to

16   hire him on a part-time basis as basically a

17   bookkeeper/accountant, and he helped with tax return

18   prep.  And so we paid him on a -- like an hourly

19   basis, and he always stayed on the account as a

20   signatory.

21         Q.    Do you know what Steve James's current

22   position is?

23         A.    I don't know.  I think he's a consultant, a

24   third-party consultant.

25         Q.    When was he last employed even as a third

Judgment Debtor Examination of Christopher Wilson — July 31, 2018

Page 35

1        party by AIT?

2            A.    Well, I mean, we never formally terminated

3        that arrangement, but I've -- we haven't paid him in

4        a couple of months, so...

5            Q.    So he may -- he was doing work for AIT up

6        until the past couple months?

7            A.    Yeah.   He was preparing tax returns until

8        we filed, which was -- I think we filed in June.

9            Q.    Okay.   Do you know when the last deposit

10       was made into any of AIT's bank accounts?

11           A.    There were a few collections of accounts

12       receivable in May, I believe, of a few thousand

13       dollars that came in from all the MRIs.

14           Q.    And do you know how much that was for?

15           A.    I -- I think it was a couple thousand

16       dollars.

17           Q.    And this occurred in May?

18           A.    Yeah.

19                 And then there were some minor

20       distributions from BBDC.   Again, it was a few

21       thousand dollars here and there.

22           Q.    This was after Castel obtained a judgment

23       against Aurora; is that correct?

24           A.    I don't know.

25                 What's the date of your judgment?

1       Q.    I believe the judgment was in March or

2    April, but I have to confirm the exact date of it.

3       A.    Yeah, I don't recall.

4       Q.    Is there a reason why AIT did not put any

5    sum or any of that money towards the judgment?

6       A.    No.

7       Q.    Do you know where that money went?

8       A.    Well, it seemed to -- we continued to pay

9    Steve.  We continued to pay Lisa.  We probably paid

10   a little rent.  That's about it.

11      Q.    Does AIT have a safe deposit box?

12      A.    No.

13      Q.    Is there any furniture or equipment still

14   owned by AIT?

15      A.    I think there's some furniture and some old

16   computer equipment, yeah.

17      Q.    And would that be in Danvers,

18   Massachusetts?

19      A.    Yes.

20      Q.    How about any MRI machines, do they still

21   own any MRI machines?

22      A.    No.

23      Q.    Is there any type of machine still out

24   there in which AIT would conceivably have a

25   receivable claim as -- as to that machine for

Judgment Debtor Examination of Christopher Wilson - July 31, 2018

1    Q.   Has AIT applied for a loan from any bank,

2    finance company, or any other lending company in the

3    last -- let's say since the sale of AIT to AHC?

4    A.   No.

5    Q.   I'm assuming prior to that, they had?

6    A.   Never -- they never really had bank loans.

7    They had -- at the time of the sale, we had roughly

8    $20 million -- $21 million in outstanding loans, and

9    we negotiated settlement agreements with all of the

10   lenders.  They were almost all individuals except

11   Castel and Pharos Capital.

12   Q.   Is Pharos still a creditor of AIT?

13   A.   No.

14   Q.   And was Pharos paid its outstanding loan

15   balance at the time of the sale?

16   A.   No.

17   Q.   And was Pharos paid any amount of money to

18   settle its claims against AIT?

19   A.   My understanding is AHC negotiated a

20   purchase of all of Pharos's interest in AIT,

21   including their equity and their debt.  And so as

22   part of the sale, some of the proceeds went to AHC.

23   Q.   Okay.

24   A.   But Pharos got nothing that I'm aware of.

25   Q.   And were you a part of those negotiations

Judgment Debtor Examination of Christopher Wilson - July 31, 2018

1      in any way?

2          A.   I mean, I was aware of them.  But, no, that

3      was done between AHC and Pharos.

4          Q.   So to your knowledge, Pharos didn't get any

5      money from AIT to satisfy the debt?

6          A.   Well, I think -- well, they got some money.

7      But the way it worked is they negotiated -- AHC

8      acquired all of their interests.  And then in the

9      sale, we basically paid back AHC some small amount.

10     I think we -- I think they paid $450,000 is my

11     understanding for all of Pharos's $30 million of

12     investment, so -- and then in the sale, they got

13     their 450,000 back.

14         Q.   Michael Devlin was with Pharos; is that

15     correct?

16         A.   Yes.  I understand he was in -- in some

17     capacity he was an affiliate.

18         Q.   And he was also affiliated with AIT?  He

19     served on the board?

20         A.   He served on the board, and then he assumed

21     the role of CEO after Olivia was basically forced to

22     resign.

