Dirk O. Julander, Bar No. 132313
  doj@jbblaw.com
Catherine A. Close, Bar No. 198549
  cac@jbblaw.com
Tiffany Wang, Bar No. 305244
  tiffany@jbblaw.com
JULANDER, BROWN & BOLLARD
9110 Irvine Center Drive
Irvine, California 92618
Telephone: (949) 477-2100
Facsimile: (949) 477-6355

Attorneys for Defendants
CHRISTOPHER A. WILSON, OLIVIA
HO CHENG and ARF PARTNERS, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CASTEL S.A., a Luxembourg joint stock company (societe anonyme),<br><br>                    Plaintiff,<br><br>          vs.<br><br>CHRISTOPHER A. WILSON, an individual; PHAROS CAPITAL PARTNERS II, LP, a Delaware limited partnership; PHAROS CAPITAL PARTNERS II-A, LP, a Delaware limited partnership; OLIVIA HO CHENG, an individual; ARF PARTNERS, LLC, a Massachusetts limited liability company; AURORA HEALTHCARE US CORP, a Massachusetts corporation; STEVEN J. JAMES, an individual,<br><br>                    Defendants. | Case No. 2:19-cv-09336-ODW-PVC<br><br>**OLIVIA HO CHENG AND ARF PARTNER'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT ON SECOND AMENDED COMPLAINT**<br><br><u>Hearing</u>:<br>Judge:  Hon. Otis D. Wright, II<br>Date:    August 30, 2021<br>Time:   1:30 p.m.<br>Crtrm.: 5D, Fifth Floor<br><br>Trial Date:        November 16, 2021 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** at 1:30 p.m. on August 30, 2021, or as soon thereafter as counsel may be heard in Department 5D of the above-captioned Court, located at First Street Court House, 350 W 1st Street, Los Angeles, CA. Defendant OLIVIA HO CHENG ("Cheng") and ARF PARTNERS, LLC ("ARF" and collectively "Defendants") will, and hereby does, move, pursuant to Federal Rule of Civil Procedure 56, for summary judgment on the Second Amended Complaint filed herein by Plaintiff CASTEL S.A. ("Plaintiff" or "Castel").  Defendants seek summary judgment on the Second Amended Complaint on the ground that, based on the undisputed evidence, Castel is not entitled to the relief requested as a matter of law.

In the alternative, Defendants move for partial summary judgment on the following issues and claims:

1.      The Second Claim for Fraudulent Deceit and Concealment against Cheng fails as a matter of law because: (a) Cheng had no duty to Castel to disclose the purchase of Pharos' debt and equity interest by ARF Partners; (b) no facts were concealed by Cheng related to the asset purchase transaction; (c) Castel would not have acted any differently had it known of the "concealed" facts; and (d) Castel was not harmed as a result of the alleged concealment.

2.      The Third Claim for Fraudulent Deceit and Concealment against ARF fails as a matter of law because: (a) ARF Partners had no duty to Castel to disclose the purchase of Pharos' debt and equity interest by ARF Partners; (b) no facts were concealed by ARF Partners related to the asset purchase transaction; (c) Castel would not have acted any differently had it known of the "concealed" facts; and (d) Castel was not harmed as a result of the alleged concealment.

3.      The Sixth Claim for Civil Conspiracy against Cheng fails as a matter of law because: (a) Cheng did not conspire with Devlin on Castel's alleged transactions; (b) AIT's board of directors consented to Devlin's investment,

Pharos' loan, and to the purchase Devlin's investment from the loan proceeds; and (c) Castel was not harmed as a result of any alleged conspiracy between Cheng and Devlin.

4.      The Seventh Claim for Breach of Contract against ARF fails as a matter of law because: (a) ARF could not have breached the Shareholder's Agreement by failing to consult prior to its purchase of Pharos' interest; and (b) Castel was not harmed as a result of any alleged breach of contract.

This Motion is based on this Notice of Motion; the accompanying Memorandum of Points and Authorities; the supporting Declarations of Dirk O. Julander, Christopher A. Wilson and Olivia Ho Cheng; the accompanying Index of Exhibits; the accompanying Separate Statement of Uncontroverted Facts and Conclusions of Law; the papers and records on file in this action; and such further evidence and argument as may be presented at or before the hearing on this matter.

This Motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on July 19, 2021.

DATED:  July 26, 2021          JULANDER, BROWN & BOLLARD


                               By:     /s/ *Dirk O. Julander*
                                   _____
                                   Dirk O. Julander
                                   Attorneys for Defendants CHRISTOPHER
                                   A. WILSON, OLIVIA HO CHENG and
                                   ARF PARTNERS, LLC

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................ 1

II.   STATEMENT OF RELEVANT FACTS .......................................... 2

    A.   Background Related to AIT and the Relevant Market ................ 2

    B.   Castel's Investments in AIT ........................................................ 3

    C.   Cheng's Involvement With AIT .................................................. 4

    D.   AIT's Insolvency and Efforts to Partially Satisfy Creditors ...... 4

    E.   Castel's Notification and Objection to the Winding Down Plan ........... 6

III.  APPLICABLE LEGAL STANDARDS ........................................... 8

IV.  CHENG IS ENTITLED TO SUMMARY JUDGMENT/
     ADJUDICATION OF EACH CLAIM ASSERTED AGAINST HER ........... 9

    A.   Cheng Is Not Liable for Fraudulent Deceit and Concealment ........... 9

        1.   Cheng Did Not Owe a Duty to Castel ........................... 10

        2.   No Facts Were Actually Concealed from Castel Related to
           the Asset Purchase ......................................................... 12

        3.   The Facts Cheng Allegedly Concealed from Castel Were
           Not Material and Castel Would Not Have Acted Any
           Differently Had it Known the Allegedly "True" Facts ............. 13

        4.   Castel Did Not Suffer Damages Caused by any Fraudulent
           Concealment ................................................................... 15

    B.   Cheng Is Not Liable for Civil Conspiracy ............................... 15

V.   ARF PARTNERS IS ENTITLED TO SUMMARY JUDGMENT/
    ADJUDICATION OF EACH CLAIM ASSERTED AGAINST IT ........... 18

    A.   Fraudulent Deceit and Concealment ........................................ 18

        1.   ARF Partners Did Not Owe a Duty to Castel ............... 18

        2.   The Facts ARF Partners Allegedly Concealed from Castel
           Were Not Material and Castel Would Not Have Acted
           Any Differently Had It Known the Allegedly "True" Facts ...... 19

        3.   Castel Did Not Suffer Damages Caused by any Fraudulent
           Concealment ................................................................... 21

B.   ARF Partners Did Not Breach the 2006 Series C and D
     Stockholder Agreements ............................................................ **21**

     1.   ARF Was Not Bound by the Stockholder Agreement ............... 22

     2.   ARF Could Not Have Been Bound Prior to its Purchase of
          Pharos' Interest ..................................................................... 22

