Dirk O. Julander, Bar No. 132313
 *doj@jbblaw.com*
Catherine A. Close, Bar No. 198549
 *cac@jbblaw.com*
Tiffany Wang, Bar No. 305244
 *tiffany@jbblaw.com*
JULANDER, BROWN & BOLLARD
9110 Irvine Center Drive
Irvine, California 92618
Telephone: (949) 477-2100
Facsimile: (949) 477-6355

Attorneys for Defendants
CHRISTOPHER A. WILSON, OLIVIA
HO CHENG and ARF PARTNERS, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CASTEL S.A., a Luxembourg joint stock company (societe anonyme),<br><br>Plaintiff,<br><br>vs.<br><br>CHRISTOPHER A. WILSON, an individual; PHAROS CAPITAL PARTNERS II, LP, a Delaware limited partnership; PHAROS CAPITAL PARTNERS II-A, LP, a Delaware limited partnership; OLIVIA HO CHENG, an individual; ARF PARTNERS, LLC, a Massachusetts limited liability company; AURORA HEALTHCARE US CORP, a Massachusetts corporation; STEVEN J. JAMES, an individual,<br><br>Defendants. | Case No. 2:19-cv-09336-ODW-PVC<br><br>**DECLARATION OF OLIVIA HO CHENG IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT ON SECOND AMENDED COMPLAINT**<br><br>Hearing:<br>Judge: Hon. Otis D. Wright II<br>Date: August 30, 2021<br>Time: 1:30 p.m.<br>Crtrm.: 5D, Fifth Floor<br><br>Trial Date: November 16, 2021 |

# DECLARATION OF OLIVIA HO CHENG

I, OLIVIA HO CHENG, hereby declare and state under penalty of perjury the following facts:

1. I am over the age of eighteen and a defendant in the above-captioned action. I am also the managing member of Defendant ARF PARTNERS ("ARF"). I submit this Declaration in support of the Motion for Summary Judgment or, Alternatively, Partial Summary Judgment on Second Amended Complaint filed on my behalf and on behalf of ARF. I have personal knowledge of the following facts and, if called upon to testify, I can and will truthfully testify thereto.

**Background Related to AIT**

2. In 1998, I partnered with Gordon Olsen and Wayne Wu to form an investment company to invest in medical technology called Pacific Republic Capital (PRC). The following year, PRC purchased Breast MRI technology from a public company called Caprius, who was selling the technology because it could not attract investors. In 1999 PRC formed Aurora Imaging Technology ("AIT"), a Delaware corporation, to hosts the assets purchased. I became a member of AIT's Board of Directors and Gordon Olsen initially served as its President and CEO.

3. The technology was an FDA-approved MRI system designed for 3-D bilateral breast imaging. Unlike whole-body MRI systems that require after-market modifications to image the breast, AIT's "Dedicated Breast MRI System" was designed from ground up specifically for a breast MRI as a tool for more accurately detecting breast cancer. As a result, AIT's technology offered better image resolution and clarity than other imaging systems. At the time, the technology was revolutionary and could detect very small cancer in even dense breast tissue. AIT's Dedicated Breast MRI System was marketed and sold to clinicians, breast care imaging centers and hospitals.

4. In 2003 I was asked by the AIT Board of Directors to step in and serve as interim President/CEO of AIT when the job became too demanding for Gordon

Olson, who was at the time in his 70's. I ended up serving as the President and CEO of AIT for approximately 10 years, until my resignation in July 2013.

5.  As the President and CEO of AIT, my duties included managing the staff, running the business, putting together a business plan, finding investors, setting goals for the company, overseeing the accuracy of the books and records of the company, including the financial books and the shareholder ledger, and reporting to the shareholders and the Board of Directors on a regular basis.

6.  My husband and I also owned stock in AIT. Together we owned 517,261 shares (264,697 shares of Common stock, 185,814 shares of Series A Preferred stock and 66,750 shares of Series B Preferred stock.) Collectively we were a small minority shareholder of AIT, holding less than 2% of the company's stock.

