1  Dirk O. Julander, Bar No. 132313
    *doj@jbblaw.com*
2  Catherine A. Close, Bar No. 198549
3    *cac@jbblaw.com*
   Tiffany Wang, Bar No. 305244
4    *tiffany@jbblaw.com*
5  JULANDER, BROWN & BOLLARD
6  9110 Irvine Center Drive
   Irvine, California 92618
7  Telephone: (949) 477-2100
8  Facsimile: (949) 477-6355

9  Attorneys for Defendants
10 CHRISTOPHER A. WILSON and ARF
   PARTNERS, LLC
11

12            **UNITED STATES DISTRICT COURT**

13            **CENTRAL DISTRICT OF CALIFORNIA**

14



| | |
|---|---|
| 15 CASTEL S.A., a Luxembourg joint stock company (societe anonyme), | Case No. 2:19-cv-09336-DFM |
| 16 | |
| 17 Plaintiff, | **DEFENDANTS CHRISTOPHER A. WILSON AND ARF PARTNERS, LLC'S AMENDED PROPOSED CONTENTIONS OF FACT AND LAW AND TRIAL BRIEF** |
| 18 vs. | |
| 19 CHRISTOPHER A. WILSON, an individual; PHAROS CAPITAL PARTNERS II, LP, a Delaware limited partnership; PHAROS CAPITAL PARTNERS II-A, LP, a Delaware limited partnership; OLIVIA HO CHENG, an individual; ARF PARTNERS, LLC, a Massachusetts limited liability company; AURORA HEALTHCARE US CORP, a Massachusetts corporation; STEVEN J. JAMES, an individual, | The Honorable Douglas F. McCormick Courtroom 6B, 6th Floor |
| 20 | |
| 21 | Pretrial Conference |
| 22 | Date:  May 3, 2023 |
| 23 | Time:  10:00 a.m. |
| 24 | |
| 25 Defendants. | Trial |
| 26 | Date:   May 22, 2023 |
| 27 | Time:  9:00 a.m. |
| 28 | |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTORY STATEMENT ................................................................ 1

   A.   Summary of the Case .................................................................. 1

   B.   Background Related to AIT and the Relevant Market ..................... 3

   C.   Castel's Investments in AIT ......................................................... 3

   D.   Wilson's Initial Involvement With AIT ......................................... 4

   E.   AIT's Insolvency and Efforts to Partially Satisfy Creditors ............ 5

   F.   Castel's Notification and Response .............................................. 9

II.  L.R. 16-4.1: CLAIMS AND DEFENSES ................................................. 12

   A.   Plaintiff's Claims: Summary Statement, Elements, and Evidence
      in Opposition to Each Claim ..................................................... 12

      1.   Claim 1: Fraudulent Deceit and Concealment as to Wilson ...... 12

         (a)   Summary of Claim 1 ........................................... 12

         (b)   Elements of Claim 1 ........................................... 14

         (c)   Key Evidence in Opposition to Claim 1 ................ 15

         (d)   Summary of Affirmative Defenses to Claim 1 ........ 16

         (e)   Elements of Affirmative Defenses to Claim 1 ........ 17

         (f)   Key Evidence for Affirmative Defenses to Claim 1 .... 17

         (g)   Anticipated Evidentiary Issues for Claim 1 .......... 18

         (h)   Issues of Law Regarding Claim 1 ........................ 18

         Castel's Fraud Claim is a Defective Breach of Fiduciary
         Duty Claim ...................................................................... 18

      2.   Claim 2: Fraudulent Deceit and Concealment as to ARF ........ 26

         (a)   Summary of Claim 2 ........................................... 26

         (b)   Elements of Claim 2 ........................................... 28

         (c)   Key Evidence in Opposition to Claim 2 ................ 28

|     |     |     |     |                                                                      |     |
| --- | --- | --- | --- | -------------------------------------------------------------------- | --- |
|     |     | (d) | Summary of Affirmative Defenses to Claim 2 ............... | 30 |
|     |     | (e) | Elements of Affirmative Defenses to Claim 2 ............... | 30 |
|     |     | (f) | Key Evidence for Affirmative Defenses to Claim 2 ........ | 31 |
|     |     | (g) | Anticipated Evidentiary Issues for Claim 2 ................... | 31 |
|     |     | (h) | Issues of Law Regarding Claim 2 ................................ | 31 |
|     | 3.  |     | Claim 3: Breach of Fiduciary Duty as to Wilson ..................... | 34 |
|     |     | (a) | Summary of Claim 3 ................................................ | 34 |
|     |     | (b) | Elements of Claim 3 ................................................ | 35 |
|     |     | (c) | Key Evidence in Opposition to Claim 3 ...................... | 35 |
|     |     | (d) | Summary of Affirmative Defenses to Claim 3 ............... | 37 |
|     |     | (e) | Elements of Affirmative Defenses to Claim 3 ............... | 38 |
|     |     | (f) | Key Evidence for Affirmative Defenses to Claim 3 ........ | 39 |
|     |     | (g) | Anticipated Evidentiary Issues for Claim 3 ................... | 39 |
|     |     | (h) | Issues of Law Regarding Claim 3 ................................ | 39 |
|     |     |     | AIT had the Right to and did Shield Wilson from Liability ...... | 39 |
|     | 4.  |     | Claim 4: Breach of Contract as to ARF.................................... | 44 |
|     |     | (a) | Summary of Claim 4 ................................................ | 44 |
|     |     | (b) | Elements of Claim 4 ................................................ | 45 |
|     |     | (c) | Key Evidence in Opposition to Claim 4 ...................... | 45 |
|     |     | (d) | Summary of Affirmative Defenses to Claim 4 ............... | 46 |
|     |     | (e) | Elements of Affirmative Defenses to Claim 4 ............... | 46 |
|     |     | (f) | Key Evidence for Affirmative Defenses to Claim 4 ........ | 47 |
|     |     | (g) | Anticipated Evidentiary Issues for Claim 4 ................... | 47 |
|     |     | (h) | Issues of Law Regarding Claim 4 ................................ | 47 |
| III. | L.R. 16-4.3: BIFURCATION OF ISSUES ................................ | | | | 48 |
| IV.  | L.R. 16-4.4: JURY TRIAL............................................................ | | | | 48 |
| V.   | L.R. 16-4.5: ATTORNEYS' FEES ................................................ | | | | 48 |

JULANDER BROWN
— & BOLLARD —

1

VI.    L.R. 16-4.6: ABANDONMENT OF ISSUES .................................................48

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' AMENDED CONTENTIONS OF FACT AND LAW/TRIAL BRIEF

1

## TABLE OF AUTHORITIES

2

**Page**

3

## CASES

4 *Allied Grape Growers v. Bronco Wine Co.*
    203 Cal.App.3d 432, 449, fn. 12 (1988) ........................................................21

5

6 *Aronson v. Lewis*
    473 A.2d 805, 812 (1984) ...............................................................38, 41

7 *Batchelder v. Kawamoto*
    147 F.3d 915, 920 (9th Cir.1998) ....................................................18

8

9 *Beard Research, Inc. v. Kates*
    8 A.3d 573, 601 (Del. Ch. 2010) .....................................................35

10 *Berg & Berg Enterprises,* LLC v. Boyle
    178 Cal.App.4th 1020, 1038 (2009).........................................20, 35, 39

11

12 *Bershad v. Curtiss–Wright Corp.*
    535 A.2d 840, 845 (Del.1987).........................................................47

13 *Brehm v. Eisner*
    746 A.2d 244, 253 (Del. 2000) .......................................................41

14

15 *Cede & Co. v. Technicolor, Inc.*
    634 A.2d 345, 361 (Del. 1993).........................................................43

16 *Central Laborers' Pension Fund v. McAfee, Inc.*
    17 Cal.App.5th 292, 317-318 (2017) ........................................39, 41

17

18 Citron v. Fairchild Camera & Instrument Corp.
    569 A.2d 53, 64 (Del. 1988).............................................................38

19 *Davis v. HSBC Bank Nevada, N.A.*
    691 F.3d 1152, 1163 (2012)...............................................18, 20, 22, 25

20

21 *eBay Domestic Holdings, Inc. v. Newmark*
    16 A.3d 1, 36 (Del. Ch. 2010) .........................................38, 39, 43

22 *Efron v. Kalmanovitz*
    226 Cal.App.2d 546, 556 (1964) ...................................................31

23

24 *Fed. Deposit Ins. Corp. v. Dellen*
    No. CV 10-4915 DSF (SHX), 2011 WL 13128983, at *2
    (C.D. Cal. Sept. 27, 2011) ...............................................................43

25

26 *Freibott v. Miller*
    No. CIV.A. S08C11025RFS, 2009 WL 1526912, at *2
    (Del. Super. Ct. June 2, 2009) .........................................................43

27

28 *Gantler v. Stephens*
    965 A2d 695, 713, fn. 54 (Del. 2009) .............................................41



JULANDER BROWN
— & BOLLARD —

iv

*Hill v. Wrather*
158 Cal.App.2d 818 (1958) .................................................22, 23, 33

*In re Dollar Thrifty S'holder Litig.*
14 A.3d 573, 598 (Del. Ch. 2010) ....................................42

*In re Tower Air, Inc.*
416 F.3d 229, 238 (3d Cir. 2005) .....................................43

*In re Trados Inc. Shareholder Litigation*
73 A.3d 17, 72-80 (Del. Ch. 2013).........................40, 44, 47

*In re Wayport, Inc. Litig.*
76 A.3d 296, 327 (Del. Ch. 2013) ....................................19

*Ivanhoe Partners v. Newmont Min. Corp.*
535 A.2d 1334, 1344 (1987) ............................................32

*Jones v. H.F. Ahmanson & Co.*
1 Cal.3d 93, 108 (1969) ...................................................31

*Lease and Rental Management Corp. v. Arrowhead Central Credit Union*
126 Cal.App.4th 1052, 1060 (2005) ................................21

*LiMandri v. Judkins*
52 Cal.App.4th 326, 337 (1997) ......................................32

*Mazza v. Am. Honda Motor Co.*
666 F.3d 581, 589 (9th Cir. 2012) ...................................18

*Metro Communication Corp. BVI v. Advanced Mobilecomm Technologies Inc.*, 854 A.2d 121, 157 (Del. Ch. 2004) ..................19

*Mirkin v. Wasserman*
5 Cal.4th 1082, 1093 (1993) .....................................26, 34

*Moran v. Household Int'l, Inc.*
500 A2d 1346, 1356 (Del. 1985) .....................................41

*NACEPF v. Gheewalla*
930 A.2d 92, 103 (2007) .......................................20, 35, 39

*Nagy v. Bistricer*
770 A.2d 43, 59–60 (Del.Ch.2000) .................................19

*Parfi Holding AB v. Mirror Image Internet, Inc.*
794 A.2d 1211, 1236-37 (Del. Ch. 2001)........................19

*Perez v. Gordon & Wong Law Grp., P.C.*
No. 11-CV-03323-LHK, 2012 WL 1029425, at *11
(N.D. Cal. Mar. 26, 2012) .......................................20, 40

*Piscitelli v. Friedenberg*
87 Cal.App.4th 953, 989 (2001).......................................25

*Regalado v. Callaghan*
   3 Cal.App.5th 582, 602 (2016).............................................................26

*Smith v. Van Gorkom*
   488 A2d 858, 873 (Del. 1985)...........................................................41

*Sterling v. Mayflower Hotel Corp.*
   93 A.2d 107, 114 (Del.1952).............................................................44

*Turner v. Bernstein*
   776 A.2d 530, 542–43 (Del.Ch.2000)...............................................19

## STATUTES

Code Civ. Proc., §2332.........................................................................21

Corp. Code, §2004................................................................................34

Corp. Code, §2116................................................................................18

Del. Code Ann. tit. 8, §102(b)(7) .........................................................39

Del. Code Ann. tit. 8, §281...................................................................34

JULANDER BROWN
— & BOLLARD —

1  Pursuant to Local Rule 16-4 and this Court's Case Management and

2  Scheduling Order filed on January 13, 2023 (Dkt. 199, §II), Defendants

3  CHRISTOPHER A. WILSON ("Wilson") and ARF PARTNERS, LLC ("ARF;"

4  collectively "Defendants") respectfully submit the following Defendants' Amended

5  Memorandum of Contentions of Fact and Law and Trial Brief.

6  **I.    INTRODUCTORY STATEMENT**

7      **A.    <u>Summary of the Case</u>**

8  Castel is a disgruntled shareholder and creditor of Aurora Imaging

9  Technology, Inc. ("AIT") who invested in 2006 and 2008, and made one loan in

10 2011]. AIT became insolvent in approximately 2012 after a proposed merger failed

11 to close. Despite more than three years of efforts, existing management of AIT

12 failed to re-capitalize the company by raising new capital. As a result, the

13 company's then management decided to file Chapter 7 bankruptcy, engaged

14 bankruptcy counsel, and resigned. At the time of their resignation, the draft

15 Voluntary Petition for Bankruptcy indicated more than $20.0 million in debt and

16 approximately $4.0 million in assets. Much of the debt was already in default.

