Olivia Ho Cheng - May 27, 2021

1            UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3      _____
                                    )
4      CASTEL, S.A., a Luxembourg   )
       joint stock company          )
5      (Societe Anonyme),           )
                                    )
6             Plaintiff,            )
                                    )
7          vs.                      )
                                    )   Case No.:
8      CHRISTOPHER A. WILSON, an    )   2:19-cv-09336-ODW-PVC
       individual; OLIVIA HO CHENG, )
9      an individual; ARF PARTNERS, )
       LLC, a Massachusetts limited )
10     liability company; STEVEN J. )
       JAMES, an individual;        )
11     MICHAEL DEVLIN, an           )
       individual,                  )
12                                  )
              Defendants.           )
13     _____)

14

15

16

17          DEPOSITION OF OLIVIA HO CHENG

18              IRVINE, CALIFORNIA

19            THURSDAY, MAY 27, 2021

20

21

22

23

24

25     DORIEN SAITO, CSR 12568, CLR

Olivia Ho Cheng – May 27, 2021

Page 2

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | CENTRAL DISTRICT OF CALIFORNIA |

```
 3   _____
                                )
 4   CASTEL, S.A., a Luxembourg  )
     joint stock company         )
 5   (Societe Anonyme),          )
                                )
 6           Plaintiff,          )
                                )
 7       vs.                     )
                                )   Case No.:
 8   CHRISTOPHER A. WILSON, an   )   2:19-cv-09336-ODW-PVC
     individual; OLIVIA HO CHENG,)
 9   an individual; ARF PARTNERS,)
     LLC, a Massachusetts limited)
10   liability company; STEVEN J.)
     JAMES, an individual;       )
11   MICHAEL DEVLIN, an          )
     individual,                 )
12                               )
             Defendants.         )
13   _____)

14

15

16          DEPOSITION OF OLIVIA HO CHENG,

17          taken on behalf of PLAINTIFF, at

18          19800 MacArthur Boulevard, Suite

19          300, Irvine, California 92612,

20          commencing at 9:36 a.m., Thursday,

21          May 27, 2021, before DORIEN SAITO,

22          CSR 12568, CLR.

23

24

25
```

Olivia Ho Cheng - May 27, 2021

```
1          A P P E A R A N C E S :

2

3              FOR PLAINTIFF:

4                  VALLA & ASSOCIATES, INC., P.C.
                   By:  ANTONIO VALLA, Attorney at Law
5                  By:  LISA SCHACHNE, Attorney at Law
                   333 Bush Street
6                  Suite 2020
                   San Francisco, California  94104
7                  (415) 856-9001
                   antonio.valla@vallalaw.com
8                  lisa.parrish@vallalaw.com

9              FOR DEFENDANT OLIVIA HO CHENG, ARF PARTNERS,
               LLC, AND CHRISTOPHER A. WILSON:
10
                   JULANDER BROWN & BOLLARD
11                 By:  CATHERINE A. CLOSE, Attorney at Law
                   9110 Irvine Center Drive
12                 Irvine, California  92618
                   (949) 477-2100
13                 cac@jbblaw.com

14             FOR DEFENDANT STEVEN J. JAMES AND AURORA
               HEALTHCARE U.S., CORP:
15
                   HOGE FENTON JONES & APPEL
16                 By:  ALISON P. BUCHANAN, Attorney at Law
                       (Present via Zoom)
17                 By:  LAURA RIPARBELLI, Attorney at Law
                       (Present via Zoom)
18                 55 South Market Street
                   Suite 900
19                 San Jose, California  95113-2348
                   (408) 287-9501
20                 alison.buchanan@hogefenton.com

21             ALSO PRESENT:

22                 CHRISTOPHER WILSON

23

24

25
```

Olivia Ho Cheng - May 27, 2021

Page 4

```
1                    I  N  D  E  X

2

3        W I T N E S S :

4     OLIVIA HO CHENG                                PAGE

5            EXAMINATION BY MR. VALLA                 7

6     AFTERNOON SESSION:

7            EXAMINATION BY MR. VALLA                127

8

9                    * * * * * * *

10

11        CONFIDENTIAL PORTIONS BOUND UNDER SEPARATE COVER:

12                      PAGES
                        54-58
13                     184-189

14

15                   * * * * * * *

16

17        QUESTIONS INSTRUCTED NOT TO ANSWER:

18                    PAGE:LINE
                       172:12
19

20                   * * * * * * *
21

22

23

24

25
```

Olivia Ho Cheng - May 27, 2021

1        E X H I B I T S :

2

3        NUMBER              DESCRIPTION                PAGE

4        Exhibit 1    Series C Preferred Stock          94
                      Purchase Agreement
5
         Exhibit 2    Series D Preferred Stock          99
6                     Purchase Agreement

7        Exhibit 3    Secured Promissory Note           110

8        Exhibit 4    Letter from Aurora Imaging        119
                      Technology, Inc. to Mattia
9                     dated November 4, 2011

10       Exhibit 5    Stock and Note Purchase           164
                      Agreement and Assignment of
11                    Amended and Restated Note
                      Purchase, Guaranty and
12                    Security Agreement

13       Exhibit 6    Home page of Aurora Healthcare    176
                      U. S. Corp
14
         Exhibit 7    Asset Purchase Agreement          193
15                    Bates
                      PLAINTIFF-CHENG00000015-
16                    PLAINTIFF-CHENG00000029

17       Exhibit 8    Asset Purchase Agreement          198
                      effective October 31, 2016
18                    Bates CHENG000001-CHENG000025

19       Exhibit 9    Email from Sarah W. Jones to      239
                      Marco Caneva dated December
20                    29, 2016

21

22                    * * * * * * *

23

24

25

GregoryEdwards, LLC |  Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

Olivia Ho Cheng - May 27, 2021

```
 1              IRVINE, CALIFORNIA; THURSDAY, MAY 27, 2021

 2                          9:36 A.M.

 3                           -oOo-

 4                            ***

 5              THE REPORTER:  Good morning.  Because

 6     we are all appearing remotely, I would like to

 7     remind everyone to be more conscious than ever of

 8     not speaking over each other.  When there are

 9     simultaneous speakers, I will not be able to hear

10     any of the words that are being said.

11              Pauses are very important to ensure that I

12     have time to clarify the record and to ensure all

13     objections are on the record.

14              Please also be aware that noises around

15     your microphone cause disruptions in how words come

16     through on a virtual platform.  If you are not

17     speaking, please mute yourself.

18              I will now swear in the witness.

19                            ***

20                      OLIVIA HO CHENG,

21          having been duly administered an oath

22            in accordance with CCP 2094, was

23            examined and testified as follows:

24     ///

25     ///
```

Olivia Ho Cheng - May 27, 2021

|   |   |
|---|---|
| 1 | EXAMINATION |
| 2 | BY MR. VALLA: |
| 3 | Q.   Good morning, Ms. Cheng. |
| 4 | A.   Good morning, Antonio. |
| 5 | Q.   Thanks for being here this morning.  We've |
| 6 | just met this morning.  We -- we've never -- never |
| 7 | met before.  My name is Antonio Valla.  I represent |
| 8 | the plaintiff in this action, Castel, S.A. |
| 9 | Are you familiar with Castel? |
| 10 | A.   Yes. |
| 11 | Q.   Okay.  Have you had your deposition taken |
| 12 | before, Ms. Cheng? |
| 13 | A.   Yes. |
| 14 | Q.   Okay.  I'll give you just some of the |
| 15 | ground rules, behavioral rules for it.  And if I |
| 16 | cover anything that you already know about, you |
| 17 | know, feel free to stop me. |
| 18 | You've just sworn to provide your -- your |
| 19 | best testimony under oath.  This is a very informal |
| 20 | environment.  We're on a -- on a conference room and |
| 21 | on video, but your testimony has the same force as |
| 22 | if it would have in a court of law. |
| 23 | Do you understand that? |
| 24 | A.   Yes. |
| 25 | Q.   Okay.  And what I'm looking for today is |

Timestamps (left margin):
09:36:47 (line 5)
09:37:01 (line 10)
09:37:11 (line 15)
09:37:27 (line 20)
09:37:38 (line 25)

Olivia Ho Cheng - May 27, 2021

```
          1          your -- is your best testimony.  Is there any reason
          2          today that you cannot provide your best testimony?
          3               A.   No.
          4               Q.   Okay.  Are you on any medication that would
09:37:49  5          impair your ability to testify today?
          6               A.   No.
          7               Q.   Okay.  Very well.
          8                    The way the deposition is going to proceed
          9          is I'm going to ask a series of questions; you're
09:38:03 10          going to provide me with answers.  Your counsel or
         11          other counsel may object from time to time to my
         12          questions.  I'll let them object.
         13                    If they instruct you not to answer, then
         14          you don't answer.  But otherwise, I expect you to
09:38:18 15          answer.  Sometimes they object because they want to
         16          preserve their objection for the record in case the
         17          deposition is later used at -- at trial.
         18                    Do you understand that?
         19               A.   Yes.
09:38:29 20               Q.   Okay.  You've testified that you had your
         21          deposition taken before.  How many times?
         22               A.   One time.
         23               Q.   And where was that?
         24               A.   Where?
09:38:38 25               Q.   Yes.
```

Olivia Ho Cheng - May 27, 2021

Page 9

1          A.    I don't remember exact place, but it's
2    somewhere in Southern California.
3          Q.    And how long ago that -- was that?
4          A.    I don't remember exactly, but it's over
09:39:02  5    probably 25 to 30 years, in that range.
6          Q.    Okay.  Quite -- quite a long time ago?
7          A.    Yeah.
8          Q.    What kind of action was that deposition
9    taken in?  What kind of lawsuit?
09:39:14  10          A.    So at the time, I was working for a bank
11    called Far East National Bank and a client sued the
12    bank.
13          Q.    And who called you to testify?
14          A.    I don't remember.  It is either the other
09:39:43  15    attorney or our attorney.  I don't remember.
16          Q.    Okay.  Do you -- do you remember what that
17    lawsuit was about?
18          A.    It was so long ago, I don't remember why
19    they sue.
09:40:08  20          Q.    Were you sued personally in that lawsuit,
21    or was the bank sued?
22          A.    The bank was sued.
23          Q.    Okay.  Very well.
24              Another rule to keep in mind is let me
09:40:17  25    finish my questions before you provide your answers.

Olivia Ho Cheng - May 27, 2021

1          Normally in conversation, we talk over each other a

2          little bit, but as the court reporter indicated,

3          that makes it hard for her.  So we'll just keep that

4          -- that pace going.

09:40:32   5              Is that okay?

6          A.   I'll do my best.

7          Q.   Thank you.

8              A little bit about -- about you, please.

9          What -- what is your current address?

09:40:39   10         A.   Forty-one Skyview Terrace, North Andover,

11         Massachusetts 01845.

12         Q.   And how long have you lived at that

13         address?

14         A.   Since 2014.

09:41:06   15         Q.   Did you live in Ma- --

16         A.   2004, I'm sorry.

17         Q.   2004.  So since 2004?

18         A.   Right, right, right.

19         Q.   And -- and where did you live previously?

09:41:16   20         Also in Massachusetts?

21         A.   No, Irvine.

22         Q.   In Irvine.

23              I saw your bio.  I understand you have a

24         bachelor's degree and a master's degree; is that

09:41:30   25         correct?

Olivia Ho Cheng - May 27, 2021

|  |  |  |
|---|---|---|
| 1 | A. | That is correct. |
| 2 | Q. | Okay.  And what was your bachelor's degree |
| 3 | in? |  |
| 4 | A. | In economics. |
| 09:41:35  5 | Q. | And what about your master's degree? |
| 6 | A. | Also in economics. |
| 7 | Q. | And what schools were those earned from? |
| 8 | A. | For my bachelor degree is Taiwan National |
| 9 | Chengchi University, spelled C-h-e-n-g-c-h-i. |  |
| 09:41:53  10 | Q. | And what about your master's degree? |
| 11 | A. | It was UCLA. |
| 12 | Q. | So is it fair to say that your background |
| 13 | is in economics and business and not in the |  |
| 14 | sciences? |  |
| 09:42:15  15 | A. | Correct. |
| 16 | Q. | Okay.  Do you have any other degrees? |
| 17 | A. | No. |
| 18 | Q. | Okay.  Do you belong to any professional |
| 19 | associations? |  |
| 09:42:30  20 | A. | No. |
| 21 | Q. | And do you hold any professional licenses? |
| 22 | A. | I did before. |
| 23 | Q. | Okay.  And what were those? |
| 24 | A. | Real estate broker license. |
| 09:42:39  25 | Q. | And what state was that in? |

Olivia Ho Cheng - May 27, 2021

```
 1              A.    California.
 2              Q.    Okay.  So did you work as a real estate
 3         broker?
 4              A.    Once.
 5              Q.    Meaning you did one deal or once upon a
 6         time?
 7              A.    Once upon a time.
 8              Q.    Okay.  And when was that, Ms. Cheng?
 9              A.    Long time ago.
10              Q.    Was it before you worked for Far East Bank?
11              A.    Oh, yes.
12              Q.    Okay.  So more than, say, 25 years ago; is
13         that about right?
14              A.    Oh, 40 -- 30, 40 years ago.
15              Q.    Okay.
16                    MR. VALLA:  Let's go off the record for a
17         second.
18                    (A recess was taken.)
19                    MR. VALLA:  Back on -- back on the record.
20         BY MR. VALLA:
21              Q.    So you had a -- a real estate broker's
22         license in California approximately 30 or 40 years
23         ago; is that right?
24              A.    Yes.
25              Q.    Okay.  And you gave up that license?
```

09:42:46 (line 5)
09:42:58 (line 10)
09:43:09 (line 15)
09:43:32 (line 20)
09:43:43 (line 25)

Olivia Ho Cheng — May 27, 2021

|        |    |                                              |
|--------|----|----------------------------------------------|
| 1      | A. | Yes.                                         |
| 2      | Q. | It was not taken away from you?               |
| 3      | A. | No.                                          |
| 4      | Q. | Okay.  Was the real estate broker position    |

09:43:57  5   your first job out of university?

|    |    |                                              |
|----|----|----------------------------------------------|
| 6  | A. | No.                                          |
| 7  | Q. | What was your first job out of university?   |
| 8  | A. | I worked for Getty Oil.                      |
| 9  | Q. | And what did you do for Getty Oil?           |

09:44:12  10  A.  I was a economist.

|    |    |                                              |
|----|----|----------------------------------------------|
| 11 | Q. | Where were you based?                        |
| 12 | A. | Los Angeles.                                 |
| 13 | Q. | And when did you start working for them?     |
| 14 | A. | 1981.                                        |

09:44:23  15  Q.  How long did you work there?

|    |    |                                              |
|----|----|----------------------------------------------|
| 16 | A. | Three years.                                 |
| 17 | Q. | Okay.  And what about after that?            |
| 18 | A. | After that, I work for Southern California   |
| 19 |    | Gas Company.                                 |

09:44:40  20  Q.  Southern California Gas.  Okay.

|    |    |                                              |
|----|----|----------------------------------------------|
| 21 |    | And what did you do there?                   |
| 22 | A. | Same, economist, doing forecast.             |
| 23 | Q. | And how long did you work there?             |
| 24 | A. | A year or two.                               |

09:45:01  25  Q.  Say, till 1983?

Olivia Ho Cheng - May 27, 2021

1       A.   Oh, no.  I worked for -- for -- I worked --

2  I start Getty oil in 1981 --

3       Q.   Uh-huh.

4       A.   -- until like '84, and then I work for gas

09:45:18  5  company for couple years.

6       Q.   So would it be until 1986?

7       A.   Like '85, '86 I think.

8       Q.   Okay.  And, Ms. Cheng, I don't want you to

9  guess at your answers.

09:45:29  10       A.   Okay.

11       Q.   What I'm entitled to get is -- is your

12  estimation.

13       A.   Okay.

14       Q.   I don't want you to pronounce any wild

09:45:37  15  guesses throughout this deposition.  I think we all

16  do that in conversation, but, again, this is a bit

17  more formal than a -- than a conversation.

18       A.   Okay.

19       Q.   And what about after Southern California

09:45:50  20  Gas, where did you go to work?

21       A.   We moved down to Irvine, and I was

22  pregnant, so I start working as a realtor.

23       Q.   Okay.  So that's when you got your real

24  estate license, then; is that right?

09:46:02  25       A.   Yes.

Olivia Ho Cheng — May 27, 2021

|  |  |  |
|---|---|---|
| | 1 | Q.   Okay.   And how long did you work as a |
| | 2 | realtor? |
| | 3 | A.   Maybe a year or so. |
| | 4 | Q.   And what about after that? |
| 09:46:18 | 5 | A.   I worked for banks. |
| | 6 | Q.   Did you go to work for Far East Bank? |
| | 7 | A.   I first worked for California Savings and |
| | 8 | Loan. |
| | 9 | Q.   What was that called? |
| 09:46:29 | 10 | A.   Huh? |
| | 11 | Q.   What -- what was that called? |
| | 12 | A.   What was that called? |
| | 13 | Q.   It was called California Savings and Loan? |
| | 14 | A.   Yes. |
| 09:46:38 | 15 | Q.   Oh, okay.   I understand.   Okay. |
| | 16 | And how long did you work there? |
| | 17 | A.   I did not know that you need my resume. |
| | 18 | Otherwise, I would have it here. |
| | 19 | Q.   That's okay.   It's -- |
| 09:46:46 | 20 | A.   I don't remember. |
| | 21 | Q.   It's background.   So, you know, if you have |
| | 22 | an estimation, give it to me.   If not, tell me you |
| | 23 | can't remember.   That's -- that's okay. |
| | 24 | A.   I don't remember exactly -- |
| 09:46:56 | 25 | Q.   Okay. |

Olivia Ho Cheng - May 27, 2021

|  |  |
|---|---|
| | 1      A.    -- but I think about a couple of years. |
| | 2      Q.    All right. I'm not going to hold you to |

1        A.    -- but I think about a couple of years.

2        Q.    All right.  I'm not going to hold you to

3    that.  What about after California Savings and Loan?

4    Who did you work for?

09:47:08   5        A.    I think I switch to Bank of America.

6        Q.    And what did you do at BofA?

7        A.    I was a loan officer.

8        Q.    Okay.  That meant that you were in -- in

9    charge of reviewing and approving loan applications?

09:47:29   10        A.    We initiate loans, and then we do some

11    underwriting.

12        Q.    Also underwriting?

13        A.    Right.

14        Q.    Understood.  And what about after BofA?

09:47:40   15        A.    I was a real estate developer.

16        Q.    What did you do as a real estate developer?

17        A.    I bought land and resumed them and -- and

18    parceled them and sell them.

19        Q.    Okay.  And you did that on your own?

09:48:06   20        A.    Yes.

21        Q.    Or through a company?

22        A.    My own.

23        Q.    On your own in your own name; is that

24    right?

09:48:12   25        A.    No, no.  It's not my own name.  I think we

Olivia Ho Cheng - May 27, 2021

1          set up a company to do that.

2                   Q.    Do you remember the name of that company?

3                   A.    I don't remember.

4                   Q.    When you say, "We set up a company," was it

09:48:26  5    you and your husband?

6                   A.    No.

7                   Q.    Was it you and some partners?

8                   A.    Yes.

9                   Q.    And who were those partners?

09:48:33  10                  A.    Don't exactly remember their names.  I

11       think one of them is Sony Chang [phonetic], Sunny

12       Chang, Sony Chang -- Sunny Chang.

13                  Q.    Okay.

14                  A.    But I don't remember exactly because it was

09:49:01  15   a long time ago.

16                  Q.    Okay.  Is -- is Sunny Chang related to you?

17                  A.    No.

18                  Q.    Okay.  Just a similar name?

19                  A.    Uh-huh.

09:49:08  20                  Q.    Okay.  One thing we shouldn't do is say

21       "uh-huh" to each other.

22                  A.    Oh.

23                  Q.    So if you mean to answer "yes," do answer

24       "yes."  If you mean to answer "no," of course,

09:49:20  25   answer "no."  But it needs to be an audible response

Olivia Ho Cheng - May 27, 2021

Page 18

```
1              for the court reporter to transcribe it.

2                   Is that okay?

3              A.    Okay.   Sorry about that.

4              Q.    That's fine.   I'm -- I'm sure she's used to

5         it.  We all do it.

6                   How long did you operate as a real estate

7         developer?

8              A.    Maybe -- don't remember exactly.   I think

9         two, three years.

10             Q.    Okay.   Does that get us about into the

11        early 1990s, mid-1990s; is that right?

12             A.    Yes.

13             Q.    Okay.   And what did you do after that?

14                  MS. CLOSE:   Vague.

15        BY MR. VALLA:

16             Q.    What did you do after you stopped working

17        as a real estate developer?

18             A.    I went to work for Far East National Bank.

19             Q.    Okay.   Do you remember the year that you

20        start working for Far East?

21             A.    I don't remember exactly, but in the -- in

22        the 1991 -- '90, '91 time.

23             Q.    Okay.   And what did you do at Far East?

24             A.    I was the vice president responsible for

25        Newport Beach branch.
```

09:49:29  (line 5)
09:49:43  (line 10)
09:49:59  (line 15)
09:50:12  (line 20)
09:50:41  (line 25)

Olivia Ho Cheng – May 27, 2021

1     Q.   Did that make you a branch manager?

2     A.   Yes.

3     Q.   And how long did you work in that position?

4     A.   I think six to seven years.

09:51:03   5     Q.   So approximately until 1996, 1997?

6     A.   1998.

7     Q.   1998.

8     And what did you do starting in 1998?

9     A.   We form investment company to invest in

09:51:28  10   medical technology industry.

11     Q.   Okay.  And when you say "we," who do you

12   mean?

13     A.   I and two other partners.

14     Q.   And who were those partners?

09:51:40  15     A.   First one is Gordon Olsen.

16     Q.   Could you spell Mr. Olsen's name.

17     A.   G-o-r-d -- d-o-n or d-e-n, and Olsen,

18   O-l-s-e-n.

19     Q.   Okay.  And the other partner was?

09:52:03  20     A.   The other partner's name is Wayne,

21   W-a-y-n-e; Wu, W-u.

22     Q.   And how did you know Mr. Olsen?

23     A.   Mr. Olsen and I worked together at Far East

24   National Bank for many years.

09:52:22  25     Q.   And how did you know Mr. Wu?

Olivia Ho Cheng - May 27, 2021

|       |    |                                                      |
|-------|----|------------------------------------------------------|
|       | 1  | A.   Mr. Wu.                                          |
|       | 2  | Q.   Wu, sorry.                                       |
|       | 3  | A.   Mr. Wu's family and my family were family       |
|       | 4  | friend for long, long time.                          |
| 09:52:34 | 5 | Q.   Okay.   And did you testify this was in      |
|       | 6  | 1998?                                                |
|       | 7  | A.   Yes.                                             |
|       | 8  | Q.   And what was the name of the investment         |
|       | 9  | company?                                             |
| 09:52:46 | 10 | A.   Pacific Republic Capital.                     |
|       | 11 | Q.   Pacific Republic Capital, so PRC for short?     |
|       | 12 | A.   Yes.                                             |
|       | 13 | Q.   Like People's Republic of China, just a --      |
|       | 14 | just a coincidence.   Okay.                          |
| 09:53:03 | 15 | And Pacific Republic Capital had three            |
|       | 16 | partners, the three of you; is that right?           |
|       | 17 | A.   Correct.                                          |
|       | 18 | Q.   Were you equal partners in the business?        |
|       | 19 | A.   We were all managers.   We have                  |
| 09:53:17 | 20 | shareholders.                                     |
|       | 21 | Q.   So there were other investors besides the       |
|       | 22 | three of you?                                        |
|       | 23 | A.   Correct.                                          |
|       | 24 | Q.   Do you recall who those investors were?         |
| 09:53:28 | 25 | A.   Many of them.                                |

Olivia Ho Cheng - May 27, 2021

1      Q.   Were -- were there many investors?

2      A.   Probably ten to 15.

3      Q.   Okay.  Ten to 15 investors.  I don't expect

4   you to remember all their names.

5      A.   Right.

6      Q.   But how did you find these investors?

7      A.   Oh, most of them were my families and

8   friends.

9      Q.   Okay.  So it was sort of a friends and

09:54:01  10   family finance company; is that correct?  Is that a

11   fair characterization?

12      A.   In a broad sense, may -- it's okay to say

13   that.

14      Q.   Okay.

15      A.   Yeah.

16      Q.   That's fine.

17           Do you recall how much money you raised for

18   PRC?

19      A.   Twenty million U.S. Dollar, 20 million.

09:54:27  20      Q.   Okay.  And I believe you testified, but

21   correct me if I'm wrong, that PRC was an investment

22   company focused on medical technology; is that

23   correct?

24      A.   That is correct.

09:54:41  25      Q.   Okay.  Besides the 20 million initial raise

Olivia Ho Cheng - May 27, 2021

Page 22

| | |
|---|---|
| | 1       for PRC, were there subsequent capital raises? |
| | 2         A.    Yes. |
| | 3         Q.    And how much more capital was raised |

1     for PRC, were there subsequent capital raises?

2        A.   Yes.

3        Q.   And how much more capital was raised

4     subsequent to the initial 20 million?

09:54:55  5        A.   So not all the subsequent raise of the

6     money went into Pacific Republic Capital. Our job

7     was to invest. So later on, the follow-up investor

8     invest in -- directly into the company we invest.

9        Q.   Into the portfolio company is what you

09:55:16 10    would call it; right?

11        A.   Correct.

12        Q.   Okay. I think we know a lot of the same

13     terminology, you and I; is that right?

14        A.   Uh-huh.

09:55:23 15       Q.   Okay. Does Pacific Republic Capital still

16     exist today?

17        A.   No.

18        Q.   When did it close down?

19        A.   It was dissolved. I don't remember exact

09:55:39 20    year, but around 2005, '6, that period of time.

21        Q.   Okay. In the mid-2000s --

22        A.   Right.

23        Q.   -- sometime.

24        Was that a California corporation,

09:55:55 25    Ms. Cheng?

Olivia Ho Cheng - May 27, 2021

1          A.    It -- it was.

2          Q.    Okay.  So if we wanted to look up the

3     dissolution, we could find it with the secretary of

4     state; right?

09:56:02    5          A.    Yes.

6          Q.    Okay.  Did -- did PRC, as part of its

7     investment activities, ultimately purchase the

8     technology that became Aurora Imaging Technology?

9          A.    Yes.

09:56:32   10          Q.    Okay.  Can you describe for me, first of

11     all, when that happened?

12          A.    That was 1999.

13          Q.    Okay.  And who did it purchase it from?

14          A.    We purchased from a public company called

09:56:53   15     Caprias [sic].

16          Q.    And when you say "public," you mean it was

17     stock exchange listed; right?

18          A.    Correct.

19          Q.    Do you recall how much PRC paid for that

09:57:06   20     business?

21          A.    I don't know ex- -- remem- -- I don't

22     remember exactly, but it's below 1 million.

23          Q.    Less than a million dollars; is that right?

24          A.    That's right.

09:57:21   25          Q.    Okay.  Do you recall what it got for less

Olivia Ho Cheng - May 27, 2021

1    than a million dollars?  What it bought, roughly?  I

2    don't need a list.

3         A.    Could you re- -- restate the question.

4         Q.    Yeah.  Of course.

09:57:36    5         I think you testified that PRC purchased

6    what became the Aurora Imaging Technology business

7    from Caprias, and I think you also testified that it

8    paid less than a million dollars for that technology

9    which I assume was a set of assets.

09:57:54    10         What did the technology consist of, or what

11    did the assets consist of that it purchased?

12         A.    So it consist of the dedicated breast MRI

13    development.

14         Q.    Was there anything unique about what it

09:58:12    15    purchased?

16         MS. CLOSE:  Objection; vague and ambiguous.

17    BY MR. VALLA:

18         Q.    Please.

19         A.    Could you restate the question so I can

09:58:23    20    be un- -- be more understanding of what you ask for.

21         Q.    Sure.

22         You testified that it purchased the

23    dedicated breast MRI technology; is that correct?

24         A.    That is correct.

09:58:34    25         Q.    Was there anything unique about that

1    technology?

2        A.    Oh.

3            MS. CLOSE:  Same objection.

4            THE WITNESS:  So the technology was the

09:58:44  5    first dedicated MRI system specifically designed for

6    breast imaging for detecting breast cancer.

7    BY MR. VALLA:

8        Q.    So the time that PRC purchased it, PRC felt

9    that there was a competitive advantage in purchasing

09:59:08  10    that technology?

11        A.    We believe so.

12        Q.    And why did Caprias sell it?

13            MS. CLOSE:  Objection; calls for

14    speculation.

09:59:15  15            THE WITNESS:  They could not support

16    further development of that technology because

17    during the time it has a dot-com boom and most of

18    the company that was still in the development stage

19    could not get funding.

09:59:33  20    BY MR. VALLA:

21        Q.    But wasn't Caprias publicly traded at the

22    time?

23        A.    During the dot-com boom whether --

24    either -- I -- whether you are a publicly traded

09:59:51  25    company or a private company, no one can get

Olivia Ho Cheng — May 27, 2021

Page 26

1          investment.   No one can attract investment if not

2          for dot-com.   Difficult.

3               Q.    I see.

4                     So how was the technology purchased from

10:00:14    5     Caprias?  Did you set up a company to purchase it?

6               A.    Yes.   We set up an Aurora Imaging

7          Technology company to host all the assets.

8               Q.    And when you say "we," again, you are

9          talking about Pacific Republic Capital?

10:00:32    10          A.    That is correct.

11              Q.    And yourself and Mr. Olsen and Mr. Wu?

12              A.    Correct.

13              Q.    Did I pronounce it correctly this time?

14              A.    Good job.

10:00:41    15          Q.    Thank you.

16                    Was Mr. Steven James involved in that

17         transaction?

18              A.    Yes.

19              Q.    Okay.   You know Mr. James, of course?

10:00:50    20          A.    I do.

21              Q.    And what was his role in the transaction?

22              A.    He was the CFO for Caprias.

23              Q.    So he was on the -- on the seller's side --

24              A.    Correct.

10:01:02    25          Q.    -- is that right?

Olivia Ho Cheng - May 27, 2021

|  |  |  |
|---|---|---|
| | 1 | A.   That is correct. |
| | 2 | Q.   And did he stay with the seller after the |
| | 3 | transaction? |
| | 4 | A.   No.  He came -- work for AIT. |
| 10:01:15 | 5 | Q.   Did he know that he was coming to work for |
| | 6 | AIT before the transaction closed? |
| | 7 | MS. CLOSE:  Calls for speculation. |
| | 8 | THE WITNESS:  I'm sorry, I have no idea. |
| | 9 | BY MR. VALLA: |
| 10:01:32 | 10 | Q.   Did you make him an offer to come to work |
| | 11 | for AIT? |
| | 12 | A.   Yes. |
| | 13 | Q.   Do you remember whether that was before the |
| | 14 | deal closed or after the deal closed? |
| 10:01:42 | 15 | A.   I don't remember. |
| | 16 | Q.   It could have been either way; right? |
| | 17 | A.   It could be either way. |
| | 18 | Q.   Okay.  Were you on the board of directors |
| | 19 | of Pacific Republic Capital? |
| 10:02:03 | 20 | A.   Yes, I was. |
| | 21 | Q.   It was a corporation, wasn't it? |
| | 22 | A.   It was. |
| | 23 | Q.   Ms. Cheng, you testified that you've been |
| | 24 | deposed once before many, many years ago when you |
| 10:02:32 | 25 | worked for Far East Bank.  Have you been sued before |

Olivia Ho Cheng - May 27, 2021

Page 28

1           as opposed to being deposed?

2                A.    Could you repeat the question again?

3                Q.    Sure.

4                      Have you been sued before, before this

10:02:45   5    lawsuit?

6                A.    Yes.

7                Q.    And do you recall when that was?

8                A.    Yes.

9                Q.    And when was that?

10:02:53   10               A.    2015.

11               Q.    And who sued you?

12               A.    East West Bank.

13               Q.    And is East West Bank a Taiwanese bank

14          operating in the U.S.?

10:03:20   15               A.    It is not a Taiwanese bank.  It is a U.S.

16          bank.

17               Q.    Correct.  Thanks for that correction.

18          You're absolutely right.

19                      Is it owned by Taiwanese investors as far

10:03:33   20          as you know?

21               MS. CLOSE:  Calls for speculation.

22          BY MR. VALLA:

23               Q.    As far as you know?

24               A.    I don't think so.

10:03:38   25               Q.    You don't think so.  Okay.

Olivia Ho Cheng - May 27, 2021

Page 29

|        |    |                                                        |
|--------|----|--------------------------------------------------------|
|        | 1  | A.    It is a public -- it's a publicly traded         |
|        | 2  | bank.                                                  |
|        | 3  | Q.    What stock exchange is it traded on, do you      |
|        | 4  | know?                                                  |
| 10:03:45 | 5  | A.    I don't know.                                   |
|        | 6  | Q.    Okay.  But you know it's publicly traded?        |
|        | 7  | A.    Yes.                                             |
|        | 8  | Q.    Okay.  And what was the lawsuit brought          |
|        | 9  | against you by East West Bank about?                   |
| 10:03:56 | 10 | A.    A line of credit was default.                   |
|        | 11 | Q.    Can you explain that to me.                      |
|        | 12 | A.    I -- I am the borrower of the loan, the          |
|        | 13 | line of credit for 1.2 million.  The loan was          |
|        | 14 | originated because AIT needed working capital.         |
| 10:04:29 | 15 | During the time before we close with a merger         |
|        | 16 | transaction, a lot of expenses were needed.  And we    |
|        | 17 | were optimistic about closing the merger              |
|        | 18 | transaction, but we are -- were -- were short of       |
|        | 19 | cash.                                                  |
| 10:04:49 | 20 | So we -- I went, talk to the bank, which is          |
|        | 21 | East West Bank, and asked the bank to extend a         |
|        | 22 | working capital loan to the company AIT.  East West    |
|        | 23 | Bank examined all our financials, and because we       |
|        | 24 | were not yet profitable, AIT, they agreed to loan      |
| 10:05:19 | 25 | the money, but I -- they want me to be the borrower   |

Olivia Ho Cheng - May 27, 2021

1     and pledge my home for the proceed to be used for

2     AIT.

3         Q.   Okay.  Understood.  So, in essence, you

4     guaranteed a loan to AIT?

10:05:40   5        A.   In a sense, yes.

6         Q.   Okay.  But -- but that's actually

7     inaccurate on my part, then.  Your testimony, then,

8     is you borrowed the money from the bank, and then

9     you loaned it to AIT; is that correct?  Is that what

10:05:55  10    happened?

11        A.   That is correct.

12        Q.   Okay.  And the line of credit came due?

13        A.   The line of credit normally due in one

14     year, so when it came due, you either renewed it or

10:06:07  15    you pay back.

16        Q.   And what did you do?

17        A.   We kept renewing it until 2013 when I

18     resign.  I assume the company will continue with the

19     practice to either renew the loan or pay back.

10:06:29  20        Q.   And what happened?

21        A.   They did not.

22        Q.   So is it your testimony that AIT did not

23     renew the line of credit; that as a result, the line

24     of credit came due; that AIT did not pay the line of

10:06:55  25    credit; and as a result of that lack of payment, the

Olivia Ho Cheng - May 27, 2021

```
            1        bank sued you?
            2               MS. CLOSE:  It's compound.
            3        BY MR. VALLA:
            4               Q.   Is that a fair summary?
10:07:05    5               A.   That was my understanding.
            6               Q.   Okay.  So you ended up getting sued because
            7        the company didn't pay, not because you didn't pay;
            8        is that right?
            9               A.   The proceeds were all used only for the
10:07:17   10        company purpose.
           11               Q.   Okay.  So everything you borrowed from Far
           12        East -- from East West Bank was given by you to the
           13        company, but the company didn't pay you back?
           14               A.   No.  It was not set up that way.  From the
10:07:35   15        very first day when the loan proceed were released,
           16        it always went into the company's account.  Never
           17        went into my account.
           18               Q.   Directly into the company's account?
           19               A.   Directly into the company account.
10:07:47   20               Q.   Okay.  What happened with the lawsuit?
           21               MS. CLOSE:  Objection; vague.
           22               THE WITNESS:  So we finally settled it.
           23        BY MR. VALLA:
           24               Q.   And when you say you "settled it," did you
10:08:03   25        settle it or did AIT settle it?
```

Olivia Ho Cheng - May 27, 2021

Page 32

1          A.    So East West Bank sue both myself and AIT

2    because they sold all the loan proceed -- all the

3    activities were with only AIT; I was not part of it.

4    But I was the borrower, so they had to sue me, and

10:08:29    5    they also sue AIT.

6          Q.    Okay.  And the case settled which -- you

7    just testified that the case settled in the end?

8          A.    Yes.

9          Q.    How did it settle?

10:08:43    10          MS. CLOSE:  Vague and ambiguous.

11          THE WITNESS:  We pay.

12    BY MR. VALLA:

13          Q.    The full 1 1/2 million?

14          A.    No.  It was negotiated down.

10:08:54    15          Q.    Okay.  How much did you pay out of the

16    1 1/2 million?

17          A.    I don't remember exactly when was the

18    outstanding balance when they sue, but it was

19    sizable.

10:09:12    20          Q.    Was it over a million?

21          A.    I don't remember that number, and it was

22    settle for much less than that.

23          Q.    Okay.  When you say "much less than that,"

24    do you know how much that was?

10:09:28    25          A.    I don't remember exactly the number.

Olivia Ho Cheng - May 27, 2021

Page 33

```
 1              Q.    Do you remember it roughly?
 2              A.    I think it's in the range between 200 to
 3      400.
 4              Q.    200- to 400,000 dollars?
10:09:56
 5              A.    Correct.
 6              Q.    And who made that payment to the bank?
 7              A.    I did.
 8              Q.    Personally?
 9              A.    Right.
10:10:04
10              Q.    Did AIT make any payment to the bank?
11              MS. CLOSE:  Calls for speculation.
12              THE WITNESS:  Yes.
13      BY MR. VALLA:
14              Q.    Do you know how much that payment was from
10:10:21
15      AIT to the bank?
16              A.    I don't remember exactly the process, but
17      it was paid through our joint effort, through the
18      lawsuit negotiation.
19              Q.    And when you say your joint efforts, who
10:10:49
20      are you talking about?
21              A.    AIT and myself both have an attorney
22      representing us.  Our attorneys negotiated with the
23      bank.
24              Q.    Okay.  And -- and so each of you and AIT
10:11:04
25      settled with the bank for some amount of money.
```

Olivia Ho Cheng - May 27, 2021

Page 34

1          Your testimony, I believe, is that your contribution

2     was somewhere between 200- and 400,000 dollars?

3          A.   I did not say it's all my contribution.

4          Q.   So did the --

5          A.   Combined.

6          Q.   -- the total amount of settlement might

7     have been between 200- and 400,000 dollars?

8          A.   That is correct.

9          Q.   Okay.   And when did the case settle?

10:11:35  10          A.   I don't remember exact day.   I don't

11    remember exact day.

12          Q.   I think you testified earlier that the case

13    was filed in 2015 --

14          A.   Uh-huh.

10:12:00  15          Q.   -- is that right?

16               Would it have settled in 2015?

17          A.   Either that or the following year.   I -- I

18    can't -- I can't remember.

19          Q.   Either 2015 or 2016; is that right?

10:12:18  20          A.   Yes.

21          Q.   Do you remember who your attorney was?

22          A.   I don't know.   I don't remember their

23    names.   I think it's David something.

24          Q.   How did you come to retain that attorney?

10:12:33  25          A.   It's -- I think it was a referral from a

Olivia Ho Cheng - May 27, 2021

1       friend of mine.

2           Q.    Okay.   You -- you were a banker for many

3       years, California Savings and Loan, BofA, Far East

4       National Bank, VP of the Newport Beach branch for

10:12:59    5       Far East National.   In your experience as a banker,

6       is it normal for a bank to settle a case like this

7       for a small amount of money?

8               MS. CLOSE:   Objection; calls for

9       speculation.

10:13:11    10              THE WITNESS:   As -- as -- yes.

11      BY MR. VALLA:

12          Q.    It is normal?

13          A.    It is normal.

14          Q.    That's good to know.   I'll borrow some more

10:13:25    15      money.

16              As part of your settlement, did you lose

17      your home?

18          A.    No.

19          Q.    You -- I think you testified that you put

10:13:33    20      up your home as collateral; right?

21          A.    That was correct.

22          Q.    So you -- you got to keep your home?

23          A.    Yes.

24          Q.    Had you put up any other collateral for

10:13:46    25      that loan besides your home?

Olivia Ho Cheng - May 27, 2021

Page 36

|        |    |    |                                              |
|--------|----|----|----------------------------------------------|
|        | 1  | A. | Collateral-wise, only my home.               |
|        | 2  | Q. | Only your home?                              |
|        | 3  | A. | Right.                                       |
|        | 4  | Q. | Do you know whether AIT had put up any       |
| 10:13:58 | 5  | collateral? |                                  |
|        | 6  | A. | No.                                          |
|        | 7  | Q. | No, it didn't or no, you don't know?         |
|        | 8  | A. | I don't know.                                |
|        | 9  | Q. | You don't know?                              |
| 10:14:05 | 10 | A. | I don't remember.                           |
|        | 11 | Q. | You don't remember.  Okay.  That's fine.     |
|        | 12 | A. | I think we did file -- they did file UCC.    |
|        | 13 | Q. | The bank filed a UCC on AIT's assets?        |
|        | 14 | A. | Right.                                       |
| 10:14:18 | 15 | Q. | That would be normal, wouldn't it?          |
|        | 16 | A. | Right I think so, but I don't remember.      |
|        | 17 | Q. | Okay.  Are you currently employed,           |
|        | 18 | Ms. Cheng? |                                   |
|        | 19 | A. | Yes.                                         |
| 10:14:33 | 20 | Q. | And where are you employed?                 |
|        | 21 | A. | Aurora Healthcare U.S. Corp.                 |
|        | 22 | Q. | And how long have you been with Aurora       |
|        | 23 | Healthcare? |                                  |
|        | 24 | A. | Four years -- about four years.             |
| 10:14:52 | 25 | Q. | Do you remember when you started?           |

Olivia Ho Cheng - May 27, 2021

|  |  |  |  |
|---|---|---|---|
| | 1 | A. | 2016. |
| | 2 | Q. | Could it have been November of '16? |
| | 3 | A. | I think so.  Thank you. |
| | 4 | Q. | No problem. |
| 10:15:14 | 5 | | And what is your role at Aurora Healthcare |
| | 6 | U.S.? | |
| | 7 | A. | I am the CEO and the president. |
| | 8 | Q. | Are you employed elsewhere? |
| | 9 | A. | No. |
| 10:15:27 | 10 | Q. | Are you also a board member of Aurora |
| | 11 | Healthcare? | |
| | 12 | A. | I am. |
| | 13 | Q. | So you are the CEO, president and a board |
| | 14 | member; is that correct? | |
| 10:15:53 | 15 | A. | That is correct. |
| | 16 | Q. | Any other roles you cover at Aurora |
| | 17 | Healthcare? | |
| | 18 | A. | No. |
| | 19 | Q. | Who else is on the board of Aurora |
| 10:16:07 | 20 | Healthcare? | |
| | 21 | A. | Four other individuals. |
| | 22 | Q. | So it's a total of five, isn't it? |
| | 23 | A. | That is. |
| | 24 | Q. | Could you tell me who the others are? |
| 10:16:16 | 25 | A. | They are Scott Lin. |

Olivia Ho Cheng - May 27, 2021

Page 38

1      Q.   Could you spell Mr. Lin's last name?

2      A.   L-i-n.

3      Q.   Okay.  And then?

4      A.   Jennifer Chen, C-h-e-n.

10:16:32    5      Q.   Okay.

6      A.   And Michael Chen, also C-h-e n, and Xifeng

7   Chen, also C-h-e-n.

8      Q.   You're going to have to help us -- help me

9   certainly also with the first name.

10:16:58    10      A.   Xifeng is X-i-n-g-f-a-n-g [sic].

11      Q.   Very good.

12           And do the other board members cover any

13   offices at the company?  Are they also officers of

14   the company?

10:17:17    15      A.   No.

16      Q.   Who is the CFO of Aurora Healthcare?

17      A.   That is Steve James.

18      Q.   And who is the corporate secretary?

19      A.   Gee, I don't remember if -- either -- don't

10:17:41    20   guess.

21           MS. CLOSE:  Don't guess.

22           THE WITNESS:  I don't know.  The record

23   should show.

24   BY MR. VALLA:

10:17:46    25      Q.   You don't know?

Olivia Ho Cheng - May 27, 2021

Page 39

                    A.   I don't remember.

                    Q.   You don't remember.  Could it be you?

                    A.   Could be me.

                    Q.   Okay.  Could it be Mr. James?

10:17:55    5       A.   It could be Mr. James.

                    Q.   Or it could be someone else?

                    A.   Yes.

                    Q.   Yeah.  Okay.

                    MS. CLOSE:  Antonio, is this a good time to

10:18:13   10    take a short break?

                    MR. VALLA:  Oh, absolutely.  Absolutely, no

                 I think everybody needs it.  And -- and, you know,

                 any time you want to take a break, Ms. Cheng, please

                 tell us and -- and we'll take it, no questions

10:18:24   15    asked.  The only courtesy I ask of you is that if

                 there's a question pending, you answer the question

                 before we take the break.

                    THE WITNESS:  Understand.

                    MR. VALLA:  Thank you very much.  We're

10:18:34   20    going off the record.  Back in ten minutes maybe?

                    MS. CLOSE:  Yeah.  Ten is fine.

                    MR. VALLA:  Ten is fine?  Okay.  Very good

                 thank you very much.

                    (A recess was taken.)

10:29:47   25       MR. VALLA:  We're going back on the record.

Olivia Ho Cheng — May 27, 2021

```
        1        BY MR. VALLA:
        2            Q.   Good morning again, Ms. Cheng.   I'm going
        3        to remind you you're still under oath.
        4                 Do you understand that?
10:29:58 5           A.   Yes, I do.
        6            Q.   Very good.
        7                 Before the break we were talking about
        8        Aurora Healthcare U.S. Corp. I think it's called; is
        9        that right?
       10            A.   (No audible response.)
       11            Q.   You told us who was on the board.   You told
       12        us that Mr. James is the CFO.   You couldn't remember
       13        who was the secretary; is that right?
       14            A.   That was right.
10:30:20 15          Q.   Okay.   Besides Aurora healthcare, do you
       16        serve as an officer or board member of other
       17        entities?
       18            A.   Yes.
       19            Q.   Can you tell me who those are?
10:30:38 20          A.   Does an advisory board count?
       21            Q.   No.   Let's not talk about the advisory
       22        board for now.
       23                 Executive boards?
       24            A.   Does NGO board count?
10:30:51 25          Q.   Sure.
```

Olivia Ho Cheng - May 27, 2021

Page 41

```
         1              A.    Yes.  I am on the board of U.S.-China
         2        Health Summit, which is an NGO.
         3              Q.    Okay.  What other entities?  Let me -- let
         4        me help you.
10:31:25 5              Are you on the board of a company called
         6        Aurora Health Intelligence?
         7              A.    Oh, yes.
         8              Q.    Yes.  Do you know what that company is?
         9              A.    Yes.
        10              Q.    What is it?
        11              A.    It -- it's a company we formed.
        12              Q.    And when you say "we," who do you mean?
        13              A.    Aurora Healthcare U.S. Corp.
        14              Q.    So is Aurora Health Intelligence a
10:31:53 15       subsidiary of Aurora Healthcare U.S.?
        16              A.    Yes.
        17              Q.    Okay.  And what does Aurora Health
        18        Intelligence do?
        19              A.    It was intended to use -- to use that
10:32:10 20       entity to develop artificial intelligence-related
        21        technology.
        22              Q.    And when you say "was intended to," did it
        23        actually do that?
        24              A.    We do have teams that do artificial
10:32:32 25       intelligence development, but it's not under that
```

Olivia Ho Cheng - May 27, 2021

Page 42

```
 1          entity.
 2                  Q.    And what entity is it under?
 3                  A.    We currently have a contract with a team --
 4          AI team that does that development.
10:32:53  5                  Q.    So you have an entity for artificial
 6          intelligence, but it's not being used; is that
 7          correct?
 8                  A.    That is correct.
 9                  Q.    And instead, Aurora has a contractor that
10:33:10 10          does artificial intelligence development?
11                  A.    That is correct.
12                  Q.    Understood.
13                        So Aurora Health Intelligence is inactive?
14                  A.    Inactive.
10:33:19 15                  Q.    Does not do any business?
16                  A.    No.
17                  Q.    Does it own anything?
18                  A.    No.
19                  Q.    Bank account?
10:33:23 20                  A.    Did not even get that far.
21                  Q.    It's a shelf company?
22                        MS. CLOSE:   Objection; vague, calls for
23          speculation.
24                        THE WITNESS:   We still have not been able
10:33:37 25          to utilize it yet.
```

Olivia Ho Cheng — May 27, 2021

Page 43

BY MR. VALLA:

1        BY MR. VALLA:

2        Q.   It's a shelf company?  You put it on the

3        shelf and leave it there for now; is that right?

4        A.   If you put the definition that way, yes.

10:33:47  5        Q.   Okay.  Understood.

6        Are you also an officer of Aurora Health

7        Intelligence?

8        A.   We formed the company, so I am the

9        president.

10:34:01  10       Q.   Okay.  And you're also on the board of

11        Aurora Health Intelligence; right?

12        A.   We -- it's inactive, so we really -- really

13        do not have any activity.

14        Q.   Okay.  But my question was different,

10:34:21  15    Ms. -- are you a board member of the company?

16        A.   I don't remember whether we form a board.

17        The company was formed but was inactive, so maybe we

18        did not.

19        Q.   Does the company file tax returns?  Do you

10:34:35  20    know?

21        A.   I don't know.  But for an inactive company,

22        I don't know the requirements.  I'm not a CPA.

23        Q.   Right.  Of course.  Of course.

24        But as far as you know, do they file tax

10:35:06  25    returns?

Olivia Ho Cheng - May 27, 2021

|          |    |                                                      |
|----------|----|------------------------------------------------------|
|          | 1  | MS. CLOSE:  Asked and answered.                      |
|          | 2  | THE WITNESS:  I -- I think we do, but I              |
|          | 3  | cannot remember.  We should look into it.            |
|          | 4  | BY MR. VALLA:                                         |
| 10:35:16 | 5  | Q.   Okay.  All right.  You -- your -- your          |
|          | 6  | lawyer will advise you as to whether you should, but |
|          | 7  | sounds like a good idea.                              |
|          | 8  | MS. CLOSE:  It's okay if you don't know.             |
|          | 9  | THE WITNESS:  I don't know.                           |
| 10:35:27 | 10 | MS. CLOSE:  That'd be a question for                 |
|          | 11 | someone else.  You could just let him know that.     |
|          | 12 | BY MR. VALLA:                                         |
|          | 13 | Q.   Okay.                                           |
|          | 14 | A.   Okay.                                           |
| 10:35:32 | 15 | Q.   But does Aurora Healthcare U.S. file tax        |
|          | 16 | returns?                                              |
|          | 17 | MS. CLOSE:  Asked and answered.                      |
|          | 18 | THE WITNESS:  Yes.                                    |
|          | 19 | MS. CLOSE:  Oh, I'm sorry.                           |
| 10:35:41 | 20 | BY MR. VALLA:                                         |
|          | 21 | Q.   Okay.  So the mother company files a tax        |
|          | 22 | return, you know that for sure?                      |
|          | 23 | A.   I know that for sure.                           |
|          | 24 | Q.   And it's filed them currently during its       |
| 10:35:53 | 25 | existence every year?                                 |

Olivia Ho Cheng - May 27, 2021

Page 45

```
 1              A.    Absolutely.
 2              Q.    Okay.  Because companies are supposed to
 3         file tax returns; right?
 4              A.    All citizens.
10:36:02  5     Q.    Right.  True.
 6              Are you familiar with a company called ARF?
 7              A.    Yes.
 8              Q.    Are you on the board of ARF?
 9              A.    It's not a company.
10:36:16 10     Q.    What is it?
11              A.    It's an LLC.
12              Q.    Oh, okay.  I won't debate that with you.
13         An LLC is a limited liability company.
14              A.    Sorry, I'm -- I'm not a lawyer.
10:36:31 15     Q.    Don't -- and -- and you're a happier person
16         because of it.  I guarantee you.
17              MS. BUCHANAN:  Can I just interject for a
18         second before you start your next question.
19         Counsel, there's a lot of, sort of, ambient noise
20         happening right now that's making it a little bit
21         difficult for us to hear the exchange.  I don't know
22         if there's some -- some paper shuffling or something
23         going on.
24              MS. CLOSE:  When you were shuffling a
10:36:56 25     minute -- a second ago.
```

Olivia Ho Cheng — May 27, 2021

Page 46

| | |
|---|---|
| | 1         MR. VALLA:  There is no pending question. |
| | 2         MS. BUCHANAN:  No.  Understood.  I'm just |
| | 3 letting you know that if you could minimize the |
| | 4 ambient noise, it would improve our ability to |
| 10:37:04 | 5 participate in the deposition.  Thank you. |
| | 6         MR. VALLA:  Sure. |
| | 7 BY MR. VALLA: |
| | 8    Q.  The company I referred to as ARF is |
| | 9 actually called ARF Partners, LLC, is it not? |
| 10:37:18 | 10    A.  Yes. |
| | 11    Q.  Okay.  What does ARF Partners, LLC, do? |
| | 12    A.  It was -- |
| | 13         MS. CLOSE:  Vague and ambiguous. |
| | 14 BY MR. VALLA: |
| 10:37:37 | 15    Q.  Let me -- let me rephrase that. |
| | 16    A.  Okay. |
| | 17    Q.  Are you on the board of ARF Partners, LLC? |
| | 18         MS. CLOSE:  I think that's been asked and |
| | 19 answered. |
| 10:37:49 | 20         THE WITNESS:  I don't know we have a board. |
| | 21 BY MR. VALLA: |
| | 22    Q.  Are you an officer of ARF Partners, LLC? |
| | 23    A.  Yes. |
| | 24    Q.  And what kind of an officer are you? |
| 10:38:00 | 25    A.  I am a manager. |

Olivia Ho Cheng — May 27, 2021

```
           1            Q.    Okay.  Are there any other managers of ARF
           2       Partners besides yourself?
           3            A.    I think there is another manager, but I'm
           4       not hundred percent sure.
10:38:28   5            Q.    You -- you don't know if you have a
           6       co-manager in ARF Partners?
           7            A.    I -- I know we had.  It has been inactive.
           8            Q.    Since when?
           9            A.    Since 2000 -- about '16, '17.
10:39:00  10            Q.    Okay.  What did it do -- what did ARF
          11       Partners do before it became inactive?
          12                  MS. CLOSE:  Vague and ambiguous.
          13                  THE WITNESS:  We raise fund to loan to a
          14       company.
10:39:17  15       BY MR. VALLA:
          16            Q.    How much funds were raised?
          17            A.    1.5 million.
          18            Q.    And were those funds loaned to a company?
          19            A.    Yes.  It made a loan to one company.
10:39:44  20            Q.    And what company was that?
          21            A.    That was AIT.
          22            Q.    Aurora Imaging Technology?
          23            A.    That is correct.
          24            Q.    Who are the owners of ARF?
10:40:01  25            A.    There were several members.
```

Olivia Ho Cheng - May 27, 2021

|         |    |    |                                              |
|---------|----|----|----------------------------------------------|
|         | 1  | Q. | Are you a member of ARF?                     |
|         | 2  | A. | Yes.                                         |
|         | 3  | Q. | Is your husband a member of ARF?             |
|         | 4  | A. | No.                                          |
| 10:40:08 | 5  | Q. | Any other family members of yours who are   |
|         | 6  |    | members of ARF?                              |
|         | 7  | A. | No.                                          |
|         | 8  | Q. | Who are the other members?                   |
|         | 9  | A. | Investors.                                   |
| 10:40:15 | 10 | Q. | How many are there?                          |
|         | 11 | A. | I think they are four to five.               |
|         | 12 | Q. | But you don't know for sure whether if it's  |
|         | 13 |    | four or five?  Today, you can't tell me; is that |
|         | 14 |    | right?                                       |
| 10:40:32 | 15 | A. | I think it's four.                           |
|         | 16 | Q. | Four including yourself?                      |
|         | 17 | A. | It's either four or five.  I can't           |
|         | 18 |    | remember.                                    |
|         | 19 | Q. | You are an investor?                         |
| 10:40:57 | 20 | A. | Yes.                                         |
|         | 21 | Q. | Okay.  Are you a majority investor?          |
|         | 22 | A. | No.                                          |
|         | 23 | Q. | What is your percentage?                     |
|         | 24 | A. | It is less than 20 percent.                  |
| 10:41:05 | 25 | Q. | Are you an officer or director of a company  |

Olivia Ho Cheng — May 27, 2021

Page 49

1          called Aurora — excuse me, Aurora Healthcare, SPC?

2          And that's a Cayman Island company.

3              A.   That company did not exist.

4              Q.   It did not exist?

10:41:28    5          A.   It was formed and then never got to use, so

6          it was dissolved.

7              Q.   When — when was it formed?

8              A.   It was form, I think, in 2016.

9              Q.   And when you say it was formed, it was

10:41:47   10      formed in the Cayman Islands?

11             A.   We use an attorney in Taiwan to form it.

12             Q.   Was the company a Cayman Islands company?

13             A.   It was intended to form a Cayman company.

14             Q.   Okay.  Were you an officer of the — or

10:42:08   15      director of that Cayman Island company?

16             A.   I do not think so.

17             Q.   You do not think so?

18             A.   I do not remember because we did not — and

19      we — and — do not use it at all.

10:42:23   20          Q.   Never used it for any business activity?

21             A.   Correct.

22             Q.   Okay.  Do you recall whether the Cayman

23      Islands company was capitalized?

24             A.   No.

10:42:33   25          Q.   It was formed but not capitalized.

| | | |
|---|---|---|
| 1 | | Why was it formed? |
| 2 | A. | It was form to purchase the AIT assets. |
| 3 | Q. | But it didn't; right? |
| 4 | A. | It did not. |
| 5 | Q. | All right.  Are you an officer or director |

of a company called B.E. Pacific?

7    A.    It is an LLC.

8    Q.    Okay.  Are you an officer or director of

9 that company?

10    A.    I'm a co-owner, member.

11    Q.    You're a member.  A co-member?

12    A.    Co-member.

13    Q.    Who are the other members?

14    A.    A lady called Lucy Chang.

15    Q.    Could you spell Lucy's last name, please?

16    A.    C-h-a-n-g.

17    Q.    And what does -- what business does B.E.

18 Pacific conduct?

19    A.    It was form to look for investment for --

20 call -- make it brief, it's a financial advisor.

21    Q.    B.E. Pacific is a financial advisor?

22    A.    Correct.

23    Q.    And when you say "a financial advisor,"

24 would you explain to me what that means?

25    A.    Like an investment banker.

10:43:04 (line 5)
10:43:24 (line 10)
10:43:38 (line 15)
10:44:09 (line 20)
10:44:24 (line 25)

Olivia Ho Cheng - May 27, 2021

Page 51

1          Q.    Okay.  You testified previously that you
2    don't hold any professional licenses.  I assume that
3    meant you're not a registered broker-dealer?
4          A.    Correct.
10:44:38    5          Q.    And you're not a registered investment
6    advisor?
7          A.    Correct.
8          Q.    But you are a member of a company that
9    provides investment banking services?
10:44:50    10          A.    We -- that was not a full -- full range of
11    investment banking capacity.
12          Q.    Does Ms. Chang hold a broker-dealer license
13    to your knowledge?
14          A.    He -- she does not.
10:45:07    15          Q.    Does Ms. Chang hold -- hold an investment
16    advisor's license to your knowledge?
17          A.    I do not believe so.
18          Q.    Okay.  And you're the only members of B.E.
19    Pacific?
10:45:18    20          A.    That is correct.
21          Q.    Where is B.E. Pacific located?
22          A.    I do not remember where we registered.
23    Maybe it's in my home.
24          Q.    Okay.  But it's -- so it is located in the
10:45:29    25    United States?

Olivia Ho Cheng - May 27, 2021

Page 52

|       |    |                                              |
|-------|----|----------------------------------------------|
|       | 1  | A.    Yes.                                    |
|       | 2  | Q.    If it were in -- if it were in your home, |
|       | 3  | it would be located at 41 Skyview --         |
|       | 4  | A.    That's my home.                         |
| 10:45:35 | 5  | Q.    -- in North Andover, Massachusetts?  |
|       | 6  | A.    That's my home.                         |
|       | 7  | Q.    Okay.  Does -- does B.E. Pacific conduct |
|       | 8  | any business?  Does it have any clients?     |
|       | 9  | A.    No.                                     |
| 10:45:50 | 10 | Q.    Does it file tax returns?            |
|       | 11 | A.    Yes.                                    |
|       | 12 | Q.    Did you form B.E. Pacific with Ms. Chang? |
|       | 13 | A.    I'm sorry, can you restate --           |
|       | 14 | Q.    Yes.                                    |
| 10:46:04 | 15 | A.    -- the question?                     |
|       | 16 | Q.    I apologize for that.  It's my accent.  |
|       | 17 |       Did you form B.E. Pacific with         |
|       | 18 | Ms. Lucy Chang?                               |
|       | 19 | A.    Yes.                                    |
| 10:46:14 | 20 | Q.    Okay.  Why did you guys form it if it does |
|       | 21 | nothing?                                      |
|       | 22 | A.    We did something.                       |
|       | 23 | Q.    Oh, what did you do?                     |
|       | 24 | A.    Try to find investor to invest in Aurora |
| 10:46:28 | 25 | Healthcare U.S. Corp.                       |

Olivia Ho Cheng - May 27, 2021

Page 53

1          Q.    Oh, okay.  And did you find investors to

2     invest in Aurora Healthcare U.S. Corp?

3          A.    Yes.

4          Q.    And are these investors in the

5     United States?

6          A.    Some in the U.S., some in Taiwan.

7          Q.    And are you aware that soliciting

8     investments in the United States requires a license?

9          A.    Unless you are part of the investment pool.

10         Q.    Okay.  So that's your exception?

11         A.    Yes.

12         Q.    Understood.

13         A.    And is less than --

14         Q.    Yeah.  I understand.  I -- I know how that

15     works.  It's less than 35 and so on; right?

16         A.    Yes.

17               (Pages 54 through 58 were deemed

18               confidential and bound under separate

19               cover.)

20     ///

21     ///

22     ///

23     ///

24     ///

25     ///

10:46:39 (line 5)
10:46:54 (line 10)
10:47:04 (line 15)

Olivia Ho Cheng - May 27, 2021

Page 54

| | | |
|---|---|---|
| 10:48:21 | 1 | [-------------------- CONFIDENTIAL --------------------] |
| 10:48:21 | 2 | [-------------------- CONFIDENTIAL --------------------] |
| 10:48:21 | 3 | [-------------------- CONFIDENTIAL --------------------] |
| 10:48:21 | 4 | [-------------------- CONFIDENTIAL --------------------] |
| 10:48:21 | 5 | [-------------------- CONFIDENTIAL --------------------] |
| 10:48:21 | 6 | [-------------------- CONFIDENTIAL --------------------] |
| 10:48:21 | 7 | [-------------------- CONFIDENTIAL --------------------] |
| 10:48:21 | 8 | [-------------------- CONFIDENTIAL --------------------] |
| 10:48:21 | 9 | [-------------------- CONFIDENTIAL --------------------] |
| 10:48:21 | 10 | [-------------------- CONFIDENTIAL --------------------] |
| 10:48:21 | 11 | [-------------------- CONFIDENTIAL --------------------] |
| 10:48:21 | 12 | [-------------------- CONFIDENTIAL --------------------] |
| 10:48:21 | 13 | [-------------------- CONFIDENTIAL --------------------] |
| 10:48:21 | 14 | [-------------------- CONFIDENTIAL --------------------] |
| 10:48:21 | 15 | [-------------------- CONFIDENTIAL --------------------] |
| 10:48:21 | 16 | [-------------------- CONFIDENTIAL --------------------] |
| 10:48:21 | 17 | [-------------------- CONFIDENTIAL --------------------] |
| 10:48:21 | 18 | [-------------------- CONFIDENTIAL --------------------] |
| 10:48:21 | 19 | [-------------------- CONFIDENTIAL --------------------] |
| 10:48:21 | 20 | [-------------------- CONFIDENTIAL --------------------] |
| 10:48:21 | 21 | [-------------------- CONFIDENTIAL --------------------] |
| 10:48:21 | 22 | [-------------------- CONFIDENTIAL --------------------] |
| 10:48:21 | 23 | [-------------------- CONFIDENTIAL --------------------] |
| 10:48:21 | 24 | [-------------------- CONFIDENTIAL --------------------] |
| 10:48:21 | 25 | [-------------------- CONFIDENTIAL --------------------] |

Olivia Ho Cheng - May 27, 2021

Page 55

| | | |
|---|---|---|
| 10:49:23 | 1 | [-------------------- CONFIDENTIAL --------------------] |
| | 2 | [-------------------- CONFIDENTIAL --------------------] |
| | 3 | [-------------------- CONFIDENTIAL --------------------] |
| | 4 | [-------------------- CONFIDENTIAL --------------------] |
| | 5 | [-------------------- CONFIDENTIAL --------------------] |
| | 6 | [-------------------- CONFIDENTIAL --------------------] |
| | 7 | [-------------------- CONFIDENTIAL --------------------] |
| | 8 | [-------------------- CONFIDENTIAL --------------------] |
| | 9 | [-------------------- CONFIDENTIAL --------------------] |
| 10:51:27 | 10 | [-------------------- CONFIDENTIAL --------------------] |
| 10:51:27 | 11 | [-------------------- CONFIDENTIAL --------------------] |
| 10:51:27 | 12 | [-------------------- CONFIDENTIAL --------------------] |
| 10:51:27 | 13 | [-------------------- CONFIDENTIAL --------------------] |
| 10:51:27 | 14 | [-------------------- CONFIDENTIAL --------------------] |
| 10:51:27 | 15 | [-------------------- CONFIDENTIAL --------------------] |
| 10:51:27 | 16 | [-------------------- CONFIDENTIAL --------------------] |
| 10:51:27 | 17 | [-------------------- CONFIDENTIAL --------------------] |
| 10:51:27 | 18 | [-------------------- CONFIDENTIAL --------------------] |
| 10:51:27 | 19 | [-------------------- CONFIDENTIAL --------------------] |
| 10:51:27 | 20 | [-------------------- CONFIDENTIAL --------------------] |
| 10:51:27 | 21 | [-------------------- CONFIDENTIAL --------------------] |
| 10:51:27 | 22 | [-------------------- CONFIDENTIAL --------------------] |
| 10:51:27 | 23 | [-------------------- CONFIDENTIAL --------------------] |
| 10:51:27 | 24 | [-------------------- CONFIDENTIAL --------------------] |
| 10:51:27 | 25 | [-------------------- CONFIDENTIAL --------------------] |

Olivia Ho Cheng - May 27, 2021

Page 56

| 10:51:27 | 1 | [------------------- CONFIDENTIAL -------------------] |
|----------|---|------------------------------------------------------|
| 10:51:27 | 2 | [------------------- CONFIDENTIAL -------------------] |
| 10:51:27 | 3 | [------------------- CONFIDENTIAL -------------------] |
| 10:51:27 | 4 | [------------------- CONFIDENTIAL -------------------] |
| 10:51:27 | 5 | [------------------- CONFIDENTIAL -------------------] |
| 10:51:27 | 6 | [------------------- CONFIDENTIAL -------------------] |
| 10:51:27 | 7 | [------------------- CONFIDENTIAL -------------------] |
| 10:51:27 | 8 | [------------------- CONFIDENTIAL -------------------] |
| 10:51:27 | 9 | [------------------- CONFIDENTIAL -------------------] |
|          | 10 | [------------------- CONFIDENTIAL -------------------] |
|          | 11 | [------------------- CONFIDENTIAL -------------------] |
|          | 12 | [------------------- CONFIDENTIAL -------------------] |
|          | 13 | [------------------- CONFIDENTIAL -------------------] |
|          | 14 | [------------------- CONFIDENTIAL -------------------] |
|          | 15 | [------------------- CONFIDENTIAL -------------------] |
|          | 16 | [------------------- CONFIDENTIAL -------------------] |
|          | 17 | [------------------- CONFIDENTIAL -------------------] |
|          | 18 | [------------------- CONFIDENTIAL -------------------] |
|          | 19 | [------------------- CONFIDENTIAL -------------------] |
|          | 20 | [------------------- CONFIDENTIAL -------------------] |
|          | 21 | [------------------- CONFIDENTIAL -------------------] |
|          | 22 | [------------------- CONFIDENTIAL -------------------] |
|          | 23 | [------------------- CONFIDENTIAL -------------------] |
|          | 24 | [------------------- CONFIDENTIAL -------------------] |
|          | 25 | [------------------- CONFIDENTIAL -------------------] |

Olivia Ho Cheng – May 27, 2021

```
              1      [-------------------- CONFIDENTIAL --------------------]

              2      [-------------------- CONFIDENTIAL --------------------]

              3      [-------------------- CONFIDENTIAL --------------------]

              4      [-------------------- CONFIDENTIAL --------------------]

              5      [-------------------- CONFIDENTIAL --------------------]

              6      [-------------------- CONFIDENTIAL --------------------]

              7      [-------------------- CONFIDENTIAL --------------------]

              8      [-------------------- CONFIDENTIAL --------------------]

              9      [-------------------- CONFIDENTIAL --------------------]

             10      [-------------------- CONFIDENTIAL --------------------]

             11      [-------------------- CONFIDENTIAL --------------------]

             12      [-------------------- CONFIDENTIAL --------------------]

10:52:00     13      [-------------------- CONFIDENTIAL --------------------]

10:52:00     14      [-------------------- CONFIDENTIAL --------------------]

10:52:00     15      [-------------------- CONFIDENTIAL --------------------]

10:52:00     16      [-------------------- CONFIDENTIAL --------------------]

10:52:00     17      [-------------------- CONFIDENTIAL --------------------]

10:52:00     18      [-------------------- CONFIDENTIAL --------------------]

10:52:00     19      [-------------------- CONFIDENTIAL --------------------]

10:52:00     20      [-------------------- CONFIDENTIAL --------------------]

10:52:00     21      [-------------------- CONFIDENTIAL --------------------]

10:52:00     22      [-------------------- CONFIDENTIAL --------------------]

10:52:00     23      [-------------------- CONFIDENTIAL --------------------]

10:52:00     24      [-------------------- CONFIDENTIAL --------------------]

10:52:00     25      [-------------------- CONFIDENTIAL --------------------]
```

Olivia Ho Cheng - May 27, 2021

| | | |
|---|---|---|
| 10:52:00 | 1 | [-------------------- CONFIDENTIAL --------------------] |
| 10:52:00 | 2 | [-------------------- CONFIDENTIAL --------------------] |
| 10:52:00 | 3 | [-------------------- CONFIDENTIAL --------------------] |
| 10:52:00 | 4 | [-------------------- CONFIDENTIAL --------------------] |
| 10:52:00 | 5 | [-------------------- CONFIDENTIAL --------------------] |
| 10:52:00 | 6 | [-------------------- CONFIDENTIAL --------------------] |
| 10:52:00 | 7 | [-------------------- CONFIDENTIAL --------------------] |
| 10:52:00 | 8 | [-------------------- CONFIDENTIAL --------------------] |
| 10:52:00 | 9 | [-------------------- CONFIDENTIAL --------------------] |
| 10:52:00 | 10 | [-------------------- CONFIDENTIAL --------------------] |
| 10:52:00 | 11 | [-------------------- CONFIDENTIAL --------------------] |
| 10:52:00 | 12 | [-------------------- CONFIDENTIAL --------------------] |
| 10:52:00 | 13 | [-------------------- CONFIDENTIAL --------------------] |
| 10:52:00 | 14 | [-------------------- CONFIDENTIAL --------------------] |
| 10:52:00 | 15 | [-------------------- CONFIDENTIAL --------------------] |
| 10:52:00 | 16 | [-------------------- CONFIDENTIAL --------------------] |
| 10:52:00 | 17 | [-------------------- CONFIDENTIAL --------------------] |
| 10:52:00 | 18 | [-------------------- CONFIDENTIAL --------------------] |
| 10:52:00 | 19 | [-------------------- CONFIDENTIAL --------------------] |
| 10:52:00 | 20 | [-------------------- CONFIDENTIAL --------------------] |
| 10:52:00 | 21 | [-------------------- CONFIDENTIAL --------------------] |
| 10:52:00 | 22 | [-------------------- CONFIDENTIAL --------------------] |
| 10:52:00 | 23 | [-------------------- CONFIDENTIAL --------------------] |
| 10:52:00 | 24 | [-------------------- CONFIDENTIAL --------------------] |
| 10:52:00 | 25 | [-------------------- CONFIDENTIAL --------------------] |

Olivia Ho Cheng — May 27, 2021

10:52:00

1    BY MR. VALLA:

2        Q.    When did you resign from Aurora Imaging

3    Technology?

4        A.    I resigned in July of 2013.

5            THE REPORTER:  Before we go further, can

6    you tell me when we stop confidential, or is the

7    whole transcript confidential?

8            MR. VALLA:  No.  The whole transcript is

9    not confidential and we just stopped confidential --

10           THE REPORTER:  Okay.

11           MR. VALLA:  -- with the previous line of

12   questioning.  So my question about the witness's

13   date of resignation to which she answered July 2013

14   was not confidential.

10:53:21

15           MS. CLOSE:  I'll agree with that.

16           MR. VALLA:  Thank you.

17   BY MR. VALLA:

18       Q.    Did you know Steven James prior to 1999

19   when he joined AIT?

10:53:36

20       A.    No.

21       Q.    Do you recall the dates that you served as

22   CEO of AIT?  You -- you testified you resigned in

23   July of 2013.

24       A.    Right.

10:54:02

25       Q.    When did you start?

Olivia Ho Cheng - May 27, 2021

Page 60

| | | |
|---|---|---|
| 10:54:02 | 1 | A.   I start as its CEO infancy or -- in 2003. |
| | 2 | Q.   Do you remember the month? |
| | 3 | A.   I think it's -- I don't remember the month, |
| | 4 | sorry. |
| 10:54:20 | 5 | Q.   Okay.   That's fine. |
| | 6 |      That's approximately 10 years, 2003 to |
| | 7 | 2013? |
| | 8 | A.   Yes. |
| | 9 | Q.   And during that period of time, was |
| 10:54:34 | 10 | Mr. James the company's CFO? |
| | 11 | A.   Yes. |
| | 12 | Q.   And, in fact, he had been the company's CFO |
| | 13 | also prior to you becoming CEO or interim CEO in |
| | 14 | 2003; is that right? |
| 10:54:48 | 15 | A.   That was correct. |
| | 16 | Q.   Why were you selected as the CEO of the |
| | 17 | company? |
| | 18 |      MS. CLOSE:  Calls for speculation. |
| | 19 |      THE WITNESS:  Very good question.   We were |
| 10:54:59 | 20 | the major investor. |
| | 21 | BY MR. VALLA: |
| | 22 | Q.   When you say "we" -- |
| | 23 | A.   "We" means Pacific Republic Capital. |
| | 24 | Q.   PRC, Pacific Republic Capital, was the |
| 10:55:12 | 25 | major investor? |

Olivia Ho Cheng - May 27, 2021

10:55:12    1        A.    Yes.

2        Q.    Okay.

3        A.    And we ran -- we hire CEO to run companies,

4    and when the CEO did not do -- wasn't -- did not --

10:55:31    5    wasn't -- sorry. When the CEO, in our view, did not

6    do -- couldn't deliver the -- the job, we had to

7    change, so I came in as a interim CEO intending to

8    find another CEO to take on the role.

9        Q.    And did you ever find another CEO to take

10:56:03    10    on the role?

11        A.    We tried all along the way but did not.

12        Q.    Okay. Who served as CEO prior to 2003?

13        A.    It was my partner Gordon Olsen.

14        Q.    And did Mr. Olsen serve as CEO from 1999

10:56:28    15    approximately then to approximately 2003 when you

16    ultimately stepped in?

17        A.    That was correct.

18        Q.    So you fired your partner?

19        A.    I did not fire my partner. He is the

10:56:38    20    chairman. He remained the chairman.

21        Q.    Okay.

22        A.    He is a lot older gentleman. It was too

23    much traveling.

24        Q.    Right. But -- I'm sorry, you -- you

10:56:55    25    testified earlier that when a CEO is not doing a

Olivia Ho Cheng - May 27, 2021

Page 62

10:56:55  1      good job -- I'm paraphrasing your testimony, but

2      essentially when a CEO is not doing a good job, you

3      -- you replace them.

4              So was -- was Mr. Olsen not doing a good

10:57:10  5      job?

6          A.   He's -- it was too demanding for him at

7      his -- when he -- at his age.  He was in the 80s.

8          Q.   At the time, he was in his 80s?

9          A.   Yes.

10:57:36 10          Q.   I understand.  Is -- is Mr. Olsen still

11      alive?

12          A.   He passed away.

13          Q.   Okay.  I'm sorry to hear that.

14              So you took over as CEO -- interim CEO

15      sometime in 2003 and -- 2003 and you carried through

16      until July of 2013?

17          A.   That is correct.

18          Q.   During your tenure as CEO of Aurora Imaging

19      Technology, you testified that Steve James served as

10:58:12 20      a company CFO.  We took his deposition.  I know you

21      were present at that deposition last week.

22              Did you ever instruct Mr. James not to file

23      tax returns for Aurora Imaging Technology?

24          A.   Absolutely not.

10:58:28 25          Q.   Were you aware that the company was not

Olivia Ho Cheng - May 27, 2021

| | | |
|---|---|---|
| 10:58:28 | 1 | filing tax returns? |
| | 2 | MS. CLOSE:  Assumes facts not in evidence. |
| | 3 | Vague as to time. |
| | 4 | THE WITNESS:  Time -- time frame. |
| 10:58:41 | 5 | BY MR. VALLA: |
| | 6 | Q.  Well, let me put it another way. |
| | 7 | Did the company, Aurora Imaging Technology, |
| | 8 | file tax returns during the years 2003 to 2013? |
| | 9 | A.  I believe so. |
| | 10 | Q.  Okay. |
| | 11 | A.  I believe so. |
| | 12 | Q.  And how do you believe so? |
| | 13 | MS. CLOSE:  Objection; vague. |
| | 14 | BY MR. VALLA: |
| 10:59:06 | 15 | Q.  Did somebody tell you they did? |
| | 16 | A.  Normally, we -- I assumed, as the CEO, that |
| | 17 | my CFO would do it. |
| | 18 | Q.  Do you recall signing income tax returns |
| | 19 | for the company during that period of time? |
| 10:59:23 | 20 | A.  I do not think I sign.  I think it was |
| | 21 | Steve that sign the tax return because he is the |
| | 22 | CFO. |
| | 23 | Q.  Okay. |
| | 24 | A.  Was the CFO.  Pardon my grammar. |
| 10:59:44 | 25 | Q.  No, no, no.  It's fine.  It's fine.  I |

Olivia Ho Cheng — May 27, 2021

Page 64

| | | |
|---|---|---|
| 10:59:44 | 1 | can't be the judge of anything, really. |
| | 2 | Besides being CEO of AIT, did you have any |
| | 3 | other roles within the company? |
| | 4 | MS. CLOSE:  Asked and answered. |
| 10:59:59 | 5 | THE WITNESS:  I do not understand your |
| | 6 | question. |
| | 7 | BY MR. VALLA: |
| | 8 | Q.   Okay.  So you testified you were CEO of |
| | 9 | AIT, interim at first, from 2003 to 2013.  That's |
| 11:00:14 | 10 | clear. |
| | 11 | Did you do anything else for the company |
| | 12 | other than acting as CEO? |
| | 13 | MS. CLOSE:  Vague and ambiguous, vague as |
| | 14 | to time. |
| 11:00:22 | 15 | THE WITNESS:  I still do not understand |
| | 16 | your question.  I was the CEO. |
| | 17 | BY MR. VALLA: |
| | 18 | Q.   Right.  Exactly.  Were you anything else? |
| | 19 | MS. CLOSE:  Same objections. |
| 11:00:32 | 20 | THE WITNESS:  I serve advisory board for |
| | 21 | other non-for-profit organizations. |
| | 22 | BY MR. VALLA: |
| | 23 | Q.   Did you do anything else for the company? |
| | 24 | A.   Oh. |
| 11:00:46 | 25 | MS. CLOSE:  Same objections. |

Olivia Ho Cheng - May 27, 2021

Page 65

11:00:46  1            THE WITNESS:  I am -- I was the CEO.  I

2       don't know what to say -- what else to say.

3       BY MR. VALLA:

4            Q.   Okay.  What did you do as the CEO?

11:00:54  5            A.   You want me to give you a -- the question

6       is too broad.  Could you rephrase it?

7            Q.   Well, give me the two-minute summary.

8            A.   Okay.  So I manage the staff, grow -- try

9       to grow the business, put the company's business

11:01:23  10      plan together, find resources, which means

11      investors, before it become profitable, set company

12      goal of business expansion and report to shareholder

13      and board on a regular base.

14           Q.   And Mr. James reported to you; right?

11:01:53  15           A.   Yes.

16           Q.   Throughout that ten-year period, roughly

17      from '03 to '13?

18           A.   Yes.

19           Q.   How often did he report to you?

11:02:02  20           MS. CLOSE:  Objection; vague as to time.

21           THE WITNESS:  We are in the same office

22      complex.

23      BY MR. VALLA:

24           Q.   So do you have daily interactions with him

11:02:10  25      during business hours?

Olivia Ho Cheng - May 27, 2021

| | | |
|---|---|---|
| 11:02:10 | 1 | A.   Yes. |
| | 2 | Q.   Do you recall what banks AIT banked with |
| | 3 | during your tenure as CEO? |
| | 4 | A.   Most of the time is Bank of America -- was |
| 11:02:40 | 5 | Bank of America. |
| | 6 | Q.   And the rest of the time? |
| | 7 | A.   We had one account with East West Bank. |
| | 8 | Q.   That is the account that you got sued on |
| | 9 | that you testified about earlier today? |
| 11:03:02 | 10 | A.   I think that was related, I think. |
| | 11 | Q.   Understood. |
| | 12 | During the period of time that you served |
| | 13 | as interim CEO or full CEO of AIT, was the company |
| | 14 | profitable? |
| 11:03:23 | 15 | A.   It was never profitable during the entire |
| | 16 | time. |
| | 17 | Q.   How about prior to 2003?  From 1999 until |
| | 18 | you became interim CEO, was it ever profitable? |
| | 19 | A.   It was never profitable. |
| 11:03:40 | 20 | Q.   And as far as you know -- I realize you |
| | 21 | resigned in July of 2013.  But between July of 2013 |
| | 22 | and November of 2016, was the company profitable? |
| | 23 | MS. CLOSE:  Calls for speculation. |
| | 24 | BY MR. VALLA: |
| 11:03:55 | 25 | Q.   As far as you know? |

Olivia Ho Cheng - May 27, 2021

11:03:55    1          A.    No, not profitable.

            2          Q.    Okay.  How much money did the company lose

            3    during the time that you were CEO?

            4              MS. CLOSE:  Vague and ambiguous.

11:04:05    5              THE WITNESS:  From 2003 to 2013?

            6    BY MR. VALLA:

            7          Q.    That's right.

            8          A.    I cannot remember exactly but roughly 15 --

            9    between 15 to 25 million loss or even more.  I -- I

11:04:31   10    don't remember.  It's --

           11          Q.    Were you on the board of AIT?

           12          A.    Yes.

           13          Q.    And was that during the time that you were

           14    also CEO?

11:04:44   15          A.    Yes.

           16          Q.    Did the board seek to replace you as CEO

           17    during that ten-year period of time?

           18          A.    Yes.

           19          Q.    Do you know why?

11:04:52   20          A.    Because the company wasn't profitable.

           21          Q.    You had spoken about your resignation in

           22    July 2013.  Ms. Cheng, did you resign or were asked

           23    to resign?

           24          A.    I resigned myself, but I was almost

11:05:17   25    forced -- I was forced out.

Olivia Ho Cheng - May 27, 2021

Page 68

| | | |
|---|---|---|
| 11:05:17 | 1 | Q.    And can you explain that to me? |
| | 2 | A.    Because the board and the investors have a |
| | 3 | different financial goal, and I could not serve to |
| | 4 | fulfill that goal. |
| 11:05:43 | 5 | Q.    And what was that goal, Ms. Cheng? |
| | 6 | A.    Exit for investors. |
| | 7 | Q.    And when you say "exit for investors," just |
| | 8 | to make sure the record is clear, you mean for a |
| | 9 | sale of the company? |
| 11:05:55 | 10 | A.    IPO or sale of the company so their stock |
| | 11 | can be liquid. |
| | 12 | Q.    It's a liquidity event? |
| | 13 | A.    Correct. |
| | 14 | Q.    Is that right? |
| 11:06:05 | 15 | A.    Yes. |
| | 16 | Q.    Very good. |
| | 17 | And -- and -- and they asked you to cause a |
| | 18 | liquidity event? |
| | 19 | A.    That is an unspoken goal for any investor |
| 11:06:27 | 20 | who invest in the companies.  That's the purpose. |
| | 21 | Q.    Do you recall, Ms. Cheng, participating in |
| | 22 | negotiations for the sale of Aurora Imaging |
| | 23 | Technology to a third-party investor group? |
| | 24 | A.    Yes. |
| 11:07:00 | 25 | Q.    Do you recall who that third party was? |

Olivia Ho Cheng - May 27, 2021

11:07:00  1         A.    It was China Resources Group or --
          2   Corporation.
          3         Q.    CRC?
          4         A.    CRC.
11:07:12  5         Q.    Yeah, CRC.  I think it's China Resources
          6   Corporation, something like that?
          7         A.    Yeah.
          8         Q.    And -- and they are a -- as far as you
          9   know, they are an arm of the Chinese government?
11:07:28 10               MS. CLOSE:  Objection; calls for
         11   speculation.
         12               THE WITNESS:  I'm sorry, I did not hear
         13   you.
         14   BY MR. VALLA:
11:07:32 15         Q.    Are they a Chinese, state-owned company?
         16         A.    They are Chinese, state-owned company.
         17         Q.    Okay.  And you're aware that there are
         18   certain provisions against the sale of U.S.
         19   technology to China?
11:07:47 20         A.    Yes.
         21         Q.    Okay.  Not just China but other countries
         22   too; right?
         23               MS. CLOSE:  Objection; vague as to time,
         24   calls for a legal conclusion, calls for speculation.
11:07:56 25   ///

Olivia Ho Cheng - May 27, 2021

Page 70

11:07:56  1        BY MR. VALLA:

        2            Q.    When did the negotiations with CRC take

        3        place?

        4            A.    It started 2010.

11:08:03  5            Q.    And how long did they last?

        6            A.    It last a long period of time, roughly less

        7        than two years.

        8            Q.    And did they come to a conclusion?

        9            A.    Yes, they did.

11:08:26 10            Q.    And what was the conclusion?

       11            A.    They did not purchase the company.  The

       12        merger did not happen.

       13            Q.    Do you know why?

       14            A.    Long list of -- some reason we know; some

11:08:48 15        reason we don't know.

       16            Q.    What are the reason you do know?

       17            A.    The reason -- the reason we know, which we

       18        were notified, was they were not interested to enter

       19        medical technology field.  That's what we were told.

11:09:07 20            Q.    So they -- they looked at AIT as a

       21        potential acquisition target for two years, and then

       22        they realized they're not interested in medical

       23        technology?

       24            A.    That's --

11:09:19 25                MS. CLOSE:  Calls for speculation.

Olivia Ho Cheng - May 27, 2021

Page 71

| | | |
|---|---|---|
| 11:09:19 | 1 | BY MR. VALLA: |
| | 2 | Q.   Is that what your te- -- testimony is? |
| | 3 | A.   That's what we was -- we were told. |
| | 4 | Q.   Okay.  Do you believe that? |
| 11:09:28 | 5 | A.   I did not believe that. |
| | 6 | Q.   What did you believe? |
| | 7 | A.   I believe there were some political issues |
| | 8 | causing that deals to fall through. |
| | 9 | Q.   And when you say "political issues," do you |
| 11:09:46 | 10 | mean political issues internal to AIT? |
| | 11 | A.   No. |
| | 12 | Q.   Political with a capital P.  Political |
| | 13 | issues between the United States and China? |
| | 14 | A.   No. |
| 11:09:57 | 15 | Q.   What do you mean? |
| | 16 | A.   It was political within China -- with- -- |
| | 17 | within CRC. |
| | 18 | Q.   In -- in any event, the deal didn't happen; |
| | 19 | right? |
| 11:10:10 | 20 | A.   Right. |
| | 21 | Q.   Okay.  Do you recall what the purchase |
| | 22 | price would have been that you guys were discussing |
| | 23 | in your deal negotiations? |
| | 24 | A.   It was hundred million. |
| 11:10:23 | 25 | Q.   And this was in 2010; right?  It started in |

Olivia Ho Cheng - May 27, 2021

Page 72

| | | |
|---|---|---|
| 11:10:23 | 1 | 2010.   And the company had not made any money? |
| | 2 | MS. CLOSE:  Asked and answered. |
| | 3 | BY MR. VALLA: |
| | 4 | Q.   Ever? |
| 11:10:45 | 5 | MS. CLOSE:  Asked and answered. |
| | 6 | BY MR. VALLA: |
| | 7 | Q.   You -- you -- you made a pitch to CRC to |
| | 8 | sell the company for a hundred million.  Do you |
| | 9 | recall how you just identified that valuation? |
| 11:10:56 | 10 | MS. CLOSE:  Assumes facts not in evidence. |
| | 11 | THE WITNESS:  I don't know whether you know |
| | 12 | the U.S. stock market.  One third, at least, of |
| | 13 | company in the U.S. stock exchange were not |
| | 14 | profitable. |
| 11:11:13 | 15 | BY MR. VALLA: |
| | 16 | Q.   Okay.  So that was your pitch to CRC? |
| | 17 | A.   That was one of the pitch. |
| | 18 | Q.   Okay.  What were the others? |
| | 19 | A.   It's a medical technology company that you |
| 11:11:34 | 20 | can save lives, and that's very valuable. |
| | 21 | Q.   Of course. |
| | 22 | Anything else you can recall was the basis |
| | 23 | of your valuation?  It's a good technology for a |
| | 24 | good purpose, the stock market is full of losers. |
| 11:11:51 | 25 | A.   No losers. |

Olivia Ho Cheng - May 27, 2021

Page 73

11:11:51 | 1    Q.    Well, losers meaning they're losing money;
2    right?
3         A.    Yes.
4         Q.    Right?
5         A.    Yeah.
6         Q.    And what was -- anything else?
7         A.    The company at that time when we were
8    negotiating with them have a revenue in around 20
9    million.
11:12:07 | 10    Q.    Twenty million?
11         A.    Revenue.
12         Q.    Okay.  It was spending more than 20 million
13    a year, then, because it was losing money?
14         A.    Correct.
11:12:21 | 15    Q.    But there was some revenue?
16         A.    Uh-huh.
17         Q.    Was that the highest revenue level during
18    that -- during your ten-year tenure?
19         A.    Yes.
11:12:31 | 20    Q.    Okay.  And the 20 million was in, roughly,
21    2010?
22         A.    I don't remember which year, but it's
23    between '08 and '09 maybe.
24         Q.    Okay.  So prior to the beginning of
11:12:46 | 25    negotiation so you could show the numbers to --

Olivia Ho Cheng — May 27, 2021

Page 74

| | | | |
|---|---|---|---|
| 11:12:46 | 1 | A. | Right. |
| | 2 | Q. | -- to the Chinese -- |
| | 3 | A. | Yes. |
| | 4 | Q. | -- right?  Okay. |
| 11:12:51 | 5 | A. | It takes time to finalize yearly report. |
| | 6 | Q. | Oh, absolutely. |

11:12:46   1       A.    Right.

2       Q.    -- to the Chinese --

3       A.    Yes.

4       Q.    -- right?  Okay.

11:12:51   5       A.    It takes time to finalize yearly report.

6       Q.    Oh, absolutely.

7              When you resigned in July of 2013, what was

8       the valuation of the company at that time?

9       A.    When you say "valuation," you need to

11:13:31  10    rephrase your question because --

11      Q.    Okay.

12      A.    -- I want a definition.

13      Q.    So in 2010 or so when you started speaking

14      with CRC about a sale of the company, you pitched it

11:13:42  15    to them as about a hundred-million dollar value.

16      Three years, roughly, you resign.  What do you think

17      was the value of the company at the time you

18      resigned?

19              MS. CLOSE:  Calls for speculation, calls

11:13:54  20    for expert testimony.

21              MR. VALLA:  Well --

22              MS. CLOSE:  Lacks foundation.

23      BY MR. VALLA:

24      Q.    I'm asking you as the CEO.  Did you know

11:14:03  25    what it was?

11:14:03    1          A.    My view, which is not an appraisal --
            2          Q.    No, of course.  And I'm not -- let -- let
            3    me be perfectly clear.  I am not asking for an
            4    appraisal, and I'm not asking for expert testimony.
            5    However, you testified you were the CEO of this
            6    company for ten years; you pitched it for a hundred
            7    million dollars to a group out of China, three years
            8    later you resign.
            9          I know you had an opinion of what the
11:14:26   10    company was worth when you resigned, and I'm asking
           11    for that opinion.
           12          MS. CLOSE:  Same objections.  If you had an
           13    opinion -- a lay opinion, you can go ahead and
           14    answer.
11:14:37   15          THE WITNESS:  My opinion was the value is
           16    south of 100 million.
           17    BY MR. VALLA:
           18          Q.    Okay.  And how far south of a hundred
           19    million?
11:14:47   20          MS. CLOSE:  Same objections.
           21          THE WITNESS:  It was --
           22    BY MR. VALLA:
           23          Q.    You don't know that?
           24          A.    I don't know that.
11:14:57   25          Q.    All right.  Let me ask it differently.

Olivia Ho Cheng - May 27, 2021

| | | |
|---|---|---|
| 11:14:57 | 1 | Do you think it was less than 50 million? |
| | 2 | MS. CLOSE:  Same objections. |
| | 3 | THE WITNESS:  I wouldn't go that far. |
| | 4 | BY MR. VALLA: |
| 11:15:09 | 5 | Q.  Okay.  So it might have been more than 50 |
| | 6 | million, but you don't have an opinion? |
| | 7 | A.  Yeah. |
| | 8 | Q.  It certainly was not less than 10 million? |
| | 9 | A.  Yeah. |
| 11:15:18 | 10 | Q.  Right? |
| | 11 | A.  Yeah. |
| | 12 | Q.  Correct.  All right. |
| | 13 | We talked a little earlier about Mr. James. |
| | 14 | He's a friends of yours; right? |
| 11:15:35 | 15 | A.  He's my colleague. |
| | 16 | Q.  Of course.  Are you on friendly terms? |
| | 17 | A.  We all -- all friendly with our colleagues. |
| | 18 | Q.  Okay.  That's an unusual company. |
| | 19 | Do you -- do you know whether Mr. James |
| 11:15:53 | 20 | made any personal investment in Aurora Imaging |
| | 21 | Technology? |
| | 22 | A.  I think during the time when the CRC |
| | 23 | transaction was about to be closed, employees that |
| | 24 | had stock options could choose to exercise, so I |
| 11:16:13 | 25 | think he did. |

Olivia Ho Cheng - May 27, 2021

Page 77

| | | |
|---|---|---|
| 11:16:13 | 1 | Q. In fact, I'll represent to you that he |
| | 2 | testified in his deposition that he did exercise |
| | 3 | some options, and he paid about approximately |
| | 4 | $75,000 for that option exercise. |
| 11:16:29 | 5 | Does that ring a bell with you? |
| | 6 | A. I don't re- -- |
| | 7 | MS. CLOSE: Are you asking if she recalls |
| | 8 | his testimony or recalls the event? |
| | 9 | MR. VALLA: I'm asking whether she recalls |
| 11:16:39 | 10 | the event. |
| | 11 | THE WITNESS: I remember. |
| | 12 | BY MR. VALLA: |
| | 13 | Q. That he exercised his stock options and |
| | 14 | paid about 75 grand for it? |
| 11:16:48 | 15 | A. I do not remember how much he pay. |
| | 16 | Q. Okay. But do you recall his testimony the |
| | 17 | other day? Were you present during that portion of |
| | 18 | his deposition? |
| | 19 | A. I was. |
| 11:16:57 | 20 | Q. Okay. Do you think he lied? |
| | 21 | A. I do not think he lied. |
| | 22 | Q. He tells the truth; right? |
| | 23 | A. He's an honest man. |
| | 24 | Q. Right. Do you know of any other investment |
| 11:17:09 | 25 | by Mr. James in AIT? |

Olivia Ho Cheng - May 27, 2021

Page 78

| | | |
|---|---|---|
| 11:17:09 | 1 | A.   I don't remember. |
| | 2 | Q.   You don't know, or you don't remember? |
| | 3 | A.   I don't know.  I -- yeah.  I need to be |
| | 4 | more clear of the -- |
| 11:17:30 | 5 | Q.   That's okay.  Take your time.  And if I ask |
| | 6 | questions too quickly, take your time in answering |
| | 7 | them.  I -- again, I want your best testimony, |
| | 8 | nothing else. |
| | 9 | After you left AIT in June of 2013 -- July |
| 11:17:54 | 10 | of 2013, did you stay in touch with Mr. James? |
| | 11 | A.   No. |
| | 12 | Q.   You cut off all communications with him? |
| | 13 | A.   I wouldn't -- |
| | 14 | Q.   Well, I asked if you stayed in touch with |
| 11:18:08 | 15 | him, you said no.  So -- |
| | 16 | MS. CLOSE:  There's a difference between |
| | 17 | not being in touch and cutting off communications. |
| | 18 | BY MR. VALLA: |
| | 19 | Q.   Okay.  What kind of communications did you |
| 11:18:17 | 20 | have with Mr. James after July of 2013? |
| | 21 | A.   Very infrequent if there was any. |
| | 22 | Q.   Okay. |
| | 23 | A.   I do not remember. |
| | 24 | Q.   Correct. |
| 11:18:28 | 25 | And do you remember whether they were by |

Olivia Ho Cheng — May 27, 2021

| | | |
|---|---|---|
| 11:18:28 | 1 | telephone? |
| | 2 | MS. CLOSE:  Objection; it assumes facts. |
| | 3 | THE WITNESS:  If we contact, telephone was |
| | 4 | the way. |
| 11:18:39 | 5 | BY MR. VALLA: |
| | 6 | Q.   How about email? |
| | 7 | A.   I don't remember. |
| | 8 | Q.   Okay.  But Mr. James came back to work for |
| | 9 | you at some point; right? |
| 11:18:56 | 10 | A.   Yes. |
| | 11 | Q.   And when was that? |
| | 12 | A.   As a CFO. |
| | 13 | Q.   Of what? |
| | 14 | A.   Aurora Healthcare U.S. Corp. |
| 11:19:08 | 15 | Q.   Okay.  So you were in touch with him before |
| | 16 | he came back to work, I assume? |
| | 17 | A.   Could you -- |
| | 18 | MS. CLOSE:  Is that a question? |
| | 19 | THE WITNESS:  Yeah.  Could you rephrase the |
| 11:19:17 | 20 | question? |
| | 21 | BY MR. VALLA: |
| | 22 | Q.   I assume you were in contact with Mr. James |
| | 23 | before he came to Aurora Healthcare. |
| | 24 | MS. CLOSE:  Is it -- that's not a question. |
| 11:19:25 | 25 | /// |

Olivia Ho Cheng - May 27, 2021

Page 80

| | | |
|---|---|---|
| 11:19:25 | 1 | BY MR. VALLA: |
| | 2 |     Q.  Is that right? |
| | 3 |     THE WITNESS:  Do you have a -- can you |
| | 4 | rephrase the question with a time? |
| 11:19:30 | 5 | BY MR. VALLA: |
| | 6 |     Q.  Sure. |
| | 7 |     Do you remember when he came back to work |
| | 8 | for you? |
| | 9 |     A.  In November of 2016. |
| 11:19:37 | 10 |     Q.  Okay.  Did you have contact with him prior |
| | 11 | to November of 2016 to ask him to come and work for |
| | 12 | you? |
| | 13 |     A.  Yes. |
| | 14 |     Q.  Okay.  Do you know when that contact was? |
| 11:19:49 | 15 |     A.  I do not remember. |
| | 16 |     Q.  Was it a month prior to November of 2016? |
| | 17 |     A.  Maybe earlier. |
| | 18 |     Q.  How much earlier? |
| | 19 |     A.  I do not remember. |
| 11:20:06 | 20 |     Q.  Okay.  And do you remember whether that |
| | 21 | contact was by email, by telephone? |
| | 22 |     A.  I don't remember. |
| | 23 |     Q.  Do you remember being contacted by the |
| | 24 | Securities and Exchange Commission about an |
| 11:20:37 | 25 | investigation of a gentleman by the name of Michael |

Olivia Ho Cheng - May 27, 2021

Page 81

| | | |
|---|---|---|
| 11:20:37 | 1 | Devlin, D-e-v-l-i-n? |
| | 2 | A.   Yes. |
| | 3 | Q.   Do you remember when that was? |
| | 4 | A.   I do not remember. |
| 11:20:50 | 5 | Q.   Did you ask Mr. James to ask you in res- -- |
| | 6 | to assist you in responding to the SEC request for |
| | 7 | information? |
| | 8 | A.   I do not remember. |
| | 9 | Q.   Do you remember who contacted you from the |
| 11:21:17 | 10 | Securities and Exchange Commission? |
| | 11 | A.   I do not remember his name. |
| | 12 | Q.   Do you remember his title? |
| | 13 | A.   I do not remember his title either. |
| | 14 | Q.   Did he call you? |
| 11:21:32 | 15 | A.   Yes, he did. |
| | 16 | Q.   Did he also write to you? |
| | 17 | A.   Yes, he did. |
| | 18 | Q.   Did he do so by email? |
| | 19 | A.   Yes. |
| 11:21:45 | 20 | Q.   Do you have that correspondence? |
| | 21 | A.   I don't know whether I have kept it. |
| | 22 | Q.   If it's email correspondence, what email |
| | 23 | address would you have used at the time? |
| | 24 | A.   I don't remember.  I have more than one |
| 11:22:05 | 25 | email account. |

Olivia Ho Cheng - May 27, 2021

Page 82

| | | |
|---|---|---|
| 11:22:05 | 1 | Q.   Can you tell me your email accounts? |
| | 2 | A.   One for -- with Gmail.  The other is with |
| | 3 | B.E. Capital. |
| | 4 | Q.   Any others? |
| 11:22:30 | 5 | A.   That's all. |
| | 6 | Q.   What is the Gmail address? |
| | 7 | A.   O-l-i-h-o-c-h-e-n-g at gmail.com. |
| | 8 | Q.   And what about the one for B.E. Capital? |
| | 9 | A.   I don't remember.  I think it's |
| 11:22:50 | 10 | Olivia.Cheng@becapital, but I -- I don't remember. |
| | 11 | I don't use it. |
| | 12 | Q.   You do not use it? |
| | 13 | A.   Anymore. |
| | 14 | Q.   When did you stop using it? |
| 11:23:01 | 15 | A.   I don't remember exactly when, but I think |
| | 16 | after 2000 -- sometime in 2016 I don't use it. |
| | 17 | Q.   Would it surprise you if I told you that we |
| | 18 | asked you and your counsel to turn over emails |
| | 19 | between yourself and Mr. James and we got a handful |
| 11:23:38 | 20 | of emails for all these years? |
| | 21 | MS. CLOSE:  That would surprise me, |
| | 22 | Counsel, because I haven't received any document |
| | 23 | requests from you. |
| | 24 | BY MR. VALLA: |
| 11:22:05 | 25 | Q.   No? |

Olivia Ho Cheng - May 27, 2021

Page 83

1           MS. CLOSE:  Assumes facts not in evidence.

2       BY MR. VALLA:

3           Q.    So you would be surprised, then?

4           MS. CLOSE:  I'm surprised.

5           THE WITNESS:  We do things that we don't

6       remember all the time.

7           MS. CLOSE:  No, no.  He's asking if you

8       would be surprised if he sent us a document request

9       for emails.

11:24:01    10          THE WITNESS:  I'm sorry, I still do not

11      understand the question.

12          MR. VALLA:  Forget about it.

13          MS. CLOSE:  I'll represent you have not.

14          MR. VALLA:  That we have not received

11:24:08    15      anything?

16          MS. CLOSE:  No.  You have not sent a

17      request for that.

18          MR. VALLA:  Okay.

19          THE WITNESS:  Antonio, can we take a break?

11:24:19    20          MR. VALLA:  Absolutely.

21          THE WITNESS:  I need to go to the restroom.

22          MR. VALLA:  Absolutely can take a break.

23      What time is it?  You want to take an early lunch

24      break?  It's up to you.  We can -- we can go off the

11:24:32    25      record.

Olivia Ho Cheng — May 27, 2021

Page 84

| | | |
|---|---|---|
| 11:24:32 | 1 | (A recess was taken.) |
| | 2 | MR. VALLA:  We can go back on the record. |
| | 3 | BY MR. VALLA: |
| | 4 | Q.   Good morning again, Ms. Cheng. |
| 11:37:45 | 5 | A.   Good morning. |
| | 6 | Q.   And we're back on the record, and you're |
| | 7 | still under oath. |
| | 8 | You understand that? |
| | 9 | A.   I do. |
| 11:37:50 | 10 | Q.   Good. |
| | 11 | Ms. Cheng, did you personally invest in |
| | 12 | Aurora Imaging Technology? |
| | 13 | A.   I did. |
| | 14 | Q.   And how much did you invest? |
| 11:38:10 | 15 | A.   I don't remember the exact amount. |
| | 16 | Q.   Can you give me an approximate amount? |
| | 17 | A.   Over time, more than a million. |
| | 18 | Q.   But less than 2 million? |
| | 19 | A.   I think so. |
| 11:38:33 | 20 | Q.   So between 1 million and 2 million; is that |
| | 21 | right? |
| | 22 | A.   (Nodding head.)  That's the best of my |
| | 23 | recollection. |
| | 24 | Q.   Okay.  And what kind of investments were |
| 11:38:50 | 25 | those?  Were they loans, or were they equity |

Olivia Ho Cheng - May 27, 2021

11:38:50   1    contributions?

2         A.    A lot of equity contribution and loans and

3    participation in other project.

4         Q.    Okay.  Let's talk about equity

11:39:10   5    contributions first.  Did you make those equity

6    contributions directly in your own name?

7         A.    Yes, or my -- with my husband -- with my

8    husband.

9         Q.    And your husband's name is?

11:39:22  10         A.    Ken Cheng.

11         Q.    Cheng.  Okay.

12               And how much were the equity contributions?

13         A.    I do not remember the exact amount.

14         Q.    Do you remember an approximate amount?

11:39:39  15         A.    Approximately maybe 500,000.

16         Q.    Okay.  And you also testified that you made

17    some loans.  Do you remember the amount of those

18    loans?

19         A.    I made several loans to the company along

11:39:57  20    the way.

21         Q.    Okay.  My question was:  Do you remember

22    the amounts of those loans?

23               MS. CLOSE:  Vague as to which one.

24               THE WITNESS:  I don't know which one you

11:40:12  25    are ment- -- you -- you refer to.

Olivia Ho Cheng — May 27, 2021

Page 86

| | | |
|---|---|---|
| 11:40:12 | 1 | BY MR. VALLA: |
| | 2 | Q.   Well, how much was the first loan? |
| | 3 | A.   I don't remember how many loans I made. |
| | 4 | Q.   Okay.  I didn't understand that. |
| 11:40:22 | 5 | So you made some loans; you didn't remember |
| | 6 | how many? |
| | 7 | A.   I don't remember how many. |
| | 8 | Q.   Do you remember how much in total? |
| | 9 | A.   I don't remember how much in total either. |
| 11:40:39 | 10 | Q.   And do you remember if these loans were |
| | 11 | secured or unsecured? |
| | 12 | A.   It normally was unsecure. |
| | 13 | Q.   You also testified that you gave money to |
| | 14 | the company, besides equity and loans, also as |
| 11:41:07 | 15 | contribution to projects; correct? |
| | 16 | A.   Correct. |
| | 17 | Q.   And what does that mean? |
| | 18 | A.   For example, if we want to set up a breast |
| | 19 | center but the company was short of capital, we may |
| 11:41:19 | 20 | ask investor to come in to build the breast center. |
| | 21 | And when we do that, investors will normally say, |
| | 22 | "Will you be willing to do it yourself as a CEO?" |
| | 23 | And if you say yes, then their confident level is |
| | 24 | higher.  So under those kind of circumstances, I |
| 11:41:49 | 25 | made investment with board consent. |

Olivia Ho Cheng - May 27, 2021

Page 87

| | | |
|---|---|---|
| 11:41:49 | 1 | Q.   Understood. |
| | 2 | To help you raise money from other |
| | 3 | investors; right? |
| | 4 | A.   That is correct. |
| 11:42:05 | 5 | Q.   So your testimony is that you invested, in |
| | 6 | one manner or another -- equity, project |
| | 7 | contributions or loans -- somewhere between 1 and |
| | 8 | 2 million dollars in AIT; is that right? |
| | 9 | A.   No.   The equity invest -- oh, I'm sorry.   I |
| 11:42:25 | 10 | did not hear clearly.   Could you repeat the |
| | 11 | question? |
| | 12 | Q.   Sure. |
| | 13 | MR. VALLA:   Madam Court Reporter, can you |
| | 14 | read back the question? |
| | 15 | (The record was read by the reporter.) |
| | 16 | THE WITNESS:   Okay.   Exclude that |
| | 17 | $1.2 million loan guarantee. |
| | 18 | BY MR. VALLA: |
| | 19 | Q.   Plus the 1.2 million loan guarantee with |
| 11:43:01 | 20 | East West Bank that we discussed previously in your |
| | 21 | deposition? |
| | 22 | A.   Right. |
| | 23 | Q.   Okay.   Did you get any of that money |
| | 24 | back -- |
| 11:43:09 | 25 | MS. CLOSE:   Objection; vague and -- |

Olivia Ho Cheng — May 27, 2021

| | | |
|---|---|---|
| 11:43:09 | 1 | BY MR. VALLA: |
| | 2 | Q.   -- that you invested? |
| | 3 | MS. CLOSE:  -- vague and ambiguous. |
| | 4 | THE WITNESS:  Yes. |
| 11:43:15 | 5 | BY MR. VALLA: |
| | 6 | Q.   What did you get back? |
| | 7 | A.   It was 40 percent of the last loan that I |
| | 8 | made which -- |
| | 9 | Q.   Would -- |
| 11:43:28 | 10 | A.   -- was 300,000. |
| | 11 | Q.   So the last loan that you made, you do |
| | 12 | remember was $300,000 and you received back |
| | 13 | 40 percent of that amount; is that right? |
| | 14 | A.   That was correct. |
| 11:43:44 | 15 | Q.   Okay.  Did you get any money out of the |
| | 16 | centers that you contributed to? |
| | 17 | A.   Unfortunately, no. |
| | 18 | Q.   And did you get any money out of the equity |
| | 19 | that you contributed? |
| 11:44:01 | 20 | A.   Unfortunately, no. |
| | 21 | Q.   You mentioned that some of your investments |
| | 22 | were made jointly with your husband.  Did your other |
| | 23 | family members also invest? |
| | 24 | A.   Yes. |
| 11:44:24 | 25 | Q.   Do you know who? |

Olivia Ho Cheng - May 27, 2021

| | | | |
|---|---|---|---|
| 11:44:24 | 1 | A. | My brother. |
| | 2 | Q. | And what is your brother's name? |
| | 3 | A. | Ming Hung Ho, M-i-n-g, H-u-n-g, H-o. |
| | 4 | Q. | And how much did your brother invest? |
| 11:44:40 | 5 | A. | I do not remember. |
| | 6 | Q. | Did you get some or all of that investment |
| | 7 | | back? |
| | 8 | A. | Zero. |
| | 9 | Q. | Did any fa- -- other family members invest? |
| 11:44:54 | 10 | A. | Yes. |
| | 11 | Q. | Do you recall who? |
| | 12 | A. | My uncle. |
| | 13 | Q. | And what is your uncle's name? |
| | 14 | A. | Matthew Lin, L-i-n. |
| 11:45:06 | 15 | Q. | Did your daughter Katherine Cheng invest? |
| | 16 | A. | Yes. |
| | 17 | Q. | How much did she invest? |
| | 18 | A. | I do not remember.  We made the investment |
| | 19 | | for her and just using her name. |
| 11:45:45 | 20 | Q. | You used your money but put it in her name; |
| | 21 | | is that right? |
| | 22 | A. | We invest for her. |
| | 23 | Q. | Right.  How old was she when you did that? |
| | 24 | A. | She's now 35, so during the time when I was |
| 11:46:04 | 25 | | the CEO. |

Olivia Ho Cheng - May 27, 2021

Page 90

| | | |
|---|---|---|
| 11:46:04 | 1 | Q. And she would have been in her 20s? |
| | 2 | A. In her 20s. |
| | 3 | Q. Okay. What about your son Joshua Cheng? |
| | 4 | A. I did it always equally. |
| 11:46:17 | 5 | Q. Did they get any money back from their |
| | 6 | investment? |
| | 7 | A. No. |
| | 8 | Q. Do you know somebody by the name of Ya-I |
| | 9 | Ho? |
| 11:46:43 | 10 | A. Oh, that's my sister-in-law. |
| | 11 | Q. Is she your brother's -- |
| | 12 | A. Wife. |
| | 13 | Q. -- wife? |
| | 14 | A. Yes. |
| 11:46:49 | 15 | Q. Okay. Did she invest? |
| | 16 | A. They invest together. Maybe it was held in |
| | 17 | her name. |
| | 18 | Q. Okay. What about -- forgive -- forgive my |
| | 19 | pronunciation. But what about Yuan Yuan Ho? |
| 11:47:14 | 20 | A. That's my mother. |
| | 21 | Q. Did she invest? |
| | 22 | A. Yes. |
| | 23 | Q. Did she get any money back? |
| | 24 | A. No. |
| 11:47:56 | 25 | THE WITNESS: You have some Italian |

Olivia Ho Cheng — May 27, 2021

Page 91

| 11:47:56 | 1 | expression. |
| | 2 | MR. VALLA:  You can tell -- you can take |
| | 3 | the Italian out of Italy but not the Italian out of |
| | 4 | the Italian.  The older -- I find that the older I |
| 11:48:12 | 5 | get, the more Italian I become.  It's either a |
| | 6 | progression or a regression.  I'm not sure. |
| | 7 | BY MR. VALLA: |
| | 8 | Q.    Do you recall, Ms. Cheng, that my client |
| | 9 | Castel, S.A., also invested in AIT? |
| 11:48:38 | 10 | A.    Absolutely. |
| | 11 | Q.    Did you meet with Castel -- |
| | 12 | MS. CLOSE:  Vague as to time. |
| | 13 | BY MR. VALLA: |
| | 14 | Q.    -- in connection with their investment? |
| 11:48:46 | 15 | A.    When you say Castel, I normally don't -- |
| | 16 | that's the company name.  But the two brothers that |
| | 17 | I dealt with or -- the one I dealt with, I call -- I |
| | 18 | talked to. |
| | 19 | Q.    And who did you speak with? |
| 11:49:08 | 20 | A.    They're name is -- are Davide Malacalza and |
| | 21 | Mattia Malacalza. |
| | 22 | Q.    Did you meet with both of them? |
| | 23 | A.    Several times, many times. |
| | 24 | Q.    And when was this? |
| 11:49:29 | 25 | A.    I don't remember the first time, but it's |

Olivia Ho Cheng - May 27, 2021

| | | |
|---|---|---|
| 11:49:29 | 1 | before 2006. |
| | 2 | Q.   In fact, Castel invested in AIT in 2006? |
| | 3 | A.   Right. |
| | 4 | Q.   So did you meet with Davide and Mattia |
| 11:49:45 | 5 | before Castel invested? |
| | 6 | A.   Yes. |
| | 7 | Q.   Did you meet with anyone else from Castel? |
| | 8 | A.   Their father and family. |
| | 9 | Q.   Do you remember their father's name? |
| 11:50:00 | 10 | A.   Well, here we call Victor, but they call |
| | 11 | Victoria, I think.  Victor and mother and Mattia's |
| | 12 | -- I mean Davide's wife Cecilia. |
| | 13 | Q.   Sylvia. |
| | 14 | A.   Sylvia -- Sylvia. |
| | 15 | Q.   Yeah. |
| | 16 | A.   And Mattia's wife -- |
| | 17 | Q.   Sylvia. |
| | 18 | A.   That's Sylvia? |
| | 19 | Q.   They married two women with the same name. |
| 11:50:25 | 20 | A.   Really? |
| | 21 | Q.   Yes.  Don't ask me. |
| | 22 | A.   Beautiful.  Both beautiful ladies. |
| | 23 | Q.   Yeah. |
| | 24 | A.   Beautiful ladies. |
| 11:50:37 | 25 | Q.   I won't say anything about that. |

Olivia Ho Cheng - May 27, 2021

Page 93

| | | |
|---|---|---|
| 11:50:37 | 1 | MS. CLOSE:  You're not going to comment on |
| | 2 | the record? |
| | 3 | MR. VALLA:  Not on the record. |
| | 4 | BY MR. VALLA: |
| 11:50:45 | 5 | Q.    Did you meet with anyone else from Castel |
| | 6 | other than the Malacalza family that you just |
| | 7 | described? |
| | 8 | MS. CLOSE:  Vague as to time.  Anytime? |
| | 9 | BY MR. VALLA: |
| 11:50:58 | 10 | Q.    At any time. |
| | 11 | A.    Yes, many of their colleagues. |
| | 12 | Q.    Okay.  Do you remember any of their names? |
| | 13 | A.    So many.  Roberto, Antonio.  Many.  Those |
| | 14 | two I remember the most, especially Roberto. |
| 11:51:25 | 15 | Q.    Okay.  Did -- you've stated -- I think you |
| | 16 | testified earlier that Castel first invested in |
| | 17 | 2006, and you met with Castel representatives prior |
| | 18 | to their investment; is that right? |
| | 19 | A.    Yes. |
| 11:51:45 | 20 | Q.    Do you recall that investment documents |
| | 21 | were signed in connection with Castel's investment |
| | 22 | in 2006? |
| | 23 | A.    Could you restate the question -- |
| | 24 | Q.    Yeah. |
| 11:51:56 | 25 | A.    -- again? |

Olivia Ho Cheng - May 27, 2021

Page 94

| | | |
|---|---|---|
| 11:51:56 | 1 | Q.    Do you recall whether papers were signed in |
| | 2 | connection with Castel's investment in 2006? |
| | 3 | A.    Yes. |
| | 4 | MR. VALLA:  Ms. Cheng, I'm going to direct |
| 11:52:27 | 5 | your attention to an exhibit.  The way -- the way we |
| | 6 | do this to simplify things is we've shared all the |
| | 7 | potential exhibits in advance. |
| | 8 | THE WITNESS:  Okay. |
| | 9 | MR. VALLA:  I provided a printout of all |
| 11:52:37 | 10 | exhibits to your lawyer this morning before the |
| | 11 | deposition started and -- so that we can have those |
| | 12 | available for you to consult.  Everyone who is on |
| | 13 | Zoom has received a link to be able to view or |
| | 14 | download those exhibits. |
| 11:52:52 | 15 | The exhibits are in a physical binder as |
| | 16 | well as in a folder.  They're tabbed identically in |
| | 17 | the binder and in the folder, and I'm going to |
| | 18 | direct your attention to document or -- Exhibit |
| | 19 | No. 36. |
| 11:53:12 | 20 | So, Madam Court Reporter, if you could mark |
| | 21 | this as Plaintiff's 1 for identification. |
| | 22 | (The aforementioned document was |
| | 23 | marked Exhibit 1 for |
| | 24 | identification.) |
| 11:53:47 | 25 | /// |

Olivia Ho Cheng - May 27, 2021

Page 95

| | | |
|---|---|---|
| 11:53:47 | 1 | BY MR. VALLA: |
| | 2 | Q.    Please take your time and -- and review |
| | 3 | that document, and let me know when you're ready to |
| | 4 | -- speak about it. |
| 11:53:55 | 5 | A.    This is a loan documentation.  I don't read |
| | 6 | that quickly. |
| | 7 | Q.    Well, maybe you can just turn pages on it. |
| | 8 | I only have a couple of questions for you on it. |
| | 9 | A.    Okay. |
| 11:54:14 | 10 | MS. CLOSE:  Why don't you just familiarize |
| | 11 | yourself with it, and then we'll see if -- if one of |
| | 12 | his questions requires you to dig deeper, we'll read |
| | 13 | more. |
| | 14 | MS. BUCHANAN:  Counsel, can I just make |
| 11:54:26 | 15 | sure that we're all looking at the same thing?  This |
| | 16 | is the document that's marked in the file as |
| | 17 | Exhibit 36? |
| | 18 | MR. VALLA:  It is 36.  It's a doc- -- |
| | 19 | MS. BUCHANAN:  Is that correct? |
| 11:54:37 | 20 | MR. VALLA:  It is 36.  It's a document |
| | 21 | titled "Series C Preferred Stock Purchase |
| | 22 | Agreement." |
| | 23 | MS. BUCHANAN:  I thought -- as soon as you |
| | 24 | said it was a loan document, maybe I misunderstood |
| 11:54:53 | 25 | what she said, but -- just thank you for the |

Olivia Ho Cheng - May 27, 2021

11:54:53  1        confirmation.

2            Q.    Maybe, Ms. Cheng, I can short-cut the

3        process a little bit.

4            A.    Yeah.

11:58:13  5        Q.    I'll represent to you that this is a

6        document titled "Series C Preferred Stock Purchase

7        Agreement" --

8            A.    Okay.

9            Q.    -- that it's dated June 2006.

11:58:24 10        A.    Uh-huh.

11           Q.    And, in fact, you seem to recall earlier

12       that my client Castel invested in AIT in 2006; is

13       that right?

14           A.    That is right.

11:58:34 15        Q.    And I'll represent to you this is their

16       investment document whereby they purchased 1,010,101

17       shares of Series C --

18           A.    Uh-huh.

19           Q.    -- for a purchase price or investment

11:58:51 20       amount of $2 million.

21           A.    Okay.

22           Q.    Okay.  Do you recall that transaction,

23       generally?  Do you recall Castel investing?

24           A.    Yes.

11:59:01 25        Q.    And that was after you met with some of

Olivia Ho Cheng - May 27, 2021

Page 97

| | | |
|---|---|---|
| 11:59:01 | 1 | Castel's representatives as you described earlier; |
| | 2 | right? |
| | 3 | A.  Yes. |
| | 4 | Q.  I would like you to turn to page 21 of that |
| 11:59:15 | 5 | document.  Do you see that at the top of the page |
| | 6 | there is a paragraph called C -- |
| | 7 | A.  Uh-huh. |
| | 8 | Q.  -- paragraph C? |
| | 9 | And that paragraph says that Aurora shall |
| 11:59:40 | 10 | deliver to the investor -- that is Castel -- so long |
| | 11 | as the investor holds at least 500,000 shares of |
| | 12 | Series C stock, and then it lists a series of things |
| | 13 | that Aurora would deliver. |
| | 14 | Do you see that? |
| 11:59:56 | 15 | A.  Yes. |
| | 16 | Q.  Okay.  And I stated to you earlier and it's |
| | 17 | reflected on page -- Exhibit E of the document that |
| | 18 | my client received over a million shares -- |
| | 19 | A.  Okay. |
| 12:00:07 | 20 | Q.  -- of Series C for -- in exchange for an |
| | 21 | investment of $2 million; is that right? |
| | 22 | A.  Yes. |
| | 23 | Q.  Okay.  If you turn back to page 21, still |
| | 24 | paragraph C, sub Roman numeral V reads:  "Such other |
| 12:00:36 | 25 | reporting materials as may be reasonably requested |

Olivia Ho Cheng — May 27, 2021

Page 98

| | | |
|---|---|---|
| 12:00:36 | 1 | by the investor." |
| | 2 | So, again, this is the stock purchase |
| | 3 | agreement.  Castel invests for the first time Series |
| | 4 | C preferred, and paragraph C Roman numeral V |
| 12:00:53 | 5 | basically says that they can request Aurora to |
| | 6 | provide information as long as they reasonably |
| | 7 | request it. |
| | 8 | Is that your understanding of that |
| | 9 | contract -- |
| 12:01:05 | 10 | MS. CLOSE:  Document -- |
| | 11 | BY MR. VALLA: |
| | 12 | Q.    -- that little piece of that document? |
| | 13 | MS. CLOSE:  Document speaks for itself -- |
| | 14 | THE WITNESS:  Yes. |
| 12:01:10 | 15 | MS. CLOSE:  -- calls for a legal |
| | 16 | conclusion. |
| | 17 | BY MR. VALLA: |
| | 18 | Q.    You -- is that your understanding, |
| | 19 | Ms. Cheng? |
| 12:01:14 | 20 | A.    Yes. |
| | 21 | Q.    Okay.  That's fine. |
| | 22 | MR. VALLA:  Let us turn, then, to Document |
| | 23 | No. 38, which I'll ask the court to mark next in |
| | 24 | order. |
| 12:00:36 | 25 | /// |

```
 1              (The aforementioned document was
 2          marked Exhibit 2 for
 3          identification.)
 4              MS. CLOSE:  I'm going to write on this just
 5          so we don't get it confused if you ever want to go
 6          back.  This is Tab 36, Exhibit 1.  This isn't the
 7          official copy anyway.  And this is Tab 38?  This is
 8          Tab 38; right, Antonio?
 9              MR. VALLA:  That is correct.
10      BY MR. VALLA:
11          Q.   Okay.  Ms. Cheng, you have the document in
12      front of you; right?
13          A.   Yes.
14          Q.   In fact, you and I appear to be looking at
15      the same page which is Exhibit A of the document,
16      the document being the Series D Preferred Stock
17      Purchase Agreement entered into in July -- July 15,
18      2008 --
19          A.   Uh-huh.
20          Q.   -- between my client among others and
21      Aurora.
22          A.   Uh-huh.
23          Q.   And the last page of that document being
24      Exhibit A reflects that Castel further invested
25      $1,666,000 in exchange for 512,821 shares of Series
```

Timestamps (left margin): 12:01:47 (line 5), 12:02:33 (line 10), 12:02:45 (line 15), 12:02:54 (line 20), 12:03:09 (line 25)

Olivia Ho Cheng - May 27, 2021

Page 100

| | | |
|---|---|---|
| 12:03:09 | 1 | D preferred stock; is that correct? |
| | 2 | A.   Yes. |
| | 3 | Q.   Do you need a minute, Ms. Cheng? |
| | 4 | A.   I'm okay. |
| 12:03:36 | 5 | Q.   Okay.  I saw you taking notes, so I don't |
| | 6 | want to interrupt that. |
| | 7 | A.   Yeah. |
| | 8 | Q.   So between the Series D and the Series C as |
| | 9 | reflected in your notes that I can read from here, |
| 12:03:47 | 10 | my client invested nearly $3.7 million between the |
| | 11 | two series approximately two years apart.  First the |
| | 12 | C and then the D; is that correct? |
| | 13 | A.   Yes. |
| | 14 | Q.   Okay.  So I'm going to ask you to turn to |
| 12:04:08 | 15 | page 21 of the document we're currently examining |
| | 16 | which is the Series D Stock Purchase Agreement. |
| | 17 | A.   Yeah. |
| | 18 | Q.   I'll direct your attention on page 21 to |
| | 19 | subparagraph D, as in "David." |
| 12:04:24 | 20 | A.   Yeah. |
| | 21 | Q.   It's very similar to the subparagraph we |
| | 22 | just reviewed in the prior agreement. |
| | 23 | A.   Right. |
| | 24 | Q.   And paragraph D says that Aurora shall |
| 12:04:33 | 25 | deliver certain information to each investor as long |

Olivia Ho Cheng - May 27, 2021

| | | |
|---|---|---|
| 12:04:33 | 1 | as they hold at least 500,000 shares of Series D |
| | 2 | stock.  And then subparagraph Roman numeral V again |
| | 3 | reads "Such other reporting materials as may |
| | 4 | reasonably be requested by the investor"; is that |
| 12:04:54 | 5 | correct? |
| | 6 | A.   That is correct. |
| | 7 | Q.   And you understand that to mean that as |
| | 8 | long as Aurora — as long as Castel have at least |
| | 9 | half a million shares Series D, it could make |
| 12:05:07 | 10 | reasonable requests for information. |
| | 11 | Do you understand that? |
| | 12 | MS. CLOSE:  Document speaks for itself, |
| | 13 | calls for legal conclusion. |
| | 14 | BY MR. VALLA: |
| 12:05:11 | 15 | Q.   Do you understand that, Ms. Cheng? |
| | 16 | A.   Yes. |
| | 17 | MS. CLOSE:  Did you get both of those |
| | 18 | objections? |
| | 19 | THE REPORTER:  No. |
| 12:05:23 | 20 | MS. CLOSE:  Document speaks for itself, |
| | 21 | calls for a legal conclusion.  He started talking |
| | 22 | over me. |
| | 23 | BY MR. VALLA: |
| | 24 | Q.   And, Ms. Cheng, if you could turn to |
| 12:05:34 | 25 | page 25 of that document.  You see there's a |

Olivia Ho Cheng — May 27, 2021

| | | |
|---|---|---|
| 12:05:34 | 1 | signature block for Aurora Imaging Technology, Inc. |
| | 2 | Do you see that, Ms. Cheng? |
| | 3 | A. Uh-huh. Right. |
| | 4 | Q. Do you see that signature block? |
| | 5 | A. Right. |
| | 6 | Q. Is that your signature, Ms. Cheng? |
| | 7 | A. That is. |
| | 8 | Q. Okay. So when Castel invested in 2006 -- |
| | 9 | so we're talking about June 2006 -- |
| 12:06:15 | 10 | A. Right. |
| | 11 | Q. What was the valuation of Aurora? |
| | 12 | MS. CLOSE: Calls for speculation. |
| | 13 | MR. VALLA: No. |
| | 14 | MS. CLOSE: Calls for expert opinion. |
| 12:06:25 | 15 | BY MR. VALLA: |
| | 16 | Q. What was the valuation of Aurora -- |
| | 17 | MS. CLOSE: Same. |
| | 18 | BY MR. VALLA: |
| | 19 | Q. -- at the time of Castel's investment? |
| 12:06:33 | 20 | MS. CLOSE: Same objection. |
| | 21 | THE WITNESS: The valuation in this case is |
| | 22 | the price the share -- the investor paid. |
| | 23 | BY MR. VALLA: |
| | 24 | Q. So, in fact, you know exactly what that |
| 12:06:44 | 25 | valuation was, of the company right? |

Olivia Ho Cheng - May 27, 2021

Page 103

| | | |
|---|---|---|
| 12:06:44 | 1 | A.    It should be -- the calculator's off. |
| | 2 | Q.    Right. |
| | 3 | A.    Yeah. |
| | 4 | Q.    Right.  Do you recall what that was? |
| 12:06:50 | 5 | A.    I don't recall.  We can sum it up.  We can |
| | 6 | do calculation now. |
| | 7 | Q.    Okay.  I'd be happy for you to do them at a |
| | 8 | break.  Maybe we can pick up that subject again |
| | 9 | later. |
| | 10 | A.    Uh-huh. |
| | 11 | Q.    My point here and what I'm seeking your |
| | 12 | testimony on is that when investors invest as Castel |
| | 13 | did in 2006 and 2008, they receive a certain number |
| | 14 | of shares for their money? |
| 12:07:16 | 15 | A.    Right. |
| | 16 | Q.    That assumes that their shares represent a |
| | 17 | percentage of the overall value of the company; is |
| | 18 | that true? |
| | 19 | A.    That is correct. |
| 12:07:22 | 20 | Q.    And so the percentage of the overall value |
| | 21 | of the company multiplied by a hundred percent gives |
| | 22 | you the total value of the company; is that -- is |
| | 23 | that correct? |
| | 24 | A.    That's how people calculate. |
| 12:07:35 | 25 | Q.    That is how it's calculated, correct. |

Olivia Ho Cheng - May 27, 2021

| | | |
|---|---|---|
| 12:07:35 | 1 | A.    Uh-huh. |
| | 2 | Q.    Good.   I'm glad that economics hasn't |
| | 3 | changed much since I last studied it.   Now, that -- |
| | 4 | does that mean, Ms. Cheng, that when the company |
| 12:07:48 | 5 | sold shares to Castel -- when AIT sold shares to |
| | 6 | Castel, it represented to Castel that its value -- |
| | 7 | AIT's value was a certain amount, does it not? |
| | 8 | MS. CLOSE:  Calls for a legal conclusion. |
| | 9 | THE WITNESS:  In general -- I don't want to |
| 12:08:08 | 10 | say something that you don't already know.   When |
| | 11 | investor invest, the value -- they decide how much |
| | 12 | they want to invest at what price based on their |
| | 13 | thinking of the valuation.   Whether this valuation |
| | 14 | was presented by the company or it's been done by |
| 12:08:34 | 15 | outsider, that was the value they agree, and they |
| | 16 | put the money in.   So -- |
| | 17 | BY MR. VALLA: |
| | 18 | Q.    I understand. |
| | 19 | I understand but did the company present a |
| 12:08:44 | 20 | valuation, as far as you can remember, in 2006? |
| | 21 | A.    Yes. |
| | 22 | Q.    Well, did the company present a valuation, |
| | 23 | as far as you can remember, in 2008? |
| | 24 | A.    Yes. |
| 12:08:55 | 25 | Q.    Okay.   Do you remember what those |

Olivia Ho Cheng - May 27, 2021

Page 105

12:08:55    1        valuations were?

            2            A.    I cannot think -- I cannot remember on the

            3        top of my head.  It can be calculated.

            4            Q.    Okay.  All right.  Are you aware,

12:09:08    5        Ms. Cheng, that in addition to the two equity

            6        investments we just discussed, the Series D and the

            7        Series C, Castel also loaned money to Aurora Imaging

            8        Technology?

            9                MS. CLOSE:  Vague as to time.

           10        BY MR. VALLA:

           11            Q.    Ever?

           12                MS. CLOSE:  No, vague as to the time of her

           13        awareness.

           14        BY MR. VALLA:

           15            Q.    Are you aware now?

           16            A.    I'm sorry, could you restate the question?

           17            Q.    Yes.  As you sit here today, Ms. Cheng --

           18            A.    Yes.

           19            Q.    -- did you know that Castel was also a

12:09:43   20        lender to AIT?

           21            A.    Yes.

           22            Q.    Do you know how much money Castel lent to

           23        AIT?

           24            A.    250,000.

12:09:50   25            Q.    Do you know whether it was more than one

Olivia Ho Cheng - May 27, 2021

Page 106

| | | |
|---|---|---|
| 12:09:50 | 1 | loan or just one loan? |
| | 2 | A.    I don't remember, but I think -- |
| | 3 | THE WITNESS:  Should I guess? |
| | 4 | MS. CLOSE:  No. |
| 12:10:00 | 5 | THE WITNESS:  I don't want to guess. |
| | 6 | MS. CLOSE:  Okay. |
| | 7 | BY MR. VALLA: |
| | 8 | Q.    I'll represent to you that I'm aware of one |
| | 9 | loan.  Are you aware of any other loans? |
| 12:10:06 | 10 | A.    I do not believe so -- |
| | 11 | Q.    Okay. |
| | 12 | A.    -- but I don't remember. |
| | 13 | Q.    And do you know what the valuation of AIT |
| | 14 | was at the time that Castel lent $250,000 to AIT? |
| 12:10:19 | 15 | A.    I do not know. |
| | 16 | Q.    Do you know how much money AIT already owed |
| | 17 | to other lenders at the time that Castel invested -- |
| | 18 | at the time that Castel made its loan? |
| | 19 | A.    Could you restate the question again? |
| 12:10:40 | 20 | Q.    Sure. |
| | 21 | How deep into debt was AIT by the time it |
| | 22 | sought my client's money? |
| | 23 | A.    Deep. |
| | 24 | Q.    Deep. |
| 12:10:52 | 25 | And can you give me a sense of the depth? |

Olivia Ho Cheng - May 27, 2021

Page 107

| | | |
|---|---|---|
| 12:10:52 | 1 | A.   I do not remember exactly, but it's in the |
| | 2 | millions. |
| | 3 | Q.   Could be -- could it be over 20 million? |
| | 4 | A.   I don't remember. |
| 12:11:07 | 5 | Q.   Do you know that Castel made demands for |
| | 6 | payment on its $250,000 loan to AIT? |
| | 7 | MS. CLOSE:  Vague as to time. |
| | 8 | BY MR. VALLA: |
| | 9 | Q.   At any time. |
| 12:11:37 | 10 | A.   Most of the -- of the lender, when the loan |
| | 11 | made due, make demands. |
| | 12 | Q.   Isn't that right? |
| | 13 | So are you aware of -- of Castel making a |
| | 14 | demand for payment? |
| 12:11:48 | 15 | A.   I don't remember, but logically they did. |
| | 16 | Q.   Who would they have made that demand to? |
| | 17 | MS. CLOSE:  Lacks foundation, calls for |
| | 18 | speculation. |
| | 19 | THE WITNESS:  The company. |
| 12:12:04 | 20 | BY MR. VALLA: |
| | 21 | Q.   The company, right.  So to you? |
| | 22 | A.   I am the -- I was the CEO. |
| | 23 | Q.   You are the CEO, aren't you? |
| | 24 | A.   Unfortunately; right?  If I was the CEO, |
| 12:12:16 | 25 | then I was the one they made a demand to. |

Olivia Ho Cheng - May 27, 2021

Page 108

| 12:12:16 | 1 | Q.   Okay.  Could it have been to Steven James? |
| | 2 | MS. CLOSE:  Calls for speculation. |
| | 3 | THE WITNESS:  I don't remember, but it's |
| | 4 | most -- very likely. |
| 12:12:30 | 5 | BY MR. VALLA: |
| | 6 | Q.   More likely, isn't it? |
| | 7 | A.   More likely. |
| | 8 | Q.   And you testified you and Mr. James were |
| | 9 | colleagues and on good terms and you spoke daily |
| 12:12:38 | 10 | because you were in the office together; is that |
| | 11 | right? |
| | 12 | A.   That is right. |
| | 13 | Q.   So Mr. James would have told you about a |
| | 14 | lender demand for payment -- |
| 12:12:45 | 15 | MS. CLOSE:  It calls for -- |
| | 16 | BY MR. VALLA: |
| | 17 | Q.   -- whether it was my client or anyone else? |
| | 18 | MS. CLOSE:  Calls for speculation. |
| | 19 | THE WITNESS:  In general, yes. |
| 12:12:51 | 20 | BY MR. VALLA: |
| | 21 | Q.   Yeah.  Because Mr. James didn't hide things |
| | 22 | from you; right? |
| | 23 | MS. CLOSE:  Calls for speculation. |
| | 24 | BY MR. VALLA: |
| 12:12:57 | 25 | Q.   As far as you know? |

Olivia Ho Cheng - May 27, 2021

Page 109

| | | | |
|---|---|---|---|
| 12:12:57 | 1 | A. | Agree.  No. |
| | 2 | Q. | Okay.  He's an honest person? |
| | 3 | A. | Yes. |
| | 4 | Q. | Okay.  Did AIT pay my client's loan back? |
| 12:13:14 | 5 | A. | No. |
| | 6 | Q. | Why not? |
| | 7 | A. | We don't have cash. |
| | 8 | Q. | Is that a good reason not to pay back a |

9        loan?

12:13:21   10        A.    That is never a good reason, but that was

11        the situation.

12        Q.    Okay.  Do you know whether my client's

13        demand for payment was brought up to the board for a

14        decision?

12:13:38   15        A.    I don't remember, but it normally should

16        be.

17        Q.    Okay.  You've managed companies for many,

18        many years in different industries.  When a company

19        doesn't have cash to pay back debt, what does it

12:13:56   20        usually do?

21            MS. CLOSE:  Objection; calls for

22        speculation.

23        BY MR. VALLA:

24        Q.    Does it sell assets?

12:14:02   25            MS. CLOSE:  Lacks foundation, calls for

Olivia Ho Cheng - May 27, 2021

Page 110

12:14:02    1          speculation, an incomplete hypothetical.

            2                  THE WITNESS:  I think it's a very difficult

            3          question to answer because the company are very --

            4          all different.

12:14:21    5    BY MR. VALLA:

            6          Q.    That's right.

            7                But a promise to pay is a promise to pay,

            8          is it not?

            9          A.    Absolutely.

12:14:27   10          Q.    Okay.  Who made that promise to pay my

           11          client?

           12                  MS. CLOSE:  Objection; calls for a legal

           13          conclusion.

           14                  THE WITNESS:  The paper speak itself, the

12:14:44   15          company.

           16    BY MR. VALLA:

           17          Q.    The company did?

           18          A.    (Nodding head.)

           19                  MR. VALLA:  I'm going to turn your

12:15:18   20          attention, Ms. Cheng, to Document No. 41 in our

           21          exhibit list which I ask the reporter to mark next

           22          in order.

           23                  (The aforementioned document was

           24                  marked Exhibit 3 for

12:15:29   25                  identification.)

Olivia Ho Cheng - May 27, 2021

```
12:15:29    1              MS. CLOSE:  Was Document 38 ever marked as

            2       an exhibit?

            3              MR. VALLA:  It was marked as two.

            4              MS. CLOSE:  As two.  And this is

12:15:38    5       Document 41.  Then it's Exhibit 3?

            6              MR. VALLA:  It is Exhibit 3, next in order,

            7       yes.

            8       BY MR. VALLA:

            9          Q.   Ms. Cheng, I'll represent to you that this

12:16:00   10       is a document titled "secured promissory note."

           11          A.   Yes.

           12          Q.   It is --

           13          A.   Secured --

           14          Q.   I'm sorry, what did you say?

12:16:06   15              MS. CLOSE:  She was just reading it.

           16              THE WITNESS:  I was mumbling.  I was just

           17       repeating what you were saying.

           18              MS. BUCHANAN:  I'm sorry, can you tell me

           19       what exhibit we're on?

12:16:24   20              MR. VALLA:  Forty-one.

           21              MS. BUCHANAN:  Thank you.

           22              MS. CLOSE:  Tab 41, it's Exhibit No. 3.

           23              MS. BUCHANAN:  Got it.

           24       BY MR. VALLA:

12:16:29   25          Q.   So, Ms. Cheng, this is a document titled
```

Olivia Ho Cheng - May 27, 2021

Page 112

| | | |
|---|---|---|
| 12:16:29 | 1 | "Secure Promissory Note." It appears to be dated |
| | 2 | March 14, 2011. |
| | 3 | A.   Okay. |
| | 4 | Q.   It's a promissory note in the principal |
| 12:16:38 | 5 | amount of $250,000 payable to Castel, S.A., by |
| | 6 | Aurora Imaging Technology; is that correct? |
| | 7 | A.   Correct. |
| | 8 | Q.   If you turn to the last page of the |
| | 9 | document, Ms. Cheng, you'll see that there is a |
| 12:17:02 | 10 | signature block purporting to be your signature on |
| | 11 | behalf of Aurora. |
| | 12 | Is that your signature, Ms. Cheng? |
| | 13 | A.   Yes. |
| | 14 | Q.   And when you signed that document in 2011 |
| 12:17:15 | 15 | you, on behalf of the company -- not you personally |
| | 16 | but you on behalf of the company were promising to |
| | 17 | pay that money back; is that right? |
| | 18 | MS. CLOSE:  Document speaks for itself, |
| | 19 | calls for a legal conclusion. |
| 12:17:28 | 20 | THE WITNESS:  Just like the counsel say, |
| | 21 | yes, the document speaks for itself. |
| | 22 | BY MR. VALLA: |
| | 23 | Q.   So you on behalf of the company were |
| | 24 | promising to pay that money back; is that right? |
| 12:17:37 | 25 | MS. CLOSE:  Same objections. |

Olivia Ho Cheng - May 27, 2021

| | | |
|---|---|---|
| 12:17:37 | 1 | THE WITNESS:  Yes. |
| | 2 | BY MR. VALLA: |
| | 3 | Q.    Yes?  Okay. |
| | 4 | And did the company pay that money back as |
| 12:17:44 | 5 | far as you know? |
| | 6 | A.    No. |
| | 7 | Q.    The document is dated March of 2011.  How |
| | 8 | deep in debt was the company at that point? |
| | 9 | A.    I do not remember. |
| 12:18:01 | 10 | Q.    Could it have been in the millions? |
| | 11 | A.    Yes. |
| | 12 | MS. CLOSE:  Lacks foundation. |
| | 13 | BY MR. VALLA: |
| | 14 | Q.    Over 10 million? |
| 12:18:09 | 15 | A.    I don't remember. |
| | 16 | Q.    How likely was it in 2011 that this debt |
| | 17 | would be paid back? |
| | 18 | A.    I don't want to speculate. |
| | 19 | Q.    Of course you do not, and I don't want you |
| 12:18:27 | 20 | to.  In fact, I -- I have I made it very clear. |
| | 21 | But just to summarize your testimony so |
| | 22 | far, the company never made any money, it lost a lot |
| | 23 | of money, between 25 and 30 million over a rather |
| | 24 | lengthy period of time. |
| 12:18:39 | 25 | MR. VALLA:  And, Counsel, I appreciate your |

Olivia Ho Cheng - May 27, 2021

| | | |
|---|---|---|
| 12:18:39 | 1 | hand, you know, asking your client not to answer |
| | 2 | until you have an opportunity to object -- |
| | 3 | MS. CLOSE:  If necessary. |
| | 4 | MR. VALLA:  -- which is fine, but you've |
| 12:18:51 | 5 | been doing it for the past hour.  I mean, I know |
| | 6 | these are sensitive topics.  I will stop, I will not |
| | 7 | take her answer unless you've had an opportunity to |
| | 8 | object. |
| | 9 | MS. CLOSE:  I'm just signaling to her that |
| 12:19:02 | 10 | you're about to recap a bunch of things before |
| | 11 | asking -- |
| | 12 | MR. VALLA:  It's -- it's extremely -- it's |
| | 13 | extremely distracting, so I understand why you're |
| | 14 | doing it.  But if could stop coaching the witness by |
| 12:19:11 | 15 | waving your hand, I would very much appreciate it. |
| | 16 | MS. CLOSE:  It's not coaching.  I'm just |
| | 17 | saying hold off on answering until I can object. |
| | 18 | MR. VALLA:  You're telling your client |
| | 19 | to -- to not answer until you have a chance to |
| 12:19:25 | 20 | object -- |
| | 21 | MS. CLOSE:  Exactly.  That is not coaching. |
| | 22 | MR. VALLA:  Isn't that -- that is not |
| | 23 | coaching the witness, suggesting that you not answer |
| | 24 | a question? |
| 12:19:31 | 25 | MS. CLOSE:  It is not.  I have never |

Olivia Ho Cheng — May 27, 2021

Page 115

| | | |
|---|---|---|
| 12:19:31 | 1 | prevented her from answering a question yet so far, |
| | 2 | so just let me get my objection on the record.  You |
| | 3 | like to talk over my objections, too, so I'm just |
| | 4 | trying to signal, hold off, there's probably an |
| 12:19:40 | 5 | objection coming. |
| | 6 | MR. VALLA:  All right. |
| | 7 | BY MR. VALLA: |
| | 8 | Q.    Do you remember my question? |
| | 9 | A.    No. |
| 12:19:45 | 10 | Q.    The problem is I don't remember my |
| | 11 | question. |
| | 12 | So in 2011, my client lends $250,000 to |
| | 13 | your company and you, on behalf of the company, |
| | 14 | promise to pay it back.  And my question was:  How |
| 12:20:01 | 15 | likely was it, back in 2011, that it would actually |
| | 16 | be paid back? |
| | 17 | MS. CLOSE:  Calls for speculation, |
| | 18 | incomplete hypothetical. |
| | 19 | THE WITNESS:  It was not zero. |
| 12:20:13 | 20 | BY MR. VALLA: |
| | 21 | Q.    Okay. |
| | 22 | A.    We had a hundred-million merger deal |
| | 23 | pending. |
| | 24 | Q.    This was the CRC merger that you discussed |
| 12:20:26 | 25 | previously in the testimony; is that right? |

Olivia Ho Cheng — May 27, 2021

Page 116

12:20:26
1      A.   Yes.

2      Q.   Okay.   And if that deal had gone through,

3   there would have been enough money to pay back this

4   promissory note?

12:20:35
5      A.   Absolutely.

6      Q.   Absolutely.

7           But, in fact, the deal did not go through,

8   and the note didn't get paid back; right?

9           MS. CLOSE:   Asked and answered, compound.

12:20:45
10          THE WITNESS:   Yes.

11   BY MR. VALLA:

12     Q.   Do you see anywhere in this promissory note

13   where it says that it's going to be paid back only

14   if the CRC deal goes through?

12:21:00
15          MS. CLOSE:   The document speaks for itself.

16   BY MR. VALLA:

17     Q.   Do you see anything in the promissory

18   note --

19          MS. CLOSE:   Take your time.

12:21:06
20   BY MR. VALLA:

21     Q.   -- that says that?   And take your time.

22     A.   I do see on page 1 under mature- --

23   maternity -- maturity date, if the maturity date of

24   this note is the first to occur of A(1), 3:00 p.m.

12:22:10
25   Boston, Massachusetts, time on the date that certain

Olivia Ho Cheng – May 27, 2021

| | | |
|---|---|---|
| 12:22:10 | 1 | letter of credit dated December 23rd, 2010, in the |
| | 2 | amount of U.S. Dollar 1.485 million issued by China |
| | 3 | Merchant Bank, Shanghai branch and benefiting the |
| | 4 | maker is paid in full. |
| 12:22:32 | 5 | Two, 3:00 p.m. Boston Massachusetts time, |
| | 6 | on the date that any stock purchase transaction |
| | 7 | between the maker as Ye Sure [phonetic] and China |
| | 8 | Resources Strategic Investment Company or its |
| | 9 | designee -- designee as purchaser has been |
| 12:22:54 | 10 | consummated. |
| | 11 | Three, 3:00 p.m. Boston, Massachusetts time |
| | 12 | on May 28th, 2011. |
| | 13 | Q.   Right.  So that says that whatever happens |
| | 14 | happens.  It may be paid early, but if it isn't paid |
| 12:23:12 | 15 | early, it's going to have to be paid May 28th, 2011; |
| | 16 | right? |
| | 17 | MS. CLOSE:  Calls for legal conclusion, |
| | 18 | document speaks for itself. |
| | 19 | BY MR. VALLA: |
| 12:23:21 | 20 | Q.   Isn't that what that clause said that you |
| | 21 | chose to read to me? |
| | 22 | MS. CLOSE:  Same objections. |
| | 23 | THE WITNESS:  You asked me the question |
| | 24 | that whether this loan have made -- have any |
| 12:23:29 | 25 | connection with the merger transaction, and I say |

Olivia Ho Cheng - May 27, 2021

12:23:29   1      yes.

2      BY MR. VALLA:

3          Q.    No.   My question was -- and I'll ask it

4      again -- whether the payment of this loan was

12:23:38   5      contingent on the merger transaction going through?

6              MS. CLOSE:   Same objections.

7              THE WITNESS:   It did not say that in -- in

8      legal term, but it hinted at that.

9      BY MR. VALLA:

12:23:48   10         Q.    Oh, it hinted at it.   Okay.   That's fine.

11      I'm satisfied.

12         A.    Okay.

13         Q.    Or maybe not.

14             Did you ever instruct anyone at AIT to pay

12:24:07   15      back that loan to my client?

16         A.    I don't remember.

17         Q.    Did you -- did anybody at AIT ever ask you

18      whether they should pay back that loan to my client?

19         A.    A loan is a loan.   When it's due, it's a

12:24:35   20      company's accounts payable.

21         Q.    Only when it's due, not before?

22         A.    Of course.   When it's due.

23         Q.    Okay.   Did AIT keep its books on the cash

24      or the accrual method of accounting?

12:24:50   25         A.    That, I don't know.

Olivia Ho Cheng - May 27, 2021

Page 119

| | | |
|---|---|---|
| 12:24:50 | 1 | Q.    That's okay.   I think it was accrual; |
| | 2 | right? |
| | 3 | MS. CLOSE:  It calls for speculation. |
| | 4 | BY MR. VALLA: |
| 12:25:03 | 5 | Q.    Did you ever request of my client an |
| | 6 | extension to pay back this loan? |
| | 7 | A.    I don't remember.   But in normal case when |
| | 8 | a loan is due and we have no ability to pay, |
| | 9 | extension is requested. |
| 12:25:33 | 10 | MR. VALLA:  I'm going to direct your |
| | 11 | attention Document No. 42 which should be marked |
| | 12 | Plaintiff's next in order which should be Number 4. |
| | 13 | (The aforementioned document was |
| | 14 | marked Exhibit 4 for |
| 12:25:56 | 15 | identification.) |
| | 16 | MS. BUCHANAN:  I'm sorry, Counsel.  Did you |
| | 17 | say 32 or 42? |
| | 18 | MR. VALLA:  Forty-two, four, two. |
| | 19 | MS. BUCHANAN:  Thank you so much. |
| 12:26:04 | 20 | MR. VALLA:  Sure. |
| | 21 | BY MR. VALLA: |
| | 22 | Q.    Have you had a chance to read that |
| | 23 | document, Ms. Cheng?  It's just one page. |
| | 24 | A.    Okay. |
| 12:27:28 | 25 | Q.    Have you had a chance to review it, |

Olivia Ho Cheng — May 27, 2021

Page 120

| | | |
|---|---|---|
| 12:27:28 | 1 | Ms. Cheng? |
| | 2 | A.   Yeah.   Now I did. |
| | 3 | Q.   Okay.   Good. |
| | 4 | So this is a letter dated November 4, 2011, |
| 12:27:36 | 5 | addressed from Castel from Aurora Imaging |
| | 6 | Technology, Inc., purportedly signed by you. |
| | 7 | Is that your signature, Ms. Cheng? |
| | 8 | A.   It is. |
| | 9 | Q.   Okay.   So I'll represent to you that this |
| 12:27:47 | 10 | is a letter by which Aurora, through you, asking my |
| | 11 | client Castel to extend the maturity date of the |
| | 12 | note that we've been talking about; is that right? |
| | 13 | MS. CLOSE:  Document speaks for itself, |
| | 14 | calls for a legal conclusion. |
| 12:28:03 | 15 | THE WITNESS:  It shows that. |
| | 16 | BY MR. VALLA: |
| | 17 | Q.   It shows that; right? |
| | 18 | In fact, it says very clearly in plain |
| | 19 | English that the maturity date is extended to as |
| 12:28:13 | 20 | late as December 31, 2012; is that right? |
| | 21 | MS. CLOSE:  The document speaks for itself. |
| | 22 | BY MR. VALLA: |
| | 23 | Q.   The fourth line of the letter, Ms. Cheng? |
| | 24 | A.   "Three years after the closing date as |
| 12:28:24 | 25 | defined in the merger agreement"; right? |

Olivia Ho Cheng - May 27, 2021

12:28:24   1          Q.    Or?

2          A.    Extent.  Or in the -- this language will

3     replace the designation of my 30 days in this note.

4     So it's extended for three years is what I see;

12:28:49   5     right?

6          Q.    Well --

7          A.    Three years after the closing date.

8          Q.    Let me point you to the language on the

9     fourth line of the letter --

12:28:56  10          A.    Uh-huh.

11          Q.    -- paragraph 2, In the event no such

12     closing has occurred -- the Chinese don't buy the

13     business; right?  December 31, 2012; is that right?

14          A.    Right.

12:29:07  15               MS. CLOSE:  Is there a question?

16               MR. VALLA:  I'm asking whether that -- she

17     sees that.

18     BY MR. VALLA:

19          Q.    Is that correct?

12:29:11  20          A.    Now you point it out, yes.  I read it.

21          Q.    That's fine.

22          A.    I see it.

23          Q.    So it's an extension to December 31, 2012,

24     subject to certain conditions that are detailed in

12:29:24  25     the letters.  And I -- I agree the document speaks

Olivia Ho Cheng - May 27, 2021

Page 122

| | | |
|---|---|---|
| 12:29:24 | 1 | for itself. |
| | 2 | But that is your signature; right, |
| | 3 | Ms. Cheng? |
| | 4 | A.    That is correct. |
| 12:29:30 | 5 | Q.    And at the time you asked for this |
| | 6 | extension by this letter, was Aurora heavily in |
| | 7 | debt? |
| | 8 | A.    Yes. |
| | 9 | Q.    And what were the chances that it would pay |
| 12:29:40 | 10 | back this debt? |
| | 11 | MS. CLOSE:  Calls for speculation, lacks |
| | 12 | foundation -- |
| | 13 | BY MR. VALLA: |
| | 14 | Q.    More than zero? |
| 12:29:47 | 15 | MS. CLOSE:  -- incomplete hypothetical. |
| | 16 | THE WITNESS:  Yes, the same question -- the |
| | 17 | same answer I gave you. |
| | 18 | BY MR. VALLA: |
| | 19 | Q.    Right.  More than zero? |
| 12:29:55 | 20 | A.    The deal -- yes -- was still on. |
| | 21 | Q.    The deal was on.  Okay. |
| | 22 | Did you ever tell Castel that AIT was |
| | 23 | insolvent? |
| | 24 | A.    Please rephrase that question. |
| 12:30:13 | 25 | Q.    No.  Actually, I'm not this time because |

Olivia Ho Cheng - May 27, 2021

Page 123

| | | |
|---|---|---|
| 12:30:13 | 1 | it's pretty straightforward. |
| | 2 | Did you ever tell Castel that AIT was |
| | 3 | insolvent? |
| | 4 | A.   Can you -- okay.   A -- |
| 12:30:26 | 5 | Q.   If you don't know, you can tell me that, |
| | 6 | but the question is straight. |
| | 7 | A.   I don't remember. |
| | 8 | Q.   Okay.   Did you ever tell Castel that AIT |
| | 9 | was bankrupt? |
| 12:30:38 | 10 | A.   AIT was not bankrupt. |
| | 11 | Q.   Okay. |
| | 12 | MS. CLOSE:  It's vague as to time. |
| | 13 | THE WITNESS:  Time. |
| | 14 | MS. CLOSE:  When are we talking about? |
| 12:30:45 | 15 | THE WITNESS:  When are you talking about? |
| | 16 | BY MR. VALLA: |
| | 17 | Q.   It's not really vague. |
| | 18 | Did you ever? |
| | 19 | MS. CLOSE:  Ever?  At any time? |
| 12:30:52 | 20 | MR. VALLA:  Ever.  Just as it is phrased in |
| | 21 | my question, Counsel. |
| | 22 | BY MR. VALLA: |
| | 23 | Q.   Did you ever tell Castel that AIT was |
| | 24 | bankrupt? |
| 12:30:59 | 25 | A.   In -- because the financial statement |

Olivia Ho Cheng - May 27, 2021

Page 124

| | | |
|---|---|---|
| 12:30:59 | 1 | states -- the financial statement will normally |
| | 2 | speak for the condition of a company.  And if you -- |
| | 3 | if an experienced investor like Davide and Manicasa |
| | 4 | -- and -- and -- and Mattia read -- when they read |
| 12:31:23 | 5 | the financial statement, they should know the |
| | 6 | condition of -- the financial condition of that |
| | 7 | company. |
| | 8 | Q.    And who prepared the financial statements |
| | 9 | that you referred to just now? |
| 12:31:35 | 10 | A.    Steve James. |
| | 11 | Q.    Okay.  And he was your CFO at the time he |
| | 12 | prepared them; right? |
| | 13 | A.    He always was the one that prepared the |
| | 14 | financial statement. |
| 12:31:46 | 15 | Q.    Did you as CEO review the financial |
| | 16 | statements that Mr. James prepared? |
| | 17 | A.    Yes. |
| | 18 | Q.    Did you approve of them? |
| | 19 | A.    Yes. |
| 12:31:55 | 20 | Q.    If they had been wrong in your eyes, you |
| | 21 | would have corrected them; right? |
| | 22 | A.    If I -- yes.  If I have the knowledge of |
| | 23 | any error, yes. |
| | 24 | Q.    Okay.  And in your opinion, if they had |
| 12:32:06 | 25 | been wrong, Mr. James would have corrected them; |

Olivia Ho Cheng - May 27, 2021

Page 125

| | | |
|---|---|---|
| 12:32:06 | 1 | right? |
| | 2 | A.   Correct. |
| | 3 | Q.   Okay.   And those financial statements |
| | 4 | showed the company had been losing money its entire |
| 12:32:18 | 5 | life; right? |
| | 6 | A.   Right. |
| | 7 | Q.   And yet the company went out and borrowed |
| | 8 | money from my client; right? |
| | 9 | A.   Yes. |
| 12:32:27 | 10 | Q.   And yet the company went out and sought |
| | 11 | investments from my client; right? |
| | 12 | A.   Yes. |
| | 13 | Q.   On the strength of those financial |
| | 14 | statements? |
| 12:32:39 | 15 | MS. CLOSE:  I -- objection; assumes facts |
| | 16 | not in evidence. |
| | 17 | THE WITNESS:  Davide and Mattia were very |
| | 18 | experienced internationally investors. |
| | 19 | BY MR. VALLA: |
| 12:32:52 | 20 | Q.   Okay. |
| | 21 | A.   They would not be naive to invest in |
| | 22 | company they don't believe have a chance to succeed. |
| | 23 | Q.   Okay.   That's fair.   That's fair. |
| | 24 | MR. VALLA:  I think we can take a lunch |
| 12:33:09 | 25 | break now. |

Olivia Ho Cheng - May 27, 2021

12:33:09

1              MS. CLOSE:  Okay.

2              MR. VALLA:  We're off the record.

3              (At the hour of 12:33 p.m., a

4              luncheon recess was taken, the

5              deposition to be resumed at

6              1:28 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

12:33:09    25

Olivia Ho Cheng - May 27, 2021

Page 127

| | |
|---|---|
| | 1    IRVINE, CALIFORNIA; THURSDAY, MAY 27, 2021 |
| | 2    1:28 P.M. |
| | 3    -000- |
| | 4    *** |
| | 5    OLIVIA HO CHENG, |
| | 6    having been previously administered an |
| | 7    oath in accordance with CCP 2094, was |
| | 8    examined and testified as follows: |
| | 9    *** |
| 13:28:02 | 10    EXAMINATION (Resumed) |
| | 11    MR. VALLA:  Let's go back on the record. |
| | 12  BY MR. VALLA: |
| | 13    Q.   And, Ms. Cheng, welcome back.  We just took |
| | 14  a lunch break. |
| 13:28:10 | 15    Remember, again, you're still under oath; |
| | 16  right? |
| | 17    A.   Yes. |
| | 18    Q.   Okay.  Very good. |
| | 19    Ms. Cheng, I wanted to talk with you a |
| 13:28:19 | 20  little bit about Michael Devlin.  Do you know |
| | 21  Mr. Devlin? |
| | 22    A.   Yes. |
| | 23    Q.   And how do you know him? |
| | 24    A.   He is an investor.  They have a firm called |
| 13:28:32 | 25  Pharos Capital.  That's how I know him. |

Olivia Ho Cheng - May 27, 2021

Page 128

13:28:32    1           Q.    And how did you get introduced to

            2    Mr. Devlin?

            3           A.    I don't know exactly but --

            4                 MS. CLOSE:  You might need to turn the

13:28:48    5    laptop.  I think it's showing me --

            6                 THE WITNESS:  Oh, okay.

            7                 MS. CLOSE:  -- and this is not my good

            8    side.

            9    BY MR. VALLA:

13:28:54   10           Q.    Go ahead, Ms. Cheng.

           11           A.    Okay.  So we -- we -- we were raising fund

           12    in 2005 or '6 time, and his -- one of his -- his --

           13    I don't want to -- agent or something called us and

           14    say, "We heard that you're wanting to raise capital

13:29:15   15    and then I, you know, want to introduce you Pharos

           16    Capital," and that's how we were introduced.

           17           Q.    Okay.  So -- and Pharos ultimately invested

           18    in AIT; right?

           19           A.    Right.

13:29:30   20           Q.    In fact, I think we saw them in those

           21    documents earlier, the Series C and Series D --

           22           A.    Right.

           23           Q.    -- investments; right?  Okay.

           24                 Do you know where Mr. Devlin is right now?

13:29:39   25           A.    No.  I have not contacted him at all after

Olivia Ho Cheng - May 27, 2021

13:29:39    1          what he had done to me.  I --

2               Q.   What did he do to you?

3               A.   He sort of almost forced me out as the CEO

4          because they wanted.  They want exit, and we

13:29:57    5          couldn't deliver the exit so he --

6               Q.   I'm sorry, finish.

7               A.   So he try many ways to get -- get me

8          replaced so he can get on his exit plan.

9               Q.   And he ultimately got you replaced; right?

13:30:18   10               A.   Yes.

11               Q.   In 20- --

12               A.   13.

13               Q.   -- 13.  Thank you.

14                    To your knowledge, is Mr. Devlin an honest

13:30:28   15          person?

16                    MS. CLOSE:  Calls for speculation.

17                    THE WITNESS:  I don't know I would call

18          honest, but he's very professional.

19          BY MR. VALLA:

13:30:43   20               Q.   Okay.  But you don't believe he's honest?

21               A.   I -- I wouldn't say that.  I -- I don't

22          have that much -- well, I don't know.

23               Q.   Okay.  Was Mr. Devlin on the board of

24          directors of AIT while you were the CEO?

13:31:09   25               A.   Yes.  That's the -- the requirement of

Olivia Ho Cheng - May 27, 2021

Page 130

| | | |
|---|---|---|
| 13:31:09 | 1 | their investment. |
| | 2 | Q. Okay. And you were also on the board of |
| | 3 | directors of AIT at that time; right? |
| | 4 | A. Yes. |
| 13:31:20 | 5 | Q. So you guys worked together on board |
| | 6 | meetings? |
| | 7 | A. Yes. |
| | 8 | MS. CLOSE: Objection; relevance. |
| | 9 | BY MR. VALLA: |
| 13:31:25 | 10 | Q. How frequently did you work with him? |
| | 11 | A. When we had board meeting. |
| | 12 | Q. That's fine. And how often was that? |
| | 13 | A. I think in the -- initially was one every |
| | 14 | quarter, and then it became -- then -- then it -- |
| 13:31:43 | 15 | when the -- when the -- there's more activity, |
| | 16 | sometime it became more frequent. |
| | 17 | Q. Okay. And how was your working |
| | 18 | relationship with him on the board? |
| | 19 | MS. CLOSE: Vague as to time. |
| 13:31:59 | 20 | THE WITNESS: Time. So yeah, it exactly |
| | 21 | right. I think time made a difference. In 2006 and |
| | 22 | between -- '6 when they invested to -- to '8 -- 2008 |
| | 23 | we were, you know -- were very good -- I -- I |
| | 24 | consider him very good partners -- investor. |
| 13:32:20 | 25 | BY MR. VALLA: |

Olivia Ho Cheng - May 27, 2021

Page 131

13:32:20  1         Q.    And then what happened?

2         A.    Then -- then because the Pharos fund has a

3    life of seven years, they -- when they invest in us,

4    they're already two years into -- in their -- in

13:32:36  5    their fund's terms.  So by the fifth year, which

6    would be three years after they invest, they will --

7    they are very anxious to have an exit plan because,

8    otherwise, the -- the fund will close.

9          And they have to deliver -- you know, they

13:32:55  10   have to -- if the -- if the investment is -- was not

11   liquid -- we didn't have a liquidity event, then

12   they will have -- they will have many problems.  So

13   starting about 2010, the pressure started to get

14   heavier to -- to exit.

13:33:14  15       Q.    And this was about the time that the CRC

16   negotiations started; is that right?

17       A.    That is correct.  Because a company like

18   ours, we -- normally, we want to go IPO.  Merger is

19   a second choice if you couldn't successfully IPO.

13:33:41  20       Q.    Why is that?

21       A.    It's just -- you know, once you -- you --

22   once you've sold, it's somebody's company.  You

23   know, even if you have a growth potential, you

24   couldn't benefit from it.  An IPO, you could.

13:33:59  25       Q.    Okay.  And did Mr. Devlin want to sell

Olivia Ho Cheng - May 27, 2021

Page 132

| | | |
|---|---|---|
| 13:33:59 | 1 | instead of doing an IPO? |
| | 2 | MS. CLOSE:  Calls for speculation. |
| | 3 | BY MR. VALLA: |
| | 4 | Q.    What did he tell you about it? |
| 13:34:13 | 5 | A.    It all depends on the situation time.  So |
| | 6 | after 2008, the financial crisis, the U.S. IPO |
| | 7 | market shut down for at least two, three years. |
| | 8 | There's no chance.  Just extremely difficult for |
| | 9 | IPO.  The market is just not very -- not good at |
| 13:34:34 | 10 | all, and so the only choice become merger -- |
| | 11 | Q.    Okay. |
| | 12 | A.    -- if they want exit. |
| | 13 | Q.    Understood. |
| | 14 | So you resigned in 2013 -- July of 2013 |
| 13:34:47 | 15 | from AIT.  Did you have any contact with Mr. Devlin |
| | 16 | after your resignation? |
| | 17 | A.    No. |
| | 18 | Q.    Do you know if he still works for Pharos? |
| | 19 | A.    No. |
| 13:35:03 | 20 | Q.    Do you know a person by the name of Anna |
| | 21 | Kovalkova? |
| | 22 | A.    Yes. |
| | 23 | Q.    Who is Ms. Kovalkova? |
| | 24 | A.    She is Michael Devlin's protege, so she |
| 13:35:16 | 25 | worked for him. |

Olivia Ho Cheng - May 27, 2021

Page 133

13:35:16   1              Q.    I see.
          2                    Do you know if Ms. Kovalkova is still with
          3       Pharos?
          4              A.    I don't know.
13:35:24  5              Q.    Do you have an address or any contact
          6       information for Ms. Kovalkova?
          7              A.    I -- I think you can go online to see
          8       Pharos' address.
          9              Q.    Okay.  But beyond that, you do not have a
13:35:37 10       personal address or any contact information?
         11              A.    No, I don't.  She's a -- no.  She's --
         12       yeah.
         13              Q.    Do you have any contact information for
         14       Mr. Devlin?
13:35:43 15              A.    No.
         16              Q.    No email or anything like that?
         17              A.    No.
         18              Q.    Okay.
         19              A.    We become pretty odd at each other.
13:35:50 20              Q.    Understood.
         21                    He's not on your Christmas list?
         22              A.    (Nodding head.)
         23              Q.    Okay.  I understand.
         24                    Ms. -- Ms. Cheng, at some point during your
13:36:07 25       tenure as CEO --

Olivia Ho Cheng - May 27, 2021

Page 134

13:36:07   1          A.    Yeah.

           2          Q.    -- you became aware of an SEC investigation

           3    regarding Mr. Devlin; is that correct?

           4          A.    During my CEO time?

13:36:21   5          Q.    Right.

           6          A.    No.

           7          Q.    Not during your time as CEO?

           8          A.    No.

           9          Q.    When did you become aware of an SEC

13:36:29  10    investigation involving Mr. Devlin?

          11          A.    When they call me.

          12          Q.    And -- and when was that?

          13          A.    I just don't remember the time.  I think

          14    it's sometime -- I -- I don't remember exact -- but

13:36:39  15    definitely after I left Aurora.

          16          Q.    Okay.  Did you tell the person from the SEC

          17    that you were no longer with Aurora?

          18          A.    Yes.  They knew that.

          19          Q.    Did they ask you to provide information to

13:37:00  20    the SEC?

          21          A.    Yes.

          22          Q.    And did you provide information?

          23          A.    The best I could when I had the capacity.

          24    For example in the email, I could, then I provide.

13:37:13  25          Q.    Okay.  Do you recall the information you

Olivia Ho Cheng - May 27, 2021

13:37:13   1   provided to the SEC?

2      A.   I don't remember, but there were quite a

3   few.

4      Q.   Okay.   Are you aware that the SEC issued an

13:37:30   5   order against Mr. Devlin, essentially a penalty

6   order?

7      A.   I do not know the result of it, no.

8      Q.   Okay.   You never saw that order?

9      A.   I didn't seek it either.   No, I don't.

13:37:43   10     Q.   You did not see it?

11      A.   I did not see it.

12      Q.   As -- as you sit here today, you've never

13   seen it?

14      A.   I've never seen it.

13:37:51   15     Q.   Okay.   That's fine.   Okay.

16      I'll represent to you that the SEC took

17   action against Mr. Devlin --

18      A.   Uh-huh.

19      Q.   -- banned him for the -- from the

13:38:02   20   securities industry for a period of time and banned

21   him from any kind of management role in a

22   broker-dealer investment advisor for a period of

23   time.

24      A.   Uh-huh.

13:38:14   25     Q.   This is all public information.

Olivia Ho Cheng - May 27, 2021

Page 136

13:38:14   1          A.    I see.

2          Q.    And I believe what I just told you is a

3    fair summary of what happened to him.

4          A.    Okay.

13:38:20   5          Q.    The reason he was banned, according to the

6    SEC's order, is that he had invested his own funds

7    in a center in Taiwan.  Are you aware of that, his

8    investment?

9          A.    Yes.

13:38:39  10          Q.    You knew of his investment in that center?

11          A.    Yes.

12          Q.    And when did you know about it?

13          A.    At the time of investment.

14          Q.    Okay.  And how did you come to know about

13:38:49  15    it?

16          A.    Because I was part -- I was also an

17    investor.

18          Q.    Okay.  Okay.  So the SEC alleges, and

19    ultimately convicts, Mr. Devlin of violating --

13:39:04  20    there's no accusation against you by the way but --

21          A.    Uh-huh.

22          Q.    -- there's clear accusation against

23    Mr. Devlin of, essentially, having Pharos contribute

24    money to that center as an investment.  And then

13:39:30  25    Devlin getting his investment paid back from Pharos'

Olivia Ho Cheng - May 27, 2021

Page 137

| | | |
|---|---|---|
| 13:39:30 | 1 | investment. |
| | 2 | A.    Oh. |
| | 3 | Q.    In other words, getting his funds -- moneys |
| | 4 | used to pay his investment back in the center; okay? |
| 13:39:37 | 5 | A.    Uh-huh. |
| | 6 | Q.    Now, you didn't know this because you told |
| | 7 | me you haven't seen the order, so I'm telling you |
| | 8 | what that is.  Did you also get your investment paid |
| | 9 | back in the center? |
| 13:39:49 | 10 | A.    No. |
| | 11 | Q.    You did not. |
| | 12 |       I represent to you that Mr. Devlin did, but |
| | 13 | you didn't.  What happened to your investment in the |
| | 14 | center? |
| 13:39:57 | 15 | A.    It's like a bad investment, it went sour. |
| | 16 | Q.    How much did you invest? |
| | 17 | A.    200,000. |
| | 18 | Q.    Okay.  And did you make that investment |
| | 19 | while you were CEO of AIT? |
| 13:40:13 | 20 | A.    Yes. |
| | 21 | Q.    Okay.  And as far as you know, did |
| | 22 | Mr. Devlin make his investment at the time that he |
| | 23 | was on the board of AIT? |
| | 24 | A.    Yes. |
| 13:40:22 | 25 | Q.    And you knew about each other's investment? |

GregoryEdwards, LLC  |   Worldwide Court Reporting
GregoryEdwards.com  |  866-4Team GE

Olivia Ho Cheng - May 27, 2021

Page 138

| | | |
|---|---|---|
| 13:40:22 | 1 | A.   Yes. |
| | 2 | Q.   Did -- did you tell Castel about your |
| | 3 | investment in the center? |
| | 4 | A.   That was disclosed in the board meeting. |
| 13:40:42 | 5 | Q.   Okay.  And you mentioned that earlier, that |
| | 6 | this was approved by the board; is that right? |
| | 7 | A.   Yes. |
| | 8 | Q.   Okay.  And who was on the board at the time |
| | 9 | that it was approved? |
| 13:40:52 | 10 | A.   I, myself, Devlin, Dr. Wang, Tiffany Chu, |
| | 11 | Gordon Olsen. |
| | 12 | Q.   Okay.  No one else? |
| | 13 | A.   I think we had five.  I don't remember |
| | 14 | the -- all board members, but we have five to seven |
| 13:41:17 | 15 | board members. |
| | 16 | Q.   Okay.  So your testimony, then, is that you |
| | 17 | disclosed your investment in the Taipei center to |
| | 18 | the board and the board approved it; is that -- |
| | 19 | A.   It's not Taipei.  It's Taichung. |
| 13:41:33 | 20 | Q.   Sorry, I -- I -- I made a mistake.  But |
| | 21 | your position -- is your testimony is that you did |
| | 22 | disclose your investment in Taiwan -- |
| | 23 | A.   Yes. |
| | 24 | Q.   -- to the board -- |
| 13:40:22 | 25 | A.   Yes. |

Olivia Ho Cheng - May 27, 2021

Page 139

1          Q.    -- and the board, composed of the

2    individuals you just named, approved it --

3          A.    Yes.

4          Q.    -- is that correct?

13:41:50    5          A.    Correct.

6          Q.    Did any of the individuals on the board at

7    the time represent Castel?

8          A.    Yes.

9          Q.    And who was that?

13:42:02   10          A.    I don't remember.  It was either Davide or

11   Marco.

12          Q.    And when was this?

13          A.    I think it's 200- -- I don't remember

14   exactly, but I est- --

13:42:25   15          THE WITNESS:  Should I estimate?

16          MS. CLOSE:  Estimate is fine.

17          THE WITNESS:  Estimate 2007 time.

18   BY MR. VALLA:

19          Q.    2007?

13:42:31   20          A.    Seven.

21          Q.    Okay.  As part of your response to the SEC

22   when they contacted you about the investigation of

23   Mr. Devlin --

24          A.    Uh-huh.

13:42:52   25          Q.    -- you said you gathered some information

Olivia Ho Cheng - May 27, 2021

Page 140

| | | |
|---|---|---|
| 13:42:52 | 1 | what you could. |
| | 2 | A.   Uh-huh. |
| | 3 | Q.   I think you mentioned emails. |
| | 4 | A.   Uh-huh. |
| 13:42:59 | 5 | Q.   Did you turn those over to the SEC? |
| | 6 | A.   Yes. |
| | 7 | Q.   Did you do so directly or through your |
| | 8 | lawyers? |
| | 9 | A.   No lawyer.  I dealt with -- I respond to |
| 13:43:11 | 10 | the SEC myself. |
| | 11 | Q.   Okay.  Did you work with Mr. Steven James |
| | 12 | to gather that information? |
| | 13 | A.   I -- I don't remember, but if I -- but I -- |
| | 14 | I may. |
| 13:43:32 | 15 | Q.   Did Mr. James work for AIT at the time? |
| | 16 | A.   I don't remember.  I thought he was not. |
| | 17 | Q.   Why would he have AIT information if he |
| | 18 | didn't work for AIT? |
| | 19 | MS. CLOSE:  Calls for speculation, lacks |
| 13:43:56 | 20 | foundation. |
| | 21 | THE WITNESS:  Some of the emails -- |
| | 22 | sometimes we do use personal email if the company |
| | 23 | email wasn't working, and so there may be some |
| | 24 | record that shows on our personal email. |
| 13:44:09 | 25 | BY MR. VALLA: |

Olivia Ho Cheng - May 27, 2021

Page 141

13:44:09    1       Q.   And for you, that would have been the Gmail

2    address that you told me about earlier?

3       A.   Uh-huh.

4       Q.   How often was the company email not

13:44:31    5    working?

6         MS. CLOSE:  Vague as to time.

7         THE WITNESS:  I don't remember.

8    BY MR. VALLA:

9       Q.   Was it a weekly occurrence that you had to

13:44:39    10    use your personal email address?

11       A.   It shouldn't be.

12       Q.   It wasn't?

13       A.   It wasn't.

14       Q.   Okay.  A monthly occurrence maybe?

13:44:48    15       A.   No.  I don't think that.

16       Q.   Very rare, then?

17       A.   Rare I would say.

18       Q.   Okay.  When you made your investment in the

19    Taiwan center that we've been talking about, did you

13:45:02    20    make it in your own name or through a company?

21       A.   Through my sister's name.

22       Q.   And what is your sister's name?

23       A.   Su, S-u; Feng, F-e-n-g; Ho, H-o is the last

24    name.

13:45:27    25       Q.   Why did you make it through your sister?

Olivia Ho Cheng - May 27, 2021

Page 142

13:45:27   1              A.    In order to invest in Taiwan, you have

2        to -- there's a lot of -- how do you say --

3        application if you are a foreigner, so it's a lot

4        easier to do it through a Chinese -- Taiwanese.

13:45:53   5              Q.    Do you know if your sister got any of her

6        money back from that investment?

7              A.    No.

8              Q.    So it was all lost?

9              A.    It was a loss.

13:46:08  10              Q.    How much was it?

11              A.    Well, we -- we -- I lost 200,000.   Other

12        shareholders lost more than that.

13              Q.    When you were contacted by the SEC about

14        Mr. Devlin, did you, in turn, contact Mr. Devlin?

13:46:33  15              A.    No.

16              Q.    Did you inform anyone else about the SEC

17        investigation besides Mr. James?

18              A.    I don't remember who I talked to, my

19        husband.   I don't really know.   I don't remember who

13:47:02  20        else --

21              Q.    Okay.

22              A.    -- I tell.

23              Q.    Do you remember whether you contacted

24        Pharos about the SEC investigation?

13:47:08  25              A.    No.   I had no contact with Pharos.

Olivia Ho Cheng — May 27, 2021

Page 143

| | |
|---|---|
| 13:47:08 | 1        Q.    Okay.   Besides Mr. Devlin and |
| | 2    Ms. Kovalkova, did you have any contacts at Pharos |
| | 3    at any time? |
| | 4        A.    Yes. |
| 13:47:21 | 5        Q.    Do you remember who they are? |
| | 6        A.    Yes. |
| | 7        Q.    Who are they? |
| | 8        A.    There were three at Pharos.   A gentleman |
| | 9    called Kneeland Youngblood -- |
| 13:47:36 | 10       Q.    Okay. |
| | 11       A.    -- and he's a senior partner in Dallas. |
| | 12    Devlin worked from their Nashville office, and his |
| | 13    partner's name is Bob Crant, C-r-a-n-t [sic]. |
| | 14       Q.    So your contacts at Pharos were with |
| 13:48:01 | 15    Mr. Devlin, Mr. Youngblood and Mr. Crant; is that |
| | 16    right? |
| | 17       A.    Right. |
| | 18       Q.    No one else? |
| | 19       A.    There were other people -- |
| 13:48:08 | 20       Q.    Ms. Kovalkova we talked about? |
| | 21       A.    Yeah. |
| | 22       Q.    Anyone else besides her? |
| | 23       A.    There's one gentleman, I forgot his name. |
| | 24    I forgot his name. |
| 13:48:18 | 25       Q.    That's fine. |

Olivia Ho Cheng - May 27, 2021

| | | | |
|---|---|---|---|
| 13:48:18 | 1 | A. | Junior. |
| | 2 | Q. | Junior was not his name. |
| | 3 | A. | No, no. |
| | 4 | Q. | He was just junior -- |
| 13:48:27 | 5 | A. | Investment, junior. |
| | 6 | Q. | Okay.  Have you -- are you -- are you aware |

of a company, Ms. Cheng, called Aurora Asia Limited?

         8      A.    Aurora Asia, yes.
         9      Q.    Okay.  What is Aurora Asia?
13:48:48 10      A.    Aurora Asia was the fully owned subsidiary
        11   of AIT.
        12      Q.    And where was it based?
        13      A.    Taipei.
        14      Q.    And what was its purpose?
13:49:07 15      A.    Is to develop business in Asia -- Aurora
        16   business in Asia.
        17      Q.    By "Aurora business in Asia," you mean
        18   selling MRI machines, servicing machines, opening
        19   centers, all that?
13:49:24 20      A.    Yes.
        21      Q.    Okay.  Was it successful in that -- in that
        22   business?
        23      A.    Please define "successful."
        24      Q.    Profitable?
13:49:31 25      A.    No.

Olivia Ho Cheng - May 27, 2021

Page 145

| | | |
|---|---|---|
| 13:49:31 | 1 | Q.   How do you define "successful"? |
| | 2 | A.   That's a good question. |
| | 3 | Q.   I know.  I'm asking. |
| | 4 | A.   I think profitable is a good -- is -- is a |
| 13:49:45 | 5 | good one. |
| | 6 | Q.   Is a good answer; right? |
| | 7 | How long approximately -- how many years |
| | 8 | approximately was Aurora Asia in operation? |
| | 9 | A.   I don't remember, but I remember |
| 13:49:59 | 10 | approximately in 2007 it started. |
| | 11 | Q.   Okay.  And do you know approximately when |
| | 12 | it stopped if it stopped? |
| | 13 | A.   I don't -- after I left -- before I left, |
| | 14 | it still there.  It was still there. |
| 13:50:17 | 15 | Q.   It was still there when you left the |
| | 16 | company in June of 2013; is that right? |
| | 17 | A.   July 2013. |
| | 18 | Q.   July 2013; right? |
| | 19 | A.   Right. |
| 13:50:27 | 20 | Q.   Okay.  Were you the chairman of Aurora |
| | 21 | Asia? |
| | 22 | A.   Yes. |
| | 23 | Q.   Did you hold any other positions with the |
| | 24 | company? |
| 13:50:34 | 25 | A.   I hold it because Aurora Asia is the wholly |

Olivia Ho Cheng - May 27, 2021

Page 146

13:50:34   1        owned subsidiary of AIT and I was the CEO, so that's
           2        why I was chairman.
           3             Q.   Okay.  So you were the CEO of AIT, and it
           4        was natural for you to be the chairman of its
13:50:54   5        subsidiary in Taiwan?
           6             A.   Yes.
           7             Q.   Okay.  Besides being the chairman, were you
           8        anything else within Aurora Asia?  You -- were you
           9        an employee of Aurora Asia?
13:51:04  10             A.   I -- I am the chair -- I was the chairman.
          11        That's -- in Taiwan, that's -- that's -- that's
          12        consider employee.
          13             Q.   Oh, okay.  Were you paid by Aurora Asia to
          14        serve as chairman?
13:51:24  15             A.   I think so, but I don't remember how much.
          16        It was a small fraction.  No -- no elaboration.
          17             Q.   Well, I mean, you're -- you're free not to
          18        elaborate, but I would have asked you anyways
          19        whether remember how much you were paid.
13:51:43  20             Do you remember?
          21             A.   I do not remember.
          22             Q.   Okay.  And when you say small fraction,
          23        what do you mean?  A fraction of what?
          24             A.   Of my salary in the U.S.
13:51:51  25             Q.   How much were you paid in the U.S.?

Olivia Ho Cheng - May 27, 2021

Page 147

13:51:51   1              A.    I don't remember exactly, but I -- between
        2       150 to 200.
        3              Q.    And that was throughout the approximately
        4       ten years that you served as CEO?
13:52:05   5              A.    Yes, I think so.
        6              Q.    Who determined your salary at AIT?
        7              A.    Board.
        8              Q.    Did you have any input into that
        9       determination?
13:52:20  10              A.    No.   There's a compensation committee.
       11              Q.    And who sat on that compensation committee?
       12              A.    I don't remember, but it has different --
       13       different time had different people served.
       14              Q.    How about at the end of you -- towards the
13:52:36  15       end of your tenure, the most recent one?
       16              A.    Michael Devlin.   He's definitely --
       17              Q.    But not alone; right?
       18              A.    Not alone.   Committee meetings more than --
       19              Q.    It was not a committee of one?
13:52:50  20              A.    I don't know -- I don't remember which
       21       other -- who other.
       22              Q.    Was Steve James on that compensation
       23       committee?
       24              A.    No, he's not.   It has to be board member.
13:52:58  25              Q.    What happened to Aurora Asia as far as you

Olivia Ho Cheng - May 27, 2021

Page 148

13:52:58   1     know?

2                     MS. CLOSE:  Calls for speculation.

3                     THE WITNESS:  I don't know.

4     BY MR. VALLA:

13:53:18   5         Q.    We've been talking about it in the past.  I

6     do so because Mr. James testified last week that the

7     company doesn't exist anymore.

8                 Do you know what came of it?

9                     MS. CLOSE:  Same objection, lacks

13:53:34  10     foundation.

11                    THE WITNESS:  It's not profitable.

12     BY MR. VALLA:

13         Q.    Just like AIT?

14         A.    Right.

13:53:41  15         Q.    Do you remember whether Aurora Asia, in

16     turn, had subsidiary companies?

17         A.    Yes.

18         Q.    Do you know how many?

19         A.    Three.

13:53:58  20         Q.    Do you know what they did?

21         A.    They are breast centers.

22         Q.    Each subsidiary owned and operated a breast

23     imaging center; is that right?

24         A.    Right.

13:54:12  25         Q.    Do you know what happened to those three

Olivia Ho Cheng - May 27, 2021

Page 149

13:54:12    1         companies?

            2                MS. CLOSE:  Calls for speculation, lacks

            3         foundation.

            4                THE WITNESS:  I don't know.

13:54:21    5    BY MR. VALLA:

            6         Q.   Do you know what happened to those three

            7         centers?

            8                MS. CLOSE:  Same objection.

            9                THE WITNESS:  I don't know.

13:54:27   10    BY MR. VALLA:

           11         Q.   Does Aurora Healthcare U.S. have an

           12         interest in those three centers today?

           13         A.   No.

           14                MS. CLOSE:  Calls for speculation.  Oh,

13:54:41   15    Aurora Healthcare, sorry.  I'm getting my Auroras

           16    mixed.

           17                MR. VALLA:  Well, they're all the same.

           18                MS. CLOSE:  That's your story.  It's your

           19    narrative.

13:54:49   20                MR. VALLA:  It is.

           21    BY MR. VALLA:

           22         Q.   Does Aurora Healthcare U.S. --

           23                MS. CLOSE:  Thank you.

           24    BY MR. VALLA:

13:54:59   25         Q.   -- have any of the assets of those three

Olivia Ho Cheng - May 27, 2021

Page 150

13:54:59    1           centers?

            2                   A.    I don't remember.

            3                   Q.    Besides your salary at AIT, would which you

            4           testified was somewhere between 150- and 200,000

13:55:31    5           dollars a year, did you receive any other

            6           compensation from AIT?

            7                   A.    Stock option.

            8                   Q.    Do you remember how many stock options you

            9           had?

13:55:45   10                   A.    I don't remember.

           11                   Q.    Did you ever exercise the stock options?

           12                   A.    I did.

           13                   Q.    When did you exercise them?

           14                   A.    I don't know.

13:55:57   15                   Q.    Besides your salary and stock options, did

           16           you have any other compensation?

           17                   A.    I don't remember.

           18                   Q.    Did you have standard benefits such as

           19           health insurance?

13:56:24   20                   A.    Yes.

           21                   Q.    A 401(k) plan?

           22                   A.    Yes.

           23                   Q.    With respect to your 401(k) plan, what

           24           happened to that plan?

13:56:33   25                   MS. CLOSE:   Calls for speculation.

Olivia Ho Cheng - May 27, 2021

Page 151

13:56:33  1              THE WITNESS:  My AIT -- my --

        2     BY MR. VALLA:

        3          Q.    Your 401(k).  That's right.

        4          A.    After I quit, we transfer it out.

13:56:44  5          Q.    Okay.  So you got that money out?  That was

        6     your money; right?

        7          A.    Right.

        8          Q.    Did you ever receive any dividends from

        9     AIT?

13:56:58 10          A.    When you have no profit, you don't give

       11     dividends.

       12              MS. CLOSE:  So that's a no?

       13              THE WITNESS:  No.  Sorry.

       14     BY MR. VALLA:

13:57:15 15          Q.    Do you know Christopher Wilson?

       16          A.    Yes.

       17          Q.    Who is Mr. Wilson?

       18          A.    He is an attorney.

       19          Q.    And as an attorney, did he represent AIT?

13:57:31 20          A.    He was a board member of AIT.

       21          Q.    Was he also an attorney for AIT?

       22              MS. CLOSE:  Calls for speculation.

       23              THE WITNESS:  I don't remember whether he

       24     represent AIT, but AIT had its own attorney.

13:57:56 25     BY MR. VALLA:

Olivia Ho Cheng - May 27, 2021

Page 152

13:57:56  1          Q.    And that attorney was not Mr. Wilson?

          2          A.    No.

          3          Q.    Okay.  Besides being a board member, was

          4     Mr. Wilson also an officer of AIT?

13:58:04  5          A.    Time?

          6                MS. CLOSE:  Vague as to time.

          7                THE WITNESS:  When?

          8     BY MR. VALLA:

          9          Q.    Ever.

13:58:14 10          A.    He was CEO of AIT sometime in the 2015 --

         11     2015.

         12          Q.    So much after you left?

         13          A.    Yes.

         14          Q.    So you leave your position as CEO of AIT in

13:58:32 15     July of 2013.  Who steps into your shoes as CEO at

         16     that time?

         17          A.     I wasn't totally clear, but to the best of

         18     my recollection, it was -- it was -- right after me

         19     was the head of our R&D department, Dr. Hung,

13:58:54 20     H-u-n-g.  And then after that, I don't know.

         21          Q.    But at some point, you do know that

         22     Mr. Wilson became CEO?

         23          A.    That was -- yes.

         24          Q.    You just don't know whether it's

13:59:08 25     immediately after Dr. Hung or not?

Olivia Ho Cheng - May 27, 2021

Page 153

| | | | |
|---|---|---|---|
| 13:59:08 | 1 | A. | No. |
| | 2 | Q. | Now, you were still an investor in AIT |
| | 3 | | after you left the company; right? |
| | 4 | A. | Yes. |
| 13:59:18 | 5 | Q. | Did you receive regular investor reports? |
| | 6 | A. | No. |
| | 7 | Q. | And do you -- |
| | 8 | A. | I wasn't. |
| | 9 | Q. | I'm sorry? |
| 13:59:29 | 10 | A. | No. |
| | 11 | Q. | Did you ask for them? |
| | 12 | A. | I don't remember. |
| | 13 | Q. | Before you left the company in July of |
| | 14 | | 2013, did the company send out regular investor |
| 13:59:44 | 15 | | reports? |
| | 16 | A. | Yes. |
| | 17 | Q. | How regularly did it do so? |
| | 18 | A. | In general, annually. |
| | 19 | Q. | And what did those reports include? |
| 14:00:03 | 20 | A. | Financial statements and the status of the |
| | 21 | | market -- market development -- business development |
| | 22 | | and plan for -- for -- business plan. |
| | 23 | Q. | Okay.  So a narrative portion, I assume, |
| | 24 | | when you say "the status"; is that right? |
| 14:00:24 | 25 | A. | Yes. |

Olivia Ho Cheng - May 27, 2021

| | | |
|---|---|---|
| 14:00:24 | 1 | Q. The financial statements which are numbers? |
| | 2 | A. Right. |
| | 3 | Q. And a plan which I assume -- but please |
| | 4 | confirm for me -- is sort of what the vision was |
| 14:00:35 | 5 | going forward; is that right? |
| | 6 | A. That is right. |
| | 7 | Q. Okay. Were the financial statements |
| | 8 | audited? |
| | 9 | MS. CLOSE: Vague as to time. |
| 14:00:44 | 10 | BY MR. VALLA: |
| | 11 | Q. Ever. |
| | 12 | A. Yes. |
| | 13 | Q. What years were they audited for? |
| | 14 | Do you know? |
| 14:00:50 | 15 | A. I don't remember vividly, but I can |
| | 16 | estimate. Is that okay to estimate? |
| | 17 | Q. Sure. |
| | 18 | A. Yeah. I think from 2003 -- at least 2002 |
| | 19 | to 2009, we have audit financial statement. |
| 14:01:19 | 20 | Q. And is it fair to state that after 2009, |
| | 21 | the company did not have audited financial |
| | 22 | statements anymore? |
| | 23 | A. I don't remember which exactly when or -- |
| | 24 | Q. Let me put it -- |
| 14:01:32 | 25 | A. May have been. |

Olivia Ho Cheng - May 27, 2021

| | | |
|---|---|---|
| 14:01:32 | 1 | Q.    Let me put it this way.  Did the company |
| | 2 | stop auditing financial statements while you were |
| | 3 | still CEO? |
| | 4 | MS. CLOSE:  Assumes facts not in evidence. |
| 14:01:44 | 5 | THE WITNESS:  I cannot remember, but in |
| | 6 | May we may have stopped the auditing process in |
| | 7 | 2012. |
| | 8 | BY MR. VALLA: |
| | 9 | Q.    With respect to calendar year 2011? |
| 14:02:04 | 10 | A.    Yes. |
| | 11 | Q.    Okay.  If you're off by a year or so, it |
| | 12 | doesn't -- |
| | 13 | A.    I'm not sure, yeah.  Okay. |
| | 14 | Q.    But the point is the company stopped |
| 14:02:22 | 15 | auditing financial statements at some point, whether |
| | 16 | it was 2011 or 2012.  You were still CEO, why did |
| | 17 | the company stop auditing financial statements? |
| | 18 | A.    Audit process is very costly.  And so if -- |
| | 19 | if the -- if the cash flow wasn't supporting enough, |
| 14:02:44 | 20 | then it will be hard to produce an audit statement. |
| | 21 | Second que- -- second -- secondly, if you know that |
| | 22 | financials will be -- will have going concern, then |
| | 23 | the audit will be moot.  There's no use.  It's -- |
| | 24 | you think that it's -- |
| 14:03:03 | 25 | Q.    By "going concern," you talk about the |

Olivia Ho Cheng - May 27, 2021

Page 156

| | | |
|---|---|---|
| 14:03:03 | 1 | auditor's letter or the auditor's report that sits |
| | 2 | on top of the financial statements -- |
| | 3 | A.    Right. |
| | 4 | Q.    -- would have expressed its doubts as to |
| 14:03:17 | 5 | whether the company could continue as a going |
| | 6 | concern? |
| | 7 | A.    Absolutely. |
| | 8 | Q.    Okay.  Now, Ms. Cheng, you remember that a |
| | 9 | while back -- before lunch, we had a look together |
| 14:03:28 | 10 | at the investment documents for the Series C and |
| | 11 | Series D investments, parts of which were made by -- |
| | 12 | by my client Castel.  I'll represent to you that |
| | 13 | both those documents require that the company |
| | 14 | provide audited financial statements every year. |
| 14:03:51 | 15 | Do you understand that? |
| | 16 | A.    Yes. |
| | 17 | MS. CLOSE:  The document speaks for itself. |
| | 18 | BY MR. VALLA: |
| | 19 | Q.    Okay.  But the company stopped auditing its |
| 14:03:59 | 20 | financial statements at some point. |
| | 21 | MS. CLOSE:  Asked and answered. |
| | 22 | MR. VALLA:  And -- there's no question. |
| | 23 | MS. CLOSE:  Oh. |
| | 24 | MR. VALLA:  There's no question. |
| 14:04:06 | 25 | MS. CLOSE:  Sometimes it's hard to tell. |

Olivia Ho Cheng - May 27, 2021

| | | |
|---|---|---|
| 14:04:06 | 1 | BY MR. VALLA: |
| | 2 | Q.   The company stopped auditing its financial |
| | 3 | statements at some point.  Did the company advise |
| | 4 | the investors that it did -- that it would stop |
| 14:04:22 | 5 | providing financial statements that were audited to |
| | 6 | your knowledge? |
| | 7 | A.   The board members all know about it. |
| | 8 | Q.   Were all the investors board members? |
| | 9 | A.   No. |
| 14:04:47 | 10 | Q.   In fact, I think you testified there were, |
| | 11 | you know, more than 20 investors at some point, |
| | 12 | maybe more than 30 investors at some point; right? |
| | 13 | A.   Uh-huh.  Correct. |
| | 14 | Q.   And you said the board knew about it. |
| 14:05:03 | 15 | Fine.  My question, though, was:  Were the investors |
| | 16 | told about it? |
| | 17 | A.   We sent out annual report, and in our |
| | 18 | annual report, if it's audit financial statement, it |
| | 19 | would say it's audit.  If it's not, then it's |
| 14:05:20 | 20 | company prepared financial statement, unaudited. |
| | 21 | Q.   So the investor would receive the company's |
| | 22 | annual report, and they would figure out on their |
| | 23 | own whether it was audited or unaudited because it |
| | 24 | would say so? |
| 14:05:33 | 25 | A.   Correct. |

Olivia Ho Cheng - May 27, 2021

Page 158

14:05:33  1        Q.    Okay.  Do you know the difference between
2      audited and unaudited financial statements?
3            A.    Yes.
4            Q.    Can you tell me what it is?
14:05:56  5        A.    I'm not an expert, but audit means the
6      auditor have gone through all your books and issue a
7      statement.  So those has been audited.
8            Q.    Okay.  Did Mr. James participate in the
9      formation of ARF Partners, LLC?
14:06:18  10              MS. CLOSE:  Vague and ambiguous.
11              THE WITNESS:  Please state the question
12     again.
13     BY MR. VALLA:
14           Q.    Did Mr. James participate in the formation
14:06:25  15   of ARF Partners LLC?
16              MS. CLOSE:  Same objection.
17              THE WITNESS:  Yes.
18     BY MR. VALLA:
19           Q.    And how did he participate?
14:06:36  20       A.    File an application to form the company.
21           Q.    That's all he did?
22           A.    Yes.
23           Q.    Did he do so at your request?
24           A.    Yes.
14:06:55  25       Q.    He was not working for AIT at the time?

Olivia Ho Cheng - May 27, 2021

| | | |
|---|---|---|
| 14:06:55 | 1 | A.   I don't know. |
| | 2 | Q.   You're the sole owner of ARF; right? |
| | 3 | A.   No. |
| | 4 | Q.   You have investors.  I think you told me |
| 14:07:19 | 5 | about them earlier; right? |
| | 6 | A.   Right. |
| | 7 | Q.   And I think you testified earlier that the |
| | 8 | purpose of ARF was to acquire some debt -- make some |
| | 9 | loans and -- and acquire some debt; is that right? |
| 14:07:39 | 10 | MS. CLOSE:  Misstates prior testimony. |
| | 11 | THE WITNESS:  The purpose of ARF is to loan |
| | 12 | AIT to deal with its financial difficulties. |
| | 13 | BY MR. VALLA: |
| | 14 | Q.   Do you know what ARF stands for?  Does the |
| 14:07:57 | 15 | acronym stand for something? |
| | 16 | A.   It's Aurora Rescue Fund. |
| | 17 | Q.   So the "rescue" in the name of the company |
| | 18 | was to lend more money to AIT; is that right? |
| | 19 | A.   To deal -- yeah.  To deal with -- because |
| 14:08:10 | 20 | we have receive a letter from Chris that the company |
| | 21 | will have to file bankruptcy -- bankruptcy. |
| | 22 | Q.   When you say "Chris," you mean Chris |
| | 23 | Wilson? |
| | 24 | A.   Yes. |
| 14:08:22 | 25 | Q.   And Mr. Wilson wrote to you as -- |

Olivia Ho Cheng - May 27, 2021

Page 160

14:08:22  1    A.    He wrote to all shareholder as its CEO --

2    Q.    As CEO of AIT?

3    A.    -- AIT.  (Nodding head.)

4    Q.    Okay.  Understood.

14:08:36  5          So Mr. Wilson wrote to you and all the

6    other investors as CEO of AIT saying that AIT would

7    have to file bankruptcy; right?

8    A.    Right.

9    Q.    And you and your partners through ARF lent

14:08:55  10   money to AIT in response though that letter?

11   A.    Later, yes.

12   Q.    How much later?

13   A.    Months later.

14   Q.    How much did you lend?

14:09:03  15   A.    Huh?

16   Q.    How much did you lend?

17   A.    1.5 million.

18   Q.    When you say much "later," do you remember

19   when that was?

14:09:12  20   A.    I don't know.  I don't remember exactly,

21   but toward the end of 2015.

22   Q.    Did that money get paid back?

23   A.    Yes.

24   Q.    By AIT?

14:09:34  25   A.    By -- no.  It was a conversion to the AHD

14:09:34   1          U.S. shares.

           2                  Q.    Can you explain that to me?

           3                  A.    I don't remember exactly the -- the process

           4          of it.  But when we -- ARF became shareholder of AHC

14:10:08   5          U.S., Aurora Healthcare U.S., and when we buy the

           6          asset knowing that AIT owe ARF money, we forgive the

           7          -- forgave the debt in exchange for -- we forgive

           8          the debt, I think, was the -- how it works.

           9                  Q.    Okay.  Let me see if we can unpack that

14:10:37  10          together a little bit.  I think I follow you, but I

          11          want to make sure I -- I actually do.  ARF, or ARF,

          12          lends $1 1/2 million dollars to AIT sometimes [sic]

          13          in 2015 -- probably towards the end of 2015.  That

          14          is true; right?

14:10:54  15                  A.    Uh-huh.

          16                  MS. CLOSE:  Is that a "yes"?

          17                  THE WITNESS:  Yes, sorry.

          18                  MS. CLOSE:  It's hard for the reporter --

          19                  THE WITNESS:  Sorry.

14:11:02  20                  MS. CLOSE:  -- to say -- to transcribe

          21          "uh-huh."

          22          BY MR. VALLA:

          23                  Q.    Then at that point, ARF is the lender and

          24          AIT is the borrower; is that right?

14:11:14  25                  A.    Right.

Olivia Ho Cheng - May 27, 2021

14:11:14  1          Q.    Then ARF contributes that debt to Aurora
2    Healthcare U.S.; is that right?
3          A.    Correct.
4          Q.    Okay.  When does that contribution take
14:11:29  5    place?
6          A.    When we close the purchase.
7          Q.    Which would have been November of 2016;
8    right?
9          A.    Right.
14:11:37  10         Q.    November 6th, 2016; correct?
11         A.    November time -- sometime 2016.
12         Q.    Okay.  So ARF becomes a shareholder of
13   Aurora Healthcare by contributing its rights as a
14   lender vis-à-vis AIT?
14:11:58  15         A.    Correct.
16         Q.    Then as part of that transaction -- but
17   we'll talk more about it -- Aurora Healthcare
18   forgives that debt in part payment of the AIT assets
19   that it purchased; is that true?
14:12:14  20         A.    That is true.
21         Q.    Okay.  Now I understand how Aurora
22   Healthcare was capitalized.  And this is -- this is
23   Aurora Healthcare U.S. Corp; right?  It's not the
24   Cayman Island company?
14:12:28  25         A.    Never is it -- yeah.  Never use them.

Olivia Ho Cheng - May 27, 2021

Page 163

| | | |
|---|---|---|
| 14:12:28 | 1 | Q.    Did the ARF debt ever go into the Cayman |
| | 2 | Island company at any point? |
| | 3 | A.    No. |
| | 4 | Q.    It didn't.  Okay.  All right. |
| 14:12:52 | 5 | In addition to the $1 1/2 million that |
| | 6 | you've just told me about, did ARF also buy Pharos' |
| | 7 | debt and equity in AIT? |
| | 8 | A.    Yes. |
| | 9 | Q.    And would that have been around the end of |
| 14:13:11 | 10 | 2015 also? |
| | 11 | A.    End of 2015.  I don't remember exact time. |
| | 12 | MR. VALLA:  Okay.  Ms. Cheng, let's see if |
| | 13 | this helps you remember a little bit.  I'm going to |
| | 14 | ask you to turn to our Tab No. 21 which is going to |
| 14:14:03 | 15 | be marked as next in order.  I believe it's five. |
| | 16 | And I will tell you that that document is titled |
| | 17 | "Stock and Note Purchase Agreement and Assignment of |
| | 18 | Amended and Restated Note Purchase Guarantee and |
| | 19 | Security Agreement."  That's a mouthful. |
| 14:14:27 | 20 | It's dated November 25, 2015, and it's |
| | 21 | between ARF Partners, LLC, care of your company B.E. |
| | 22 | Pacific Capital Partners and Pharos, Pharos 2 and |
| | 23 | Pharos 2A. |
| | 24 | /// |
| 14:12:28 | 25 | /// |

Olivia Ho Cheng - May 27, 2021

Page 164

| | | |
|---|---|---|
| | 1 | (The aforementioned document was |
| | 2 | marked Exhibit 5 for |
| | 3 | identification.) |
| | 4 | BY MR. VALLA: |
| 14:14:44 | 5 | Q.   I guess there were funds involved; right? |
| | 6 | A.   Right. |
| | 7 | Q.   Okay.  If you could, please, turn to the |
| | 8 | last page of that document -- sorry, the signature |
| | 9 | page of that document.  There is an execution block |
| 14:15:02 | 10 | there for purchaser, that being ARF Partners, LLC. |
| | 11 | And is that your signature on behalf of |
| | 12 | ARF? |
| | 13 | A.   Yes. |
| | 14 | Q.   And do you recall how much ARF paid for |
| 14:15:18 | 15 | that debt and equity that it was purchasing from |
| | 16 | Pharos?  Let me do it this way.  Turn to the very |
| | 17 | last page of the document, please. |
| | 18 | A.   (Complies.) |
| | 19 | Q.   Very, very last. |
| 14:15:32 | 20 | A.   Uh-huh. |
| | 21 | Q.   It's a page called schedule B. |
| | 22 | A.   Uh-huh. |
| | 23 | Q.   And it provides some wire instructions for |
| | 24 | payment of the purchase price; right? |
| 14:15:42 | 25 | A.   Uh-huh. |

Olivia Ho Cheng - May 27, 2021

Page 165

14:15:42
1          Q.    And there's apparently two Pharos funds
2    that were selling the equity and debt?
3          A.    Uh-huh.
4          Q.    And they each received some amount of
14:15:54
5    money.  Pharos 2 got 185,000, just rounding, and
6    Pharos 2A got 239,000, again just rounding; is that
7    correct?
8          A.    That is correct.
9          Q.    Okay.  So is it correct, Ms. Cheng, that
14:16:10
10   the sum of those two numbers was the amount paid by
11   ARF to purchase the debt and equity from Pharos?
12         A.    Yes.
13         Q.    Okay.  And that money was actually paid to
14   Pharos?
14:16:23
15         A.    Yes.
16         Q.    Okay.  Essentially, at that point Pharos
17   stepped out of Aurora; right?  It was no longer an
18   investor and no longer a lender; is that true?
19         A.    True.
14:16:37
20         Q.    Okay.  Did you inform any of the other
21   investors in AIT that your company, ARF, was buying
22   out Pharos' position?
23         A.    I call shareholders when -- after I
24   received the letter from Chris Wilson saying the
14:17:18
25   company -- company will file bankruptcy.

Olivia Ho Cheng - May 27, 2021

Page 166

| | | |
|---|---|---|
| 14:17:18 | 1 | Q.   And who did you call? |
| | 2 | A.   I call many of them. |
| | 3 | Q.   Did you call my client Castel? |
| | 4 | A.   Yes. |
| 14:17:33 | 5 | Q.   Who did you speak with? |
| | 6 | A.   I spoke with Davide, Mattia and Marco. |
| | 7 | Q.   And this was on the telephone, I assume? |
| | 8 | A.   Yes. |
| | 9 | Q.   Was this before or after you signed this |
| 14:17:55 | 10 | document that we just looked at? |
| | 11 | A.   Before. |
| | 12 | Q.   And do you recall what you told them? |
| | 13 | A.   I told them -- I don't remember exactly, |
| | 14 | but I think the conversation was about the letter we |
| 14:18:14 | 15 | received from Chris Wilson about company going |
| | 16 | bankrupt. |
| | 17 | Q.   Okay. |
| | 18 | A.   We reiterate how important this technology |
| | 19 | was to many people in the world, how much we put in |
| 14:18:32 | 20 | effort to develop that technology and is there any |
| | 21 | way they can all come back to help to make -- to -- |
| | 22 | to -- to allow this technology to survive. |
| | 23 | Q.   And what did they say to you? |
| | 24 | A.   They said they will think about it. |
| 14:18:50 | 25 | Q.   Did they ever come back to you on it? |

Olivia Ho Cheng - May 27, 2021

Page 167

| | | |
|---|---|---|
| 14:18:50 | 1 | A.   They did not come back at all. |
| | 2 | Q.   Okay.  In that conversation, did you tell |
| | 3 | them that you were going to buy out Pharos' |
| | 4 | position? |
| 14:19:05 | 5 | A.   I did not know whether -- what I was going |
| | 6 | to do. |
| | 7 | Q.   Okay.  But -- so you didn't tell them |
| | 8 | because you didn't know that you were going to do |
| | 9 | it? |
| 14:19:13 | 10 | A.   Right. |
| | 11 | Q.   Once you knew you were going to do it, did |
| | 12 | you tell them? |
| | 13 | A.   No. |
| | 14 | Q.   Any particular reason that you didn't? |
| 14:19:21 | 15 | A.   They did not express interest to |
| | 16 | participate. |
| | 17 | Q.   Well, you didn't tell them what you were |
| | 18 | going to do? |
| | 19 | A.   I did not know what I was going to do.  I |
| 14:19:33 | 20 | can't tell them what I don't already have. |
| | 21 | Q.   But you never told them that you were going |
| | 22 | to do this deal here? |
| | 23 | MS. CLOSE:  Asked and answered. |
| | 24 | BY MR. VALLA: |
| 14:19:45 | 25 | Q.   With Pharos? |

Olivia Ho Cheng - May 27, 2021

14:19:45    1          A.    No, no, I didn't know.

            2          Q.    Okay.  Would it surprise you to know that

            3    they didn't know about it -- Castel did not know

            4    about this deal with Pharos?

14:20:02    5          A.    I don't know.

            6          Q.    You're not surprised at that?

            7          A.    I don't know.

            8          Q.    Okay.  You don't know whether to be

            9    surprised or not?

14:20:15   10          A.    Yes.

           11          Q.    That's fine.

           12                Now, at the time that the deal with Pharos

           13    and ARF was done, so November of 2015, approximately

           14    how much had Pharos invested in Aurora Imaging

14:20:33   15    Technology?

           16          A.    I don't know -- I don't remember the exact

           17    amount, but I estimate about 20 million.

           18          Q.    Okay.  And they sold that position to ARF,

           19    according to this agreement, for approximately

14:20:58   20    $450,000; is that right?

           21          A.    Should I trust your math?

           22          Q.    I think you can.  To that -- to that extent

           23    you can trust it.  Less than -- less than half a

           24    million dollars for sure?

14:21:07   25                MS. CLOSE:  Document speaks for itself.

14:21:07    1        BY MR. VALLA:

            2            Q.   Right?

            3            A.   Yes.

            4            Q.   So 20 million, half a million, that is

14:21:14    5        about 2 1/2 percent of their investment; is that

            6        right?

            7            A.   That's the calculation.

            8            Q.   Why would Pharos sell $20 million worth of

            9        investments for half a million dollars?

14:21:37   10            MS. CLOSE:  Calls for speculation.

           11            THE WITNESS:  I can not suspect --

           12        BY MR. VALLA:

           13            Q.   Well, what -- what do you know?  I don't

           14        want you to suspect.  But what do you know?

14:21:48   15            A.   Can you rephrase the question again?

           16            Q.   Sure.

           17                 Did you negotiate the deal with Pharos?

           18            A.   Yes.

           19            Q.   Did you go to them and say "I'd like to buy

14:21:56   20        your position in Aurora" or words to that effect?

           21            A.   Yes.

           22            Q.   Okay.  And did you tell them you'd like to

           23        pay about a half million dollars for it?

           24            A.   That was the deal.

14:22:12   25            Q.   That was the deal.  But did you tell them

Olivia Ho Cheng - May 27, 2021

Page 170

| | |
|---|---|
| 14:22:12 | 1    that that's what you were willing to pay? |
| | 2         A.    That was the deal. |
| | 3         Q.    Okay.  Did they ask you why so little?  Did |
| | 4    they object to the amount? |
| 14:22:23 | 5         A.    That was the deal.  I don't remember the |
| | 6    negotiation process.  Are we going into the -- |
| | 7    the -- going back to -- to -- to remember who saying |
| | 8    what? |
| | 9         Q.    Well, we're -- we're going back to 2015. |
| 14:22:40 | 10         A.    Right. |
| | 11         Q.    We're going back to the time where you, |
| | 12    through ARF, want to purchase the Pharos position. |
| | 13    Did the price get negotiated between you two? |
| | 14         A.    Normally, that was the transaction.  That |
| 14:22:53 | 15    was the case.  In business deal, you negotiate. |
| | 16         Q.    I understand what normally happens. |
| | 17              MS. CLOSE:  Just answer his question. |
| | 18    BY MR. VALLA: |
| | 19         Q.    I'm asking you whether you negotiated it or |
| 14:23:01 | 20    not. |
| | 21         A.    Yes. |
| | 22         Q.    Okay.  And do you remember what they wanted |
| | 23    to get for that position from you, how much? |
| | 24         A.    I don't remember. |
| 14:23:13 | 25         Q.    Okay.  Was -- was there some price |

Olivia Ho Cheng - May 27, 2021

14:23:13   1          negotiation back and forth?

2               A.   Yes.

3               Q.   Okay.  Did you provide Pharos with

4          information available to you about the Aurora

14:23:35   5          business at the time that ARF purchased their

6          interest in Aurora?

7                    MS. CLOSE:  Vague and ambiguous.

8                    THE WITNESS:  Are you kidding?

9          BY MR. VALLA:

14:23:46   10              Q.   No.

11              A.   No.

12              Q.   You did not?

13              A.   Do buyers offer information of what they --

14                    MS. CLOSE:  Just answer his question,

14:24:02   15          please.

16                    THE WITNESS:  No.

17          BY MR. VALLA:

18              Q.   Okay.  How did you come to the price, then?

19                    MS. CLOSE:  Asked and answered.

14:24:14   20          BY MR. VALLA:

21              Q.   How do you come to the price?

22              A.   That's the price we offer.  That's the

23          price I like.

24              Q.   Okay.  Did they provide you -- did Pharos

14:24:26   25          provide you with information about Aurora since they

Olivia Ho Cheng - May 27, 2021

14:24:26    1        were selling their position in Aurora?

2                A.   I don't remember.

3                Q.   If they had provided you with information,

4        would it have been in writing?

14:24:39    5                A.   I don't remember.

6                Q.   Do you still have the records relating to

7        the negotiations of the ARF Pharos deal?

8                A.   I don't remember.  I don't think so.

9                Q.   You testified earlier that ARF files tax

14:25:04   10        returns; right?

11                A.   Yes.

12                Q.   Okay.  This transaction would have been

13        reflected on ARF's tax return for that year; right?

14                     MS. CLOSE:  I'm going to object that the

14:25:16   15        contents of tax returns are privileged.

16                     MR. VALLA:  I'm not asking for contents.

17                     MS. CLOSE:  You're asking if something is

18        in the tax return.  I'm going to instruct her not to

19        answer about the contents of the tax return.

14:25:29   20        BY MR. VALLA:

21                Q.   Okay.  But you confirm that ARF files tax

22        returns; right?

23                A.   Yes.

24                Q.   Okay.  Besides Castel and some of the other

14:25:58   25        investors that you testified you spoke to about this

Olivia Ho Cheng - May 27, 2021

14:25:58
1    deal before it happened, did you discuss the deal
2    with anyone else?
3          A.   What -- I don't understand the question.
4          Q.   Who did you discuss this deal with?
14:26:23
5          A.   What dis- -- what discussion?  Who -- I
6    don't understand the question.
7               MS. CLOSE:  Well, that's vague as to time.
8    It's vague and ambiguous.
9    BY MR. VALLA:
14:26:37
10         Q.   Okay, Ms. Cheng.  ARF did a deal with
11   Pharos.  You testified that you reached out to a
12   number of the investors, not all of them.  You
13   testified before this deal was structured.  In fact,
14   you didn't know what to tell them when you spoke
14:26:57
15   with my clients.
16              After this deal was structured but before
17   it was executed, did you discuss the deal with any
18   of the investors again?
19         A.   No.
14:27:11
20         Q.   Are some of the investors in ARF the same
21   as the investors in AIT?
22         A.   No, except me.
23         Q.   Of course, except you.
24              THE WITNESS:  Antonio?
14:27:58
25              MR. VALLA:  Yes.

Olivia Ho Cheng – May 27, 2021

Page 174

| | | |
|---|---|---|
| 14:27:58 | 1 | THE WITNESS:  Can we take a break? |
| | 2 | MR. VALLA:  Oh, absolutely.  Before I come |
| | 3 | up with the next brilliant question, that's a good |
| | 4 | idea.  Let's go off the record and come back in ten. |
| 14:28:10 | 5 | MS. CLOSE:  Sure. |
| | 6 | MR. VALLA:  Is that okay, Ms. Cheng? |
| | 7 | MS. CLOSE:  Thank you. |
| | 8 | (A recess was taken.) |
| | 9 | MR. VALLA:  All right.  Back on the record |
| 14:38:11 | 10 | again. |
| | 11 | BY MR. VALLA: |
| | 12 | Q.   Ms. Cheng, we're back on the record. |
| | 13 | You're still under oath.  You understand that; |
| | 14 | right? |
| 14:38:22 | 15 | A.   Yes. |
| | 16 | Q.   Okay.  Very well. |
| | 17 | Going back again to this document that |
| | 18 | we've been looking amount which is Tab No. 21, it's |
| | 19 | the stock and note purchase agreement between Pharos |
| 14:38:34 | 20 | as seller and ARF as –– as buyer.  During the time |
| | 21 | that this agreement and this deal were being |
| | 22 | negotiated –– so I presume prior to November 25th, |
| | 23 | 2015, did those negotiations also involve email |
| | 24 | negotiations? |
| 14:38:54 | 25 | A.   I –– no.  I think most of them were phone |

Olivia Ho Cheng - May 27, 2021

14:38:54    1        conversations.

2              Q.    Phone conversations.   Okay.

3                    If -- if there were any emails, would you

4        still have those emails?

14:39:04    5        A.    2015, maybe not.

6              Q.    Would have emails have been on your B.E.

7        Pacific account?

8              A.    Yes.

9              Q.    Okay.   Would they also have been on your

14:39:21   10        Gmail account?

11             A.    I don't remember.

12             Q.    Okay.   We'll -- we'll be asking for those,

13        just so your counsel knows; okay?

14             A.    Sure.

14:39:33   15        Q.    You testified that you're currently CEO at

16        Aurora Healthcare U.S. Corp; is that correct?

17             A.    That is correct.

18             Q.    And you're also a board member of that

19        company; is that right?

20             A.    Yes.

21             Q.    There's going to be a separate deposition

22        of the corporate representative of that company, so

23        I'm not going to go into a lot of topics having to

24        do with Aurora Healthcare U.S. currently.   I will

14:40:29   25        ask you this, to have a look at our Exhibit No. 43

Olivia Ho Cheng - May 27, 2021

Page 176

14:40:29   1        which I'm going to be asked marked next in order.   I

2        believe it's Plaintiff's 6.

3                  (The aforementioned document was

4                  marked Exhibit 6 for

14:40:55   5                  identification.)

6                  MS. SCHACHNE:  Six is 43?

7                  MR. VALLA:  Forty-three.

8                  MS. CLOSE:  And it's Exhibit 6?

9                  MR. VALLA:  Yes, I think so.

10       BY MR. VALLA:

11            Q.   I'll represent to you, Ms. Cheng, that that

12       exhibit consists of a printout of the current

13       website -- or at least it was current as of

14       May 18th, 2021 -- of Aurora Healthcare U.S.

14:41:44   15                  Do you, generally, recognize your website?

16            A.   Yes.

17            Q.   Okay.  If you turn to your bio, which is

18       towards the end of the exhibit, there is a photo of

19       you.

14:42:04   20                  Do you see that?

21            A.   Yes.

22            Q.   And -- and -- and that is your bio; is that

23       correct?

24            A.   That is.

14:42:12   25            Q.   Okay.  It says -- is it starts by saying

14:42:12    1        "Olivia has served as CEO of Aurora Healthcare Corp

         2        in Massachusetts medical technology and global

         3        healthcare company for more than ten years."

         4           Now, when was Aurora Healthcare U.S.

14:42:30    5        formed?

         6          A.    It was form November 2016.

         7          Q.    Okay. So you -- you could not have served

         8        as CEO of Aurora Healthcare U.S. for more than

         9        ten years; right?

14:42:47   10          A.    Right.

       11          Q.    Okay. So that -- that's not true; right?

       12          A.    It is not -- when -- when we state that,

       13        that really includes the AIT time.

       14          Q.    Ah, okay. Doesn't say anything about the

14:43:02   15        three years that you were not connected with the

       16        company, does it?

       17          A.    No.

       18          Q.    So that -- that is left out, isn't it?

       19          A.    Right.

14:43:09   20          Q.    Why is that?

       21          A.    Website is not resume.

       22          Q.    Okay. And --

       23          A.    You deliver the message that is -- tells --

       24        tells the -- tells the story.

14:43:28   25          Q.    Whether it's true or not; right?

Olivia Ho Cheng - May 27, 2021

14:43:28   1          A.   That is not --

           2               MS. CLOSE:  Objection; argumentative.

           3               THE WITNESS:  That is not true.  I am very

           4          offended of your -- your --

14:43:37   5     BY MR. VALLA:

           6          Q.   I -- I apologize if I offended you, but you

           7          just testified that this statement is not true?

           8               MS. CLOSE:  That misstates her testimony.

           9     BY MR. VALLA:

          10          Q.   Is that right?

          11          A.   It is not untrue.

          12          Q.   It's not untrue.  Okay.  All right.  I'll

          13          take that.

          14               Did you have any involvement in designing

14:43:54  15          that website?

          16          A.   No.  Well, I mean, I give instructions, and

          17          we hire a company to do it.

          18          Q.   And you approved it; right?

          19          A.   Yes.

14:44:06  20          Q.   It wouldn't be live if you didn't approve

          21          it?

          22          A.   Yes.

          23          Q.   Did Mr. Steven James also approve it?

          24          A.   I think he probably -- I don't -- I don't

14:44:15  25          remember what's his involvement.

Olivia Ho Cheng - May 27, 2021

| | | |
|---|---|---|
| 14:44:15 | 1 | Q.   Okay.  If you could turn back to the |
| | 2 | exhibit and have a look please at Mr. Steven James' |
| | 3 | bio on the website. |
| | 4 | A.   Yeah. |
| 14:44:30 | 5 | Q.   It also says that Mr. James has served as |
| | 6 | executive vice president and chief financial officer |
| | 7 | since 2003 and joined the company as CFO in 1999. |
| | 8 | That -- that's also not correct, is it?  Whether |
| | 9 | it's true or untrue, it's just not correct, is it? |
| 14:44:50 | 10 | A.   It is not untrue because when we link AIT |
| | 11 | and AHC U.S., we bought the -- all the assets. |
| | 12 | Q.   Everything -- |
| | 13 | A.   It is -- |
| | 14 | Q.   -- right? |
| 14:45:08 | 15 | A.   -- same company. |
| | 16 | Q.   Yeah, same company. |
| | 17 | A.   Sort of. |
| | 18 | Q.   Okay.  In fact, your email address -- well, |
| | 19 | strike that. |
| 14:45:13 | 20 | In fact, website itself is the same -- the |
| | 21 | website address -- |
| | 22 | The www address, do you know what I mean? |
| | 23 | A.   Yes. |
| | 24 | Q.   -- is the same, isn't it? |
| 14:45:23 | 25 | A.   Yes. |

Olivia Ho Cheng - May 27, 2021

Page 180

| | | |
|---|---|---|
| 14:45:23 | 1 | Q.    And the email addresses are the same, |
| | 2 | aren't they? |
| | 3 | A.    Yes. |
| | 4 | Q.    Both for yourself and for Mr. James? |
| 14:45:30 | 5 | A.    Yes. |
| | 6 | Q.    Okay.  And the banks are the same, aren't |
| | 7 | they? |
| | 8 | A.    Yes. |
| | 9 | Q.    What about the offices?  Are they the same? |
| 14:45:40 | 10 | A.    No. |
| | 11 | Q.    Where is the Aurora Healthcare U.S. office? |
| | 12 | A.    In Danvers, Massachusetts. |
| | 13 | Q.    Is that your home? |
| | 14 | A.    No. |
| 14:45:59 | 15 | Q.    You're in North Andover; right? |
| | 16 | A.    Right. |
| | 17 |      THE WITNESS:  You have a good memory. |
| | 18 |      MR. VALLA:  I try.  It gets worse with |
| | 19 | time, as -- as you well know. |
| | 20 | BY MR. VALLA: |
| | 21 | Q.    How many people work for AIT in Danvers, |
| | 22 | Massachusetts besides yourself? |
| | 23 | A.    Less than ten. |
| | 24 | Q.    Okay.  Besides yourself and Mr. James -- |
| 14:46:29 | 25 | you being the CEO and Mr. James being the CFO -- who |

Olivia Ho Cheng - May 27, 2021

14:46:29  1           are the other officers of Aurora Healthcare U.S.?

2                A.   Ken Cheng.

3                Q.   And what is Mr. Cheng's role?

4                A.   He is the COO.

14:46:45  5           Q.   Is that chief operating officer?

6                A.   Right.

7                Q.   Who else?

8                A.   We have -- you mean officer?

9                Q.   That is what I'm asking about, yes.

14:47:04 10           A.   That is it.

11               Q.   Okay.   There are no vice presidents?

12               A.   No.

13                    MR. VALLA:   Can we go off the record for a

14           second.

14:47:37 15                MS. CLOSE:   Sure.

16                    (A recess was taken.)

17                    MR. VALLA:   All right.   Let's go back on

18           the record.

19           BY MR. VALLA:

14:49:57 20           Q.   Ms. Cheng, we're back on the record.

21           Again, you're still under oath.

22                    You understand that?

23               A.   Yes.

24               Q.   Very good.   Just a couple more questions

14:50:06 25           about Aurora Healthcare U.S.

Olivia Ho Cheng - May 27, 2021

Page 182

| | | | |
|---|---|---|---|
| 14:50:06 | 1 | | The logo for Aurora is the same as AIT? |
| | 2 | A. | Yes. |
| | 3 | Q. | Was Mr. Cheng a corporate officer of AIT as |
| | 4 | | well, Mr. Ken Cheng? |
| 14:50:21 | 5 | A. | Yes. |
| | 6 | Q. | And what was his role as corporate officer |
| | 7 | | of AIT? |
| | 8 | A. | Vice president. |
| | 9 | Q. | Something specific or just a generic |
| 14:50:30 | 10 | | vice president? |
| | 11 | A. | Manufacture. |
| | 12 | Q. | Is that, essentially, the same role that he |
| | 13 | | has now as COO, or is there a difference? |
| | 14 | A. | Yes. |
| 14:50:40 | 15 | Q. | There is a difference, or is it the same? |
| | 16 | A. | Similar. |
| | 17 | Q. | Similar.  Okay. |
| | 18 | | The U.S. employees of Aurora Healthcare |
| | 19 | | U.S. are just the same folks who worked for AIT? |
| 14:51:03 | 20 | A. | Yes. |
| | 21 | Q. | They all came over from AIT? |
| | 22 | A. | Not all. |
| | 23 | Q. | Not all.  Okay. |
| | 24 | | So how many people came over from AIT |
| 14:51:09 | 25 | | when -- when you purchased the business? |

Olivia Ho Cheng – May 27, 2021

Page 183

| | | |
|---|---|---|
| 14:51:09 | 1 | A.    When I purchased the business.   It's |
| | 2 | intended -- |
| | 3 | MS. CLOSE:  Assumes facts.   You purchased |
| | 4 | the assets; right? |
| 14:51:22 | 5 | MR. VALLA:  Yes.  It's shorthand. |
| | 6 | BY MR. VALLA: |
| | 7 | Q.    When you purchased the assets, I'm sorry. |
| | 8 | A.    Less than ten. |
| | 9 | Q.    Fewer than ten.  Okay. |
| 14:51:32 | 10 | And you currently have about that number of |
| | 11 | employees in -- in Aurora Healthcare U.S.? |
| | 12 | A.    Yes. |
| | 13 | Q.    Okay.  And Aurora Healthcare U.S. has |
| | 14 | subsidiaries? |
| 14:51:42 | 15 | A.    Yes. |
| | 16 | Q.    And where are those subsidiaries? |
| | 17 | A.    In Asia. |
| | 18 | Q.    And where in Asia? |
| | 19 | A.    In China. |
| 14:51:49 | 20 | Q.    Okay.  People's Republic of China? |
| | 21 | A.    Yes. |
| | 22 | (Pages 184 through 189 were deemed |
| | 23 | confidential and bound under separate |
| | 24 | cover.) |
| 14:51:09 | 25 | /// |

Olivia Ho Cheng - May 27, 2021

Page 184

| 14:53:12 | 1  | [-------------------- CONFIDENTIAL --------------------] |
| 14:53:12 | 2  | [-------------------- CONFIDENTIAL --------------------] |
| 14:53:12 | 3  | [-------------------- CONFIDENTIAL --------------------] |
| 14:53:12 | 4  | [-------------------- CONFIDENTIAL --------------------] |
| 14:53:12 | 5  | [-------------------- CONFIDENTIAL --------------------] |
| 14:53:12 | 6  | [-------------------- CONFIDENTIAL --------------------] |
| 14:53:12 | 7  | [-------------------- CONFIDENTIAL --------------------] |
| 14:53:12 | 8  | [-------------------- CONFIDENTIAL --------------------] |
| 14:53:12 | 9  | [-------------------- CONFIDENTIAL --------------------] |
| 14:53:12 | 10 | [-------------------- CONFIDENTIAL --------------------] |
| 14:53:12 | 11 | [-------------------- CONFIDENTIAL --------------------] |
| 14:53:12 | 12 | [-------------------- CONFIDENTIAL --------------------] |
| 14:53:12 | 13 | [-------------------- CONFIDENTIAL --------------------] |
| 14:53:12 | 14 | [-------------------- CONFIDENTIAL --------------------] |
| 14:53:12 | 15 | [-------------------- CONFIDENTIAL --------------------] |
| 14:53:12 | 16 | [-------------------- CONFIDENTIAL --------------------] |
| 14:53:12 | 17 | [-------------------- CONFIDENTIAL --------------------] |
| 14:53:12 | 18 | [-------------------- CONFIDENTIAL --------------------] |
| 14:53:12 | 19 | [-------------------- CONFIDENTIAL --------------------] |
| 14:53:12 | 20 | [-------------------- CONFIDENTIAL --------------------] |
| 14:53:12 | 21 | [-------------------- CONFIDENTIAL --------------------] |
| 14:53:12 | 22 | [-------------------- CONFIDENTIAL --------------------] |
| 14:53:12 | 23 | [-------------------- CONFIDENTIAL --------------------] |
| 14:53:12 | 24 | [-------------------- CONFIDENTIAL --------------------] |
| 14:53:12 | 25 | [-------------------- CONFIDENTIAL --------------------] |

Olivia Ho Cheng - May 27, 2021

Page 185

| | | |
|---|---|---|
| 14:54:21 | 1 | [--------------------- CONFIDENTIAL ---------------------] |
| 14:54:21 | 2 | [--------------------- CONFIDENTIAL ---------------------] |
| 14:54:21 | 3 | [--------------------- CONFIDENTIAL ---------------------] |
| 14:54:21 | 4 | [--------------------- CONFIDENTIAL ---------------------] |
| 14:54:21 | 5 | [--------------------- CONFIDENTIAL ---------------------] |
| 14:54:21 | 6 | [--------------------- CONFIDENTIAL ---------------------] |
| 14:54:21 | 7 | [--------------------- CONFIDENTIAL ---------------------] |
| 14:54:21 | 8 | [--------------------- CONFIDENTIAL ---------------------] |
| 14:54:21 | 9 | [--------------------- CONFIDENTIAL ---------------------] |
| 14:54:21 | 10 | [--------------------- CONFIDENTIAL ---------------------] |
| 14:54:21 | 11 | [--------------------- CONFIDENTIAL ---------------------] |
| 14:54:21 | 12 | [--------------------- CONFIDENTIAL ---------------------] |
| 14:54:21 | 13 | [--------------------- CONFIDENTIAL ---------------------] |
| 14:54:21 | 14 | [--------------------- CONFIDENTIAL ---------------------] |
| 14:54:21 | 15 | [--------------------- CONFIDENTIAL ---------------------] |
| 14:54:21 | 16 | [--------------------- CONFIDENTIAL ---------------------] |
| 14:54:21 | 17 | [--------------------- CONFIDENTIAL ---------------------] |
| 14:54:21 | 18 | [--------------------- CONFIDENTIAL ---------------------] |
| 14:54:21 | 19 | [--------------------- CONFIDENTIAL ---------------------] |
| 14:54:21 | 20 | [--------------------- CONFIDENTIAL ---------------------] |
| 14:54:21 | 21 | [--------------------- CONFIDENTIAL ---------------------] |
| 14:54:21 | 22 | [--------------------- CONFIDENTIAL ---------------------] |
| 14:54:21 | 23 | [--------------------- CONFIDENTIAL ---------------------] |
| 14:54:21 | 24 | [--------------------- CONFIDENTIAL ---------------------] |
| 14:54:21 | 25 | [--------------------- CONFIDENTIAL ---------------------] |

Olivia Ho Cheng - May 27, 2021

Page 186

| | | |
|---|---|---|
| 14:55:28 | 1 | [-------------------- CONFIDENTIAL --------------------] |
| 14:55:28 | 2 | [-------------------- CONFIDENTIAL --------------------] |
| 14:55:28 | 3 | [-------------------- CONFIDENTIAL --------------------] |
| 14:55:28 | 4 | [-------------------- CONFIDENTIAL --------------------] |
| 14:55:28 | 5 | [-------------------- CONFIDENTIAL --------------------] |
| 14:55:28 | 6 | [-------------------- CONFIDENTIAL --------------------] |
| 14:55:28 | 7 | [-------------------- CONFIDENTIAL --------------------] |
| 14:55:28 | 8 | [-------------------- CONFIDENTIAL --------------------] |
| 14:55:28 | 9 | [-------------------- CONFIDENTIAL --------------------] |
| 14:55:28 | 10 | [-------------------- CONFIDENTIAL --------------------] |
| 14:55:28 | 11 | [-------------------- CONFIDENTIAL --------------------] |
| 14:55:28 | 12 | [-------------------- CONFIDENTIAL --------------------] |
| 14:55:28 | 13 | [-------------------- CONFIDENTIAL --------------------] |
| 14:55:28 | 14 | [-------------------- CONFIDENTIAL --------------------] |
| 14:55:28 | 15 | [-------------------- CONFIDENTIAL --------------------] |
| 14:55:28 | 16 | [-------------------- CONFIDENTIAL --------------------] |
| 14:55:28 | 17 | [-------------------- CONFIDENTIAL --------------------] |
| 14:55:28 | 18 | [-------------------- CONFIDENTIAL --------------------] |
| 14:55:28 | 19 | [-------------------- CONFIDENTIAL --------------------] |
| 14:55:28 | 20 | [-------------------- CONFIDENTIAL --------------------] |
| 14:55:28 | 21 | [-------------------- CONFIDENTIAL --------------------] |
| 14:55:28 | 22 | [-------------------- CONFIDENTIAL --------------------] |
| 14:55:28 | 23 | [-------------------- CONFIDENTIAL --------------------] |
| 14:55:28 | 24 | [-------------------- CONFIDENTIAL --------------------] |
| 14:55:28 | 25 | [-------------------- CONFIDENTIAL --------------------] |

Olivia Ho Cheng - May 27, 2021

```
14:56:43   1    [-------------------- CONFIDENTIAL --------------------]
14:56:43   2    [-------------------- CONFIDENTIAL --------------------]
14:56:43   3    [-------------------- CONFIDENTIAL --------------------]
14:56:43   4    [-------------------- CONFIDENTIAL --------------------]
14:56:43   5    [-------------------- CONFIDENTIAL --------------------]
14:56:43   6    [-------------------- CONFIDENTIAL --------------------]
14:56:43   7    [-------------------- CONFIDENTIAL --------------------]
14:56:43   8    [-------------------- CONFIDENTIAL --------------------]
14:56:43   9    [-------------------- CONFIDENTIAL --------------------]
14:56:43   10   [-------------------- CONFIDENTIAL --------------------]
14:56:43   11   [-------------------- CONFIDENTIAL --------------------]
14:56:43   12   [-------------------- CONFIDENTIAL --------------------]
14:56:43   13   [-------------------- CONFIDENTIAL --------------------]
14:56:43   14   [-------------------- CONFIDENTIAL --------------------]
14:56:43   15   [-------------------- CONFIDENTIAL --------------------]
14:56:43   16   [-------------------- CONFIDENTIAL --------------------]
14:56:43   17   [-------------------- CONFIDENTIAL --------------------]
14:56:43   18   [-------------------- CONFIDENTIAL --------------------]
14:56:43   19   [-------------------- CONFIDENTIAL --------------------]
14:56:43   20   [-------------------- CONFIDENTIAL --------------------]
14:56:43   21   [-------------------- CONFIDENTIAL --------------------]
14:56:43   22   [-------------------- CONFIDENTIAL --------------------]
14:56:43   23   [-------------------- CONFIDENTIAL --------------------]
14:56:43   24   [-------------------- CONFIDENTIAL --------------------]
14:56:43   25   [-------------------- CONFIDENTIAL --------------------]
```

Olivia Ho Cheng - May 27, 2021

| 14:57:42 | 1 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 2 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 3 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 4 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 5 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 6 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 7 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 8 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 9 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 10 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 11 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 12 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 13 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 14 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 15 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 16 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 17 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 18 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 19 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 20 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 21 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 22 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 23 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 24 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 25 | [-------------------- CONFIDENTIAL --------------------] |

Olivia Ho Cheng - May 27, 2021

Page 189

| 14:57:42 | 1  | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 2  | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 3  | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 4  | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 5  | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 6  | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 7  | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 8  | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 9  | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 10 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 11 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 12 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 13 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 14 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 15 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 16 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 17 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 18 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 19 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 20 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 21 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 22 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 23 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 24 | [-------------------- CONFIDENTIAL --------------------] |
| 14:57:42 | 25 | [-------------------- CONFIDENTIAL --------------------] |

Olivia Ho Cheng - May 27, 2021

1          BY MR. VALLA:

2              Q.    All right.  Ms. Cheng, let me take you now

3          to the -- let me take you now to November of 2016;

4          all right?  And what I want to discuss in the next

14:58:32   5          few minutes with you is the sale of the AIT assets

6          to Aurora Healthcare; okay?

7              Do you generally know what I'm talking

8          about?

9              A.    Yes.

14:58:44   10             Q.    Okay.  Good.  That will save us both a lot

11         of time.  I have some documents that I'm going to

12         show you.  We're going to go through them together.

13         You may need the light to -- to come back on in

14         order to see them better.

14:59:00   15             But, fundamentally, the November 2016

16         transaction is an asset purchase by Aurora

17         Healthcare U.S. of certain assets and no liabilities

18         of AIT.  Is that generally correct?

19             A.    Yes.

14:59:21   20             Q.    Okay.  Was an investment banking firm

21         involved in this transaction either advising

22         yourself, ARF or Aurora?

23             A.    No.

24             Q.    You hesitated.  May I ask you why?

14:59:42   25             A.    Because the ARF Partners -- Lucy is also a

Olivia Ho Cheng - May 27, 2021

Page 191

14:59:42   1          very good investor, but she's not an investment --

           2          investment -- investment -- not investment banker.

           3              Q.   Okay.   Understood.

           4                   You know, sometimes in these -- in these

15:00:10   5          deals, there are bankers involved, so I always ask

           6          whether the parties were presented by bankers; okay?

           7              A.   Yeah.

           8              Q.   Were -- were lawyers involved in the

           9          transaction?

15:00:22  10                   MS. CLOSE:   Vague and ambiguous.

          11          BY MR. VALLA:

          12              Q.   Representing -- for example, representing

          13          ARF?

          14                   MS. CLOSE:   Vague and ambiguous.   In the

15:00:31  15          negotiations?

          16          BY MR. VALLA:

          17              Q.   At any point in the transaction.

          18              A.   We do consult with counsel from time to

          19          time.

15:00:40  20              Q.   Okay.   And I don't want to -- I don't want

          21          to know what you talked about.   I just want to know

          22          whether there were lawyers involved; okay?

          23              A.   Yeah.

          24              Q.   And when you say "we do consult," who do

15:00:50  25          you mean by "we"?

Olivia Ho Cheng - May 27, 2021

Page 192

15:00:50
1          A.     "We" means the shareholder of -- I mean the
2    board member of AHC U.S.
3          Q.     Aurora Healthcare U.S.?
4          A.     Right.
15:01:01
5          Q.     Okay.  Do you know whether AIT was
6    represented by lawyers in that transaction?  AIT was
7    the seller.  Was it represented by lawyers to your
8    knowledge?
9          A.     I don't know.
15:01:17
10         Q.     You do know, of course, because you
11    testified to it that Mr. Wilson is a lawyer?
12         A.     Right.
13         Q.     Do you know whether Mr. Wilson represented
14    AIT in the transaction?
15:01:29
15         A.     Yes.
16         Q.     He did.  As a lawyer, I mean.  Not as a
17    CEO, as a lawyer?
18         A.     I don't know.
19         Q.     You don't know that?
20         A.     I don't know that.
21         Q.     He was the CEO of AIT and you know that.
22         A.     Right.
23         Q.     But you don't know whether he acted as a
24    lawyer.  Okay.  I don't want to put words in your
15:01:46
25    mouth, but I think we got that straight.

Olivia Ho Cheng - May 27, 2021

Page 193

15:01:46 | 1    A.   Good.

2    Q.   Okay.

3    A.   Thank you.

4    Q.   For once.

15:01:51 | 5         You also testified earlier that a company

6    was set up in the Cayman Islands called Aurora

7    Healthcare SPC.  That company was not used in the

8    transaction.  Do you confirm your testimony?

9    A.   Yes.

15:02:05 | 10        MR. VALLA:  Okay.  So I'm going to show you

11   a document that puzzles me.  Oh, now I know why you

12   got a headache.

13        MS. CLOSE:  Tell me if that sometimes --

14        THE WITNESS:  It's okay.  I read it --

15:02:34 | 15        MR. VALLA:  If should be -- it is Document

16   No. 29, and we are going to be asked it be marked as

17   Plaintiff's next in order which I believe is Number

18   7.

19        MS. CLOSE:  So this is Tab 29, Exhibit 7.

20        (The aforementioned document was

21        marked Exhibit 7 for

22        identification.)

23   BY MR. VALLA:

24        Q.   Ms. Cheng, I'll represent to you that this

15:03:11 | 25   is -- the document that I'm showing you now is an

Olivia Ho Cheng - May 27, 2021

Page 194

15:03:11

1     asset purchase agreement dated October 31, 2016,

2     between Aurora Healthcare SPC, a Cayman Islands

3     company, as the buyer and Aurora Imaging Technology,

4     AIT, as the seller.

15:03:37

5            The asset purchase agreement, I will

6     represent to you, relates to all of the assets or --

7     most of the assets AIT; okay?  And I'll turn your

8     attention to page 15 which is the last page of the

9     document with any writing on it.

10     A.     Yeah.

11     Q.     And I'll ask you to confirm to me that this

12     is your signature on page 16 on behalf of Aurora

13     Healthcare SPC?

14     A.     Correct.

15:04:08

15     Q.     Okay.  And we understand that Aurora

16     Healthcare SPC is a Cayman Islands company but the

17     signature block reflects an address in Taipei,

18     Taiwan, is that right?

19     A.     Yes.

15:04:21

20     Q.     Okay.  What address is that?  Do you

21     recognize it?

22     A.     That's our attorney's address.

23     Q.     Okay.  And I think you testified earlier

24     that a lawyer in Taiwan had formed this company for

15:04:30

25     you; right?

Olivia Ho Cheng - May 27, 2021

15:04:30   1          A.   Yes.

           2          Q.   Okay.  Did I ask you whether you recognize

           3      your signature on this document?

           4          A.   You did.

15:04:38   5          Q.   Okay.  Thank you.  Sorry.

           6               And it appears that Mr. Christopher Wilson

           7      signed on behalf of Aurora Imaging Technology, Inc.

           8      Does that look right to you as well.  I'm not asking

           9      you to authenticate his signature because you can't.

15:04:55  10               But does it -- does it look right?

          11          A.   Yeah.

          12          Q.   Do you remember whether the two of you,

          13      meaning yourself and Mr. Wilson, were in the same

          14      room when you signed this document?

15:05:06  15          A.   I don't remember.

          16          Q.   Okay.  Is it possible that you just

          17      exchanged signature pages by fax or email?

          18          A.   Possible.

          19          Q.   But you don't remember specifically?

15:05:17  20          A.   I don't.

          21          Q.   The date of this document is October 31,

          22      2016.

          23          A.   Looks like it.

          24          Q.   That's what it says at least.  Okay.  So is

15:05:28  25      October -- it's Halloween 2016, a perfect date for

Olivia Ho Cheng — May 27, 2021

Page 196

| | | |
|---|---|---|
| 15:05:28 | 1 | this deal.  It's Halloween 2016 and Aurora enters |
| | 2 | into a contract to sell its assets to the Cayman |
| | 3 | Islands company. |
| | 4 | A.   Uh-huh. |
| 15:05:44 | 5 | Q.   But this transaction did not go through; |
| | 6 | right? |
| | 7 | A.   We decided not to use Cayman Island entity. |
| | 8 | Q.   I understand.  That's what you testified -- |
| | 9 | I'm just -- want to make sure.  They didn't sell the |
| 15:05:56 | 10 | assets twice, did they? |
| | 11 | A.   No. |
| | 12 | Q.   Okay.  So the transaction documented by |
| | 13 | this contract that you're looking at right now, |
| | 14 | Exhibit 7, did not go through? |
| 15:06:09 | 15 | A.   Correct. |
| | 16 | MS. CLOSE:  Asked and answered. |
| | 17 | BY MR. VALLA: |
| | 18 | Q.   Was it formally rescinded in writing? |
| | 19 | MS. CLOSE:  Calls for speculation. |
| 15:06:15 | 20 | THE WITNESS:  No. |
| | 21 | MR. VALLA:  No.  I'm asking the CEO of the |
| | 22 | company. |
| | 23 | BY MR. VALLA: |
| | 24 | Q.   Do you know if it was formally rescinded in |
| 15:06:26 | 25 | writing? |

Olivia Ho Cheng - May 27, 2021

Page 197

| | | |
|---|---|---|
| 15:06:26 | 1 | A.   We simply did not use it. |
| | 2 | Q.   You didn't use it.  You signed the |
| | 3 | contract -- |
| | 4 | A.   Mutual agreement. |
| 15:06:29 | 5 | Q.   Okay.  And that's good. |
| | 6 | And that agreement was reached between |
| | 7 | yourself and Mr. Wilson? |
| | 8 | A.   Yes. |
| | 9 | Q.   Okay.  And you said it was a mutual |
| 15:06:37 | 10 | agreement.  That's fine. |
| | 11 | Was it a written agreement? |
| | 12 | A.   The other asset purchase agreement |
| | 13 | represent -- represented it. |
| | 14 | Q.   Represented it? |
| 15:06:47 | 15 | A.   Right, that we used. |
| | 16 | Q.   What do you mean? |
| | 17 | A.   That we use.  Replace it. |
| | 18 | Q.   Not represented it but replaced it? |
| | 19 | A.   Replaced it. |
| 15:06:56 | 20 | Q.   I see. |
| | 21 | MR. VALLA:  Okay.  Let's look at the other |
| | 22 | asset purchase agreement. |
| | 23 | MS. CLOSE:  What tab number again? |
| | 24 | MR. VALLA:  The tab number for that |
| 15:07:30 | 25 | document is now Tab No. 28, and we're going to mark |

Olivia Ho Cheng - May 27, 2021

Page 198

| | |
|---|---|
| 15:07:30 | 1    it next in order which is going to be exhibit -- |
| | 2    Plaintiff's Exhibit 8. |
| | 3          (The aforementioned document was |
| | 4    marked Exhibit 8 for |
| 15:07:43 | 5    identification.) |
| | 6    MS. CLOSE:  Sorry, which number? |
| | 7    MR. VALLA:  Twenty-eight. |
| | 8    THE WITNESS:  This is loan agreement. |
| | 9    MR. VALLA:  Sorry for jumping around. |
| | 10    MS. CLOSE:  Are you sure it's tab -- maybe |
| | 11    I have the wrong one.  Twenty -- oh, I got the wrong |
| | 12    one, and now I've messed it all up.  Don't ask me |
| | 13    which one I got that out of, probably 27.  Exhibit |
| | 14    8?  Yes. |
| | 15    BY MR. VALLA: |
| | 16    Q.   All right, Ms. Cheng.  I'll represent to |
| | 17    you that the document we just pulled out, |
| | 18    Plaintiff's 8, is an asset purchase agreement.  This |
| | 19    time it's between Aurora Healthcare U.S., a |
| 15:08:33 | 20    Massachusetts corporation -- so it's no longer the |
| | 21    Cayman Island company -- as buyer and Aurora Imaging |
| | 22    Technology as seller.  It's for certain assets and |
| | 23    -- and no liabilities of AIT; okay? |
| | 24    Now, if you could turn to page 15 of the |
| 15:09:04 | 25    agreement. |

Olivia Ho Cheng - May 27, 2021

Page 199

15:09:04    1          A.    Okay.

2          Q.    You will see that it is once again a

3   signature page.

4          A.    Right.

15:09:10    5          Q.    And once again, it appears to bear -- to

6   bear your signature on behalf of Aurora Healthcare

7   U.S. and that of Mr. Wilson on behalf of AIT.

8                Is -- is your signature as it appears on

9   the agreement indeed your signature, Ms. Cheng?

15:09:27   10          A.    Yes.

11          Q.    Okay.  So you signed this document?

12          A.    Yes.

13          Q.    You will also notice that the date is once

14   again was Halloween 2016, October 31st; is that

15:09:40   15   correct?

16          A.    Correct.

17          Q.    Okay.  So on the same day you signed two

18   contracts?

19          A.    I don't remember exactly when was it

15:09:53   20   signed, but the date probably -- I really don't

21   remember.  I -- all I remember was Cayman Island --

22   if we purchased the assets through Cayman Island, it

23   will be a lot more process to transfer the company

24   to a U.S. company for -- for business.  So that's

15:10:19   25   too much work, so we decided not to do it.

Olivia Ho Cheng - May 27, 2021

Page 200

| | | |
|---|---|---|
| 15:10:19 | 1 | Q.   Okay.  But you -- you -- |
| | 2 | MS. CLOSE:  Just stick to the -- |
| | 3 | BY MR. VALLA: |
| | 4 | Q.   -- signed the contract.  I follow you.  I |
| 15:10:30 | 5 | understand -- |
| | 6 | A.   Uh-huh. |
| | 7 | Q.   -- being through these deals many, many |
| | 8 | times, things change. |
| | 9 | A.   Right. |
| 15:10:34 | 10 | Q.   But what caught my eye about it is the date |
| | 11 | is the same. |
| | 12 | A.   Right. |
| | 13 | Q.   So you sort of wake up in the morning, and |
| | 14 | it's the Cayman Islands company doing the deal.  You |
| 15:10:48 | 15 | go to bed at night, it's the U.S. company doing the |
| | 16 | deal.  What -- what -- did it actually all happen in |
| | 17 | one day, this change of mind? |
| | 18 | A.   I don't remember, but the logic was what I |
| | 19 | just told you.  Maybe we -- I don't want to |
| 15:11:09 | 20 | speculate. |
| | 21 | MS. CLOSE:  Yeah.  If you don't remember, |
| | 22 | just tell him you don't remember. |
| | 23 | BY MR. VALLA: |
| | 24 | Q.   So could these dates be wrong, Ms. Cheng? |
| 15:11:10 | 25 | The dates are the same. |

Olivia Ho Cheng - May 27, 2021

Page 201

| | | | |
|---|---|---|---|
| 15:11:10 | 1 | A. | Yeah. |
| | 2 | Q. | Is one of the dates wrong? |
| | 3 | A. | I don't remember. |
| | 4 | Q. | Yeah.  Okay.  Besides yourself on behalf of |
| 15:11:30 | 5 | the buyer, was Mr. James assisting you with this | |
| | 6 | transaction? | |
| | 7 | A. | Yes. |
| | 8 | | MS. CLOSE:  Vague and ambiguous. |
| | 9 | BY MR. VALLA: | |
| 15:11:39 | 10 | Q. | I'm sorry, your answer was "yes"; right? |
| | 11 | A. | Yes. |
| | 12 | Q. | And what assistance did he lend to you? |
| | 13 | A. | Paperwork. |
| | 14 | Q. | Meaning? |
| 15:11:47 | 15 | A. | Getting -- getting the -- getting the |
| | 16 | paperwork together because there were a lot of | |
| | 17 | documentations. | |
| | 18 | Q. | What -- what was the documentation?  I |
| | 19 | think here we have about 20 pages of documentation. | |
| 15:12:05 | 20 | Was there more documentation? | |
| | 21 | A. | For example, the -- all the list of the |
| | 22 | exhibits. | |
| | 23 | Q. | Okay.  So -- |
| | 24 | A. | We had to be consistent with that. |
| 15:12:14 | 25 | Q. | Okay.  That's fine.  Let's have a look at |

Olivia Ho Cheng - May 27, 2021

Page 202

| | |
|---|---|
| 15:12:14 | 1     the exhibits together. |
| | 2       A.  Sure. |
| | 3       Q.  So the document is right in front of you. |
| | 4     After the signature page that we just went over, |
| 15:12:25 | 5     you'll see a page that is Bates-stamped, meaning |
| | 6     there's a string of numbers at the bottom of the |
| | 7     page. |
| | 8       A.  Uh-huh. |
| | 9       Q.  Bates-stamped -- |
| 15:12:34 | 10       A.  Uh-huh. |
| | 11       Q.  -- CHENG 000016.  Do you see that? |
| | 12       A.  Yeah. |
| | 13       Q.  Okay.  And it says there it is produced in |
| | 14     native format and then it makes a reference to |
| 15:12:50 | 15     another file. |
| | 16       You see that? |
| | 17       A.  Yeah. |
| | 18       MS. CLOSE:  It's an Excel. |
| | 19       THE WITNESS:  Oh. |
| 15:12:55 | 20     BY MR. VALLA: |
| | 21       Q.  Okay.  And the same for the next page; |
| | 22     right? |
| | 23       A.  Uh-huh. |
| | 24       Q.  And the same for the page after that; |
| 15:13:00 | 25     right? |

Olivia Ho Cheng - May 27, 2021

Page 203

15:13:00    1            A.    Uh-huh.

            2            Q.    Okay.   And then you get to the page

            3     Bates-stamped CHENG 000020.

            4            A.    Okay.

15:13:08    5            Q.    And there's an exhibit called Exhibit A6.

            6                  Do you see that exhibit?

            7            A.    Yes.

            8            Q.    And that purports to be a list of excluded

            9     assets as they're called.

15:13:21   10            A.    Uh-huh.

           11            Q.    And it says that "The following assets are

           12     not included in the assets purchased the buyer" --

           13                  So you weren't buying them; okay?

           14            A.    Yeah.

15:13:31   15            Q.    -- "and remain the sole property of the

           16     seller."

           17                  Are you -- are you familiar with the assets

           18     listed on that page?

           19            A.    Yes.

15:13:38   20            Q.    Okay.   What are they?

           21            A.    They were either breast centers that

           22     company own or have a percentage of or joint

           23     ventured with breast centers.

           24            Q.    Okay.   Do you see that one of the assets

15:13:54   25     listed is described as Aurora Asia International,

Olivia Ho Cheng – May 27, 2021

Page 204

15:13:54    1          Inc.?

            2               A.    Right.

            3               Q.    Is that the company we talked about

            4          previously, Aurora Asia?

15:14:06    5               A.    Correct.

            6               Q.    Okay.   So this was the company in Taiwan

            7          that owned or had operations in three centers?

            8               A.    Right.

            9               Q.    Okay.   So that stayed with the seller.

15:14:18   10               All these assets stayed with the seller?

           11               A.    Right.

           12               Q.    Do you have any knowledge about whether AIT

           13          still owns any of these assets?

           14               A.    I don't.

15:14:27   15               Q.    Okay.   Let's now look at the next page

           16          which is labeled Exhibit A7.   It's titled

           17          "software."

           18               A.    Uh-huh.

           19               Q.    Purports to sell all of the seller's

15:14:51   20          interest in the following software applications.   It

           21          talks about Aurora CAD, software designed to assist

           22          in the shimming of magnets, Office 365, Great Plains

           23          accounting software, software installed on computer

           24          systems and any software that can be freely

15:15:16   25          transferred.

Olivia Ho Cheng - May 27, 2021

Page 205

15:15:16    1              Do you know why there's a reference to free

2       transferability of software on Item 6?

3          A.    I have no idea.

4          Q.    Do you know whether any of the software

15:15:33    5       that was being acquired in the deal --

6          A.    Uh-huh.

7          Q.    -- was governed by U.S. laws prohibiting

8       the export of software technology to China?

9          A.    Could you rephrase that question again?

15:15:49   10          Q.    Yeah.   Absolutely.

11              Did -- did you buy any software --

12          A.    Uh-huh.

13          Q.    -- that the U.S. has export control over?

14          A.    No.

15:16:00   15          Q.    And how do you know that?

16          A.    Because when we had a transaction with the

17       CRC, we applied to the U.S. CFIUS and have gone

18       through the entire process, and it was approved.

19          Q.    In that -- in that transaction?

15:16:24   20          A.    In that transaction.   So there's nothing

21       more than what we were already involved in the

22       merger --

23          Q.    Okay.

24          A.    -- transaction.

15:16:33   25          Q.    And I believe you testified that the CRC

Olivia Ho Cheng - May 27, 2021

Page 206

| | | |
|---|---|---|
| 15:16:33 | 1 | transaction took almost a couple of years before it |
| | 2 | fell apart.  I think it lasted from 2011 to 2012; is |
| | 3 | that right? |
| | 4 | A.    It started in 2010. |
| 15:16:46 | 5 | Q.    2010.  Okay.  And it ended in 2011? |
| | 6 | A.    Ended in 2012. |
| | 7 | Q.    Okay.  So now here we're in 2016 -- |
| | 8 | A.    Right. |
| | 9 | Q.    -- right? |
| 15:16:59 | 10 | Four years have gone by; right? |
| | 11 | A.    Uh-huh. |
| | 12 | Q.    Did anybody check whether the laws had |
| | 13 | changed in four years that you know of? |
| | 14 | A.    No, I did not. |
| 15:17:10 | 15 | Q.    Nobody did; right?  Okay. |
| | 16 | Could you turn to the next page, please, |
| | 17 | Ms. Cheng, Exhibit A8.  Oh, by the way, is any of |
| | 18 | the software that you testified as being developed |
| | 19 | or written in China currently dual-use software? |
| 15:17:33 | 20 | A.    Say it again. |
| | 21 | Q.    Dual-use software? |
| | 22 | A.    I do not understand that terms. |
| | 23 | Q.    Dual-use software, I'll represent to you, |
| | 24 | is software that can have both a civil and a |
| 15:17:44 | 25 | military application. |

Olivia Ho Cheng - May 27, 2021

Page 207

| | | |
|---|---|---|
| 15:17:44 | 1 | A.   Not at all. |
| | 2 | Q.   Okay.  To your knowledge it's not? |
| | 3 | A.   No. |
| | 4 | Q.   Okay.  So if you would turn to Exhibit A8, |
| 15:17:55 | 5 | you see it's got four bullet points, 1 through 4, |
| | 6 | the title of the exhibit is "Investments." |
| | 7 |      The first item is 80 percent of the |
| | 8 | membership interest in Boston Breast -- |
| | 9 | A.   Uh-huh. |
| 15:18:06 | 10 | Q.   -- diagnostic. |
| | 11 |      Is that one of the assets that you were |
| | 12 | buying? |
| | 13 | A.   We were buying. |
| | 14 | Q.   You -- you were.  You -- you were planning |
| 15:18:15 | 15 | to buy it?  It was part of the deal? |
| | 16 | A.   Right. |
| | 17 | Q.   Okay.  Did you ultimately actually buy that |
| | 18 | asset? |
| | 19 | A.   No. |
| 15:18:23 | 20 | Q.   And why not? |
| | 21 | A.   Because the seller could not deliver that, |
| | 22 | a clear title. |
| | 23 | Q.   Okay.  What was unclear about the title? |
| | 24 | A.   Because the deal required the minority |
| 15:18:43 | 25 | shareholder which is Dr. Levin to consent to |

Olivia Ho Cheng - May 27, 2021

Page 208

15:18:43    1         transfer of the 80 percent ownership.

2              Q.   And did -- did Dr. Levin consent?

3              A.   Did not consent.

4              Q.   Do you know why?

15:18:57    5              MS. CLOSE:  Calls for speculation.

6              THE WITNESS:  I don't know.

7    BY MR. VALLA:

8              Q.   Did you have any communicating with

9    Dr. Levin about obtaining her consent?

15:19:04   10              A.   I don't remember.

11              Q.   If you did not communicate with her, who

12    would have communicated with her?

13              A.   The CEO.

14              Q.   And the CEO of -- of what?

15:19:15   15              A.   AIT, the owner --

16              Q.   Oh.

17              A.   -- of the 80 percent.

18              Q.   The owner of the 80 percent being AIT.  So

19    the CEO of AIT would have been

15:19:28   20    Mr. Christopher Wilson; right?  Is that who you're

21    referring to?

22              A.   Yes.

23              Q.   Do you know if Mr. Wilson did communicate

24    this with Dr. Levin about this?

15:19:36   25              A.   I don't know.

Olivia Ho Cheng - May 27, 2021

15:19:36   1          Q.    Okay.  Do you know if Mr. James

2    communicated with Dr. Levin about this?

3          A.    I don't know.

4          Q.    So as far as you know -- oh, strike that.

15:19:45   5    I think I know the answer.

6                What about Aurora Breast MRI of Central

7    Massachusetts.  That was 100 percent -- that came

8    along with the deal; right?  You bought that?

9          A.    I -- it shows that we did, but I don't

15:20:11   10    remember.

11          Q.    Okay.  It's actually contingent on

12    receiving some kind of government approval --

13          A.    Uh-huh.

14          Q.    -- so maybe.

15:20:22   15                What about a hundred percent of the capital

16    stock of Aurora Imaging Corp?  Did you buy that?

17          A.    That one is actually the -- the 80 percent

18    ownership -- represent the 80 percent ownership is

19    not directly to -- through AIT, but AIC is the

15:20:42   20    80 perc- -- is the 80 percent owner which AIC is --

21    AIC is a hundred percent subsidiary of AIT.  Do you

22    know what I mean?

23          Q.    Absolutely not.

24          A.    Okay.

15:20:59   25          Q.    So the Point 3 -- Item 3 on that list

Olivia Ho Cheng - May 27, 2021

Page 210

15:20:59   1          refers to an investment being sold to you in the

2          deal, and it speaks to 100 percent of the stock of

3          Aurora Imaging Corp.  So that tells me that AIT

4          owned a hundred percent of Aurora Imaging Corp.

15:21:24   5              Is that your understanding as well?

6      A.   Yes.

7      Q.   Okay.  Did you buy that?

8      A.   No.

9      Q.   Why not?

15:21:31   10     A.   Because C -- three is one.

11     Q.   Three is one.  Oh, I think I get it.  I

12          think I get it.

13              So AIT owns a hundred percent of AIC which

14          owns 80 percent of Boston Breast Diagnostic?

15:21:52   15     A.   Yes.

16     Q.   Because Dr. Levin didn't consent, then

17          there was no point -- in fact, you couldn't buy a

18          hundred percent of Aurora Imaging Corp.  I get it.

19          So that stayed with the seller?

15:22:09   20     A.   Yes.

21     Q.   Okay.  What about the last item?

22          Hopefully, this one's easier.  100 percent of the

23          membership interest of Aurora Imaging Leasing Little

24          Rock, LLC?

15:22:24   25     A.   Yes.

Olivia Ho Cheng - May 27, 2021

Page 211

15:22:24 1        Q.    You bought that?

2        A.    Yes.

3        Q.    Okay.   And what is -- what is Aurora

4    Imaging Leasing Little Rock?

15:22:32 5        A.    It's a share revenue program with -- with

6    university -- Massachusetts -- University of

7    Arkansas -- University of Arkansas Little Rock.

8        Q.    Shared revenue program.   And could you tell

9    me what a shared revenue program is?

15:22:54 10       A.    So we enter a share revenue partnership

11   with breast center in the U.S., and in this case,

12   this is a University of Arkansas medical center.

13       Q.    Uh-huh.

14       A.    We install our system and they provide

15:23:14 15  medical personnel, the -- everything, and we share

16   the revenue generated from the MRI.   That's the

17   share revenue.

18       Q.    So that actually makes money.   There's some

19   revenue to share?

15:23:30 20       A.    Right, right.

21       Q.    Okay.   Got it.   Thank you.

22            Last exhibit.   If you could turn to the

23   following page please, you'll see there's an exhibit

24   marked Exhibit B.

15:23:43 25       A.    Uh-huh.

Olivia Ho Cheng - May 27, 2021

Page 212

15:23:43  1          Q.    Do you see it?

2          A.    Yes.

3          Q.    Okay.  Very well.

4                That exhibit is titled "Assumed

15:23:50  5     Liabilities."  And it says "The following

6     liabilities are assumed by buyer from and after the

7     closing date," and there's sort of a laundry list of

8     things.  I'd like you to focus on Item 5 which

9     refers to an independent contractor services

15:24:06  10    agreement with ML Services Group, LLC.

11         A.    Right.

12         Q.    Okay.  What -- what is ML Services Group?

13         A.    So ML Service Group [sic] is a couple of

14    service engineer went out and form their own

15:24:27  15    company.  And during the time that Aurora -- AIT was

16    preparing to close its operation, they offer to the

17    customers to service their Aurora system.

18         Q.    Okay.

19         A.    And the personnel -- the two engineers are

15:24:49  20    very experienced engineers in our service team.  So

21    when we bought the company, we want them to also

22    continue to service our customer's side, so we

23    assume that contract.

24         Q.    Okay.  So you viewed it as a core element

15:25:07  25    of the business; is that right?

Olivia Ho Cheng - May 27, 2021

Page 213

| | | |
|---|---|---|
| 15:25:07 | 1 | A.    That is important too.   That was the |
| | 2 | purpose. |
| | 3 | Q.    It is important element of the business. |
| | 4 | Okay. |
| 15:25:21 | 5 | Item 8 states that you are also assuming |
| | 6 | all liabilities for trade payables no more than |
| | 7 | 30 days past due.   In other words, if there were |
| | 8 | bills outstanding older than 30 days, you did not |
| | 9 | take those on, did you? |
| 15:25:40 | 10 | A.    It looks like that way. |
| | 11 | MS. CLOSE:   Document speaks for itself. |
| | 12 | BY MR. VALLA: |
| | 13 | Q.    Okay.   Any reason to 30 days as opposed to |
| | 14 | some other number of days? |
| 15:25:53 | 15 | A.    I don't know. |
| | 16 | Q.    Okay.   You negotiated this contract, |
| | 17 | though; right? |
| | 18 | A.    Yes. |
| | 19 | Q.    Okay.   With Mr. James? |
| 15:26:14 | 20 | A.    With AIT -- with Chris Wilson. |
| | 21 | Q.    On AIT with Christopher Wilson on the other |
| | 22 | side, but on your side of the deal Mr. James; right? |
| | 23 | A.    He assist. |
| | 24 | Q.    He assisted.   I think you testified that he |
| 15:26:24 | 25 | assisted in putting together the documents including |

Olivia Ho Cheng - May 27, 2021

Page 214

15:26:24  1         the exhibits to this contract; is that right?

       2              A.   Some of the exhibit.

       3              Q.   Some of them.   Okay.

       4                   I'm going to ask you, Ms. Cheng, to turn

15:26:49  5    back to a prior exhibit which was the contract with

       6    the Cayman Islands company.

       7              A.   Uh-huh.

       8              Q.   Do we have the right one?

       9                   MS. CLOSE:   Is it Exhibit 7?   Is it this

15:27:10 10    one?

      11    BY MR. VALLA:

      12              Q.   It would have the name of the Cayman

      13    Islands company on the second line.   Okay.   That's

      14    great.

15:27:17 15                   You've already testified -- I'm not going

      16    to ask you again -- that this contract didn't happen

      17    in the end.   It got substituted for; right?   Would

      18    you please -- would you, please, turn to page 5 of

      19    the contract.

15:27:36 20              A.   (Complies.)

      21              Q.   You'll see on page 5 that there is a

      22    provision, Number 3, titled "Buyer's Consideration."

      23                   That's the price, isn't it?

      24              A.   Yes.

15:27:54 25              Q.   Okay.   And Section 3 articulates how the

Olivia Ho Cheng - May 27, 2021

Page 215

| | | |
|---|---|---|
| 15:27:54 | 1 | purchase price is going to be paid.  The total |
| | 2 | purchase price appears to be $8 1/2 million; is that |
| | 3 | correct? |
| | 4 | A.   Yes. |
| 15:28:09 | 5 | Q.   And then there are four payments that add |
| | 6 | up to 8 1/2 million; is that right? |
| | 7 | A.   Yes. |
| | 8 | Q.   The first payment it states "U.S. Dollars |
| | 9 | 4.3 million of the amount that would otherwise be |
| 15:28:30 | 10 | due and payable to buyer as the holder of the senior |
| | 11 | secure debt of seller to Pharos Capital and its |
| | 12 | affiliates.  Debt will be canceled and deemed repaid |
| | 13 | in full." |
| | 14 | A.   Right. |
| 15:28:44 | 15 | Q.   So that is the cancellation of the Pharos |
| | 16 | debt that ARF had purchased from Pharos and then |
| | 17 | contributed to Aurora Healthcare? |
| | 18 | A.   Uh-huh. |
| | 19 | Q.   Is that right? |
| 15:28:56 | 20 | A.   Yes. |
| | 21 | Q.   Okay.  So that it's a way of saying, "I'm |
| | 22 | going to pay you 8 1/2 million, but you owe me 4.3, |
| | 23 | so we're going to cancel that 4.3 as a form of |
| | 24 | payment"; is that correct? |
| 15:29:11 | 25 | A.   That is correct. |

Olivia Ho Cheng - May 27, 2021

Page 216

15:29:11    1          Q.    Okay.   And 3.2 says -- "3.2 million shall
            2    be payable in cash at the closing," presumably to
            3    the seller; right?
            4          A.    Yes.
15:29:23    5          Q.    And then Section 3.3 says "U.S. Dollars
            6    500,000 shall be payable to one or more assignees of
            7    seller within four months from the closing."   In
            8    other words, what that means is that "Within four
            9    months after closing, I'll tell you who to pay that
15:29:43   10    money to"; right?  Is it --
           11          MS. CLOSE:   Document speaks for itself.
           12    BY MR. VALLA:
           13          Q.    Look, what do you think it means,
           14    Ms. Cheng?
15:29:54   15          MS. CLOSE:   Calls for a legal conclusion.
           16          THE WITNESS:   This contract we never use.
           17    BY MR. VALLA:
           18          Q.    Oh, I understand.   I -- I'm just trying
           19    to -- I'm just trying to understand just this
15:30:03   20    paragraph because there's 8 1/2 million purchase
           21    price --
           22          A.    Uh-huh.
           23          Q.    -- I get it that 4.3 were, you know, debt
           24    cancellation.   We agree on that.   3.2 million is
15:30:13   25    cash to the seller, I understand.   500,000 is cash

Olivia Ho Cheng - May 27, 2021

Page 217

15:30:13   1      to someone else who is not named, and then the

2      remaining 500,000, again, is cash to someone else

3      who's not named, but then it speaks to having it

4      being payable in Chinese yuan and delivered in the

15:30:32   5      People's Republic of China?

6              MS. CLOSE:  Document speaks for itself.

7      BY MR. VALLA:

8          Q.   Right?

9          A.   Yes.

15:30:38  10          Q.   Do you know who these assignees of the

11      seller mentioned in Section 3.3 and 3.4 are?

12          A.   Yes.

13          Q.   And who are they?

14          A.   They are the creditors of AIT that AIT

15:30:53  15      needs to pay, and so they are those -- the

16      creditors.

17          Q.   Okay.  They're creditors of AIT.  That's

18      fine.  Now I -- now at least I understand where that

19      money was supposed to go, although we agree it

15:31:11  20      didn't go anywhere because this contract --

21          A.   Right.

22          Q.   -- was signed but not executed.

23          A.   Right.

24          Q.   Not -- the deal was not done on the basis

15:31:19  25      of this contract; right?

Olivia Ho Cheng - May 27, 2021

Page 218

| | | |
|---|---|---|
| 15:31:19 | 1 | A.   Right. |
| | 2 | Q.   Okay.  All right.  Let's turn to Document |
| | 3 | No. 28. |
| | 4 | A.   Twenty-eight.  Which is? |
| 15:31:46 | 5 | Q.   I'm waiting for your counsel so that I |
| | 6 | don't -- I don't want to get ahead of her while |
| | 7 | she's trying to help us and doesn't have a chance to |
| | 8 | object. |
| | 9 | A.   Okay. |
| 15:31:55 | 10 | Q.   So Document No. 28 -- we've already looked |
| | 11 | at it together -- is the actual asset purchase |
| | 12 | agreement, the deal that got done? |
| | 13 | A.   Uh-huh. |
| | 14 | Q.   And if you turn, Ms. Cheng, to Section 3 -- |
| 15:32:15 | 15 | A.   Three. |
| | 16 | Q.   -- of that document, it is similar -- |
| | 17 | A.   Uh-huh. |
| | 18 | Q.   -- but not identical to the contract we |
| | 19 | just looked at, the one with the Cayman Islands |
| 15:32:30 | 20 | company? |
| | 21 | A.   Right. |
| | 22 | Q.   So, in fact, the two contracts are not the |
| | 23 | same in this respect? |
| | 24 | MS. CLOSE:  Document speaks for itself. |
| 15:31:19 | 25 | /// |

Olivia Ho Cheng — May 27, 2021

                    BY MR. VALLA:

                        Q.    Is that right?  The waterfall is different?

                        A.    Uh-huh.

                            MS. CLOSE:  Same objection.

15:32:44            BY MR. VALLA:

                        Q.    The numbers.  There's nothing to argue

                    about.  It's different, isn't it?

                            MS. CLOSE:  Same objection.

                            THE WITNESS:  Uh-huh.

                    BY MR. VALLA:

                        Q.    "Yes"?

                        A.    Yes.

                        Q.    Good.

                            So let's see what this waterfall says, who

15:32:51            the lucky winners are in this deal number.

                            So 8 1/2 million purchase price, it's the

                    same.

                        A.    Uh-huh.

                        Q.    Four million is debt forgiving?

15:33:02            A.    Uh-huh.

                        Q.    Okay.  Again, this is the Pharos debt that

                    was purchased by ARF contributed to Aurora

                    Healthcare, et cetera.

                        A.    Uh-huh.

15:33:10            Q.    And this is $4 million, whereas the

Olivia Ho Cheng — May 27, 2021

Page 220

| | | |
|---|---|---|
| 15:33:10 | 1 | agreement with the Cayman Islands company was |
| | 2 | $4.3 million. |
| | 3 | A.   Uh-huh. |
| | 4 | Q.   Do you agree with me? |
| 15:33:20 | 5 | A.   Yes. |
| | 6 | MS. CLOSE:  Document speaks for itself. |
| | 7 | THE WITNESS:  Document speaks for itself. |
| | 8 | BY MR. VALLA: |
| | 9 | Q.   Well, you agree with me that those are the |
| | 10 | numbers? |
| | 11 | A.   Documents -- |
| | 12 | MS. CLOSE:  Same objection. |
| | 13 | THE WITNESS:  State that.  Okay. |
| | 14 | BY MR. VALLA: |
| | 15 | Q.   We're there; right? |
| | 16 | A.   Yeah. |
| | 17 | Q.   One says 4.3 million; is that right?  We |
| | 18 | can do it that way.  It's a lot harder, but we can |
| | 19 | do it that way. |
| 15:33:39 | 20 | A.   Yeah. |
| | 21 | Q.   One document says 4.3 million; is that |
| | 22 | right? |
| | 23 | A.   Right. |
| | 24 | Q.   The other document says 4 million; is that |
| 15:33:10 | 25 | right? |

Olivia Ho Cheng - May 27, 2021

|  |  |  |
|---|---|---|
| 1 | A. | Right. |
| 2 | Q. | So they're two different numbers; right? |
| 3 | A. | Yes. |
| 4 | Q. | Okay.  What happened to the $300,000 in |

15:33:49

5  debt that was going to be forgiven under the Cayman
6  Islands deal and was not forgiven in the Aurora
7  Healthcare U.S. deal?
8         A.   I don't remember why --
9         Q.   Okay.

15:34:01

10        A.   -- there is --
11        Q.   The second item --
12        A.   Uh-huh.
13        Q.   -- in the actual deal, not the fake deal,
14  is 2.8 million --

15:34:10

15        A.   I object.
16             MS. CLOSE:  No, you can't object.
17  BY MR. VALLA:
18        Q.   No, not the -- not -- the unexecuted deal.
19  I'll correct that.  I'll correct that.  You're

15:34:16

20  absolutely right.  I'll correct that.
21             MS. CLOSE:  Don't -- let's take a break.
22  BY MR. VALLA:
23        Q.   The next item --
24             MR. VALLA:  You want to take a break?

15:34:22

25             MS. CLOSE:  Yeah, you're not in the middle

Olivia Ho Cheng - May 27, 2021

Page 222

15:34:22    1           a question right now.

2                     MR. VALLA:  Okay.  That's fine.

3                     MS. CLOSE:  Calm down.  Off the record.

4                     (A recess was taken.)

15:43:40    5           MR. VALLA:  All right.  Back on the record?

6                     MS. CLOSE:  Back on the record.

7           BY MR. VALLA:

8                Q.    Very good.

9                     Ms. Cheng, we're back on the record.  Thank

15:43:50   10      you.  You're still under oath.  You understand that;

11      right?

12                A.    Yes.

13                Q.    May I turn your attention back to page 5 of

14      Tab 28 in our exhibit list.

15:44:01   15                A.    Yes.

16                Q.    This is the contract between Aurora

17      Healthcare U.S. and Aurora Imaging Technology?

18                A.    Yes.

19                Q.    Okay.  So looking back at page 5, section

15:44:16   20      3, we were going through the breakdown of the

21      purchase price.

22                     Do you remember that?

23                A.    Right.

24                Q.    And the purchase price is the same, $8 1/2

15:44:24   25      million.  The first item is the forgiveness of the

Olivia Ho Cheng — May 27, 2021

Page 223

15:44:24    1           Pharos debt; right?

            2               A.   Right.

            3               Q.   And there is a $300,000 difference between

            4       the superceded contract with the Cayman Island

15:44:39    5       company and the actual contract with Aurora

            6       Healthcare; is that right?

            7               A.   Yes.

            8               Q.   And I believe you testified -- but I'm

            9       asking to make sure I remember it correctly -- that

15:44:49   10       you don't remember why there is a difference; is

           11       that true?

           12               A.   That is true.

           13               Q.   Okay.  So then looking at section 3.2 on

           14       the actual contract, $2.8 million is payable to the

15:45:07   15       seller at close.  That's what it says.  The previous

           16       version -- the superceded version we'll call it

           17       instead mentioned $3.2 million.  So it's 2.8 instead

           18       of 3.2.  So the seller is getting $400,000 less out

           19       of this item; is that right?

15:45:35   20               A.   Cash.

           21               Q.   Cash, yeah.  Cash, yes.

           22               A.   Right.

           23               Q.   Correct?  Okay.

           24                   Then we have a $500,000 item -- that's

15:45:46   25       section 3.3 -- to be paid to one or more assignees

Olivia Ho Cheng - May 27, 2021

15:45:46

1    of the seller in Chinese yuan and delivered in the

2    People's Republic of China.

3          Do you know what that payment was for?

4    A.    Creditors --

15:46:04

5    Q.    Creditors?

6    A.    -- of AIT.

7    Q.    -- of AIT.  Okay.

8          And -- and these were creditors of AIT in

9    China; is that right?

15:46:13

10   A.    I don't think they were in China but they

11   are -- they have Chinese account.

12   Q.    Do you know who those creditors were?

13   A.    Dr. Wang.

14   Q.    Is Dr. Wang one of the investors in AIT?

15:46:29

15   A.    Dr. Wang was one of the investors -- the

16   largest investor shareholder -- I mean board member

17   and creditor -- the largest creditors of AIT.

18   Q.    You may not know this, but, to your

19   knowledge, did other creditors of AIT other than

15:46:52

20   Dr. Wang get paid out of this thing?

21          MS. CLOSE:  Calls for speculation.

22   BY MR. VALLA:

23   Q.    I prefaced it by saying that you may not

24   know it.  So if you don't, say so.  But do you?

15:47:05

25   A.    I don't know.

Olivia Ho Cheng - May 27, 2021

Page 225

15:47:05    1              Q.    You don't know.

            2                    Do you know whether Dr. Wang was paid this

            3       $500,000?

            4              A.    What?  Could you restate the question

15:47:12    5       again?

            6              Q.    Yeah.  Do you know whether Dr. Wang

            7       received these $500,000?

            8              A.    I think he did.

            9              Q.    Okay.  Because you would have paid him -- I

15:47:20   10       mean your company would have paid him; right?

           11              A.    Right.

           12              Q.    Okay.  And your company would have records

           13       of those payments?

           14              A.    One of the Aurora Healthcare shareholder

15:47:31   15       that -- during that -- those time wiring Chinese

           16       dollar [sic] to U.S. is very difficult so --

           17              Q.    I'm sorry, I didn't understand that.

           18              A.    So the investors -- one of the investors

           19       was a Chinese citizen.

15:47:52   20              Q.    Okay.

           21              A.    It was difficult to wire -- to wire money

           22       from China to U.S. because China had a restriction.

           23              Q.    Currency control?

           24              A.    Currency control, right.

15:47:05   25              Q.    Okay.

Olivia Ho Cheng - May 27, 2021

1        A.    So he ask can he invest through Chinese

2    dollars -- using Chinese dollar.

3        Q.    Using yuan?

4        A.    Using yuan, right.

5        Q.    Okay.

6        A.    And so -- so we have to ask AIT when he --

7    when AIT receive the cash --

8        Q.    Uh-huh.

9        A.    -- he -- AIT will pay his creditors, could

15:48:31   10    some of the creditor -- would some of the creditors

11    willing to accept Chinese yuan if they have an

12    account in China.

13        Q.    Okay.  Okay.  I see.

14            The contract, however, says that this

15:48:50   15    $500,000 payment mentioned in section 3.3 goes from

16    the buyer to these people in China.  It doesn't name

17    them.

18        A.    Correct.

19        Q.    It talks to them about assignees; right?

15:49:03   20        A.    Uh-huh.

21        Q.    Do you know whether your company, Aurora

22    Healthcare U.S., actually paid this $500,000?

23        A.    The bor- -- yes.

24        Q.    You did?

15:49:13   25        A.    Yes.

15:49:13  1          Q.    And would you have records of that payment

2      or payments?

3          A.    I think we would.

4          Q.    Okay.    Your bank records probably; right?

15:49:26  5          A.    Uh-huh, but it's in Chinese yuan so --

6          Q.    Right.

7          A.    Yeah.

8          Q.    But the money -- where would the money have

9      come from?   Chinese --

15:49:37  10         A.    From investor -- from a Chinese investor.

11         Q.    Let me -- let me clarify that because I --

12     I know you're trying to answer my question, but I

13     didn't frame my question correctly.

14              The contract says Aurora would pay $500,000

15:49:54  15     in Chinese currency to certain people in China.

16         A.    Uh-huh.

17         Q.    Did Aurora have a bank account in China?

18         A.    No.

19         Q.    Aurora Healthcare U.S.?

15:50:09  20         A.    No.

21         Q.    Okay.    So it must have paid this amount of

22     money from its U.S. bank account.

23              Do you agree?

24         A.    No.   Okay.   So the investors when they --

15:50:19  25     Aurora Healthcare U.S. Corp --

Olivia Ho Cheng - May 27, 2021

Page 228

| | | |
|---|---|---|
| 15:50:19 | 1 | Q.   Uh-huh. |
| | 2 | A.   -- got the money from investors. |
| | 3 | Q.   Okay. |
| | 4 | A.   So those investors either put the money |
| 15:50:29 | 5 | into the U.S. -- Aurora U.S. account or -- or pay |
| | 6 | whoever the company said that we need to pay in |
| | 7 | order to -- |
| | 8 | Q.   Paid suppliers? |
| | 9 | A.   Yeah, or -- like that. |
| 15:50:43 | 10 | Q.   Or creditors? |
| | 11 | A.   Or creditors. |
| | 12 | Q.   I see. |
| | 13 | A.   Because -- yeah. |
| | 14 | Q.   But this $500,000 was paid at some point. |
| | 15 | A.   Right. |
| | 16 | Q.   It was actually paid at some point? |
| | 17 | A.   Right, right. |
| | 18 | Q.   And you -- you think, though you can't be |
| | 19 | sure right now -- that you may -- the company may |
| 15:50:59 | 20 | have records of these payments; right? |
| | 21 | A.   Right, but it would not be our U.S. account |
| | 22 | because it didn't pay out of U.S. account. |
| | 23 | Q.   In what account did it pay out of? |
| | 24 | A.   So the investor would pay. |
| 15:51:12 | 25 | Q.   I -- I get it.  But you -- you the |

Olivia Ho Cheng - May 27, 2021

Page 229

| | | |
|---|---|---|
| 15:51:12 | 1 | company -- I don't mean you personally, but you the |
| | 2 | company would have received proof of payment from |
| | 3 | somebody? |
| | 4 | A.   Yes.  We should. |
| 15:51:21 | 5 | Q.   Okay.  So those are records that we're |
| | 6 | talking about. |
| | 7 | A.   Right. |
| | 8 | Q.   Okay.  And you -- do you confirm in your |
| | 9 | testimony that this would have been Dr. Wang?  And |
| 15:51:31 | 10 | it's W-a-n-g; right? |
| | 11 | A.   W-a-n-g, right. |
| | 12 | Q.   And what is Dr. Wang's first name? |
| | 13 | A.   Chao-Hsiung Wang. |
| | 14 | Q.   I'm sorry, I'm going to ask -- |
| 15:51:47 | 15 | A.   C-h-a-o -- don't -- don't count me on the |
| | 16 | spelling.  Sometimes it may be off one or two. |
| | 17 | H-s-i-u-n-g. |
| | 18 | Q.   And it's Wang, W-a-n-g? |
| | 19 | A.   W-a-n-g. |
| 15:52:01 | 20 | Q.   -- right?  Okay. |
| | 21 | A.   But then when they invest, I think they use |
| | 22 | either personal name or their investment company |
| | 23 | called Janan Investment. |
| | 24 | Q.   Janan? |
| 15:52:14 | 25 | A.   J-a-n-a-n. |

Olivia Ho Cheng - May 27, 2021

Page 230

15:52:14    1                Q.    Janan Investments?

            2                A.    Yes.

            3                     MS. CLOSE:  Antonio, I don't think we

            4        remembered to designate this portion of the

15:52:28    5        testimony as confidential talking about the

            6        investors and Aurora Healthcare U.S. and the

            7        payment.

            8                     MR. VALLA:  I thought Dr. Wang was an

            9        investor.

15:52:39   10                     MS. CLOSE:  Oh, no.  He --

           11                     MR. VALLA:  -- in AIT.

           12                     MS. CLOSE:  Oh, that's right.  He was an

           13        AIT investor.  Okay.  Got it.

           14                     MR. VALLA:  So that's why I didn't think it

15:52:47   15        was confidential.

           16                     MS. CLOSE:  I'm sorry.

           17                     THE WITNESS:  But -- but we do have AHC --

           18        Aurora Healthcare U.S. new investors they are

           19        paying, so I don't -- we -- I -- we do want to have

15:52:54   20        those con- -- in confidence.

           21                     MR. VALLA:  But you didn't given me any

           22        names.

           23                     MS. CLOSE:  Yeah.  So far we haven't given

           24        any --

15:52:14   25                     MR. VALLA:  Okay.

Olivia Ho Cheng - May 27, 2021

```
 1              MS. CLOSE:  -- or amounts.

 2              MR. VALLA:  And I don't want any names.

 3              THE WITNESS:  Okay.

 4              MR. VALLA:  Right.

 5              THE WITNESS:  Uh-huh.

 6              MR. VALLA:  Okay.  So I think we're good --

 7              THE WITNESS:  Yeah.

 8              MR. VALLA:  -- this portion of the record

 9      is not confidential.

10      BY MR. VALLA:

11          Q.   Do you have contact information for

12      Dr. Wang?

13          A.   I have -- yeah.  I do have contact

14      information for Dr. Wang, but I have not contacted

15      him for a long time.

16          Q.   Okay.  We may ask your counsel to see if

17      you could share that contact information.

18              Do you know Dr. Wang resides in the

19      United States?

20          A.   He is a Taiwan citizen.

21          Q.   Okay.

22          A.   Yeah.  But he's quite old, too.

23          Q.   How -- how old is "quite old"?

24          A.   He's in the 80s.

25          Q.   Okay.  Even by my standards, then, I guess,
```

15:53:15 (line 15)
15:53:27 (line 20)
15:53:35 (line 25)

Olivia Ho Cheng - May 27, 2021

Page 232

| | | |
|---|---|---|
| 15:53:35 | 1 | yeah. |
| | 2 | All right.  The last item -- going back to |
| | 3 | the contract, Ms. Cheng -- |
| | 4 | A.    Uh-huh. |
| 15:53:43 | 5 | Q.    -- the last item is -- in the waterfall |
| | 6 | from the purchase price is the reference to |
| | 7 | 1.2 million being paid -- being paid to the seller. |
| | 8 | I think there's a word missing, but being paid to |
| | 9 | the seller after AIT obtains department -- DOH -- |
| 15:54:05 | 10 | Do you know what DOH means? |
| | 11 | A.    Department of Health. |
| | 12 | Q.    Is that the Massachusetts Department of |
| | 13 | Health -- |
| | 14 | A.    Right. |
| 15:54:12 | 15 | Q.    -- do you know? |
| | 16 | A.    Right. |
| | 17 | Q.    It is?  Okay. |
| | 18 | A.    Yes. |
| | 19 | Q.    -- DOH approval to transfer ownership of |
| 15:54:20 | 20 | clinics.  Ask it mentions two clinics, BBDC which is |
| | 21 | Boston Breast Diagnostic; is that right? |
| | 22 | A.    Correct. |
| | 23 | Q.    And UMass.  I've not sure I've seen UMass. |
| | 24 | A.    UMass is the University of Massachusetts |
| 15:54:34 | 25 | Central, so that's -- that was part of the -- |

Olivia Ho Cheng – May 27, 2021

Page 233

| | | |
|---|---|---|
| 15:54:34 | 1 | Q.    It was part of the list of the investments? |
| | 2 | It was Item 4 on the investments?  I thought that |
| | 3 | was Little Rock. |
| | 4 | A.    No, Number 2. |
| 15:54:43 | 5 | Q.    Number 2 on the list of investments? |
| | 6 | A.    Right. |
| | 7 | Q.    Okay.  To your knowledge, Dr. Cheng [sic], |
| | 8 | today, was this 1.2 million ever paid? |
| | 9 | A.    No. |
| 15:54:54 | 10 | Q.    Was any of it ever paid? |
| | 11 | A.    Was -- |
| | 12 | Q.    I'm sorry, of the 1.2 million, was -- was |
| | 13 | it paid in full?  I think your answer was no. |
| | 14 | A.    No. |
| 15:55:05 | 15 | Q.    Was it partially paid? |
| | 16 | A.    No. |
| | 17 | Q.    Okay.  And what was the reason for not |
| | 18 | paying the 1.2 million? |
| | 19 | A.    Because the -- the DOH approval was not |
| 15:55:16 | 20 | obtained. |
| | 21 | Q.    Okay.  Very good.  I understand. |
| | 22 | Who pursued that approval?  Did the buyer |
| | 23 | or the seller pursue it? |
| | 24 | A.    The seller. |
| 15:55:26 | 25 | Q.    The seller. |

Olivia Ho Cheng - May 27, 2021

Page 234

| | | |
|---|---|---|
| 15:55:26 | 1 | A. They have to deliver clear title. |
| | 2 | Q. Right. I understand that concept. Yes. |
| | 3 | A. Uh-huh. |
| | 4 | Q. Of course. |
| 15:55:35 | 5 | A. Uh-huh. |
| | 6 | Q. Did you have any involvement with the DOH? |
| | 7 | As the buyer, did they ask you questions? I mean, |
| | 8 | "Who are you and why are you buying this?" or |
| | 9 | anything like that? |
| 15:55:46 | 10 | A. No. |
| | 11 | Q. Okay. So it was just a seller deliverable, |
| | 12 | and they didn't deliver? |
| | 13 | A. Correct. |
| | 14 | Q. Okay. So net -- net cash to the seller |
| 15:55:58 | 15 | 2.8 million; is that correct? |
| | 16 | A. Correct. |
| | 17 | Q. Okay. Plus cash out another 500,000 to |
| | 18 | China as you explained to me; is that right? |
| | 19 | A. That's right. |
| 15:56:07 | 20 | Q. Okay. 1.2 was never paid, and the 4 |
| | 21 | million was forgiveness of indebtedness? |
| | 22 | A. Uh-huh. |
| | 23 | Q. Yes. Okay. I said yes, and you said |
| | 24 | uh-huh. |
| 15:56:19 | 25 | A. Yes. |

Olivia Ho Cheng - May 27, 2021

Page 235

| | |
|---|---|
| 15:56:19 | 1 |

Q.    But it -- probably you should say "yes,"
and I'll say "uh-huh."  Okay.  Great.

Do you remember whether you told Castel
about this transaction after it happened?

15:56:43    5       A.    No.

6       Q.    I think I've asked you, but I'll ask again
just in case.  Do you remember whether you told
Castel about this transaction before it happened?

9       A.    No.

15:56:55   10       Q.    Do you know if Mr. James told Castel about
this transaction either before or after it happened?

12       A.    I don't know.

13       Q.    Do you know whether Mr. Wilson told Castel
about this transaction either before it happened or

15:57:10   15    after it happened?

16       A.    I don't know.

17       Q.    When the transaction happened, you were
still an investor in AIT, were you not?

19       A.    Yes.

15:57:24   20       Q.    Okay.  In fact, I think you testified that
you -- were you a co-investor with your husband and,
I think, your children as well, plus a few other
relatives; is that right?

24       A.    Correct.

15:57:36   25       Q.    Okay.  I have -- I'm just going to show you

Olivia Ho Cheng - May 27, 2021

Page 236

| | | |
|---|---|---|
| 15:57:36 | 1 | a copy of a letter and see if you recognize it. |
| | 2 | MS. BUCHANAN:  Counsel, do you have an |
| | 3 | electronic version that you can share or a share |
| | 4 | screen? |
| 15:57:56 | 5 | MR. VALLA:  Yeah.  I'll keep doing what |
| | 6 | I've been doing.  It's in our exhibits. |
| | 7 | MS. BUCHANAN:  Oh, then do you want to just |
| | 8 | tell me the number? |
| | 9 | MR. VALLA:  As soon as I find it I will. |
| 15:58:07 | 10 | Absolutely.  Are you kidding me?  Yeah. |
| | 11 | MS. BUCHANAN:  Okay.  I can't see you.  I |
| | 12 | assumed that you, like, threw something at her. |
| | 13 | MR. VALLA:  I'm look -- I'm looking for it |
| | 14 | silently because last time I made noise with paper, |
| 15:58:17 | 15 | you got upset at me. |
| | 16 | MS. BUCHANAN:  Okay.  Fair.  Fair enough. |
| | 17 | MR. VALLA:  All right.  Good.  Oh, here it |
| | 18 | is; it's Item 20.  Two, zero in our tabs. |
| | 19 | MS. BUCHANAN:  Can you point me back |
| 15:59:01 | 20 | towards the witness? |
| | 21 | THE WITNESS:  (Complies.) |
| | 22 | MS. BUCHANAN:  Thank you. |
| | 23 | MR. VALLA:  Yeah.  Are you there?  All |
| | 24 | right. |
| 15:59:42 | 25 | /// |

Olivia Ho Cheng - May 27, 2021

Page 237

| | | |
|---|---|---|
| 15:59:42 | 1 | BY MR. VALLA: |
| | 2 |     Q.   Did you get a chance to review it, |
| | 3 | Ms. Cheng? |
| | 4 |     A.   Yeah. |
| 16:00:32 | 5 |     Q.   So the document I'm referring you to is a |
| | 6 | letter dated December 19, 2016, addressed to all |
| | 7 | shareholders of Aurora Imaging Technology.  It |
| | 8 | appears to be signed by Christopher Wilson as CEO of |
| | 9 | Aurora. |
| 16:00:52 | 10 |     Do you remember receiving that letter, |
| | 11 | Ms. Cheng? |
| | 12 |     A.   Yes. |
| | 13 |     Q.   And would you have received it as a |
| | 14 | shareholder of Aurora? |
| 16:01:01 | 15 |     A.   Yes. |
| | 16 |     Q.   Did you respond to this letter in any |
| | 17 | manner? |
| | 18 |     A.   I don't remember. |
| | 19 |     Q.   Did you participate in drafting the letter? |
| 16:01:16 | 20 |     A.   No. |
| | 21 |     Q.   I'm going to direct your attention to the |
| | 22 | first paragraph of the letter.  It talks about |
| | 23 | Aurora having outstanding liabilities of |
| | 24 | approximately 16 million. |
| 16:01:36 | 25 |     Does that sound right to you based on your |

Olivia Ho Cheng - May 27, 2021

Page 238

16:01:36   1         recollection?

2                     MS. CLOSE:  Calls for speculation.

3                     THE WITNESS:  I don't know, but for -- the

4         best of my recollection, it's -- it's in the

16:01:50   5         ballpark.

6         BY MR. VALLA:

7              Q.    Okay.  And it does talk about the 8 1/2

8         million in the sale?

9              A.    Uh-huh.

16:01:58  10              Q.    It then goes on to say "After selling its

11         assets" -- and I know you didn't write this or sign

12         it, but I'm running through it with you.

13                     "After selling its assets and paying back

14         creditors, Aurora does not have any further

16:02:25  15         operations or cash."

16                     Do you believe that to have been true back

17         in 2016?

18              A.    I don't know.

19              Q.    You -- you didn't buy all the assets of

16:02:36  20         Aurora; right?

21              A.    Right.

22              Q.    In fact, we just learned that -- well, I

23         think Mr. James also testified to it -- that for

24         example, the BBDC investment you -- you couldn't buy

16:02:49  25         because you couldn't get the Department of --

Olivia Ho Cheng - May 27, 2021

Page 239

16:02:49       1          A.    Health.

               2          Q.    -- Health consent and -- and this other

               3    UMass investment also you couldn't buy.  The letter

               4    then goes on to say in the second paragraph worth

16:03:06       5    reading "Any shares of stock that you have in Aurora

               6    Technology Imaging, Inc., are worthless."

               7          Did you believe that to you true when you

               8    received this letter?

               9          A.    I did.

16:03:22      10          Q.    Okay.  That's all I have on this document.

              11          A.    Okay.

              12          MS. CLOSE:  Was that marked Exhibit 9?

              13          MR. VALLA:  Oh, gosh.  I believe so.

              14          (The aforementioned document was

              15          marked Exhibit 9 for

              16          identification.)

              17    BY MR. VALLA:

              18          Q.    To your knowledge, Ms. Cheng -- and I know

              19    you were not the CEO of AIT at the time, so it's

16:03:48      20    just a question.

              21          But to your knowledge, did Castel consent

              22    to the sale of the AIT assets to Aurora Healthcare?

              23          A.    I did not know.

              24          Q.    To your knowledge, was Castel's consent

16:04:06      25    requested?  Was it asked for?

Olivia Ho Cheng - May 27, 2021

Page 240

| | | |
|---|---|---|
| 16:04:06 | 1 | A.    I don't know, but it should. |
| | 2 | Q.    When you bought the assets, you did it |
| | 3 | pursuant to the asset purchase agreement dated |
| | 4 | October 31st of 2016, that being Exhibit -- |
| 16:04:36 | 5 | MS. CLOSE:  Exhibit 8. |
| | 6 | MR. VALLA:  -- 8. |
| | 7 | Tab 28, Allison. |
| | 8 | BY MR. VALLA: |
| | 9 | Q.    Do you understand that this agreement -- |
| 16:04:47 | 10 | MS. BUCHANAN:  Yes. |
| | 11 | BY MR. VALLA: |
| | 12 | Q.    -- contains certain representations and |
| | 13 | warranties of the seller of AIT being made to you as |
| | 14 | the buyer? |
| 16:04:55 | 15 | A.    Yes. |
| | 16 | Q.    The representation and warranties are set |
| | 17 | out in Article 4 of this agreement starting on |
| | 18 | page 5.  I'm not going to take you all of them.  The |
| | 19 | reps and warranties came on for dozens of pages |
| 16:05:28 | 20 | mostly in these deals.  This is very short, |
| | 21 | actually, in my experience. |
| | 22 | But I'll point you to a few and ask you |
| | 23 | whether you believed them to be true when they were |
| | 24 | made to you.  Now, you didn't make this work.  They |
| 16:05:47 | 25 | were made to you as the buyer.  The first one I'd |

Olivia Ho Cheng - May 27, 2021

Page 241

16:05:47  1        like you to look at is 4.2.  Do you see that?

2                  Section 4.2, do you see it?

3          A.    Yes, uh-huh.

4          Q.    Okay.  That section says that "The seller

16:05:59  5        has the requisite power and authority to enter into

6          this agreement and perform its obligations."  In

7          other words, it can sell what it says it's selling.

8          A.    Uh-huh.

9          Q.    And then it goes on more interestingly to

16:06:13 10        say that "The seller has taken all necessary actions

11        on its part to authorize the execution and delivery

12        of this agreement."  That language says -- I'll

13        represent to you -- is that the seller has gotten

14        all consents necessary to sell you the stuff that

16:06:29 15        they are purporting to sell you.

16                 When you received this representational

17        warranty from Mr. Wilson, did you believe it to be

18        true?

19        A.    Yes.

16:06:40 20        Q.    Did you have any reason not to believe it

21        be to true?

22        A.    No reason.

23        Q.    I then would like to point you to

24        section 4.4 of the same document which is on the

16:06:53 25        next page.

Olivia Ho Cheng - May 27, 2021

Page 242

| | |
|---|---|
| 16:06:53 | 1                  Do you see that, Ms. Cheng? |

16:06:53  1                Do you see that, Ms. Cheng?

2        A.   Yes.

3        Q.   Okay.  That section says that "Except as

4    provided elsewhere" -- which I'll represent to you

16:07:22  5    is inapplicable -- "no permanent consent, approval

6    or authorization," et cetera, et cetera "from a

7    third party is or will be necessary" --

8        A.   Uh-huh.

9        Q.   -- "in connection with the seller's

16:07:35  10   execution."  In other words, the seller is saying to

11   you as the buyer "I don't have to go ask anyone for

12   their consent in order to sell you these assets

13   under this agreement."

14               Do you understand that?

16:07:47  15               MS. CLOSE:  I'll object to the

16   characterization of -- the document speaks for

17   itself.

18               MR. VALLA:  Yeah, it does.

19   BY MR. VALLA:

16:07:52  20       Q.   But do you understand what I said?

21       A.   I understand what the documentations say.

22       Q.   Perfect.

23               Do you believe it -- did you believe it to

24   be true at the time that this document was signed?

16:08:03  25       A.   Yes.

Olivia Ho Cheng - May 27, 2021

Page 243

| | | |
|---|---|---|
| 16:08:03 | 1 | Q.    Do you still believe it to be true? |
| | 2 | A.    Yes. |
| | 3 | Q.    After the closing of this transaction -- |
| | 4 | A.    Uh-huh. |
| 16:08:25 | 5 | Q.    -- because the document is signed |
| | 6 | October 31st, 2016.  I understand from Mr. James |
| | 7 | that the closing took place on November 6th, more or |
| | 8 | less.  That's what he told me under oath. |
| | 9 | After the closing of this transaction, did |
| 16:08:43 | 10 | you as the buyer find out any of these |
| | 11 | representations not to be true? |
| | 12 | A.    No. |
| | 13 | MS. CLOSE:  Objection; vague, ambiguous, |
| | 14 | compound. |
| 16:08:55 | 15 | BY MR. VALLA: |
| | 16 | Q.    Did you have any claim back against the |
| | 17 | seller for anything that wasn't as represented to |
| | 18 | you? |
| | 19 | MS. CLOSE:  Objection; calls for a legal |
| 16:09:03 | 20 | conclusion if she had a claim. |
| | 21 | MR. VALLA:  Yeah. |
| | 22 | BY MR. VALLA: |
| | 23 | Q.    Did you exercise any claim against the |
| | 24 | seller for anything that turned out not to be true? |
| 16:09:11 | 25 | A.    No. |

Olivia Ho Cheng - May 27, 2021

Page 244

16:09:11    1         Q.    Okay.   In fact, your company did not bring

            2   any claim whatsoever against AIT after the closing;

            3   is that right?

            4         A.    Correct.

16:09:20    5         Q.    Okay.   Can you tell me, Ms. Chang, what

            6   happened to the Cayman Island company?

            7         A.    I don't know.   We abandoned it, I guess.

            8         Q.    Okay.   Your lawyer in Taiwan does not care

            9   for it anymore?

16:10:17   10         A.    Right.

           11         Q.    I believe a valuation of the AIT business

           12   was performed before this sale went through in

           13   October, November 2016.

           14              Do -- do you know what I'm talking about?

16:10:44   15         A.    Yes.

           16         Q.    And do you recall that valuation?

           17         A.    I don't remember exactly.

           18         Q.    Do you know whether you ordered an

           19   valuation or the seller?

16:10:58   20         A.    I don't remember it's either the buyer or

           21   the seller ordered it.   I don't remember who ordered

           22   it, but one of us ordered it.

           23         Q.    Do you remember who paid for it?

           24         A.    I don't remember.

16:11:20   25         Q.    But you remember getting a copy of it

Olivia Ho Cheng - May 27, 2021

Page 245

| | | |
|---|---|---|
| 16:11:20 | 1 | before you signed the agreement; right? |
| | 2 | A.   Yes. |
| | 3 | Q.   Do you know what a fairness opinion is, |
| | 4 | Ms. Cheng? |
| 16:11:31 | 5 | A.   I cannot be quoted. |
| | 6 | Q.   I'm sorry? |
| | 7 | A.   I cannot be quoted about this.  I don't |
| | 8 | know. |
| | 9 | Q.   Oh, okay.  Okay. |
| 16:11:40 | 10 | A.   Fair is fair. |
| | 11 | Q.   Oh, no.  It's -- I'm sorry.  That's why I |
| | 12 | was asking you.  It's actually a technical term. |
| | 13 | A.   No. |
| | 14 | Q.   It's a fairness opinion.  Do you know what |
| 16:11:49 | 15 | a "fairness opinion" is? |
| | 16 | A.   I guess it's a third-party opinion -- |
| | 17 | credible third-party opinion. |
| | 18 | Q.   Yeah.  It's -- it's a corporate law term, |
| | 19 | and I'm not trying to trick you or anything with it. |
| 16:12:01 | 20 | If you don't know what a fairness opinion is, you |
| | 21 | probably don't know whether the valuation provided |
| | 22 | by Orchard Partners was a fairness opinion? |
| | 23 | A.   Please restate the question again.  Is |
| | 24 | there a question pending or not? |
| 16:12:18 | 25 | Q.   There -- there -- there is.  The question |

Olivia Ho Cheng — May 27, 2021

16:12:18   1        is this:  You remember the valuation was done by

2        Orchard Partners in connection with this

3        transaction?

4             A.    Yes.

16:12:27   5             Q.    Okay.   Do you know whether that valuation

6        constituted a fairness opinion?

7             A.    I believe --

8                  MS. CLOSE:  Objection; calls for

9        speculation, calls for a legal conclusion.

16:12:38  10                  You can answer if you know.

11                  THE WITNESS:  I believe -- I believe so.

12                  MR. VALLA:  Okay.  All right.  Thank you.

13                  That's all I have for you, Ms. Cheng.

14        Thank you very much for your testimony today.

16:12:57  15                  THE WITNESS:  Thank you.

16                  MS. CLOSE:  I have no questions of the

17        witness.

18                  MR. VALLA:  Allison, do you have questions?

19                  MS. BUCHANAN:  I have no questions.  Thank

16:13:05  20        you so much.

21                  MR. VALLA:  Great.  We're adjourned.

22        Appreciate your patience.  We're going off the

23        record then.  Thank you very much.

24        ///

16:12:18  25        ///

Olivia Ho Cheng - May 27, 2021

1              (The deposition proceedings were

2        concluded at 4:13 p.m.)

3                     -oOo-

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Olivia Ho Cheng - May 27, 2021

Page 248

1          CERTIFICATE OF REPORTER

2          I, DORIEN SAITO, CSR 12568, CLR, a certified

3   Shorthand reporter in and for the State of

4   California, County of Los Angeles, do hereby

5   certify;

6          That OLIVIA HO CHENG, the witness named in

7   the foregoing deposition, was, before the

8   commencement of the deposition, duly administered an

9   oath in accordance with CCP 2094;

10          That said deposition was taken down in

11   stenograph writing by me and thereafter transcribed

12   into typewriting under my direction.

13          That before completion of the deposition,

14   review of the transcript [ ] was [X] was not

15   requested.  If requested any changes made by the

16   deponent (and provided to the reporter) during the

17   period allowed are appended hereto.

18          I further certify that I am neither counsel

19   for nor related to any party to said action, nor in

20   any way interested in the outcome thereof.

21          Dated this 8th day of June, 2021.

22   _____

23          CERTIFIED SHORTHAND REPORTER

24          IN AND FOR THE COUNTY OF

25          LOS ANGELES, STATE OF CALIFORNIA

```
 1                  CERTIFICATE OF DEPONENT

 2

 3           I hereby certify that I have read the

 4     foregoing pages of my deposition testimony in

 5     this proceeding, and with the exception of

 6     changes and/or corrections, if any, find them to

 7     be a true and correct transcription thereof.

 8

 9     _____

10                     Deponent

11

12     _____

13                      Date

14

15                   NOTARY PUBLIC

16           Subscribed and sworn to before me this

17     _____ day of _____, 20___.

18     _____

19                 Notary Republic

20     My Commission Expires:_____

21

22

23

24

25
```

1                          ERRATA SHEET

2

3        PAGE -- LINE -- CORRECTION/REASON

4         16        17     Replace "resume" with "re-zone / Reason: Transcription error

5         17       11-12   Replace "Sony Chang" with "Sunny Chang" / Reason:  Spelling correction

6         60        1      Replace "infancy or" with "interim CEO" / Reason:  Transcription error

7         71        8      Replace "deals" with  "deal" / Reason: Transcription error

8        124        3      Replace "Davide and Manicasa" with "Davide Malacalza" / Reason: Transcription Error

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DATE: 7/6/2021                              _____
                                              Olivia Ho Cheng

Olivia Ho Cheng - May 27, 2021

Page 249

1                           LAWYER'S NOTES

2        PAGE  LINE

3        ____  ____        _____

4        ____  ____        _____

5        ____  ____        _____

6        ____  ____        _____

7        ____  ____        _____

8        ____  ____        _____

9        ____  ____        _____

10       ____  ____        _____

11       ____  ____        _____

12       ____  ____        _____

13       ____  ____        _____

14       ____  ____        _____

15       ____  ____        _____

16       ____  ____        _____

17       ____  ____        _____

18       ____  ____        _____

19       ____  ____        _____

20       ____  ____        _____

21       ____  ____        _____

22       ____  ____        _____

23       ____  ____        _____

24       ____  ____        _____

25       ____  ____        _____

Olivia Ho Cheng - May 27, 2021

Page 250

1                    CERTIFICATE OF DEPONENT

2

3           I hereby certify that I have read the

4    foregoing pages of my deposition testimony in

5    this proceeding, and with the exception of

6    changes and/or corrections, if any, find them to

7    be a true and correct transcription thereof.

8

9    _____

10                    Deponent

11

12   _____

13                    Date

14

15                    NOTARY PUBLIC

16           Subscribed and sworn to before me this

17   _____ day of _____, 20___.

18   _____

19                    Notary Republic

20   My Commission Expires:_____

21

22

23

24

25

Olivia Ho Cheng - May 27, 2021

Page 251

                    INSTRUCTIONS TO WITNESS

1

2

3        Please read your deposition over carefully

4    and make any necessary corrections.  You

5    should state the reason in the appropriate

6    space on the errata sheet for any corrections

7    that are made.

8        After doing so, please sign the errata

9    sheet and date it.

10       You are signing same subject to the changes

11   you have noted on the errata sheet, which

12   will be attached to your deposition.

13        It is imperative that you return the

14   original errata sheet to the deposing

15   attorney within thirty (30) days of

16   receipt of the deposition transcript by

17   you. If you fail to do so, the deposition

18   transcript may be deemed to be accurate

19   and may be used in court.

20

21

22

23

24

25

Olivia Ho Cheng — May 27, 2021

Page 252

```
 1                        ERRATA SHEET

 2

 3       PAGE -- LINE -- CORRECTION/REASON

 4       ____      ____      _____

 5       ____      ____      _____

 6       ____      ____      _____

 7       ____      ____      _____

 8       ____      ____      _____

 9       ____      ____      _____

10       ____      ____      _____

11       ____      ____      _____

12       ____      ____      _____

13       ____      ____      _____

14       ____      ____      _____

15       ____      ____      _____

16       ____      ____      _____

17       ____      ____      _____

18       ____      ____      _____

19       ____      ____      _____

20       ____      ____      _____

21       ____      ____      _____

22       ____      ____      _____

23       ____      ____      _____

24       ____      ____      _____

25       ____      ____      _____
```

Olivia Ho Cheng - May 27, 2021

Page 253

```
1                        ERRATA SHEET

2

3        PAGE -- LINE -- CORRECTION/REASON

4        _____    _____    _____

5        _____    _____    _____

6        _____    _____    _____

7        _____    _____    _____

8        _____    _____    _____

9        _____    _____    _____

10       _____    _____    _____

11       _____    _____    _____

12       _____    _____    _____

13       _____    _____    _____

14       _____    _____    _____

15       _____    _____    _____

16       _____    _____    _____

17       _____    _____    _____

18       _____    _____    _____

19       _____    _____    _____

20       _____    _____    _____

21       _____    _____    _____

22       _____    _____    _____

23       _____    _____    _____

24       _____    _____    _____

25       _____    _____    _____
```