1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3

4   CASTEL S.A., a Luxembourg    )
    joint stock company          )
5   (societe anonyme)            )
                                 )
6            Plaintiff,          )
                                 )
7       vs.                      )   Case No.
                                 )   2:19-cv-09336-ODW-PVC
8   CHRISTOPHER A. WILSON, an    )
    individual; OLIVIA HO        )
9   CHENG, an individual; ARF    )
    PARTNERS, LLC, a             )
10  Massachusetts limited        )
    liability company; STEVEN    )
11  J. JAMES, an individual;     )
    MICHAEL DEVLIN, an           )
12  individual,                  )
                                 )
13           Defendants.         )
    _____   )

14

15

16

17      DEPOSITION OF OLIVIA HO CHENG (ARF Representative)

18                (Remote Videoconference)

19              Wednesday, September 22, 2021

20

21   Stenographically Reported via Zoom by:
     Peggy Tsujimoto, CSR No. 5229

22

23              PEGGY TSUJIMOTO & ASSOCIATES
                Certified Shorthand Reporters
24              Peggytsujimoto@gmail.com
                   (415) 828-1919

25

```
1                         I N D E X

2

3   Remote Videoconference Deposition of OLIVIA HO CHENG

4   Wednesday, September 22, 2021

5

6

7   Examination by                                    Page

8          Ms. Schachne                                 7

9

10

11

12

13  Questions advised or instructed not to answer:

14          Page Line

15           (None)

16

17

18

19

20

21

22

23

24

25
```

```
 1                        E X H I B I T S

 2

 3   Remote Videoconference Deposition of OLIVIA HO CHENG

 4   Wednesday, September 22, 2021

 5

 6   Plaintiff's                                         Page

 7   Exhibit 1    Fourth Amended Notice of FRCP           11

 8                Rule 30(b)(6) Deposition of Defendant

 9                ARF Partners, LLC, 6 pages

10   Exhibit 2    The Commonwealth of Massachusetts       14

11                Certificate of Organization, 3 pages

12   Exhibit 3    Financial Advisor Engagement Letter     22

13                dated August 12, 2015, 7 pages

14   Exhibit 4    ARF Partners LLC Summary, 2 pages       34

15   Exhibit 5    E-mail chain between Chris Wilson       60

16                and Olivia Cheng dated July 28 and 29,

17                2015, 2 pages

18   Exhibit 6    Stock and Note Purchase Agreement       72

19                and Assignment of Amended and Restated

20                Note Purchase, Guaranty and Security

21                Agreement, 12 pages

22   Exhibit 7    E-mail chain between Chris Wilson       77

23                and Olivia Cheng dated September 23, 2016,

24                2 pages

25                        ---o0o---
```

```
 1       BE IT REMEMBERED that, pursuant to Notice, and on

 2  Wednesday, September 22, 2021, commencing at the hour of

 3  12:03 p.m. EST thereof, appeared remotely before me,

 4  Peggy Tsujimoto, a Certified Shorthand Reporter for the

 5  State of California,

 6                      OLIVIA HO CHENG,

 7  located in North Andover, Massachusetts, called as a

 8  witness by Plaintiff, who, being by me first duly sworn,

 9  was thereupon examined and testified as hereinafter set

10  forth.

11

12     (All appearances via Zoom remote videoconference)

13                      ---o0o---

14  FOR THE PLAINTIFF:

15     VALLA & ASSOCIATES

16     333 Bush Street, Suite 2020

17     San Francisco, California 94104

18     Represented by:  LISA SCHACHNE, Attorney at Law

19     415 856-9001

20     Lisa.schachne@vallalaw.com

21

22  FOR THE DEFENDANT STEVEN J. JAMES and AURORA HEALTHCARE

23  US, CORP.:

24     HOGE, FENTON, JONES & APPEL, INC.

25     60 S. Market Street, Suite 1400
```

```
 1        San Jose, California 95113-2396

 2        Represented by:  LAURA RIPARBELLI, Attorney at Law

 3        408 287-9501

 4        Laura.riparbelli@hogefenton.com

 5

 6   FOR THE DEFENDANT OLIVIA HO CHENG, ARF PARTNERS, LLC, and

 7   CHRISTOPHER A. WILSON:

 8        JULANDER, BROWN & BOLLARD

 9        9110 Irvine Center Drive

10        Irvine, California 92618

11        Represented by:  CATHERINE CLOSE, Attorney at Law

12        949 477-2100

13        Cac@jbblaw.com

14

15   Also Present:  Kevin Sherman (no video), Christopher

16   Wilson (no video)

17

18                      ---o0o---

19

20

21

22

23

24

25
```

```
 1  September 22, 2021                       12:03 p.m. EST

 2          CERTIFIED REPORTER:  Good afternoon.  My name

 3  is Peggy Tsujimoto, and I am a California Certified

 4  Stenographic Reporter with CSR No. 5229.  Today's date

 5  is Wednesday, September 22, 2021, and the time is

 6  12:03 p.m. in Massachusetts.

 7          I am not in the same location as the witness.

 8  Under the current National Emergency pursuant to Section

 9  319 of the Public Health Safety Act and Federal Rule

10  30(b)(4), I will be administering the binding oath to

11  the deponent via Zoom.

12          This is the deposition of Olivia Cheng as the

13  corporate representative of the ARF Partners, LLC, in

14  the case of Castel versus Wilson, et al., in the United

15  States District Court, Central District of California,

16  with Case No. 2:19-cv-09336-ODW-PVC.

17          At this time, I will ask all counsel to state

18  their name for the record and state who you represent,

19  and if we may please start with plaintiff's counsel,

20  Ms. Schachne.

21          MS. SCHACHNE:  Thank you, Peggy.  Lisa Schachne

22  for the plaintiff.

23          MS. CLOSE:  Catherine Close appearing on behalf

24  of defendant, Olivia Cheng, ARF Partners, and

25  Christopher Wilson.
```

```
 1          MS. RIPARBELLI:  Laura Riparbelli for
 2   defendant, Steven James.
 3          CERTIFIED REPORTER:  May I ask if there is
 4   anyone else, excluding the deponent, who has not stated
 5   their appearance but participating in this Zoom
 6   deposition by viewing or listening to please identify
 7   themselves at this time.
 8          MR. WILSON:  This is Christopher Wilson.
 9          CERTIFIED REPORTER:  At this time I will now
10   swear in our deponent, Ms. Olivia Cheng.  May I please
11   ask you to raise your right hand to be sworn.
12                      OLIVIA HO CHENG,
13   having been first duly sworn to tell the truth, the whole
14   truth, and nothing but the truth testified as follows:
15                EXAMINATION BY MS. SCHACHNE:
16      Q.   BY MS. SCHACHNE:  We are on record.  Good
17   morning, Ms. Cheng, or good afternoon to you.  We have
18   met before, so I won't introduce myself again, but I am
19   glad to hear that you're feeling better to proceed with
20   your deposition today.
21          You are here as a person most knowledgeable for
22   ARF Partners, LLC; is that correct?
23      A.   That is correct.
24      Q.   If we call ARF Partners, LLC, ARF today, will
25   you understand who I'm talking about?
```

1          A.    Yes.

2          Q.    Because this deposition is remote, I have

3     another screen in front of me.  So if I'm looking over

4     to the side, it's not to be rude; it's because I am

5     looking at my other screen.  So I just want to let you

6     know that in advance.

7          A.    Okay.

8          Q.    You have had your deposition as an individual

9     taken fairly recently, so I won't go through the whole

10    admonitions or ground rules, but I will remind you of

11    some of them just to give a bit of a fresher.

12               You understand that you are under oath;

13    correct?

14         A.    Yes.

15         Q.    This deposition is slightly different than your

16    individual deposition in that you're here to testify on

17    behalf of ARF and not as an individual.  You understand

18    that; correct?

19         A.    Yes.

20         Q.    So your testimony will bind ARF or whatever you

21    say will bind the company.  Do you understand that?

22         A.    Yes.

23         Q.    We are speaking via Zoom obviously, and even

24    more so than when we're in person, it's important that

25    we don't speak over each other; we allow each other to

1   finish our sentences, even if we anticipate the ending,

2   and then I ask you to provide yes or no responses, no

3   nodding of the head and that sort of thing.

4          Does that make sense?

5      A.   Yes.  I will do my best.

6      Q.   Other than that, we'll take short breaks.  If

7   you need a break for any reason, please let us know.  I

8   just ask that you finish the response or answer that

9   you're on and not leave a question pending.

10     A.   I understand.

11     Q.   Did you do anything to prepare for your

12  deposition here today?

13     A.   In terms of reading documentation?

14     Q.   Yes.  Did you read, review any documents, or

15  speak to anyone?

16     A.   I spoke to my attorney, read some documentation

17  but not a lot of them.

18     Q.   I'm not asking what you spoke to your attorney

19  about.  Approximately how long did you speak with your

20  attorney about this deposition?

21         MS. CLOSE:  Objection, vague as to time.  This

22  deposition has been noticed several times.

23         MS. SCHACHNE:  Well, the deposition has been

24  noticed several times because of unfortunate

25  circumstances related to your client, but the question

```
 1   is really this deposition, not today, but just
 2   generally.
 3        Q.   What have you done to prepare for this
 4   deposition at any point in time, whether it was for the
 5   noticed deposition in the beginning or this being the
 6   fourth amended notice of deposition?  What have you done
 7   cumulatively?  How much time have you spent cumulatively
 8   speaking with your attorney?
 9        A.   That would be an estimation, okay?
10        Q.   Okay.
11        A.   For the past maybe over a month, maybe totally
12   45 minutes.
13        Q.   You said you also reviewed some documents?
14        A.   Uh-huh.
15        Q.   How much time did you spend reviewing
16   documents?
17        A.   Due to a lot of work at hand and family, I
18   didn't review a whole lot of it.
19        Q.   You understand that you have an obligation to
20   prepare for this type of deposition?
21        A.   Yes.
22        Q.   Do you believe, as you sit here today, that you
23   are the person most knowledgeable for ARF Partners?
24        A.   Yes.
25             MS. SCHACHNE:  I'm going to bring an exhibit
```

1    that we will mark as Exhibit 1.  I will ask Madam Court

2    Reporter to please ignore my exhibit titles.  We will

3    just do them as next in line, but they will be out of

4    order.  This happens to be one, but some of them will

5    not be one after another.  We will mark them as next in

6    line, this one being Exhibit 1.

7                    (Fourth Amended Notice of FRCP Rule

8                    30(b)(6) Deposition of Defendant ARF

9                    Partners, LLC, 6 pages, marked for

10                   identification as Plaintiff's Exhibit 1)

11       Q.   BY MS. SCHACHNE:  Ms. Cheng, are you able to

12   open this particular document?

13       A.   It's in Chat, right?

14       Q.   Yes, it should be in the Chat, and it's titled

15   here in the Chat ARF Exhibit 1, and then if you click to

16   open it, you should be able to open the document, but

17   please let me know if you are unable to.

18       A.   Yes, I just opened it, but I cannot see you

19   now.  Now it's the documentation in front of me.

20       Q.   Right.  I understand.  You just have, I'm

21   assuming, one screen in front of you?

22       A.   Yes.

23       Q.   Please take a couple of minutes to review it,

24   and then if you just look up, I'll know that you're

25   finished reviewing the document.

1    A.   This is the amended notice to -- okay.  I can't

2  read it that fast.

3    Q.   I understand.  Let me try it this way.  This is

4  a notice of deposition for ARF Partners that we provided

5  to your counsel.  The content of this notice has not

6  changed since the original notice.  The dates and times

7  have changed, so that's why it's the fourth amended

8  notice.

9         Do you know if you have seen this document or

10  something like this document before?

11    A.   I think I do, but I don't remember because so

12  many documentation, and I'm not very knowledgeable in

13  terms of the legal terms.

14    Q.   I understand.  I'm not going to ask you to

15  define or tell me anything legal.

16    A.   Okay.

17    Q.   The document includes a number of what we call

18  topic areas or it's the scope of the deposition, and if

19  you scroll down to page 3 and then through 4 on to 5,

20  you'll see that there are 23 topic areas.

21    A.   Got it.  Okay.

22    Q.   Do you see those?

23    A.   Yes, I see the list of 23.

24    Q.   Do you think you have been apprised or you have

25  been informed about those particular topic areas for the

```
 1   scope of this deposition today?
 2        A.   Most of them, yes.
 3        Q.   Do you think that you are the person most
 4   knowledgeable to testify on each of those topic areas?
 5        A.   I don't know whether it's every single one, but
 6   most of them, yes.
 7        Q.   Do you think there is anyone in ARF Partners
 8   that may be more knowledgeable than you are on any of
 9   these topic areas?
10        A.   No.  I would be.
11        Q.   You would be the most knowledgeable?
12        A.   Right.
13        Q.   Are you still -- let me ask you this:  Is
14   ARF Partners still an operating company?
15        A.   It's not an operating company, but it's still
16   in existence.
17        Q.   Do you have a role currently within
18   ARF Partners?
19        A.   Yes, I am still the managing director of
20   ARF Partners.
21        Q.   Have you always been managing director of
22   ARF Partners?
23        A.   Yes.
24        Q.   Do you recall when ARF was formed?
25        A.   ARF was formed in 2015.
```

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

```
 1              MS. SCHACHNE:  I just dropped another exhibit
 2    into the Chat box.  You will see that it is titled ARF
 3    Exhibit 3, and I will mark it as Exhibit 2.  Go ahead
 4    and open this exhibit and let us know when you're able
 5    to open.
 6                   (The Commonwealth of Massachusetts
 7                    Certificate of Organization, 3 pages,
 8                    marked for identification as Plaintiff's
 9                    Exhibit 2)
10              THE WITNESS:  Yes, I opened.
11         Q.   BY MS. SCHACHNE:  What I just uploaded into the
12    Chat box and marked as Exhibit 2 is titled Certificate
13    of Organization, and it's for ARF Partners, LLC.  Do you
14    see that?
15         A.   Yes.
16         Q.   Does this look like the Certificate of
17    Organization of ARF Partners?
18         A.   Yes.
19         Q.   So you have seen this document before?
20         A.   Yes.
21         Q.   Do you know who organized the company, who
22    drafted and filed this document?
23              MS. CLOSE:  Objection, compound and vague.
24              MS. SCHACHNE:  I'll take that back.  I'll
25    strike that question.
```

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

1    Q.   Do you know who drafted this document?

2    A.   This is a documentation given by the

3  Commonwealth of Massachusetts, so it's a government

4  documentation.

5    Q.   I understand that, but somebody -- did somebody

6  at ARF Partners fill in the details?

7    A.   Yes.

8    Q.   Who was that?

9    A.   That was Steve James.

10    Q.   Did he file this document?

11    A.   Yes.

12    Q.   I see that there's a date at the top of this

13  document, September 1st, 2015.  Do you see that?

14    A.   Yes.

15    Q.   Do you believe that was when this document was,

16  in fact, filed?

17    A.   Yes.

18    Q.   The document shows that Mr. James was the

19  resident agent.  Was he the resident agent of

20  ARF Partners?

21    A.   I'm sorry, I don't know the legal things about

22  that, but he is the secretary, I believe.

23    Q.   It also shows that you and Mr. James have

24  signatory powers.  Is that accurate?  Do you and

25  Mr. James have signatory powers for ARF Partners?

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

1    A.   Correct.

2         MS. CLOSE:  Vague as to time.

3         THE WITNESS:  Do I answer or do you want to

4    specify time?

5         MS. SCHACHNE:  I heard "correct," but if you

6    want to change that response.

7         THE WITNESS:  So signatory power means what?

8    We can sign on behalf of the company?

9    Q.   BY MS. SCHACHNE:  Yes.

10   A.   Yes.

11   Q.   Ms. Cheng, I'll remind you, and you did a good

12   job of it, if you don't understand the question for any

13   reason or need clarification, as you just did, please

14   ask for clarification, and to the extent that I am able

15   to, I will certainly provide it or rephrase the

16   question.

17   A.   Okay.  All right.  So the answer was yes.

18   Q.   Why was ARF Partners formed?

19   A.   So ARF means Aurora Rescue Fund.  We formed an

20   entity, raised money to see how we can save this

21   technology.

22   Q.   This technology being that of Aurora Imaging

23   Technology?

24   A.   Yes, Aurora dedicated the breast MRI technology

25   specifically designed for breast cancer detection,

16

1    diagnosis, and treatment.

2        Q.    At the time ARF was formed, did AIT own that

3    technology?

4        A.    Yes.

5        Q.    You understand when I say AIT, I mean Aurora

6    Imaging Technology?

7        A.    Yes.

8        Q.    We're going to be using a lot of abbreviations

9    today.  For some reason if they are confusing and you

10   don't know what I'm talking about or you prefer to call

11   them something else, please just let me know.

12       A.    Okay.

13       Q.    Since ARF Partners was formed in 2015, has its

14   function or its purpose changed at any time?

15       A.    No.

16       Q.    Its entire purpose was, has been, and still is

17   to rescue AIT or rescue the technology that AIT owned?

18       A.    Yes.

19            MS. SCHACHNE:  Mr. Wilson, I'll just let you

20   know that you are not on mute.

21            MR. WILSON:  I'm sorry.  Thank you.

22            MS. SCHACHNE:  No problem.  I just wanted to

23   let you know.

24       Q.    When ARF Partners was formed, you were the

25   managing director; correct?

1      A.    Yes.

2      Q.    Were there any other directors in ARF Partners

3  at that time?

4      A.    No.

5      Q.    Are there any other directors in ARF Partners

6  now?

7      A.    Managing director.  You mean --

8      Q.    Just only the managing director?

9      A.    No.

10      Q.    To clarify, there are no other directors in

11  ARF Partners currently?

12      A.    Correct.

13      Q.    Were there any officers in ARF Partners at the

14  time it was formed?

15      A.    Except Steve James as the secretary, yes.

16      Q.    Have you ever heard of a company called BE

17  Pacific?

18      A.    Yes.

19      Q.    What is BE Pacific?

20      A.    BE Pacific is a Taiwanese company, and its main

21  role is a financial adviser.

22      Q.    Did BE Pacific, at the time that ARF was

23  formed, have any relationship or involvement with

24  ARF Partners?

25      A.    ARF Partners worked with BE Pacific to raise

1    money.

2         Q.   Did the managing members of BE Pacific own

3    ARF Partners?

4         A.   They have ownership but not own a hundred

5    percent.

6         Q.   What ownership did BE Pacific have at the time

7    ARF Partners was formed?

8         A.   When ARF Partners was formed, BE -- let's call

9    it BE.  It's too long to say.  BE was retained or worked

10   with ARF as its financial advisers to raise money.  BE

11   management or owners participate in investing themselves

12   into ARF.

13        Q.   Did you have a role in BE Pacific?

14        A.   Early on, I worked -- I know them, so I worked

15   with them, but I'm not the officer of it.

16        Q.   Are you or were you a managing member of BE

17   Pacific?

18        A.   No.

19        Q.   So you didn't own any part of BE Pacific?

20        A.   I don't believe so.

21        Q.   Do you recall how many managing members

22   BE Pacific had?

23        A.   I don't remember, but I think it's one.

24        Q.   Can you provide me with the name of that one

25   individual?

```
 1          A.    Yes, it's Lucy Chang.

 2          Q.    You had a relationship with Lucy Chang before

 3    ARF Partners was formed; correct?

 4          A.    Yes.

 5          Q.    When you formed ARF Partners, did you ask

 6    Ms. Chang to help fund ARF Partners so that it could

 7    carry out its goal of rescuing the Aurora technology?

 8          A.    Can you repeat the question again.

 9          Q.    How did -- let me rephrase.  How did

10    ARF Partners first get involved with BE Pacific?  Did

11    you reach out to Ms. Chang?

12          A.    Yes.

13          Q.    Was that in 2015 around the time ARF Partners

14    was formed?

15          A.    I have known Lucy for 35 years, 40 years.

16          Q.    Was Lucy Chang involved in AIT at any point in

17    time?

18          A.    In terms of operation?

19          Q.    In terms of acting as -- let's go one by one.

20    In terms of management operation, et cetera, in that

21    capacity.

22          A.    No.

23          Q.    In terms of lending AIT money?

24          A.    Yes, to AIT subsidiary in Taiwan.

25          Q.    Do you know how much money Lucy Chang lent AIT
```

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

```
 1   subsidiaries?
 2        A.   I don't remember exactly.
 3        Q.   Does approximately $100,000 sound correct to
 4   you?
 5        A.   I think it's more than that.
 6        Q.   A lot more?
 7        A.   I don't know what a lot means but more.
 8        Q.   Double that, 200,000 or more?
 9        A.   I think it's in that range.
10        Q.   Around $200,000?
11        A.   My estimation.
12        Q.   That's fine, your best estimate is fine.  I
13   appreciate that.  Was Lucy Chang an investor in AIT as
14   well?
15        A.   No.
16        Q.   Do you know if Lucy Chang ever received
17   repayment of her loan to AIT subsidiaries?
18             MS. CLOSE:  Calls for speculation.
19             THE WITNESS:  AIT did -- you have to ask Chris.
20        Q.   BY MS. SCHACHNE:  You don't know then?
21        A.   I don't know for sure.
22             MS. SCHACHNE:  I just put another exhibit into
23   the Chat.  It is titled in the Chat Exhibit 8.  I would
24   ask Madam Court Reporter to please mark this as next in
25   line.  And while she is doing so, Ms. Cheng, go ahead
```

21

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

```
 1   and take a look at the document.

 2                    (Financial Advisor Engagement Letter dated

 3                    August 12, 2015, 7 pages, marked for

 4                    identification as Plaintiff's Exhibit 3)

 5             THE WITNESS:  I just -- it's a long

 6   documentation.

 7        Q.   BY MS. SCHACHNE:  Ms. Cheng, when I put up an

 8   exhibit, I think it would be best if you just reviewed

 9   it quickly and then I will ask you specific questions.

10   And if it requires you to read a section in detail, I'll

11   point you out to that section so you don't have to read

12   all of these documents, every word of them.

13        A.   Okay.

14        Q.   Is that fair?

15        A.   That's fair.

16             MS. CLOSE:  Lisa, I would like her to review it

17   so she's comfortable.  Something like this that she's

18   not a party to, she probably may or may not have ever

19   seen before.  This is all new to her.  I mean, I would

20   like her to review it as much as it takes so she's

21   comfortable answering questions about it.

22        Q.   BY MS. SCHACHNE:  Sure.  What I'm saying is

23   that she doesn't have to review it word for word unless

24   there's a specific question in which she feels that she

25   needs to review it but, yes, do whatever makes you feel
```

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

1  comfortable.  Please review, Ms. Cheng.  Let me know

2  when you have had an opportunity to.

3     A.   It's a long documentation, so I took your offer

4  to, when you ask me a specific question, I will go back

5  to it.

6     Q.   This document is titled Financial Adviser

7  Engagement Letter, and then the next line is BE Pacific

8  Management Consulting Company Limited.  Do you see that?

9     A.   Yes, I do.

10    Q.   Have you seen this document before?

11    A.   I do not remember.

12    Q.   To your knowledge, was BE Pacific retained by

13 AIT as a financial adviser?

14    A.   From the documentation, it appears to be that

15 way.

16         MS. CLOSE:  I want to get in a late objection

17 that it calls for speculation and, Olivia, I don't want

18 you to speculate based on the document that you may not

19 have ever seen before.  Just testify as to what you

20 actually know.

21         THE WITNESS:  Okay.

22    Q.   BY MS. SCHACHNE:  I specifically asked to your

23 knowledge.  If you scroll to the last page of the

24 document, page 7, you'll see there's a signature there

25 above the name, Lucy Chang, president.  Do you see that?

```
 1        A.   I do.

 2        Q.   Have you seen Ms. Chang's signature before?

 3        A.   I think I did.

 4        Q.   Does this look like her signature to you?

 5             MS. CLOSE:   Calls for speculation.

 6             THE WITNESS:   I'm not an expert.   I don't

 7   remember.

 8        Q.   BY MS. SCHACHNE:   I understand.   From what you

 9   can recall from at least seeing her signature before, do

10   you have any reason to believe that this is not her

11   signature?

12        A.   No.

13        Q.   Were you made aware at any time that BE Pacific

14   was engaged to assist AIT in raising money for the

15   company?

16             MS. CLOSE:   Assumes facts not in evidence.

17             THE WITNESS:   Can you repeat the question.

18        Q.   BY MS. SCHACHNE:   The question is, were you

19   made aware at any time, regardless of this particular

20   document, that BE Pacific was engaged by AIT to assist

21   AIT in raising funds?

22             MS. CLOSE:   Same objection.

23             THE WITNESS:   Yes.

24        Q.   BY MS. SCHACHNE:   Did BE Pacific, in fact,

25   assist AIT in raising funds?
```

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

```
 1              MS. CLOSE:  Calls for speculation.
 2              THE WITNESS:  Yes.
 3       Q.   BY MS. SCHACHNE:  Do you know how much money
 4   BE Pacific helped raise on behalf of AIT?
 5       A.   On behalf of AIT?
 6              MS. CLOSE:  Calls for speculation.
 7              THE WITNESS:  I cannot -- I don't know exactly
 8   what amount was attributed to them, their effort.
 9       Q.   BY MS. SCHACHNE:  The document, if you look
10   under scope of work, and it says stage 1.  We're still
11   on page 1 toward the bottom of the page there.  It says
12   that BE Pacific will be responsible for raising the ARF,
13   which I assume is rescue fund, estimated between
14   1 million and $1.5 million to loan the company as
15   needed.  Do you see that?
16       A.   Yes.
17       Q.   Did you understand at the time that you were
18   managing director of ARF when ARF was formed that
19   BE Pacific would help ARF -- essentially help capitalize
20   ARF, the Aurora Rescue Fund, so that that money could be
21   used to sustain or save AIT's technology?
22       A.   Yes.
23       Q.   Was that amount between 1 and $1.5 million?
24       A.   I think so.
25       Q.   Do you know how BE Pacific was able to raise
```

1   that capital in order to capitalize ARF Partners?