23         Q.   Was he still on the board during the sale

24     of AIT to AHC?

25         A.   No.  No.  He resigned.  He -- the CFO was

1        also a Pharos appointee.  And Kornakova

2        [phonetic] -- I'm not sure of the exact name.  But

3        they resigned suddenly, I think, in March or April

4        of 2015.  And shortly after that is when they

5        approached me to serve as CEO.

6             Q.   Was Pharos's approval of the sale of AIT to

7        AHC dependent on their negotiation with AHC to

8        assume or purchase their interest in AIT?

9             A.   They -- they had no interest in AIT at the

10       time of the sale.  That -- that sale happened long

11       before the acquisition.

12            Q.   I see.

13            A.   AHC bought the Pharos interest down.  So

14       AHC actually had the interest.

15            Q.   So at the time of the sale, Pharos's only

16       interest in AIT was as a majority shareholder?

17            A.   No.  They -- they sold their shares, their

18       debt.  So they had no further interest in AIT

19       whatsoever.  AHC had purchased that interest.  Paid

20       cash for it is my understanding and -- and assumed

21       both the debt and the equity.

22            Q.   So when the sale occurred, the majority

23       shareholder of the AIT was AHC?

24            A.   Not a majority, no.  They had -- they

25       had -- they had a majority of the Series C and D

1        A.    Yes.

2        Q.    -- agreement between AIT and Dr. Wang?

3        A.    Yes.

4        Q.    Do you remember what that was for?

5        A.    I don't remember how much we agreed to pay

6    him.  I think it was roughly $2 million.  It was

7    maybe a little more than that.  But we didn't pay

8    him the last $950,000.

9        Q.    Okay.  Since then has AIT had any

10   involvement with Dr. Wang or his family?

11       A.    No.  I've spoken to his -- his attorney

12   just to tell him that we weren't going to be able to

13   pay the remainder.

14       Q.    And he's still in Taiwan?

15       A.    Yes.

16       Q.    His attorney is also in Taiwan?

17       A.    Yeah.  I mean, they travel to the U.S.

18   quite frequently --

19       Q.    Okay.

20       A.    -- so I don't know where he's at.  But

21   he -- he has a home here somewhere in Southern

22   California.

23       Q.    You mentioned earlier that Devlin was

24   interested in filing for bankruptcy, was pursuing

25   that, and then you stepped in because you thought

Judgment Debtor Examination of Christopher Wilson - July 31, 2018

Page 60

1       you may be able to save the company.

2               For what reason did you step in?  Did you

3       have any other like personal interest in saving the

4       company?

5           A.   Just that my father-in-law had invested --

6       I don't know exactly how much, but I guess it's

7       somewhere around half a million dollars.  I didn't

8       want to see him lose that.  I thought we could

9       preserve some value for the shareholders.  But in

10      the end, we didn't.

11          Q.   Okay.  Did you or your wife ever loan AIT

12      any money?

13          A.   No.

14          Q.   Did your father-in-law ever loan --

15          A.   No.

16          Q.   -- AIT any money?

17              Did you or your wife get any payment --

18      money from the sale of AIT to AHC other than your

19      payment as your duty as CEO?

20          A.   No.

21          Q.   Do you recall how much you made annually as

22      a CEO?

23          A.   There was no annual salary.  It was just

24      kind of a here's what we can afford to pay you kind

25      of thing.

1          Q.    Do you remember what that was?

2          A.    I -- I was -- I think it was roughly $65-

3     to $80,000 a year, but that's -- it really depended

4     on what cash was available to pay.

5          Q.    Have you spoken to Dr. Elsie Levin

6     recently?

7          A.    No.   Since the lawsuit, I only speak to

8     counsel.

9          Q.    Okay.   When is last time AIT really had any

10    active management in BBDC?

11         A.    Well, I mean, technically we were the

12    active management until they won that default

13    judgment.   So we would still -- up until the default

14    judgment, we would process their payroll, we would

15    handle their billing and handle the collections and

16    distributions.   So we were -- we were running the

17    economic side of the business until they won the

18    judgment.

19         Q.    And what was their claim for why -- for

20    their judgment against AIT?

21         A.    Well, first, they -- I think it goes back

22    to the MRI machine did not produce the kind of

23    images that Dr. Levin thought were diagnostic.   So

24    she shut the machine down, which destroyed a large

25    part of the revenue of the business.

1      Q.    -- at the time?

2      A.    She was just a controller.

3            MS. PARRISH:  Okay.  Those are all the

4      questions I have for you right now.

5            You didn't have any objections to any of

6      the questions, so we're not going to, you know,

7      reach out to the court.  There's no reason to.