     3.   Castel's Alleged Damages Were Not Caused by any
          Breach by ARF ........................................................................ 22

VI.  CONCLUSION ................................................................................ 23

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242, 248 (1986)...................................................................................13

*Bigler-Engler v. Breg, Inc.*
7 Cal.App.5th 276, 311 (2017) ....................................................................13, 14

*Campbell v. Vitran Express Inc.,* No. CV1105029RGKSSX
2016 WL 873009, at *3 (C.D. Cal. Mar. 2, 2016)...................................................12

*Careau & Co. v. Security Pac. Bus. Credit, Inc.*
222 Cal.App.3d 1371, 1388 (1990) ......................................................................25

*Celotex Corp. v. Catrett*
477 U.S. 317, 322-24 (1986) ..........................................................................12, 13

*Davis v. HSBC Bank Nevada, N.A.*
691 F.3d 1152, 1163 (9th Cir. 2012) ................................................................13, 21

*Efron v. Kalmanovitz*
226 Cal. App. 2d 546, 556 (1964) ........................................................................15

*GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc.,*
83 Cal. App. 4th 409, 421 (2000) ........................................................................14

*Hatch v. Collins*
225 Cal.App.3d 1104, 1110 (1990) ......................................................................20

*IIG Wireless, Inc. v. Yi*
22 Cal.App.5th 630, 652 (2018) .....................................................................19, 20

*Ivanhoe Partners v. Newmont Min. Corp.*
535 A.2d 1334, 1344 (1987).................................................................................15

*Jones v. H.F. Ahmanson & Co.*
1 Cal. 3d 93, 108 (1969) ......................................................................................15

*LiMandri v. Judkins*
52 Cal.App.4th 326, 336 (1997) ....................................................................14, 22

*Magpali v. Farmers Group, Inc.*
48 Cal. App. 4th 471, 482 (1996) ........................................................................14

*Norgart v. Upjohn Co.*
21 Cal.4th 383, 397-398 (1999)...........................................................................21

*Shin v. Kong*
80 Cal.App. 4th 498 (2000) .................................................................................14

*Trane Co. v. Gilbert*
267 Cal.App.2d 720, 727 (1968) .........................................................................21

*Wilkins v. National Broadcasting Co.*
  71 Cal.App.4th 1066, 1082 (1999) .......................................................................... 14

*Williamson v. Gen. Dynamics Corp.*
  208 F.3d 1144, 1156 n. 3 (9th Cir. 2000) ...................................................... 13, 21

**Statutes**

Fed. R. Civ. P. 56(a) ....................................................................................................... 12

**Other Authorities**

15 Cal. Jur. 3d, Corporations § 337 ................................................................................22

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Castel is a disgruntled shareholder and creditor of Aurora Imaging Technology, Inc. ("AIT") acting as a Monday-morning quarterback.  After AIT became insolvent in 2015, its management had no choice but to either file bankruptcy or attempt to obtain some value for its assets so it could partially satisfy its creditors. Cheng – the company's former President, CEO and a minority shareholder – believed in AIT's technology so much that upon learning of its intent to file bankruptcy, she tried to salvage the company's image and technology to save lives overseas while providing some compensation to the company's aggrieved creditors that they would not receive in bankruptcy. Her solution was to purchase AIT's assets. At the time AIT's assets were sold, Cheng was not an officer, director or majority shareholder and owed no fiduciary duties whatsoever to the company or its shareholders. Likewise, ARF owed no fiduciary duties to AIT or its shareholders. As the owner of the senior secured debt, ARF had the right to foreclose on all of AIT's assets giving no additional consideration to the junior, unsecured creditors, like Castel. Nevertheless, ARF and Cheng elected instead to raise money to purchase the assets of AIT.

During the winding-up process, all classes of creditors were treated alike and treated fairly.  When Castel was offered its share of the money to satisfy its unsecured debt, it turned the offer down, electing instead to sue AIT on its outstanding notes. Castel's unopposed judgment against AIT apparently unsatisfied, Castel initiated this litigation three years after the company's assets were already sold and the other creditors each partially satisfied.

Castel's claims against Cheng for "Fraudulent Deceit and Concealment" and "Civil Conspiracy," as well as its claims against ARF for "Fraudulent Deceit and Concealment" and "Breach of Contract" are meritless. Cheng and ARF did not conceal any facts from Castel. Castel admits that after being advised of the proposed

1  sale and asked to consent, it expressly refused to consent to the sale. Rather than

2  accept the partial payment on its debt, it elected to reject the offer and obtain a

3  judgment against AIT on its loan.

4       Cheng also did not conspire with Devlin to do anything.  All transactions

5  related to Devlin's investment in a Taiwanese Breast Cancer Detection Center, and

6  the purchase of Devlin's interest from money loaned by Pharos, were disclosed to,

7  and approved by, AIT's board of directors.

8       Finally, ARF could not have breached any contractual obligation to Castel

9  prior to its assumption of the contractual obligation.  Regardless, even if ARF had

10 breached a contractual obligation to Castel, Castel's alleged damages were not

11 caused by ARF's breach. Castel lost its investment in AIT because AIT was

12 insolvent and Castel chose not to participate in the proceeds of the only offer that

13 the company received to purchase its assets.

14      Thus, for the reasons set forth herein, summary judgment should be granted in

15 favor of Cheng and ARF.

16 **II.    STATEMENT OF RELEVANT FACTS[1]**

17      **A.    <u>Background Related to AIT and the Relevant Market</u>**

18      AIT was originally formed as a Delaware Corporation in 1999. The company

19 developed, manufactured and sold an FDA-approved MRI system designed for 3-D

20 bilateral breast imaging.  Unlike whole-body MRI systems that require after-market

21 modifications to image the breast, AIT's "Dedicated Breast MRI System" was

22 designed from top to bottom specifically for a breast MRI. As a result, AIT's

23 technology offered better image resolution and clarity for a breast MRI than other

24 imaging systems. At the time, the technology was revolutionary and could detect

25

26 [1]    Pursuant to the Court's Scheduling Order and Case Management Order (Dkt. 82, p. 7:18-
27 19), directing that "No party should submit any evidence other than the specific items of evidence
   or testimony necessary to support or controvert a proposed statement of undisputed fact," Cheng
28 and ARF omit in this fact section the citations to the supporting evidence.

very small cancer cells in even dense breast tissue. AIT's MRI System was marketed and sold to clinicians, breast care imaging centers and hospitals.

### B.    Castel's Investments in AIT

On June 19, 2006, Castel first invested in AIT, purchasing 1,010,101 shares of Series C preferred stock.  Years later, in July 2008, Castel purchased 512,821 shares of Series D preferred stock. Castel owned 16.7% of series C and 16.7% of series D preferred stock in AIT and was a minority shareholder, holding less than 5% of AIT's outstanding shares of capital stock. Pharos Capital Partners II, LP ("Pharos") and Pharos Capital Partners II-A, LP ("Pharos II-A;" collectively "Pharos") owned the remaining 83.3% of AIT's series C and D preferred stock. Pharos was also a minority shareholder of AIT, holding less than 20% of the company's outstanding shares of capital stock.  Pharos also held $3.3 million in senior secured promissory notes of AIT. The Pharos notes were the only loans secured by all of the assets of AIT.