**Castel Investments**

7.  I was first introduced to Davide Malacalza, the owner of Plaintiff CASTEL S.A. ("Castel") in 2005 when he was interested in investing in ParaMed, an Italy extremity MRI maker who was our partner in MRI business and when it expressed interest in investing in AIT. I met with Castel representative Davide Malacalza in Boston and later met Mattia Malacalza in Italy several times prior to Castel's investment.

8.  In June 2006 Castel followed a lead investor Pharos Capital and purchased 1,010,101 shares of Series C stock for $2 million. The Series C round was led by Pharos Capital Partners II, L.P. and Pharos Capital Partners II-A, L.P. (collectively, "Pharos"), a private equity fund, who collectively purchased 5,050,505 shares of the Company's Series C Preferred Stock. A true and correct copy of the Series C Stock Purchase Agreement is attached to the Index of Exhibits as **Exhibit 10.**

9.  Pursuant to the Series C Shareholder's Agreement, Castel was entitled to designate an observer to attend all meetings of the AIT Board of Directors and

each of its committees in a non-voting capacity. Over the course of my tenure as President and CEO of AIT, Castel designated both Davide Malacalza and Marco Caneva as its board observer at various times and they regularly attended and participated in the Board of Directors meetings, either in-person or remotely by telephone. At various times, Castel was also represented on the Board of Directors as the Series C and D director designee. Both Davide Malacalza and Marco Caneva were held out by Castel as its representatives with respect to AIT.

10. During my tenure as President and CEO of AIT, Castel was also provided with all materials that were provided to the other members of the Board of Directors, including Minutes of the Board of Director meetings and corporate resolutions. These materials were provided to Davide Malacalza and/or Marco Caneva.

11. In July 2008, Castel again invested in AIT's Series D Preferred round, purchasing 512,821 shares of Series D Preferred stock for $1,666,668.25. Again, the round was led by Pharos who collectively purchased 2,564,103 shares of Series D Preferred stock for $8,333,334.75. A true and correct copy of the Series D Stock Purchase Agreement is attached to the Index of Exhibits as **Exhibit 11**.

12. With their collective Series C and Series D shares, Pharos and Castel were both minority shareholders of AIT. Pharos held a less than 20% and Castel held a less than 4% of the total equity in the company.

**The CRC Transaction and Castel Loan**

13. In 2010, with the approval of AIT's Board of Directors, I began negotiations for the sale of AIT to China Resources Corporation ("CRC"), a Chinese state-owned company interested in merging with AIT or purchasing the company for approximately $100 million. At the time the negotiations started, AIT had approximately $20 million in revenue, though it was not technically "profitable." A true and correct copy of the Action by Written Consent of the Board of Directors authorizing the negotiations with CRC is attached to the Index of Exhibits as

**Exhibit 12**. The document reflects that the negotiations were approved by the Board of Directors which, at the time, included Castel representative Davide Malacalza.

14. The negotiations with CRC lasted two years and I was optimistic that a transaction would close. During that time, the company stopped raising funds and was required to borrowed money as bridge loans to fund operations until the CRC transaction closed.

15. Between March 2010 and March 2011, my husband and I loaned AIT $300,000. In addition, I personally guaranteed a $1,200,000 line of credit from East West Bank which went entirely into AIT operations.

16. On March 14, 2011, Castel also made a $250,000 bridge loan to the company and became a creditor of AIT. A true and correct copy of Castel's "Secured Promissory Note" with my signature is attached to the Index of Exhibits as **Exhibit 13**. Castel's note was to be secured by a December 2010 letter of credit issued by China Merchants Bank in favor of CRC. The letter of credit was to be paid to AIT in the event the CRC transaction failed to close. A true and correct copy of the fully executed Pledge Agreement related to Castel's "Secured Promissory Note," with my signature, is attached to the Index of Exhibits as **Exhibit 14**. I do not know what ever happened to the line of credit because, as of the date of my resignation from Aurora, it had not been released.