17 Defendant Christopher Wilson ("Wilson"), who was serving on the Board of

18 Directors at the time, volunteered to act as interim CEO in an attempt to obtain some

19 value for AIT's assets so it could partially satisfy its creditors. At this point of

20 insolvency – years after Castel invested and loaned money to the company – Wilson

21 sought to identify potential acquirors. Attempts to interest prominent competitors of

22 AIT, such as Siemens, GE and Phillips, as well as several venture capital firms that

23 had previously invested in medical imaging technology, proved unsuccessful.

24 When AIT's former President and a minority shareholder, Olivia Cheng

25 ("Cheng"), learned of the company's imminent bankruptcy, she sprung into action

26 in an effort to rescue the technology that AIT owned, possibly putting it to use in

27 other, less affluent markets. As a breast cancer survivor, Cheng believed that AIT's

28 3-D bilateral breast imaging technology could still save lives somewhere.

JULANDER BROWN
— & BOLLARD —

Cheng started by reaching out to AIT's shareholders, including Castel, for support to raise the funding needed to rescue the technology. Unfortunately, none of the other shareholders were interested in helping. Undeterred, Cheng eventually found a group of Chinese investors willing to help. Together they formed Defendant ARF Partners, LLC ("ARF"). "ARF" stands for Aurora Rescue Fund.

In addition to providing AIT with a $1.5 million cash infusion to fund operations, ARF also purchased the debt and equity interest of the company's largest creditor, Pharos Capital Partners, to prevent Pharos from foreclosing on all of AIT's assets while the rescue effort was underway. Sadly, after a little more than a year, it became clear that AIT could not continue operations because it could not raise sufficient funds after ARF's infusion.

Faced once again with the inevitability of bankruptcy and liquidation, with the help of a business broker, Cheng was able to find a group of Asian investors willing to purchase some of AIT's assets for their appraised value of $8.5 million so that AIT's creditors could receive something for their debt.

The asset purchase was to be made through a newly-formed corporation called Aurora Healthcare. Although the purchasers initially wanted to use a Cayman Islands company, it was later determined that a newly-formed US corporation should instead purchase the assets.

Wilson advised all shareholders, including Castel, of the purchase offer and sought their consent. He also began negotiating settlements with the creditors to be paid from the purchase proceeds. After receiving the requisite votes of a majority of the shareholders, the asset purchase transaction closed in November 2016. Wilson used the money to satisfy all of AIT's unsecured creditors who were willing to settle their debts, partially and proportionately. Though it was offered $100,000 for its Note, Castel refused to settle and did not consent to the transaction. Castel was the only significant creditor that refused the proposed settlement.

During the winding up process, all classes of creditors were treated alike and treated fairly. None of the shareholders received any consideration. After turning down the $100,000 offer, Castel sued AIT on its outstanding Note. Castel's unopposed judgment against AIT apparently unsatisfied, Castel initiated this litigation three years after the company's assets were sold and the other creditors who agreed to settle were each paid from the proceeds.

**B.**    **Background Related to AIT and the Relevant Market**

AIT was formed as a Delaware Corporation in 1999. (Joint Admitted Facts ("AF") (a); Trial Ex. 64., p. 2.) The company developed, manufactured, and sold an FDA-approved MRI system designed for 3-D bilateral breast imaging. (AF (b).) Unlike whole-body MRI systems that require after-market modifications to image the breast, AIT's "Dedicated Breast MRI System" was designed specifically for a breast MRI. As a result, AIT's technology offered better image resolution and clarity for a breast MRI than other imaging systems. At the time, the technology was revolutionary and could detect very small cancer in even dense breast tissue. AIT's Dedicated Breast MRI System was marketed and sold to clinicians, breast care imaging centers, and hospitals.

**C.**    **Castel's Investments in AIT**

On June 19, 2006, Castel first invested in AIT by purchasing 1,010,101 shares of Series C preferred stock. (AF (d); Trial Ex. 1.) Two years later, in July 2008, Castel purchased 512,821 shares of Series D preferred stock. Castel owned 16.7% of series C and 16.7% of series D preferred stock in AIT and was a minority shareholder, holding less than 5% of AIT's outstanding shares of capital stock. (AF (e) and (f); Trial Ex. 3.)

Pharos Capital Partners II, LP ("Pharos") and Pharos Capital Partners II-A, LP ("Pharos II-A;" collectively "Pharos") owned the remaining 83.3% of AIT's series C and D preferred stock. (Trial Exs. 2, 3, 65-68.) Pharos was also a minority shareholder of AIT, holding less than 20% of the company's outstanding shares of

capital stock. Pharos also held $3.3 million in senior secured promissory notes of AIT. (AF (h).) The Pharos notes were the only loans secured by all of the assets of AIT. (Trial Ex. 93.)

Under the terms of the June 2006 AIT Stockholder Agreement between Pharos and Castel, neither AIT nor Pharos could take any action to amend, modify, waive or repeal specified provisions of the Certificate of Incorporation to adversely affect Castel's interest without its written consent. For all other matters requiring the approval of the Series C shareholders, Pharos II-A was only required to "make reasonable efforts to consult with [Castel] before approving such a matter." (Trial Ex. 2.) The transparent purpose of the foregoing protections was to prevent Castel's Series C shares from becoming diluted.

Critically, nothing in the Stockholder Agreement prevented Pharos from selling its own interest and debt position in AIT. (Id.) And there was no requirement in the Stockholder Agreement that Pharos obtain the consent or approval of Castel before doing so.[1] (Id.)

### D.  <u>Wilson's Initial Involvement With AIT</u>

Wilson is a corporate M&A and securities attorney by trade, practicing in Orange County, California, since approximately 1987. Wilson's father-in-law, Rondell B. Hanson, originally owned approximately 89,050 shares of AIT common stock, 65,611 shares of Series A preferred stock and roughly 3,125 shares of Series B preferred stock. Beginning in approximately 2012, Wilson's law firm (Wilson & Oskam at the time) was retained as outside corporate general counsel for AIT with respect to two specific loan agreements. Later that year, Hanson gifted his AIT stock to his children and their spouses, including Wilson who received 17,811 shares of common stock, 13,122 shares Series A preferred stock and 625 shares Series B

---

[1]     The only advance written consent requirement dealt with amending specific provisions of the Certificate of Incorporation. Castel does not allege that any of the enumerated provisions of AIT's Certificate of Incorporation were ever amended in violation of the Stockholder Agreement.

1   preferred stock, making Wilson a very small minority shareholder of AIT.

2   **E.**     **AIT's Insolvency and Efforts to Partially Satisfy Creditors**

3         In 2011, AIT entered into negotiations with a Chinese company, China

4   Recourses Strategic Investment Company Limited ("CRC"), to sell the business.

5   (Joint Stipulated Fact ("SF") (a); Trial Exs. 58 & 69.) AIT stopped raising funds as a

6   result. During this time, on March 14, 2011, Castel made a $250,000 bridge loan to

7   the company and became a creditor. (AF (g); Trial Ex. 4.) Unfortunately, the CRC

8   deal fell through in 2012. (SF (c); Trial Exs. 75-77.)

9         The failed sale transaction placed a tremendous financial hardship on AIT

10   because the company was not raising funds during the CRC negotiations. AIT began

11   falling behind in the market. Its niche product was becoming outdated and large

12   diagnostic imaging vendors began marketing competing products at price points that

13   AIT could not compete with, particularly in the United States due to its private

14   insurance-driven medical structure. Olivia Cheng resigned as AIT's CEO in July

15   2013 after serving as its CEO for 10-years (since 2003). (SF (d).) She was

16   succeeded as CEO by Michael Devlin, who was affiliated with Pharos. (SF (g).)

17   Anna Kovalkova, also affiliated with Pharos, was appointed as the company's

18   Secretary and Treasurer. (Id.) Devlin and Kovalkova ran AIT's operations for

19   approximately two years.

20         In March 2015, Devlin and Kovalkova both resigned as CEO and

21   Secretary/Treasurer, respectively. (SF (h).) By the spring of 2015, AIT had over $20

22   million in liabilities and was insolvent. (Trial Exs. 54, 92, 97.) By this time, AIT had

23   been sued by five creditors, three of which obtained judgments. AIT had not sold a

24   new MRI system since 2013 and was operating with a skeleton crew of accounting

25   and subcontracted service providers for the remaining installed systems. (Trial Ex.

26   54.)

27         On May 4, 2015, the Board of Directors adopted resolutions to engage a firm

28   to review the financial condition of the Company and to assist, if deemed necessary,

JULANDER BROWN
— & BOLLARD —

to liquidate its assets and operations. (Trial Ex. 54.) All other members of the Board subsequently resigned, leaving Wilson as the sole remaining director. (Id.; SF (i).) AIT's outgoing Board of Directors also appointed Wilson to act as its CEO to shepherd the company through the liquidation/bankruptcy process. (Trial Ex. 54.) The Board determined that, for his service, Wilson would receive a flat fee of $250,000, regardless of how long the winding down process took to complete.

Critically, at this time, Pharos' notes, secured by AIT's assets, were in default. The total due under those notes was $3,100,000, plus interest and fees. Pharos believed that liquidation was the only option available to the Company. Accordingly, on May 21, 2015, Pharos entered into a Forbearance Agreement with AIT, wherein it agreed to loan AIT another $175,000, specifically to assist in the liquidation process, and agreed to forebear on foreclosing on AIT's assets up to June 5, 2015. (Trial Ex. 93.) If the company were to liquidate, the amount available for distribution to creditors would not have been sufficient to pay the company's senior, secured debt. (Trial Ex. 54.)

In a letter to all of AIT's shareholders, dated June 18, 2015, Wilson informed the shareholders (including Castel) of all of these facts and put the shareholders on notice that AIT's "assets are insufficient to pay [its] liabilities and monthly revenue is insufficient to pay the Company's debts as they become due." Wilson further notified the shareholders that:

> "Based upon our current analysis, upon any liquidation of the Company the amount available for distribution to the creditors would not be sufficient to repay the senior secured loan. As a result, all other creditors would receive no repayment of any portion of their debt. Of course, shareholders would likewise receive no distributions and the shares of the Company common and preferred stock would be worthless."

(Trial Ex. 54.) To solve this problem as best as circumstances would allow, Wilson informed the shareholders that "To date, we have decided not to file for bankruptcy believing that we could wind down the affairs of the Company less expensively on

an informal basis." (Id.) No shareholders objected to the underlying facts presented by Wilson or to his proposed course of action.

Based on his stated course of action, Wilson first endeavored to find a purchaser for AIT's assets. To that end, he and the Chief Operating Officer, Mike Parilla, shopped the company around, including reaching out to AIT's three biggest competitors and several venture capital firms. Unfortunately, there were no buyers interested in purchasing the company or its assets.

After learning of AIT's insolvency and its plans to liquidate the company in June 2015, Cheng, decided to try to rescue the company or, at a minimum, rescue the technology that AIT owned, possibly putting it to use in other, less affluent markets. As a breast cancer survivor, Cheng believed that AIT's 3-D bilateral breast imaging technology could still save lives somewhere.

Cheng reached out to several AIT shareholders to join in her effort and specifically discussed her efforts to save the company with Castel in August 2015, asking its principals, Davide and Mattia Malacalza, to invest additional money in AIT and to act to preserve the value of Castel's loan and investment in AIT. (Trial Ex. 61.)

In September 2015, counsel for Castel, Antonio Valla, reached out to Wilson to inquire about the facts and issues raised in Wilson's June 18 letter. (Trial Ex. 55.) Wilson spelled out the plan being put forward by Cheng to invest new money in AIT based on a settlement with existing creditors. Wilson also sent the draft bankruptcy petition to Mr. Valla. (Trial Ex. 55.) The Malacalzas declined to participate.