2          MS. CLOSE:  Calls for speculation, lacks

3   foundation.

4          MS. SCHACHNE:  Catherine, she is here to

5   testify on behalf of ARF Partners as the person most

6   knowledgeable.  So if she is not the person most

7   knowledgeable and she is speculating that kind of

8   information, I would like to talk to somebody who is

9   knowledgeable and isn't speculating.

10          MS. CLOSE:  You're asking her how BE Pacific,

11   another entity, a separate entity, went about raising

12   funds pursuant to an agreement neither Olivia nor ARF

13   are a party to.

14          MS. SCHACHNE:  She just testified that she had

15   knowledge about this.

16          MS. CLOSE:  If she knows, she can still

17   testify, but I'm getting in the objections because she

18   may not know.

19          MS. SCHACHNE:  This is going to be a long

20   deposition then.

21     Q.   Go ahead, Olivia.

22     A.   I'm sorry, can you repeat the question.

23          MS. SCHACHNE:  Yes.  Madam Court Reporter,

24   could you please repeat the question.

25          (Record read by the Certified Reporter:

1    "Question:  Do you know how BE Pacific was able

2    to raise that capital in order to capitalize

3    ARF Partners?")

4    THE WITNESS:  I think so.

5    Q.   BY MS. SCHACHNE:  What can you recall?

6    A.   Lucy is a well-connected person in Taiwan, and

7    she knows a lot of wealthy people.

8    Q.   Basically she utilized connections within

9    Taiwan to be able to raise capital, to your knowledge?

10   A.   Right, to my knowledge.

11   Q.   Would her role be similar to that of a private

12   equity fund or is BE Pacific similar to that of a

13   private equity fund there in Taiwan?

14   A.   The private equity fund is organizations.  I

15   don't know whether she functioned as the private equity

16   fund manager.

17   MS. CLOSE:  Don't speculate, Olivia.  Just

18   whatever you know, you can testify to.

19   MS. SCHACHNE:  That's fine, but please don't

20   interrupt while she is providing an answer.

21   THE WITNESS:  She functioned as a financial

22   adviser.

23   Q.   BY MS. SCHACHNE:  Do you know whether or not

24   BE Pacific received a commission for its work as the

25   financial adviser for AIT?

```
 1            MS. CLOSE:  Calls for speculation, lacks

 2    foundation.

 3            THE WITNESS:  You have to ask Chris Wilson.

 4        Q.  BY MS. SCHACHNE:  Do you know if BE Pacific was

 5    supposed to receive a commission, if that was part of

 6    the agreement?

 7            MS. CLOSE:  Calls for speculation, lacks

 8    foundation.

 9            THE WITNESS:  If the agreement says so, that's

10    the agreement.

11        Q.  BY MS. SCHACHNE:  Did ARF Partners ever receive

12    any sort of commission from AIT at any point in time?

13        A.  No.

14        Q.  And you don't know as you sit here today

15    whether BE Pacific received any sort of commission from

16    AIT at any point in time?

17        A.  I do not know.

18        Q.  If you go to page 3 of this same document -- I

19    take that back.  Go to the bottom of page 2, please.

20    Under number 3, it says fees and expenses.  Do you see

21    that?

22        A.  Yes.

23        Q.  Go ahead and read that section.  Let me know

24    when you're finished.

25        A.  Okay, I read it.
```

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

 1      Q.   The beginning of this section talks about, for
 2   completing stage 1, which we read earlier, and it says
 3   again here, for BE Pacific to successfully raise the
 4   Aurora Rescue Fund loan to the company, the company
 5   being AIT.  The company, AIT, will pay BE Pacific five
 6   percent of ARF as its consulting fee.  Do you see that?
 7      A.   Will pay BE Capital five percent of ARF as its
 8   consulting fee.  Yes, I see that.
 9      Q.   Do you know what that means?
10           MS. CLOSE:  The document speaks for itself,
11   lacks foundation.
12           THE WITNESS:  Just like what it says, company
13   will pay BE Pacific five percent of ARF as a consulting
14   fee.
15      Q.   BY MS. SCHACHNE:  You're managing director of
16   ARF; correct?
17      A.   Correct.
18      Q.   What was five percent of ARF?  What does that
19   mean?  Let me clarify for you.  Do you think -- because
20   I'm a little confused myself.  Does ARF mean something
21   different here than ARF Partners, the company; do you
22   know?
23           MS. CLOSE:  Calls for speculation.
24           THE WITNESS:  I don't know.  I don't think so,
25   but I don't know.

1      Q.   BY MS. SCHACHNE:  Do you know if BE Pacific was
2   also retained to find a new buyer for AIT technology?
3           MS. CLOSE:  Calls for speculation, lacks
4   foundation.
5           THE WITNESS:  I think I read, yeah, on the
6   following, that's another assignment, the stage 2.
7      Q.   BY MS. SCHACHNE:  That's on the top of page 2;
8   correct?
9      A.   Top of page 3.
10     Q.   Do you know -- did you know at the time that
11  BE Pacific was also retained by AIT to assist AIT in
12  finding potential buyers of AIT technology?
13     A.   From this documentation, it looks like that.
14     Q.   You didn't have any independent knowledge of
15  that agreement?
16     A.   I don't remember.
17     Q.   Do you know -- did BE Pacific have any
18  agreements directly with ARF Partners?
19     A.   I don't believe so.
20     Q.   You don't recall signing anything on behalf of
21  ARF that also had BE Pacific as a party?
22     A.   I don't recall.  We may.  I don't recall.
23     Q.   What was ARF's goal when it was formed?
24          MS. CLOSE:  Asked and answered, but go ahead.
25          THE WITNESS:  We stated earlier, ARF's job was

1    to rescue the technology so it will not be shattered

2    through bankruptcy.

3         Q.   BY MS. SCHACHNE:  How did it plan on doing so?

4              MS. CLOSE:  Vague as to time.

5              THE WITNESS:  It's to provide AIT with enough

6    resources to either deal with its creditors or find

7    buyers to buy the technology so you will not be

8    bankrupt.

9         Q.   BY MS. SCHACHNE:  Was ARF's goal from the

10   beginning to find a buyer that you, as an individual,

11   Ms. Cheng, as an individual, would manage?

12        A.   ARF's goal solely was to rescue the situation,

13   and when the task is achieved, ARF fulfilled its

14   responsibility to prevent the technology to be bankrupt.

15        Q.   Was its goal to find or to form a new Aurora?

16        A.   Still ARF's job is to make sure that the

17   technology could be saved through somebody else.  Not

18   ARF itself, but it's a bridge for that stage to be

19   entered into.

20        Q.   But was it to -- was it specific that it would

21   find a new Aurora; there would be a new buyer?

22        A.   If they can assist in doing that, that's their

23   job; that's their goal.

24        Q.   I guess that wasn't my question.  Was its goal

25   originally to find a new buyer to transition the

 1   technology into a new company?

 2       A.   Again, we said several times.  Whether it could

 3   be finding enough money to invest into AIT and keep AIT,

 4   you know, afloat or survive, or to find -- if that's not

 5   possible, then find a new buyer to buy the technology

 6   and carry it through.

 7       Q.   Was that new buyer always going to be managed

 8   by you as an individual, Ms. Cheng?

 9       A.   Whoever can manage that would be for that job,

10   but at that time, I thought being the -- had been CEO

11   for more than ten years, involved with the company for

12   that long, I think I was the one that could be qualified

13   for that position.

14       Q.   You testified that ARF was formed by

15   BE Pacific; correct?

16           MS. CLOSE:  Objection, misstates testimony.

17           THE WITNESS:  No.  ARF was formed by me, but it

18   was funded -- helped funded by BE.

19       Q.   BY MS. SCHACHNE:  Is it your testimony that ARF

20   had no involvement with BE's role or engagement by AIT

21   to act as AIT's financial adviser?

22       A.   ARF is an entity that -- I'm sorry, you may

23   have to rephrase your question.

24       Q.   We were just looking at the consulting

25   agreement between BE Pacific and AIT.

1          MS. CLOSE:  Sorry.

2          (Dog barking)

3      Q.   BY MS. SCHACHNE:  We were looking at the

4  consulting agreement between AIT and BE Pacific.  Did

5  ARF help facilitate that relationship or that engagement

6  in any way?

7      A.   ARF is an entity.  When you say ARF is

8  facilitating, you mean what?

9      Q.   ARF is an entity, but there are people,

10  including yourself, who are the managing director of ARF

11  who acts on behalf of the company, I assume, in carrying

12  out the goals, et cetera.

13          Yes, ARF as a company can't do anything, but

14  its managing director can certainly act on behalf of it.

15  Did you, I guess as a managing director, help facilitate

16  a relationship between ARF and BE Pacific?

17      A.   We all wear different hats, and sometimes it

18  gets mixed up.  I told you that I have known Lucy for

19  40 years since college.  I know her family was well --

20  very well to do in Taiwan.  So I introduced Lucy to

21  Chris.  Does that count as ARF facilitating?

22      Q.   You introduced Lucy to Chris Wilson?

23      A.   Correct.

24      Q.   Was this at the time that -- around the time

25  that BE Pacific was engaged by AIT; do you know?

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

```
 1        A.   I believe so.

 2             MS. SCHACHNE:  I dropped another exhibit into

 3   the Chat.  Please take a look at this while Madam Court

 4   Reporter marks it next in line.

 5                  (ARF Partners LLC Summary, 2 pages, marked

 6                   for identification Plaintiff's Exhibit 4)

 7             THE WITNESS:  Okay.  I did not read every

 8   single word of it, but I assume this is ARF's summary.

 9        Q.   BY MS. SCHACHNE:  Have you seen this document

10   before?

11        A.   I can't remember, but I think I do.

12        Q.   Do you know if you drafted this document?

13        A.   Maybe me.

14        Q.   Could it have been anyone other than you?

15        A.   Could be a joint effort.

16        Q.   Who would have been involved in the joint

17   effort?

18        A.   Lucy.

19        Q.   But you had input into this document; is that

20   correct?

21        A.   Yes.

22        Q.   Do you recall at what time or approximately

23   when this document was drafted?

24        A.   I do not remember.  From what it says,

25   September.
```

1       Q.   Approximately around the time ARF Partners was

2   formed?

3       A.   I believe so.

4       Q.   Was this document drafted on behalf of

5   ARF Partners?

6       A.   Appears to be that way.

7       Q.   What was the purpose of this document?

8       A.   I guess it's to provide a summary of what ARF

9   is.

10      Q.   It starts -- the summary starts with, "ARF is

11  formed with a total capital amount of $1.5 million from

12  members for the purpose of loaning the necessary funds,

13  ARF loan, to AIT."

14      A.   Yes.

15      Q.   Does that seem accurate to you?  Was ARF formed

16  with approximately 1.5 million?

17      A.   Yes.

18      Q.   Was the capital funded by BE Pacific?  Was that

19  provided by BE Pacific?

20      A.   BE Pacific is the financial adviser helping the

21  fundraising.

22      Q.   Do you know where that capital, the

23  1.5 million, in capital came from?

24      A.   Could you ask -- repeat the question.

25      Q.   Sure.  Do you know -- the $1.5 million that it

1  refers to in this summary, do you know where that came

2  from, that money came from?

3      A.   Some are investors introduced by Lucy.

4      Q.   Did those investors become the managing members

5  of the company; do you know?

6          MS. CLOSE:  Vague as to which company.

7          THE WITNESS:  Which company?

8      Q.   BY MS. SCHACHNE:  Let's drop down just a little

9  bit in that same summary.  It says, "ARF is formed by

10  BE Pacific as its managing member.  BE is a Taiwanese

11  firm and is retained by Aurora as its financial advisor

12  to help Aurora realize the plan of transition."

13          Was ARF a managing member of BE Pacific?

14      A.   No.

15      Q.   Looking still at the summary a little above --

16  actually, strike that.

17          Looking at this document, it looks like the

18  plan -- ARF's plan was to form a new Aurora company.

19  Does that jog your memory as to what ARF's goal was when

20  it was formed?

21      A.   According to this documentation, that's the

22  plan, you know.  Most of the business plans don't go

23  exactly as its goals.

24      Q.   Did this plan fall through in some way?

25      A.   I did not read through every single point of

1    that, but the fact is, ARF did provide 1.5 million

2    rescue fund to AIT, and AIT's assets were successfully

3    purchased by a new investor with an agreed price.

4        Q.   The goal of ARF in this -- summarized by this

5    plan was successful ultimately?

6            MS. CLOSE:  Objection, vague and ambiguous.

7            THE WITNESS:  The goal of Aurora technology was

8    rescued successfully.  It didn't go into bankruptcy, so

9    it fulfilled that goal, and then the technology now are

10   in the hands of a new organization that had ability to

11   carry it over; that is also fulfilled.

12       Q.   BY MS. SCHACHNE:  That new organization was

13   formed by you.  You personally are the CEO of that new

14   organization; correct?

15           MS. CLOSE:  Objection, compound.

16           THE WITNESS:  The company that currently owns

17   the technology and continues to further develop it is

18   Aurora Healthcare US Corp. and, yes, I am the CEO of

19   that.

20       Q.   BY MS. SCHACHNE:  Do you know if this

21   transition plan was ever presented to AIT?

22       A.   I do not recall.  I don't remember.

23       Q.   If you scroll to the bottom, the last page,

24   there's some reddish highlights.  Do you see that?

25       A.   Yes.

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

```
 1        Q.    Then there is a comment by CW1?

 2        A.    CW1.

 3        Q.    Is that Chris Wilson?

 4        A.    Could be.

 5        Q.    Do you know anybody else with the initials

 6   C.W.?

 7        A.    No.

 8        Q.    But you don't recall whether or not this was

 9   presented to Mr. Wilson?

10        A.    I don't remember.

11              MS. CLOSE:  Vague as to presented.

12        Q.    BY MS. SCHACHNE:  If you look on the first page

13   of this document under Transition Plan, there's numbers

14   1 through 4.  Do you see that?

15        A.    Yes.

16        Q.    Number 1 says, "Buy Aurora's assets for

17   $15 million."  Was the original plan to purchase

18   Aurora's assets for 15 million?

19        A.    That's the goal.

20        Q.    Do you know where that number 15 million came

21   from?

22        A.    I don't know how that number came about, but

23   that was the goal.

24        Q.    To your knowledge, the assets of AIT were not

25   sold for 15 million; correct?
```

```
 1        A.    At the end, it did not get sold for that.

 2        Q.    It was about half that?

 3        A.    It was eight and a half, yes.

 4        Q.    If you look on the next page of this document,

 5   about halfway -- a little before halfway through this

 6   page, it says Members Return.  Do you see that?

 7        A.    Let me read it.

 8        Q.    Sure, please.

 9        A.    Yes.

10              (Phone interruption)

11              Let me answer this question.  I'll tell them

12   that I cannot talk, but it's an important person that I

13   need to answer it.

14              MS. SCHACHNE:  Why don't we go off record for

15   one second.

16              (Discussion off the record)

17              MS. SCHACHNE:  Back on the record.

18        Q.    This talks about Members Return.  Do you know

19   who these members -- what this is referring to, who

20   these members are?

21        A.    Let me see.  I believe it refers -- from what

22   it says in the document, should be the members of ARF,

23   A-R-F.

24        Q.    Do you know who those members were?

25        A.    The members of ARF?
```

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

1      Q.    Yes.

2      A.    I do.

3      Q.    Who are they?  Who were they at the time of

4  this transition plan?

5      A.    It's always been the same, the few members of

6  the ARF.

7      Q.    Okay.  Who are they?

8      A.    There are five.  I think it's five.  I don't

9  remember exactly, five or six members.

10     Q.    What are their names?

11     A.    They are myself, Lucy, Chang family, Wong

12  family.  I think that's it.  Four or five.

13     Q.    They are the managing members of ARF?

14     A.    Managing member is just me.

15     Q.    Just you, but they are the members of ARF?

16     A.    Correct.

17     Q.    This members return would refer to those five

18  particular members; is that right?

19     A.    From this documentation.  Again, this is just a

20  business plan.  No business plan always go exactly like

21  what it happens.

22     Q.    Sure.  I'm asking specifically regarding this

23  plan.

24     A.    This was the plan, I guess.

25     Q.    Was the plan that ARF would essentially

1    capitalize or provide $1.5 million to AIT to help

2    transition AIT technology to a new Aurora?

3         A.   That was the plan.

4         Q.   And that the new Aurora would purchase the

5    technology or the assets for approximately 15 million?

6         A.   That was the plan.

7         Q.   And ARF would assist in that; right?

8         A.   Yes.

9         Q.   And then in doing --

10        A.   Sorry.

11        Q.   Sorry, go ahead.

12        A.   Through the transition, if the transition

13   didn't happen, then there is no stage 2.  So the stage 1

14   has to happen.

15        Q.   Understood.  I understand we're just talking

16   about the plan here.  I do understand that.  If stage 1

17   happened and the assets were transitioned to a new

18   Aurora, then the members here where it says members

19   return would get approximately a hundred percent return

20   on their investment; is that correct?

21        A.   That was the plan.

22        Q.   Did they receive approximately a hundred

23   percent return on their investment?

24        A.   No.

25        Q.   Do you know how much return on their investment

1  approximately they received?

2      A.   I don't know yet because they did not exit.

3      Q.   This is upon exiting of ARF Partners?

4      A.   ARF Partners did not exit.  They end up

5  purchasing the senior loans, contributed back to the new

6  company, and received ownership of the company.  So they

7  did not exit.

8      Q.   So instead of basically getting a monetary

9  return on their investment, they received ownership of

10 the new Aurora in exchange for their investment in

11 ARF Partners?

12     A.   Correct.

13     Q.   What percentage of ownership did they receive

14 in the new Aurora?

15     A.   They got credited at 4.3 million of the

16 purchase price -- 4 or 4.3 million of the purchase

17 price.

18     Q.   Let me clarify.  When I say new Aurora, you

19 understand I'm referring to Aurora Healthcare US

20 Corporation?

21     A.   Yes.

22     Q.   The members of ARF, in exchange for investing

23 or providing funds which were ultimately used for AIT,

24 they received an ownership of the new Aurora equal to 4

25 or $4.3 million?

1    A.   Credited, yes, so their position exchanged for

2    use of the proceeds of 4.3, I think.

3    Q.   What percentage of the company is that now?

4    A.   That's less than 15 percent.

5    Q.   That less than 15 percent is distributed

6    equally among the five members?

7    A.   No, because ARF is not dissolved.  So that's

8    still hold in the ARF.

9    Q.   It's still held in ARF and those five members

10   are still the same five members of ARF?

11   A.   Correct.

12   Q.   The ownership structure has not changed of ARF?

13   A.   No.

14   Q.   Not once since the beginning or its formation?

15   A.   No.  Lisa?

16        MS. SCHACHNE:  Yes.

17        THE WITNESS:  I need to go to the bathroom.

18        MS. SCHACHNE:  Sure, let's go off record.

19        (Recess taken from 1:13 to 1:26 p.m.)

20        MS. SCHACHNE:  Back on the record.

21   Q.   We were just at a short break.  Ms. Cheng, are

22   you ready to proceed with your deposition today?

23   A.   Yes.

24   Q.   We were looking at Exhibit 4, which is the

25   transition plan for ARF.  Ms. Cheng, do you have that

1   document in front of you?

2       A.   Let me click it open.

3       Q.   It is entitled in the Chat as ARF Exhibit 6.

4       A.   Okay, got it.  I had it open.

5       Q.   Looking at the second page of the document,

6   about towards the bottom of the page, it says Managing

7   Member's Compensation.  Do you see that?

8       A.   Managing member's compensation, yes, I see

9   that.

10      Q.   20 percent of the senior loan balance $500,000?

11      A.   Right.

12      Q.   You are the managing member of ARF; correct?

13      A.   Right.

14      Q.   Was your compensation for this plan $500,000?

15      A.   For this plan, but it didn't happen.

16      Q.   The original plan, assuming it had gone

17  through, you would have received personally $500,000 for

18  assisting in the plan essentially?

19      A.   That's what the plan -- plan scope.

20      Q.   What was the 500,000 for?  Is it for you

21  essentially managing ARF Partners?

22      A.   No.  It's to finish the plan which is, you

23  know, stage 2, get Aurora transferred to an entity that

24  could carry on.

25      Q.   Was it a commission?  I mean, why would you

1    have received $500,000 in compensation?

2        A.    That's a lot of work.  Think about that.  You

3    have to raise 15 million, according to the plan, right,

4    15 million to get the company to be transferred to a

5    healthier organization and then, you know, continue to

6    develop the product to serve more people.  So that's a

7    lot of work.

8        Q.    Essentially it's a commission, right, for your

9    work?

10           MS. CLOSE:  Objection.

11       Q.    BY MS. SCHACHNE:  Or is it -- it's to

12   compensate you for your work.  Is that what you're

13   trying to say?

14       A.    Yeah, that's what's the compensation for work.

15       Q.    For your work through ARF or through ARF and

16   then as the CEO of the new Aurora?

17       A.    No one knows what that was yet.  The goal is

18   again to get the technology to be in good hands.

19       Q.    Was it always the goal that -- was it always

20   understood that you would be CEO of whatever company

21   purchased the technology from AIT?

22       A.    No, it was not originally.  Again, whoever can

23   manage this technology to -- to its greatest capacity

24   will be a better entity or better person to handle it.

25   It could be someone else, and I am one of potential to

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

1   run that operation.

2      Q.   But you testified earlier that because of your

3   experience in the industry and with AIT that you were

4   the likely candidate; is that correct?

5           MS. CLOSE:  Objection, misstates her testimony.

6           THE WITNESS:  I was one of the candidates, but

7   there are a lot more capable people out there better

8   than me.  So I am not the only candidate.

9      Q.   BY MS. SCHACHNE:  Do you recall if there was

10  anyone else, any other company or individual, in mind to

11  purchase the assets and technology of AIT?

12     A.   Yes, we made many, many tries.  We talked to

13  many people.

14     Q.   Who are those people?  Who was one of the

15  potential candidates or companies that would purchase

16  AIT's assets?

17     A.   Before I stepped down as the CEO, we were

18  planning for IPO in Taiwan.  So we have already gone in

19  2012 and 2013, talked to a lot of high-tech companies in

20  Taiwan, wanted to get into healthcare -- medical

21  technology industry.  They could be a robotic company.

22  It could be other electronic company.  So we did talk to

23  several of those, continue our talk, kind of resume our

24  discussion with them, including Foxconn, which is one of

25  the largest manufacturers of iPhone.  They are based in

1    Taiwan, but they have operation all in China and in U.S.

2    There is another company called HIWIN.  They are a

3    robotic business, but they are highly electronics and

4    highly mechanical.  They are one of them.  There are

5    several of them, but those two we put a lot of effort

6    because they expressed interest to enter medical

7    technology industry.

8        Q.    When you spoke with them, was that in 2015

9    around this time that the plan was created?

10       A.    Right.

11       Q.    The plan was potentially that a Taiwanese

12   company would purchase the assets and then Aurora in the

13   U.S. would cease to exist entirely?

14       A.    No, no, no.  The U.S. company always --

15   especially in the technology sector, innovation is very

16   important.  Innovation could be technology innovation.

17   It could be sales model innovation.  It could be all

18   kinds of innovation.  That's what I think the U.S. is

19   very, very good for.

20            So it always had the plan to keep the U.S.

21   company here and using the U.S. people, technology, or

22   marketing, whatever, and then Taiwanese company will

23   probably work more on the manufacturer side to make it

24   cheaper, to make it more productive, and this and that.

25       Q.    If you were speaking with these Taiwanese

1    companies, there would still be a new Aurora in the U.S.

2    who purchased AIT's assets and then worked directly with

3    the Taiwanese company.  Did I understand that correctly?

4        A.   It could be.  If we were successfully sort of

5    rescued or convince people to invest into AIT, then that

6    would be -- AIT will continue as it is.  If that was not

7    successful, if people say, no, that is too complicated,

8    there is just too much trouble or problems in there,

9    they may elect to buy the assets and that could be --

10   that will be the second choice.