8            I'm going to leave the examination open on

9      the small chance that we have to come back here.  I

10     don't anticipate having to come back here, but I

11     will leave it open for that purpose.

12           THE WITNESS:  And feel free to email me

13     questions, and I'll consider myself still under oath

14     when I respond to those, so...

15           MS. PARRISH:  Okay.  I appreciate that.

16           Okay.  We'll end the examination here

17     today.

18           And to your understanding if we didn't have

19     any objections, we don't have to go --

20           THE WITNESS:  No. I don't think so.

21           MS. PARRISH:  -- and notify the court that

22     we concluded.

23           THE WITNESS:  I don't care.  No.

24           MS. PARRISH:  Yeah.  She sounded like she

25     was a busy individual.

Judgment Debtor Examination of Christopher Wilson — July 31, 2018

Page 70

1                    (The deposition proceedings were

2               adjourned at 12:06 p.m.)

3                         -0o0-

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Judgment Debtor Examination of Christopher Wilson — July 31, 2018

Page 71

```
 1     STATE OF CALIFORNIA   )
                             )  ss.
 2     COUNTY OF LOS ANGELES )

 3

 4         I, CHRISTOPHER WILSON, having appeared for my

 5     deposition on July 31, 2018, do this date state that

 6     I have read the foregoing deposition and that I have

 7     made any corrections, additions, or deletions that I

 8     was desirous of making in order to render the within

 9     transcript true and correct.

10         IN WITNESS WHEREOF, I have hereunto subscribed

11     my name this      day of                  , 2018.

12

13                        _____
                                CHRISTOPHER WILSON
14

15

16

17

18

19

20

21

22

23

24

25
```

Judgment Debtor Examination of Christopher Wilson - July 31, 2018

Page 72

```
 1              DEPONENT'S CHANGES OR CORRECTIONS
 2     Note:  If you are adding to your testimony, print
 3     the exact words you want to add.  If you are
 4     deleting from your testimony, print the exact words
 5     you want to delete.  Specify with "add" or "delete"
 6     and sign this form.
 7
 8     DEPOSITION OF:     CHRISTOPHER WILSON
 9     CASE:             CASTEL, S.A. V. AURORA IMAGING
10                       TECHNOLOGY, INC., ET AL.
11     DATE OF DEPOSITION:  JULY 31, 2018
12
13     PAGE LINE    CHANGE/ADD/DELETE
14     _____/_____  _____
15     _____/_____  _____
16     _____/_____  _____
17     _____/_____  _____
18     _____/_____  _____
19     _____/_____  _____
20     _____/_____  _____
21     _____/_____  _____
22     _____/_____  _____
23     _____/_____  _____
24     _____      _____
25     Deponent's Signature           Date
```

Judgment Debtor Examination of Christopher Wilson - July 31, 2018

Page 73

```
 1      PAGE    LINE    CHANGE/ADD/DELETE
 2      ____/_____   _____
 3      ____/_____   _____
 4      ____/_____   _____
 5      ____/_____   _____
 6      ____/_____   _____
 7      ____/_____   _____
 8      ____/_____   _____
 9      ____/_____   _____
10      ____/_____   _____
11      ____/_____   _____
12      ____/_____   _____
13      ____/_____   _____
14      ____/_____   _____
15      ____/_____   _____
16      ____/_____   _____
17      ____/_____   _____
18      ____/_____   _____
19      ____/_____   _____
20      ____/_____   _____
21      ____/_____   _____
22      ____/_____   _____
23      ____/_____   _____
24      _____        _____
25      Deponent's Signature             Date
```

1                    CERTIFICATE OF REPORTER

2            I, DORIEN SAITO, CSR 12568, CLR, a certified

3    Shorthand reporter in and for the State of

4    California, County of Los Angeles, do hereby

5    certify;

6            That CHRISTOPHER WILSON, the witness named

7    in the foregoing deposition, was, before the

8    commencement of the deposition, duly administered an

9    oath in accordance with CCP 2094;

10           That said deposition was taken down in

11   stenograph writing by me and thereafter transcribed

12   Into typewriting under my direction.

13           That before completion of the deposition,

14   review of the transcript [ ] was [X] was not

15   requested.  If requested any changes made by the

16   deponent (and provided to the reporter) during the

17   period allowed are appended hereto.

18           I further certify that I am neither counsel

19   for nor related to any party to said action, nor in

20   any way interested in the outcome thereof.

21           Dated this 13th day of August, 2018.

22

23   _____
         CERTIFIED SHORTHAND REPORTER
24            IN AND FOR THE COUNTY OF
         LOS ANGELES, STATE OF CALIFORNIA
25