Under the terms of the June 2006 AIT Stockholder Agreement between Pharos and Castel, neither AIT nor Pharos could take any action to amend, modify, waive or repeal specified provisions of the Certificate of Incorporation to adversely affect Castel's interest without its written consent.  For all other matters, Pharos was only required to "make reasonable efforts to consult with [Castel] before approving such a matter."  The transparent purpose of the foregoing protections was to prevent Castel's Series C shares from becoming diluted. Critically, nothing in the Stockholder Agreement prevented Pharos from selling its own interest and debt position in AIT. And there was no requirement in the Stockholder Agreement that Pharos obtain the consent or approval of Castel before doing so.[2]

---

[2]     The only written consent required by Stockholder Agreement dealt with amending the Certificate of Incorporation. Castel does not allege such a violation.

C.  **Cheng's Involvement With AIT**

Cheng was a former President, CEO and a minority shareholder of AIT. In 1998, Cheng was a principal of Pacific Republic Capital ("PRC"), an investment company formed to invest in medical technology. A year later, PRC purchased Breast MRI technology from Caprius, a publicly traded company. PRC believed that there was a competitive advantage in purchasing the technology and set up AIT to host all the assets.

Cheng became the President and CEO of AIT after the resignation of the Company's President/CEO in 2003. She and her husband collectively owned 185,814 shares of Series A preferred stock, 66,750 shares of Series B preferred stock and 264,697 shares of Common Stock of AIT. She served as AIT's President and CEO until her resignation in July 2013.

D.  **AIT's Insolvency and Efforts to Partially Satisfy Creditors**

In 2011, AIT entered into negotiations with a Chinese company to sell the business, and AIT stopped raising funds as a result. During this time, on March 14, 2011, Castel made a bridge loan to the company in the amount of $250,000 and became a creditor. After AIT signed the purchase agreement with the Chinese buyers, the deal fell through in 2012.

The failed sale transaction placed a tremendous financial hardship on the company because the company was not raising funds. AIT began falling behind in the market. Its niche product was becoming outdated, and large diagnostic imaging vendors began marketing competing products at price points that AIT could not compete with, particularly in the United States due to its private insurance-driven medical structure. Olivia Cheng resigned as AIT's CEO in July 2013 after serving as its CEO for 10-years (since 2003).

Two years later, in 2015, AIT was over $20 million in debt and was insolvent. AIT had been sued by five creditors, three of which obtained judgments against the company. AIT had not sold a new MRI system since 2013 and was operating with a

1  skeleton crew of accounting and subcontracted service providers for the remaining

2  installed systems. Critically, Pharos' notes, secured by AIT's assets, were in default.

3  If the company were to liquidate, the amount available for distribution to creditors

4  would not even have been sufficient to pay AIT's senior, secured debt.

5      After AIT's remaining officers and directors resigned in the Spring of 2015,

6  AIT appointed Wilson to act as its CEO to shepherd the company through the

7  liquidation/bankruptcy process. Wilson's appointment was done with the consent of

8  the Board of Directors prior to their resignation.

9      On June 18, 2015, Wilson sent a letter to AIT's shareholders advising of the

10  board's resignation, his appointment, the Company's insolvency and the retention of

11  bankruptcy counsel. After learning of AIT's insolvency and its plans to file

12  bankruptcy in June 2015, Cheng, a breast cancer survivor, was devastated by the

13  news. She believed that AIT's dedicated breast MRI technology could save lives

14  and wanted to try to do something to rescue the company from bankruptcy and

15  liquidation. Even if AIT's technology was outdated in the United States, Cheng

16  believed the technology was still valuable to save lives in those markets overseas

17  that could not afford the latest and most expensive technology available.

18      Cheng reached out to several AIT shareholders to join in her effort and ***even***

19  ***discussed the plan with Castel in August 2015, but Castel declined to***

20  ***participate.*** In September 2015, Wilson also sent the draft bankruptcy petition to

21  Castel's counsel and discussed with counsel AIT's insolvency and plans for

22  dissolution absent debt reduction, but Castel didn't respond further. Eventually,

23  Cheng raised money through ARF[3] and ultimately purchased the Pharos' senior

24  secured notes and shares of AIT for $425,000. Although Castel alleges that the stock

25  and debt were heavily discounted, Castel cannot dispute that the purchase price for

26  Pharos' debt and equity was determined in arms-length negotiations between two

27  _____

[3]    "ARF" is an acronym for Aurora Rescue Fund, which Cheng originally used to raise

28  money to save AIT.

JULANDER | BROWN | BOLLARD
ATTORNEYS AT LAW

completely unrelated parties—Pharos and ARF.

After purchasing Pharos' debt and equity position, ARF tried to raise enough money to keep AIT going. It loaned the company $1.5 million but it quickly became clear that it would not be possible to raise enough money to keep the company afloat.  So, Cheng found a group of Chinese investors that were willing to purchase AIT's assets and, in or about October 2016, began negotiations for the purchase of AIT's assets through Aurora Healthcare US Corp ("AHC").[4] Given her experience with the technology, Cheng was to be the manager and CEO of AHC. which was a new corporation formed specifically to purchase AIT's assets.

In connection with the negotiations over the price, AIT obtained an independent appraisal of the fair market value of its assets as of the proposed sale date that determined that the assets were worth between $6,181,000 and $9,652,000. Based on the appraisal, AHC agreed to purchase AIT's assets for $8.5 million, and the Company accepted the offer, subject to shareholder approval.

**E.   Castel's Notification and Objection to the Winding Down Plan**

Prior to the asset purchase, Wilson gave notice to counsel for Castel on October 20, 2016 that AIT "received only one offer to purchase the assets of the business for $8,500,000, which we are going to accept, subject to the approval of shareholders."  Wilson further explained that the purchase price was not sufficient to pay all the existing debts of AIT and that all unsecured creditors, including Castel, were eligible to receive 40% of the principal amount of each obligation.  The notice also included a form for shareholder written consent to the transaction, a draft of the proposed Asset Purchase Agreement, and a spreadsheet showing the proposed disbursement of the funds.

---

[4]    A Cayman Islands corporation was originally designated as the purchaser but AHC was instead designated to purchase the assets. Both companies were shells formed specifically for the purpose of raising money to purchase the AIT Assets.