17. When the negotiations with CRC took longer than anticipated, in November 2011 Castel agreed to extend the maturity date on its note to either three years after the closing date identified in the Merger Agreement with CRC or December 31, 2012 if no closing occurred. A true and correct copy of the fully executed letter agreement extending the maturity date on Castel's note with my signature is attached to the Index of Exhibits as **Exhibit 15**.

18. Over the years, Pharos had also made numerous loans to AIT totaling $3.3 million. The promissory notes reflecting all of these loans were later cancelled

and reissued to Defendant, ARF Partners as reflected in the fully executed November 25, 2015 Stock and Note Purchase Agreement and Assignment of Amended and Restated Note Purchase Agreement, Guarantee and Security Agreement (the "ARF/Pharos Agreement") and the Novation Agreement entered into between ARF and Pharos, which includes my signature, are attached to the Index of Exhibits as **Exhibits 3 and 17**. Pharos's loans were the only loans that were secured by all of the company's assets and it was the company's senior, secured creditor.

### Cheng's Resignation

19. In 2012, the political climate in China underwent a change. When this happened, CRC advised AIT that it no longer wanted to enter into the contemplated merger transaction being negotiated.

20. Pharos, led by Michael Devlin who was a member of AIT's Board of Directors, was extremely unhappy with the failure of the CRC transaction. Through the board of directors, at meetings that I personally attended, Mr. Devlin undertook efforts to have me removed as President and CEO of AIT because I failed to deliver a liquidity event for the shareholders. Devlin's efforts were always supported by Castel's board representatives Marco Caneva and Davide Malacalza at the board of directors' meetings. From my observations in connection with those meetings, Castel appeared to have a very close relationship with Devlin.

21. As a medical technology development company, AIT had never been profitable during my tenure as President and CEO. Companies like AIT invest in innovation to make better technology and to provide better solution for addressing health issues to save more lives. However, it is costly and risky to be an innovator and an entrepreneur. So, companies like AIT look to attract experienced investors (like Pharos and Castel) willing to invest before operation turn profitable with the objective of going public or a private sale at an increased valuation (like the CRC) while running loss in net operating income. After the CRC transaction failed AIT's

financial condition worsened. At that point, the company had not raised funds for two years, its operations were not generating enough revenue to cover its expenses and AIT was consistently running a deficit. Other factors also played a role in the company's financial struggles, such as the global economic recession and downsizing of the US healthcare industry.

22. Pharos finally got its way in July 2013 when I resigned as President and CEO of AIT and resigned from the Board of Directors due to the immense pressure I was feeling from Pharos' unrelenting efforts to have me fired. Pharos representative Michael Devlin became the CEO until 2015. Under his 2-year management, AIT did not sell one machine, did not raise any more funds and did not solicit any interest to buy the company to the point that they decide to file for bankruptcy.

**The Company's Insolvency and Efforts to Rescue the Company**

23. After my resignation in 2013, I had no involvement in AIT apart from remaining a minority shareholder.

24. In June 2015, I received a letter from then President and CEO, Christopher Wilson, advising me and all of the other AIT shareholders that AIT was engaging bankruptcy counsel to potentially liquidate the company's asset and operations. A true and correct copy of the June 18, 2015 letter I received from Chris Wilson is attached to the Index of Exhibits as **Exhibit 1**.

25. I was devastated by this news! As a breast cancer survivor, I firmly believed that AIT's dedicated breast MRI technology could save lives and I wanted to try to do something to rescue the technology and the company from bankruptcy and liquidation. Even if AIT's technology has not been more updated for the United States market, the technology was still valuable to save lives in those markets overseas that could not afford the latest and most expensive technology available.