Specifically, for over a year, Castel sat on the sideline and did nothing to support the company or to save its investment. It chose to let Cheng work alone to create new value for the insolvent company. Undeterred, Cheng did work hard and eventually found a group of Chinese investors willing to help. Together they formed Defendant ARF. (Trial Exs. 15 & 43.) "ARF" stands for Aurora Rescue Fund.

JULANDER BROWN
— & BOLLARD —

1    Eventually, through ARF Cheng raised money and on November 5, 2015,

2  ARF entered into a Stock and Note Purchase Agreement ("Purchase Agreement") to

3  purchase the Pharos' senior secured notes and shares of AIT for $425,000, to

4  prevent Pharos from foreclosing on the company's assets. (Trial Ex. 11.) Although

5  Castel alleges that the stock and debt were heavily discounted, Castel cannot dispute

6  that the purchase price for Pharos' debt and equity was determined in arms-length

7  negotiations between two completely unrelated parties—Pharos and ARF. As a

8  result of this Stock and Note Purchase Agreement, ARF now owned less than 20%

9  of AIT's stock and Pharos' secured debt in the amount of $3.1 million, plus interest

10 and fees. ARF thus became the largest secured creditor over all of AIT's assets.

11 (Trial Ex. 123.)

12    In connection with the Stock and Note Purchase Agreement, on November 5,

13 2015, ARF and Pharos also entered into a Novation Agreement (the "Novation

14 Agreement") whereby ARF assumed all of Pharos's obligations under an Amended

15 and Restated Note Purchase, Guaranty and Security Agreement dated August 19,

16 2014 (the "Amended Note Purchase Agreement").[2] (Trial Exs. 12 & 90.)

17    After purchasing Pharos' debt and equity position, ARF made efforts to raise

18 enough money to keep AIT going. It loaned AIT $1.5 million to AIT to fund

19 operations. However, within a year it became clear that it would not be possible to

20 raise enough money to keep the company going.

21    With the help of a business broker, Cheng ultimately found another group of

22 investors willing to purchase some of AIT's assets. In or about October 2016, AIT

23 began negotiations for the purchase of some of AIT's assets through Aurora

24

25

26  _____

27  [2]    Significant to Castel's claim of breach of contract, the Novation Agreement has nothing
    whatever to do with any obligation by Pharos to consult with Castel under their shareholders

28  Agreement. The only purpose of the Novation Agreement was to transfer Pharos's obligations
    under the Amended Note Purchase Agreement to ARF.

JULANDER BROWN
— & BOLLARD —

1  Healthcare US Corp ("AHC").[3] Cheng was to be the President and CEO of AHC,

2  which was a new corporation formed specifically to purchase AIT's assets.

3       In connection with the negotiations over the price, AIT obtained an

4  independent appraisal of the fair market value of its assets as of the proposed sale

5  date that determined the assets being sold were worth between $6,181,000 and

6  $9,652,000. (Trial Ex. 7.) Consistent with the appraisal, AHC agreed to purchase the

7  assets for $8.5 million, and the company accepted the offer subject to shareholder

8  approval. But for this asset purchase and the money Cheng raised, there was no way

9  for AIT to avoid bankruptcy and the cost of liquidation, through which Castel, an

10  unsecured creditor, would have received nothing.

11      **F.**    **Castel's Notification and Response**

12       Prior to the asset purchase, Wilson gave notice to counsel for Castel, Antonio

13  Valla, on October 20, 2016, that AIT "received only one offer to purchase the assets

14  of the business for $8,500,000, which we are going to accept, subject to the approval

15  of shareholders." (Trial Ex. 5.) Wilson further explained to Mr. Valla that the

16  purchase price was not sufficient to pay all the existing debts of AIT and that he

17  believed the purchase price would enable AIT to pay five to ten percent of the

18  outstanding trade payables and approximately 40% of the original principal amount

19  of the loans from unsecured lenders, including Castel. Wilson therefore offered to

20  pay to Castel $100,000 in exchange for a release from its debt of $250,000. (Id.) The

21  notice also included a form for shareholder written consent to the transaction, a draft

22  of the proposed Asset Purchase Agreement, and a spreadsheet showing the proposed

23  disbursement of the funds. (Id.)

24

25  _____

26  [3]     Although the investors initially wanted to use a newly formed Cayman Islands company to purchase the assets, they later determined that a newly formed US corporation should be used

27  instead for the purchase. Thereafter, the investors formed a new US corporation, Aurora Healthcare, to complete the asset purchase. Both companies were shells formed specifically for the

28  purpose of raising money to purchase the AIT assets.

JULANDER BROWN
— & BOLLARD —

1    Mr. Valla responded to Wilson's notice on October 26, 2016, complaining

2  that Castel did not have sufficient information to make an informed decision

3  regarding the proposed Asset Purchase Agreement ("Draft APA"), vaguely arguing

4  that Castel was entitled to receive "all material information" regarding the proposed

5  sale. (Trial Ex. 6.) Wilson responded later that same day by transmitting AIT's

6  financial statements for the previous five years showing liabilities far in excess of

7  assets, including over $12 million in past due loans. (Id.) AIT's financial statements

8  showed its Balance Sheet at the time with $4,200,313 in total assets, $20,195,830 in

9  total liabilities and a shareholders' deficit of $15,140,609. (Id.) AIT had no other

10  viable option than to sell the assets under the pending transaction.

11    Wilson also offered to provide any other information Castel wanted, including

12  making all of the company records available to Castel for inspection. Wilson further

13  explained that, "[t]he current owner of the senior secured debt originally issued to

14  Pharos *could have acquired all of the assets of the company by commencing legal*

15  *proceedings, which would have left nothing for any of the unsecured creditors*."

16  And while the offer was less than hoped, Wilson explained that "it is the only offer

17  we have that returns any amounts to the unsecured creditors." (Trial Ex. 6.)

18  Wilson's October 26, 2016 email to Castel's counsel also attached an estimated list

19  of the payments expected to be paid after closing from the proceeds of the sale ($8.5

20  million) and the company's cash on hand ($90,000). (Id.) The estimated list of the

21  payments included $100,000 to be paid to Castel from the sale proceeds. (Id.)

22    Over the next week, the required majority of shareholders consented to the

23  $8,500,000 asset purchase transaction, with ARF voting the shares purchased from

24  Pharos. (Trial Ex. 8.) After obtaining the required number of consents, AHC and

25  AIT executed a final Asset Purchase Agreement dated October 31, 2016 (the

26  "APA") in which AHC agreed to purchase specific assets of AIT for $8,500,000.

27  (Trial Ex. 10.) As the senior secured lien holder at the time, ARF would have

28  foreclosed on AIT's assets if the other creditors and shareholders had not agreed to

the APA transaction. As discussed below, the terms of the APA executed by the parties remained the same from the draft in all respects that were material to Castel.

The purchase price was paid with a combination of the senior, secured debt (secured by the assets) formerly held by Pharos and ARF credited in the amount of $4,000,000 ($300,000 less than what was owed), $500,000 paid directly by the buyer to a Chinese creditor (to avoid transferring this money from China to the US then back to China), and $2,800,000 in cash at closing. (Trial Ex. 10.) $1,200,000 of the purchase price that was designated for a specific Chinese creditor was held back with the creditor's consent pending AIT's delivery of its 80% interest in Boston Breast Diagnostic Center ("BBDC") and its interest in the UMass clinic. These assets could not be delivered at the closing because the required consents from the 20% owner of BBDC and the Massachusetts Department of Health had not yet been obtained.

After the closing of the asset purchase, Wilson used the purchase money to satisfy AIT's unsecured creditors who had agreed to settle, partially and proportionately. Trade creditors settled for between $0.05 and $0.10 on the dollar. Other unsecured creditors, including Castel, were offered 40% of the original principal amount of their loans. Wilson made every effort to treat creditors within each class the same.

Without further communication, Castel did not consent to the APA and did not accept the offer of $100,000. Over the year that Castel was on notice of AIT's insolvency, it did not ask for any other information, it did not accept the offer to examine the company's records, and did not offer any alternatives to the dissolution of the company. Castel merely sat back and waited until all funds were dispersed and then filed an action against AIT entitled *Castel S.A. v. Aurora Imaging Technology, Inc.,* USDC Case No. CV 17-4198-DMG-KS. (Trial Exs. 117 & 118.) With no funds left to defend Castel's lawsuit, Castel obtained a judgment against AIT for the entire balance due on its notes and all accrued interest. (Trial Ex. 119.)

1    Not surprisingly, Castel's Judgment against AIT remains unsatisfied.

2  Desperate to find a "deep pocket" to blame for its own obstinacy, this action

3  followed.

4  **II.    L.R. 16-4.1: CLAIMS AND DEFENSES**

5    Castel asserts four (4) claims against Defendants: (1) Fraudulent Deceit and

6  Concealment as to Wilson; (2) Fraudulent Deceit and Concealment as to ARF; (3)

7  Breach of Fiduciary Duty as to Wilson; and (4) Breach of Contract as to ARF.

8    Defendants deny the claims and assert the following affirmative defenses: (1)

9  Delaware's Business Judgment Rule by Wilson; (2) Limitation on Liability by

10 Wilson; and (3) Failure to Mitigate Damages by all Defendants.

11    **A.    Plaintiff's Claims: Summary Statement, Elements, and Evidence in**

12        **Opposition to Each Claim**

13        1.    **Claim 1: Fraudulent Deceit and Concealment as to Wilson**

14            (a)    **Summary of Claim 1:**

15    Castel alleges that: "Defendant [Wilson] and Castel were in a fiduciary

16 relationship and Defendant intentionally failed to disclose certain facts to Castel."

17 ([Joint Proposed] Final Pretrial Conference Order ("FPCO"), p. 12-13.)

18    The facts Castel claims Wilson concealed were actually disclosed to Castel,

19 were untrue or were immaterial and therefore not actionable. As set forth in the

20 [Joint Proposed] Final Pretrial Conference Order ("FPCO"), at page 10, Castel

21 alleges the following facts were concealed or not disclosed and Wilson will show as

22 follows:

23

24

25

26

27

28

| Castel's Alleged Concealed and Undisclosed Facts | Wilson's Response |
|---|---|
| The transfer of Pharos's interests to ARF | ARF purchased Pharos's interest for $425,000. (Trial Ex. 11.) Castel never inquired about the interest and Wilson did nothing to conceal it. |

JULANDER BROWN
— & BOLLARD —

| | |
|---|---|
| AIT's financial statements | Wilson sent to Mr. Valla 6 years of audited (through 2010) and unaudited (2011-2015) financial statements and offered Castel access to all of AIT's books and records. (Trial Ex. 6.) Castel never responded to that offer. |
| Information about the buyer and terms of the sale | Wilson sent the Draft APA to Castel. (Trial Ex. 5.) Changes to the APA were consistent with prior versions and otherwise immaterial. The buyer was a newly formed entity and was paying cash at the closing. The funds were coming from the same investors. The buyer's place of organization was therefore immaterial. And the payment terms in the final APA did not alter the amount paid to Castel. (Trial Ex. 10.) The Written Consent of the shareholders provided for changes to the terms of the APA between drafts and the definitive agreement and gave discretion to the officers of the company to negotiate and approve such changes. (Trial Ex. 5.) |
| A "4 million dollar discount" the buyer allegedly received in the purchase | There was no hidden "discount." ARF received an equity interest in AHC in exchange for the Pharos' senior secured debt. (Trial Ex. 11.) AHC received AIT's assets in exchange for the senior secured debt and payment of another $3.3 million in cash. |
| Personal benefits Wilson allegedly received | Although Wilson and Cheng discussed an equity position for Wilson in the buying entity, Wilson never received any equity. (Trial Ex. 22.) Wilson's flat fee compensation for his work |

JULANDER BROWN
— & BOLLARD —

| | on behalf of AIT was authorized in advance by the AIT board of directors before they resigned. |
|---|---|
| Cheng was on both sides of the sale as managing member of ARF and as CEO of Aurora Healthcare | Castel knew of Cheng's involvement "on the buyer's side" when Wilson sent the Draft APA to Castel. (Trial Ex. 5.) ARF was not "on the seller's side." AIT was the seller of the assets. (Trial Ex. 10.) ARF was on the buyer's side of the sale as its senior secured notes were used by the buyer to offset $4 million of the purchase price. |
| Other similar creditors were offered more money in return for their loans, than Castel | Wilson made every effort to treat similarly situated creditors the same and did nothing to conceal the amounts paid to the creditors. |

Wilson had no intention of defrauding Castel and even offered to grant Castel full access to all of AIT's books and records, an invitation that Castel ignored. More fundamentally, nothing Wilson failed to disclose to Castel caused the loss of Castel's investment or AIT's failure to repay Castel's note. Castel rejected the only payment offer available to it. Its own conduct therefore caused its damages.