11       Q.   When you were talking with these potential

12   companies, were you part of the deal?  In other words,

13   did you tell them that you would lead or you would be in

14   charge of the U.S. company?

15       A.   Most of the companies -- I mean, especially

16   those that we were talking to, they are global

17   conglomerates.  They are big companies.  They have

18   people in the U.S.; they have people in Taiwan and

19   China, everywhere.  So they could pick their own people,

20   and I'm more welcome.  You know, I'm in the 60s.  Are

21   you kidding me?  I can't run the show.  I don't have

22   that energy.

23       Q.   I understand.  You may have had a relationship

24   with them in the past.  I mean, when you were speaking

25   with them, did you at any point say, you know, I would

1   be running the U.S. company or I would like to run the

2   U.S. company?

3       A.   It's always at their choice.  I did step down.

4   So remember between -- from 2013.  I'm not the only

5   choice they have.

6       Q.   Further up in this document on the first page,

7   the last paragraph --

8       A.   Investment return for members.

9       Q.   Yes.

10      A.   I see this, okay.

11      Q.   Part of the plan was for ARF to purchase

12  Pharos's security interest or entire interest in AIT; is

13  that correct?

14          MS. CLOSE:  That misstates the document.

15          MS. SCHACHNE:  That's not the question I asked,

16  Counsel.

17          THE WITNESS:  Lisa, could you --

18          MS. CLOSE:  Vague as to time then.

19      Q.   BY MS. SCHACHNE:  Part of the plan -- ARF's

20  plan, the plan was to purchase Pharos's interest, both

21  its security interest and its investments in AIT from

22  Pharos; is that right?

23          MS. CLOSE:  Vague as to time.

24          THE WITNESS:  We are talking on this

25  documentation, right?

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

 1          Q.   BY MS. SCHACHNE:   No.   I'm just talking about
 2     ARF's plan from the beginning.
 3          A.   Okay.   If we could go back to sort of the
 4     logic, right.   Pharos owns -- is the only senior
 5     creditor.   They could foreclose and everybody else wiped
 6     out.   They could put the company into involuntary
 7     bankruptcy, and the technology will be lost.   Their
 8     position is so strong that without having arms around
 9     it, the future was very uncertain.   So that's the way --
10     that's why Pharos's position needed to be -- put their
11     arms around it.
12          Q.   It was essential to -- ARF being able to rescue
13     Aurora, it had to purchase Pharos's interest in AIT;
14     correct?
15          A.   That's correct.
16          Q.   Without it, ARF would unlikely be able to carry
17     out its goals; is that right?
18          A.   The rescue plan will be very difficult.
19          Q.   ARF was successful in doing so; correct?
20          A.   Yes.
21          Q.   This paragraph says that Mr. Wilson, as
22     chairman and CEO of AIT or Aurora, negotiated with
23     Pharos.   Is that accurate, he did negotiate with Pharos?
24          A.   That was the plan.
25          Q.   But he did, in fact, negotiate with Pharos;

1  correct?

2      A.   Yes.  At the time to be able to have -- Pharos

3  position, it could be through AIT, if we could find

4  investor to invest AIT and AIT can buy that position

5  from Pharos as AIT.  That's one plan.  If that cannot be

6  accomplished, then maybe a third party could acquire

7  that position.  That's an alternative, but no one knows

8  what's going to happen eventually.

9      Q.   But this particular -- going back to this

10  particular document, it says that -- I see what you're

11  saying.  You said part of ARF's plan was to purchase

12  Pharos's interest, but who purchased the interest,

13  whether it was AIT or ARF specifically, you didn't know

14  at the time?

15      A.   Correct.

16      Q.   Ultimately ARF purchased Pharos's interest;

17  correct?

18      A.   Correct.

19      Q.   Mr. Wilson helped facilitate; he negotiated on

20  behalf of ARF to do so; correct?

21      A.   Initially he negotiated with Pharos on behalf

22  of AIT because ARF would loan the money to them; he goes

23  and buy.  It started from there.  The introduction to

24  the Foxconn and HIWIN, we are all thinking about

25  starting with invest in AIT, you know, and you can

1   appoint CEO or appoint anybody.  This is a good

2   opportunity to have this technology and run with it.

3       Q.   I don't think that answered my question.

4   Regardless of what happened before, Mr. Wilson did

5   negotiate on behalf of ARF to purchase Pharos's interest

6   in AIT; correct?

7           MS. CLOSE:  Objection, calls for a legal

8   conclusion as to who he is negotiating on behalf of.

9           THE WITNESS:  Originally started with AIT

10  negotiating to buy Pharos's position.  It fell through;

11  no deal was done.  But the negotiation already carried

12  on for months.  So then we say, well, why don't you and

13  see a third party; can they accept.

14      Q.   BY MS. SCHACHNE:  The third party being ARF?

15      A.   ARF, yes.

16      Q.   Mr. Wilson continued those negotiations after

17  the AIT negotiations fell through.  He continued those

18  negotiations on behalf of ARF with Pharos directly?

19          MS. CLOSE:  Calls for a legal conclusion as to

20  who he is negotiating on behalf of.

21          THE WITNESS:  That's what happened.

22      Q.   BY MS. SCHACHNE:  It says here that he did

23  successfully negotiate with Pharos.

24      A.   Yes, that's the result.

25      Q.   That was the result.  Do you know why the

1  original negotiations with AIT fell through?

2      A.   Could you repeat the question.

3      Q.   You mentioned earlier that Mr. Wilson started

4  negotiating on behalf of AIT.  Those negotiations fell

5  through, and then he negotiated on behalf of a third

6  party, which was ARF, and those negotiations were

7  successful.  Is that accurate?

8          MS. CLOSE:  Objection, it misstates her

9  testimony as to who he is negotiating on behalf of.  I

10  don't think she ever said that he was negotiating on

11  behalf of ARF.

12     Q.   BY MS. SCHACHNE:  Is that accurate?

13     A.   So let's just repeat what I said earlier.  He

14  started negotiating on behalf of AIT.  The source of

15  funds will come from ARF.  It fell through.

16     Q.   Yes.

17     A.   So he continued with the negotiation and said,

18  well, now it's a third party buying your position and it

19  succeeds.

20     Q.   So he continued those negotiations on behalf of

21  that third party and succeeded; correct?

22          MS. CLOSE:  Calls for a legal conclusion.

23          THE WITNESS:  So he negotiated with Pharos and

24  said if there's a third party and they want to buy -- he

25  is not on behalf.  It's sort of negotiator in between.

1        Q.   BY MS. SCHACHNE:   He was communicating directly

2    with Pharos regarding ARF purchasing Pharos --

3        A.   Third party, yes.

4        Q.   -- interest.   He knew it was ARF; correct?

5        A.   ARF potentially.   Could be one.   It could be

6    someone else.   For example, we were talking to Foxconn.

7    It could be Foxconn.   So it's all still up in the air.

8    All this took months.

9        Q.   Did Mr. Wilson know when he was negotiating on

10   behalf of a third party that it was ARF?

11            MS. CLOSE:   Vague as to time.

12            THE WITNESS:   After the AIT negotiation fell

13   through, he continued the discussion and he knew that

14   ARF was one of the potential, could acquire that.

15       Q.   BY MS. SCHACHNE:   In order for him to

16   successfully negotiate, he needed authority to provide

17   certain numbers which he would purchase Pharos's

18   interest; right?

19            MS. CLOSE:   Objection, vague and ambiguous,

20   calls for a legal conclusion.

21            THE WITNESS:   I think logically in everyday

22   world, say you want to buy a house, right.   You have a

23   broker.   The broker has no authority, but he can carry

24   this negotiation.   Once it's done, then the both sides'

25   principal can decide the details.

1      Q.   BY MS. SCHACHNE:   So you decide the details

2   after the negotiation.   Is that what happened here with

3   Pharos that Pharos agreed to sell and then the amount it

4   sold for was determined later?

5      A.   Price is a key.

6      Q.   I think so.

7      A.   That has to be in the discussion.   Even though

8   if you reach an agreement, things may not come through.

9   Just like I reach agreement with CRC for 100 million,

10   everything signed, everything done, didn't go through.

11      Q.   Understood.   Mr. Wilson -- what I'm trying to

12   get at is, in order to successfully negotiate with

13   Pharos, he provided them a price in which he paid the

14   investments -- paid for their interest in AIT; correct?

15      A.   Correct.

16      Q.   Where did he get that amount from?   Was that

17   from ARF?

18      A.   It's a negotiation just like it's bargain.

19      Q.   AIT didn't have the funds itself to purchase

20   that interest; correct?

21      A.   Correct.

22      Q.   Because if it did, it would actually have

23   enough money or at least some money to provide Pharos

24   payment on its debt, but they didn't have that money;

25   correct?

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

1    A.    Right.  They relied on people like ARF or new

2  buyers to give them money.

3    Q.    AIT was relying on ARF in order to purchase

4  Pharos's interest; correct?

5    A.    During the transition stage, yes.

6    Q.    ARF was specifically communicating with

7  Pharos -- I'm sorry.  ARF was specifically communicating

8  with Mr. Wilson on behalf of AIT so that Mr. Wilson

9  could purchase Pharos's interest; correct?

10    A.    Correct.

11    Q.    Is it fair to say that Mr. Wilson was

12  negotiating on behalf of ARF?

13        MS. CLOSE:  Calls for a legal conclusion.

14        THE WITNESS:  We went through that earlier.  On

15  behalf?  I don't know what is the definition of that.

16  Just like a broker can carry the conversation, but at

17  the end, it is the principal to say yes or no.

18    Q.    BY MS. SCHACHNE:  Right, of course, somebody

19  has to agree.  Somebody has to agree to the sale, but in

20  negotiating the sale, somebody has to do the

21  negotiating.  Mr. Wilson was the one doing the

22  negotiating; correct?

23    A.    Correct.

24    Q.    And you never specifically communicated with

25  anyone from Pharos regarding the purchase of its

```
1   interest; correct?
2       A.   It was so long ago and I have -- I used to have
3   a lot of communication with Pharos principals.  So I
4   don't really remember exactly specific time, who did
5   what and called or whatever.  I don't remember.
6       Q.   I will represent to you that we deposed
7   Ms. Kovalkova, who was involved in that particular
8   transaction, and she testified that she had no knowledge
9   that you were the managing partner or involved with ARF
10  Partners until after the transaction went through.
11          Does that help jog your memory?
12      A.   I have some memory, but when I talked to Pharos
13  people, I don't talk to Anna; I talk to the principals.
14  All my communication was a lot with the principals.
15      Q.   Did you have an e-mail address on behalf of
16  ARF Partners?
17      A.   We don't have ARF Partners e-mail.
18      Q.   How did you communicate via e-mail on behalf of
19  ARF Partners?  Did you use another e-mail address?
20      A.   Yes.
21      Q.   Was it your BE Capital, BE Pacific e-mail
22  address?
23      A.   It's not BE Pacific.  Before I came back to
24  Aurora, I was vice chairman of BE Capital, not
25  BE Pacific.  And that was a Taiwanese firm as well.
```

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

1     Q.   Is that different -- entirely different than

2  BE Pacific?

3     A.   Entirely different.

4     Q.   Lucy Chang has no relation to BE Capital?

5     A.   No.

6     Q.   Just coincidental?

7     A.   We like that name.  They asked me why b-e.  I

8  said because be -- you always associate be something, as

9  be something good, be strong, be nice, be thankful.  So

10  be is positive beginning of it.  And then also b-e in

11  Chinese is two wings.  So it takes cooperation of two

12  wings to work together to fly.  That's good both Chinese

13  and English, and that's why we like that name.

14     Q.   Is it good luck?

15     A.   It's a very good one, yes.  Positive, yes.

16     Q.   Did you come up with the name both BE Capital

17  and BE Pacific?

18     A.   I came up with the name BE.

19     Q.   Your e-mail address of

20  olivia.cheng@becapital.com.tw, do you recognize that

21  e-mail address?

22     A.   Yes.

23     Q.   Were you using that e-mail address to

24  communicate on behalf of ARF Partners?

25     A.   Yes.  I think after I left Aurora, my Aurora

1    e-mail wasn't available, and I joined the BE Capital,

2    and so I started using that, but I also have a personal

3    e-mail at gmail.  So it's kind of mixed.

4         Q.   It was your personal e-mail or is your personal

5    e-mail at gmail Olihocheng@gmail.com?

6         A.   Yes, olihocheng.

7         Q.   Were you using that e-mail address as well to

8    communicate on behalf of ARF Partners?

9         A.   Yes.  So it's always mixed.

10        Q.   Mixed.  Those two e-mail addresses, it

11   didn't -- just depended on what you were using at the

12   time, but they didn't mean anything specific?

13        A.   No.  China, for example, gmail doesn't work.

14        Q.   That's right.  That's when you use, for sure,

15   your becapital.com.tw e-mail address?

16        A.   That's right.

17        Q.   Did you have any other e-mail addresses other

18   than the two we just talked about that you used to

19   communicate on behalf of ARF Partners?

20        A.   Two is already a lot for me to manage.

21             MS. SCHACHNE:  I can imagine.  I put an exhibit

22   in the Chat.  It's titled ARF Exhibit 9.  We will mark

23   it as next in line, and I will give you a chance to take

24   a look at it while Madam Court Reporter is marking the

25   exhibit.

1                    (E-mail chain between Chris Wilson and

2                    Olivia Cheng dated July 28 and 29, 2015,

3                    2 pages, marked for identification as

4                    Plaintiff's Exhibit 5)

5          THE WITNESS:  I see it.

6      Q.   BY MS. SCHACHNE:  This is an e-mail exchange

7   with you and Mr. Wilson; correct?

8      A.   Correct.

9      Q.   Do you recall this e-mail exchange?

10     A.   I don't remember, but I guess it is there.

11     Q.   Included in this e-mail exchange is one of the

12  e-mail addresses we just talked about, which is

13  olivia.cheng@becapital.com.tw.  That is you; correct?

14     A.   That is me, yes.

15     Q.   To your knowledge, cwilson@wilsonoskam.com is

16  Mr. Wilson, who was the CEO of AIT?

17     A.   Yes.

18     Q.   This e-mail address, the first one, which is

19  from Mr. Wilson and it's farther down in the chain, is

20  dated July 28th, 2015, and its subject is Pharos offer

21  letter 7-29-2015.  Do you see that?

22     A.   Yes, I see that.

23     Q.   Do you understand this e-mail exchange to be

24  discussing the negotiations between AIT and Pharos for

25  ARF to purchase Pharos's interest?

1      A.   I think this is about AIT to purchase -- AIT to

2  buy Pharos.  I don't think it's for ARF.  ARF wasn't

3  even formed, I think, at that time.

4      Q.   Do you know why Mr. Wilson was asking -- saying

5  to you, "I know you want to offer $300,000"?  If AIT was

6  purchasing Pharos, why would he ask what you want to

7  offer?

8      A.   Because we will loan the money to him to buy.

9      Q.   Is it standard practice that when you loan

10 money, you also get to dictate entirely the terms?

11     A.   Yes.

12          MS. CLOSE:  Objection, incomplete hypothetical.

13 Also, Lisa, I think you cut at the end there, at least

14 on my end.

15     Q.   BY MS. SCHACHNE:  My question -- then I'll

16 rephrase it.  Is it your standard practice that when you

17 enter into a negotiation or you enter into where you're

18 going to loan a company money that you dictate the terms

19 of that negotiation?  In this case, you're saying that

20 ARF was not yet going to purchase Pharos's investments;

21 they were simply going to loan AIT money; correct?

22     A.   Correct.

23     Q.   But at the same time, ARF was going to

24 determine how much money AIT would purchase Pharos's

25 investments for or interest for?

1    A.   We have an opinion in it.

2    Q.   Then if you scroll up in this e-mail exchange,

3  you respond to Mr. Wilson?

4    A.   Yes.

5    Q.   You say in your third sentence, "I too kept my

6  mouth tightly closed with anyone, many people called but

7  I offer no information."  What were you referring to

8  there?  What were you keeping your mouth tightly closed

9  about?

10   A.   I don't remember who I was referring to.

11  Again, we were talking to many potential investors like

12  the Foxconn, HIWIN, and a lot of -- some of the

13  Taiwanese companies there.  After we are talking to

14  them, they all know something is working on -- that we

15  are working on something.  I guess that's what I was

16  referring to, but I don't remember who I was referring

17  to.

18   Q.   In other words, you were not going to tell the

19  potential purchasers of this deal that you're working on

20  with Mr. Wilson?

21   A.   Yes.

22        MS. CLOSE:  Objection, vague and ambiguous.

23        THE WITNESS:  I don't remember who again.  I

24  don't remember who I was referring to, but there were so

25  many parties that we were talking to.  And at that time,

62

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

1   AIT owed not just Pharos, you know.  They have a lot of

2   creditors there, a lot.  So people had skepticism about

3   how this rescue could be successful.

4       Q.   BY MS. SCHACHNE:  Why wouldn't you want this

5   negotiation disclosed to anyone else?

6            MS. CLOSE:  Objection, misstates her testimony.

7            THE WITNESS:  At the best of my business

8   experience, when you are a buyer, you want to be a clean

9   deal.  You don't want to assume a mess.  So this kind of

10  dirty linen, you don't want to air in front of others.

11  That was probably the primary concern.

12      Q.   BY MS. SCHACHNE:  Looking at number 2, same

13  page, it says, "Give him a definite timeline."  I think

14  "him" is referring to Kneeland Youngblood; is that

15  correct?

16      A.   That's correct.

17      Q.   Kneeland Youngblood being one of the managing

18  partners of Pharos?

19      A.   He is the senior partner.

20      Q.   It says, give him, Mr. Youngblood, a timeline.

21  If he doesn't accept, move ahead of filing the first

22  week of August.  This is not a bluff.  You will tell him

23  you will surely pull the trigger.

24            Were you talking about bankruptcy filing?

25      A.   Yes.  By that time, the company already

63

1   prepared all the package for bankruptcy.  And even

2   though we have -- we would like to rescue it from

3   bankruptcy, but if all the efforts were failed, then,

4   you know, the bankruptcy is inevitable, then proceed to

5   bankruptcy.

6        Q.   You wanted Mr. Wilson to threaten Pharos with

7   bankruptcy so that this deal would go through; is that

8   correct?

9        A.   It was not a threat; it was the situation.

10  It's touch and go at that time.  It is not a threat.

11  They already prepared it at Pharos's expense.  Pharos

12  funds the preparation of bankruptcy.

13       Q.   You weren't involved -- you weren't a director

14  or officer of AIT on July 29th, 2015, were you?

15       A.   No, I wasn't.  I was only informed of the

16  situation -- of AIT's situation in June, just one month

17  ahead.

18       Q.   ARF was not formed until September 1st, 2015;

19  correct?

20       A.   That's correct.

21       Q.   At the time you're instructing Mr. Wilson to

22  tell Pharos that AIT will file for bankruptcy, you had

23  no position in AIT, did you?

24            MS. CLOSE:  Objection to the characterization

25  of she is instructing Mr. Wilson.

1        THE WITNESS:  I'm not instructing Chris.  I'm

2   only saying that's the plan.  I mean, I was still a

3   shareholder of Aurora -- AIT.  I have no official

4   position, but I was a shareholder.  That's a lot of

5   money in there.

6        Q.   BY MS. SCHACHNE:  As a shareholder of AIT, you

7   were telling Mr. Wilson to tell another shareholder of

8   AIT and a senior secured creditor that AIT will pull the

9   trigger and file bankruptcy if they don't accept;

10  correct?

11       MS. CLOSE:  Objection, misstates the document.

12       THE WITNESS:  Lisa, I think you're unfairly put

13  that -- I do not have that kind of power, but this is

14  just reiteration of what was going -- what was the plan

15  that Pharos prepared the -- fund the plan to file

16  bankruptcy.  All the papers has already been prepared.

17  There is maybe a slim chance that this could be avoided,

18  and if he did not want to take this, then the natural

19  course is to proceed.  I was just stating that.  It's

20  not telling anybody.  That is already in action.

21       Q.   BY MS. SCHACHNE:  I'm just reading your words,

22  which say, "Give him a timeline.  If he does not accept,

23  you will move ahead of filing the first week of August."

24  To me, it sounds like you're telling him what to do and

25  how to proceed with the negotiations.

```
 1        A.    Maybe --
 2              MS. CLOSE:   There is no question pending.
 3   There is no question.   That is Lisa's interpretation.
 4        Q.    BY MS. SCHACHNE:   Are you telling me that this
 5   is not related to the negotiations between AIT and
 6   Pharos?
 7              MS. CLOSE:   Objection, vague and ambiguous.
 8              MS. SCHACHNE:   Strike that.
 9        Q.    Was Mr. Wilson reaching out to you because you
10   were a shareholder of AIT?
11        A.    I was a potential source of funds for rescue of
12   AIT.  He could be talking to anybody.  Who knows who
13   else?
14        Q.    Do you know if he was talking to anyone else?
15        A.    I do not know.
16        Q.    Do you know approximately when Pharos agreed to
17   sell its interest to ARF?
18        A.    Could you repeat the question and the time
19   also.
20        Q.    Do you know the timing, the approximate time
21   that Pharos agreed to sell its interest to ARF?
22        A.    That's when the documentation was executed
23   prior to that.
24        Q.    Do you recall when that was?
25        A.    I don't remember, but it's in the
```

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

1   documentation.

2       Q.    It was after this date, July 29th, 2015;

3   correct?

4       A.    It has to be after that.

5       Q.    Does November 2015, sometime in November, sound

6   correct to you?

7       A.    Yeah, that sounds more kind of in the timeline.

8       Q.    When you say documentation, are you referring

9   to the actual agreement between ARF and Pharos regarding

10  Pharos's interest?

11      A.    Right.

12      Q.    Was there any documentation entered into with

13  Pharos between ARF and Pharos before that time that you

14  know of?

15      A.    I don't remember, but we go by the last

16  documentation.

17      Q.    Do you know approximately how long Mr. Wilson

18  was negotiating with Pharos for the purchase -- for

19  ARF's purchase of Pharos's notes and investments?

20      A.    The negotiation of purchasing Pharos's position

21  started like this July thing, and it lasted until the

22  time that the deal was put together or concluded upon.

23      Q.    Approximately three to four months, does that

24  sound correct?

25      A.    I think so.

1    Q.   What did ARF ultimate -- how much did ARF

2    ultimately purchase Pharos's interest for?

3    A.   You know that.  You probably reviewed that

4    documentation many times.  425,000.

5    Q.   Did ARF offer anything else in the deal?

6    A.   Cash, that's it.

7    Q.   Just cash.  Pharos didn't, for example, receive

8    any equity or ownership interest in any company that you

9    know of from the deal?

10   A.   No.

11   Q.   Did Pharos receive any capital cash money after

12   the deal?  Was there a later payment or was it paid --

13   was the $425,000 paid at one time and that was it?

14   A.   That was it.

15   Q.   Was it paid at the signing of the deal?  I mean

16   when they entered into an agreement together.

17   A.   According to the agreement terms.

18   Q.   Did Pharos -- was part of the deal that Pharos

19   be indemnified by AIT; do you know?

20   A.   I don't remember, but -- I don't remember.

21   Sorry.

22   Q.   Mr. Wilson successfully negotiated that deal

23   for $425,000; correct?

24   A.   Yes.

25   Q.   Once ARF received Pharos's interest in AIT, it

1   became the only senior secured creditor of AIT; correct?

2       A.   Correct.

3       Q.   Was its goal at that time that it became the

4   only senior secured creditor of AIT still to transition

5   AIT to a new Aurora?

6       A.   If that was -- if that was the market, you

7   know, condition.

8       Q.   Meaning if that was feasible?

9       A.   Okay, you have a better word for that.

10      Q.   No, I'm just trying to clarify or understand,

11  honestly.  If it was feasible, that was still ARF's

12  goal.  In other words, ARF's goal didn't change once it

13  became the senior secured creditor of AIT?

14      A.   It didn't change.  If AIT could survive, go

15  with that.  If AIT cannot survive, then a new entity may

16  buy assets and then so be it.

17      Q.   Understood, but its goal was to somehow keep

18  the technology alive?

19      A.   Yes.

20      Q.   If ARF would have forced AIT into bankruptcy as

21  the only senior secured creditor of AIT, it wouldn't be

22  able to complete its goal; correct?

23      A.   Could you repeat that question again.

24      Q.   Sure.  If ARF were to have forced bankruptcy of

25  AIT, it wouldn't have been able to succeed in achieving

1    its goal of maintaining or keeping alive AIT's

2    technology; correct?

3           MS. CLOSE:  Calls for speculation, incomplete

4    hypothetical.

5           THE WITNESS:  It was never ARF's goal to force

6    bankruptcy, no.  Totally opposite.

7       Q.   BY MS. SCHACHNE:  So you wouldn't have -- ARF

8    wouldn't have forced bankruptcy?