1    Castel's counsel responded to Wilson's notice on October 26, 2016 by
2    complaining that Castel did not have sufficient information to make an informed
3    decision regarding the proposed Asset Purchase Agreement ("Draft APA"), arguing
4    that it was entitled to receive "all material information" regarding the proposed sale.
5    Wilson responded later that same day by transmitting AIT's financial statements for
6    the previous five years showing liabilities far in excess of assets, including over $12
7    million in past due loans.  When asked in discovery for evidence that AIT was not
8    truly insolvent at the time of these transactions, Castel only pointed to the fact that
9    the company never actually filed bankruptcy.  AIT's financial statements showed its
10   Balance Sheet at the time with $4,200,313 in total assets, $20,195,830 in total
11   liabilities and a shareholders' deficit of $15,140,609.  AIT had no other viable
12   option to sell its assets.

13   Wilson also offered to provide any other information Castel wanted, including
14   making all the company records available for inspection. Wilson further explained
15   that, "[t]he current owner of the senior secured debt originally issued to Pharos
16   *could have acquired all of the assets of the company by commencing legal*
17   *proceedings, which would have left nothing for any of the unsecured creditors*."
18   And while the offer was less than hoped, Wilson explained that "it is the only offer
19   we have that returns any amounts to the unsecured creditors." Wilson's October
20   26, 2016 email to Castel's counsel also attached an estimated list of the payments
21   expected to be paid after closing from the proceeds of the sale ($8.5 million) and the
22   company's cash on hand ($90,000).  AIT also anticipated paying Castel $100,000
23   from the proceeds.

24   Over the next week, the required majority of shareholders consented to the
25   $8,500,000 asset purchase transaction. After obtaining the required majority
26   consents of the AIT shareholders, AHC and AIT executed a final Asset Purchase
27   Agreement dated October 31, 2016, ("APA") in which AHC agreed to purchase all
28   the assets of AIT for $8,500,000. The terms of the APA executed by the parties

7

1   remained the same from the draft in all respects that were material to Castel.

2   The purchase price was paid with a combination of the senior, secured debt

3   (secured by the assets) formerly held by Pharos and ARF credited in the amount of

4   $4,000,000 ($300,000 less than what was owed), $500,000 paid directly by the

5   buyer to a Chinese creditor, $1,200,000 held back pending the delivery of AIT's

6   80% interest in Boston Breast Diagnostic Center ("BBDC")and $2,800,000 in cash

7   at closing.  After the closing of the asset purchase, Wilson used the purchase money

8   to satisfy AIT's other unsecured creditors, partially and proportionately.  Trade

9   creditors settled for between $0.05 and $0.10 on the dollar.  Other unsecured

10  creditors, including Castel, were offered 40% of the original principal amount of

11  their loans.  Creditors within each class were treated identically.

12  Castel did not consent to the APA transaction and did not accept the offer of

13  $100,000, representing 40% of its unsecured debt, without further communication.

14  Over the 12 months that Castel was on notice of AIT's insolvent condition, it did not

15  present any demands for information or offer any alternatives to the dissolution of

16  the company. Castel instead filed a civil action against AIT entitled *Castel S.A. v.*

17  *Aurora Imaging Technology, Inc.,* Central District of California Civil Case No. CV

18  17-4198-DMG-KS, and obtained a judgment against AIT in that action for the

19  balance due on its notes and all accrued interest. (See, Request for Judicial Notice.)

20  Not surprisingly, Castel's Judgment against AIT remains unsatisfied. This action

21  followed.

22  **III.   APPLICABLE LEGAL STANDARDS**

23  The Court may grant summary judgment on "each claim or defense—or the

24  part of each claim or defense—on which summary judgment is sought."  (Fed. R.

25  Civ. P. 56(a).) "The standards and procedures for granting partial summary

26  judgment, also known as summary adjudication, are the same as those for summary

27  judgment." (*Campbell v. Vitran Express Inc.,* No. CV1105029RGKSSX, 2016 WL

28  873009, at *3 (C.D. Cal. Mar. 2, 2016).)

1   A court should enter summary judgment when, reading the record in the light

2   most favorable to the party opposing judgment, "there is no genuine issue as to any

3   material fact and . . . the moving party is entitled to a judgment as a matter of law."

4   (Fed. R. Civ. P. 56(c); see *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-24 (1986).)

5   A fact is material if it is necessary to the proof or defense of a claim, and a factual

6   dispute is genuine "if the evidence is such that a reasonable jury could return a

7   verdict for the nonmoving party." (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,

8   248 (1986).) Initially, the moving party has the burden of demonstrating the absence

9   of a genuine issue of material fact, but if the party meets its burden, then the non-

10  moving party must adduce evidence sufficient to create a genuine issue of material

11  fact to defeat summary judgment. (See *Celotex,* 477 U.S. at 322-23.) The opposing

12  party must show more than the "mere existence of a scintilla of evidence"; rather,

13  "there must be evidence on which the jury could reasonably find for the [opposing

14  party]." (*Anderson, supra,* 477 U.S. at 252.)

15  **IV.   CHENG IS ENTITLED TO SUMMARY JUDGMENT/**

16  **ADJUDICATION OF EACH CLAIM ASSERTED AGAINST HER**

17  **A.   <u>Cheng Is Not Liable for Fraudulent Deceit and Concealment</u>**

18  To state a claim for "fraud by concealment," Castel must prove that Cheng

19  had a duty to disclose a material fact, concealed the fact with an intent to defraud,

20  and caused damage to Castel who would have acted differently had it known of the

21  true facts. (*Davis v. HSBC Bank Nevada, N.A.,* 691 F.3d 1152, 1163 (9th Cir. 2012);

22  *Williamson v. Gen. Dynamics Corp.,* 208 F.3d 1144, 1156 n. 3 (9th Cir. 2000).)

23  Castel alleges that Cheng withheld and failed to communicate material facts

24  from Castel regarding: (1) the sale of Pharos' shares and notes to ARF Partners; and

25  (2) the sale of AIT's assets to AHC, specifically that Cheng was involved in AHC.

26  (SAC, ¶¶121-122.) Castel claims that it "would have behaved differently" if Cheng

27  had disclosed all the facts and that it "lost its entire investment and loan" as a result

28  of Wilson's non-disclosure of the concealed facts. (*Id.*, ¶¶128-129.) There are

1  numerous problems with these claims, the most obvious of which are discussed

2  below.

### 1.  Cheng Did Not Owe a Duty to Castel

4  The duty to disclose only arises in a limited number of circumstances.

5  (See *Bigler-Engler v. Breg, Inc*. 7 Cal.App.5th 276, 311 (2017).) "There are 'four

6  circumstances in which nondisclosure or concealment may constitute actionable

7  fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2)

8  when the defendant had exclusive knowledge of material facts not known to the

9  plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff;

10  and (4) when the defendant makes partial representations but also suppresses some

11  material facts.'" (*LiMandri v. Judkins* 52 Cal.App.4th 326, 336 (1997).)