26. After receiving Mr. Wilson's letter, I began contacting many of AIT's shareholders to enlist their help to rescue the technology and the company. On

August 30, 2015, I spoke to Castel representative Davide Malacalza and set up a telephone conference for the following day. On the morning of August 31, 2015, I spoke to Mattia Malacalza, Davide Malacalza and Marco Caneva and asked them if they would join in my effort to rescue the technology since it has made such a contribution to the world. I explained to them my interest in raising new money to continue the operations of the company and in negotiating with the creditors of the company for debt forgiveness to either allow the company to continue its operations or to fund the purchase of the companies' assets so that the technologies could continue to be used in the US or foreign markets where it was desperately needed. I expressly invited Castel to be a part of this effort. During the conversation, Castel's representatives advised me that they had not seen the June 18th letter. In response to their request, I sent a copy of the letter to Messrs. Malacalza and Caneva by email on August 31, 2015. A true and correct copy of my August 31, 2015 email to Mattia Malacalza, Davide Malacalza and Marco Caneva is attached to the Index of Exhibits as **Exhibit 16**. Although Castel's representatives promised that they would get back to me regarding their participation, I never received any further communication from Castel.

27. After receiving no support from the AIT shareholders, I decided to attempt to raise money for AIT to fund its operations from outside investors. I eventually located some Taiwanese and Chinese investors who had never invested in AIT but were interested in helping. Together we formed ARF Partners, LLC and began trying to raise money. The abbreviation "ARF" stands for Aurora Rescue Fund. Although I am its managing member, I only hold a 13.12% ownership interest in ARF.

28. ARF's first goal was to ensure that the senior secured creditor of AIT, Pharos, did not foreclose on the company's assets. Pharos's notes were in default at the time. So, in or around November 2015, I contacted Bob Crants of Pharos to see whether Pharos would be willing to sell its interest in AIT to ARF.

29. After several offers and counteroffers were exchanged, on behalf of ARF, I negotiated a deal with Pharos who would sell its debt and equity interest in AIT to ARF for a total of $425,000 so that Pharos could avoid future liability that could persist even after bankruptcy inherent in closing a medical technology company without providing solutions to installed customers (healthcare providers who serve cancer patients) for maintenance. This transaction is documented in the ARF/Pharos Agreement previously referenced and attached to the Index of Exhibits as **Exhibit 3**. In connection with the purchase, Pharos assigned all of its security interests in AIT's assets to ARF and the UCC-1 financing statements were amended to reflect ARF as the creditor.

30. Having ensured that Pharos could not foreclose on the company's assets, on November 25, 2015, ARF made a line of credit to make available $1,000,000 to AIT to be used as working capital and to settle with AIT's creditors. A true and correct copy of the ARF/AIT Loan Agreement is attached to the Index of Exhibits as **Exhibit 3**.

### The Asset Purchase

31. Over the course of about a year, it became clear that the funds AIT borrowed from ARF would be insufficient to support the company's operations and satisfy its creditors. Though I tried to raise additional funds through ARF, I could not find investors willing to invest in the endeavor. At the time, AIT was approximately $20 million in debt.

32. I was determined to not let AIT's technology go to waste. So, I found another group of new investors in Taiwan and China that were interested in purchasing the technology and other assets from AIT.

33. AIT obtained a valuation of selected assets as of November 3, 2016 which determined that the fair market value of the assets to be purchased was between $6,181,000 and $9,652,000. A true and correct copy of the Orchard Partners Valuation for AIT's assets that was used as the basis for negotiations

between the Taiwanese/Chinese investors and AIT is attached to the Index of Exhibits as **Exhibit 5**.

34. Based on the Orchard Partners valuation, I negotiated a purchase price on behalf of the Taiwanese/Chinese investors of $8,500,000 for specific assets of AIT.

35. The Taiwanese/Chinese investors planned to form a brand-new corporation to host the assets and call it Aurora Healthcare.  Initially, a Cayman Islands company was formed through an attorney in Taiwan for this purpose.  An initial Asset Purchase Agreement was drafted with the Cayman Islands company as the buyer.