(b)     **Elements of Claim 1:**

A claim for fraudulent concealment requires that Castel prove:

(1) the defendant must have concealed or suppressed a material fact,

(2) the defendant must have been under a duty to disclose the fact to the plaintiff,

(3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff,

(4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and

1      (5) as a result of the concealment or suppression of the fact, the plaintiff must

2   have sustained damage.

3      (Judicial Council of California Civil Jury Instruction 1901.)

4            (c)      **Key Evidence in Opposition to Claim 1:**

5   • Evidence of AIT's insolvency and impending bankruptcy in 2015.

6   • Evidence of the resignation of AIT's Board of Directors and their

7      appointment of Wilson to shepherd AIT through bankruptcy or

8      liquidation.

9   • Evidence of Wilson's efforts to obtain some value for the company's

10     assets to partially satisfy the company's creditors.

11  • Evidence of Wilson's 2015 disclosures regarding AIT's insolvent

12     financial condition and potential bankruptcy petition to AIT's

13     shareholders, including Castel, and Castel's failure to act on this

14     information to protect its investment and loan.

15  • Evidence of Cheng's conversations with Castel inviting it to join the

16     rescue effort in 2015, and Castel's failure to act on this information to

17     protect its investment and loan.

18  • Evidence of ARF and Olivia Ho Cheng's efforts to rescue the company

19     by successfully raising money from new investors to sustain AIT's

20     operations.

21  • Evidence of ARF's loan to AIT in an effort to keep the company

22     operational.

23  • Evidence of ARF's buy-out of AIT's largest secured creditors, Pharos

24     Capital Partners II, L.P., Pharos Capital Partners II-A, L.P., to prevent

25     foreclosure on all of the company's assets in 2015.

26  • Evidence of AIT's continued insolvent financial condition through

27     2016.

28

JULANDER BROWN
— & BOLLARD —

- Evidence of Cheng's efforts to again raise new funds to purchase some of AIT's assets and partially repay AIT's creditors.
- Evidence of the valuation of AIT's assets.
- Evidence of the asset purchase transaction and Wilson's disclosures to shareholders, including Castel, regarding same.
- Evidence of Wilson's discussions with, and information provided to, Castel's counsel regarding the proposed asset purchase transaction.
- Evidence of Wilson's invitation to Castel to examine all of AIT's books and records.
- Evidence of the approval of the asset purchase transaction by a majority of AIT's shareholders.
- Evidence of the terms of the asset purchase transaction, immaterial changes that were necessarily made, and the reasons for those modifications.
- Evidence of the settlements with AIT's creditors.
- Evidence of Castel's refusal to settle and accept its offer of partial payment on its note.
- Evidence of the payments made from the purchase proceeds and forgiveness of senior, secured debt held by ARF.
- Evidence that no shareholder received any value for their equity in AIT.
- Evidence of Castel's election to proceed in filing an action against AIT on its Note and eventually obtaining a judgment against AIT.
- Evidence of Wilson's intent.

(d)    **Summary of Affirmative Defenses to Claim 1:**

Castel's claim of fraudulent concealment based on Wilson's fiduciary duty, is nothing more than a claim for breach of fiduciary duty. As such, Wilson incorporates by reference each of the affirmative defenses raised in connection with Castel's fourth claim for breach of fiduciary duty. (See discussion *infra* at

§II(A)(3)(d) below.)

Castel knew that AIT was insolvent in 2015 when Wilson provided Castel with an updated status on the financial condition and operations of the company that it was "in dire financial difficulty and cannot continue operations without the infusion of a significant amount of capital." Castel also knew that Cheng was attempting to "rescue" the company by raising new capital. Castel elected not to participate or even respond to her plea for help, and did nothing to inform itself or to save its investment and loan. Castel knew that AIT was insolvent in 2016 when it was provided with the financial statements for the company, Wilson discussed the financial condition with Castel's counsel, and Wilson offered to make all the company's books and records available for inspection by Castel. Castel ignored Wilson's invitation to educate itself regarding the company's finances and the proposed purchase transaction, choosing to act solely on the information Wilson had already provided its counsel. Had Castel accepted the offer, it would have been able to learn all of the facts that were allegedly concealed and avoided any damages through the reasonable expenditure of time and effort.

(e) <strong>Elements of Affirmative Defenses to Claim 1:</strong>

Wilson incorporates by reference each of the elements of the affirmative defenses raised in connection with Castel's fourth claim for breach of fiduciary duty. (See discussion *infra* at §II(A)(3)(e) below.)

Castel cannot be compensated for damages which he could have avoided by reasonable effort or expenditures. Thus, Castel's recovery, if any be found, should be reduced by the amount of damages that it could have avoided with reasonable efforts or expenditures.

(Judicial Council of California Civil Jury Instruction 3931.)

(f) <strong>Key Evidence for Affirmative Defenses to Claim 1:</strong>

Wilson incorporates by reference each of the categories of key evidence set forth in section 1(c), above.

(g) **Anticipated Evidentiary Issues for Claim 1:**

None that are presently anticipated.

(h) **Issues of Law Regarding Claim 1:**

**Castel's Fraud Claim is a Defective Breach of Fiduciary Duty Claim**

For its complaint in this action, Castel has pled a claim for fraudulent concealment against Wilson under California law. (SAC, Dkt. No. 89, ¶ 19 ["this action also arises under California substantive law for all other causes of actions, including those related to WILSON's governance and actions taken by him as CEO of AIT, from the State of California."].) Castel continues with this claim for trial alleging that "Defendant [Wilson] and Castel were in a fiduciary relationship and Defendant intentionally failed to disclose certain facts to Castel." (FPCO , p. 12-13.) This claim of fraudulent concealment is nothing more than a claim of breach of fiduciary duty. By its pleading, Castel is improperly attempting to circumvent the protections granted under Delaware law to directors and officers related to claims of breach of fiduciary duty.

A federal court sitting in diversity applies the choice-of-law rules of the forum state. (See *Mazza v. Am. Honda Motor Co*., 666 F.3d 581, 589 (9th Cir. 2012). California has long recognized, and even codified, the internal affairs doctrine which mandates that the Court apply the law of the state of incorporation when considering claims relating to internal corporate affairs. (See Corp. Code, §2116; *Batchelder v. Kawamoto*, 147 F.3d 915, 920 (9th Cir.1998); *Davis & Cox v. Summa Corp*., 751 F.2d 1507, 1527 (9th Cir.1985). It is undisputed that AIT is a Delaware corporation. (See, Dkt. 91, ¶20.) Thus, Delaware law applies to Castel's claims related to the governance of the corporation. (See also, Dkt. 73, p. 22; Dkt. 176, p. 21.) Each of Castel's claims against Wilson relating to the APA transaction, implicate the governance of the corporation.

Under Delaware law, where a constructive fraud claim (also called "equitable fraud") is based on a fiduciary duty, the fraud claim may be redundant to a breach of

JULANDER BROWN
— & BOLLARD —

JB

1 fiduciary duty claim. (See *In re Wayport, Inc. Litig.*, 76 A.3d 296, 327 (Del. Ch.

2 2013); *Parfi Holding AB v. Mirror Image Internet, Inc.,* 794 A.2d 1211, 1236-37

3 (Del. Ch. 2001), rev'd on other grounds, 817 A.2d 149 (Del. 2002).)

4      While equitable fraud potentially provides a remedy for negligent or even

5 innocent misrepresentations, a fiduciary in the corporate context cannot be held

6 liable for damages for a failure to disclose a material fact unless that fiduciary acted

7 with at least gross negligence. (See, e.g., *Turner v. Bernstein*, 776 A.2d 530, 542–43

8 (Del.Ch.2000); *Nagy v. Bistricer*, 770 A.2d 43, 59–60 (Del.Ch.2000).)

9      To allow such a claim in the context of a director's disclosure to shareholders

10 would contravene Delaware law and policy which provides that:

11

12        "[B]ecause fiduciaries of business entities must take risks
       and make difficult decisions about what is material to

13        disclose, they are exposed to liability for breach of
       fiduciary duty only if their breach of the duty of care is

14        extreme. Furthermore, by contract – such as an
       exculpatory provision in a corporate charter or in an LLC
       Agreement – the beneficiaries may insulate their

15        fiduciaries from liability for any breach of the duty of
       care, including one related to disclosure."

16

17 (*Metro Communication Corp. BVI v. Advanced Mobilecomm Technologies Inc.*, 854

18 A.2d 121, 157 (Del. Ch. 2004).)

19      Inasmuch as Castel's fraudulent concealment against Wilson is nothing more

20 than a claim for breach of fiduciary duty, that claim should be dismissed as

21 redundant, or through application of the limit the liability and the Business

22 Judgment Rule defenses applicable to Castel's third claim for breach of fiduciary

23 duty, Wilson should have judgment on this claim. (See discussion *infra* at

24 §II(A)(3)(h) below.)

25      **As a Creditor, Castel has no Claim for Fraud Based on Breach of**

26      **Fiduciary Duty**

27      Castel explicitly alleges that its claim for fraud against Wilson is based on "a

28 fiduciary relationship." (FPCO, p. 12-13.) Under Delaware law, directors do not

owe fiduciary duties to creditors, even if the corporation is insolvent. (*NACEPF v. Gheewalla*, 930 A.2d 92, 103 (2007); *Berg & Berg Enterprises,* LLC v. Boyle, 178 Cal.App.4th 1020, 1038 (2009).) Because Castel, as a creditor, has no standing to sue Wilson based on a fiduciary duty, Castel cannot recover damages where the claim is based solely on a fiduciary duty. Lack of standing is not an affirmative defense; it is a jurisdictional requirement. (See *Perez v. Gordon & Wong Law Grp., P.C.*, No. 11-CV-03323-LHK, 2012 WL 1029425, at *11 (N.D. Cal. Mar. 26, 2012) Castel may therefore not recover damages arising from its lost debt based on its fraud claim against Wilson.

Fraudulent concealment requires Castel to prove that Wilson "intentionally concealed or suppressed the fact with the intent to defraud the plaintiff." (*Davis v. HSBC Bank Nevada, N.A.,* 691 F.3d 1152, 1163 (2012).) Wilson did not intentionally conceal anything from Castel and never intended to defraud Castel.

### **Wilson Disclosed AIT's Financial Statements to Castel**

October 20, 2016, Wilson sent correspondence to all of AIT's shareholders, including Castel's counsel, requesting their consent to the asset purchase. The letter enclosed a draft of the Asset Purchase Agreement and a document entitled Action by Written Consent in Lieu of Special Meeting of Stockholders. (Trial Ex. 5.) The Written Consent expressly contemplated that there might be changes, amendments or supplements to the terms and conditions of the Asset Purchase Agreement between the current draft and the definitive agreement and gave discretion to the officers of the company to negotiate and approve such changes. (Id.) The draft APA clearly indicated that it would be executed by "Olivia Ho Cheng, Chairman" on behalf of the buyer. (Id.)

On October 26, 2016, Mr. Valla responded to Wilson's email, indicating that Castel did not have sufficient information to make an informed decision regarding the proposed APA, arguing that it was entitled to receive "all material information" regarding the proposed sale. (Trial Ex. 6.) In response, Wilson told Mr. Valla that he

JULANDER BROWN
— & BOLLARD —

would be happy to provide any specific information Castel wanted and attached the company's financial statements for the previous five years and a list of the payments expected to be made from the proceeds of the sale ($8.5 million) and the company's cash on hand ($90,000). (Id.) The financial statements showed that the company had only $4.2 million (based on historical book value, not current fair market value) in assets as of December 2015 and over $20 million in liabilities. (Id.) Wilson also offered to provide any further specific documentation requested and offered to make **all** of the company books and records available for inspection at the corporate office. (Id.) Wilson heard nothing more from Castel or Mr. Valla, Castel never submitted its executed consent to the sale, and Castel never agreed to accept the $100,000 it was offered in settlement of its debt.