9       A.   Absolutely not.  But remember, there are many

10   creditors.  Other creditors could force AIT into

11   bankruptcy.

12      Q.   But ARF -- to your knowledge, ARF was the only

13   senior secured creditor; correct?

14      A.   Correct.

15      Q.   After ARF purchased Pharos's interest in AIT,

16   did ARF loan AIT any additional capital?

17      A.   Yes.

18      Q.   Do you recall how much that was?

19      A.   About a million because it needs to use the

20   money to settle the creditors.  When you have that many

21   creditors, three creditors get together can force a

22   company into involuntary bankruptcy.  If we could not

23   settle all the creditors, there is still risk of

24   bankruptcy.

25      Q.   Was that million dollars in addition to the

1   $1.5 million or was that -- was that the only amount of

2   capital that ARF put into AIT?

3        A.   That was the amount, 1.5.

4        Q.   That was the amount.  So first ARF purchased

5   Pharos's interest and then ARF loaned AIT approximately

6   $1 million?

7        A.   Correct.

8        Q.   And then that million dollars was funded by BE

9   Capital -- BE Pacific?

10       A.   Funded by ARF, but money was helped partially

11   raised -- investor introduced by BE Pacific.

12       Q.   Was there any condition with Pharos when ARF

13   purchased its interest that ARF recapitalize AIT?

14       A.   I'm sorry, could you repeat that question.

15       Q.   Sure.  When ARF and Pharos were -- when that

16   deal was negotiated, was it a condition for the deal

17   that ARF recapitalize AIT?

18       A.   From Pharos?  I mean Pharos condition?

19       Q.   Yes.

20       A.   No, Pharos wouldn't care.

21       Q.   Pharos didn't care at all what happened to AIT

22   once it was out?

23       A.   They were prepared to go bankruptcy.

24            MS. SCHACHNE:  I think this is a good time to

25   take another ten-minute or so break, if that's okay with

1    you.

2              THE WITNESS:  Sure.

3              (Recess taken from 2:19 to 2:30)

4              MS. SCHACHNE:  Back on the record from another

5    short break.

6         Q.   Are you ready to proceed, Ms. Cheng?

7         A.   Yes, Lisa.

8         Q.   Thank you.  Before the break, we were chatting

9    about the purchase of Pharos -- ARF's purchase of

10   Pharos's interest.  We were talking that it probably

11   occurred around November 2015; correct?

12        A.   Correct.

13        Q.   I saw on the break that the stock and note

14   purchase agreement with Pharos occurred on

15   November 25th, 2015.  Does that sound -- jog your

16   memory?

17        A.   Okay, yeah.

18             MS. SCHACHNE:  I can pull it up so that you

19   don't have to guess.  It is now loaded in the Chat.  It

20   should be marked next in line.  And while the court

21   reporter is marking that, Ms. Cheng, go ahead and take a

22   look at that document.

23             THE WITNESS:  That is the purchase agreement.

24             (Stock and Note Purchase Agreement and

25             Assignment of Amended and Restated Note

```
 1                    Purchase, Guaranty and Security Agreement,

 2                    12 pages, marked for identification as

 3                    Plaintiff's Exhibit 6)

 4        Q.   BY MS. SCHACHNE:  If you scroll to the

 5   signature page of that document, which is page 10, I

 6   believe, also marked as WIL000390.

 7        A.   Okay, yes.

 8        Q.   Is that your signature under purchaser, ARF

 9   Partners, LLC?

10        A.   Yes.

11        Q.   Does this document reflect ARF's purchase of

12   Pharos's notes and investments in AIT?

13        A.   Yes.

14        Q.   The date of this document is November 25th,

15   2015.  Do you see that?

16        A.   I see that.

17        Q.   When you signed this document, did you

18   understand that ARF would be assuming the rights and

19   responsibilities of Pharos for its now ownership of the

20   series C and series D shares?

21             MS. CLOSE:  Objection.  The document speaks for

22   itself, calls for a legal conclusion.

23             THE WITNESS:  Just like what the documentation

24   say, whatever responsibility assumed is assumed.

25        Q.   BY MS. SCHACHNE:  Did you understand on behalf
```

1    of ARF that that would be occurring?

2          MS. CLOSE:  Same objections.

3          THE WITNESS:  I'm not a lawyer, but I do

4    understand the documentation.

5      Q.   BY MS. SCHACHNE:  You have talked a little bit

6    about ARF's structure.  You said that there are five,

7    and you have listed for us who those members are and

8    that you are the managing member; correct?

9      A.   Correct.

10     Q.   Mr. James is the secretary?

11     A.   Correct.

12     Q.   Does ARF have any employees?

13     A.   No.

14     Q.   Did they ever have any employees?

15     A.   No.

16     Q.   Other than those five individuals that you

17   mentioned earlier in the deposition, does anyone else

18   have ownership interest in ARF?

19     A.   No.

20     Q.   Some of the individuals that you mentioned as

21   members of ARF are also shareholders of AIT; correct?

22     A.   Through ARF.

23     Q.   You're both a member of ARF, and separately as

24   an individual, you are also a shareholder of AIT;

25   correct?

1        A.    If they put more money into it, yes.

2        Q.    Let me clarify that a bit.  You were a

3   shareholder of AIT before ARF was formed; correct?

4        A.    Correct.

5        Q.    And then ARF was formed and you were a managing

6   or are a managing member of ARF?

7        A.    Right.

8        Q.    So you have interest or you are an investor of

9   AIT both individually as Olivia Cheng and through ARF as

10  well?

11       A.    That's separately.  I was a shareholder of ARF

12  throughout our involvement since 1999 all the way to

13  2016 before it closed or before all the assets were

14  purchased.  So that was my shareholder portion of AIT.

15       Q.    Through ARF's plan to either recapitalize or

16  basically to revive the technology of AIT, was there any

17  agreement between ARF and Wilson that Wilson would get

18  something, get anything out of that deal?  In other

19  words, would he be compensated for his assistance with

20  realizing that plan?

21       A.    There was no agreement done.

22       Q.    Was there a discussion of anything?

23       A.    There was a discussion of it before.

24       Q.    What was the discussion about?

25       A.    I don't remember, but if -- I don't remember,

1    but I think if AIT would have survived, for him to carry

2    AIT from on the cliff jumping off the cliff stage to

3    safely landed in some good hands, that is tremendous

4    responsibility, and he would be compensated for that.

5        Q.   Would he have been compensated like through

6    monetary value, like a commission, or would it have been

7    through some sort of ownership interest?

8            MS. CLOSE:   Incomplete hypothetical.

9            THE WITNESS:   It's really hypothetical because

10   at the end, what result is more important because things

11   move all along.  All that many months, things move

12   along; plan changed, you know, this didn't work, that

13   didn't work.  So it's changing all the time.

14       Q.   BY MS. SCHACHNE:   That wasn't my question.  My

15   question is, was the plan that you had discussed with

16   Mr. Wilson that he would gain some sort of monetary

17   compensation for his assistance in carrying out the plan

18   or was it going to be some ownership interest?

19       A.   Normally compensation will be involved with

20   both or either/or.

21       Q.   You said that never happened?

22       A.   Didn't happen.

23       Q.   Mr. Wilson didn't get anything?

24       A.   Did not get anything.

25           MS. SCHACHNE:   If you look in the Chat, I just

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

1    uploaded ARF Exhibit 24, which will be marked next in

2    line.  I will ask Madam Court Reporter to please mark

3    that exhibit while you take a look at this.

4                    (E-mail chain between Chris Wilson and

5                    Olivia Cheng dated September 23, 2016,

6                    2 pages, marked for identification as

7                    Plaintiff's Exhibit 7)

8              THE WITNESS:  I see it.

9        Q.   BY MS. SCHACHNE:  This is an e-mail exchange

10   between you and Mr. Wilson; correct?

11       A.   Correct.

12       Q.   Mr. Wilson, I think, originally e-mails you

13   dated September 23, 2016.  Do you see that?

14       A.   Right.

15       Q.   Do you recall this e-mail exchange?

16       A.   I don't recall, but I guess it happened.

17       Q.   This e-mail exchange happened approximately a

18   month before the sale of AIT's assets to Aurora

19   Healthcare US Corporation; correct?

20       A.   Correct.

21       Q.   Mr. Wilson asks you when you discussed the

22   first trans -- "When we first discussed the transaction,

23   you planned to grant some of ARF's interest to

24   management, including me.  Is that still the plan?"

25              You responded, it looks like, that same day and

```
 1   you say, "It is still the plan."

 2            What was Mr. Wilson referring to?

 3        A.   So referring to maybe interest in the

 4   organization.

 5        Q.   In ARF?

 6        A.   In ARF.

 7        Q.   Not in Aurora Healthcare US Corporation?

 8        A.   I guess not because ARF is going to be the

 9   shareholder, and so that's sort of indirectly interest.

10        Q.   Indirectly Wilson would have ownership interest

11   of Aurora Healthcare US Corp. through an interest in

12   ARF Partners?

13        A.   That's what the letter said.

14        Q.   This plan -- you said that was still the plan

15   approximately a month before that sale occurred;

16   correct?

17        A.   Correct.

18        Q.   Did that plan ever go through?

19        A.   Never.

20        Q.   Why not?

21        A.   I think because Chris probably, you know,

22   thought about it and felt that that may be a conflict of

23   interest, so he decided not to do it.

24        Q.   Do you know that's what Chris thought?

25        A.   I don't know whether that was, but that was the
```

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

1   result.  He didn't do it.

2        Q.   He didn't do it?

3        A.   He didn't ask and we didn't grant either.

4        Q.   But the plan was for him to get some sort of

5   ownership interest for his help in facilitating the

6   transaction?

7        A.   Yes, the plan.  Life is always that way; plan

8   never really happens.

9        Q.   Understood.  Very early on in this deposition,

10  you mentioned that ARF exists but it is no longer

11  operating; is that correct?

12       A.   Yeah.  We should have dissolved it and

13  distributed the ownership back to the members, but I

14  never get around to do it.

15       Q.   But it is not conducting any activity?

16       A.   No activities.

17       Q.   Do you know who is paying for the legal bills

18  of this lawsuit?

19       A.   Our insurance company.

20       Q.   Is ARF insured in this case?

21       A.   No.

22       Q.   Is ARF being indemnified, to your knowledge, in

23  this lawsuit?

24       A.   I don't know.

25       Q.   ARF isn't earning any money separately from its

1  ownership interest in Aurora Healthcare; correct?

2      A.   Correct.  Aurora is not paying dividends.

3      Q.   Does ARF have any ownership interest in any

4  other companies?

5      A.   No.

6      Q.   It solely exists at this point for its

7  ownership interest in Aurora Healthcare US Corp.?

8      A.   Correct.

9      Q.   Does ARF owe anyone money for any reason?

10      A.   No.

11      Q.   Does ARF have any assets besides its ownership

12  interest in Aurora Healthcare US Corp.?

13      A.   No.

14      Q.   Did ARF ever notify Castel that it was a series

15  C and series D shareholder?

16      A.   No.

17      Q.   Did ARF ever consult with Castel regarding the

18  sale of AIT's assets to Aurora Healthcare US

19  Corporation?

20      A.   No.

21      Q.   As, I guess, a minority ownership in Aurora

22  Healthcare US Corp., does ARF have -- is ARF capable of

23  making any decisions on behalf of the company?

24      A.   No.

25      Q.   Does it have any managing power in Aurora

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

1    Healthcare US Corp.?

2        A.   No.

3        Q.   But you are the managing -- I guess it would be

4    confusing anyway because you're the managing member of

5    ARF and the CEO of Aurora Healthcare US Corp.  So it

6    would be hard to know what you're making a decision on

7    behalf of anyway.

8             Did ARF consent to the sale of AIT's assets to

9    Aurora Healthcare US Corp.?

10       A.   Yes.

11       Q.   Did it sign a consent?

12       A.   Yes.

13       Q.   Did it sign a consent that specifically

14   identified Aurora Healthcare US Corporation as the

15   buyer?

16       A.   I'm sorry, say it again.

17       Q.   You testified that ARF consented and signed a

18   consent to the sale of AIT's assets to Aurora Healthcare

19   US Corporation; correct?

20       A.   Correct.

21       Q.   Did it sign a consent that identified Aurora

22   Healthcare US Corp. as the buyer?

23       A.   I think so.

24       Q.   I will represent to you that I have not

25   received any consent that shows Aurora Healthcare US

1    Corporation as the buyer.  However, I did receive a

2    consent that shows the Cayman -- Aurora Healthcare SPC

3    as the buyer.

4        A.    Correct.

5        Q.    Is it possible that ARF only consented to the

6    AIT's assets being sold to Aurora Healthcare SPC?

7        A.    That was the confusing part, because when the

8    consent was circulated, it was SPC.  And then later on

9    at the last minute, it changed to Healthcare, but it

10   really is not a significant change.  So I guess no new

11   consent form were sent out.

12       Q.    How come it's not a significant change?

13       A.    Because it's a new corporation and the buyer is

14   willing to pay and the payment are the same, so there is

15   no significant change in terms of shareholder consent,

16   who the new buyer is.  It's a new corporation regardless

17   which one.

18       Q.    As a shareholder, then is it of no consequence

19   who the buyer is?  In other words, if the buyer is the

20   Mafia, the shareholder doesn't care as long as they're

21   paying money?

22       A.    I think that is not a good example.  That

23   wasn't the case.

24       Q.    It wasn't the case and it's a bit of an extreme

25   example, but what I'm trying to ask is:  Does the

1   shareholder never care who the buyer is so long as

2   they're paying money?

3          MS. CLOSE:  Objection, vague and ambiguous,

4   calls for speculation, incomplete hypothetical.

5          THE WITNESS:  I agree that was not -- I agree

6   with Catherine because...

7       Q.   BY MS. SCHACHNE:  Whether or not you agree with

8   your attorney's objections, the question still stands.

9   Do you as a shareholder never care who the buyer is so

10  long as they're paying money?

11      A.   No, the shareholder do care.  In this case, we

12  knew that the change of name to new corporation wasn't

13  significant enough to change our mind.

14      Q.   Is that because you were the CEO regardless of

15  what the corporation was called?

16      A.   It was just a form of corporation and, you

17  know.

18      Q.   In other words, the name and the form would

19  change but everything else would stay the same?

20      A.   Significantly similar.

21      Q.   You knew that because you were involved as the

22  buyer; correct?

23      A.   Correct.

24      Q.   So you as ARF already had that information

25  because you personally have that information; correct?

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

```
 1        A.    Uh-huh.

 2        Q.    Did other shareholders have that information?

 3              MS. CLOSE:  Objection, calls for speculation.

 4        Q.    BY MS. SCHACHNE:  That you know of.

 5        A.    I don't know.

 6        Q.    But did you provide shareholders that

 7   information?

 8        A.    It was not my responsibility to provide

 9   shareholder.  It was AIT's responsibility.

10        Q.    Understood, but I'm just asking if you did or

11   didn't.

12        A.    Those people, if they call and ask, then I

13   answered.

14        Q.    The question is, did you, in fact, provide that

15   information to any other shareholders?

16        A.    I don't remember, but I think I did.

17        Q.    Do you recall who that would have been to?

18        A.    I do not remember.

19        Q.    But not to Castel; correct?

20        A.    Not to Castel.  I have no communication to

21   Castel after that call.

22        Q.    That call, and we haven't discussed it, but I

23   think you're referring to a call that you made to Castel

24   sometime in early 2015?

25        A.    In June of 2015 after I received the letter.
```

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

```
 1              MS. CLOSE:  It was August.

 2       Q.   BY MS. SCHACHNE:  A letter from Mr. Wilson?

 3       A.   Correct.

 4       Q.   After that call, you had no communication with

 5  Castel?

 6       A.   They did not get back to me.

 7       Q.   The question is:  After that call, you had no

 8  communication with Castel?

 9       A.   The ball was not in my court.

10       Q.   That wasn't the question.  I understand there

11  may be an explanation for the answer, but the question

12  is:  After that call, you had no communication with

13  Castel?

14       A.   I had no communication.

15       Q.   When ARF purchased the interest of Pharos, it

16  acquired series D and -- series C and series D shares in

17  AIT; correct?

18       A.   Correct.

19       Q.   It had a majority interest in both series C and

20  series D shares?

21       A.   Correct.

22       Q.   Castel being the only other shareholder in both

23  of those classes; correct?

24       A.   Correct.

25       Q.   Did you understand that in order for the sale
```

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

1   of AIT's assets to go through that AIT needed ARF's

2   consent to the sale?

3        A.    ARF consent was part of it.

4        Q.    Let me rephrase that question.  Do you know

5   whether or not if ARF had not consented to the sale, if

6   the sale could have gone through?

7             MS. CLOSE:  Calls for a legal conclusion, calls

8   for speculation, lacks foundation.

9             THE WITNESS:  I don't remember the calculation,

10  but there are rules in order to get approval.

11       Q.    BY MS. SCHACHNE:  Understood.  Mr. Wilson

12  testified that, in fact, for the sale to go through, AIT

13  needed a majority of each of series C and series D to

14  approve the sale, among other things?

15       A.    Must be.

16       Q.    Did you know that prior to the sale?

17       A.    I think I do.

18       Q.    Did ARF exercise options prior to the sale?

19       A.    I think we did, but I don't remember.

20       Q.    Was that because AIT did not, in fact, have a

21  majority of votes and needed additional votes to have

22  the sale go through?

23            MS. CLOSE:  Objection, calls for speculation,

24  lacks foundation.

25            THE WITNESS:  I don't remember the calculation.

1     Q.   BY MS. SCHACHNE:  Could you give me any reason,

2   other than for the purpose of pushing that sale through,

3   why ARF would have exercised options in AIT?

4     A.   The options were normally granted at a very low

5   price, so it was a nominal amount and owns a lot of

6   shares.  In normal circumstances, one should exercise.

7     Q.   Whether or not there was a sale pending?

8     A.   The earlier you exercise, the better you are

9   with that price.

10    Q.   Other than the ownership interest in Aurora

11   Healthcare US, did ARF Partners receive any other

12   benefit from the sale?

13    A.   No.

14    Q.   Did BE Pacific receive, to your knowledge, any

15   benefit from the sale?

16         MS. CLOSE:  Calls for speculation, lacks

17   foundation.

18         THE WITNESS:  No.

19    Q.   BY MS. SCHACHNE:  Did ARF receive ownership

20   interest in Aurora Healthcare US Corp. at the closing of

21   the sale?

22    A.   Could you repeat the question.

23    Q.   In other words, was ARF's interest in Aurora

24   Healthcare simultaneous with the closing of the sale of

25   the entire sale?

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

 1                MS. CLOSE:  Vague as to time.

 2                MS. SCHACHNE:  The time is the closing of the

 3      sale.

 4                THE WITNESS:  We went through that before.  ARF

 5      have a debt, control the senior debt, and they owe, and

 6      they also loan AIT money.  So they forgave both loans,

 7      the loan position of Pharos and their loan to ARF, and

 8      receive as an offset -- from the buyer's side, the

 9      ownership of Aurora Healthcare Corporation.

10          Q.   BY MS. SCHACHNE:  I guess my question is more

11      about timing, not about what happened.  At what point in

12      time did ARF receive ownership interest in Aurora

13      Healthcare US?  Was it simultaneous with the closing of

14      the sale?

15          A.   Yes.

16          Q.   In order for it to receive that interest, was

17      it a condition that ARF waive its right to loan

18      repayment?

19          A.   Yes.

20          Q.   In order for the sale to go through, ARF needed

21      to waive that $4 million, approximately $4 million?

22          A.   Yes.

23          Q.   Basically, there are a number of things that

24      had to occur for the sale to go through, but ARF being

25      the primary factor in that, so that ARF had to waive its

1  interest in its loan repayment, and in turn, get equity

2  interest in Aurora Healthcare for that sale to have

3  occurred?

4      A.   Right.

5      Q.   Understood.  Has ARF been involved in any other

6  litigation other than this lawsuit?

7      A.   No.

8           MS. SCHACHNE:  I'm going to take just probably

9  about five minutes to go over my notes and then we'll be

10 back on, but I'm almost finished with this deposition.

11 Why don't we come back in five to seven minutes or so.

12          MS. CLOSE:  12:10 to put a time on it.

13          MS. SCHACHNE:  That works for me.  Let's go off

14 the record.

15          (Recess taken from 3:02 to 3:11)

16          MS. SCHACHNE:  Back on the record.

17          Ms. Cheng, I don't have any more questions for

18 you today.  I don't know whether or not your counsel

19 does or Ms. Riparbelli, but I'm done today.  So thank

20 you so much for your time.

21          MS. CLOSE:  I have no questions.

22          MS. RIPARBELLI:  Nothing from us.

23          MS. SCHACHNE:  Okay, thank you.  Off the

24 record.

25          (The deposition adjourned at 3:12 p.m.)

```
 1                 DEPOSITION OFFICER'S CERTIFICATE

 2

 3    UNITED STATES DISTRICT COURT          )
                                            )
 4    CENTRAL DISTRICT OF CALIFORNIA        )

 5        I, PEGGY TSUJIMOTO, CSR, hereby certify:

 6        I am a duly qualified Certified Shorthand Reporter in
      the State of California, holder of Certificate Number
 7    5229 issued by the Court Reporters Board of California
      and which is in full force and effect  (Fed. R. Civ. P.
 8    28(a).

 9        I am authorized to administer oaths or affirmations
      pursuant to California Code of Civil Procedure, Section
10    2093(b); and prior to being examined, the deponent was
      first duly sworn by me.  (Fed. R. Civ. P. 28(a),
11    30(f)(1)).

12        I am not a relative or employee or attorney or
      counsel of any of the parties, nor am I a relative or
13    employee of such attorney or counsel, nor am I
      financially interested in this action.  (Fed. R. Civ. P.
14    28).

15        I am the deposition officer that stenographically
      recorded the testimony in the foregoing deposition and
16    the foregoing transcript is a true record of the
      testimony given by the deponent.  (Fed. R. Civ. P.
17    30(f)(1)).

18        Before completion of the deposition, review of the
      transcript [   ] was [ x ] was not requested.  If
19    requested, any changes made by the deponent (and provided
      to the reporter) during the period allowed, are appended
20    hereto.  (Fed. R. Civ. P. 30(e)).

21             Dated:  October 4, 2021

22

23                                _____

24                                PEGGY TSUJIMOTO, CSR
                                  State of California
25                                CSR License No. 5229
```

90

# **DEPOSITION ERRATA SHEET**

DEPOSITION OF OLIVIA HO CHENG (ARF Representative)

*Castel v. Wilson, etc., et. al.*

2:19-cv-09336-ODW-PVC

| Page / Line | Correction | Reason |
|---|---|---|
| 16/24 | **Change from: Aurora dedicated the breast MRI technology**<br><br>**Change to: Aurora Dedicated Breast MRI technology** | **Transcription Error** |
| 37/7 | **Change from: The goal of Aurora technology was rescued**<br><br>**Change to: The goal was – Aurora technology would be rescued** | **Transcription Error** |
| 47/1 | **Change from: all in China and in U.S.**<br><br>**Change to: all over in China and in US** | **Transcription Error** |
| 50/3 | **Change from: If we could go back to sort of the**<br><br>**Change to: If you could go back to sort out of the** | **Transcription Error** |
| 50/6 | **Change from: involuntary**<br><br>**Change to: voluntary** | **Transcription Error** |
| 52/13 | **Change from: why don't you and see a third party;**<br><br>**Change to: why don't you say it was a third party** | **Transcription Error** |

Signature: _____   Date: _____

## $

**$100,000** [1] - 21:3
**$15** [1] - 38:17
**$200,000** [1] - 21:10
**$300,000** [1] - 61:5
**$425,000** [2] - 68:13, 68:23
**$500,000** [4] - 44:10, 44:14, 44:17, 45:1

## 1

**1** [15] - 3:7, 11:1, 11:6, 11:10, 11:15, 25:10, 25:11, 25:14, 25:23, 29:2, 38:14, 38:16, 41:13, 41:16, 71:6
**1.5** [10] - 25:14, 25:23, 35:11, 35:16, 35:23, 35:25, 37:1, 41:1, 71:1, 71:3
**10** [1] - 73:5
**100** [1] - 55:9
**11** [1] - 3:7
**12** [4] - 3:13, 3:21, 22:3, 73:2
**12:03** [3] - 4:3, 6:1, 6:6
**12:10** [1] - 89:12
**14** [1] - 3:10
**1400** [1] - 4:25
**15** [8] - 38:18, 38:20, 38:25, 41:5, 43:4, 43:5, 45:3, 45:4
**1999** [1] - 75:12
**1:13** [1] - 43:19
**1:26** [1] - 43:19
**1st** [2] - 15:13, 64:18