12  Where a fiduciary duty does not exist, one of the other three circumstances

13  must apply for any duty to disclose to arise, but those three circumstances still

14  "presuppose[ ]the existence of some other relationship between the plaintiff and

15  defendant in which a duty to disclose can arise." (*Id*. at 336-337). "A duty to

16  disclose facts arises only when the parties are in a relationship that gives rise to the

17  duty, such as 'seller and buyer, employer and prospective employee, doctor and

18  patient, or parties entering into any kind of contractual arrangement.'" (*Bigler-*

19  *Engler*, supra, 7 Cal.App.5th at 311, quoting *Shin v. Kong,* 80 Cal.App.4th

20  498 (2000), quoting *Wilkins v. National Broadcasting Co.* 71 Cal.App.4th 1066,

21  1082 (1999).)

22  As a preliminary matter, Cheng ***in her individual capacity*** owed no duty to

23  disclose anything to Castel. "Ordinarily, failure to disclose material facts is not

24  actionable fraud unless there is some fiduciary relationship giving rise to a duty to

25  disclose…." (*Magpali v. Farmers Group, Inc.,* 48 Cal. App. 4th 471, 482 (1996);

26  internal citation omitted.) Second, a former CEO and co-minority shareholder owes

27  no fiduciary duties to a current shareholder of the company. (*GAB Business*

28  *Services, Inc. v. Lindsey & Newsom Claim Services, Inc.,* 83 Cal. App. 4th 409, 421

1  (2000).) Cheng was the CEO of AIT only until 2013. (Dkt. 91, ¶69.)

2      The first alleged concealment occurred in connection with the November

3  2015 purchase of Pharos' notes and October 2016 sale of AIT's assets. (*Id.*¶ 110.)

4  At that time, Cheng had not been the President/CEO of AIT for more than two

5  years.  (Uncontroverted Material Fact ("UMF") No. 1.) As a former CEO, Cheng did

6  not have a duty to Castel or any other shareholders of AIT to disclose any facts

7  regarding ARF Partner's purchase of Pharos' notes. And as a co-minority

8  shareholder, Cheng owed no fiduciary duties to Castel. (UMF No. 2.)

9      Pursuant to Delaware law, "a shareholder owes a fiduciary duty only if it

10  owns a majority interest in or exercises control over the business affairs of the

11  corporation." (*Ivanhoe Partners v. Newmont Min. Corp.,* 535 A.2d 1334, 1344

12  (1987) ["Owner of 26% of target corporation breached no fiduciary duty to

13  remaining shareholders by executing street sweep, thereby acquiring 49.7% interest

14  in corporation, in order to deter break up and squeeze out threat posed by hostile

15  bidder's inadequate, coercive two-tier bid."].) "Moreover, it is well established law

16  that nothing precludes […] a stockholder from acting in its own self-interest."

17  (*Id*). Castel alleges that Cheng was a "preferred shareholder" of AIT. (Dkt. 91,

18  ¶120.) To the extent that Castel is referring to the fact that Cheng owned some

19  preferred shares, the statement is true; *but* Cheng was not a majority or controlling

20  shareholder of AIT.  (UMF No. 2.) A preferred shareholder who is not the majority

21  shareholder owes no fiduciary duties to other shareholders. (See *Jones v. H.F.*

22  *Ahmanson & Co.*, 1 Cal. 3d 93, 108 (1969) [majority shareholders owe fiduciary

23  duties to minority shareholders]; *Efron v. Kalmanovitz*, 226 Cal. App. 2d 546, 556

24  (1964) [same].) Similarly, Cheng had no fiduciary duties to Castel as a member of

25  ARF or the CEO of AHC. AHC was never a shareholder of AIT. (UMF No. 4.)

26  Accordingly, Cheng did not personally have a fiduciary duty to disclose any facts to

27  Castel.

28

2. **No Facts Were Actually Concealed from Castel Related to the Asset Purchase**

Castel alleges that Cheng failed to disclose that she was involved "as an agent for ARF PARTNERS on the seller side" and "as an agent for [Aurora Healthcare SPC] on the buyer side."[5] (Dkt. No. 91, SAC, ¶122.) This contention is without merit. Castel was advised of Cheng's involvement "on the buyer's side" when Wilson sent the draft APA to Castel on October 20, 2016.  (UMF No. 5.)  The draft APA clearly indicated that it would be executed by "Olivia Ho Cheng, Chairman" on behalf of the buyer; however, Cheng was not "on the buyer's side" in any individual capacity. (UMF No. 6.)

And ARF Partners was not "on the seller's side." ARF was not the seller of the assets; AIT was the seller of the assets. (UMF No. 8.)  ARF did not receive any amount of the purchase price; AIT received the purchase price from the sale.  (UMF No. 9.) ARF did not sell anything in the APA.  (UMF No. 10.) ARF was on the buyer's side of the transaction because the senior secured notes that it owned were used by the buyer to offset $4.0 million of the purchase price. (UMF No. 11.) But ARF did not receive cash from the purchase price.  (UMF No. 12.) Cheng's only involvement in her individual capacity was on the Seller's side as a creditor, which was also fully disclosed to Castel in the Sources and Uses of Funds. (UMF No. 13.) Cheng and her husband received the same 40% of their debt that all other similarly-situated creditors, including Castel, were offered.  (UMF No. 15.)

Castel also alleges that Cheng failed to disclose the "kickback" ARF Partners was going to receive. (Dkt. 91, SAC, ¶123.) In reality, there was no hidden "kickback." AHC received AIT's assets in exchange for its senior secured debt (originally held by Pharos) and payment of another $3.3 million in cash ($500,000

---

[5]     This allegation makes no sense since ARF was not on the "seller side" of the transaction, it was simply the holder of the senior secured debt of AIT, which it obtained from Pharos.

1  paid directly to a Chinese creditor and $2,800,000 cash at closing). (UMF No.

2  16.) ARF received an equity interest in AHC as the previous holder of Pharos'

3  senior secured debt. (UMF No. 17.) The remaining creditors who participated

4  divided the $3.3 million in cash from the purchase price and cash held by

5  AIT. (UMF No. 19.) Neither ARF nor AHC received any portion of the $3.3 million

6  in cash or any other "kickback" for the senior secured notes that they gave as

7  consideration for the Asset Purchase Agreement. (UMF No. 20.)