36. On or about October 20, 2016, Chris Wilson sent correspondence to all of AIT's shareholders, including me and ARF, requesting consent for the asset purchase.  The letter enclosed a draft of the Asset Purchase Agreement, a document entitled Action by Written Consent in Lieu of Special Meeting of Stockholders and an Excel spreadsheet setting out the Sources and Uses of Funds.  True and correct copies of the draft of the Asset Purchase Agreement, the Action by Written Consent in Lieu of Special Meeting of Stockholders the Excel spreadsheet setting out the Sources and Uses of Funds are attached to the Index of Exhibits as **Exhibits 6 & 8**.

37. My husband and I voted our shares in favor of the transaction.  At the instruction of ARF's members, I also voted ARF's shares in favor of the transaction.  Even if Castel had specifically requested that ARF vote against the transaction, ARF's shares would have been voted in favor of the transaction.  In fact, as the senior secured lien holder at the time, ARF would have foreclosed on AIT's assets if the other creditors and shareholders had not agreed to the APA transaction.

38. After the requisite shareholder consents were obtained, the Asset Purchase Agreement with the Cayman Islands company was signed in October 2016.  A true and correct copy of the Asset Purchase Agreement between AIT and Aurora Healthcare SPC is attached to the Index of Exhibits as **Exhibit 6**.  The

closing on the asset purchase transaction was scheduled to take place on November 15, 2016. After the Asset Purchase Agreement with the Cayman Islands company was executed but prior to the scheduled closing, we learned that it would be too complicated to purchase the assets though a Cayman Islands Company.

39. Because of the complications associated with the Cayman Islands entity being the purchaser, Aurora Healthcare US Corp. ("AHC") was formed as a Massachusetts corporation in November 2015 and a new Asset Purchase Agreement was executed reflecting the US company as the buyer (the "APA"). A true and correct copy of the APA between AIT and Aurora Healthcare US Corp. ("AHC") is attached to the Index of Exhibits as **Exhibit 9**. Since its inception, I have been the President and CEO of AHC. I also own less than 5% of AHC's common stock and am a minority shareholder.

40. The APA superseded the Draft APA executed by the Cayman Islands Company. The APA differed from the Draft APA with the Cayman Islands company in very minor respects for the following reasons:

    a. *Debt Cancellation*: The APA cancelled all debt due under the senior secured notes. However, the definitive APA reduced the amount of cash to be offset from the closing price from $4.3 million to $4 million. This resulted in $300,000 in additional cash AIT had available to pay creditors.

    b. *Holdback*: Finally, certain of the assets subject to the APA required the consent of outside parties to transfer to AHC. AIT had an 80% interest in Boston Breast Diagnostic Center ("BBDC") which required the approval of Dr. Elise Levin to transfer. AIT's installation at the University of Massachusetts ("UMass") also required governmental approval from the Department of Health to transfer. After the Asset Purchase Agreement with the Cayman Islands company was signed, AIT advised me that it was having difficulties obtaining the necessary consents for the transfer of these assets in time for the scheduled November 15 closing. Because it was unclear whether

AIT would be able to deliver clear title to BBDC and UMass, Mr. Wilson and I negotiated a $1,200,000 holdback of the purchase money which would only become due when and if clear title to the assets was transferred. The holdback is reflected in the APA. Chris Wilson negotiated settlements with virtually all of AIT's creditors, except Castel. Trade payables were settled between $0.05 and $0.10 on the dollar. Unsecured creditors (such as my husband and I) were offered 40% of the face value of the notes without any interest in settlement of their debt obligations. AIT's largest unsecured creditor who was owed more than $6 million, Dr. Wang and his company Janan Investments, agreed to settle for much less than 40% of their debt, $2.2 million. Dr. Wang also agreed that a portion of his settlement payment would be paid when (and if) the $1,200,000 holdback was paid by AHC. Thus, the $6,000,000, when and if paid, was earmarked for Dr. Wang and his company Janan Investments This holdback therefor did not negatively affect any other creditor, including of course Castel.