It is axiomatic that notice of a fact to an agent imparts notice of that fact to the principal. (Code Civ. Proc., §2332.) Thus, actual notice of a fact to a litigant's attorney is imputed to the litigant. (See, *Allied Grape Growers v. Bronco Wine Co.*, 203 Cal.App.3d 432, 449, fn. 12 (1988), as modified on denial of reh'g (Aug. 26, 1988) (citing cases).) Wilson contends that Castel had knowledge of all documents and information he provided to Castel's attorney, Mr. Valla, in 2015 and 2016.

Both Wilson's words and deeds demonstrated his willingness to provide Castel with any information it felt it needed with respect to the transaction and his lack of any intention to conceal any fact that Castel may deem material. When the fault lies with the method of inquiry and not the responses provided, a defendant is not liable for fraud. (*Lease and Rental Management Corp. v. Arrowhead Central Credit Union,* 126 Cal.App.4th 1052, 1060 (2005).) Wilson cannot be liable for fraud for providing the past five years of financial statements and inviting Castel to examine all of the company's books and records in response to Castel's vague request for "all material information related to the transaction," without specifying what "material information" Castel was seeking.

**<u>Castel's Claims of Non-Disclosure are of Immaterial Facts</u>**

Fraudulent concealment requires that "the defendant must have concealed or suppressed a material fact." (*Davis, supra,* 691 F.3d at 1163.) *Hill v. Wrather,* 158 Cal.App.2d 818 (1958), involved a stock transaction in which the plaintiff alleged he was fraudulently induced to enter the transaction by the defendants' concealment of the fact that they were married. The court held that "[t]he allegedly concealed and misrepresented relationship between Hill and Alvarez must be regarded as wholly collateral and immaterial since it had no bearing upon the value of either the property or the services which defendants bargained for." (Id. at p. 824.) The court concluded that fraud, "which cannot possibly affect the intrinsic merits of a business transaction must necessarily be immaterial because reliance upon it could not produce injury in a legal sense." (Id.) Measured against this standard, Castel's claims of fraudulent concealment are legally deficient.

<u>The Transfer of Pharos's Interests to ARF</u>: Whether or not Wilson had a duty to disclose ARF's purchase of Pharos's secured debt and equity interests to Castel, which he did not, the disclosure of that information to Castel was immaterial to its decision to accept or reject the AIT settlement offer. Castel does not, and cannot, dispute that ARF paid fair value to Pharos in an arm's length transaction. (Trial Ex. 11.) That ARF thereafter exchanged that interest for equity in AHC, in connection with its purchase of AIT's assets (Trial Ex. 14), has no bearing on the merits of the AIT settlement offer to Castel. Castel can show no connection between the source of funds offered to it and the decision to accept those funds. Moreover, ARF's purchase of the Pharos interest occurred almost a year prior to the AHC asset purchase transaction. (Trial Ex. 11.) Any idea that, had Castel known of ARF's purchase of the Pharos interest, it could have "purchase[d] AIT, recapitalize[d] AIT, or make other decisions to preserve the value of its loans and investment in AIT" is nothing but speculation. Castel had one year to make those decisions and it elected not to do so.

JULANDER BROWN
— & BOLLARD —

The True Buyer of AIT's Assets: The buyer was to be a newly formed business entity, formed specifically for the purpose of the transaction. Castel has never, and cannot reasonably explain how the fact that the corporation was formed in the US instead of the Cayman Islands somehow impacted its decision to accept the $100,000 settlement (or any other decision). There were no other offers. The funds for the transaction were coming from the same investors. In this cash transaction, AIT's $100,000 settlement offer to Castel would not have changed if Aurora SPC paid the purchase price instead of AHC. Thus, the identity of the buyer "cannot possibly affect the intrinsic merits" of the APA transaction. (*Hill, supra,* 158 Cal.App.2d at 824.)

The Operative APA and its Payment Terms: Castel similarly has not, and cannot, explain how the differences between the Draft APA and the final APA would have altered its decision to accept the $100,000 settlement. Issues Castel previously raised do not overcome the test of materiality. The $1.2 million holdback was earmarked for another creditor, Dr. Wang/Janan Investments, who agreed to defer part of his settlement payment until the money came in. The holdback had no potential impact on the offer made to Castel. Likewise, neither the decrease in cash paid at closing nor the debt forgiveness gained by AIT would have changed the offer to Castel. The fact that $500,000 of the cash paid at closing was being paid directly from the buyer to AIT's Chinese creditors in Chinese Yuan so the money would not need to be wired to the US and then wired back to China had no impact whatsoever on the terms of the APA or the offer made to Castel.

**Castel's Claims of Non-Disclosure are of Inaccurate Facts**

The "4 Million Dollar Discount": There was no hidden "discount." ARF paid fair value to Pharos in an arm's length transaction for its secured debt and all of its equity in AIT. (Trial Ex. 11.) The debt was secured by all of AIT's assets. At the time of the APA, the debt owed by AIT exceeded $3,300,000. ARF exchanged that debt for equity in AHC, in connection with its purchase of AIT's assets. (Trial Ex.

14.) AHC then used that secured debt to offset the purchase price by $4 Million and made payment of another $3.3 million in cash. That is not a "discount" to AHC; but rather, is fair value in an arm's length transaction between AIT and AHC.

<u>Personal Benefits Wilson Allegedly Received</u>: Castel relies on an email between Wilson and Cheng which discussed a plan to share equity in ARF with Wilson. (Trial Ex. 22.) The September 2016 email discusses an unidentified "transaction" in which the "plan" was to grant equity in ARF to Wilson. Even if the "transaction" was somehow related to the APA, Wilson never received any stock in ARF or AHC.

The only money Wilson ever received was the stipend that the resigning Board of Directors voted for prior to their resignations. That stipend was not tied to the asset purchase transaction, which was not even contemplated at the time Wilson's compensation was authorized. He received nothing for his equity interest in AIT and, because he was never a creditor, no settlement from the sale proceeds.

<u>Cheng Was on Both Sides of the Transaction</u>: At the time of the APA, Cheng was the managing member of ARF and was also CEO of Aurora Healthcare. This does not put Cheng on both sides of the APA transaction. Castel was advised of Cheng's involvement "on the buyer's side" when Wilson sent the Draft APA to Castel on October 20, 2016. (Trial Ex. 5.) The Draft APA expressly indicated that it would be executed by "Olivia Ho Cheng, Chairman" on behalf of the buyer. (Id.) However, ARF was not "on the seller's side." ARF was not the seller of the assets; AIT was the seller of the assets. (Trial Ex. 10.) ARF did not receive any amount of the purchase price; AIT received the purchase price from the sale. ARF did not sell anything in the APA. ARF was on the buyer's side of the transaction because the senior secured notes that it owned were used by the buyer to offset $4.0 million of the purchase price, with ARF receiving equity in the buying entity. Cheng's only involvement in her individual capacity was on the Seller's side as a creditor, which was also fully disclosed to Castel in the Sources and Uses of Funds. (Trial Ex. 6.)

1    <u>Other Similar Creditors Were Offered More Money than Castel</u>: Wilson made

2    every effort to treat similarly situated creditors the same and did nothing to conceal

3    the amounts paid to the creditors.

4    **Castel Sustained No Damages Because of Fraudulent Concealment**

5    Even if Castel could show fraudulent concealment by Wilson, which it

6    cannot, Castel's claim is not actionable because it cannot show it sustained damage

7    "as a result of the concealment or suppression of the fact…." (*Davis*, *supra,* 691

8    F.3d at 1163.) Castel alleges that it "lost its entire investment and loans in AIT" and

9    "lost out on the opportunity to: accept the $100,000 settlement, purchase AIT,

10   recapitalize AIT, or make other decisions to preserve the value of its loans and

11   investment in AIT." (FPCO, p. 11.) But the reasons that Castel lost its investment

12   were because AIT was insolvent, the senior secured creditor would have obtained all

13   of AIT's assets either through foreclosure or bankruptcy, and a majority of AIT's

14   shareholders approved the asset sale transaction. Castel did not recover on its debt

15   because it refused to participate in the proceeds of the only available asset sale and

16   rejected a proportionate partial payment on its note. Castel elected to sit back and

17   wait until all of the purchase money was paid out to the settling creditors to pursue a

18   judgment against the insolvent corporation. (Trial Exs. 117-119.)

19   No additional disclosures to Castel would have made AIT solvent or garnered

20   any more money to settle with creditors. No shareholder was going to receive

21   anything for their equity, and none did. Castel did not take any action or forbear

22   from taking any action that could have salvaged more value from its investment and

23   promissory note than it would have received from accepting its proportionate share

24   of the proceeds for its debt from the APA transaction.

25   Any claim that it would have or could have done anything to alter the

26   outcome is pure speculation. "[I]t is fundamental that damages which are

27   speculative, remote, imaginary, contingent, or merely possible cannot serve as a

28   legal basis for recovery." (*Piscitelli v. Friedenberg*, 87 Cal.App.4th 953, 989 (2001),

JULANDER BROWN
— & BOLLARD —

citing *Regalado v. Callaghan*, 3 Cal.App.5th 582, 602 (2016).) Speculation as to what Castel could have done is not evidence of reliance which requires that Castel prove that, "had the omitted information been disclosed [it] would have been aware of it and behaved differently." (*Mirkin v. Wasserman*, 5 Cal.4th 1082, 1093 (1993).) The best evidence of what Castel would have done is what it actually did for a year after receiving notice that AIT was insolvent and headed to liquidation—it did nothing. Accordingly, Castel's concealment claim against Wilson fails.

### 2. Claim 2: Fraudulent Deceit and Concealment as to ARF

#### (a) Summary of Claim 2:

Castel's claim of fraud against ARF is substantially similar to its claim against Wilson. As with its claim against Wilson, so too, its claim against ARF is based on facts that are not actionable. As set forth in the FPCO at pages 12-13, Castel alleges the following facts were concealed and undisclosed and ARF will show as follows:

| Castel's Alleged Concealed and Undisclosed Facts | ARF's Response |
|---|---|
| The transfer of Pharos's interests to ARF | ARF purchased Pharos's interest for $425,000. (Trial Ex. 11.) Castel never inquired about the interest and ARF did nothing to conceal it. |
| Information about the buyer and terms of the sale | Wilson sent the Draft APA to Castel. (Trial Ex. 5.) Changes to the APA were consistent with prior versions and otherwise immaterial. The buyer was a newly formed entity. The funds were coming from the same investors. The buyer's place of organization was therefore immaterial. And the payment terms in the final APA did not alter the amount paid to Castel. (Trial Ex. 10.) The Written Consent of the shareholders provided for changes to the |

JULANDER BROWN
— & BOLLARD —

| | |
|---|---|
| | terms of the APA between drafts and the definitive agreement and gave discretion to the officers of the company to negotiate and approve such changes. (Trial Ex. 5.) |
| A "4 million dollar discount" the buyer allegedly received in the purchase | There was no hidden "discount." ARF received an equity interest in AHC in exchange for the Pharos' senior secured debt. (Trial Ex. 14.) AHC received AIT's assets in exchange for the senior secured debt and payment of another $3.3 million in cash. |
| The additional financial and equity benefits ARF received from the sale of AIT | The financial and equity benefits ARF received from the sale of AIT, were in exchange for the Pharos' senior secured debt. (Trial Ex. 14.) As the only secured creditor of all of AIT's assets, ARF could have foreclosed on the secured debt and received all of the assets with no obligation to AIT's unsecured creditors, like Castel, |
| Cheng was on both sides of the sale as managing member of ARF and as CEO of Aurora Healthcare | Castel knew of Cheng's involvement "on the buyer's side" when Wilson sent the Draft APA to Castel. (Trial Ex. 5.) ARF was not "on the seller's side." AIT was the seller of the assets. (Trial Ex. 10.) ARF was on the buyer's side of the sale as its senior secured notes were used by the buyer to offset $4 million of the purchase price. |

ARF had no duty to disclose any of the allegedly concealed facts to Castel. Regardless, the facts Castel claims ARF concealed were either actually disclosed to Castel or were immaterial. ARF had no intention of defrauding Castel. More fundamentally, nothing ARF failed to disclose to Castel caused the loss of Castel's

1   investment or AIT's failure to repay Castel's note. Castel rejected the only payment

2   offer available to it. Its own conduct therefore caused its damages.