## 2

**2** [16] - 3:10, 3:14, 3:17, 3:24, 14:3, 14:9, 14:12, 28:19, 30:6, 30:7, 34:5, 41:13, 44:23, 60:3, 63:12, 77:6
**20** [1] - 44:10
**200,000** [1] - 21:8
**2012** [1] - 46:19
**2013** [2] - 46:19, 49:4
**2015** [19] - 3:13, 3:17, 13:25, 15:13, 17:13, 20:13, 22:3, 47:8, 60:2, 60:20, 64:14, 64:18, 67:2, 67:5, 72:11, 72:15, 73:15, 84:24, 84:25
**2016** [4] - 3:23,

75:13, 77:5, 77:13
**2020** [1] - 4:16
**2021** [7] - 1:19, 2:4, 3:4, 4:2, 6:1, 6:5, 90:21
**2093(b** [1] - 90:10
**22** [7] - 1:19, 2:4, 3:4, 3:12, 4:2, 6:1, 6:5
**23** [5] - 3:23, 12:20, 12:23, 77:5, 77:13
**24** [1] - 77:1
**25th** [2] - 72:15, 73:14
**28** [2] - 3:16, 60:2
**28(a** [1] - 90:10
**28(a)** [1] - 90:8
**28)** [1] - 90:14
**287-9501** [1] - 5:3
**28th** [1] - 60:20
**29** [2] - 3:16, 60:2
**29th** [2] - 64:14, 67:2
**2:19** [1] - 72:3
**2:19-cv-09336-ODW-PVC** [2] - 1:7, 6:16
**2:30** [1] - 72:3

## 3

**3** [9] - 3:11, 3:12, 12:19, 14:3, 14:7, 22:4, 28:18, 28:20, 30:9
**30(b)(4** [1] - 6:10
**30(b)(6** [2] - 3:8, 11:8
**30(e))** [1] - 90:20
**30(f)(1))** [2] - 90:11, 90:17
**319** [1] - 6:9
**333** [1] - 4:16
**34** [1] - 3:14
**35** [1] - 20:15
**3:02** [1] - 89:15
**3:11** [1] - 89:15
**3:12** [1] - 89:25

## 4

**4** [10] - 3:14, 12:19, 34:6, 38:14, 42:16, 42:24, 43:24, 88:21, 90:21
**4.3** [4] - 42:15, 42:16, 42:25, 43:2
**40** [2] - 20:15, 33:19
**408** [1] - 5:3
**415** [2] - 1:24, 4:19
**425,000** [1] - 68:4
**45** [1] - 10:12
**477-2100** [1] - 5:12

## 5

**5** [3] - 3:15, 12:19, 60:4
**500,000** [1] - 44:20
**5229** [4] - 1:21, 6:4, 90:7, 90:25

## 6

**6** [5] - 3:9, 3:18, 11:9, 44:3, 73:3
**60** [2] - 3:15, 4:25
**60s** [1] - 48:20

## 7

**7** [6] - 2:8, 3:13, 3:22, 22:3, 23:24, 77:7
**7-29-2015** [1] - 60:21
**72** [1] - 3:18
**77** [1] - 3:22

## 8

**8** [1] - 21:23
**828-1919** [1] - 1:24
**856-9001** [1] - 4:19

## 9

**9** [1] - 59:22
**9110** [1] - 5:9
**92618** [1] - 5:10
**94104** [1] - 4:17
**949** [1] - 5:12
**95113-2396** [1] - 5:1

## A

**A-R-F** [1] - 39:23
**abbreviations** [1] - 17:8
**ability** [1] - 37:10
**able** [12] - 11:11, 11:16, 14:4, 16:14, 25:25, 27:1, 27:9, 50:12, 50:16, 51:2, 69:22, 69:25
**absolutely** [1] - 70:9
**accept** [4] - 52:13, 63:21, 65:9, 65:22
**accomplished** [1] - 51:6
**according** [3] - 36:21, 45:3, 68:17
**accurate** [5] - 15:24, 35:15, 50:23, 53:7, 53:12
**achieved** [1] - 31:13
**achieving** [1] - 69:25
**acquire** [2] - 51:6, 54:14

**acquired** [1] - 85:16
**Act** [1] - 6:9
**act** [2] - 32:21, 33:14
**acting** [1] - 20:19
**action** [2] - 65:20, 90:13
**activities** [1] - 79:16
**activity** [1] - 79:15
**acts** [1] - 33:11
**actual** [1] - 67:9
**addition** [1] - 70:25
**additional** [2] - 70:16, 86:21
**address** [9] - 57:15, 57:19, 57:22, 58:19, 58:21, 58:23, 59:7, 59:15, 60:18
**addresses** [3] - 59:10, 59:17, 60:12
**adjourned** [1] - 89:25
**administer** [1] - 90:9
**administering** [1] - 6:10
**admonitions** [1] - 8:10
**advance** [1] - 8:6
**advised** [1] - 2:13
**adviser** [6] - 18:21, 23:13, 27:22, 27:25, 32:21, 35:20
**Adviser** [1] - 23:6
**advisers** [1] - 19:10
**Advisor** [2] - 3:12, 22:2
**advisor** [1] - 36:11
**affirmations** [1] - 90:9
**afloat** [1] - 32:4
**afternoon** [2] - 6:2, 7:17
**agent** [2] - 15:19
**ago** [1] - 57:2
**agree** [5] - 56:19, 83:5, 83:7
**agreed** [4] - 37:3, 55:3, 66:16, 66:21
**agreement** [16] - 26:12, 28:6, 28:9, 28:10, 30:15, 32:25, 33:4, 55:8, 55:9, 67:9, 68:16, 68:17, 72:14, 72:23, 75:17, 75:21
**Agreement** [4] - 3:18, 3:21, 72:24, 73:1
**agreements** [1] - 30:18
**ahead** [10] - 14:3, 21:25, 26:21, 28:23,

30:24, 41:11, 63:21, 64:17, 65:23, 72:21
**air** [2] - 54:7, 63:10
**AIT** [120] - 17:2, 17:5, 17:17, 20:16, 20:23, 20:24, 20:25, 21:13, 21:17, 21:19, 23:13, 24:14, 24:20, 24:21, 24:25, 25:4, 25:5, 27:25, 28:12, 28:16, 29:5, 30:2, 30:11, 30:12, 31:5, 32:3, 32:20, 32:25, 33:4, 33:25, 35:13, 37:2, 37:21, 38:24, 41:1, 41:2, 42:23, 45:21, 46:3, 46:11, 48:5, 48:6, 49:12, 49:21, 50:13, 50:22, 51:3, 51:4, 51:5, 51:13, 51:22, 51:25, 52:6, 52:9, 52:17, 53:1, 53:4, 53:14, 54:12, 55:14, 55:19, 56:3, 56:8, 60:16, 60:24, 61:1, 61:5, 61:21, 61:24, 63:1, 64:14, 64:22, 64:23, 65:3, 65:6, 65:8, 66:5, 66:10, 66:12, 68:19, 68:25, 69:1, 69:4, 69:5, 69:13, 69:14, 69:15, 69:20, 69:21, 69:25, 70:10, 70:15, 70:16, 71:2, 71:5, 71:13, 71:17, 71:21, 73:12, 74:21, 74:24, 75:3, 75:9, 75:14, 75:16, 76:1, 76:2, 85:17, 86:1, 86:12, 86:20, 87:3, 88:6
**AIT's** [16] - 25:21, 32:21, 37:2, 46:16, 48:2, 64:16, 70:1, 77:18, 80:18, 81:8, 81:18, 82:6, 84:9, 86:1
**al** [1] - 6:14
**alive** [2] - 69:18, 70:1
**allow** [1] - 8:25
**allowed** [1] - 90:19
**almost** [1] - 89:10
**alternative** [1] - 51:7
**ambiguous** [5] - 37:6, 54:19, 62:22, 66:7, 83:3
**amended** [3] - 10:6, 12:1, 12:7
**Amended** [4] - 3:7, 3:19, 11:7, 72:25

DEPOSITION OF OLIVIA HO CHENG (ARF)
September 22, 2021

**amount** [9] - 25:8, 25:23, 35:11, 55:3, 55:16, 71:1, 71:3, 71:4, 87:5

**Andover** [1] - 4:7

**Anna** [1] - 57:13

**anonyme** [1] - 1:5

**answer** [8] - 2:13, 9:8, 16:3, 16:17, 27:20, 39:11, 39:13, 85:11

**answered** [3] - 30:24, 52:3, 84:13

**answering** [1] - 22:21

**anticipate** [1] - 9:1

**anyway** [2] - 81:4, 81:7

**appearance** [1] - 7:5

**appearances** [1] - 4:12

**appeared** [1] - 4:3

**appearing** [1] - 6:23

**APPEL** [1] - 4:24

**appended** [1] - 90:19

**appoint** [2] - 52:1

**appreciate** [1] - 21:13

**apprised** [1] - 12:24

**approval** [1] - 86:10

**approve** [1] - 86:14

**approximate** [1] - 66:20

**areas** [5] - 12:18, 12:20, 12:25, 13:4, 13:9

**ARF** [230] - 1:9, 1:17, 3:9, 3:14, 5:6, 6:13, 6:24, 7:22, 7:24, 8:17, 8:20, 10:23, 11:8, 11:15, 12:4, 13:7, 13:14, 13:18, 13:20, 13:22, 13:24, 13:25, 14:2, 14:13, 14:17, 15:6, 15:20, 15:25, 16:18, 16:19, 17:2, 17:13, 17:24, 18:2, 18:5, 18:11, 18:13, 18:22, 18:24, 18:25, 19:3, 19:7, 19:8, 19:10, 19:12, 20:3, 20:5, 20:6, 20:10, 20:13, 25:12, 25:18, 25:19, 25:20, 26:1, 26:5, 26:12, 27:3, 28:11, 29:6, 29:7, 29:13, 29:16, 29:18, 29:20, 29:21, 30:18, 30:21, 31:13, 31:18, 32:14, 32:17, 32:19,

32:22, 33:5, 33:7, 33:9, 33:10, 33:13, 33:16, 33:21, 34:5, 35:1, 35:5, 35:8, 35:10, 35:13, 35:15, 36:9, 36:13, 37:1, 37:4, 39:22, 39:25, 40:6, 40:13, 40:15, 40:25, 41:7, 42:3, 42:4, 42:11, 42:22, 43:7, 43:8, 43:9, 43:10, 43:12, 43:25, 44:3, 44:12, 44:21, 45:15, 49:11, 50:12, 50:16, 50:19, 51:13, 51:16, 51:20, 51:22, 52:5, 52:14, 52:15, 52:18, 53:6, 53:11, 53:15, 54:2, 54:4, 54:5, 54:10, 54:14, 55:17, 56:1, 56:3, 56:6, 56:7, 56:12, 57:9, 57:16, 57:17, 57:19, 58:24, 59:8, 59:19, 59:22, 60:25, 61:2, 61:20, 61:23, 64:18, 66:17, 66:21, 67:9, 67:13, 68:1, 68:5, 68:25, 69:20, 69:24, 70:7, 70:12, 70:15, 70:16, 71:2, 71:4, 71:5, 71:10, 71:12, 71:13, 71:15, 71:17, 73:8, 73:18, 74:1, 74:12, 74:18, 74:21, 74:22, 74:23, 75:3, 75:5, 75:6, 75:9, 75:11, 75:17, 77:1, 78:5, 78:6, 78:8, 78:12, 79:10, 79:20, 79:22, 79:25, 80:3, 80:9, 80:11, 80:14, 80:17, 80:22, 81:5, 81:8, 81:17, 82:5, 83:24, 85:15, 86:3, 86:5, 86:18, 87:3, 87:11, 87:19, 88:4, 88:7, 88:12, 88:17, 88:20, 88:24, 88:25, 89:5

**ARF's** [22] - 30:23, 30:25, 31:9, 31:12, 31:16, 34:8, 36:18, 36:19, 49:19, 50:2, 51:11, 67:19, 69:11, 69:12, 70:5, 72:9, 73:11, 74:6, 75:15, 77:23, 86:1, 87:23

**arms** [2] - 50:8, 50:11

**assets** [20] - 37:2,

38:16, 38:18, 38:24, 41:5, 41:17, 46:11, 46:16, 47:12, 48:2, 48:9, 69:16, 75:13, 77:18, 80:11, 80:18, 81:8, 81:18, 82:6, 86:1

**assignment** [1] - 30:6

**Assignment** [2] - 3:19, 72:25

**assist** [6] - 24:14, 24:20, 24:25, 30:11, 31:22, 41:7

**assistance** [2] - 75:19, 76:17

**assisting** [1] - 44:18

**associate** [1] - 58:8

**ASSOCIATES** [2] - 1:23, 4:15

**assume** [4] - 25:13, 33:11, 34:8, 63:9

**assumed** [2] - 73:24

**assumes** [1] - 24:16

**assuming** [3] - 11:21, 44:16, 73:18

**Attorney** [3] - 4:18, 5:2, 5:11

**attorney** [6] - 9:16, 9:18, 9:20, 10:8, 90:12, 90:13

**attorney's** [1] - 83:8

**attributed** [1] - 25:8

**August** [5] - 3:13, 22:3, 63:22, 65:23, 85:1

**AURORA** [1] - 4:22

**Aurora** [57] - 16:19, 16:22, 16:24, 17:5, 20:7, 25:20, 29:4, 31:15, 31:21, 36:11, 36:12, 36:18, 37:7, 37:18, 41:2, 41:4, 41:18, 42:10, 42:14, 42:18, 42:19, 42:24, 44:23, 45:16, 47:12, 48:1, 50:13, 50:22, 57:24, 58:25, 65:3, 69:5, 77:18, 78:7, 78:11, 80:1, 80:2, 80:7, 80:12, 80:18, 80:21, 80:25, 81:5, 81:9, 81:14, 81:18, 81:21, 81:25, 82:2, 82:6, 87:10, 87:20, 87:23, 88:9, 88:12, 89:2

**Aurora's** [2] - 38:16, 38:18

**authority** [2] - 54:16,

54:23

**authorized** [1] - 90:9

**available** [1] - 59:1

**avoided** [1] - 65:17

**aware** [2] - 24:13, 24:19

# B

**b-e** [1] - 58:7

**balance** [1] - 44:10

**ball** [1] - 85:9

**bankrupt** [2] - 31:8, 31:14

**bankruptcy** [21] - 31:2, 37:8, 50:7, 63:24, 64:1, 64:3, 64:4, 64:5, 64:7, 64:12, 64:22, 65:9, 65:16, 69:20, 69:24, 70:6, 70:8, 70:11, 70:22, 70:24, 71:23

**bargain** [1] - 55:18

**barking** [1] - 33:2

**based** [2] - 23:18, 46:25

**bathroom** [1] - 43:17

**BE** [68] - 4:1, 18:16, 18:19, 18:20, 18:22, 18:25, 19:2, 19:6, 19:8, 19:9, 19:10, 19:13, 19:16, 19:19, 19:22, 20:10, 23:7, 23:12, 24:13, 24:20, 24:24, 25:4, 25:12, 25:19, 25:25, 26:10, 27:1, 27:12, 27:24, 28:4, 28:15, 29:3, 29:5, 29:7, 29:13, 30:1, 30:11, 30:17, 30:21, 32:15, 32:18, 32:25, 33:4, 33:16, 33:25, 35:18, 35:19, 57:21, 57:23, 57:24, 57:25, 58:2, 58:4, 58:10, 58:16, 58:17, 58:18, 59:1, 71:8, 71:9, 71:11, 87:14

**BE's** [1] - 32:20

**became** [3] - 69:1, 69:3, 69:13

**becapital.com.tw** [1] - 59:15

**because..** [1] - 83:6

**become** [1] - 36:4

**beginning** [6] - 10:5, 29:1, 31:10, 43:14, 50:2, 58:10

**behalf** [35] - 6:23, 8:17, 16:8, 25:4, 25:5,

26:5, 30:20, 33:11, 33:14, 35:4, 51:20, 51:21, 52:5, 52:8, 52:18, 52:20, 53:4, 53:5, 53:9, 53:11, 53:14, 53:20, 53:25, 54:10, 56:8, 56:12, 56:15, 57:15, 57:18, 58:24, 59:8, 59:19, 73:25, 80:23, 81:7

**benefit** [2] - 87:12, 87:15

**best** [4] - 9:5, 21:12, 22:8, 63:7

**better** [6] - 7:19, 45:24, 46:7, 69:9, 87:8

**between** [17] - 3:15, 3:22, 25:13, 25:23, 32:25, 33:4, 33:16, 49:4, 53:25, 60:1, 60:24, 66:5, 67:9, 67:13, 75:17, 77:4, 77:10

**big** [1] - 48:17

**bills** [1] - 79:17

**bind** [2] - 8:20, 8:21

**binding** [1] - 6:10

**bit** [5] - 8:11, 36:9, 74:5, 75:2, 82:24

**bluff** [1] - 63:22

**Board** [1] - 90:7

**BOLLARD** [1] - 5:8

**bottom** [4] - 25:11, 28:19, 37:23, 44:6

**box** [2] - 14:2, 14:12

**break** [6] - 9:7, 43:21, 71:25, 72:5, 72:8, 72:13

**breaks** [1] - 9:6

**breast** [2] - 16:24, 16:25

**bridge** [1] - 31:18

**bring** [1] - 10:25

**broker** [2] - 54:23, 56:16

**BROWN** [1] - 5:8

**Bush** [1] - 4:16

**business** [5] - 36:22, 40:20, 47:3, 63:7

**buy** [11] - 31:7, 32:5, 48:9, 51:4, 51:23, 52:10, 53:24, 54:22, 61:2, 61:8, 69:16

**Buy** [1] - 38:16

**buyer** [18] - 30:2, 31:10, 31:21, 31:25, 32:5, 32:7, 63:8, 81:15, 81:22, 82:1, 82:3, 82:13, 82:16,

82:19, 83:1, 83:9,
83:22
**buyer's** [1] - 88:8
**buyers** [3] - 30:12,
31:7, 56:2
**buying** [1] - 53:18
**BY** [61] - 7:15, 7:16,
11:11, 14:11, 16:9,
21:20, 22:7, 22:22,
23:22, 24:8, 24:18,
24:24, 25:3, 25:9,
27:5, 27:23, 28:4,
28:11, 29:15, 30:1,
30:7, 31:3, 31:9,
32:19, 33:3, 34:9,
36:8, 37:12, 37:20,
38:12, 45:11, 46:9,
49:19, 50:1, 52:14,
52:22, 53:12, 54:1,
54:15, 55:1, 56:18,
60:6, 61:15, 63:4,
63:12, 65:6, 65:21,
66:4, 70:7, 73:4,
73:25, 74:5, 76:14,
77:9, 83:7, 84:4, 85:2,
86:11, 87:1, 87:19,
88:10

## C

**C.W** [1] - 38:6
**cac@jbblaw.com** [1]
- 5:13
**calculation** [2] -
86:9, 86:25
**CALIFORNIA** [2] -
1:2, 90:4
**California** [10] - 4:5,
4:17, 5:1, 5:10, 6:3,
6:15, 90:6, 90:7, 90:9,
90:24
**cancer** [1] - 16:25
**candidate** [2] - 46:4,
46:8
**candidates** [2] -
46:6, 46:15
**cannot** [5] - 11:18,
25:7, 39:12, 51:5,
69:15
**capable** [2] - 46:7,
80:22
**capacity** [2] - 20:21,
45:23
**Capital** [7] - 29:7,
57:21, 57:24, 58:4,
58:16, 59:1, 71:9
**capital** [10] - 26:1,
27:2, 27:9, 35:11,
35:18, 35:22, 35:23,
68:11, 70:16, 71:2
**capitalize** [4] - 25:19,

26:1, 27:2, 41:1
**care** [6] - 71:20,
71:21, 82:20, 83:1,
83:9, 83:11
**carried** [1] - 52:11
**carry** [8] - 20:7, 32:6,
37:11, 44:24, 50:16,
54:23, 56:16, 76:1
**carrying** [2] - 33:11,
76:17
**case** [6] - 6:14,
61:19, 79:20, 82:23,
82:24, 83:11
**Case** [2] - 1:7, 6:16
**cash** [3] - 68:6, 68:7,
68:11
**Castel** [11] - 6:14,
80:14, 80:17, 84:19,
84:20, 84:21, 84:23,
85:5, 85:8, 85:13,
85:22
**CASTEL** [1] - 1:4
**Catherine** [2] - 6:23,
83:6
**catherine** [1] - 26:4
**CATHERINE** [1] -
5:11
**Cayman** [1] - 82:2
**cease** [1] - 47:13
**Center** [1] - 5:9
**CENTRAL** [2] - 1:2,
90:4
**Central** [1] - 6:15
**CEO** [11] - 32:10,
37:13, 37:18, 45:16,
45:20, 46:17, 50:22,
52:1, 60:16, 81:5,
83:14
**certain** [1] - 54:17
**certainly** [2] - 16:15,
33:14
**CERTIFICATE** [1] -
90:1
**Certificate** [5] - 3:11,
14:7, 14:12, 14:16,
90:6
**Certified** [5] - 1:23,
4:4, 6:3, 26:25, 90:6
**CERTIFIED** [3] - 6:2,
7:3, 7:9
**certify** [1] - 90:5
**cetera** [2] - 20:20,
33:12
**chain** [5] - 3:15,
3:22, 60:1, 60:19,
77:4
**chairman** [2] - 50:22,
57:24
**chance** [2] - 59:23,
65:17

**Chang** [11] - 20:1,
20:2, 20:6, 20:11,
20:16, 20:25, 21:13,
21:16, 23:25, 40:11,
58:4
**Chang's** [1] - 24:2
**change** [9] - 16:6,
69:12, 69:14, 82:10,
82:12, 82:15, 83:12,
83:13, 83:19
**changed** [6] - 12:6,
12:7, 17:14, 43:12,
76:12, 82:9
**changes** [1] - 90:19
**changing** [1] - 76:13
**characterization** [1]
- 64:24
**charge** [1] - 48:14
**Chat** [12] - 11:13,
11:14, 11:15, 14:2,
14:12, 21:23, 34:3,
44:3, 59:22, 72:19,
76:25
**chatting** [1] - 72:8
**cheaper** [1] - 47:24
**CHENG** [7] - 1:9,
1:17, 2:3, 3:3, 4:6,
5:6, 7:12
**Cheng** [21] - 3:16,
3:23, 6:12, 6:24, 7:10,
7:17, 11:11, 16:11,
21:25, 22:7, 23:1,
31:11, 32:8, 43:21,
43:25, 60:2, 72:6,
72:21, 75:9, 77:5,
89:17
**China** [3] - 47:1,
48:19, 59:13
**Chinese** [2] - 58:11,
58:12
**choice** [3] - 48:10,
49:3, 49:5
**Chris** [12] - 3:15,
3:22, 21:19, 28:3,
33:21, 33:22, 38:3,
60:1, 65:1, 77:4,
78:21, 78:24
**Christopher** [3] -
5:15, 6:25, 7:8
**CHRISTOPHER** [2] -
1:8, 5:7
**circulated** [1] - 82:8
**circumstances** [2] -
9:25, 87:6
**Civ** [5] - 90:7, 90:10,
90:13, 90:16, 90:20
**Civil** [1] - 90:9
**clarification** [2] -
16:13, 16:14
**clarify** [5] - 18:10,

29:19, 42:18, 69:10,
75:2
**classes** [1] - 85:23
**clean** [1] - 63:8
**click** [2] - 11:15, 44:2
**client** [1] - 9:25
**cliff** [2] - 76:2
**Close** [1] - 6:23
**CLOSE** [62] - 5:11,
6:23, 9:21, 14:23,
16:2, 21:18, 22:16,
23:16, 24:5, 24:16,
24:22, 25:1, 25:6,
26:2, 26:10, 26:16,
27:17, 28:1, 28:7,
29:10, 29:23, 30:3,
30:24, 31:4, 32:16,
33:1, 36:6, 37:6,
37:15, 38:11, 45:10,
46:5, 49:14, 49:18,
49:23, 52:7, 52:19,
53:8, 53:22, 54:11,
54:19, 56:13, 61:12,
62:22, 63:6, 64:24,
65:11, 66:2, 66:7,
70:3, 73:21, 74:2,
76:8, 83:3, 84:3, 85:1,
86:7, 86:23, 87:16,
88:1, 89:12, 89:21
**closed** [3] - 62:6,
62:8, 75:13
**closing** [4] - 87:20,
87:24, 88:2, 88:13
**Code** [1] - 90:9
**coincidental** [1] -
58:6
**college** [1] - 33:19
**comfortable** [3] -
22:17, 22:21, 23:1
**commencing** [1] -
4:2
**comment** [1] - 38:1
**commission** [7] -
27:24, 28:5, 28:12,
28:15, 44:25, 45:8,
76:6
**Commonwealth** [3] -
3:10, 14:6, 15:3
**communicate** [4] -
57:18, 58:24, 59:8,
59:19
**communicated** [1] -
56:24
**communicating** [3] -
54:1, 56:6, 56:7
**communication** [7] -
57:3, 57:14, 84:20,
85:4, 85:8, 85:12,
85:14
**companies** [8] -