8          **3.**     **The Facts Cheng Allegedly Concealed from Castel Were Not**

9                  **Material and Castel Would Not Have Acted Any Differently**

10                  **Had it Known the Allegedly "True" Facts**

11        Even if Cheng had concealed (which she did not) her involvement, those facts

12  are not material. Castel allleges that these facts were material because it "would

13  have behaved differently" if it had known these facts and that it lost its entire

14  investment and loan because of the concealment. (SAC, ¶¶128-129.) The allegedly

15  "concealed facts" could only be material to Castel's conduct if Castel could have

16  behaved differently to preserve more of its investment and loan than was offered

17  through the APA. But in reality the "concealed facts" could not be material because

18  it was not possible for Castel to behave any differently to preserve more of its

19  investment and loan because:

20         • AIT was insolvent by June 2015 and remained so through 2016 (UMF

21           No. 21);

22         • Because AIT was insolvent, no shareholder, including Castel, was

23           entitled to or did receive any value under the APA in consideration for

24           their equity investment (UMF No. 22);

25         • The senior secured noteholder (ARF) would have foreclosed on AIT's

26           assets if the shareholders had not approved the APA (UMF No. 23);

27         • AIT received only one offer to purchase its assets for $8.5 million

28           (UMF No. 24); and

- Castel's only avenue to salvage any of its debt was to accept the offered portion of the asset sale proceeds; it had no other options (UMF No. 25);

- The buyer of AIT's assets did not receive any "kickback" but lawfully purchased the AIT assets using as an offset the value of the Pharos Notes it obtained in an arms-length transaction (UMF No. 26);

- The consideration ARF gave ($425,000) to purchase the senior secured Pharos Notes ($3.3 million face value) could not logically affect Castel's ability to preserve its investment or loan;

- An express disclosure of Cheng's interest in ARF on the buyer's side of the APA or ARF's purchase price for the Pharos Notes would not have made AIT solvent (UMF No. 27); and

- An express disclosure of Cheng's interest in ARF on the buyer's side of the APA or ARF's purchase price for the Pharos Notes would not have increased the appraised value of AIT's assets and created a higher offer to purchase AIT's assets (UMF No. 28).

Castel's investments in AIT, and its loans to, AIT all predate the alleged fraudulent conduct. (UMF No. 29.) Castel could not have made, and does not allege that it made, any investments in or loans to AIT in reliance upon Cheng's alleged concealments. The only actions taken by Castel after the alleged fraudulent concealment was its objection and refusal to consent to the asset purchase transaction and its decision to instead pursue a lawsuit against AIT.

Castel asserts that had Cheng "disclosed the concealed facts, PLAINTIFF would have behaved differently." (Dkt.91, SAC, ¶128.) Though Castel claims it did not receive sufficient information necessary to make an informed decision regarding the transaction, Castel does *not* claim that it would have instead consented to the transaction had it known the true facts. And yet, ***those were the only two options***— consent to the transaction or reject the transaction and pursue an action on the

14

notes. Rather than accept the partial payment on its debt, it elected to reject the offer and obtain a judgment against AIT on the full amount of its loans. (Dkt. No. 91, SAC, Ex. L.) It may regret that decision now, but it cannot blame Cheng for its decision.

### 4. Castel Did Not Suffer Damages Caused by any Fraudulent Concealment

Castel lost its equity investment because AIT was insolvent. (UMF Nos. 21, 22, 30, 47, 54 and 66.)  Castel did not recover on its debt because Castel refused to participate in the proceeds of the only available asset sale and accept a proportionate partial payment on its notes like the other creditors did. (UMF Nos. 32-33.) Instead, it elected to pursue a Judgment against AIT for the full amount of its notes, which it obtained. (Dkt. No. 91, Ex. L.) Castel lost its investment because the senior secured creditor would have obtained all of AIT's assets either through foreclosure or bankruptcy. (UMF No. 31.) Even if Cheng had disclosed all of the facts that Castel claims she concealed, Castel *still* would have lost its entire investment and debt position. As a result, Castel suffered no damages caused by the claimed concealment.

### B. Cheng Is Not Liable for Civil Conspiracy

### 1. Plaintiff's Conspiracy Claim Fails Because Cheng Did Not – And Could Not – Breach Devlin's Fiduciary Duties

Castel's Sixth Cause of Action against Cheng is for Civil Conspiracy. Civil conspiracy is often labeled as a cause of action. But in reality it is a "remedial measure for affixing liability on all who have agreed to a common design to commit a wrong when damage to the plaintiff results." (*IIG Wireless, Inc. v. Yi*, 22 Cal.App.5th 630, 652 (2018).) Because "[c]onspiracy is not a separate tort[,]" a predicate tort must exist for liability under a civil conspiracy claim to be viable. (*Id.*) Even then, such a claim is only viable if the defendant themselves could have committed the tort. (*Id.*)

1    Here, the only possible predicate tort is the breach of fiduciary duty claim

2   alleged against Devlin. (Dkt. 91, ¶¶149-157.) Specifically, Castel's conspiracy claim

3   against Cheng is premised on the theory that ***Devlin somehow breached his***

4   ***fiduciary duties*** as the managing partner of Pharos when it entered into a certain

5   *Note Purchase and Guaranty Agreement* on May 6, 2013 ("May 6 Agreement").

6   (Dkt. 91, ¶¶151(f).) The May 6 Agreement involved Pharos' purchase of certain

7   secured notes for $500,000 on the condition that a portion of the loan proceeds

8   would be used to purchase Devlin's investment in bMRI-C. (Dkt. 91, ¶¶151(f).) The

9   SEC later found that ***Devlin*** had a conflict of interest and engaged in self-dealing

10   with respect to the transactions by failing to obtain the prior approval of Pharos.

11   (UMF No. 35.)

12    As noted above, a claim for conspiracy is only viable if it would have been

13   possible for the conspirator to have committed the tort by themselves. (*IIG Wireless,*

14   *Inc.,* 22 Cal.App.5th at 652.) Here, Cheng could not have engaged in the same

15   tortious conduct as Devlin. Cheng was not affiliated with Pharos. (UMF No. 36;

16   [Cheng Decl.].) Unlike Devlin, she was not a registered securities broker.  (UMF

17   No. 37.) Without a fiduciary duty owed to Pharos arising out of Devlin's

18   relationship with Pharos as its investment banker, Cheng could not have

19   independently committed a tort, and therefore cannot be held liable as a co-

20   conspirator for that tort. (*IIG Wireless, Inc.,* 22 Cal.App.5th at 652.) Accordingly,

21   the conspiracy claim fails as a matter of law because Cheng could not have

22   committed the predicate tort.