  c. *Cash Due at Closing*: Instead of paying of $3.2 million in cash at closing, AHC was only required to pay $2.8 million. The reason for this change was that AHC was going to pay the difference to AIT's Chinese creditors directly in Chinese Yuan. Since some of AHC's money was coming from China, it made more sense to pay AIT's Chinese creditors directly, rather than wiring the money to the US and sending it back to China. This change was neutral having no impact on the financial aspects of the transaction.

  41. At the closing on the asset purchase, AHC paid $2,800,000 in cash to AIT. ARF (the holder of the senior secured debt), pledged its debt in exchange for shares of AHC and the debt was cancelled pursuant to the APA. To date, AIT has never delivered clear title to BBDC or UMass to AHC so the $1.2 million was never paid.

42. After the closing, my husband and I received the agreed-upon $120,000, representing 40% of the face value of our outstanding notes.

43. My husband and I received nothing for our joint equity interest in AIT.

44. ARF Partners provided a loan of over a million dollars to AIT on November 25, 2015. At the closing of the APA, this debt was also forgiven in exchange for shares of AHC. ARF received no cash from the closing of the APA. Neither ARF nor AHC were ever shareholders of AIT."

**bMRI-C**

45. In 2007 when I was President and CEO of AIT, the company was looking for investors for a breast diagnostic center in Taichung, Taiwan which would operate as a subsidiary of AIT's Taiwanese subsidiary ("bMRI-C"). In my years of experience in working with Taiwanese/Chinese investors I have found that they want to know you are so confident in the investment that you are willing to put your own money into it.

46. Pharos representative Michael Devlin and I were both on the Board of Directors of AIT in 2007. To generate investors for bMRI-C, we both agreed to separately invest in bMRI-C. Our proposed investments were bought before the AIT Board of Directors and were unanimously approved by the disinterested directors. At the time, Castel's representatives, Marco Caneva and Davide Malacalza, regularly participated in the AIT board meetings as non-voting observers. Based on this approval, I made my investment in bMRI-C in the name of my sister, who was a Taiwanese citizen.

47. Years later, in 2013, Pharos offered to purchase secured notes from a subsidiary of AIT in the amount of $500,000 on the condition that a portion of the loan proceeds would be used to purchase Devlin's investment in bMRI-C (the "May 6 Agreement"). Again, the proposed transaction was brought before the AIT Board of Directors and unanimously approved by a majority of the disinterested directors.

48. Years after my resignation as President and CEO of AIT, I was contacted by an SEC investigator who was investigating Devlin related to the May 6 Agreement. I cooperated fully with the investigation. I provided all of the information the investigator requested and even flew to Atlanta to sit for an in-person interview. Prior to this litigation, I was not aware of the outcome of the investigation or that Devlin had never disclosed the purchase of his investment from the proceeds of the May 6 Agreement to Pharos.

49. I did not conspire or agree with Michael Devlin to conceal the repayment of his loan from Pharos or any other AIT shareholder. I had no affiliation with Pharos. Unlike Devlin, I was not a registered broker and I had no fiduciary relationship with Pharos. Michael Devlin and I were not on good terms in 2013. As described above, for years he had been attempting to have me terminated as AIT's President and CEO, and was eventually successful in obtaining my resignation in July 2013 (two months after the May 6 Agreement). The idea that I would conspire with Devlin at the expense of any AIT shareholder is ludicrous.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 26th day of July 2021

_____
OLIVIA HO CHENG

# CERTIFICATE OF SERVICE

I hereby certify that on this 26th of July, 2021, I electronically filed the foregoing paper(s) with the Clerk of the Court using the ECF system which will send notification to all parties of record or persons requiring notice.

*/s/ Dirk O. Julander*
Dirk O. Julander