3                    (b)      **Elements of Claim 2:**

4           A claim for fraudulent concealment requires that Castel prove:

5           (1) the defendant must have concealed or suppressed a material fact,

6           (2) the defendant must have been under a duty to disclose the fact to the

7   plaintiff,

8           (3) the defendant must have intentionally concealed or suppressed the fact

9   with the intent to defraud the plaintiff,

10          (4) the plaintiff must have been unaware of the fact and would not have acted

11  as he did if he had known of the concealed or suppressed fact, and

12          (5) as a result of the concealment or suppression of the fact, the plaintiff must

13  have sustained damage.

14          (Judicial Council of California Civil Jury Instruction 1901.)

15                   (c)      **Key Evidence in Opposition to Claim 2:**

16    • Evidence of AIT's insolvency and impending bankruptcy in 2015.

17    • Evidence of the resignation of AIT's Board of Directors and their

18       appointment of Wilson to shepherd AIT through bankruptcy or

19       liquidation.

20    • Evidence of Wilson's efforts to obtain some value for the company's

21       assets to partially satisfy the company's creditors.

22    • Evidence of Wilson's 2015 disclosures regarding AIT's insolvent

23       financial condition and potential bankruptcy petition to AIT's

24       shareholders, including Castel, and Castel's failure to act on this

25       information to protect its investment and loan.

26    • Evidence of Cheng's conversations with Castel inviting it to join the

27       rescue effort in 2015, and Castel's failure to act on this information to

28       protect its investment and loan.

---

28

DEFENDANTS' AMENDED CONTENTIONS OF FACT AND LAW/TRIAL BRIEF

JULANDER BROWN
— & BOLLARD —

- Evidence of ARF's formation as the "Aurora Rescue Fund."
- Evidence of ARF and Olivia Ho Cheng's efforts to rescue the company by successfully raising money from new investors to sustain AIT's operations.
- Evidence of Cheng's conversations with Castel inviting it to join the rescue effort in 2015.
- Evidence of ARF's buy-out of AIT's largest secured creditors, Pharos Capital Partners II, L.P., Pharos Capital Partners II-A, L.P., to prevent foreclosure on all of the company's assets in 2015.
- Evidence of the terms of the agreements between ARF, Pharos and AIT.
- Evidence of ARF's status as a minority shareholder of AIT.
- Evidence of ARF's loans to AIT in an effort to keep the company operational.
- Evidence of AIT's continued insolvent financial condition through 2016.
- Evidence of Cheng's efforts to again raise new funds to purchase some of AIT's assets and partially repay AIT's creditors.
- Evidence of the valuation of AIT's assets.
- Evidence of the asset purchase transaction and Wilson's disclosures to shareholders, including Castel, regarding same.
- Evidence of Wilson's discussions with, and information provided to, Castel's counsel regarding the proposed asset purchase transaction.
- Evidence of Wilson's invitation to Castel to examine all of AIT's books and records.
- Evidence of the approval of the asset purchase transaction by a majority of AIT's shareholders.

- Evidence of the terms of the asset purchase transaction, immaterial changes that were necessarily made, and the reasons for those modifications.
- Evidence of the settlements with AIT's creditors.
- Evidence of Castel's refusal to settle and accept its offer.
- Evidence of the payments made from the purchase proceeds and forgiveness of senior, secured debt held by ARF.
- Evidence that no shareholder received any value for their equity in AIT.
- Evidence of Castel's election to proceed in filing an action against AIT on its Note and eventually obtaining a judgment against AIT.
- Evidence of ARF's intent.

          (d)     **Summary of Affirmative Defenses to Claim 2:**

Castel knew that AIT was insolvent in 2015 and that Cheng was attempting to "rescue" the company. Notwithstanding, Castel elected not to participate or even respond to Cheng's plea for help.

Castel again knew that AIT was insolvent in 2016 when it was provided with the financial statements for the company. Wilson discussed the financial condition with Castel's counsel, and Wilson offered to make all the company's books and records available for inspection by Castel. Castel ignored Wilson's invitation to educate itself regarding the company's finances and the proposed purchase transaction. Had Castel accepted the offer, it would have been able to learn all of the facts that were allegedly concealed and avoided any damages through the reasonable expenditure of time and effort.

          (e)     **Elements of Affirmative Defenses to Claim 2:**

Castel cannot be compensated for damages which he could have avoided by reasonable effort or expenditures. Thus, Castel's recovery, if any be found, should be reduced by the amount of damages that it could have avoided with reasonable

1  efforts or expenditures.

2     (Judicial Council of California Civil Jury Instruction 3931.)

3        (f)    **Key Evidence for Affirmative Defenses to Claim 2:**

4     ARF incorporates by reference each of the categories of key evidence set out

5  in paragraph 2(c), above.

6        (g)    **Anticipated Evidentiary Issues for Claim 2:**

7     None that are presently anticipated.

8        (h)    **Issues of Law Regarding Claim 2:**

9     Because ARF owed no duty to disclose facts to Castel, the fraud claim against

10  ARF is legally defective. Moreover, the facts Castel alleges ARF failed to disclose

11  or concealed were actually disclosed to Castel, were untrue or were immaterial and

12  therefore not actionable.[4]

13     **ARF Owed No Duty to Disclose Facts to Castel**

14     Castel alleges that ARF was in a fiduciary relationship with Castel because of

15  ARF's status as a majority shareholder of AIT series C and series D stock. (FPCO,

16  p. 12.) A preferred shareholder who is not a majority shareholder owes no fiduciary

17  duties to other shareholders. (See *Jones v. H.F. Ahmanson & Co.,* 1 Cal.3d 93, 108

18  (1969) [majority shareholders owe fiduciary duties to minority shareholders]; *Efron*

19  *v. Kalmanovitz,* 226 Cal.App.2d 546, 556 (1964) [same].)

20     After purchasing Pharos's debt and equity, ARF was not a majority

21  shareholder. It simply had a majority of the Series C and D stock, amounting to less

22  than 5% of AIT's total stock. As revealed by the Stock and Note Purchase

23  Agreements, Pharos only ever owned a majority of the Series C and D preferred

24  shares among the millions of common shares and Series A and B preferred shares

25  issued. (Trial Exs. 1 & 3.) As such, ARF was never a majority AIT shareholder and

26  did not have fiduciary duties to Castel or any other shareholders of AIT under either

27  ────────────────

28  [4]   To avoid duplication, ARF incorporates by reference each of the Issues of Law set out in
Section II(A)(1)(h), above, which are equally applicable to Claim No. 2.

JULANDER BROWN
— & BOLLARD —

California or Delaware law. (See *LiMandri v. Judkins,* 52 Cal.App.4th 326, 337 (1997); *Ivanhoe Partners v. Newmont Min. Corp.,* 535 A.2d 1334, 1344 (1987).)

Castel also argues that ARF's duty to disclose arose out of the 2006 Stockholder's Agreement between Castel, Pharos and AIT. (The "Series C Stockholder Agreement;" Trial Ex. 2.) In June 2006, Pharos and Castel entered into a Series C Stockholder Agreement, the express purpose of which was to protect Castel as a minority holder of the Series C preferred stock from specified actions by Pharos, the majority owner of the Series C preferred stock. Among those protections was a requirement that "Pharos shall make reasonable efforts to consult with [Castel] before approving" matters that require "the approval of the holders of the Series C Stock as a separate class…." (Id. at §4.)

The Series C Stockholder Agreement also had a provision for successors that applied the terms of the agreement to the transferees of the shares once they "executed a written agreement, substantially in the form of this Agreement, pursuant to which such person becomes a party to this Agreement and agrees to be bound by all the provisions hereof as if such person were a party hereunder." (Id. at §6.) After ARF purchased the Pharos equity, it was never required to, and therefore never did, enter into a written agreement "substantially in the form of [the Stockholder] Agreement, pursuant to which" it became "a party to [the Stockholder] Agreement and agree[d] to be bound by all the provisions [t]hereof as if [it] were a party [t]hereunder." As such, ARF was never bound to the terms of the Stockholders Agreement and has no duties to Castel arising from that agreement.[5]

Further, Castel has argued that ARF was bound to the terms of the Series C Stockholder Agreement by reason of it entering into the Novation Agreement. Indeed, in connection with the Stock and Note Purchase Agreement, on November

---

[5]     Although Pharos agreed in its Stock and Note Purchase Agreement with ARF (Trial Ex. 11) that it would deliver to ARF the Series C Stockholder Agreement, ARF did not agree in that contract to assume the obligations of that agreement.

5, 2015, ARF and Pharos did enter into the Novation Agreement whereby ARF assumed all of Pharos's obligations under the Amended Note Purchase Agreement. (Trial Exs. 12 & 90.) However, the Novation Agreement has nothing whatever to do with the Series C Stockholder Agreement and Pharos's obligation to consult with Castel. The only purpose of the Novation Agreement was to transfer Pharos's obligations under the Amended Note Purchase Agreement to ARF. Nothing in the integrated Novation Agreement refers to the Series C Stockholder Agreement or constitutes an assumption by ARF of the obligations of that agreement. (Trial Ex. 12.)

ARF therefore has no contractual or legal duties to Castel. As such, ARF has no duty to disclose arising out of the Series C Stockholder Agreement and cannot be held liable for fraud based on non-disclosure.

**The Facts Allegedly Concealed Were Not Material**

Even if ARF owed Castel a duty to disclose material facts, which it did not, that duty could have only arisen after November 25, 2015 when ARF purchased Pharos's secured debt to prevent Pharos from foreclosing on AIT's assets. Up to that date, the duty to disclose facts to Castel (if any existed) rested with Pharos. Castel alleges that ARF failed to disclose its purchase of Pharos's interest. (FPCO, p. 10.) But, because ARF had no duty to disclose anything to Castel until after that transaction closed, it cannot form the basis of a concealment claim against ARF.

Castel also argues that, with respect to the asset purchase transaction a year later, ARF failed to disclose: (1) the identity of the buyer; and (2) that the draft APA differed from the agreement that actually closed. But, as discussed above in connection with Claim 1, none of these facts impacted the intrinsic merits of the transaction and were therefore immaterial. (*Hill,* 158 Cal.App.2d at 824; see discussion *supra*, at §II(A)(1)(h).)

**Castel Did Not Suffer Damages Caused by ARF's Alleged Concealment**

Even if the foregoing facts could somehow be deemed "material," ARF's failure to expressly disclose the facts to Castel did not cause damage to Castel. As discussed above, AIT was insolvent and had one avenue to salvage some value for its aggrieved creditors. The only other alternative was to file bankruptcy which would have resulted in all of the company's assets going to satisfy ARF's senior secured debt, leaving nothing for unsecured creditors such as Castel. (See discussion *supra*, at §II(A)(1)(h).)

No amount of disclosure would have resulted in Castel recovering anything for its equity interest in AIT – no shareholder did. The value of Castel's equity prior to the transaction was zero and the value after the transaction was still zero. (Corp. Code, §2004; Del. Code Ann. tit. 8, §281 [the value of shares in an insolvent corporation is nothing because all debts must be paid first].)

Castel's options were to either recover 40% of its outstanding debt by accepting the settlement offer or to reject the offer and sue AIT for the entire outstanding amount of its Note. It chose the latter and has never proffered any evidence or testimony to suggest that it would have done the former had it known the allegedly-concealed facts. Speculation as to what Castel could have done is not evidence of reliance which requires that Castel prove that, "had the omitted information been disclosed [it] would have been aware of it and behaved differently." (*Mirkin, supra,* 5 Cal.4th at 1093.) The best evidence of what Castel would have done is what it actually did for a year after receiving notice that AIT was insolvent and headed to liquidation—it did nothing. Accordingly, Castel's concealment claim against ARF fails.

3. **Claim 3: Breach of Fiduciary Duty as to Wilson**

(a) **Summary of Claim 3:**

Wilson is entitled to judgment on this claim because under Delaware law, Wilson owed Castel no fiduciary duties as a creditor and breached no fiduciary

34

JULANDER BROWN
— & BOLLARD —

1  duties owed to Castel as a shareholder.

2  Under Delaware law, where the company is insolvent, a corporate director

3  does not breach his duty to shareholders by agreeing to a transaction in which the

4  shareholders receive nothing for their equity because the stock had no economic

5  value before the transaction.