46:15, 46:19, 48:1,
48:12, 48:15, 48:17,
62:13, 80:4
**Company** [1] - 23:8
**company** [49] - 1:4,
1:10, 8:21, 13:14,
13:15, 14:21, 16:8,
18:16, 18:20, 24:15,
25:14, 29:4, 29:5,
29:12, 29:21, 32:1,
32:11, 33:11, 33:13,
36:5, 36:6, 36:7,
36:18, 37:16, 42:6,
43:3, 45:4, 45:20,
46:10, 46:21, 46:22,
47:2, 47:12, 47:14,
47:21, 47:22, 48:3,
48:14, 49:1, 49:2,
50:6, 61:18, 63:25,
68:8, 70:22, 79:19,
80:23
**compensate** [1] -
45:12
**compensated** [3] -
75:19, 76:4, 76:5
**Compensation** [1] -
44:7
**compensation** [6] -
44:8, 44:14, 45:1,
45:14, 76:17, 76:19
**complete** [1] - 69:22
**completing** [1] - 29:2
**completion** [1] -
90:18
**complicated** [1] -
48:7
**compound** [2] -
14:23, 37:15
**concern** [1] - 63:11
**concluded** [1] -
67:22
**conclusion** [7] -
52:8, 52:19, 53:22,
54:20, 56:13, 73:22,
86:7
**condition** [5] - 69:7,
71:12, 71:16, 71:18,
88:17
**conducting** [1] -
79:15
**conflict** [1] - 78:22
**confused** [1] - 29:20
**confusing** [3] - 17:9,
81:4, 82:7
**conglomerates** [1] -
48:17
**connected** [1] - 27:6
**connections** [1] -
27:8
**consent** [12] - 81:8,

81:11, 81:13, 81:18,
81:21, 81:25, 82:2,
82:8, 82:11, 82:15,
86:2, 86:3
 **consented** [3] -
81:17, 82:5, 86:5
 **consequence** [1] -
82:18
 **consult** [1] - 80:17
 **consulting** [5] - 29:6,
29:8, 29:13, 32:24,
33:4
 **Consulting** [1] - 23:8
 **content** [1] - 12:5
 **continue** [3] - 45:5,
46:23, 48:6
 **continued** [5] -
52:16, 52:17, 53:17,
53:20, 54:13
 **continues** [1] - 37:17
 **contributed** [1] -
42:5
 **control** [1] - 88:5
 **conversation** [1] -
56:16
 **convince** [1] - 48:5
 **cooperation** [1] -
58:11
 **CORP** [1] - 4:23
 **Corp** [10] - 37:18,
78:11, 80:7, 80:12,
80:22, 81:1, 81:5,
81:9, 81:22, 87:20
 **corporate** [1] - 6:13
 **corporation** [5] -
82:13, 82:16, 83:12,
83:15, 83:16
 **Corporation** [8] -
42:20, 77:19, 78:7,
80:19, 81:14, 81:19,
82:1, 88:9
 **correct** [101] - 7:22,
7:23, 8:13, 8:18, 16:1,
16:5, 17:25, 18:12,
20:3, 21:3, 29:16,
29:17, 30:8, 32:15,
33:23, 34:20, 37:14,
38:25, 40:16, 41:20,
42:12, 43:11, 44:12,
46:4, 49:13, 50:14,
50:15, 50:19, 51:1,
51:15, 51:17, 51:18,
51:20, 52:6, 53:21,
54:4, 55:14, 55:15,
55:20, 55:21, 55:25,
56:4, 56:9, 56:10,
56:22, 56:23, 57:1,
60:7, 60:8, 60:13,
61:21, 61:22, 63:15,
63:16, 64:8, 64:19,

64:20, 65:10, 67:3,
67:6, 67:24, 68:23,
69:1, 69:2, 69:22,
70:2, 70:13, 70:14,
71:7, 72:11, 72:12,
74:8, 74:9, 74:11,
74:21, 74:25, 75:3,
75:4, 77:10, 77:11,
77:19, 77:20, 78:16,
78:17, 79:11, 80:1,
80:2, 80:8, 81:19,
81:20, 82:4, 83:22,
83:23, 83:25, 84:19,
85:3, 85:17, 85:18,
85:21, 85:23, 85:24
 **correctly** [1] - 48:3
 **counsel** [6] - 6:17,
6:19, 12:5, 89:18,
90:12, 90:13
 **Counsel** [1] - 49:16
 **count** [1] - 33:21
 **couple** [1] - 11:23
 **course** [2] - 56:18,
65:19
 **COURT** [2] - 1:1,
90:3
 **court** [2] - 72:20,
85:9
 **Court** [8] - 6:15,
11:1, 21:24, 26:23,
34:3, 59:24, 77:2,
90:7
 **CRC** [1] - 55:9
 **created** [1] - 47:9
 **credited** [2] - 42:15,
43:1
 **creditor** [7] - 50:5,
65:8, 69:1, 69:4,
69:13, 69:21, 70:13
 **creditors** [8] - 31:6,
63:2, 70:10, 70:20,
70:21, 70:23
 **CSR** [5] - 1:21, 6:4,
90:5, 90:24, 90:25
 **cumulatively** [2] -
10:7
 **current** [1] - 6:8
 **cut** [1] - 61:13
 **CW1** [2] - 38:1, 38:2
 **cwilson@**
**wilsonoskam.com** [1]
- 60:15

**D**

 **date** [4] - 6:4, 15:12,
67:2, 73:14
 **dated** [8] - 3:13,
3:16, 3:23, 22:2, 60:2,
60:20, 77:5, 77:13

**Dated** [1] - 90:21
 **dates** [1] - 12:6
 **deal** [16] - 31:6,
48:12, 52:11, 62:19,
63:9, 64:7, 67:22,
68:5, 68:9, 68:12,
68:15, 68:18, 68:22,
71:16, 75:18
 **debt** [3] - 55:24, 88:5
 **decide** [2] - 54:25,
55:1
 **decided** [1] - 78:23
 **decision** [1] - 81:6
 **decisions** [1] - 80:23
 **dedicated** [1] - 16:24
 **Defendant** [2] - 3:8,
11:8
 **DEFENDANT** [2] -
4:22, 5:6
 **defendant** [2] - 6:24,
7:2
 **Defendants** [1] -
1:13
 **define** [1] - 12:15
 **definite** [1] - 63:13
 **definition** [1] - 56:15
 **depended** [1] - 59:11
 **deponent** [6] - 6:11,
7:4, 7:10, 90:10,
90:16, 90:19
 **deposed** [1] - 57:6
 **DEPOSITION** [2] -
1:17, 90:1
 **deposition** [28] -
6:12, 7:6, 7:20, 8:2,
8:8, 8:15, 8:16, 9:12,
9:20, 9:22, 9:23, 10:1,
10:4, 10:5, 10:6,
10:20, 12:4, 12:18,
13:1, 26:20, 43:22,
44:7, 79:9, 89:10,
89:25, 90:15, 90:15,
90:18
 **Deposition** [4] - 2:3,
3:3, 3:8, 11:8
 **designed** [1] - 16:25
 **detail** [1] - 22:10
 **details** [3] - 15:6,
54:25, 55:1
 **detection** [1] - 16:25
 **determine** [1] - 61:24
 **determined** [1] -
55:4
 **develop** [2] - 37:17,
45:6
 **DEVLIN** [1] - 1:11
 **diagnosis** [1] - 17:1
 **dictate** [2] - 61:10,
61:18
 **different** [6] - 8:15,

29:21, 33:17, 58:1,
58:3
 **difficult** [1] - 50:18
 **directly** [4] - 30:18,
48:2, 52:18, 54:1
 **director** [11] - 13:19,
13:21, 17:25, 18:7,
18:8, 25:18, 29:15,
33:10, 33:14, 33:15,
64:13
 **directors** [3] - 18:2,
18:5, 18:10
 **dirty** [1] - 63:10
 **disclosed** [1] - 63:5
 **discussed** [4] -
76:15, 77:21, 77:22,
84:22
 **discussing** [1] -
60:24
 **Discussion** [1] -
39:16
 **discussion** [6] -
46:24, 54:13, 55:7,
75:22, 75:23, 75:24
 **dissolved** [2] - 43:7,
79:12
 **distributed** [2] -
43:5, 79:13
 **DISTRICT** [4] - 1:1,
1:2, 90:3, 90:4
 **District** [2] - 6:15
 **dividends** [1] - 80:2
 **document** [44] -
11:12, 11:16, 11:25,
12:9, 12:10, 12:17,
14:19, 14:22, 15:1,
15:10, 15:13, 15:15,
15:18, 22:1, 23:6,
23:10, 23:18, 23:24,
24:20, 25:9, 28:18,
29:10, 34:9, 34:12,
34:19, 34:23, 35:4,
35:7, 36:17, 38:13,
39:4, 39:22, 44:1,
44:5, 49:6, 49:14,
51:10, 65:11, 72:22,
73:5, 73:11, 73:14,
73:17, 73:21
 **documentation** [21]
- 9:13, 9:16, 11:19,
12:12, 15:2, 15:4,
22:6, 23:3, 23:14,
30:13, 36:21, 40:19,
49:25, 66:22, 67:1,
67:8, 67:12, 67:16,
68:4, 73:23, 74:4
 **documents** [4] -
9:14, 10:13, 10:16,
22:12
 **Dog** [1] - 33:2

**dollars** [2] - 70:25,
71:8
 **done** [7] - 10:3, 10:6,
52:11, 54:24, 55:10,
75:21, 89:19
 **double** [1] - 21:8
 **down** [5] - 12:19,
36:8, 46:17, 49:3,
60:19
 **drafted** [5] - 14:22,
15:1, 34:12, 34:23,
35:4
 **Drive** [1] - 5:9
 **drop** [1] - 36:8
 **dropped** [2] - 14:1,
34:2
 **due** [1] - 10:17
 **duly** [4] - 4:8, 7:13,
90:6, 90:10
 **during** [2] - 56:5,
90:19

**E**

 **e-mail** [26] - 57:15,
57:17, 57:18, 57:19,
57:21, 58:19, 58:21,
58:23, 59:1, 59:3,
59:4, 59:5, 59:7,
59:10, 59:15, 59:17,
60:6, 60:9, 60:11,
60:12, 60:18, 60:23,
62:2, 77:9, 77:15,
77:17
 **E-mail** [4] - 3:15,
3:22, 60:1, 77:4
 **e-mails** [1] - 77:12
 **early** [3] - 19:14,
79:9, 84:24
 **earning** [1] - 79:25
 **effect** [1] - 90:7
 **effort** [4] - 25:8,
34:15, 34:17, 47:5
 **efforts** [1] - 64:3
 **eight** [1] - 39:3
 **either** [3] - 31:6,
75:15, 79:3
 **either/or** [1] - 76:20
 **elect** [1] - 48:9
 **electronic** [1] - 46:22
 **electronics** [1] - 47:3
 **Emergency** [1] - 6:8
 **employee** [2] -
90:12, 90:13
 **employees** [2] -
74:12, 74:14
 **end** [6] - 39:1, 42:4,
56:17, 61:13, 61:14,
76:10
 **ending** [1] - 9:1

**energy** [1] - 48:22
**engaged** [3] - 24:14, 24:20, 33:25
**Engagement** [3] - 3:12, 22:2, 23:7
**engagement** [2] - 32:20, 33:5
**English** [1] - 58:13
**enter** [3] - 47:6, 61:17
**entered** [3] - 31:19, 67:12, 68:16
**entire** [3] - 17:16, 49:12, 87:25
**entirely** [4] - 47:13, 58:1, 58:3, 61:10
**entitled** [1] - 44:3
**entity** [9] - 16:20, 26:11, 32:22, 33:7, 33:9, 44:23, 45:24, 69:15
**equal** [1] - 42:24
**equally** [1] - 43:6
**equity** [6] - 27:12, 27:13, 27:14, 27:15, 68:8, 89:1
**especially** [2] - 47:15, 48:15
**essential** [1] - 50:12
**essentially** [5] - 25:19, 40:25, 44:18, 44:21, 45:8
**EST** [2] - 4:3, 6:1
**estimate** [1] - 21:12
**estimated** [1] - 25:13
**estimation** [2] - 10:9, 21:11
**et** [3] - 6:14, 20:20, 33:12
**eventually** [1] - 51:8
**everyday** [1] - 54:21
**everywhere** [1] - 48:19
**evidence** [1] - 24:16
**exactly** [6] - 21:2, 25:7, 36:23, 40:9, 40:20, 57:4
**EXAMINATION** [1] - 7:15
**Examination** [1] - 2:7
**examined** [2] - 4:9, 90:10
**example** [5] - 54:6, 59:13, 68:7, 82:22, 82:25
**except** [1] - 18:15
**exchange** [10] - 42:10, 42:22, 60:6, 60:9, 60:11, 60:23,

62:2, 77:9, 77:15, 77:17
**exchanged** [1] - 43:1
**excluding** [1] - 7:4
**executed** [1] - 66:22
**exercise** [3] - 86:18, 87:6, 87:8
**exercised** [1] - 87:3
**Exhibit** [25] - 3:7, 3:10, 3:12, 3:14, 3:15, 3:18, 3:22, 11:1, 11:6, 11:10, 11:15, 14:3, 14:9, 14:12, 21:23, 22:4, 34:6, 43:24, 44:3, 59:22, 60:4, 73:3, 77:1, 77:7
**exhibit** [10] - 10:25, 11:2, 14:1, 14:4, 21:22, 22:8, 34:2, 59:21, 59:25, 77:3
**exist** [1] - 47:13
**existence** [1] - 13:16
**exists** [2] - 79:10, 80:6
**exit** [3] - 42:2, 42:4, 42:7
**exiting** [1] - 42:3
**expense** [1] - 64:11
**expenses** [1] - 28:20
**experience** [2] - 46:3, 63:8
**expert** [1] - 24:6
**explanation** [1] - 85:11
**expressed** [1] - 47:6
**extent** [1] - 16:14
**extreme** [1] - 82:24

## F

**facilitate** [3] - 33:5, 33:15, 51:19
**facilitating** [1] - 33:8, 33:21, 79:5
**fact** [7] - 15:16, 24:24, 37:1, 50:25, 84:14, 86:12, 86:20
**factor** [1] - 88:25
**facts** [1] - 24:16
**failed** [1] - 64:3
**fair** [3] - 22:14, 22:15, 56:11
**fairly** [1] - 8:9
**fall** [1] - 36:24
**family** [4] - 10:17, 33:19, 40:11, 40:12
**fast** [1] - 12:2
**feasible** [2] - 69:8, 69:11
**Fed** [3] - 90:7, 90:10,

90:13
**fed** [2] - 90:16, 90:20
**Federal** [1] - 6:9
**fee** [3] - 29:6, 29:8, 29:14
**fees** [1] - 28:20
**fell** [6] - 52:10, 52:17, 53:1, 53:4, 53:15, 54:12
**felt** [1] - 78:22
**FENTON** [1] - 4:24
**few** [4] - 40:5
**file** [5] - 15:10, 64:22, 65:9, 65:15
**filed** [2] - 14:22, 15:16
**filing** [3] - 63:21, 63:24, 65:23
**fill** [1] - 15:6
**Financial** [3] - 3:12, 22:2, 23:6
**financial** [8] - 18:21, 19:10, 23:13, 27:21, 27:25, 32:21, 35:20, 36:11
**financially** [1] - 90:13
**fine** [3] - 21:12, 27:19
**finish** [3] - 9:1, 9:8, 44:22
**finished** [3] - 11:25, 28:24, 89:10
**firm** [2] - 36:11, 57:25
**first** [12] - 4:8, 7:13, 20:10, 38:12, 49:6, 60:18, 63:21, 65:23, 71:4, 77:22, 90:10
**five** [16] - 29:5, 29:7, 29:13, 29:18, 40:8, 40:9, 40:12, 40:17, 43:6, 43:9, 43:10, 74:6, 74:16, 89:9, 89:11
**fly** [1] - 58:12
**following** [1] - 30:6
**follows** [1] - 7:14
**FOR** [3] - 4:14, 4:22, 5:6
**force** [4] - 70:5, 70:10, 70:21, 90:7
**forced** [3] - 69:20, 69:24, 70:8
**foreclose** [1] - 50:5
**foregoing** [2] - 90:15, 90:16
**forgave** [1] - 88:6
**form** [5] - 31:15, 36:18, 82:11, 83:16,

83:18
**formation** [1] - 43:14
**formed** [28] - 13:24, 13:25, 16:18, 16:19, 17:2, 17:13, 17:24, 18:14, 18:23, 19:7, 19:8, 20:3, 20:5, 20:14, 25:18, 30:23, 32:14, 32:17, 35:2, 35:11, 35:15, 36:9, 36:20, 37:13, 61:3, 64:18, 75:3, 75:5
**forth** [1] - 4:10
**foundation** [8] - 26:3, 28:2, 28:8, 29:11, 30:4, 86:8, 86:24, 87:17
**four** [2] - 40:12, 67:23
**fourth** [2] - 10:6, 12:7
**Fourth** [2] - 3:7, 11:7
**Foxconn** [5] - 46:24, 51:24, 54:6, 54:7, 62:12
**Francisco** [1] - 4:17
**FRCP** [2] - 3:7, 11:7
**fresher** [1] - 8:11
**front** [5] - 8:3, 11:19, 11:21, 44:1, 63:10
**fulfilled** [3] - 31:13, 37:9, 37:11
**full** [1] - 90:7
**function** [1] - 17:14
**functioned** [2] - 27:15, 27:21
**fund** [8] - 20:6, 25:13, 27:12, 27:13, 27:14, 27:16, 37:2, 65:15
**Fund** [3] - 16:19, 25:20, 29:4
**funded** [5] - 32:18, 35:18, 71:8, 71:10
**fundraising** [1] - 35:21
**funds** [9] - 24:21, 24:25, 26:12, 35:12, 42:23, 53:15, 55:19, 64:12, 66:11
**future** [1] - 50:9

## G

**gain** [1] - 76:16
**generally** [1] - 10:2
**given** [2] - 15:2, 90:16
**glad** [1] - 7:19
**global** [1] - 48:16

**gmail** [3] - 59:3, 59:5, 59:13
**goal** [22] - 20:7, 30:23, 31:9, 31:12, 31:15, 31:23, 31:24, 36:19, 37:4, 37:7, 37:9, 38:19, 38:23, 45:17, 45:19, 69:3, 69:12, 69:17, 69:22, 70:1, 70:5
**goals** [3] - 33:12, 36:23, 50:17
**government** [1] - 15:3
**grant** [2] - 77:23, 79:3
**granted** [1] - 87:4
**greatest** [1] - 45:23
**ground** [1] - 8:10
**Guaranty** [2] - 3:20, 73:1
**guess** [13] - 31:24, 33:15, 35:8, 40:24, 60:10, 62:15, 72:19, 77:16, 78:8, 80:21, 81:3, 82:10, 88:10

## H

**half** [2] - 39:2, 39:3
**halfway** [1] - 39:5
**hand** [2] - 7:11, 10:17
**handle** [1] - 45:24
**hands** [3] - 37:10, 45:18, 76:3
**hard** [1] - 81:6
**hats** [1] - 33:17
**head** [1] - 9:3
**Health** [1] - 6:9
**healthcare** [1] - 46:20
**HEALTHCARE** [1] - 4:22
**Healthcare** [26] - 37:18, 42:19, 77:19, 78:7, 78:11, 80:1, 80:7, 80:12, 80:18, 80:22, 81:1, 81:5, 81:9, 81:14, 81:18, 81:22, 81:25, 82:2, 82:6, 82:9, 87:11, 87:20, 87:24, 88:9, 88:13, 89:2
**healthier** [1] - 45:5
**hear** [1] - 7:19
**heard** [2] - 16:5, 18:16
**held** [1] - 43:9
**help** [9] - 20:6,

25:19, 33:5, 33:15, 36:12, 41:1, 57:11, 79:5
**helped** [4] - 25:4, 32:18, 51:19, 71:10
**helping** [1] - 35:20
**hereby** [1] - 90:5
**hereinafter** [1] - 4:9
**hereto** [1] - 90:20
**high** [1] - 46:19
**high-tech** [1] - 46:19
**highlights** [1] - 37:24
**highly** [2] - 47:3, 47:4
**HIWIN** [3] - 47:2, 51:24, 62:12
**HO** [7] - 1:8, 1:17, 2:3, 3:3, 4:6, 5:6, 7:12
**HOGE** [1] - 4:24
**hold** [1] - 43:8
**holder** [1] - 90:6
**honestly** [1] - 69:11
**hour** [1] - 4:2
**house** [1] - 54:22
**hundred** [3] - 19:4, 41:19, 41:22
**hypothetical** [5] - 61:12, 70:4, 76:8, 76:9, 83:4

**I**

**identification** [7] - 11:10, 14:8, 22:4, 34:6, 60:3, 73:2, 77:6
**identified** [2] - 81:14, 81:21
**identify** [1] - 7:6
**ignore** [1] - 11:2
**imagine** [1] - 59:21
**Imaging** [2] - 16:22, 17:6
**important** [4] - 8:24, 39:12, 47:16, 76:10
**INC** [1] - 4:24
**included** [1] - 60:11
**includes** [1] - 12:17
**including** [3] - 33:10, 46:24, 77:24
**incomplete** [4] - 61:12, 70:3, 76:8, 83:4
**indemnified** [2] - 68:19, 79:22
**independent** [1] - 30:14
**indirectly** [2] - 78:9, 78:10
**individual** [13] - 1:8, 1:9, 1:11, 1:12, 8:8,

8:16, 8:17, 19:25, 31:10, 31:11, 32:8, 46:10, 74:24
**individually** [1] - 75:9
**individuals** [2] - 74:16, 74:20
**industry** [3] - 46:3, 46:21, 47:7
**inevitable** [1] - 64:4
**information** [7] - 26:8, 62:7, 83:24, 83:25, 84:2, 84:7, 84:15
**informed** [2] - 12:25, 64:15
**initials** [1] - 38:5
**innovation** [5] - 47:15, 47:16, 47:17, 47:18
**input** [1] - 34:19
**instead** [1] - 42:8
**instructed** [1] - 2:13
**instructing** [3] - 64:21, 64:25, 65:1
**insurance** [1] - 79:19
**insured** [1] - 79:20
**interest** [53] - 47:6, 49:12, 49:20, 49:21, 50:13, 51:12, 51:16, 52:5, 54:4, 54:18, 55:14, 55:20, 56:4, 56:9, 57:1, 60:25, 61:25, 66:17, 66:21, 67:10, 68:2, 68:8, 68:25, 70:15, 71:5, 71:13, 72:10, 74:18, 75:8, 76:7, 76:18, 77:23, 78:3, 78:9, 78:10, 78:11, 78:23, 79:5, 80:1, 80:3, 80:7, 80:12, 85:15, 85:19, 87:10, 87:20, 87:23, 88:12, 88:16, 89:1, 89:2
**interested** - 90:13
**interpretation** [1] - 66:3
**interrupt** [1] - 27:20
**interruption** [1] - 39:10
**introduce** [1] - 7:18
**introduced** [4] - 33:20, 33:22, 36:3, 71:11
**introduction** [1] - 51:23
**invest** [4] - 32:3, 48:5, 51:4, 51:25
**investing** [2] - 19:11,

42:22
**investment** [6] - 41:20, 41:23, 41:25, 42:9, 42:10, 49:8
**investments** [6] - 49:21, 55:14, 61:20, 61:25, 67:19, 73:12
**investor** [5] - 21:13, 37:3, 51:4, 71:11, 75:8
**investors** [3] - 36:3, 36:4, 62:11
**involuntary** [2] - 50:6, 70:22
**involved** [10] - 20:10, 20:16, 32:11, 34:16, 57:7, 57:9, 64:13, 76:19, 83:21, 89:5
**involvement** [3] - 18:23, 32:20, 75:12
**iPhone** [1] - 46:25
**IPO** [1] - 46:18
**Irvine** [2] - 5:9, 5:10
**issued** [1] - 90:7
**IT** [1] - 4:1
**itself** [4] - 29:10, 31:18, 55:19, 73:22

**J**

**James** [7] - 7:2, 15:9, 15:18, 15:23, 15:25, 18:15, 74:10
**JAMES** [2] - 1:11, 4:22
**job** [5] - 16:12, 20:25, 31:16, 31:23, 32:9
**jog** [3] - 36:19, 57:11, 72:15
**joined** [1] - 59:1
**joint** [3] - 1:4, 34:15, 34:16
**JONES** [1] - 4:24
**Jose** [1] - 5:1
**JULANDER** [1] - 5:8
**July** [6] - 3:16, 60:2, 60:20, 64:14, 67:2, 67:21
**jumping** [1] - 76:2
**June** [2] - 64:16, 84:25