23    **2.      Castel Has No Evidence In Support of its Civil Conspiracy**

24    **Claim**

25    Moreover, Castel has no evidence of any conspiracy between Devlin and

26   Cheng. Cheng never conspired with Devlin. (UMF No. 38.) At the time that

27   Devlin's investment was purchased through Pharos' loan proceeds, Devlin was

28   actively seeking Cheng's termination as President and CEO of AIT. The idea that

16

1   Cheng would conspire to enrich Devlin is absurd. In reality, the transactions were

2   presented to, and approved by AIT's Board of Directors as discussed below. (UMF

3   No. 43.)

4       Castel's factually devoid discovery responses reveal that it has no evidence to

5   support its claim. (UMF No. 39.) The only "evidence" Castel relies upon to support

6   its conspiracy contention is the SEC Order which does not implicate Cheng or AIT,

7   only Devlin. (UMF No. 40.) Cheng fully cooperated with the SEC's investigation,

8   provided all the information the investigator requested and even flew to Atlanta to

9   sit for an in-person interview. (UMF No. 41.) Castel's conspiracy claim against

10  Cheng is based on pure speculation and summary judgment is warranted.

### 3.    Castel's Conspiracy Claim is Time Barred

12      Actions before a court must be brought within the time period allowed under

13  any applicable statute of limitations. In the context of breach of fiduciary claims and

14  other fraud-sounding claims, California law provides a three-year statute of

15  limitations. (*Hatch v. Collins,* 225 Cal.App.3d 1104, 1110 (1990).) Castel did not

16  file this action until 2019, six years after the transaction at issue occurred. (UMF

17  No. 42.)  Consequently, the claim is facially time-barred.

18      Castel attempts to plead around the statute of limitations defense by alleging

19  that it did not discover the wrongdoing until November 12, 2020, when it found the

20  SEC Order. (Dkt. 91, SAC, ¶54) But the transactions at issue were disclosed to, and

21  approved by, the Board of Directors of AIT, which included Marco Caneva and

22  Davide Malacalza as observers at various times (collectively, the "Observers").

23  (UMF Nos. 44 & 45.)

24      As the Observers' principal, Castel was "chargeable with, and is bound by the

25  knowledge of, or notice to, his agent[.]" (*Trane Co. v. Gilbert,* 267 Cal.App.2d 720,

26  727 (1968).) Castel was therefore aware of the transaction at the time it happened,

27  (May 2013), and was under a duty of inquiry at that time. (*Norgart v. Upjohn Co.,*

28  21 Cal.4th 383, 397-398 (1999) ["[T]he plaintiff discovers the cause of action when

1  he at least suspects a factual basis, as opposed to a legal theory, for its elements,

2  even if he lacks knowledge thereof - when, simply put, he at least suspects . . . that

3  someone has done something wrong to him."].) Consequently, the limitations period

4  was triggered in 2013, and the time period for filing any claim related to the

5  transaction expired in 2016. Summary judgment should therefore be granted.

6  **V.   ARF PARTNERS IS ENTITLED TO SUMMARY JUDGMENT/**

7  **ADJUDICATION OF EACH CLAIM ASSERTED AGAINST IT**

8  **A.   <u>Fraudulent Deceit and Concealment</u>**

9  Castel must prove that ARF Partners had a duty to disclose a material fact,

10  concealed the fact with an intent to defraud, and caused damage to Castel who

11  would have acted differently had it known of the true facts.  (*Davis*, supra, 691 F.3d

12  at 1163; *Williamson*, supra, 208 F.3d at 1156 n. 3.)

13  Castel alleges that ARF Partners withheld and failed to communicate material

14  facts from Castel regarding: (1) Cheng's involvement as an agent for ARF Partners

15  on the seller side of the transaction; (2) Cheng's involvement as an agent for

16  [Aurora Healthcare SPC] on the buyer's side of the transaction; (3) ARF Partners'

17  additional financial and equity benefit received from the sale; and (4) the sale of

18  Pharos Notes and Investments to ARF Partners.  (SAC, ¶¶134-135.)  Castel claims

19  that it "would have behaved differently" if ARF Partners had disclosed all the facts

20  and that it "lost its entire investment and loan" as a result of ARF's non-disclosure

21  of the concealed facts.  (*Id.*, ¶¶139-140.)

22  **1.   ARF Partners Did Not Owe a Duty to Castel**

23  Castel claims that ARF was in a fiduciary relationship with Castel because of

24  ARF's status as a majority shareholder of AIT series C and series D stock. (*Id.*

25  at ¶132.) But after purchasing Pharos's debt and equity, ARF was not a "controlling

26  shareholder."  It simply had a majority of the Series C and D stock. As revealed by

27  the Shareholder's Agreements, Pharos only ever owned a majority of the Series C

28  and D preferred shares among the millions of common shares and Series A and B

1  preferred shares issued.  (UMF No. 45.) As such, ARF Partners was never a

2  majority AIT shareholder. (UMF No. 46.)  Accordingly, ARF did not have fiduciary

3  duties to Castel or any other shareholders of AIT. (See *LiMandri*, supra, 52 Cal.

4  App. 4th at 337.)

5       Although ARF assumed Pharos's rights and obligations, ARF had no

6  obligation to advise Castel of its intentions to purchase specific company assets and

7  had no obligation to obtain Castel's consent to the transaction. Pharos's only

8  **contractual** duties were to obtain Castel's written consent before amending specific

9  provisions of the Certificate of Incorporation. [Dkt. 91-4, p. 3, §3.1] and to consult

10 with Castel before approving matters that required the approval of the Series C

11 shareholders [*Id.* at p. 3, §4].

12      With respect to the purchase of AIT's assets, a corporation is free to enter

13 into contracts with its shareholders as long as it does not contravene the law or

14 public policy. (15 Cal. Jur. 3d, Corporations § 337.) Specifically, a corporation is

15 free to sell its property to a shareholder, just as it can sell to a third person. (*Ibid*.)  A

16 shareholder normally owes no duty to the corporation or the other shareholders to

17 disclose his or her interest in a corporate contract unless the shareholder is a

18 controlling shareholder. (*Id.* at § 339.) As discussed above, ARF was not the

19 majority shareholder of AIT and thus, does not owe any fiduciary duties to other

20 shareholders. Accordingly, ARF did not have any obligation to disclose to Castel

21 anything related to Pharos note sale or the Asset Purchase Agreement.

22             **2.       The Facts ARF Partners Allegedly Concealed from Castel**

23                       **Were Not Material and Castel Would Not Have Acted Any**

24                       **Differently Had It Known the Allegedly "True" Facts**

25      Even if ARF had a fiduciary duty to disclose to Castel facts regarding

26 Cheng's involvement – the alleged "kickback" that ARF Partners received, the

27 Pharos note purchase and the Asset Purchase Agreement – the allegedly concealed

28 facts are not material.  Castel contends that these facts were material because it

JULANDER | BROWN | BOLLARD
ATTORNEYS AT LAW

1  "would have behaved differently" if it had known these facts and that it lost its

2  entire investment and loan because of the concealment. (SAC, ¶¶139-140.)

3      The allegedly "concealed facts" could only be material if Castel could have

4  behaved differently to preserve more of its investment and loan than was offered

5  through the APA.  However, it was not possible for Castel to behave differently to

6  preserve more of its investment and loan because, as discussed above, AIT was

7  insolvent in October 2016.  ARF could have foreclosed on AIT's assets and

8  eliminated all the junior debt.  (UMF Nos. 23, 49, 56 & 67.)  AIT received only one

9  offer to purchase its assets for $8.5 million and Castel's only avenue to salvage any

10 portion of its investment was to accept its portion of the asset sale proceeds.  (UMF

11 Nos. 24 & 25.)

12     Moreover, ARF was not on the seller side of the transaction. It was the holder

13 of the senior secured debt of AIT, which it obtained from the Pharos Defendants.