6  There is no dispute that AIT was insolvent in 2015 and 2016. Wilson did not

7  cause the insolvency; he was merely appointed to wind up the company after it

8  became insolvent. Wilson maximized the corporate assets that might otherwise be

9  used to pay creditors' claims by obtaining an offer on the high side of the appraised

10  value and closing a sale that satisfied the senior secured debt and provided $3.3

11  million in cash to pay unsecured creditors. The decisions made by Wilson with

12  respect to the transactions at issue are therefore protected under Delaware's

13  Business Judgment Rule.

14  Regardless, because Castel's shares were worth nothing both before and after

15  the asset purchase transaction, Castel was not damaged by any conduct of Wilson.

16  (b)  **Elements of Claim 3:**

17  Under Delaware law, a claim for breach of fiduciary duty requires Castel to

18  prove two elements:

19  (1) that a fiduciary duty existed, and

20  (2) that the defendant breached that duty.

21  (*Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010).)

22  Under Delaware law, creditors cannot bring direct claims for breaches of

23  fiduciary duties against directors of corporations that are insolvent.

24  (*NACEPF, supra,* 930 A.2d at 103; *Berg & Berg Enterprises, LLC, supra,*

25  178 Cal.App.4th at 1038.)

26  (c)  **Key Evidence in Opposition to Claim 3:**

27  • Evidence of the terms of AIT's Articles of Incorporation.

28  • Evidence of AIT's insolvency and impending bankruptcy in 2015.

JULANDER BROWN
— & BOLLARD —

- Evidence of the resignation of AIT's Board of Directors and their appointment of Wilson to shepherd AIT through bankruptcy or liquidation.

- Evidence of Wilson's efforts to obtain some value for the company's assets to partially satisfy the company's creditors.

- Evidence of Wilson's 2015 disclosures regarding AIT's insolvent financial condition and potential bankruptcy petition to AIT's shareholders, including Castel, and Castel's failure to act on this information to protect its investment and loan.

- Evidence of Cheng's conversations with Castel inviting it to join the rescue effort in 2015, and Castel's failure to act on this information to protect its investment and loan.

- Evidence of ARF and Olivia Ho Cheng's efforts to rescue the company by successfully raising money from new investors to sustain AIT's operations.

- Evidence of ARF's loan to AIT in an effort to keep the company operational.

- Evidence of ARF's buy-out of AIT's largest secured creditors, Pharos Capital Partners II, L.P., Pharos Capital Partners II-A, L.P., to prevent foreclosure on all of the company's assets in 2015.

- Evidence of AIT's continued insolvent financial condition through 2016.

- Evidence of Cheng's efforts to again raise new funds to purchase some of AIT's assets and partially repay AIT's creditors.

- Evidence of the valuation of AIT's assets.

- Evidence of the asset purchase transaction and Wilson's disclosures to shareholders, including Castel, regarding same.

- Evidence of Wilson's discussions with, and information provided to,

Castel's counsel regarding the proposed asset purchase transaction.

- Evidence of Wilson's invitation to Castel to examine all of AIT's books and records.

- Evidence of the approval of the asset purchase transaction by a majority of AIT's shareholders.

- Evidence of the terms of the asset purchase transaction, immaterial changes that were necessarily made, and the reasons for those modifications.

- Evidence of the settlements with AIT's creditors.

- Evidence of Castel's refusal to settle and accept its offer of partial payment on its note.

- Evidence of the payments made from the purchase proceeds and forgiveness of senior, secured debt held by ARF.

- Evidence that no shareholder received any value for their equity in AIT.

- Evidence of Castel's election to proceed in filing an action against AIT on its Note and eventually obtaining a judgment against AIT.

- Evidence of Wilson's intent and good faith belief that his actions were in the best interest of AIT and its shareholders.

- Evidence that Wilson had no personal interest in the subject matter of the transaction;

- Evidence that Wilson performed due diligence concerning the transaction.

(d)    **Summary of Affirmative Defenses to Claim 3:**

Delaware law permits corporations to limit the liability of directors and officers for breach of fiduciary duty in their Articles of Incorporation. AIT's articles contain such a limitation.

Under Delaware law, Castel cannot maintain a direct claim for breach of fiduciary duty against Wilson since AIT was insolvent. Also under Delaware law, where a company is insolvent, a corporate director does not breach his duty to shareholders by agreeing to a transaction in which the shareholders receive nothing for their equity because the stock had no economic value before the transaction.

But even if Castel could maintain such a claim, Wilson's decision to approve the asset purchase transaction is protected by Delaware's Business Judgment Rule. Thus, neither the Court nor Castel should substitute its judgment for Wilson, who acted rationally and in the best interest of the company and its creditors.

Even if Castel could overcome the Business Judgment Rule, Wilson is not liable for breach of fiduciary duty because the transaction was entirely fair and because Castel cannot prove proximately caused damages.

(e)   <strong>Elements of Affirmative Defenses to Claim 3:</strong>

Delaware corporations are free to shield their officers and directors from liability for breach of the duty of care in their Certificates of Incorporation. To establish this affirmative defense, Wilson must prove that AIT's Certificate of Incorporation contains the limitation of liability.

(Delaware General Corporation Law, §102(b)(7).)

Under Delaware law, a director is presumed to have acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company. This presumption is called the business judgment rule (the "Business Judgment Rule"). To overcome the Business Judgment Rule, Castel has the burden to prove that Wilson:

(1) had a personal interest in the subject matter of the transaction;

(2) was grossly negligent in failing to inform himself regarding the transaction; or

(3) did not act in good faith in approving the transaction.

(*Aronson v. Lewis,* 473 A.2d 805, 812 (1984); Citron v. Fairchild Camera &

1   Instrument Corp., 569 A.2d 53, 64 (Del. 1988); *eBay Domestic Holdings, Inc. v.*
2   *Newmark,* 16 A.3d 1, 36 (Del. Ch. 2010); *Central Laborers' Pension Fund v.*
3   *McAfee, Inc.,* 17 Cal.App.5th 292, 317-318 (2017).)

4        If Castel can overcome the Business Judgment Rule, then Wilson must
5   establish that the transaction was "entirely fair," being the product of both (1) fair
6   dealing and (2) fair price, with price being the paramount consideration. (*eBay*
7   *Domestic Holdings, Inc., supra,* 16 A.3d at 36, 42.)

8             (f)    **Key Evidence for Affirmative Defenses to Claim 3**:
9        Wilson incorporates by reference each of the categories of key evidence set
10  out in paragraph 3(c), above.

11            (g)    **Anticipated Evidentiary Issues for Claim 3:**
12       None that are presently anticipated.

13            (h)    **Issues of Law Regarding Claim 3:**

14       **AIT had the Right to and did Shield Wilson from Liability**

15       Delaware corporations are free to shield their directors from liability for
16  breach of the duty of care in their Certificates of Incorporation.  (Del. Code Ann. tit.
17  8, §102(b)(7).) In its Certificate of Incorporation, AIT expressly "eliminate[d] the
18  personal liability of each member of its Board of Directors to the Corporation or its
19  stockholders for monetary damages for breach of fiduciary duty as a director …."
20  (Trial Ex. 62, p. 16, Art. VIII.) Castel has argued that the limitation on liability is
21  inapplicable because it only applies to "outside directors." But the plain language of
22  the statute does not state that protections that a corporation can choose to provide
23  are limited to "outside directors." To the contrary, the last sentence of the subsection
24  makes clear that it applies not only to directors but also to any person who has the
25  power to perform any of the powers or duties conferred or imposed upon the board
26  of directors.

27

28

JULANDER BROWN
— & BOLLARD —

**As a Creditor, Castel has no Claim for Breach of Fiduciary Duty**

Under Delaware law, creditors have no standing to bring direct claims for breaches of fiduciary duty against directors of corporations that are insolvent. (*NACEPF, supra,* 930 A.2d at 103; *Berg & Berg Enterprises, LLC*, *supra,* 178 Cal.App.4th at 1038.) Lack of standing is not an affirmative defense; it is a jurisdictional requirement. (See *Perez, supra,* 2012 WL 1029425, at *11.) There is no dispute in this action that AIT was insolvent in 2015 and 2016 at the time of the events that are the subject of this action. Accordingly, Castel's claim for breach of fiduciary duty for the loss of its loan, or from not participating in the APA settlement, fails. Castel argues that this authority is inapplicable because it is bringing its claim in its capacity as a shareholder. However, any claim for the loss of its loan, rather than its equity, is brought in Castel's capacity as a creditor. Thus, even if Castel could somehow prove that there was a breach of a fiduciary duty, the breach would not allow Castel to recover the $250,000 that Castel loaned to AIT.

**As a Shareholder, Castel has no Claim for Breach of Fiduciary Duty**

Under Delaware law, where the company is insolvent, a corporate director does not breach his duty to shareholders by agreeing to a transaction in which the shareholders receive nothing for their equity because the stock had no economic value before the transaction. (*In re Trados Inc. Shareholder Litigation,* 73 A.3d 17, 72-80 (Del. Ch. 2013).) There is no dispute in this action that AIT was insolvent in 2015 and 2016 at the time of the events that are the subject of this action. No shareholder received any consideration for their equity interest. Accordingly, Castel's claim for breach of fiduciary duty for the loss of its equity interest in AIT fails.

**The Business Judgment Rule Prevents Castel's Fiduciary Duty Claim**

The decisions made by Wilson with respect to the transactions at issue are protected under Delaware's Business Judgment Rule, which operates as both a procedural guide for litigants and a substantive rule of law. As a substantive rule of

JULANDER BROWN & BOLLARD

1    law, it creates a "presumption that in making a business decision, the directors of a

2    corporation acted on an informed basis, in good faith and in the honest belief that

3    the action taken was in the best interest of the company. [Citations.] Absent an

4    abuse of discretion, that judgment will be respected by the courts. The burden is on

5    the party challenging the decision to establish facts rebutting the presumption.

6    [Citation.]" (*Aronson, supra,* 473 A.2d at 812; overruled on other grounds in *Brehm*

7    *v. Eisner*, 746 A.2d 244, 253 (Del. 2000).)

8         In contrast to California law, under Delaware law directors lose Business

9    Judgment Rule protection only if grossly negligent in failing to inform themselves.

10   (See *Central Laborers' Pension Fund, supra,* 17 Cal.App.5th at 317-318 (applying

11   Delaware law).) Ignoring applicable Delaware law, Castel disputes that the standard

12   is gross negligence. However, under Delaware law, a director must be ***grossly***

13   ***negligent*** before liability attaches – mere negligence is not sufficient. (*Central*

14   *Laborers' Pension Fund, supra,* 17 Cal.App.5th at 317-318 (applying Del. law);

15   *Smith v. Van Gorkom,* 488 A2d 858, 873 (Del. 1985); and *Moran v. Household Int'l,*

16   *Inc.,* 500 A2d 1346, 1356 (Del. 1985) (overruled on other grounds by *Gantler v.*

17   *Stephens,* 965 A2d 695, 713, fn. 54 (Del. 2009).)

18        As noted above, the burden of proof is not Castel to overcome the Business

19   Judgment Rule by showing, through admissible evidence, that Wilson was grossly

20   negligent in approving the APA transaction. Castel can only meet that burden by

21   establishing the standard of care for Wilson as a director and by showing that

22   Wilson's conduct violated that standard of care. Here, Castel has not identified any

23   witnesses who can establish that standard and specifically has elected not engage an

24   expert witness to offer testimony on the standard of care for a director. Without such

25   evidence, Castel has no way to satisfy its burden of proof and its claim for breach of

26   fiduciary duty against Wilson fails.

27        Moreover, there is no factual evidence that Wilson was grossly negligent in

28   informing himself of the available facts related to the transaction. The evidence will

1  show that: AIT was insolvent, creditor lawsuits were piling up, attempts to find a

2  buyer for the assets failed, the unsecured creditors were likely to receive nothing in

3  bankruptcy, and the asset purchase was the only offer received that would return

4  anything to the company's unsecured creditors. Wilson performed extensive due

5  diligence concerning the transaction, including detailed research and analysis of

6  AIT's liabilities, the value of its assets, the seniority and default status of the Pharos

7  Notes, the availability of other buyers for the company's technology, the likelihood

8  that creditors would receive nothing in bankruptcy after the senior secured creditor

9  (ARF) and trustee's fees were paid, and the buyer's ability to complete the purchase.