**K**

**keep** [3] - 32:3, 47:20, 69:17
**keeping** [2] - 62:8, 70:1
**kept** [1] - 62:5
**Kevin** [1] - 5:15

**key** [1] - 55:5
**kidding** [1] - 48:21
**kind** [6] - 26:7, 46:23, 59:3, 63:9, 65:13, 67:7
**kinds** [1] - 47:18
**Kneeland** [2] - 63:14, 63:17
**knowledge** [12] - 23:12, 23:23, 26:15, 27:9, 27:10, 30:14, 38:24, 57:8, 60:15, 70:12, 79:22, 87:14
**knowledgeable** [9] - 7:21, 10:23, 12:12, 13:4, 13:8, 13:11, 26:6, 26:7, 26:9
**known** [2] - 20:15, 33:18
**knows** [5] - 26:16, 27:7, 45:17, 51:7, 66:12
**Kovalkova** [1] - 57:7

**L**

**lacks** [8] - 26:2, 28:1, 28:7, 29:11, 30:3, 86:8, 86:24, 87:16
**landed** [1] - 76:3
**largest** [1] - 46:25
**last** [5] - 23:23, 37:23, 49:7, 67:15, 82:9
**lasted** [1] - 67:21
**late** [1] - 23:16
**laura** [1] - 7:1
**LAURA** [1] - 5:2
**laura.riparbelli@ hogefenton.com** [1] - 5:4
**Law** [4] - 4:18, 5:2, 5:11
**lawsuit** [3] - 79:18, 79:23, 89:6
**lawyer** [1] - 74:3
**lead** [1] - 48:13
**least** [3] - 24:9, 55:23, 61:13
**leave** [1] - 9:9
**left** [1] - 58:25
**legal** [11] - 12:13, 12:15, 15:21, 52:7, 52:19, 53:22, 54:20, 56:13, 73:22, 79:17, 86:7
**lending** [1] - 20:23
**lent** [1] - 20:25
**less** [2] - 43:4, 43:5
**Letter** [3] - 3:12,

22:2, 23:7
**letter** [4] - 60:21, 78:13, 84:25, 85:2
**liability** [1] - 1:10
**License** [1] - 90:25
**life** [1] - 79:7
**likely** [1] - 46:4
**Limited** [1] - 23:8
**limited** [1] - 1:10
**line** [8] - 11:3, 11:6, 21:25, 23:7, 34:4, 59:23, 72:20, 77:2
**Line** [1] - 2:14
**linen** [1] - 63:10
**Lisa** [3] - 6:21, 61:13, 72:7
**LISA** [1] - 4:18
**lisa** [2] - 22:16, 43:15, 49:17, 65:12
**Lisa's** [1] - 66:3
**lisa.schachne@ vallalaw.com** [1] - 4:20
**list** [1] - 12:23
**listed** [1] - 74:7
**listening** [1] - 7:6
**litigation** [1] - 89:6
**LLC** [11] - 1:9, 3:9, 3:14, 5:6, 6:13, 7:22, 7:24, 11:9, 14:13, 34:5, 73:9
**loaded** [1] - 72:19
**loan** [16] - 21:17, 25:14, 29:4, 35:13, 44:10, 51:22, 61:8, 61:9, 61:18, 61:21, 70:16, 88:6, 88:7, 88:17, 89:1
**loaned** [1] - 71:5
**loaning** [1] - 35:12
**loans** [2] - 42:5, 88:6
**located** [1] - 4:7
**location** [1] - 6:7
**logic** [1] - 50:4
**logically** [1] - 54:21
**look** [12] - 11:24, 14:16, 22:1, 24:4, 25:9, 34:3, 38:12, 39:4, 59:24, 72:22, 76:25, 77:3
**looking** [9] - 8:3, 8:5, 32:24, 33:3, 36:15, 36:17, 43:24, 44:5, 63:12
**looks** [3] - 30:13, 36:17, 77:25
**lost** [1] - 50:7
**low** [1] - 87:4
**luck** [1] - 58:14
**Lucy** [16] - 20:1,

20:2, 20:15, 20:16, 20:25, 21:13, 21:16, 23:25, 27:6, 33:18, 33:20, 33:22, 34:18, 36:3, 40:11, 58:4
**Luxembourg** [1] - 1:4

# M

**Madam** [6] - 11:1, 21:24, 26:23, 34:3, 59:24, 77:2
**Mafia** [1] - 82:20
**mail** [30] - 3:15, 3:22, 57:15, 57:17, 57:18, 57:19, 57:21, 58:19, 58:21, 58:23, 59:1, 59:3, 59:4, 59:5, 59:7, 59:10, 59:15, 59:17, 60:1, 60:6, 60:9, 60:11, 60:12, 60:18, 60:23, 62:2, 77:4, 77:9, 77:15, 77:17
**mails** [1] - 77:12
**main** [1] - 18:20
**maintaining** [1] - 70:1
**majority** [3] - 85:19, 86:13, 86:21
**manage** [4] - 31:11, 32:9, 45:23, 59:20
**managed** [1] - 32:7
**management** [3] - 19:11, 20:20, 77:24
**Management** [1] - 23:8
**manager** [1] - 27:16
**Managing** [1] - 44:6
**managing** [29] - 13:19, 13:21, 17:25, 18:7, 18:8, 19:2, 19:16, 19:21, 25:18, 29:15, 33:10, 33:14, 33:15, 36:4, 36:10, 36:13, 40:13, 40:14, 44:8, 44:12, 44:21, 57:9, 63:17, 74:8, 75:5, 75:6, 80:25, 81:3, 81:4
**manufacturer** [1] - 47:23
**manufacturers** [1] - 46:25
**mark** [6] - 11:1, 11:5, 14:3, 21:24, 59:22, 77:2
**marked** [11] - 11:9, 14:8, 14:12, 22:3, 34:5, 60:3, 72:20, 73:2, 73:6, 77:1, 77:6

**Market** [1] - 4:25
**market** [1] - 69:6
**marketing** [1] - 47:22
**marking** [2] - 59:24, 72:21
**marks** [1] - 34:4
**Massachusetts** [6] - 1:10, 3:10, 4:7, 6:6, 14:6, 15:3
**mean** [13] - 17:5, 18:7, 22:19, 29:19, 29:20, 33:8, 44:25, 48:15, 48:24, 59:12, 65:2, 68:15, 71:18
**meaning** [1] - 69:8
**means** [4] - 16:7, 16:19, 21:7, 29:9
**mechanical** [1] - 47:4
**medical** [2] - 46:20, 47:6
**member** [9] - 19:16, 36:10, 36:13, 40:14, 44:12, 74:8, 74:23, 75:6, 81:4
**Member's** [1] - 44:7
**member's** [1] - 44:8
**Members** [2] - 39:6, 39:18
**members** [25] - 19:2, 19:21, 35:12, 36:4, 39:19, 39:20, 39:22, 39:24, 39:25, 40:5, 40:9, 40:13, 40:15, 40:17, 40:18, 41:18, 42:22, 43:6, 43:9, 43:10, 49:8, 74:7, 74:21, 79:13
**memory** [4] - 36:19, 57:11, 57:12, 72:16
**mentioned** [4] - 53:3, 74:17, 74:20, 79:10
**mess** [1] - 63:9
**met** [1] - 7:18
**MICHAEL** [1] - 1:11
**million** [27] - 25:14, 25:23, 35:11, 35:16, 35:23, 35:25, 37:1, 38:17, 38:18, 38:20, 38:25, 41:1, 41:5, 42:15, 42:16, 42:25, 45:3, 45:4, 55:9, 70:19, 70:25, 71:1, 71:6, 71:8, 88:21
**mind** [2] - 46:10, 83:13
**minority** [1] - 80:21
**minute** [2] - 71:25, 82:9
**minutes** [4] - 10:12,

11:23, 89:9, 89:11
**misstates** [6] - 32:16, 46:5, 49:14, 53:8, 63:6, 65:11
**mixed** [4] - 33:18, 59:3, 59:9, 59:10
**model** [1] - 47:17
**monetary** [3] - 42:8, 76:6, 76:16
**money** [31] - 16:20, 19:1, 19:10, 20:23, 20:25, 24:14, 25:3, 25:20, 32:3, 36:2, 51:22, 55:23, 55:24, 56:2, 61:8, 61:10, 61:18, 61:21, 61:24, 65:5, 68:11, 70:20, 71:10, 75:1, 79:25, 80:9, 82:21, 83:2, 83:10, 88:6
**month** [4] - 10:11, 64:16, 77:18, 78:15
**months** [4] - 52:12, 54:8, 67:23, 76:11
**morning** [1] - 7:17
**most** [10] - 7:21, 10:23, 13:2, 13:3, 13:6, 13:11, 26:5, 26:6, 36:22, 48:15
**mouth** [2] - 62:6, 62:8
**move** [4] - 63:21, 65:23, 76:11
**MR** [2] - 7:8, 17:21
**MRI** [1] - 16:24
**MS** [156] - 6:21, 6:23, 7:1, 7:15, 7:16, 9:21, 9:23, 10:25, 11:11, 14:1, 14:11, 14:23, 14:24, 16:2, 16:5, 16:9, 17:19, 17:22, 21:18, 21:20, 21:22, 22:7, 22:16, 22:22, 23:16, 23:22, 24:5, 24:8, 24:16, 24:18, 24:22, 24:24, 25:1, 25:3, 25:6, 25:9, 26:2, 26:4, 26:10, 26:14, 26:16, 26:19, 26:23, 27:5, 27:17, 27:19, 27:23, 28:1, 28:4, 28:7, 28:11, 29:10, 29:15, 29:23, 30:1, 30:3, 30:7, 30:24, 31:3, 31:4, 31:9, 32:16, 32:19, 33:1, 33:3, 34:2, 34:9, 36:6, 36:8, 37:6, 37:12, 37:15, 37:20, 38:11, 38:12, 39:14, 39:17,

43:16, 43:18, 43:20, 45:10, 45:11, 46:5, 46:9, 49:14, 49:15, 49:18, 49:19, 49:23, 50:1, 52:7, 52:14, 52:19, 52:22, 53:8, 53:12, 53:22, 54:1, 54:11, 54:15, 54:19, 55:1, 56:13, 56:18, 59:21, 60:6, 61:12, 61:15, 62:22, 63:4, 63:6, 63:12, 64:24, 65:6, 65:11, 65:21, 66:2, 66:4, 66:7, 66:8, 70:3, 70:7, 71:24, 72:4, 72:18, 73:4, 73:21, 73:25, 74:2, 74:5, 76:8, 76:14, 76:25, 77:9, 83:3, 83:7, 84:3, 84:4, 85:1, 85:2, 86:7, 86:11, 86:23, 87:1, 87:16, 87:19, 88:1, 88:2, 88:10, 89:8, 89:12, 89:13, 89:16, 89:21, 89:22, 89:23
**must** [1] - 86:15
**mute** [1] - 17:20

# N

**name** [6] - 6:2, 6:18, 19:24, 23:25, 58:7, 58:13, 58:16, 58:18, 83:12, 83:18
**names** [1] - 40:10
**National** [1] - 6:8
**natural** [1] - 65:18
**necessary** [1] - 35:12
**need** [4] - 9:7, 16:13, 39:13, 43:17
**needed** [7] - 25:15, 50:10, 54:16, 86:1, 86:13, 86:21, 88:20
**needs** [2] - 22:25, 70:19
**negotiate** [6] - 50:23, 50:25, 52:5, 52:23, 54:16, 55:12
**negotiated** [7] - 50:22, 51:19, 51:21, 53:5, 53:23, 68:22, 71:16
**negotiating** [13] - 52:8, 52:10, 52:20, 53:4, 53:9, 53:10, 53:14, 54:9, 56:12, 56:20, 56:21, 56:22, 67:18
**negotiation** [10] -

52:11, 53:17, 54:12, 54:24, 55:2, 55:18, 61:17, 61:19, 63:5, 67:20
**negotiations** [10] - 52:16, 52:17, 52:18, 53:1, 53:4, 53:6, 53:20, 60:24, 65:25, 66:5
**negotiator** [1] - 53:25
**never** [8] - 56:24, 70:5, 76:21, 78:19, 79:8, 79:14, 83:1, 83:9
**new** [32] - 22:19, 30:2, 31:15, 31:21, 31:25, 32:1, 32:5, 32:7, 36:18, 37:3, 37:10, 37:12, 37:13, 41:2, 41:4, 41:17, 42:5, 42:10, 42:14, 42:18, 42:24, 45:16, 48:1, 56:1, 69:5, 69:15, 82:10, 82:13, 82:16, 83:12
**next** [9] - 11:3, 11:5, 21:24, 23:7, 34:4, 39:4, 59:23, 72:20, 77:1
**nice** [1] - 58:9
**nominal** [1] - 87:5
**None** [1] - 2:15
**normal** [1] - 87:6
**normally** [2] - 76:19, 87:4
**North** [1] - 4:7
**note** [1] - 72:13
**Note** [4] - 3:18, 3:20, 72:24, 72:25
**notes** [3] - 67:19, 73:12, 89:9
**nothing** [2] - 7:14, 89:22
**notice** [6] - 10:6, 12:1, 12:4, 12:5, 12:6, 12:8
**Notice** [3] - 3:7, 4:1, 11:7
**noticed** [3] - 9:22, 9:24, 10:5
**notify** [1] - 80:14
**November** [5] - 67:5, 72:11, 72:15, 73:14
**number** [7] - 12:17, 28:20, 38:16, 38:20, 38:22, 63:12, 88:23
**Number** [1] - 90:6
**numbers** [2] - 38:13, 54:17

## O

**oath** [2] - 6:10, 8:12
**oaths** [1] - 90:9
**objection** [22] - 9:21, 14:23, 23:16, 24:22, 32:16, 37:6, 37:15, 45:10, 46:5, 52:7, 53:8, 54:19, 61:12, 62:22, 63:6, 64:24, 65:11, 66:7, 73:21, 83:3, 84:3, 86:23
**objections** [3] - 26:17, 74:2, 83:8
**obligation** [1] - 10:19
**obviously** [1] - 8:23
**occur** [1] - 88:24
**occurred** [4] - 72:11, 72:14, 78:15, 89:3
**occurring** [1] - 74:1
**October** [1] - 90:21
**OF** [3] - 1:2, 1:17, 90:4
**offer** [6] - 23:3, 60:20, 61:5, 61:7, 62:7, 68:5
**officer** [3] - 19:15, 64:14, 90:15
**OFFICER'S** [1] - 90:1
**officers** [1] - 18:13
**official** [1] - 65:3
**offset** [1] - 88:8
**olihocheng** [1] - 59:6
**Olihocheng@gmail .com** [1] - 59:5
**OLIVIA** [7] - 1:8, 1:17, 2:3, 3:3, 4:6, 5:6, 7:12
**Olivia** [12] - 3:16, 3:23, 6:12, 6:24, 7:10, 23:17, 26:12, 26:21, 27:17, 60:2, 75:9, 77:5
**olivia.cheng@ becapital.com.tw** [2] - 58:20, 60:13
**once** [5] - 43:14, 54:24, 68:25, 69:12, 71:22
**one** [30] - 11:4, 11:5, 11:6, 11:21, 13:5, 19:23, 19:24, 20:19, 32:12, 39:15, 45:17, 45:25, 46:6, 46:14, 46:24, 47:4, 51:5, 51:7, 54:5, 54:14, 56:21, 58:15, 60:11, 60:18, 63:17, 64:16, 68:13, 82:17, 87:6
**open** [7] - 11:12,

11:16, 14:4, 14:5, 44:2, 44:4
**opened** [2] - 11:18, 14:10
**operating** [3] - 13:14, 13:15, 79:11
**operation** [4] - 20:18, 20:20, 46:1, 47:1
**opinion** [1] - 62:1
**opportunity** [2] - 23:2, 52:2
**opposite** [1] - 70:6
**options** [3] - 86:18, 87:3, 87:4
**order** [10] - 11:4, 26:1, 27:2, 54:15, 55:12, 56:3, 85:25, 86:10, 88:16, 88:20
**organization** [5] - 37:10, 37:12, 37:14, 45:5, 78:4
**Organization** [4] - 3:11, 14:7, 14:13, 14:17
**organizations** [1] - 27:14
**organized** [1] - 14:21
**original** [4] - 12:6, 38:17, 44:16, 53:1
**originally** [4] - 31:25, 45:22, 52:9, 77:12
**owe** [2] - 80:9, 88:5
**owed** [1] - 63:1
**own** [5] - 17:2, 19:2, 19:4, 19:19, 48:19
**owned** [1] - 17:17
**owners** [1] - 19:11
**ownership** [24] - 19:4, 19:6, 42:6, 42:9, 42:13, 42:24, 43:12, 68:8, 73:19, 74:18, 76:7, 76:18, 78:10, 79:5, 79:13, 80:1, 80:3, 80:7, 80:11, 80:21, 87:10, 87:19, 88:9, 88:12
**owns** [3] - 37:16, 50:4, 87:5

## P

**p.m** [5] - 4:3, 6:1, 6:6, 43:19, 89:25
**Pacific** [52] - 18:17, 18:19, 18:20, 18:22, 18:25, 19:2, 19:6, 19:13, 19:17, 19:19, 19:22, 20:10, 23:7, 23:12, 24:13, 24:20,

24:24, 25:4, 25:12, 25:19, 25:25, 26:10, 27:1, 27:12, 27:24, 28:4, 28:15, 29:3, 29:5, 29:13, 30:1, 30:11, 30:17, 30:21, 32:15, 32:25, 33:4, 33:16, 33:25, 35:18, 35:19, 35:20, 36:10, 36:13, 57:21, 57:23, 57:25, 58:2, 58:17, 71:9, 71:11, 87:14
**package** [1] - 64:1
**Page** [3] - 2:7, 2:14, 3:6
**page** [19] - 12:19, 23:23, 23:24, 25:11, 28:18, 28:19, 30:7, 30:9, 37:23, 38:12, 39:4, 39:6, 44:5, 44:6, 49:6, 63:13, 73:5
**pages** [14] - 3:9, 3:11, 3:13, 3:14, 3:17, 3:21, 3:24, 11:9, 14:7, 22:3, 34:5, 60:3, 73:2, 77:6
**paid** [5] - 55:13, 55:14, 68:12, 68:13, 68:15
**papers** [1] - 65:16
**paragraph** [2] - 49:7, 50:21
**part** [9] - 19:19, 28:5, 48:12, 49:11, 49:19, 51:11, 68:18, 82:7, 86:3
**partially** [1] - 71:10
**participate** [1] - 19:11
**participating** [1] - 7:5
**particular** [7] - 11:12, 12:25, 24:19, 40:18, 51:9, 51:10, 57:7
**parties** [2] - 62:25, 90:12
**partner** [2] - 57:9, 63:19
**Partners** [59] - 3:9, 3:14, 6:13, 6:24, 7:22, 7:24, 10:23, 11:9, 12:4, 13:7, 13:14, 13:18, 13:20, 13:22, 14:13, 14:17, 15:6, 15:20, 15:25, 16:18, 17:13, 17:24, 18:2, 18:5, 18:11, 18:13, 18:24, 18:25, 19:3, 19:7, 19:8, 20:3, 20:5,

20:6, 20:10, 20:13, 26:1, 26:5, 27:3, 28:11, 29:21, 30:18, 34:5, 35:1, 35:5, 42:3, 42:4, 42:11, 44:21, 57:10, 57:16, 57:17, 57:19, 58:24, 59:8, 59:19, 73:9, 78:12, 87:11
**PARTNERS** [2] - 1:9, 5:6
**partners** [1] - 63:18
**party** [12] - 22:18, 26:13, 30:21, 51:6, 52:13, 52:14, 53:6, 53:18, 53:21, 53:24, 54:3, 54:10
**past** [2] - 10:11, 48:24
**pay** [4] - 29:5, 29:7, 29:13, 82:14
**paying** [5] - 79:17, 80:2, 82:21, 83:2, 83:10
**payment** [3] - 55:24, 68:12, 82:14
**Peggy** [4] - 1:21, 4:4, 6:3, 6:21
**PEGGY** [3] - 1:23, 90:5, 90:24
**peggytsujimoto@ gmail.com** [1] - 1:24
**pending** [3] - 9:9, 66:2, 87:7
**people** [17] - 27:7, 33:9, 45:6, 46:7, 46:13, 46:14, 47:21, 48:5, 48:7, 48:18, 48:19, 56:1, 57:13, 62:6, 63:2, 84:7
**percent** [10] - 19:5, 29:6, 29:7, 29:13, 29:18, 41:19, 41:23, 43:4, 43:5, 44:10
**percentage** [2] - 42:13, 43:3
**period** [1] - 90:19
**person** [9] - 7:21, 8:24, 10:23, 13:3, 26:5, 26:6, 27:6, 39:12, 45:24
**personal** [3] - 59:2, 59:4
**personally** [3] - 37:13, 44:17, 83:25
**Pharos** [53] - 49:22, 50:4, 50:23, 50:25, 51:2, 51:5, 51:21, 52:18, 52:23, 53:23, 54:2, 55:3, 55:13,

55:23, 56:7, 56:25, 57:3, 57:12, 60:20, 60:24, 61:2, 61:6, 63:1, 63:18, 64:6, 64:11, 64:22, 65:15, 66:6, 66:16, 66:21, 67:9, 67:13, 67:18, 68:7, 68:11, 68:18, 71:12, 71:15, 71:18, 71:20, 71:21, 72:9, 72:14, 73:19, 85:15, 88:7
**Pharos's** [24] - 49:12, 49:20, 50:10, 50:13, 51:12, 51:16, 52:5, 52:10, 54:17, 56:4, 56:9, 60:25, 61:20, 61:24, 64:11, 67:10, 67:19, 67:20, 68:2, 68:25, 70:15, 71:5, 72:10, 73:12
**Phone** [1] - 39:10
**pick** [1] - 48:19
**PLAINTIFF** [1] - 4:14
**Plaintiff** [2] - 1:6, 4:8
**plaintiff** [1] - 6:22
**Plaintiff's** [8] - 3:6, 11:10, 14:8, 22:4, 34:6, 60:4, 73:3, 77:7
**plaintiff's** [1] - 6:19
**Plan** [1] - 38:13
**plan** [56] - 31:3, 36:12, 36:18, 36:22, 36:24, 37:5, 37:21, 38:17, 40:4, 40:20, 40:23, 40:24, 40:25, 41:3, 41:6, 41:16, 41:21, 43:25, 44:14, 44:15, 44:16, 44:18, 44:19, 44:22, 45:3, 47:9, 47:11, 47:20, 49:11, 49:19, 49:20, 50:2, 50:18, 50:24, 51:5, 51:11, 65:2, 65:14, 65:15, 75:15, 75:20, 76:12, 76:15, 76:17, 77:24, 78:1, 78:14, 78:18, 79:4, 79:7
**planned** [1] - 77:23
**planning** [1] - 46:18
**plans** [1] - 36:22
**point** [9] - 10:4, 20:16, 22:11, 28:12, 28:16, 36:25, 48:25, 80:6, 88:11
**portion** [1] - 75:14
**position** [13] - 32:13, 43:1, 50:8, 50:10, 51:3, 51:4, 51:7,

8

52:10, 53:18, 64:23, 65:4, 67:20, 88:7
**positive** [2] - 58:10, 58:15
**possible** [2] - 32:5, 82:5
**potential** [8] - 30:12, 45:25, 46:15, 48:11, 54:14, 62:11, 62:19, 66:11
**potentially** [2] - 47:11, 54:5
**power** [2] - 16:7, 65:13, 80:25
**powers** [2] - 15:24, 15:25
**practice** [2] - 61:9, 61:16
**prefer** [1] - 17:10
**preparation** [1] - 64:12
**prepare** [3] - 9:11, 10:3, 10:20
**prepared** [5] - 64:1, 64:11, 65:15, 65:16, 71:23
**Present** [1] - 5:15
**presented** [3] - 37:21, 38:9, 38:11
**president** [1] - 23:25
**prevent** [1] - 31:14
**price** [7] - 37:3, 42:16, 42:17, 55:5, 55:13, 87:5, 87:9
**primary** [2] - 63:11, 88:25
**principal** [2] - 54:25, 56:17
**principals** [3] - 57:3, 57:13, 57:14
**private** [4] - 27:11, 27:13, 27:14, 27:15
**problem** [1] - 17:22
**problems** [1] - 48:8
**Procedure** [1] - 90:9
**proceed** [6] - 7:19, 43:22, 64:4, 65:19, 65:25, 72:6
**proceeds** [1] - 43:2
**product** [1] - 45:6
**productive** [1] - 47:24
**provide** [12] - 9:2, 16:15, 19:24, 31:5, 35:8, 37:1, 41:1, 54:16, 55:23, 84:6, 84:8, 84:14
**provided** [4] - 12:4, 35:19, 55:13, 90:19
**providing** [2] -