14 (UMF No. 50.) The APA recites that as of October 31, 2016, Aurora Healthcare

15 SPC, and not ARF Partners, was the holder of the senior secured debt of AIT to the

16 Pharos Defendants. (UMF No. 51.) ARF was not a party to the APA.  (UMF No.

17 52.)

18     There was also no hidden "kickback." The buyer, AHC, received the AIT

19 assets in exchange for its senior secured debt (originally held by the Pharos

20 Defendants) and its $3.3 million in cash. (Dkt. 91-10.) ARF received an equity

21 interest in AHC as the previous holder of Pharos' senior secured debt.  (UMF No.

22 53.) The remaining creditors who participated divided the $3.3 million in cash from

23 the purchase price and cash held by AIT. (UMF No. 19.)  Neither ARF nor AHC

24 received any portion of the $3.3 million in cash or any other "kickback" for the

25 senior secured notes that they gave as consideration for the APA.

26     Ultimately, Castel only had two options: Consent to the transaction or reject

27 the transaction and pursue an action on its note. Castel elected to reject the partial

28 payment offered on its debt and obtain a judgment against AIT on the full amount of

1   its loans. (Dkt. Nos. 90, 91, SAC, Ex. L.)

2           **3.**      **Castel Did Not Suffer Damages Caused by any Fraudulent**

3                  **Concealment**

4       As discussed above, Castel lost its investment because AIT was insolvent and

5 the senior secured creditor, ARF would have foreclosed on AIT's assets if the

6 shareholders had not approved the APA. (UMF Nos. 23, 48, 55 & 67.) Castel did

7 not recover on its debt because Castel refused to participate in the proceeds of the

8 only available asset sale and accept a proportionate partial payment on its notes like

9 the other creditors did. (UMF Nos. 25, 33, 57 & 69.)  Even if ARF had disclosed all

10 of the facts that Castel claims it concealed, Castel ***still*** would have lost its entire

11 investment and debt position. As a result, Castel suffered no damages caused by the

12 claimed concealment.

13      **B.**     <u>**ARF Partners Did Not Breach the 2006 Series C and D**</u>

14            <u>**Stockholder Agreements**</u>

15       The seventh cause of action alleges breach of contract against ARF. "A cause

16 of action for damages for breach of contract is comprised of the following elements:

17 (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3)

18 defendant's breach, and (4) the resulting damages to plaintiff." (*Careau & Co. v.*

19 *Security Pac. Bus. Credit, Inc*., 222 Cal.App.3d 1371, 1388 (1990).)

20       Castel alleges that ARF breached the 2006 Series C and D Stockholder

21 Agreements by failing to notify and consult with it regarding the Pharos note

22 transaction and Asset Purchase Agreement with AHC.  Castel also alleges that ARF

23 is bound by the obligations of the 2006 Series C Stockholder Agreement between

24 Castel and Pharos through the Novation Agreement.[6]

25

26 ────────────

27 [6]      Though Castel alleges the existence of a Series D Stockholder Agreement (Dkt. No. 91, ¶27), it is not attached to the complaint and no Series D Stockholder Agreement has ever been

28 produced in this action by any party. (UMF No. 59.)

### 1. ARF Was Not Bound by the Stockholder Agreement

The Novation Agreement undermines Plaintiff's position that it is bound by the Series C Stockholder Agreement. The purpose of the Novation Agreement was for ARF to assume the rights and obligations of Pharos under the Amended and Restated Note Purchase, Guaranty and Security Agreement dated August 19, 2014 with AIT in connection with ARF's purchase of Pharos' notes. (UMF No. 60.) Nothing in the integrated Novation Agreement refers to the 2006 Series C (or D) Stockholder Agreements or constitutes an assumption by ARF of the obligations of those agreements. (UMF No. 61.) Although Pharos agreed in its Stock and Note Purchase Agreement with ARF that it would deliver to ARF the 2006 Stockholder Agreement, ARF did not agree in that contract to assume the obligations of that agreement. (UMF No. 62.) Thus, ARF was never a party to the 2006 Series C Stockholder Agreement and cannot be liable for its breach. On this basis alone, partial summary judgment is warranted.

### 2. ARF Could Not Have Been Bound Prior to its Purchase of Pharos' Interest

Assuming, arguendo, that ARF did assume the obligations of the 2006 Stockholder Agreement, ARF could not have, and did not, breach any obligations under the agreements. The first alleged breach is that ARF failed to consult with Plaintiff *prior to purchasing Pharos' debt and equity*. (UMF No. 63.) Even if this were an obligation under the 2006 Stockholder Agreement, ARF would not have been bound to that agreement until the sale actually took place and it assumed Pharos's obligations. Before that, ARF was merely a prospective buyer of Pharos's interest with no contractual relationship with Plaintiff whatsoever. Any duty to consult in advance of a transaction would thus fall on Pharos, not ARF.

### 3. Castel's Alleged Damages Were Not Caused by any Breach by ARF

Finally, even if ARF had a contractual obligation to notify and consult with

22

1 Castel prior to approving the asset purchase, Castel did not suffer any damages
2 caused by ARF's failure to notify or consult. (UMF No. 65.) As with each of
3 Castel's other claims, Castel lost its investment in AIT because AIT was insolvent
4 and Castel lost its debt position because it chose not to participate in the proceeds of
5 the only offer that the company received to purchase its assets. (UMF No. 25.)

6       As a practical matter, even if ARF had consulted with Castel before voting,
7 and Castel was adamant that the sale should be voted down, the sale still would have
8 occurred because the majority of all AIT shareholders voted in favor of the asset
9 purchase. (UMF No. 70.) Castel could not have stopped the sale even if a
10 consultation had occurred.  Consequently, Castel cannot succeed on his claim for
11 breach of contract.

## VI.   CONCLUSION

13       For the reasons set forth above, Cheng and ARF Partners respectfully requests
14 entry of summary judgment pursuant to Federal Rule of Civil Procedure 56 on
15 Castel's Second Amended Complaint. If, for any reason, summary judgment cannot
16 be granted, Cheng and ARF Partners respectfully requests entry of partial summary
17 judgment on the issues and claims set forth in the Notice of Motion and discussed
18 herein.

20 DATED:  July 26, 2021           JULANDER, BROWN & BOLLARD

22                       By:      /s/ Dirk O. Julander
23                         Dirk O. Julander
24                         Attorneys for Defendants CHRISTOPHER
25                         A. WILSON, OLIVIA HO CHENG and
                        ARF PARTNERS, LLC.

JULANDER | BROWN | BOLLARD
ATTORNEYS AT LAW

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of July, 2021, I electronically filed the foregoing paper(s) with the Clerk of the Court using the ECF system which will send notification to all parties of record or persons requiring notice.

*/s/ Dirk O. Julander*
Dirk O. Julander

24
CHENG & ARF'S MOTION FOR SUMMARY JUDGMENT/PARTIAL SUMMARY JUDGMENT