10  Wilson made the decision to recommend approval of the sale to the shareholders

11  based on his extensive due diligence. Because the decision to approve the asset

12  purchase was "rational in the sense of being one logical approach to advancing the

13  corporation's objectives," there was no breach of fiduciary duty in connection with

14  that transaction. (*In re Dollar Thrifty S'holder Litig.,* 14 A.3d 573, 598 (Del. Ch.

15  2010).)

16      Similarly, there is no evidence that Wilson engaged in self-dealing with

17  respect to the transaction. As referenced above, neither he nor his family members

18  received anything for their equity interest in AIT, Wilson never received any equity

19  interest in ARF or AHC, and his stipend was not dependent on a successful

20  transaction. Wilson thus did not engage in self-dealing and he cannot be liable for

21  breach of any alleged fiduciary duty. (See discussion *supra,* at §II(A)(1)(h).)

22      At the end of the day, Wilson maximized the corporate assets that might

23  otherwise be used to pay creditors' claims by obtaining an offer on the high side of

24  the appraised value and closing the sale that satisfied the senior secured debt and

25  provided $3.3 million in cash to pay unsecured creditors. Yet, no good deed goes

26  unpunished.

27      AIT's failure to return any money to Castel for its equity investment on the

28  sale of the assets to AHC cannot result in any liability for Wilson who directed the

JULANDER BROWN
— & BOLLARD —

1   payment of the proceeds to the creditors of the company, for whom the assets were

2   held in trust under Delaware law.  Accordingly, neither the Court nor Castel should

3   substitute its judgment for Wilson, who acted rationally and in the best interest of

4   the company and its creditors.

5         Castel has argued that the Business Judgment Rule is inapplicable here

6   because it only applies to directors, and Wilson was an officer and director during

7   the alleged transactions. But the decision to approve the transaction was made by

8   Wilson in his capacity as a director, not an officer. Regardless, under Delaware law,

9   the Business Judgment Rule protects both corporate officers and directors. (*Cede &*

10  *Co. v. Technicolor, Inc*., 634 A.2d 345, 361 (Del. 1993), decision modified on

11  reargument, 636 A.2d 956 (Del. 1994) ["[T]he business judgment rule attaches to

12  protect corporate officers and directors and the decisions they make…"]; *Freibott v.*

13  *Miller*, No. CIV.A. S08C11025RFS, 2009 WL 1526912, at *2 (Del. Super. Ct. June

14  2, 2009) [holding that the Business Judgment Rule applied to an officer because "the

15  business judgment rule applies to officers, as well as directors…"]; *Fed. Deposit*

16  *Ins. Corp. v. Dellen*, No. CV 10-4915 DSF (SHX), 2011 WL 13128983, at *2 (C.D.

17  Cal. Sept. 27, 2011) [noting that under California law, it is unclear whether the

18  Business Judgment Rule applies, but that under Delaware law, the Business

19  Judgment Rule applies to officers.]; see also *In re Tower Air, Inc*., 416 F.3d 229,

20  238 (3d Cir. 2005) [assuming without discussion that the Business Judgment Rule

21  applies to both officers as well as directors.].)

22        **The APA Transaction was Entirely Fair and Castel was not Damaged**

23        If Castel can overcome the Business Judgment Rule, and it cannot, then

24  Wilson must establish that the transaction was "entirely fair," being the product of

25  both (1) fair dealing and (2) fair price, with price being the paramount consideration.

26  (*eBay Domestic Holdings, Inc., supra,* 16 A.3d at 36, 42.) Castel argues that

27  Enhanced Scrutiny is not a test that is to be applied if the Business Judgment Rule is

28  rebutted, but instead as an alternative standard to be used at the outset in place of

JULANDER BROWN
— & BOLLARD —

1   and before any analysis under the Business Judgment Rule and entire fairness

2   standards. Castel's authorities do not support such a position.

3       As a shareholder, Castel did not suffer damages based on any breach of

4   fiduciary duty by Wilson because Castel's shares had no value prior to the asset

5   purchase transaction, and that remained unchanged after the asset purchase. (*In re*

6   *Trados, supra,* 73 A.3d at 72-80.) Castel disputes *In re Trados* holding, claiming

7   that value before/after the transaction was merely a factor for consideration.

8       However, the Delaware Supreme Court has characterized the proper "test of

9   fairness" as whether "the minority stockholder shall receive the substantial

10  equivalent in value of what he had before." (*Sterling v. Mayflower Hotel Corp.*, 93

11  A.2d 107, 114 (Del.1952); *accord Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 940

12  (Del.1985).) If the common stock has no economic value, a corporate director

13  cannot breach his fiduciary duty by agreeing to a transaction in which the

14  shareholder receive nothing for their equity. (*In re Trados, supra,* 73 A.3d at 76.)

15  Thus, if the value of the stock before the transaction was nothing, the stockholder

16  was not harmed if it received nothing as part of the transaction. (Id.)

17      Regardless, an independent appraiser was engaged who valued the assets to

18  be purchased at between $6,181,000 and $9,652,000. (Trial Ex. 7.) The purchase

19  price was within the appraised value range. Castel has no expert witnesses to dispute

20  that valuation and cannot provide any evidence that the price was somehow unfair.

21          4.    **Claim 4: Breach of Contract as to ARF**

22          (a)    **Summary of Claim 4:**

23      Castel alleges that ARF breached the Series C Stockholder Agreement by

24  failing to notify and consult with it regarding the Pharos note transaction and Asset

25  Purchase Agreement. However, as discussed in detail above, ARF is not a party to

26  the Series C Stockholder agreement and never assumed the obligations of that

27  agreement. (See discussion *supra*, §II(A)(2)(h).)

28

JULANDER BROWN
— & BOLLARD —

1    But even if ARF had tacitly assumed the obligations, the assumption could

2  have only occurred after the Pharos note transaction and ARF had no duty to consult

3  prior to the transaction. With respect to the asset purchase transaction, Castel did not

4  suffer any damages caused by ARF's failure to notify or consult. Castel lost its

5  investment in AIT because AIT was insolvent, and Castel lost its debt position

6  because it chose not to participate in the proceeds of the only offer that the company

7  received to purchase its assets. No amount of notification or consultation would

8  have changed that result.

9              (b)    **Elements of Claim 4:**

10    Under Delaware law, a claim for breach of contract requires Castel to prove

11  of all of the following:

12    (1) a contractual obligation;

13    (2) a breach of that obligation by the defendant; and

14    (3) resulting damage.

15    (DEL. P.J.I. CIV. § 19.20 (2000), Breach of Contract Defined.)

16              (c)    **Key Evidence in Opposition to Claim 4:**

17    •   Evidence of ARF's buy-out of AIT's largest secured creditors, Pharos

18        Capital Partners II, L.P., Pharos Capital Partners II-A, L.P., to prevent

19        foreclosure on all of the company's assets in 2015.

20    •   Evidence of the terms of the agreements between ARF, Pharos and

21        AIT.

22    •   Evidence of AIT's continued insolvent financial condition through

23        2016.

24    •   Evidence of Cheng's efforts to again raise new funds to purchase some

25        of AIT's assets and partially repay AIT's creditors.

26    •   Evidence of the valuation of AIT's assets.

27    •   Evidence of the asset purchase transaction and Wilson's disclosures to

28        shareholders, including Castel, regarding same.

JULANDER BROWN
— & BOLLARD —

- Evidence of Wilson's discussions with, and information provided to, Castel's counsel regarding the proposed asset purchase transaction.
- Evidence of Wilson's invitation to Castel to examine all of AIT's books and records.
- Evidence of the approval of the asset purchase transaction by a majority of AIT's shareholders.
- Evidence of the terms of the asset purchase transaction.
- Evidence of the settlements with AIT's creditors.
- Evidence of Castel's refusal to settle and accept its offer of partial payment on its note.
- Evidence of the payments made from the purchase proceeds and forgiveness of senior, secured debt held by ARF.
- Evidence of Castel's election to proceed in filing an action against AIT on its Note and eventually obtaining a judgment against AIT.

(d)     **Summary of Affirmative Defenses to Claim 4:**

Castel knew that AIT was insolvent in 2016 when it was provided with the financial statements for the company. Wilson discussed the financial condition with Castel's counsel, and Wilson offered to make all the company's books and records available for inspection by Castel. Castel ignored Wilson's invitation to educate itself regarding the company's finances and the proposed purchase transaction. Had Castel accepted the offer, it would have been able to learn all of the facts necessary to make its decision to accept or reject AIT's settlement offer and thereby avoid any damages through the reasonable expenditure of time and effort.

(e)     **Elements of Affirmative Defenses to Claim 4:**

Under Delaware law, the measure of damages for one who is harmed by a breach of contract is tempered by a rule requiring that the injured party make a reasonable effort, whether successful or not, to minimize the losses suffered. To mitigate a loss means to take steps to reduce the loss. If an injured party fails to

1   make a reasonable effort to mitigate its losses, its damage award must be reduced by

2   the amount a reasonable effort would have produced under the same circumstances.

3   (DEL. P.J.I. CIV. § 22.26 (2000), Duty to Mitigate Damages in Contract.)

4         (f)  **Key Evidence for Affirmative Defenses to Claim 4:**

5     ARF incorporates by reference each of the categories of key evidence set out

6   in paragraph 4(c), above.

7         (g)  **Anticipated Evidentiary Issues for Claim 4:**

8     None that are presently anticipated.

9         (h)  **Issues of Law Regarding Claim 4:**

10     Castel claims that ARF is bound by the Series C Stockholder agreement based

11   on the Novation Agreement executed in connection with the purchase of Pharos's

12   interest. As discussed in detail above, the terms of the Novation Agreement do not

13   support Castel's position. (See discussion *supra* at §II(A)(2)(h).) Nothing in the

14   integrated Novation Agreement refers to the Series C Stockholder Agreements or

15   constitutes an assumption by ARF of the obligations of those agreements.

16     Even if ARF had a contractual obligation under the Series C Shareholder

17   Agreement to notify and consult with Castel prior to approving the asset purchase,

18   Castel did not suffer any damages caused by ARF's failure to notify or consult. As

19   with each of Castel's other claims, Castel lost its investment in AIT because AIT

20   was insolvent, and Castel lost its debt position because it chose not to participate in

21   the proceeds of the only offer that the company received to purchase its assets.

22     Even if ARF had consulted with Castel before voting and Castel was adamant

23   that the sale should be voted down, the sale still would have occurred because the

24   majority of all AIT shareholders voted in favor of the asset purchase. Even if a

25   consultation occurred and Castel was adamant that ARF not vote on the transaction,

26   ARF would still have done so – and voted in favor – because it had every right to

27   vote its shares, even if in its own interest. (*In re Trados, supra,* 73 A.3d at 65;

28   *Bershad v. Curtiss–Wright Corp.,* 535 A.2d 840, 845 (Del.1987).) Thus, Castel

JULANDER BROWN
— & BOLLARD —

1  could not have stopped the sale even if a consultation had occurred and the lack of

2  consultation could not have caused Castel harm.

3  **III.    L.R. 16-4.3: BIFURCATION OF ISSUES**

4       Defendants do not request bifurcation of any issues.

5  **IV.    L.R. 16-4.4: JURY TRIAL**

6       The parties agreed to waive trial by jury. (Dkt. 191.)

7  **V.    L.R. 16-4.5: ATTORNEYS' FEES**

8       Defendants are not aware of any statutory or contractual basis for an award of

9  attorneys' fees, but reserve all rights should a basis exist.

10  **VI.    L.R. 16-4.6: ABANDONMENT OF ISSUES**

11       Defendants have not abandoned any pleaded defenses related to the claims

12  alleged against Wilson and ARF. ARF jointly filed its Answer with Olivia Cheng,

13  who has been granted judgment on each of Castel's claims against her. The

14  affirmative defense of Statute of Limitations applied only to the claims against

15  Cheng and will not be pursued by ARF at trial.

16

17  DATED:  April 19, 2023                JULANDER, BROWN & BOLLARD

18

19                                By:    /s/ Dirk O. Julander

20                                      Dirk O. Julander
                                        Attorneys for Defendants CHRISTOPHER
21                                      A. WILSON and ARF PARTNERS, LLC

22

23

24

25

26

27

28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**JULANDER BROWN**
**—— & BOLLARD ——**

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of April, 2023, I electronically filed the foregoing paper(s) with the Clerk of the Court using the ECF system which will send notification to all parties of record or persons requiring notice.

*/s/ Dirk O. Julander*
Dirk O. Julander

49