27:20, 42:23
**Public** [1] - 6:9
**pull** [3] - 63:23, 65:8, 72:18
**purchase** [29] - 38:17, 41:4, 42:16, 46:11, 46:15, 47:12, 49:11, 49:20, 50:13, 51:11, 52:5, 54:17, 55:19, 56:3, 56:9, 56:25, 60:25, 61:1, 61:20, 61:24, 67:18, 67:19, 68:2, 72:9, 72:14, 72:23, 73:11
**Purchase** [4] - 3:18, 3:20, 72:24, 73:1
**purchased** [10] - 37:3, 45:21, 48:2, 51:12, 51:16, 70:15, 71:4, 71:13, 75:14, 85:15
**purchaser** [1] - 73:8
**purchasers** [1] - 62:19
**purchasing** [4] - 42:5, 54:2, 61:6, 67:20
**purpose** [5] - 17:14, 17:16, 35:7, 35:12, 87:2
**pursuant** [4] - 4:1, 6:8, 26:12, 90:9
**pushing** [1] - 87:2
**put** [11] - 21:22, 22:7, 47:5, 50:6, 50:10, 59:21, 65:12, 67:22, 71:2, 75:1, 89:12

## Q

**qualified** [2] - 32:12, 90:6
**questions** [4] - 22:9, 22:21, 89:17, 89:21
**Questions** [1] - 2:13
**quickly** [1] - 22:9

## R

**raise** [9] - 7:11, 18:25, 19:10, 25:4, 25:25, 27:2, 27:9, 29:3, 45:3
**raised** [2] - 16:20, 71:11
**raising** [5] - 24:14, 24:21, 24:25, 25:12, 26:11
**range** [1] - 21:9
**reach** [3] - 20:11, 55:8, 55:9

**reaching** [1] - 66:9
**read** [13] - 9:14, 9:16, 12:2, 22:10, 22:11, 26:25, 28:23, 28:25, 29:2, 30:5, 34:7, 36:25, 39:7
**reading** [2] - 9:13, 65:21
**ready** [2] - 43:22, 72:6
**realize** [1] - 36:12
**realizing** [1] - 75:20
**really** [5] - 10:1, 57:4, 76:9, 79:8, 82:10
**reason** [6] - 9:7, 16:13, 17:9, 24:10, 80:9, 87:1
**recapitalize** [3] - 71:13, 71:17, 75:15
**receive** [13] - 28:5, 28:11, 41:22, 42:13, 68:7, 68:11, 82:1, 87:11, 87:14, 87:19, 88:8, 88:12, 88:16
**received** [12] - 21:16, 27:24, 28:15, 42:1, 42:6, 42:9, 42:24, 44:17, 45:1, 68:25, 81:25, 84:25
**recently** [1] - 8:9
**Recess** [3] - 43:19, 72:3, 89:15
**recognize** [1] - 58:20
**record** [12] - 6:18, 7:16, 39:14, 39:16, 39:17, 43:18, 43:20, 72:4, 89:14, 89:16, 89:24, 90:16
**Record** [1] - 26:25
**recorded** [1] - 90:15
**reddish** [1] - 37:24
**refer** [1] - 40:17
**referring** [12] - 39:19, 42:19, 62:7, 62:10, 62:16, 62:24, 63:14, 67:8, 78:2, 78:3, 84:23
**refers** [2] - 36:1, 39:21
**reflect** [1] - 73:11
**regarding** [5] - 40:22, 54:2, 56:25, 67:9, 80:17
**regardless** [4] - 24:19, 52:4, 82:16, 83:14
**reiteration** [1] - 65:14
**related** [2] - 9:25,

66:5
**relation** [1] - 58:4
**relationship** [5] - 18:23, 20:2, 33:5, 33:16, 48:23
**relative** [2] - 90:12, 90:12
**relied** [1] - 56:1
**relying** [1] - 56:3
**remember** [31] - 12:11, 19:23, 21:2, 23:11, 24:7, 30:16, 34:11, 34:24, 37:22, 38:10, 40:9, 49:4, 57:4, 57:5, 60:10, 62:10, 62:16, 62:23, 62:24, 66:25, 67:15, 68:20, 70:9, 75:25, 84:16, 84:18, 86:9, 86:19, 86:25
**REMEMBERED** [1] - 4:1
**remind** [2] - 8:10, 16:11
**Remote** [3] - 1:18, 2:3, 3:3
**remote** [2] - 4:12, 8:2
**remotely** [1] - 4:3
**repayment** [3] - 21:17, 88:18, 89:1
**repeat** [11] - 20:8, 24:17, 26:22, 26:24, 35:24, 53:2, 53:13, 66:18, 69:23, 71:14, 87:22
**rephrase** [5] - 16:15, 20:9, 32:23, 61:16, 86:4
**Reported** [1] - 1:21
**Reporter** [10] - 4:4, 6:4, 11:2, 21:24, 26:23, 26:25, 34:4, 59:24, 77:2, 90:6
**REPORTER** [3] - 6:2, 7:3, 7:9
**reporter** [2] - 72:21, 90:19
**Reporters** [2] - 1:23, 90:7
**represent** [3] - 6:18, 57:6, 81:24
**Representative** [1] - 1:17
**representative** [1] - 6:13
**Represented** [3] - 4:18, 5:2, 5:11
**requested** [2] - 90:18, 90:19
**requires** [1] - 22:10

**Rescue** [3] - 16:19, 25:20, 29:4
**rescue** [11] - 17:17, 25:13, 31:1, 31:12, 37:2, 50:12, 50:18, 63:3, 64:2, 66:11
**rescued** [2] - 37:8, 48:5
**rescuing** [1] - 20:7
**resident** [2] - 15:19
**resources** [1] - 31:6
**respond** [1] - 62:3
**responded** [1] - 77:25
**response** [2] - 9:8, 16:6
**responses** [1] - 9:2
**responsibilities** [1] - 73:19
**responsibility** [5] - 31:14, 73:24, 76:4, 84:8, 84:9
**responsible** [1] - 25:12
**Restated** [2] - 3:19, 72:25
**result** [4] - 52:24, 52:25, 76:10, 79:11
**resume** [1] - 46:23
**retained** [5] - 19:9, 23:12, 30:2, 30:11, 36:11
**Return** [2] - 39:6, 39:18
**return** [7] - 40:17, 41:19, 41:23, 41:25, 42:9, 49:8
**review** [9] - 9:14, 10:18, 11:23, 22:16, 22:20, 22:23, 22:25, 23:1, 90:18
**reviewed** [3] - 10:13, 22:8, 68:3
**reviewing** [2] - 10:15, 11:25
**revive** [1] - 75:16
**rights** [1] - 73:18
**Riparbelli** [1] - 7:1
**riparbelli** [1] - 89:19
**RIPARBELLI** [3] - 5:2, 7:1, 89:22
**risk** [1] - 70:23
**robotic** [2] - 46:21, 47:3
**role** [5] - 13:17, 18:21, 19:13, 27:11, 32:20
**rude** [1] - 8:4
**Rule** [3] - 3:8, 6:9, 11:7

9

**rules** [2] - 8:10, 86:10
**run** [4] - 46:1, 48:21, 49:1, 52:2
**running** [1] - 49:1

## S

**S.A** [1] - 1:4
**safely** [1] - 76:3
**Safety** [1] - 6:9
**sale** [28] - 56:19, 56:20, 77:18, 78:15, 80:18, 81:8, 81:18, 85:25, 86:2, 86:5, 86:6, 86:12, 86:14, 86:16, 86:18, 86:22, 87:2, 87:7, 87:12, 87:15, 87:21, 87:24, 87:25, 88:3, 88:14, 88:20, 88:24, 89:2
**sales** [1] - 47:17
**San** [2] - 4:17, 5:1
**save** [2] - 16:20, 25:21
**saved** [1] - 31:17
**saw** [1] - 72:13
**schachne** [1] - 6:20
**SCHACHNE** [94] - 4:18, 6:21, 7:15, 7:16, 9:23, 10:25, 11:11, 14:1, 14:11, 14:24, 16:5, 16:9, 17:19, 17:22, 21:20, 21:22, 22:7, 22:22, 23:22, 24:8, 24:18, 24:24, 25:3, 25:9, 26:4, 26:14, 26:19, 26:23, 27:5, 27:19, 27:23, 28:4, 28:11, 29:15, 30:1, 30:7, 31:3, 31:9, 32:19, 33:3, 34:2, 34:9, 36:8, 37:12, 37:20, 38:12, 39:14, 39:17, 43:16, 43:18, 43:20, 45:11, 46:9, 49:15, 49:19, 50:1, 52:14, 52:22, 53:12, 54:1, 54:15, 55:1, 56:18, 59:21, 60:6, 61:15, 63:4, 63:12, 65:6, 65:21, 66:4, 66:8, 70:7, 71:24, 72:4, 72:18, 73:14, 73:25, 74:5, 76:14, 76:25, 77:9, 83:7, 84:4, 85:2, 86:11, 87:1, 87:19, 88:2, 88:10, 89:8, 89:13, 89:16, 89:23
**Schachne** [2] - 2:8,

6:21
**scope** [4] - 12:18, 13:1, 25:10, 44:19
**screen** [3] - 8:3, 8:5, 11:21
**scroll** [5] - 12:19, 23:23, 37:23, 62:2, 73:4
**second** [3] - 39:15, 44:5, 48:10
**secretary** [3] - 15:22, 18:15, 74:10
**section** [4] - 22:10, 22:11, 28:23, 29:1
**Section** [2] - 6:8, 90:9
**sector** [1] - 47:15
**secured** [6] - 65:8, 69:1, 69:4, 69:13, 69:21, 70:13
**security** [2] - 49:12, 49:21
**Security** [2] - 3:20, 73:1
**see** [32] - 11:18, 12:20, 12:22, 12:23, 14:2, 14:14, 15:12, 15:13, 16:20, 23:8, 23:24, 23:25, 25:15, 28:20, 29:6, 29:8, 37:24, 38:14, 39:6, 39:21, 44:7, 44:8, 49:10, 51:10, 52:13, 60:5, 60:21, 60:22, 73:15, 73:16, 77:8, 77:13
**seeing** [1] - 24:9
**seem** [1] - 35:15
**sell** [3] - 55:3, 66:17, 66:21
**senior** [11] - 42:5, 44:10, 50:4, 63:19, 65:8, 69:1, 69:4, 69:13, 69:21, 70:13, 88:5
**sense** [1] - 9:4
**sent** [1] - 82:11
**sentence** [1] - 62:5
**sentences** [1] - 9:1
**separate** [1] - 26:11
**separately** [3] - 74:23, 75:11, 79:25
**September** [12] - 1:19, 2:4, 3:4, 3:23, 4:2, 6:1, 6:5, 15:13, 34:25, 64:18, 77:5, 77:13
**series** [11] - 73:20, 80:14, 80:15, 85:16, 85:19, 85:20, 86:13

**serve** [1] - 45:6
**set** [1] - 4:9
**settle** [2] - 70:20, 70:23
**seven** [1] - 89:11
**several** [5] - 9:22, 9:24, 32:2, 46:23, 47:5
**shareholder** [19] - 65:3, 65:4, 65:6, 65:7, 66:10, 74:24, 75:3, 75:11, 75:14, 78:9, 80:15, 82:15, 82:18, 82:20, 83:1, 83:9, 83:11, 84:9, 85:22
**shareholders** [4] - 74:21, 84:2, 84:6, 84:15
**shares** [4] - 73:20, 85:16, 85:20, 87:6
**shattered** [1] - 31:1
**Sherman** [1] - 5:15
**short** [3] - 9:6, 43:21, 72:5
**Shorthand** [3] - 1:23, 4:4, 90:6
**show** [1] - 48:21
**shows** [4] - 15:18, 15:23, 81:25, 82:2
**side** [3] - 8:4, 47:23, 88:8
**sides'** [1] - 54:24
**sign** [4] - 16:8, 81:11, 81:13, 81:21
**signatory** [3] - 15:24, 15:25, 16:7
**signature** [7] - 23:24, 24:2, 24:4, 24:9, 24:11, 73:5, 73:8
**signed** [3] - 55:10, 73:17, 81:17
**significant** [4] - 82:10, 82:12, 82:15, 83:13
**significantly** [1] - 83:20
**signing** [2] - 30:20, 68:15
**similar** [3] - 27:11, 27:12, 83:20
**simply** [1] - 61:21
**simultaneous** [2] - 87:24, 88:13
**single** [3] - 13:5, 34:8, 36:25
**sit** [2] - 10:22, 28:14
**situation** [4] - 31:12, 64:9, 64:16
**six** [1] - 40:9
**skepticism** [1] - 63:2

**slightly** [1] - 8:15
**slim** [1] - 65:17
**societe** [1] - 1:5
**sold** [4] - 38:25, 39:1, 55:4, 82:6
**solely** [2] - 31:12, 80:6
**someone** [2] - 45:25, 54:6
**sometime** [2] - 67:5, 84:24
**sometimes** [1] - 33:17
**sorry** [11] - 15:21, 17:21, 26:22, 32:22, 33:1, 41:10, 41:11, 56:7, 68:21, 71:14, 81:16
**sort** [10] - 9:3, 28:12, 28:15, 48:4, 50:3, 53:25, 76:7, 76:16, 78:9, 79:4
**sound** [4] - 21:3, 67:5, 67:24, 72:15
**sounds** [2] - 65:24, 67:7
**source** [2] - 53:14, 66:11
**SPC** [3] - 82:2, 82:6, 82:8
**speaking** [4] - 8:23, 10:8, 47:25, 48:24
**speaks** [2] - 29:10, 73:21
**specific** [6] - 22:9, 22:24, 23:4, 31:20, 57:4, 59:12
**specifically** [8] - 16:25, 23:22, 40:22, 51:13, 56:6, 56:7, 56:24, 81:13
**specify** [1] - 16:4
**speculate** [2] - 23:18, 27:17
**speculating** [2] - 26:7, 26:9
**speculation** [16] - 21:18, 23:17, 24:5, 25:1, 25:6, 26:2, 28:1, 28:7, 29:23, 30:3, 70:3, 83:4, 84:3, 86:8, 86:23, 87:16
**spend** [1] - 10:15
**spent** [1] - 10:7
**stage** [10] - 25:10, 29:2, 30:6, 31:18, 41:13, 41:16, 44:23, 56:5, 76:2
**standard** [2] - 61:9, 61:16

**stands** [1] - 83:8
**start** [1] - 6:19
**started** [6] - 51:23, 52:9, 53:3, 53:14, 59:2, 67:21
**starting** [1] - 51:25
**starts** [2] - 35:10
**State** [2] - 4:5, 90:6
**state** [3] - 6:17, 6:18, 90:24
**STATES** [2] - 1:1, 90:3
**States** [2] - 6:15
**stating** [1] - 65:19
**stay** [1] - 83:19
**Stenographic** [1] - 6:4
**stenographically** [1] - 90:15
**Stenographically** [1] - 1:21
**step** [1] - 49:3
**stepped** [1] - 46:17
**Steve** [2] - 15:9, 18:15
**STEVEN** [2] - 1:10, 4:22
**Steven** [1] - 7:2
**still** [22] - 13:13, 13:14, 13:15, 13:19, 17:16, 25:10, 26:16, 31:16, 36:15, 43:8, 43:9, 43:10, 48:1, 54:7, 65:2, 69:4, 69:11, 70:23, 77:24, 78:1, 78:14, 83:8
**Stock** [2] - 3:18, 72:24
**stock** [2] - 1:4, 72:13
**Street** [2] - 4:16, 4:25
**strike** [3] - 14:25, 36:16, 66:8
**strong** [2] - 50:8, 58:9
**structure** [2] - 43:12, 74:6
**subject** [1] - 60:20
**subsidiaries** [2] - 21:1, 21:17
**subsidiary** [1] - 20:24
**succeed** [1] - 69:25
**succeeded** [1] - 53:21
**succeeds** [1] - 53:19
**successful** [7] - 37:5, 48:7, 50:19, 53:7, 63:3
**successfully** [8] - 29:3, 37:2, 37:8, 48:4,

52:23, 54:16, 55:12, 68:22

**Suite** [2] - 4:16, 4:25

**summarized** [1] - 37:4

**Summary** [2] - 3:14, 34:5

**summary** [6] - 34:8, 35:8, 35:10, 36:1, 36:9, 36:15

**supposed** [1] - 28:5

**surely** [1] - 63:23

**survive** [3] - 32:4, 69:14, 69:15

**survived** [1] - 76:1

**sustain** [1] - 25:21

**swear** [1] - 7:10

**sworn** [4] - 4:8, 7:11, 7:13, 90:10

## T

**Taiwan** [9] - 20:24, 27:6, 27:9, 27:13, 33:20, 46:18, 46:20, 47:1, 48:18

**Taiwanese** [8] - 18:20, 36:10, 47:11, 47:22, 47:25, 48:3, 57:25, 62:13

**talks** [2] - 29:1, 39:18

**task** [1] - 31:13

**tech** [1] - 46:19

**technology** [34] - 16:21, 16:22, 16:24, 17:3, 17:17, 20:7, 25:21, 30:2, 30:12, 31:1, 31:7, 31:14, 31:17, 32:1, 32:5, 37:7, 37:9, 37:17, 41:2, 41:5, 45:18, 45:21, 45:23, 46:11, 46:21, 47:7, 47:15, 47:16, 47:21, 50:7, 52:2, 69:18, 70:2, 75:16

**Technology** [2] - 16:23, 17:6

**ten** [2] - 32:11, 71:25

**ten-minute** [1] - 71:25

**terms** [11] - 9:13, 12:13, 20:18, 20:19, 20:20, 20:23, 61:10, 61:18, 68:17, 82:15

**testified** [8] - 4:9, 7:14, 26:14, 32:14, 46:2, 57:8, 81:17, 86:12

**testify** [6] - 8:16,

13:4, 23:19, 26:5, 26:17, 27:18

**testimony** [8] - 8:20, 32:16, 32:19, 46:5, 53:9, 63:6, 90:15, 90:16

**thankful** [1] - 58:9

**THE** [55] - 4:14, 4:22, 5:6, 14:10, 16:3, 16:7, 21:19, 22:5, 23:21, 24:6, 24:17, 24:23, 25:2, 25:7, 27:4, 27:21, 28:3, 28:9, 29:12, 29:24, 30:5, 30:25, 31:5, 32:17, 34:7, 36:7, 37:7, 37:16, 43:17, 46:6, 49:17, 49:24, 52:9, 52:21, 53:23, 54:12, 54:21, 56:14, 60:5, 62:23, 63:7, 65:1, 65:12, 70:5, 72:2, 72:23, 73:23, 74:3, 76:9, 77:8, 83:5, 86:9, 86:25, 87:18, 88:4

**themselves** [2] - 7:7, 19:11

**thereof** [1] - 4:3

**thereupon** [1] - 4:9

**thinking** [1] - 51:24

**third** [10] - 51:6, 52:13, 52:14, 53:5, 53:18, 53:21, 53:24, 54:3, 54:10, 62:5

**threat** [2] - 64:9, 64:10

**threaten** [1] - 64:6

**three** [2] - 67:23, 70:21

**throughout** [1] - 75:12

**tightly** [2] - 62:6, 62:8

**timeline** [4] - 63:13, 63:20, 65:22, 67:7

**timing** [1] - 66:20, 88:11

**titled** [6] - 11:14, 14:2, 14:12, 21:23, 23:6, 59:22

**titles** [1] - 11:2

**today** [11] - 7:20, 7:24, 9:12, 10:1, 10:22, 13:1, 17:9, 28:14, 43:22, 89:18, 89:19

**today's** [1] - 6:4

**together** [4] - 58:12, 67:22, 68:16, 70:21

**took** [2] - 23:3, 54:8

**top** [3] - 15:12, 30:7, 30:9

**topic** [2] - 12:18, 12:20, 12:25, 13:4, 13:9

**total** [1] - 35:11

**totally** [2] - 10:11, 70:6

**touch** [1] - 64:10

**toward** [1] - 25:11

**towards** [1] - 37:22

**trans** [1] - 77:22

**transaction** [4] - 57:8, 57:10, 77:22, 79:6

**transcript** [2] - 90:16, 90:18

**transferred** [2] - 44:23, 45:4

**Transition** [1] - 38:13

**transition** [10] - 31:25, 36:12, 37:21, 40:4, 41:2, 41:12, 43:25, 56:5, 69:4

**transitioned** [1] - 41:17

**treatment** [1] - 17:1

**tremendous** [1] - 76:3

**tries** [1] - 46:12

**trigger** [2] - 63:23, 65:9

**trouble** [1] - 48:8

**true** [1] - 90:16

**truth** [3] - 7:13, 7:14

**try** [1] - 12:3

**trying** [4] - 45:13, 55:11, 69:10, 82:25

**Tsujimoto** [3] - 1:21, 4:4, 6:3

**TSUJIMOTO** [3] - 1:23, 90:5, 90:24

**turn** [1] - 89:1

**two** [6] - 47:5, 58:11, 59:10, 59:18, 59:20

**type** [1] - 10:20

## U

**U.S** [11] - 47:1, 47:13, 47:14, 47:18, 47:20, 47:21, 48:1, 48:14, 48:18, 49:1, 49:2

**ultimate** [1] - 68:1

**ultimately** [4] - 37:5, 42:23, 51:16, 68:2

**unable** [1] - 11:17

**uncertain** [1] - 50:9

**under** [5] - 8:12, 25:10, 28:20, 38:13, 73:8

**Under** [1] - 6:8

**understood** [8] - 41:15, 45:20, 55:11, 69:17, 79:9, 84:10, 86:11, 89:5

**unfairly** [1] - 65:12

**unfortunate** [1] - 9:24

**UNITED** [2] - 1:1, 90:3

**United** [1] - 6:14

**unless** [1] - 22:23

**unlikely** [1] - 50:16

**up** [10] - 11:24, 22:7, 33:18, 42:4, 49:6, 54:7, 58:16, 58:18, 62:2, 72:18

**uploaded** [2] - 14:11, 77:1

**US** [20] - 4:23, 37:18, 42:19, 77:19, 78:7, 78:11, 80:7, 80:12, 80:18, 80:22, 81:1, 81:5, 81:9, 81:14, 81:19, 81:22, 81:25, 87:11, 87:20, 88:13

**utilized** [1] - 27:8

## V

**vague** [15] - 9:21, 14:23, 16:3, 34:1, 36:6, 37:6, 38:11, 49:18, 49:23, 54:11, 54:19, 62:22, 66:7, 83:3, 88:1

**VALLA** [1] - 4:15

**value** [1] - 76:6

**versus** [1] - 6:14

**via** [5] - 1:21, 4:12, 6:11, 8:23, 57:18

**vice** [1] - 57:24

**video** [2] - 5:15, 5:16

**videoconference** [1] - 4:12

**Videoconference** [3] - 1:18, 2:3, 3:3

**viewing** [1] - 7:6

**votes** [2] - 86:21

**vs** [1] - 1:7

## W

**waive** [3] - 88:17, 88:21, 88:25

**wealthy** [1] - 27:7

**wear** [1] - 33:17

**Wednesday** [5] -

1:19, 2:4, 3:4, 4:2, 6:5

**week** [2] - 63:22, 65:23

**welcome** [1] - 48:20

**well-connected** [1] - 27:6

**whole** [3] - 7:13, 8:9, 10:18

**WIL000390** [1] - 73:6

**willing** [1] - 82:14

**Wilson** [48] - 3:15, 3:22, 5:16, 6:14, 6:25, 7:8, 17:19, 28:3, 33:22, 38:3, 38:9, 50:21, 51:19, 52:4, 52:16, 53:3, 54:9, 55:11, 56:8, 56:11, 56:21, 60:1, 60:7, 60:16, 60:19, 61:4, 62:3, 62:20, 64:6, 64:21, 64:25, 65:7, 66:9, 67:17, 68:22, 75:17, 76:16, 76:23, 77:4, 77:10, 77:12, 77:21, 78:2, 78:10, 85:2, 86:11

**WILSON** [4] - 1:8, 5:7, 7:8, 17:21

**wings** [2] - 58:11, 58:12

**wiped** [1] - 50:5

**WITNESS** [52] - 14:10, 16:3, 16:7, 21:19, 22:5, 23:21, 24:6, 24:17, 24:23, 25:2, 25:7, 27:4, 27:21, 28:3, 28:9, 29:12, 29:24, 30:5, 30:25, 31:5, 32:17, 34:7, 36:7, 37:7, 37:16, 43:17, 46:6, 49:17, 49:24, 52:9, 52:21, 53:23, 54:12, 54:21, 56:14, 60:5, 62:23, 63:7, 65:1, 65:12, 70:5, 72:2, 72:23, 73:23, 74:3, 76:9, 77:8, 83:5, 86:9, 86:25, 87:18, 88:4

**witness** [2] - 4:8, 6:7

**Wong** [1] - 40:11

**word** [5] - 22:12, 22:23, 34:8, 69:9

**words** [8] - 48:12, 62:18, 65:21, 69:12, 75:19, 82:19, 83:18, 87:23

**works** [1] - 89:13

**world** [1] - 54:22

11

| **Y** |
|---|
| **years** [4] - 20:15, 32:11, 33:19<br>**Youngblood** [2] - 63:14, 63:17<br>**youngblood** [1] - 63:20<br>**yourself** [1] - 33:10 |

| **Z** |
|---|
| **Zoom** [5] - 1:21, 4:12, 6:11, 7:5, 8:23 |