1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3

4    CASTEL S.A., a Luxembourg    )
     joint stock company          )
5    (societe anonyme)            )
                                  )
6              Plaintiff,         )
                                  )
7         vs.                     )   Case No.
                                  )   2:19-cv-09336-ODW-PVC
8    CHRISTOPHER A. WILSON, an    )
     individual; OLIVIA HO        )
9    CHENG, an individual; ARF    )
     PARTNERS, LLC, a             )
10   Massachusetts limited        )
     liability company; STEVEN    )
11   J. JAMES, an individual;     )
     MICHAEL DEVLIN, an           )
12   individual,                  )
                                  )
13             Defendants.        )
     _____  )

14

15

16

17

18         REMOTE DEPOSITION OF STEVEN J. JAMES

19                Friday, May 21, 2021

20

21

22    Stenographically Reported by:
     Peggy Tsujimoto, CSR No. 5229

23

24            PEGGY TSUJIMOTO & ASSOCIATES
             Certified Shorthand Reporters
25              Peggytsujimoto@gmail.com
                  (415) 828-1919

                DEPOSITION OF STEVEN J. JAMES
                      May 21, 2021

```
 1                    I N D E X

 2

 3   Remote Deposition of STEVEN J. JAMES

 4   Friday, May 21, 2021

 5

 6   Examination by                          Page

 7        Mr. Valla                            7

 8

 9   Afternoon Session                        130

10

11   Questions advised or instructed not to answer:

12                                   Page Line

13   As far as you can recall, did your then    53    2

14   lawyer help you prepare your resignation letter?

15   It follows that Mr. Wilson was an officer of  83    2

16   the company at least in 2015.  We will ask

17   him about it, but I want to make sure I understand.

18   Now we have this U.S. company that tries to

19   do business with the Chinese Communist Party

20   and in the meantime doesn't pay taxes.  Is

21   that about right?

22

23   Confidential Sections bound separately

24   Pages 27-28

25   Pages 145-150
```

1                           E X H I B I T S

2

3    Remote Deposition of STEVEN J. JAMES

4    Friday, May 21, 2021

5

6    Plaintiff's                                              Page

7    Exhibit 1    Settlement Agreement and Release of    55

8                 Claims, 5 pages

9    Exhibit 2    Document of 52 pages                    202

10

11

12                          ---o0o---

13

14

15

16

17

18

19

20

21

22

23

24

25

1          BE IT REMEMBERED that, pursuant to Notice, and on

2     Friday, May 21, 2021, commencing at the hour of 9:02 a.m.

3     PST thereof, appeared remotely before me, Peggy

4     Tsujimoto, a Certified Shorthand Reporter for the State

5     of California,

6                         STEVEN J. JAMES,

7     located in Boston, Massachusetts, called as a witness by

8     Plaintiff, who, being by me first duly sworn, was

9     thereupon examined and testified as hereinafter set

10    forth.

11

12        (All appearances via Zoom remote videoconference)

13                        ---o0o---

14    FOR THE PLAINTIFF:

15        VALLA & ASSOCIATES

16        333 Bush Street, Suite 2020

17        San Francisco, California 94104

18        Represented by:  ANTONIO VALLA, Attorney at Law

19                LISA PARRISH, Attorney at Law (no video)

20        415 856-9001

21        Antonio.valla@vallalaw.com

22        Lisa.parrish@vallalaw.com

23

24    FOR THE DEFENDANT STEVEN J. JAMES

25        HOGE, FENTON, JONES & APPEL, INC.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1        60 S. Market Street, Suite 1400

 2        San Jose, California 95113-2396

 3        Represented by:  ALISON BUCHANAN, Attorney at Law

 4                         LAURA RIPARBELLI, Attorney at Law

 5        408 287-9501

 6        Alison.buchanan@hogefenton.com

 7        Laura.riparbelli@hogefenton.com

 8

 9   FOR THE DEFENDANT OLIVIA HO CHENG, ARF PARTNERS, LLC, and

10   CHRISTOPHER A. WILSON:

11        JULANDER, BROWN & BOLLARD

12        9110 Irvine Center Drive

13        Irvine, California 92618

14        Represented by:  CATHERINE CLOSE, Attorney at Law

15        949 477-2100

16        Cac@jbblaw.com

17

18   Also Present:  Christopher Wilson and Olivia Ho Cheng

19

20                     ---o0o---

21

22

23

24

25
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1   May 21, 2021                          9:02 a.m. PST
 2          THE COURT REPORTER:  Good morning.  My name is
 3   Peggy Tsujimoto, and I am a California Certified
 4   Stenographic Reporter with CSR No. 5229.  Today's date is
 5   Friday, May 21, 2021, and the time is 9:02 a.m. in
 6   California.
 7          I am not in the same location as the witness.
 8   Under the current National Emergency pursuant to Section
 9   319 of the Public Health Safety Act and Federal Rule
10   30(b)(4), I will be administering the binding oath to the
11   deponent via Zoom.
12          This is the deposition of Steven J. James in the
13   case of Castel S.A. versus Wilson, et al., venued in the
14   United States District Court, Central District of
15   California with Case No. 2:19-cv-09336-ODW-PVC.
16          At this time, I will ask all counsel to state
17   their name for the record and state who you represent,
18   and if we may please start with the noticing attorney,
19   Mr. Valla.
20          MR. VALLA:  Good morning, everyone.  Good
21   morning, Madam Court Reporter.  My name is Antonio Valla
22   and I represent Castel S.A. in this action.  Here with me
23   is my co-counsel, and she will introduce herself
24          MS. PARRISH:  Good morning, everyone.  Lisa
25   Parrish also for Castel.
```

 1              MS. BUCHANAN:  Good morning, Alison Buchanan

 2      for the deponent, Steve James.

 3              MS. RIPARBELLI:  Good morning, Laura Riparbelli

 4      also for defendant James.

 5              MS. CLOSE:  Good morning, Catherine Close,

 6      Julander, Brown & Bollard appearing on behalf of Olivia

 7      Cheng, Chris Wilson, and ARF Partners, LLC.

 8              THE COURT REPORTER:  May I ask if there is

 9      anyone else, excluding the deponent, who has not stated

10      their appearance but participating in this Zoom

11      deposition by viewing or listening to please identify

12      themselves at this time.

13              MR. WILSON:  This is Chris Wilson.  I'm

14      attending.  I'm a named party in the lawsuit.

15              MS. CHENG:  This is Olivia Cheng.  I am

16      attending.  I am also a party of the lawsuit.

17              THE COURT REPORTER:  At this time, I will now

18      swear in our deponent, Steven James, so please raise

19      your right hand.

20                       **STEVEN J. JAMES,**

21      being first duly sworn to tell the truth, the whole

22      truth, and nothing but the truth testified as follows:

23                  **EXAMINATION BY MR. VALLA:**

24          Q.   BY MR. VALLA:  Good morning, Mr. James.

25          A.   Good morning.

```
 1        Q.   My name is Antonio Valla.  We just met on video

 2   a few minutes ago.  Thank you for being present for your

 3   deposition, and thanks to you and counsel for being on

 4   time.  We appreciate it.

 5            I understand you are not in the Pacific time

 6   zone; is that correct?

 7        A.   I'm on the East Coast.

 8        Q.   So you're three hours ahead of us, which means

 9   it's lunchtime for you.

10        A.   I ate a late breakfast.

11        Q.   That's good.  Let's start, if you could,

12   please, state your full name for the record.

13        A.   Sure, Steven J. James.

14        Q.   Mr. James, what is your current address?

15        A.   Current address is 20 Brewster Circle in

16   Bridgton, Maine, 04009.

17        Q.   Mr. James, this is a deposition, and it's very

18   informal, particularly informal because we're

19   participating via video.  The lawyers are not wearing

20   suits and it all feels very casual, but it's indeed a

21   formal court proceeding.

22            You understand, of course, that you have just

23   been placed under oath, do you?

24        A.   Yes.

25        Q.   In fact, your testimony that you are about to
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    render today may be used in a court of law in this case

2    or perhaps even in some other case.  Do you understand

3    that?

4        A.   Yes.

5        Q.   You are kept to the same standard of

6    truthfulness as if you were testifying in a courtroom.

7    Is that something you understand?

8        A.   Yes.

9        Q.   Mr. James, have you ever been deposed before?

10       A.   Yes, I have.

11       Q.   How many times, do you know?

12       A.   Probably three or four times.

13       Q.   Since you have been deposed before, I'll give

14   you a short version of my usual depo speech.  The

15   testimony you are about to give once again is under

16   oath.  I will ask you to answer my questions.  We will

17   be taking breaks periodically during the deposition,

18   probably every hour or so.

19            However, if you are tired or for whatever

20   reason you wish to take a break sooner than the time

21   that I set the break for, please say so.  The only thing

22   that I ask of you is that if there is a question

23   pending, you answer that question before we take the

24   break.  Is that okay?

25       A.   Yes, that's fine.

1    Q.   Are you currently taking any medication that

2  would impair your ability to completely and truthfully

3  testify today?

4    A.   No.

5    Q.   Is there any other reason that you feel you

6  cannot completely and fully and truthfully testify

7  today?

8    A.   No.

9    Q.   You mentioned that you have been deposed three

10  or four times before.  What kind of cases were those?

11    A.   One was an employment case.  The other was some

12  kind of other contract dispute, and the other was with a

13  predecessor company with -- I think it was a tax fraud

14  issue.  I'm also a CPA.

15    Q.   When you say the predecessor company, what

16  company are you referring to?

17    A.   Aurora Imaging Technology.

18    Q.   Were the other cases, the contract case and the

19  employment case you mentioned, also related to Aurora

20  Imaging Technology?

21    A.   Related to Aurora, yes.

22    Q.   How did these three cases resolve?  Did they go

23  to trial?

24    A.   The employment case got settled and the other

25  case got dismissed, I believe.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1       Q.   The contract case, you mean?

2       A.   Yes.

3       Q.   What about the tax fraud case?

4       A.   What's that?

5       Q.   What about the tax fraud case?

6       A.   I can't say.  It's confidential.  It got

7    settled.  It's involving another client of mine.

8       Q.   The tax fraud case did not relate to Aurora

9    Imaging Technology?

10      A.   No.

11      Q.   Okay.  Did it relate to any company related to

12   Aurora Imaging Technology?

13      A.   No.

14      Q.   Did it relate to any officers or directors or

15   employees of Aurora Imaging Technology?

16      A.   No.

17      Q.   Understood.  So you have been deposed a total

18   of three times, not four; right?

19      A.   Yes, that I can recall, yes, three times.

20      Q.   That's fine.  Could you tell me a little bit

21   about your educational background?

22      A.   Yes, I'm a -- I got my bachelor's degree in

23   accounting at Bentley University, worked in a public

24   accounting firm for approximately seven or eight years,

25   got my CPA license in '81 and practiced public

1    accounting and became chief financial officer for what

2    was then a medical device -- medical company client that

3    was one of my clients.  I became CFO.  Since then, I

4    have been CFO of a number of companies along the way,

5    some publicly traded, some private.  I also have

6    maintained a private practice as CPA primarily doing tax

7    compliance work.

8        Q.   By tax compliance, do you mean tax filings?

9        A.   Yes, preparing taxes and doing -- helping small

10   clients, small businesses primarily.

11       Q.   You hold a license as a CPA, do you not?

12       A.   Yes, I do.

13       Q.   What state are you licensed in?

14       A.   I am licensed in Massachusetts.

15       Q.   But you currently live in Maine, right?

16       A.   Correct.

17       Q.   Are you practicing public accounting in Maine?

18       A.   No.  All my clients are in Mass.

19       Q.   When did you graduate from college?

20       A.   '79.

21       Q.   When did you obtain your CPA license?

22       A.   Three years later, '82.

23       Q.   What is the name of the regulatory agency for

24   certified public accountants in Massachusetts?

25       A.   It's the Massachusetts Board of Licensure.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1      Q.   Does the Massachusetts Board of Licensure also

2  have disciplinary authority over certified public

3  accountants?

4      A.   That I know of, yes.

5      Q.   Have you ever been disciplined by that agency?

6      A.   No.

7      Q.   Have you ever been licensed as a CPA in any

8  other jurisdiction?

9      A.   No.

10     Q.   Do you hold any other professional licenses?

11     A.   No.

12     Q.   Did you hold any other professional licenses in

13  the past?

14     A.   No.

15     Q.   So your license in other jurisdictions, you

16  never had one and it's never been revoked; is that

17  correct?

18     A.   Correct.  It's been continuous since then.  I

19  have never had a lapse either.

20     Q.   You have been a CPA in Massachusetts since

21  1982.  You are subject to the jurisdiction of the

22  Massachusetts agency with respect to certified public

23  accountants.  You have never been disciplined and your

24  license hasn't lapsed.  Is that a fair summary of your

25  testimony?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1        A.   Yes.
 2        Q.   You mentioned that you practiced public
 3   accounting within an accounting firm.  Do you recall the
 4   name of that firm?
 5        A.   The name of the firm was Laventhol & Horwath.
 6        Q.   I know them.
 7        A.   They were a national firm.  They were actually
 8   an international firm.  They were probably top ten, as
 9   they liked to call themselves.  Remember big eight, but
10   they were top ten.
11        Q.   The big eight became the big six and then they
12   became the big four.
13        A.   I know a lot of colleagues that got caught up
14   in that shrinking of the public accounting firms.
15        Q.   When did you start working for Laventhol &
16   Horwath approximately?  I mean, I'm looking for the
17   year, not a precise date.
18        A.   Early '80s.  '82-'83.
19        Q.   By the way, Mr. James, I'm not asking you to
20   guess.  If you don't know something, tell me you don't
21   know.  What I will ask you, if possible, if you're not
22   certain about something is to estimate it but not guess.
23   Do you understand the difference?
24        A.   Approximately.  I couldn't tell you the exact
25   year, but it was early '80s.
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1     Q.   You worked there for eight years; is that

2   correct?

3     A.   Seven or eight years.  I left there in '89, I

4   believe.

5     Q.   Did you leave of your own accord?

6     A.   Yes.

7     Q.   Did you leave to become CFO of a medical

8   client?  Is that what you testified to?

9     A.   Yes.

10    Q.   Do you recall the name of that company?

11    A.   Name of that company was Medical Diagnostics,

12  Inc.

13    Q.   How long were you CFO of Medical Diagnostics,

14  Inc.?

15    A.   Until '92.

16    Q.   Where did you go to work in 1992 when you left

17  Medical Diagnostics, Inc.?

18    A.   Company called Advanced MMR Systems did a

19  takeover of Medical Diagnostics.  Advanced MMR Systems,

20  which was a medical device company, and eventually in

21  two years, I became CFO of that company as well.  They

22  took it over, but I no longer was CFO.  They put me into

23  more of a financial position because they had their own

24  CFO.  So it became a subsidiary of that company.

25    Q.   How long did you stay in that position?

 1        A.   A couple of years, two years.

 2        Q.   What did you do after that?

 3        A.   Became CFO of that publicly traded company,

 4   Advanced MMR Systems.

 5        Q.   When say publicly traded, its stock was listed

 6   on an exchange?

 7        A.   Yes.

 8        Q.   What exchange was Advanced Diagnostics Systems

 9   listed on?

10        A.   Advanced Diagnostics Systems was listed on the

11   Nasdaq.  They were also listed on the Berlin Exchange.

12        Q.   Do you recall whether that was the Nasdaq

13   National Market System?

14        A.   Yes.

15        Q.   So they were not a pink sheet type company,

16   were they?

17        A.   No.

18        Q.   Do you know what that is?

19        A.   Yes, I know pink sheet.  No, they were not pink

20   sheet.

21        Q.   One thing I didn't mention earlier, it's going

22   to make it a lot easier for the court reporter and

23   everyone if you let me finish my question and then you

24   provide your answer so that we do not overlap.  I will

25   certainly try to do the same with you and let you finish

1    your answer before I ask a followup question.

2         Is that okay with you?

3    A.    Uh-huh.

4    Q.    When did you leave Advanced Diagnostics

5    Systems?

6    A.    Advanced MMR had a spinoff company called

7    Advanced Mammography Systems.  That was developing a

8    mammography device, and Advanced MMR Systems sold a

9    bunch of its technology to G.E., General Electric, and

10   that was in the mid '90s, and what was left of Advanced

11   MMR and Advanced Mammography merged to become a single

12   company called Caprius, Inc., which was publicly traded.

13   Q.    Did you go to work for Caprius?

14   A.    I did.

15   Q.    When was that?

16   A.    I don't know the exact date, mid to late '90s.

17   Q.    Before 2000?

18   A.    Before 2000, yes.

19   Q.    You mentioned Caprius was also publicly traded;

20   is that right?

21   A.    Yes.

22   Q.    Do you recall what exchange Caprius was traded

23   on?

24   A.    Nasdaq.

25   Q.    Was it also Nasdaq National Market System?

1      A.   Yes.

2      Q.   Was Caprius the last publicly traded company

3 you worked for?

4      A.   Yes.

5      Q.   So you served as CFO of two publicly traded

6 companies in your career?

7      A.   Yes.  There was a period there where it was

8 actually -- when it was Advanced MMR Systems and then

9 they did the spinoff of Advanced Mammography Systems.  I

10 was actually CFO of two companies that subsequently,

11 again post the sale of certain technology to G.E.,

12 became Caprius.  And then I was CFO again of one

13 company.  So technically I was CFO of four companies

14 along the way of public companies.

15     Q.   As a CFO of the publicly traded companies that

16 you mentioned, you remember, I'm sure you know, that you

17 were responsible for signing public filings with the

18 Securities and Exchange Commission; is that right?

19     A.   Yes.

20     Q.   Those would have been annual filings as well as

21 quarterly filings as well as filings relating to

22 material transactions that took place and that to be

23 publicly announced; is that right?

24     A.   Yes.

25     Q.   Are you generally familiar, Mr. James, with the

1    U.S. Securities and Exchange Commission enforcement

2    powers?

3         A.   Yes.

4         Q.   You understand that the Securities and Exchange

5    Commission has both civil enforcement and criminal

6    enforcement jurisdiction?

7         A.   Yes.

8         Q.   Have you ever been sanctioned by the U.S.

9    Securities and Exchange Commission for any activities

10   related to the publicly traded companies that you worked

11   with?

12        A.   No.

13        Q.   Have charges ever been brought against you by

14   the Securities and Exchange Commission in any respect?

15        A.   No.

16        Q.   Have any charges ever been brought against you

17   by any state securities regulator as opposed to the

18   federal Securities and Exchange Commission for any

19   matters relating to your role as an officer of a

20   publicly traded company?

21        A.   No.

22        Q.   Have charges ever been brought against you by a

23   state securities regulation in respect of your role as

24   an officer of a publicly traded company?

25        A.   No.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1        Q.   I didn't think so, but I've got to ask.

 2        A.   No, I have never been involved.

 3        Q.   So your testimony is that somewhere in the mid

 4   to late '90s, you worked for Caprius and you left

 5   Caprius; is that right?

 6        A.   Yes.

 7        Q.   When you left Caprius, where did you move to?

 8   Where were you next employed?

 9        A.   Caprius sold the technology that became Aurora

10   Imaging Technology, and we basically took that

11   technology private with the investment group out of

12   California.  That was in 1999.

13        Q.   Let's unpack that a little bit.  I think I

14   understand it, but let's unpack it together.  Caprius

15   had certain technology which it sold.  Can you describe

16   that technology generally?

17        A.   Yes.  The technology was an MRI system

18   dedicated to imaging breasts, diagnosing breast cancer

19   and breast disease.

20        Q.   Was there anything peculiar about that

21   technology that made it competitively attractive?

22        A.   Well, it was specifically designed to image the

23   breast.  So by doing so, you're able to get clearer

24   images, which allowed physicians to get theoretically a

25   better diagnosis, better treatment, like everything with
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    cancer.

2        Q.   Caprius sold the technology.  Who did it sell

3    it to?

4        A.   It sold it to a group called Pacific Republic

5    Capital.

6        Q.   When you say a group, can you tell me what that

7    is?

8        A.   It was a private investment firm.

9        Q.   A venture capital firm?

10       A.   I don't know how you describe them.  They were

11   private equity.

12       Q.   Understood.  Where was Pacific Republic Capital

13   based at the time of the acquisition?

14       A.   Newport Beach, California.

15       Q.   Do you recall how much they paid for the

16   technology, order of magnitude?

17       A.   I don't.

18       Q.   More than ten million?

19       A.   No.

20       Q.   More than five million?

21       A.   That I don't know.  I don't think it was a huge

22   amount.

23       Q.   Did that transaction take place in 1999?  Is

24   that what you testified?

25       A.   Yes.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    Q.   What did you do?  Did you sort of go with the

2    sale?  I don't mean to be disrespectful.  That's not

3    really what I meant, but did you follow the business to

4    the new owners?

5    A.   Yes, I followed the business and became CFO of

6    the new private company.

7    Q.   What was the name of that company?

8    A.   Aurora Imaging Technology, Inc.

9    Q.   That was 1999, is that right?

10   A.   Correct.

11   Q.   Aurora Imaging Technology, Inc., is a company

12   that still exists today, as far as you know?

13   A.   I don't know if it still exists.  That would be

14   a different question.  I don't know that answer.

15   Q.   Back in 1999 when you joined Aurora Imaging

16   Technology as a CFO, were you an employee of AIT?  I

17   will call it AIT for short.  Were you an employee of

18   AIT?

19   A.   Yes.

20   Q.   Did you have an employment agreement with the

21   company?

22   A.   At that time, no.

23   Q.   Was it just a handshake?

24   A.   At-will arrangement.

25   Q.   Who did you have that arrangement with at AIT?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1      A.    The company.  I was just an employee.

2      Q.    I deserve that answer to my ill-formed

3  question.  I'll rephrase it.

4            Who did you report to at AIT at that time?

5      A.    It was one of the principals of Pacific

6  Republic Capital, what I'll call PRC, a gentleman by the

7  name of Gordon Olsen.

8      Q.    Could you spell that, please.

9      A.    Gordon.  I couldn't tell if it's an O or an E

10  at the end, but same thing, Olsen, O-l-s-e-n.

11     Q.    At the time that you joined AIT in 1999

12  following the sale, was Ms. Olivia Cheng also at AIT?

13     A.    She was with PRC as one of the principals of

14  PRC.

15     Q.    So Ms. Cheng was -- was she an investor in PRC?

16  When you say a principal, was she an investor in PRC?

17     A.    I believe so, yes.  Yes.

18     Q.    You don't know that for a fact, but that's what

19  you believe?

20     A.    I couldn't tell you the exact ownership.  Yes,

21  she had ownership in PRC, which she had ownership in

22  AIT.

23     Q.    Did Ms. Cheng also have a role in AIT when you

24  joined the company, an operational role?

25     A.    Not an operational role that I know of.

1       Q.   Was she serving on the board of directors of

2   AIT at the time?

3       A.   Yes.

4       Q.   Was she also an officer of AIT at the time?

5       A.   Not that I recall.

6       Q.   Did you know Ms. Cheng prior to you joining AIT

7   in 1999?

8       A.   Just to the extent that we presented the

9   business opportunity to them in California prior to that

10   acquisition in 1999.

11       Q.   When you say you presented the business

12   opportunity, who did the presentation, yourself and

13   others?

14       A.   Myself and another officer of the company.

15       Q.   Who did you present it to?

16       A.   To the group at Pacific Republic Capital.

17       Q.   Was that Ms. Cheng?

18       A.   Along with Gordon Olsen and another principal.

19   Wayne Woo was his name.

20       Q.   I couldn't hear your answer.

21       A.   There were three principals at PRC.  I don't

22   recall who was exactly at the presentation when we met

23   with them out in California, which of the three, but I

24   know Gordon Olsen was, I believe Olivia was, and I

25   believe another gentleman by the name of Wayne Woo was

1 as well.

2    Q.   I appreciate a number of years have gone by.

3 Sometimes I can barely remember what I had for dinner

4 last night.  So I must compliment you on your memory.

5 Again, I don't want you to guess.  If you have any

6 hesitation, let me know and I will either rephrase the

7 question or get it into a form that allows you to

8 provide a truthful answer.  Is that okay?

9    A.   That's fine.

10    Q.   I want to go back to the three cases that you

11 were deposed on previously that you testified about

12 earlier in this deposition.  You mentioned there was an

13 employment case.  Did that case resolve through

14 settlement?

15    A.   Yes.

16    Q.   Was AIT a plaintiff or a defendant in that

17 case?

18    A.   We were a defendant.

19    Q.   Meaning AIT was being sued by an employee?

20    A.   Yes.

21    Q.   Do you remember what the employee claimed?

22    A.   Wrongful termination.

23    Q.   Do you remember what the basis for that

24 wrongful termination was?

25    A.   I do not.

25

1      Q.   Did AIT pay money to this employee in

2   settlement?

3      A.   Yes.

4           (The following pages 27-28 were marked

5   confidential and bound separately)

6   ////

7   ////

8   ////

9   ////

10  ////

11  ////

12  ////

13  ////

14  ////

15  ////

16  ////

17  ////

18  ////

19  ////

20  ////

21  ////

22  ////

23  ////

24  ////

25  ////

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1        (The preceding pages 27-28 were marked confidential

2    and bound separately)

3        Q.    BY MR. VALLA:  Was that a man or a woman?

4        A.    That was a man.

5        Q.    That case obviously settled.  You testified it

6    settled.  So it got sorted out.  Do you recall whether

7    the allegations that Mr. Gates made in his complaint in

8    that lawsuit related to yourself, your behavior?

9        A.    No.

10       Q.    Do you recall whether they related to

11   Ms. Cheng's behavior?

12       A.    No.

13       Q.    Do you recall whose behavior they related to?

14       A.    No, I don't recall.

15       Q.    The second case you mentioned that you

16   testified in deposition is a contract case.  I think you

17   called it a contract case; is that right?

18       A.    Uh-huh.

19       Q.    Can you tell me a little bit more about it?

20   What kind of contract?  Who was suing whom?

21       A.    I'm pretty sure it was a service.  One of the

22   customers -- it ended up getting dropped.  The customer

23   dropped it.

24       Q.    The case was dismissed by the customer that had

25   sued AIT; is that right?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1        A.    Yes.

 2        Q.    The third case against AIT, you said, was a tax

 3   fraud case; is that correct?

 4        A.    No, that was --

 5             MS. BUCHANAN:  Misstates the previous

 6   testimony.

 7        Q.    BY MR. VALLA:  You're right.  It had nothing to

 8   do with AIT; is that right?

 9        A.    Correct.

10        Q.    Has AIT ever been involved in tax fraud

11   allegations --

12        A.    No.

13        Q.    -- that you know?

14        A.    No.

15        Q.    Mr. James, are you familiar with an entity

16   called Aurora Health Intelligence?

17        A.    Yes, I am.

18        Q.    Can you tell me what it is?  Is it a company?

19        A.    It is a company.

20        Q.    Do you know what kind of company it is?

21        A.    It's a Massachusetts corporation.

22        Q.    What does Aurora Health Intelligence do?  What

23   is its business?

24        A.    The intent was to eventually use that entity,

25   Aurora -- Aurora Healthcare, the new company, is
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1   developing reading software to be able to use artificial

2   intelligent to read the images that come off of our

3   systems.  So the intent was eventually to use that

4   corporation as a vehicle for that technology as it

5   developed and began its ability to spin that out into

6   other technologies.  We have not put that into operation

7   at this point yet, so it's still an inactive company.

8        Q.   When you say that it's an inactive company,

9   does it have any employees?

10       A.   No.

11       Q.   Are you an officer of that company?

12       A.   Yes.

13       Q.   What office do you hold?

14       A.   I believe I'm the treasurer.

15       Q.   When was that company formed?

16       A.   I'm not sure what year.  It was in the past

17   three years.

18       Q.   Sometime between 2018 and 2021, is that right?

19       A.   May have been 2017 even.

20       Q.   Sometime between 2017 and 2021?

21       A.   Yes.

22       Q.   I'm not going to hold you to that.  I'm just

23   trying to get a sense of how long it's been around.  I

24   guess it has been active, meaning in existence, but

25   inactive that entire time; it hasn't conducted any

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1   business?

2        A.   Correct.

3        Q.   Do you know who the other officers of Aurora

4   Health Intelligence are?

5        A.   I believe it's just Olivia and me.

6        Q.   When you say Olivia, you mean Ms. Cheng; right?

7        A.   Yes.

8        Q.   We can use first names if no one gets offended

9   by that, just because it's easier, but otherwise we can

10  use last names.

11            What is Olivia's role in Aurora Health

12  Intelligence?

13       A.   She's president and probably one of the --

14  probably the director.

15       Q.   Are there any other directors of that company?

16       A.   No.

17       Q.   Are you a director of that company?

18       A.   No.

19       Q.   Other than Ms. Cheng, are there any other

20  directors of that company?

21       A.   No.

22       Q.   The company corporate structure is comprised of

23  Ms. Cheng as a director, Ms. Cheng as president, and

24  yourself as treasurer; is that true?

25       A.   Yes.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    Q.   Is there a corporate secretary?

2    A.   Yeah.  I don't know if I set it up as myself or

3    Olivia, though.

4    Q.   When you say you set it up, did you form that

5    company?

6    A.   Yes, I would have filed for the federal ID

7    number and set up the articles and set up the

8    corporation in anticipation of using it for future

9    business opportunity.

10   Q.   When you set it up, you did so at whose

11   request?

12   A.   Olivia's, Ms. Cheng's.

13   Q.   She made that request to you in what capacity?

14   A.   It's a wholly-owned -- it's a subsidiary right

15   now of Aurora Healthcare.

16   Q.   Aurora Health Intelligence is a wholly-owned

17   subsidiary of Aurora Healthcare U.S.; is that correct?

18   A.   Yes.

19   Q.   Understood.  Thank you.

20        Are you familiar, Mr. James, with a company or

21   an entity called Boston Breast Diagnostic Center?

22   A.   I am.

23   Q.   Let's call it BBDC.  Is that okay?

24   A.   Yes, that's fine.

25   Q.   What is BBDC?

1        A.    BBDC is a clinic outside of Boston,

2   Massachusetts, that was established probably quite a few

3   years ago to basically do mammography, diagnostic and

4   screening services.  And it actually used the device

5   that was the Aurora Imaging Technology MRI system.  We

6   were an 80 percent owner and the physician, the

7   radiologist, Dr. L.C. Levin, was a 20 percent owner in

8   that LLC.

9        Q.    When you testified that, I think you said, we

10  were an 80 percent owner, what do you mean by "we"?

11       A.    I'm sorry.  AIT was an 80 percent owner.

12       Q.    AIT being Aurora Imaging Technology, Inc.?

13       A.    Correct.

14       Q.    You said AIT was an 80 percent owner along with

15  a physician, Dr. Levin, I believe you said; is that

16  right?

17       A.    Yes.

18       Q.    Is AIT still an 80 percent owner of BBDC?

19       A.    No, not that I believe.  No, I don't know.

20       Q.    Your answer is you do not know?

21       A.    I do not know.

22       Q.    Who would know?

23       A.    Chris Wilson.

24       Q.    Do you know Mr. Wilson?

25       A.    I do.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1     Q.   Is he an honest guy?

2          MS. BUCHANAN:  Objection, calls for

3     speculation, lacks foundation.

4          THE WITNESS:  Yes.

5     Q.   BY MR. VALLA:  He is?

6     A.   Yes.

7     Q.   Do you know Dr. Levin, the 20 percent owner of

8     BBDC?

9     A.   Yes.

10    Q.   How do you know her?

11    A.   Because I was involved in helping set the

12    clinic up and negotiate with her.  She also happened to

13    be a radiologist at one of our other customer sites in

14    downtown Boston.

15    Q.   Mr. James, do you know the term "Bottom Line

16    Accounting"?

17    A.   Yes.

18    Q.   What is Bottom Line Accounting?

19    A.   Bottom Line Accounting is a bookkeeping firm,

20    and they refer some of their tax preparation and

21    client's work over to me.

22    Q.   Who owns Bottom Line Accounting?

23    A.   Individual located in Massachusetts by the name

24    of Tamara Bryant is the name.

25    Q.   Is Ms. Bryant in any manner related to AIT?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1        A.   No.

 2        Q.   Or to Aurora Healthcare U.S.?

 3        A.   No.

 4        Q.   Or to ARF Partners?

 5        A.   No.

 6             MR. VALLA:  Let's take a ten-minute break.  Is

 7   that all right, Counsel?

 8             MS. BUCHANAN:  That's fine.

 9             MR. VALLA:  See you in ten.

10             (Recess taken from 9:46 to 9:58)

11             MR. VALLA:  We are back on the record.

12        Q.   Mr. James, we were off the record for a break,

13   which I really appreciated, and I just remind you that

14   you are still under oath.  Do you understand that?

15        A.   Yes.

16        Q.   I want to go back to Boston Breast Diagnostic

17   Center, BBDC, that you testified about a little bit

18   earlier in your deposition.  Was Aurora Imaging

19   Technology ever involved in litigation with BBDC?

20        A.   Not that I know of.

21        Q.   Was Aurora Imaging Technology ever involved in

22   litigation with Dr. Levin, the 20 percent owner of BBDC?

23        A.   Not that I know of.

24        Q.   Are you aware of any litigation between BBDC

25   and Ms. Cheng?
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
1      A.   No.

2      Q.   What about between Dr. Levin and Ms. Cheng?

3      A.   No.

4      Q.   Mr. James, are you an investor in Aurora

5  Imaging Technology?

6      A.   Now?

7      Q.   Yes, now.

8      A.   Yes, I was.

9      Q.   Are you an investor now?  Sorry.

10      A.   Not that I know of, unless the shares I had

11  ownership -- I had some shares in Aurora Imaging

12  Technology, but I couldn't tell you if AIT has been

13  dissolved or what has happened to it.

14      Q.   Who would know that?

15      A.   Chris Wilson.

16      Q.   You just testified that you either had or have

17  some shares in AIT.  You don't know if you still have

18  them, but you had them at some point; is that right?

19      A.   Yes.

20      Q.   What type of shares were those?

21      A.   Common.

22      Q.   Common stock?

23      A.   Yes, common stock.

24      Q.   Do you remember how many shares you had?

25      A.   Not many, 50,000.
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1      Q.    Did that correspond to -- what percentage of

2    the capital of the company, do you know?

3      A.    Less than one percent.

4           MS. BUCHANAN:  You're getting a little quiet,

5    Steve.  If you are able to speak up a little.

6           THE WITNESS:  Okay, I will do that.

7           MS. BUCHANAN:  Great, thanks.

8      Q.    BY MR. VALLA:  Did you purchase the AIT common

9    stock that you referred to earlier?

10     A.    Yes.  There was an option exercise.

11     Q.    Does that mean that you had options to acquire

12   the stock and you exercised that option?

13     A.    Correct.

14     Q.    Do you remember the strike price of the

15   exercise?

16     A.    I do not.

17     Q.    The way I understand an option works for the

18   purchase of stocks, and correct me if I'm wrong, the way

19   I understand it works is an option is granted typically

20   to employees of the company at a certain price called

21   strike price, and you can exercise that option by paying

22   the strike price, and you may well exercise it at a time

23   that the strike price is less than the market price so

24   that you realize a benefit from that.

25           Is that generally correct?

1      A.   Generally, yes.

2      Q.   You testified that you exercised your option

3    and that's how you acquired the shares; is that right?

4      A.   Yes.

5      Q.   But you do not recall what the strike price was

6    for your exercise; is that true?

7      A.   I do not.

8      Q.   I'm sorry.  I could not hear your answer.

9      A.   I said I don't recall at this point what the

10   strike price was.

11     Q.   Do you recall what the value of the stock was

12   at the time that you exercised your stock option?

13     A.   No.

14     Q.   Do you recall if the value of the stock at that

15   time was higher than the strike price?

16     A.   No.

17     Q.   Would you have exercised your option at a

18   strike price that was higher than the value?

19          MS. BUCHANAN:  Calls for speculation.

20          THE WITNESS:  I'm sorry.  Say that -- ask the

21   question again.

22     Q.   BY MR. VALLA:  Would you have exercised your

23   stock option at a strike price that was higher than the

24   value?

25     A.   No.

```
 1        Q.    That would be illogical, right?

 2        A.    Yes.

 3        Q.    Pay more than it's worth?

 4        A.    Yes.

 5        Q.    Is that right?  Do you remember why you

 6   exercised your option?

 7        A.    I do.

 8        Q.    Why was that?

 9        A.    We were in negotiations with a company to

10   acquire AIT, and I exercised it so I could ultimately

11   get capital -- long-term capital gain treatment in

12   anticipation of --

13             THE COURT REPORTER:  Could you repeat the very

14   end.

15             THE WITNESS:  Long-term capital gain treatment.

16             THE COURT REPORTER:  And was there more?

17        Q.    BY MR. VALLA:  Let me ask the question again,

18   Peggy, so we can get a complete answer.  Do you recall,

19   Mr. James, why you exercised your stock options?

20        A.    Yes.

21        Q.    Why was that?

22        A.    Because we were anticipating -- I was

23   anticipating that a transaction that was under

24   negotiations to acquire the company was going to occur,

25   and I wanted to exercise so that I could have a holding
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1  period long enough to be able to have capital --

2  long-term capital gain tax treatment.

3       Q.   And that is more favorable tax treatment than

4  you would have had otherwise?

5       A.   Yes.

6       Q.   Do you remember when you exercised?

7       A.   I don't remember exactly, no.

8       Q.   Do you remember the year?

9       A.   2011 or 2012.

10      Q.   Did the transaction that you were anticipating,

11 meaning the sale of AIT to another company, did that

12 take place?

13      A.   No.

14      Q.   Do you recall who the buyer was going to be in

15 that transaction?

16      A.   Group out of Asia called CRC, Capital China

17 Resources.

18      Q.   Is that a private group?

19      A.   I believe it's what they consider a state-owned

20 enterprise in China.

21      Q.   It's an SOE, isn't it?

22      A.   Yes.

23      Q.   Do you know the significance of it being an

24 SOE?

25      A.   Some of it.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    Q.   Can you tell me what you know?

2    A.   Just partly owned by the Chinese government.

3    Q.   That's right, and the Chinese government is the

4  Chinese Communist Party, isn't it?

5    A.   That I know of, yes.

6    Q.   The United States government has imposed

7  limitations on the sale of U.S. technology to the

8  Chinese government, did it not?

9    A.   Yes.

10    Q.   Were you aware of those limitations at the time

11  that the transaction was being negotiated?

12    A.   Yes.

13    Q.   Yet, you thought the transaction would go

14  through and that's why you exercised your stock option;

15  is that right?

16    A.   Yes.

17    Q.   Did you believe that the transaction would not

18  be subject to the SOE limitations?

19    A.   I believe that it would be subject.

20    Q.   In other words, the transaction could not be

21  completed?

22    A.   Not without the U.S. government approving that

23  transaction, yes.

24    Q.   So your testimony is the transaction would have

25  been subject to approval by the United States

42

1    government?

2         A.   That I'm aware of, yes.

3         Q.   Did the transaction go through -- strike that.

4    Did the transaction not go through because the United

5    States government withheld approval?

6         A.   No.

7         Q.   Did it go through -- did it not go through for

8    other business reasons?

9         A.   They decided they did not want to proceed with

10   the transaction.

11        Q.   Understood.  Were you involved in the

12   negotiations with CRC Capital?

13        A.   Yes, I was partly involved in gathering a lot

14   of information and putting together a lot of the

15   information that they requested regarding due diligence

16   before the acquisition.

17        Q.   Did you participate in the negotiations?

18        A.   No.

19        Q.   Did you meet anyone from CRC?

20        A.   Yes.

21        Q.   Do you recall their names?

22        A.   I don't recall their names, no.

23        Q.   That's fine.  I understand.  Do you know if

24   Ms. Cheng participated in the negotiations with CRC

25   Capital?

```
 1        A.    Yes.

 2        Q.    Do you recall who else participated in the

 3   negotiations with CRC Capital on behalf of AIT?

 4        A.    I do not.

 5        Q.    Do you believe it was just Ms. Cheng that

 6   negotiated?

 7        A.    No.

 8              MS. CLOSE:  Calls for speculation.

 9              THE WITNESS:  The board was definitely involved

10   in the progress as that was being negotiated.

11        Q.    BY MR. VALLA:  I'm sorry, I couldn't hear the

12   early portion of your answer.

13        A.    The board of directors of AIT was involved.

14        Q.    We're talking about 2011 or 2012, as you

15   previously testified.  Do you remember who was on the

16   board of AIT at that time?

17        A.    Vaguely -- no, I don't know exactly who was on

18   the board at that time.

19        Q.    That's fine.  We can go over that later.

20              Do you know approximately how much money you

21   invested in AIT by exercising your stock options?

22        A.    75,000.

23        Q.    Approximately $75,000?

24        A.    Yes.

25        Q.    You said that was for 50,000 shares?
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1      A.   Yes.

2      Q.   I believe you testified that 50,000 shares were

3  less than one percent?

4      A.   Yes.

5      Q.   Was it a lot less than one percent or a little

6  bit less?  Any idea of that?

7      A.   It was very small, a lot less.  I don't know

8  how many shares were outstanding at that time, but it

9  was a lot of shares.

10      Q.   But you don't recall what the company valuation

11  was at the time of your option exercise, do you?

12      A.   No.

13      Q.   But you testified that it would have been

14  higher than what you paid; otherwise, it would have been

15  illogical for you to exercise your options; is that

16  right?

17      A.   Yes.

18          MS. BUCHANAN:  Asked and answered.

19          THE WITNESS:  I didn't do it because of what

20  the value was then.  I did it in anticipation of the

21  transaction that ultimately didn't occur.

22      Q.   BY MR. VALLA:  So you became a shareholder of

23  AIT in either 2011 or 2012 when you exercised your

24  options; is that true?

25      A.   Yes.

45

 1       Q.   Were you a shareholder prior to that through

 2   some other means?

 3       A.   No.

 4       Q.   Did you ever lend any money to AIT?

 5       A.   No.

 6       Q.   Did you ever get paid any dividends on your

 7   stock?

 8       A.   No.

 9       Q.   Did you ever receive any dividends in kind on

10   your stock?

11       A.   No.

12       Q.   So you got nothing out of your $75,000; is that

13   right?

14       A.   Yes.

15       Q.   You lost that?

16       A.   Yes.

17       Q.   You mentioned a company earlier called Aurora

18   Healthcare.  I think it's Aurora Healthcare U.S. Corp.;

19   is that right?

20       A.   Yes.

21       Q.   Are you an investor in that company?

22       A.   No.

23       Q.   Are you a lender to that company?

24       A.   No.

25       Q.   I think I mentioned earlier another company

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    called ARF Partners.  Are you familiar with that?

2        A.   Somewhat.

3        Q.   Are you an investor in ARF Partners?

4        A.   No.

5        Q.   Have you loaned any money to ARF Partners?

6        A.   No.

7        Q.   Going back to your earlier testimony, you

8    testified that you joined Aurora Imaging Technology,

9    Inc., as CFO approximately in 1999 at the time that

10   Pacific Republic Capital acquired the business.  Is that

11   your testimony?

12       A.   It was 1999.

13       Q.   In 1999, do you remember what month it was?

14       A.   I believe it was April.

15       Q.   You joined them as chief financial officer?

16       A.   Correct.

17       Q.   You did not have an employment agreement?

18       A.   No.

19       Q.   Did you ever sign an employment agreement with

20   AIT?

21       A.   Yes.

22       Q.   Do you remember when that was?

23       A.   I don't recall when it was.

24       Q.   Did you sign more than one employment agreement

25   with AIT?

47

1          A.    No.

2          Q.    Your employment with AIT starts in April of

3    1999 on a more informal -- I think you classified it as

4    an at-will basis, and then at some point later, you

5    signed an employment agreement with AIT; is that

6    correct?

7          A.    Yes.

8          Q.    Do you have a copy of that employment

9    agreement?

10         A.    Not in front of me, no.

11         Q.    I didn't mean in front of you.  I mean in your

12   possession.  Do you still have that?

13         A.    I believe so.

14         Q.    How did your employment with AIT end?

15         A.    I resigned.

16         Q.    Do you know when you resigned?

17         A.    June of 2014.

18         Q.    Did you resign in writing?

19         A.    I did.

20         Q.    Do you remember why you resigned?

21         A.    I was being undermined by management at that

22   time.

23         Q.    What do you mean by undermined?

24         A.    I mean after Olivia left in 2013, the Pharos

25   group, in particular Mr. Devlin, started exercising a

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    lot more influence and control on the company and

2    started going around me to my staff without my

3    knowledge.

4         Q.   What was Mr. Devlin's role at the time that you

5    were being undermined?

6         A.   He happened to be the largest shareholder, and

7    at that point, the largest lender.

8         Q.   When you say he was the largest shareholder and

9    largest lender, you did not mean him personally?

10        A.   Correct.  I mean Pharos.

11        Q.   Pharos is spelled P-h-a-r-o-s?

12        A.   Correct.

13        Q.   Is Pharos -- as far as you know, is Pharos an

14   investment fund out of Tennessee?

15        A.   Yeah.

16        Q.   I will represent to you, Mr. James, that I have

17   a copy of your letter of resignation dated June 25,

18   2014.  It is addressed to -- I'm sorry, I can't

19   pronounce his or her name.  X-i-a-o-l-e, and the last

20   name is H-o-n-g and Aurora Imaging Technology.  How do

21   you pronounce this person's name?

22        A.   Xiaole.

23        Q.   Your letter addressed to Xiaole Hong refers to

24   her as acting chief executive officer?

25        A.   It's a him.

1      Q.   Sorry, got that wrong.  Not the first time.  He

2  was acting chief executive officer at the time?

3      A.   Yes.

4      Q.   Had Mr. Hong been previously involved with AIT

5  operationally?

6      A.   Yes.

7      Q.   What was his role?

8      A.   I think he was the head of -- Xiaole was a

9  physicist.  He was the head of research and development,

10 product development.

11          MS. BUCHANAN:  Steve, I wonder if you can get a

12 little bit closer to your microphone.  You're kind of

13 cutting out a little bit.  Your statements are sort of

14 fading out toward the end of each answer.  So I want to

15 make sure that we capture accurately what your testimony

16 is.  Thank you.

17          THE WITNESS:  Xiaole was vice-president of

18 research and development.  He was a Ph.D. and physicist.

19      Q.   BY MR. VALLA:  I will represent to you that

20 your June 25th, 2014, resignation letter addressed to

21 Mr. Hong has a subject line titled notice of resignation

22 with good cause, termination not for cause.

23          What was the good cause that you refer to in

24 your letter?

25      A.   The diminution of responsibilities.

50

1      Q.   In what ways?

2      A.   No longer participated in board meetings, no

3  longer participating in senior management meetings, no

4  longer involved with a lot of the areas of the company

5  that I had been involved with heavily up until then.  So

6  it was clear they were kind of cutting me out.

7      Q.   You felt cut out?

8      A.   Not felt.  I was, yeah.

9      Q.   You were cut out?

10     A.   Yes.

11     Q.   Were you upset?

12     A.   No.  I anticipated it.

13     Q.   What do you mean by that?

14     A.   I knew that once Pharos was in, I had had

15  issues and debates along the way because they obviously

16  didn't like the direction of the company, and so I knew

17  that they would, especially once Olivia was gone, that

18  they would have issues with myself.  And so it wasn't

19  surprising that with them kind of exercising more

20  influence and control on the company that they would

21  want me less involved.

22     Q.   At the time that you resigned, were you also --

23  strike that.  At the time that you resigned, were you

24  just CFO of the company?  Or were you also secretary and

25  treasurer?

1          A.   I was the secretary at that time, yes.

2          Q.   I will represent to you that your resignation

3     letter speaks about you being the treasurer of the

4     company as well.  Do you think that may be correct?

5          A.   Yes.

6          Q.   Did your voluntary resignation for good reason,

7     as you state in your letter of resignation, imply some

8     kind of termination benefit?

9          A.   Potentially.

10         Q.   Did you ever sue AIT over your treatment at the

11    company?

12         A.   It never got to that point.  No, I did not.

13         Q.   I'm not interested and I'm not entitled to get

14    any testimony from you about legal advice or

15    conversations you had with your lawyers.  Did you seek

16    legal counsel --

17         A.   Yes.

18         Q.   -- relating to your termination?

19         A.   Yes.

20         Q.   Do you recall who that lawyer was?

21         A.   It was a Boston attorney that was referred to

22    me by a friend of mine.  I don't recall.  I could find

23    out, but I don't recall.

24         Q.   Don't worry about it.  Did you seek that legal

25    advice before you resigned or after?

52

1     A.   Before.

2     Q.   As far as you can recall, did your then lawyer

3 help you prepare your resignation letter?

4          MS. BUCHANAN:  That is a privileged

5 communication and I object on that basis.  You don't

6 have to answer that question, Steve.

7     Q.   BY MR. VALLA:  Did you write your termination

8 letter yourself?

9     A.   Most of it.

10    Q.   Did anybody other than a lawyer help you write

11 that letter?

12    A.   No.

13    Q.   Did Ms. Cheng help you write that letter?

14    A.   No.

15    Q.   You testified that you did not sue AIT over

16 your mistreatment, and I think you stated that it didn't

17 get to that, but did you bring a claim against AIT?

18         MS. BUCHANAN:  Objection, vague as to the term

19 "claim."

20    Q.   BY MR. VALLA:  Answer if you can.

21    A.   I don't recall.  I don't recall.

22    Q.   Did you file a claim with the Massachusetts

23 labor commissioner?

24    A.   No.

25    Q.   Did you or someone at your direction send a

1    demand letter to AIT demanding they pay you some money?

2        A.   No, not that I recall.

3        Q.   But you ultimately settled with AIT, did you

4    not?

5        A.   Down the road, yes.

6        Q.   Do you remember when you settled with AIT?

7        A.   I don't recall.

8        Q.   I'll represent to you that we are in possession

9    of a settlement agreement and release of claims dated

10   November 25, 2015, between Steve James and Aurora

11   Imaging Technology, Inc.  Does that refresh your

12   recollection about when that might have been?

13       A.   Yes.

14       Q.   It appears to be signed by you on your own

15   behalf and by Christopher A. Wilson, chairman of the

16   board, on behalf of Aurora Imaging Technology.  The date

17   on those signatures -- your signature is November 25,

18   2015, and the date on Mr. Wilson's signature is

19   November 27, 2015.  Does that sound right?

20       A.   Sounds about right.

21       Q.   Let me show it to you.  Can you see it?

22       A.   Not yet.

23       Q.   You cannot?

24       A.   No.  I see your --

25            MS. BUCHANAN:  It's showing your file list.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

 1           MR. VALLA:  I'll learn this in my 60s at some

 2  point, I'm sure.

 3           MS. BUCHANAN:  Just in time for the pandemic to

 4  end.

 5           MR. VALLA:  I'm hoping.

 6       Q.   Mr. James, do you see a document?

 7       A.   Yes.

 8           MR. VALLA:  Madam Court Reporter, we will

 9  designate this document as Plaintiff's 1.

10                (Settlement Agreement and Release of

11                Claims, 5 pages, marked for identification

12                as Plaintiff's Exhibit 1)

13       Q.   BY MR. VALLA:  Would you like to review this

14  document, Mr. James?

15       A.   No.

16       Q.   I'm just going to scroll through it and point

17  you to page 5 of the document where the signatures

18  appear.  Can you see that page?

19       A.   Yes.

20       Q.   Where it says Steve James, is that your

21  signature, Mr. James?

22       A.   Yes.

23       Q.   Do you recall signing this document?

24       A.   Yes.

25       Q.   The date on your signature is November 25,

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    2015; is that correct?

2        A.    Correct.

3        Q.    And that sounds about right to you?

4        A.    Yes.

5        Q.    Let's go back to page 1.  The settlement terms,

6    Mr. James, are set forth on page 1 of the document, and

7    they include an initial payment of $25,000 and

8    subsequent payments at a monthly rate adding up to

9    another $50,000; is that right?

10       A.    Yes.

11       Q.    The total between the two is $75,000; is that

12   right?

13       A.    Yes.

14       Q.    Is that not exactly the same amount that you

15   had invested in AIT by exercising your stock options in

16   2011 or 2012?

17       A.    Yeah.  I'm guessing again on the investment

18   amount but about that, yes.

19       Q.    One could look at this and think that you got

20   your money back, could you not?

21            MS. BUCHANAN:  Objection, argumentative.

22       Q.    BY MR. VALLA:  What do you think, Mr. James?

23       A.    No, because my claim was more than -- my claim

24   was more than that.  My claim was four years salary.

25       Q.    What was your salary at the time?

```
 1      A.   It was 140 or 150,000.  I think that
 2  represented half.
 3      Q.   Is it your testimony that it's just a
 4  coincidence that you settled for 75,000 --
 5      A.   Yes.
 6      Q.   -- being the same amount you invested in the
 7  company?
 8      A.   Yes.
 9           MS. BUCHANAN:  Hold on.  Objection,
10  argumentative.  Steve, let him finish the question
11  before you answer, please.  Then you have to let me
12  object.
13           MR. VALLA:  Madam Court Reporter, would you
14  please read back the question.
15           THE COURT REPORTER:  I will read back the last
16  two questions.
17           (Record read as follows by the Court Reporter:
18           "Question:  Is it your testimony that it's just
19           a coincidence that you settled for 75,000 --
20           Answer:  Yes.
21           Question:  -- being the same amount you
22           invested in the company?
23           Answer:  Yes.")
24      Q.   BY MR. VALLA:  Is that your testimony,
25  Mr. James?
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1          MS. BUCHANAN:  Same objection, argumentative.

2     Q.   BY MR. VALLA:  You can go ahead and answer.

3     A.   I did not answer yes.  I said it is not -- yes,

4     it is a coincidence.  I'm sorry, yes.

5     Q.   Let me clean up the record a little bit.  Is it

6     your testimony then that it is a coincidence that you

7     were paid $75,000 when you left the company, that being

8     the same amount that you had invested in the company a

9     few years prior?

10    A.   As I said earlier --

11         MS. BUCHANAN:  Hold on, Steve.  You have to let

12    me object first.  Objection, argumentative.

13         Now please answer.

14         THE WITNESS:  Okay.  As I said when I answered

15    the question about the investment, I don't know that it

16    was exactly $75,000.  So I don't -- I would have to look

17    at my records to see exactly what the amount was, but it

18    might have been more or less.

19    Q.   BY MR. VALLA:  I understand.  I believe your

20    testimony was that it was approximately $75,000?

21    A.   Roughly in that range.  It was less than 100

22    grand.

23    Q.   Understood.  Besides being CFO at AIT, did you

24    have any other roles within the company?

25         Sorry, that's the wrong question.  Strike that.

1          You testified earlier that you were also

2   corporate secretary and treasurer; is that right?

3       A.   Yes.

4       Q.   You were also CFO, is that correct?

5       A.   Yes.

6       Q.   Besides those three roles, did you have any

7   other roles within the company?

8       A.   Official roles, no.

9       Q.   How about unofficial ones?

10      A.   As part of that, I oversaw a lot of the

11  operations of the clinics that the company owned.  I

12  also was involved with a lot of operations regarding

13  sales systems.  I was involved with a lot of the

14  negotiations with customers on sales and oversaw a lot

15  of the service contracts for negotiating and executing

16  service contracts for customer sites.

17      Q.   Did AIT have a 401(k) profit sharing plan?

18      A.   Not a profit sharing plan.  I had a 401(k).

19      Q.   A 401(k) plan, is that right?

20      A.   Yes.

21      Q.   Were you also the trustee of that plan?

22      A.   I don't recall whether I was or not.

23      Q.   Do you recall resigning as trustee?

24      A.   I do not.

25      Q.   Do you recall who the 401(k) plan was with?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1        A.    I don't, no.

 2        Q.    Do you think it was with a bank or a brokerage

 3   company?

 4        A.    I don't recall who we used.

 5        Q.    If you were trustee of the 401(k) plan and

 6   didn't resign, you could still be the trustee of the

 7   401(k) plan today?

 8            MS. BUCHANAN:   Incomplete hypothetical, calls

 9   for speculation, lacks foundation.

10        Q.    BY MR. VALLA:   Is that right?

11        A.    If it hasn't been dissolved, yes.

12        Q.    Do you know, Mr. James, you being an

13   experienced accountant and licensed CPA, do you know who

14   the funds in a 401(k) plan belong to?

15        A.    Yes, to the employees or the contributors.

16        Q.    To the participants in the plan?

17        A.    Yes.

18        Q.    They are not an asset of the company, right?

19        A.    Correct.

20        Q.    In fact, do they appear in the company's

21   balance sheet?

22        A.    No.

23        Q.    We established through your testimony that you

24   served as a CFO of AIT from April 1999 to June of 2014;

25   is that right?
```

60

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    A.   Yes.

2    Q.   During that period of time, and I know we're

3 talking about quite a few years, was Ms. Cheng always an

4 officer of the company?

5    A.   No.  She may have been a director all that time

6 but not an officer.

7    Q.   Do you recall who the officers of the company

8 were during that timeframe?

9    A.   I believe Ms. Cheng came in in 2005 as

10 president.  I don't even know if she was CEO at that

11 time.  Mr. Gordon Olsen was still CEO.  There was a

12 period where Gordon was actually the CEO and president,

13 and Ms. Cheng came in in 2005.

14    Q.   As president?

15    A.   Yes, I believe so.

16    Q.   Did she serve in that capacity throughout your

17 tenure?

18    A.   From 2005 to 2013, yes.

19    Q.   You testified that she had left and you were

20 dealing with new management and new management created

21 all sorts of problems for you; is that right?

22    A.   Yes.

23    Q.   But you got along with Ms. Cheng, right?

24    A.   Yes.

25    Q.   Did you ever have any serious disagreements

```
 1   with her over management?
 2        A.   No.
 3        Q.   Over any accounting issues?
 4        A.   No.
 5        Q.   You got along?
 6        A.   We got along, yes.
 7        Q.   Are you friends?
 8        A.   I would say we are.
 9        Q.   Besides Ms. Cheng, who were the other officers
10   of AIT during the period of your employment?
11        A.   Again, Gordon Olsen.  There was a period there
12   where Dan Olsen became also chairman of the board.
13   There were a few chief operating officers along the way,
14   guy by the name of Dave Gracely.  I don't recall each
15   person's name.  There was Xiaole, who was the
16   vice-president of R and D.
17             There was -- I don't know if there was
18   vice-president of the regulatory or not, and then all of
19   the board members, which were primarily -- the board was
20   primarily a shareholder represented board.
21        Q.   Thank you for that.  I know it's hard to
22   remember that far back and people switch positions, and
23   I gave you a very broad timeframe.  I appreciate you
24   providing your best testimony on that.
25             Was Ms. Cheng a board member throughout that
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    same time period, 1999 to 2014?

2       A.   I believe she was from 1999.  Yes, I believe

3    so.

4       Q.   Were you ever a board member, Mr. James?

5       A.   No.

6       Q.   You did testify earlier that new management

7    wouldn't let you participate in board meetings.

8       A.   Correct.

9       Q.   I wasn't clear about that.  How did you used to

10   participate in board meetings?

11      A.   I was the secretary, so I would be the person

12   who maintained the minutes.  A lot of the board meetings

13   involved financial aspects of the company.  I was the

14   CFO, and I would be invited by attendants to present

15   financial makeup of the company and what was going on

16   operationally and so forth.

17      Q.   How often did the board meet approximately?

18           (Ms. Riparbelli exited the Zoom deposition)

19      A.   It varied.  I would say on average, every three

20   months, every four months.

21      Q.   Back when you were CFO, which banks did AIT

22   bank with?

23      A.   AIT was with Bank of America.

24      Q.   Do you remember any other banks?

25      A.   No, I don't.

63

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1       Q.   Did AIT maintain any foreign bank accounts?

2       A.   No.

3       Q.   Did AIT have any foreign subsidiaries?

4       A.   Yes.

5       Q.   Did those foreign subsidiaries have bank

6  accounts?

7       A.   Yes, they did.

8       Q.   But not AIT directly?

9       A.   Correct.

10       Q.   Did the foreign subsidiaries have bank accounts

11  in the United States or outside of the United States?

12       A.   Outside of the United States.

13       Q.   Do you remember what countries?

14       A.   Taiwan.

15       Q.   Only in the Republic of China in Taiwan?

16       A.   Correct.

17       Q.   Do you remember the name of the banks that the

18  foreign subsidiaries did banking with?

19       A.   I don't recall.

20       Q.   Were they U.S. banks?

21       A.   I don't know.

22       Q.   It would not have been Bank of America Taipei

23  branch, by any chance?

24       A.   Not that I recall, no.

25       Q.   You testified that AIT banked with Bank of

```
 1    America; is that right?

 2         A.   Yes.

 3         Q.   Who had signatory powers over the Bank of

 4    America accounts?

 5         A.   Myself, Olivia.  I can't recall if I had my

 6    controller have signatory under 5,000.  I believe it

 7    was, so my controller at the time.

 8         Q.   Who was your controller at the time?

 9         A.   Lady by the name of Sarah Jones.

10         Q.   Anyone else that you can recall?

11         A.   Prior to that, prior to Sarah coming in, it was

12    another controller by -- lady by the name of Lisa

13    DeMari.

14         Q.   Do you recall what the average balance was in

15    the AIT bank accounts during that timeframe 1999 to

16    2014?

17         A.   I don't.

18         Q.   Was it in excess of a million dollars?

19         A.   At times.

20         Q.   Was it below $100,000?

21         A.   Not generally, no.

22         Q.   One could say it would generally be somewhere

23    between 100,000 and a million?

24         A.   Sometimes a little more, yes.

25         Q.   Did you have power over how the company's money
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1  was spent?

2      A.   No.

3      Q.   If you received a bill from a supplier, would

4  you have authority to pay it?

5      A.   Not if I didn't have proof that we received the

6  goods or services.

7      Q.   But if you had proof that goods or services

8  were received, did you have power to pay that bill?

9      A.   Yes.

10     Q.   You would not have to ask a second person to

11 approve that payment, would you?

12     A.   Yes, I would.

13     Q.   How did that work?

14     A.   We have a purchase order system where somebody

15 generally would file a purchase order to acquire goods

16 or services that would get approved either by their

17 supervisor, which would be the head of that department.

18 In some cases, it would go to Olivia for approval.

19          And then once those goods or services were

20 delivered, the person that signed the purchase order

21 would sign off that they actually received those goods

22 or materials, especially in the case of supplies by

23 manufacturing.

24          Then at that point, they would say the supplies

25 were received in good order.  And then at that point, we

1    would submit everything into accounts payable for

2    processing.

3         Q.   And then you would sign the check?

4         A.   Olivia would also sign off.

5         Q.   I'm sorry, Mr. James.  I think we lost your

6    answer.

7         A.   Are we back?  Okay.

8              MR. VALLA:  Madam Court Reporter, did you get

9    the witness's answer?

10             (Record read as follows by the Court Reporter:

11             "Answer:  Olivia would also sign off."

12             THE WITNESS:  For amounts over 5,000.

13        Q.   BY MR. VALLA:  So you and she together could

14   sign off on amounts -- any amounts, is that right?

15        A.   I'm not following the question.

16        Q.   If Olivia Cheng signed off on amounts over

17   5,000 and you could sign off on amounts below 5,000,

18   then the two of you together could sign off on any

19   amount; is that right?

20        A.   Yes.

21             (Mr. Wilson left the Zoom deposition)

22        Q.   What was the revenue of AIT towards the end of

23   your tenure, say, 2012 or 2013, just in order of

24   magnitude?

25        A.   I don't recall.  Probably in the range of --

1   under 5 million.

2        Q.   Under 5 million per year?

3        A.   Yeah.  Yes.

4        Q.   So it was basically a $5 million business that

5   required double signatures, including yourself and

6   Olivia, for any payment above $5,000?

7        A.   Yes.

8        Q.   So you left AIT in June of 2014?

9        A.   2014, yes.

10       Q.   Who took over from you?

11       A.   I don't know.

12       Q.   Who signed your settlement check?

13       A.   Several years later, I believe it was Chris.  I

14   would have to look back, but I believe it was Chris.

15       Q.   That would have been in November of 2014,

16   right?

17       A.   '15.

18       Q.   Pardon me, November 2015.

19       A.   Yes.

20       Q.   When you say Chris, do you mean Chris Wilson?

21       A.   Yes.

22            MS. BUCHANAN:  Just to clarify, the settlement

23   agreement required payments over time.  So I don't think

24   it has been an accurate statement of the record that

25   there was a single settlement payment in November of

1    2015.  Looking at the agreement, it says -- doesn't look

2    like one payment would have been due in November of 2015

3    when they signed the agreement.

4            MR. VALLA:  That's all good.

5        Q.   You got 25,000 in November 2015 and then some

6    payments over time adding up to 75,000.  Mr. James, did

7    you get paid in full on the 75,000?

8        A.   Yes.

9        Q.   The checks cleared?

10       A.   Yes.

11       Q.   Thank goodness.  It's always good when that

12   happens.

13           Besides you being an employee of AIT, the

14   corporate secretary, the corporate treasurer, did you

15   have any other relationship with AIT?

16       A.   Prior to 2014 or after?

17       Q.   Let's do one at a time.  How about prior to

18   2014?

19       A.   No relationship, no.

20       Q.   We have established you were a shareholder.  I

21   left that off my list.

22       A.   Okay.

23       Q.   How about after June of 2014 when you resigned,

24   did you have any other relationship with AIT?

25       A.   Not until later in 2015 when I started doing a

1    little bit of consulting work.

2        Q.   Do you remember when your consulting work for

3    AIT started?

4        A.   Specifically, no.

5        Q.   You do not?

6        A.   I don't recall.

7        Q.   Would it have been before you settled your

8    claim in November of 2015?

9        A.   Could have been.  I don't know.

10       Q.   Isn't it odd that you're consulting for a

11   company that you have a claim against?

12       A.   Yeah.  That's why we --

13            MS. BUCHANAN:  Hold on.  Hold on.  Objection,

14   argumentative, lacks foundation, calls for speculation,

15   incomplete hypothetical.  You can answer, Steve.

16            THE WITNESS:  Okay.  That's one of the reasons

17   why we settled because they needed assistance with

18   trying to figure out what the next path was.  Obviously,

19   I couldn't do that while I still had that claim against

20   the company.  So we agreed to settle it.  Much bigger

21   claim than that.

22       Q.   BY MR. VALLA:  Let me understand.  You had a

23   claim against the company; is that right?

24       A.   Yes.

25       Q.   Which I think you testified was a claim roughly

1  equal to one year's salary; is that right?

2      A.   Correct.

3      Q.   And you testified that your salary at the time

4  was about 130 or $140,000 a year; is that right?

5      A.   Yes.

6      Q.   So your claim was, say, for $140,000 a year for

7  one year; is that right?

8      A.   Correct, plus there was some accrued vacation.

9  I would have to go back again and look at it, but it was

10 a pretty significant claim.

11     Q.   It's a lot of money?

12     A.   It was more than just -- the contract called

13 for severance in the case of termination without cause,

14 and I was also owed accrued vacation.  And I believe I

15 settled on the vacation, but I would have to go back and

16 look.

17     Q.   So you have 140,000 or 150,000 claim against

18 the company.  You settled out for 75,000.  Is that true?

19     A.   I don't remember the exact amount of the claim.

20     Q.   I will represent to you that we went through

21 your settlement agreement together, but the settlement

22 amount was $75,000.  So that's what you got?

23     A.   Yes.

24     Q.   And you got paid in full, is that right?

25     A.   Yes.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1      Q.   Either before the settlement or after the

2  settlement, you started doing consulting work for AIT?

3      A.   Correct.

4      Q.   But you don't know whether it was before or

5  after?

6      A.   I just don't recall.

7      Q.   That's okay.  I have no problem with you not

8  recalling.  I just wanted to have a clear record that

9  you don't remember that.

10     A.   Yeah.

11     Q.   When you started doing consulting work for AIT,

12 did you sign a consulting agreement?

13     A.   I believe I did.

14     Q.   Did you provide a copy of that agreement in

15 discovery to my client?

16     A.   I don't know.  I don't know if I had a contract

17 or not.  I would have to look back.

18     Q.   If you have it, will you provide it?

19     A.   Yes.

20     Q.   Do you remember what your consulting

21 arrangement was like, how much you were getting paid?

22     A.   That was 150 an hour.

23     Q.   It was an hourly consulting fee?

24     A.   Correct.

25     Q.   So you would keep track of your time and you

1    would bill AIT for your services?

2        A.   Yes.

3        Q.   How often would you bill?

4        A.   Sometimes once a week, sometimes every two or

5    three weeks, depending upon how many hours were worked.

6        Q.   This arrangement started sometime in 2015?

7        A.   Yes.

8        Q.   Did that arrangement continue into 2016?

9        A.   Yes.

10       Q.   2017?

11       A.   I believe so, yes.

12       Q.   How about 2018?

13       A.   I don't think I did any hours.  If I did, very

14   little in 2018.

15       Q.   Did you do any work for AIT in 2019 in your

16   capacity as a consultant?

17       A.   No.

18       Q.   Your consulting invoices, you testified, would

19   be sent either weekly or every other week or monthly

20   depending on the volume of work.  Who did you send them

21   to?

22       A.   I would have sent them to Sarah, the

23   controller, and copied Chris.

24       Q.   Sarah is Sarah Jones?

25       A.   Yes.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    Q.   So you sent your consulting bills to your

2   former report, your former employee essentially?

3    A.   Yes.

4    Q.   Do you recall who signed your checks, who

5   signed your payments?

6    A.   I don't.

7    Q.   Do you recall approximately how much you were

8   being paid per month?

9    A.   It varied.  There were some months more than

10   others.  I don't recall, no.

11    Q.   How about per year?

12    A.   I think it varied by year.  I don't recall by

13   year how much I billed out.

14    Q.   I'm sorry, I didn't hear the last bit of your

15   answer.

16    A.   I said I don't recall how much I billed out in

17   each of the years that I did those services for them.

18    Q.   How many consulting clients did you have

19   between 2015 and 2019?

20    A.   I would say three or four where I did actually

21   more than just tax compliance.

22    Q.   Three or four clients, you said?

23    A.   Yes.

24    Q.   But you don't remember how much you invoiced to

25   AIT in those years?  Out of three or four clients, they

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1   were one of those three or four clients, were they not?
 2       A.   Yes.
 3       Q.   You just don't remember how much you invoiced
 4   them?
 5            MS. BUCHANAN:  Asked and answered,
 6   argumentative.  He has testified twice already that he
 7   doesn't remember.
 8            MR. VALLA:  Okay.
 9            MS. BUCHANAN:  It's really clear.
10            MR. VALLA:  That's good.  That's fair enough.
11   I appreciate the help, Alison.
12       Q.   Was it more than $100,000 a year?
13       A.   Again, I don't recall.
14       Q.   You just don't know how much?
15       A.   You have the billing records.  You have it.
16       Q.   I have some.
17       A.   I could look at it.
18       Q.   I have some.  We'll look at them together.
19       A.   You have the records.  It's not something I
20   need to generally remember because obviously I have the
21   records in my --
22            MS. BUCHANAN:  Steve, you have responded to the
23   question, so you don't need to say anything else.  You
24   have responded to the question.
25            THE WITNESS:  Okay.
```

75

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1      Q.   BY MR. VALLA:  Did you prepare tax returns for

2  AIT during your consulting period from 2015 to whenever?

3      A.   I started preparing them.

4      Q.   Could you explain that?

5      A.   We never actually got around to completing the

6  filings.

7      Q.   Well, you got me.  So you resigned from the

8  company in June of 2014?

9      A.   Yes.

10     Q.   Had the company filed federal and state income

11 tax returns for the year 2013, the year prior to your

12 resignation?

13     A.   Not that I know of.  I don't know if they ever

14 completed the work we started.

15     Q.   I'm sorry, Mr. James.  I beg you, Alison, I'm

16 not being argumentative.  I'm just being dense, and

17 those are two different things.

18          You were the CFO of the company through June of

19 2014 approximately?

20     A.   Yes.

21     Q.   Did it fall within the purview of your duties

22 to have tax returns prepared for the company?

23     A.   Yes.  However, pretty much on a regular basis,

24 we would have filed extensions.  We would have been

25 doing all of the work to file, but I resigned prior to

1   the September 2014 deadline for filing the 2013 tax

2   return.  So I don't recall if that ever got completed

3   and filed.

4       Q.   What about tax returns for 2012, do you know

5   whether those were filed?

6       A.   Yes, those were filed.

7       Q.   Because you were still at the helm and you knew

8   that; is that right?

9       A.   Yes.

10      Q.   We know that the company was tax compliant

11  through fiscal 2012; is that right?

12      A.   Yes.

13      Q.   We do not know whether it was tax compliant for

14  2013?

15      A.   We do not.  I do not.

16      Q.   You do not know that because you resigned in

17  June.  The returns were on extension and they would have

18  been filed in September 2014, by which time you had

19  already left the company?

20      A.   Correct.

21      Q.   You testified earlier that after you began

22  consulting for the company, you started some tax return

23  preparation for the company; is that right?

24      A.   Yes.

25      Q.   Do you remember for what year that was?

1       A.    I believe it was 2013.

2       Q.    2013?

3       A.    Yes, to get 2013 compliant and then begin

4    rolling into successive years and kind of get it caught

5    up.

6       Q.    So you learned after you left the company --

7    when you were no longer CFO, you learned that the 2013

8    returns, which should have been filed September 2014,

9    had not been.  So you go back to work and pick up where

10   you left off basically; is that right?

11      A.    As I said, I believe it was 2013 that I started

12   picking up from when I started coming back, yes.

13      Q.    Do you know whether the 2013 returns were

14   based -- were filed based on your work done as a

15   consultant for the company?

16      A.    No.  They would have been actually based on

17   work when I was still CFO because they were through

18   12/31/13.

19      Q.    What about fiscal year 2014, did you have any

20   involvement in the preparation and filing of returns for

21   that year?

22      A.    I don't think we ever got started on it.  I

23   would have to look back.  I don't know how far we got in

24   2014 before we began to realize that it was going to be

25   something that the company just couldn't afford to do

78

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1   and wasn't -- didn't have the resources, frankly, to

2   pull those tax returns together.

3       Q.   The company didn't have the resources to file

4   its tax returns in 2015 for 2014 fiscal?

5       A.   Yes.

6       Q.   How much did it cost to prepare and file tax

7   returns?

8       A.   That is difficult to answer.  I don't know.

9       Q.   Do you know how much you billed the company for

10  your tax consulting work?

11      A.   I'm sorry, I don't understand.  For AIT's tax

12  returns?

13      Q.   For AIT's tax returns, that's right.

14      A.   I don't recall how much, no.

15      Q.   That's work that you did hourly, as you

16  previously testified?

17      A.   Yes.

18      Q.   It was not done on a flat fee $10,000 per

19  return or something like that?

20      A.   No.

21      Q.   As you sit here today, Mr. James, do you know

22  whether AIT filed tax returns at all after you left the

23  company in June of 2014?

24      A.   I do not.

25      Q.   Do you know whether they didn't?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1      A.   I do not.

2      Q.   Did anybody tell you that they didn't?

3      A.   The last I knew, they had not.

4      Q.   How do you know that?

5      A.   Because it was -- the tax software that they

6  used, I had actually acquired software packets to be

7  able to do that.  And before we even got to entering it,

8  everything started shutting down.  So unless somebody

9  else stepped in and filed, it did not get filed.  I know

10 that now.

11     Q.   As far as you know, the company did not file

12 tax returns, federal or state, after fiscal year 2012?

13     A.   Correct.

14     Q.   All right, we got there.  Sorry about that.

15     A.   Okay, that's all right.

16     Q.   AIT is a U.S. company, right?

17     A.   Yes.

18     Q.   It's a U.S. taxpayer?

19     A.   Yes.

20     Q.   You are an accountant?

21     A.   Yes.

22     Q.   You're a CPA?

23     A.   Yes.

24     Q.   Are you, Mr. James, aware that U.S. companies

25 have an obligation under federal law to file periodic

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1   returns, including annual income tax returns?

 2       A.   Yes.

 3       Q.   Are you aware that U.S. companies doing

 4   business in certain states that have an income tax

 5   system are also required to file state tax returns for

 6   the years in which they are active in those states?

 7       A.   Yes.

 8       Q.   Are you aware that in both cases, generally the

 9   failure to file a tax return is a crime?

10       A.   Yes.

11       Q.   Are you aware that should that crime be

12   charged, those responsible for that crime are the

13   officers of the company?

14       A.   Yes.

15       Q.   Which you testified in this timeframe was

16   yourself until you resigned in June of 2014 and

17   Mr. Wilson?

18           MS. BUCHANAN:  Misstates the previous

19   testimony.

20       Q.   BY MR. VALLA:  Who were the officers of the --

21           MS. BUCHANAN:  Vague as to time.

22       Q.   BY MR. VALLA:  Who were the officers of the

23   company who should have filed the tax returns after

24   fiscal 2012?

25           MS. BUCHANAN:  Calls for a legal conclusion.
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1   Hold on, Steve.  You have to let me object.  Objection,

2   calls for a legal conclusion, incomplete hypothetical,

3   lacks foundation, calls for speculation, vague as to

4   time.

5        Q.   BY MR. VALLA:  Go ahead and answer.

6             MS. BUCHANAN:  More precise time, if you can.

7        Q.   BY MR. VALLA:  Go ahead and answer.

8             MS. BUCHANAN:  Again --

9             THE WITNESS:  After I left and when I left was

10  Xiaole Hong.  The chairman at the time was Dan Olsen.

11  After that, I don't know who the officers were.  I

12  couldn't tell you who the treasurer was, couldn't tell

13  you who the secretary was.  I was gone, so I don't know.

14       Q.   BY MR. VALLA:  I understand, but you signed a

15  settlement agreement, did you not, with AIT signed by

16  Mr. Wilson?  We looked at it together.  Remember?

17       A.   In 2015.

18       Q.   In 2015, yes.

19       A.   Yes.

20       Q.   Mr. Wilson, so says the settlement agreement,

21  is at that time the chairman of the board; is that

22  right?

23       A.   Yes.

24       Q.   The chairman of the board is an officer of the

25  company, is it not?

1      A.    Yes.

2      Q.    It follows that Mr. Wilson was an officer of

3  the company at least in 2015.  We will ask him about it,

4  but I want to make sure I understand.  Now we have this

5  U.S. company that tries to do business with the Chinese

6  Communist Party and in the meantime doesn't pay taxes.

7  Is that about right?

8           MS. BUCHANAN:  Objection, argumentative.  I'm

9  going to instruct the witness not to answer.

10     Q.    BY MR. VALLA:  Is that right, Mr. James?

11          MS. BUCHANAN:  Objection not to answer.  It's

12  argumentative.

13          MR. VALLA:  Very well.

14     Q.    Mr. James, in your many years with AIT, did it

15  ever occur to you that this company was run by a bunch

16  of crooks?

17          MS. BUCHANAN:  Objection, argumentative, lacks

18  foundation, calls for speculation.

19     Q.    BY MR. VALLA:  Please answer.

20     A.    Alison, answer it?

21          MS. BUCHANAN:  If you're comfortable doing so,

22  Steve.  If you are not, I can instruct you not to

23  answer.

24          MR. VALLA:  That's new.

25          THE WITNESS:  The answer is no.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1      Q.   BY MR. VALLA:  The answer is no, it never

2   occurred to you that it was run by a bunch of crooks?

3           MS. BUCHANAN:  Asked and answered.

4      Q.   BY MR. VALLA:  Is that right?

5      A.   No.

6      Q.   All right.  Let's take a 15-minute break.

7   Mr. James, it's 2:15 your time.

8      A.   Yes.

9      Q.   Do you want to take a longer break?  Obviously

10  you skipped over the lunch hour.  I don't want to --

11     A.   I ate before.

12     Q.   I want you at your best.

13     A.   I had lunch before.

14     Q.   What about counsel, would you like to take

15  lunch now and then carry through?  We can do 45-minute

16  instead of 15.

17          MS. BUCHANAN:  I think it's a little early for

18  a lunch break.  I think we can resume at 11:30 and then

19  maybe do another hour or hour and a half and then do

20  lunch.

21          MR. VALLA:  Let's pick it up at 11:30 Pacific,

22  2:30 p.m. Eastern.  Thank you.

23          (Recess taken from 11:16 to 11:33)

24          MR. VALLA:  Back on the record.

25     Q.   Mr. James, you are still under oath.  You know

1    that, right?

2        A.    Yes.

3        Q.    In your prior testimony, Mr. James, you

4    mentioned that Aurora Imaging Technology, AIT, had some

5    subsidiaries in Taiwan; is that right?

6        A.    Yes.

7        Q.    Do you recall how many?

8        A.    They have one direct subsidiary.

9        Q.    You used the word "direct" to distinguish it

10   for something else?

11       A.    Yes.   The subsidiary had some entities below

12   it.

13       Q.    Would you agree that AIT had a wholly-owned

14   Taiwan subsidiary, just one, and that subsidiary had in

15   turn additional subsidiaries?

16       A.    Yes.

17       Q.    Do you know what the purpose of that corporate

18   structure was?

19       A.    They owned -- that Taiwan subsidiary owned

20   clinics throughout Taiwan using our medical device.

21       Q.    Those clinics -- each of those clinics was

22   owned by each of the second-level subsidiaries

23   essentially?

24       A.    Correct.

25       Q.    Were the clinics wholly owned by the

1    second-level subsidiaries?

2         A.   Most were.  There was one that -- there were a

3    few that were not a hundred percent owned.

4         Q.   As CFO of AIT, did you consolidate the

5    financial statements of the Taiwanese subsidiary into

6    the financial statements of AIT?

7         A.   Yes.

8         Q.   To your knowledge, did the Taiwanese subsidiary

9    consolidate the financial statements of its subsidiaries

10   into its financial statements?

11        A.   Yes.

12        Q.   It was a fully consolidated structure?

13        A.   Yes.

14        Q.   Do you recall -- perhaps you testified and I

15   forgot, but do you recall how many sub-subsidiaries were

16   in Taiwan?

17        A.   I don't.  Three or four.

18        Q.   But not all of them were wholly owned.  One was

19   not, is that right?

20        A.   That's correct.

21        Q.   Who was the co-owner of that one?

22        A.   I believe it was affiliated investors.  Some of

23   the investors in AIT, primarily I know Dr. Huang had

24   some interest in that.  I don't know who else was a

25   partner in that one.

1    Q.   When you left the company -- when you left

2  AIT's employment in 2014, did the Taiwanese corporate

3  structure still exist?

4    A.   Yes.

5    Q.   Was it as you just described it for me?

6    A.   I don't know if all of those clinics were still

7  open or not when I left.  I don't recall.

8    Q.   Were the Taiwanese companies profitable?

9         MS. BUCHANAN:  Objection, vague as to time.

10   Q.   BY MR. VALLA:  Ever.  Were they ever

11 profitable?

12   A.   I believe some of them were.

13   Q.   Do you recall the extent to which they were

14 profitable?

15   A.   No.  Individually, no.

16   Q.   Of course, I understand.  What about on a

17 consolidated basis?

18   A.   No.  Taiwanese subsidiaries generally had

19 losses.

20   Q.   As you consolidated the profits and losses of

21 the sub-subsidiaries into the Taiwanese subsidiary, they

22 would offset each other, but the sum total would be a

23 loss and not a profit; is that right?

24   A.   Yes.

25   Q.   Do you remember approximately when this

87

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    Taiwanese corporate structure was put in place?

2        A.    When we first started looking at that market, I

3    don't recall.  I don't recall when, no.

4        Q.    Would it have been very close to the time that

5    you resigned or much earlier?

6        A.    No, much earlier than that.

7        Q.    Were you an officer of any of the Taiwanese

8    companies?

9        A.    No, not that I recall.

10       Q.    Were you a director of any of the Taiwanese

11   companies?

12       A.    Not that I recall.  I may have been on one of

13   them.  Maybe the parent, maybe the Taiwanese parent.  I

14   may have been.

15       Q.    But you're not sure?

16       A.    I'm not sure, no.

17       Q.    Do you remember the name of that company, the

18   Taiwanese parent?

19       A.    Yeah, it was Aurora Asia.  I'm going to get the

20   name wrong.  I think it was Aurora Asia Limited.

21       Q.    If at all, you might have been a director of

22   Aurora Asia Limited; is that right?

23       A.    Yes.

24       Q.    I'll represent to you that your letter of

25   resignation from AIT dated June 2014 does not make any

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1  reference to the Taiwanese corporate structure.  Do you

2  see any significance in that?  You didn't mean to resign

3  from that position?

4      A.   My intention was to resign from everything,

5  clearly.

6      Q.   Once you started doing consulting work for AIT

7  in the United States, did you also do consulting work

8  for the Taiwanese corporate structure?

9      A.   No.

10     Q.   Is it your testimony that after June of 2014,

11 you had no contact and no knowledge with the Taiwanese

12 corporate structure?

13     A.   Correct.

14     Q.   Did your consulting work for AIT in the United

15 States involve the preparation of financial statements?

16     A.   Some assistance.

17     Q.   How would you describe that assistance?

18     A.   Primarily to pull together the year-end report

19 in anticipation of being able to then do the tax

20 compliance.

21     Q.   Okay.

22     A.   Primarily helping them with the consolidation

23 reporting, bring all of those companies together and

24 create a consolidated financial.

25     Q.   Understood.  In your consulting role starting

1    at some point in 2015, do you recall seeing financial

2    information on the Taiwanese subsidiaries?

3         A.   I don't.

4         Q.   Because had they existed, they would have been

5    consolidated into the U.S. parent company's financial

6    statement, would they not?

7         A.   Yes.

8         Q.   Do you know what happened to that Taiwanese

9    corporate structure?

10        A.   I don't.

11        Q.   No idea?

12        A.   I know all the sites ended up closing down.

13   Beyond that, I don't know, no.

14        Q.   Do you know when they closed down?

15        A.   No.

16        Q.   Do you know if they were sold?

17        A.   No, I do not.

18        Q.   You talk about them as sites.  I understand in

19   my way of thinking, I think about companies and you

20   think about businesses.  These sites were diagnostic

21   imaging centers; is that right?

22        A.   Yes.

23        Q.   So there would have been some real estate?

24        A.   Yes, leased.

25        Q.   Leased premises, okay.  Equipment?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1      A.   Yes.

 2      Q.   Fixtures of some kind?

 3      A.   Beyond the MRI equipment, not a lot, but yes.

 4      Q.   Some furniture?

 5      A.   A little bit of furniture, yeah.

 6      Q.   Bank accounts?

 7      A.   Yeah, yes.

 8      Q.   Do you know what happened to any of those

 9 assets?

10      A.   No.

11      Q.   No one ever told you what happened to any of

12 those assets?

13      A.   No.

14           MS. BUCHANAN:  Steve, you're kind of nodding

15 your head.  So make sure that you're clearly responding.

16 I think you said no.  Sounded sort of like a little bit

17 of a grunt to me.

18           THE WITNESS:  I did say no.

19           MS. BUCHANAN:  Make sure of the extra

20 enunciated.  Thank you.

21      Q.   BY MR. VALLA:  Who would have had the

22 authority, to your knowledge, to dispose of the

23 Taiwanese corporate structure?

24           MS. BUCHANAN:  Calls for speculation, lacks

25 foundation.
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1        Q.   BY MR. VALLA:  I asked for your knowledge,

2   Mr. James.

3        A.   Whoever would be the CEO at that time.

4        Q.   Meaning the CEO of AIT U.S.?

5        A.   Parent, yes.

6        Q.   Parent company?

7        A.   Yeah.

8        Q.   You participated in board meetings and so on

9   for four years.  Do you think it would have required

10  board approval as well?

11            MS. BUCHANAN:  Objection, calls for a legal

12  conclusion, lacks foundation, calls for speculation.

13       Q.   BY MR. VALLA:  You can go ahead and answer.

14       A.   The individual clinic, no.  That is basically

15  operations.

16       Q.   What about the collective corporate structure

17  in Taiwan?

18            MS. BUCHANAN:  Objection, vague.  I don't

19  understand what your question means, Antonio.

20       Q.   BY MR. VALLA:  Do you understand what I mean,

21  Mr. James?

22       A.   No, I do not.

23       Q.   Would it have taken a board action in order to

24  sell or shut down the Taiwanese subsidiary and its

25  sub-subsidiaries as opposed to an individual center?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1      A.    Well, some subsidiaries would be effectively a

2  center.   So if you shut down a center, you would shut

3  down the subsidiary as part of the operations.

4  Sometimes you could control that shutdown.   Sometimes it

5  was just because the lease expired and they wanted you

6  out.   So it depended.   I'm sure, similar to here in the

7  U.S., each clinic closure occurs out of different

8  circumstances.

9      Q.    Right.   Would it have taken board action to

10  shut down the direct wholly-owned subsidiary, the one

11  that you thought was called Aurora Asia Limited?

12      A.    Shut it down as a bankruptcy or just a

13  dissolution?

14      Q.    In either way.

15      A.    I don't know.

16      Q.    You just don't know that?

17      A.    If the operations were minimal, then maybe,

18  maybe not.   It really depends on the extent of what was

19  still there.

20      Q.    You were not involved in any discussions

21  concerning the shutdown of any of the centers or the

22  direct subsidiary; is that right?

23      A.    No.

24      Q.    Do you believe all of that happened after you

25  left the company?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1      A.   I believe some of the clinics had shut down

2   before I left, and we terminated the service at some of

3   those clinics but, yeah, the shutdown of all of it and

4   then whatever happened post my termination, I have no

5   idea.

6      Q.   Some of the clinics were shut down while you

7   were still the CFO of AIT; is that right?

8      A.   Yes.

9      Q.   Do you know how many?

10      A.   I don't.

11      Q.   With respect to those clinics that shut down

12   during your tenure as CFO, what happened to the assets

13   in each of those clinics?

14      A.   Generally disassembled and take back as much of

15   the parts as you could salvage.  If you could get the

16   other computers and so forth, you get them out.  Again,

17   a lot of it was -- if it's a two or three-year-old

18   computer, not a lot of value there.

19           Again, you're trying to salvage what you could

20   out of the equipment.  Some of the equipment had a lot

21   of value, though, like the electronic components on the

22   MRI system were quite valuable.

23      Q.   Those components that you just stated were

24   quite valuable, where did they go?

25      A.   Typically it would go into inventory and be

94

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
1    used -- either stripped for service parts or used as --
2    in some cases, we might sell it as used Aurora system,
3    in which case it might include a refurbished component
4    from one of those shut downed clinics.
5         Q.   Would they come back to the United States then?
6         A.   No, I don't believe those did.
7         Q.   They stayed in Asia?
8         A.   That I know of.  I don't know where they ended
9    up.
10        Q.   Do you have an estimate of what those valuable
11   components would have been worth at the time?
12        A.   All of them?  The magnet itself wouldn't be of
13   much value.  Again, I'm speculating here.  Less than six
14   figures.  Electronic cells might be worth something.
15        Q.   Less than six figures in U.S. dollars per
16   clinic?
17        A.   Then there would be the cost of going out and
18   getting it, actually removing it, shipping it back, et
19   cetera.  So there would be some cost to actually get
20   that, what value there might be there.
21        Q.   Did each company that operated each clinic have
22   its own bank account?
23        A.   I don't believe all of them did, no.
24        Q.   The parent company would pay their bills?
25        A.   Yes.
```

95

```
1        Q.   Is that normal in your experience as a CPA?

2        A.   Yes.  If it is not -- if it doesn't have

3   payroll and doesn't have a lot of -- if it's just

4   providing a basic service and especially if it's

5   collecting its revenue from the hospital and not

6   actually billing patients, then it might just involve a

7   single invoice per month, in which case you might not

8   set up a separate bank account.  It just doesn't require

9   it.

10       Q.   You mix the parent's money with the

11  subsidiaries' money because there is no need to have an

12  account; is that right?

13       A.   Correct.

14       Q.   Aurora Asia Limited, the subsidiary in Taipei

15  or Taiwan, I should say, did it have a management

16  structure?  Who ran the show?

17       A.   I can't tell you who exactly.  I don't know the

18  exact corporate structure of a Taiwan company at this

19  stage, but I know -- I can't remember his last name now.

20  P.J.  I believe his name was Huang.  He was, I believe,

21  the president of Aurora Asia, and I believe that Olivia

22  was the chairman.  I don't know if there was any other

23  officers of Aurora Asia.

24       Q.   I know little or nothing about Taiwanese

25  companies and you're way ahead of me.  Who ran it
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1   operationally?

 2        A.   P.J. was his name.

 3        Q.   P.J. possibly by the last name of Huang, is

 4   that right?

 5        A.   H-u-a-n-g, I believe, is the way you spell it.

 6        Q.   Who provided you with the financial information

 7   from Aurora Asia to be able to consolidate the financial

 8   statements into AIT's financial statements?

 9        A.   They had an accountant in Asia.

10        Q.   When you say they, who do you mean?  I'm sorry.

11        A.   I mean Aurora Asia Limited had an accountant in

12   Asia.

13        Q.   Do you know who that was?

14        A.   I believe it was Ginny.  I don't know her last

15   name.

16        Q.   Do you know if Ginny, whose last name we don't

17   know, was an employee of Aurora Asia?

18        A.   Yes, she was.

19        Q.   This is an in-house accountant; it's not an

20   outside accounting firm.  Is that right?

21        A.   Correct.

22        Q.   Would you have contact information for Ginny?

23        A.   Somewhere in the records, I might.

24        Q.   If you find it, will you give it to us?

25             MS. BUCHANAN:  He will provide it to me and we
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    can discuss among counsel, if he has it.

2              MR. VALLA:  Sure.  I didn't mean for him to

3    give it to me directly, yes.

4              MS. BUCHANAN:  Right.

5              THE WITNESS:  It would be in the AIT records

6    somewhere.

7              MR. VALLA:  Right, the AIT records.

8        Q.   By the way, do you know where the AIT records

9    are?

10       A.   No.

11       Q.   Because you tell me they would be in the AIT

12   records.  Great, somebody knows where they are.

13       A.   I thought you would know they were in storage.

14   I thought you already accessed them.

15       Q.   Okay, so you knew that.  Who told you that?

16       A.   What's that?

17       Q.   Who told you that I accessed the AIT records?

18       A.   The people when they came and got them.  They

19   were in the office.

20       Q.   They were in your office?

21       A.   Yeah, stored there for a while.  Then they got

22   put into storage.

23       Q.   So you were storing the AIT records before they

24   got to storage?

25       A.   I wasn't storing anything.  They happened to be

1   there.  They couldn't move them until they assembled

2   them all.

3       Q.   You had them in your office, in any event?

4       A.   Not in my office, in the building.

5       Q.   In the building, okay.  Then you know where

6   they are.  Do you know whether AIT received any money

7   from the tearing down of the Taiwanese corporate

8   structure?

9       A.   No.

10      Q.   You don't know or it didn't receive any?

11      A.   No, I don't know.

12      Q.   You don't know?

13      A.   Yeah.

14      Q.   Are you familiar with my client, Castel S.A.?

15      A.   Yes.

16      Q.   What do you know about them?

17      A.   I know the principal.

18           MS. BUCHANAN:  Objection, vague.  Hold on.

19   Objection, vague.  You can answer.

20           THE WITNESS:  I have met Davide Malacalza.  I

21   have met Marco.  He was, in fact, was on the board for a

22   while, and I am aware that they are an investor and that

23   they were also a lender.

24      Q.   BY MR. VALLA:  When you mentioned Marco, do you

25   mean Marco Caneva?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1      A.    I do.

2      Q.    His name is spelled C-a-n-e-v-a.

3      A.    Correct.

4      Q.    You said that Mr. Caneva was on the board of

5   AIT?

6      A.    Yes.

7      Q.    Was he a director of AIT?

8      A.    He was on the board of directors, yes.

9      Q.    Would it surprise you to learn that he was not

10   a director of AIT?

11      A.    I thought he was.  It would.  I thought he was.

12      Q.    So you would be surprised to know that he was

13   an observer on the board but not a director of the

14   company?

15      A.    Yes.  I was not aware of that.

16      Q.    That's fine.  You mentioned that you're aware

17   that Castel invested money in AIT and also was a lender

18   to AIT?

19      A.    Yes.

20      Q.    With respect to its loan, do you recall that it

21   was a $250,000 loan that Castel made to AIT?

22      A.    That sounds about right, yes.

23      Q.    I will represent to you that it was.  I will

24   also represent to you that Castel sued AIT for repayment

25   of that loan and got a judgment for that principal plus

1    interest plus costs and various other things.  I think

2    the judgment is for around $400,000.  I am representing

3    that to you.  I am not asking you about it.

4             Are you aware of that judgment?

5         A.   I am not.

6         Q.   Were you aware of the lawsuit?

7         A.   I guess I thought it was part of this whole

8    lawsuit, so yes.

9         Q.   That is a separate lawsuit.  That one

10   concluded.  This one is still ongoing.

11        A.   Okay.  I was not aware of that.

12        Q.   Do you remember whether Castel asked AIT to

13   have its loan paid back at any point?

14        A.   No.

15        Q.   Do you recall -- so you do not recall any

16   demands for payments by Castel on the loan?

17        A.   No.

18        Q.   Do you recall whether Castel's loan to AIT was

19   secured or unsecured?

20        A.   I don't recall.

21        Q.   You do know the difference between an unsecured

22   loan and secured loan, do you?

23        A.   Yes.

24        Q.   Did you ever tell Castel that its loan to AIT

25   would not be paid back?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    A.   No.

2    Q.   Did you ever tell Castel that AIT was

3    insolvent?

4    A.   No.

5    Q.   Did you ever tell Castel that AIT was bankrupt?

6    A.   No.

7    Q.   Do you recall, and I know this goes back some

8    years, but do you recall ever having any communications

9    with Castel while you were CFO of AIT?

10   A.   Directly, no.  Only through board meetings to

11   the extent that they were in attendance there.

12   Q.   So you don't remember any e-mails or telephone

13   calls, for example?

14   A.   No.  I would never communicate directly like

15   that.

16   Q.   Why would you not communicate directly like

17   that?

18   A.   It's -- if I communicate to one shareholder, I

19   have to communicate to all.

20   Q.   And you would rather not?

21   A.   No, it's -- it usually goes through the board.

22   Q.   But if a shareholder had written to you asking

23   for financial information, would you have provided that

24   information?

25        MS. BUCHANAN:  Objection, incomplete

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1  hypothetical, lacks foundation, calls for speculation.

2      Q.   BY MR. VALLA:  Go ahead.

3      A.   Am I answering that?

4          MS. BUCHANAN:  Yes, you can.

5          THE WITNESS:  Okay.  It depends on the

6  financial information being requested.  If it was

7  information again that would have been provided to --

8  again, if it was being asked as a board member, then it

9  would be provided to the board meeting.  If it was asked

10  to the shareholder, then it would be provided to the

11  extent that there were formal communications through

12  shareholders.  It depends on the nature of the request

13  and the nature of the information being requested, but I

14  never received such communication.

15      Q.   BY MR. VALLA:  Did you receive such

16  communications informally perhaps, somebody called you

17  rather than you calling them?

18      A.   No.

19      Q.   How about at board meetings, do you recall

20  anybody asking you about paying back this loan?

21      A.   No.

22      Q.   You were CFO of AIT from 1999 to June of 2014?

23      A.   Uh-huh.

24      Q.   I will represent to you that Castel made two

25  separate investments in AIT.  It purchased series C

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    preferred stock in 2006 and series D preferred stock in

2    2008.  Is that your understanding as well?

3         A.    Yes.

4         Q.    Let's talk first about the 2006 investment.

5    Was this a public offering of securities?

6         A.    No.

7         Q.    Was it a private offering of securities?

8         A.    Private.

9         Q.    Was there a private offering documentation

10   prepared?

11        A.    Yes.

12        Q.    By whom?

13        A.    By attorneys.

14        Q.    Those pesky attorneys come up everywhere.  Who

15   was it?  Do you know what firm?

16        A.    I believe the law firm at the time was a

17   company called Duane Morris.

18        Q.    Duane Morris is a law firm based in

19   Philadelphia.  It's a pretty big firm.

20        A.    Yes.  This individual was based out of

21   Pittsburg.

22        Q.    Do you remember the individual's name?

23        A.    Bruce Bowden.

24        Q.    What about the 2008 investment, was that also a

25   private offering?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1        A.   Yes.

 2        Q.   Was the documentation for the private offering

 3   also prepared by a law firm?

 4        A.   Yes.

 5        Q.   Was it also Duane Morris?

 6        A.   I believe so.

 7        Q.   Did you have any involvement at all in either

 8   the 2006 or 2008 private offering of securities to my

 9   clients?

10        A.   To the extent that the offering required

11   financial disclosure, yes.

12        Q.   Were there financial disclosures made?

13        A.   Yes.

14        Q.   Were they accurate?

15        A.   At the time, we thought they were.

16        Q.   But you don't think so now?

17        A.   Yes.  They didn't come out.

18        Q.   I'm sorry, Mr. James.  I couldn't hear.

19        A.   The forecast, by their nature, they could be

20   off.

21        Q.   The forecast can be off?

22        A.   Yes.

23        Q.   The weatherman could have told us that, right?

24   What about -- were the offering documents reviewed by a

25   certified public accountant?
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1      A.    No.

2      Q.    Except yourself, right?

3      A.    That was not as my role as a CPA.  I was CFO of

4  Aurora at the time.

5      Q.    You were a licensed CPA at the time anyway,

6  right?

7      A.    Yes.

8      Q.    But you did not offer an opinion, which is

9  probably what you're trying to tell me, you did not

10  offer an opinion on the accuracy of the financial

11  statements?

12      A.    No.

13      Q.    Did you not perform an audit?

14      A.    No.  I could not.

15      Q.    In fact, you could not have performed an audit

16  because you cannot audit yourself; is that right?

17      A.    Well, plus an audit requires quality control.

18  An individual CPA by themselves should not and cannot

19  provide an audit.

20      Q.    Understood.

21      A.    It's too much oversight required to do an

22  audit.

23      Q.    Were the financial statements that accompanied

24  the 2006 and 2008 offerings unaudited?

25      A.    I don't recall.

1     Q.    Had they been unaudited, no one outside of the

2     company would have reviewed them; right?

3     A.    Correct.   It would be internal.

4     Q.    Were you aware at the time that the 2006 and

5     2008 offerings took place, were you aware that these

6     offerings had the purpose of raising equity investments

7     from third-party investors?

8     A.    Yes.

9     Q.    Were you aware that those investors would be

10    relying on the completeness and accuracy of the investor

11    documents in order to decide whether to make an

12    investment?

13    A.    Yes.   However, there would be all kinds of

14    warnings in there.

15    Q.    Just like for medication, right, you always get

16    the warnings.   Do you always read the warnings on

17    prescription medication, Mr. James?

18    A.    I do.

19          MS. BUCHANAN:   Objection, argumentative.   Hold

20    on.   Objection, argumentative, lacks foundation, calls

21    for speculation.

22    Q.    BY MR. VALLA:   Do you?

23    A.    Do I?

24    Q.    Yes.

25    A.    Many times, yes.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1          (Phone ringing sound)

2     Q.   That's good.  Everyone should.  I stopped

3  because somebody's phone was ringing.

4          You mentioned -- you testified, I should say,

5  earlier in your deposition that at some point, AIT's

6  financial condition was so poor that it couldn't afford

7  to file its tax returns; is that right?

8     A.   Yes.

9     Q.   When was that, when did it deteriorate to that

10 point?

11    A.   That's real speculation.  I mean, when did you

12 start?  Obviously they were getting -- raising equity

13 along the way to continue to fund the operations and

14 fund development.  They were, subsequent to the series

15 D, obtaining shareholder loans to continue to fund

16 operations and keep the doors open, so over a period of

17 time.

18    Q.   Did it ever occur to you that the condition of

19 the company was deteriorating and the shareholders

20 should be informed?

21    A.   Yes.

22    Q.   In fact, you were a shareholder; right?

23    A.   Yes.

24    Q.   You had some stock options and you exercised

25 those stock options in either 2011 or 2012, but you

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    either were an optionee or a shareholder through quite a

2    number of years; is that correct?

3         A.   Yes.

4         Q.   You knew that the company's financial condition

5    was deteriorating, even though you can't tell me when it

6    started, but you knew it was, wasn't it?

7         A.   The company experienced losses over a number of

8    years and that was clear in the financial statements.

9         Q.   You knew of those losses?

10        A.   Yes.

11        Q.   And the financial statements reflected them?

12        A.   Yes.

13        Q.   And did you feel that as an officer of the

14   company, as CFO of the company who was also a

15   shareholder, you should have told your fellow

16   shareholders, hey, guys, things ain't so good?

17        A.   Yes.

18        Q.   Did you do that?

19        A.   Yes, there were shareholder communications,

20   yes.

21        Q.   From you?

22        A.   Not from me individually, no.

23        Q.   I'm not trying to be --

24        A.   That would be the responsibility of the company

25   and of the board to make sure that they get that

```
 1   communication out.

 2       Q.   So --

 3            THE COURT REPORTER:  Would you repeat the end

 4   of your answer.

 5            THE WITNESS:  To get the communication out

 6   would generally be at the direction of the board.

 7            MS. BUCHANAN:  Then he said it would be at the

 8   direction of the board.

 9            THE WITNESS:  Right.

10       Q.   BY MR. VALLA:  Did the board ever direct you,

11   Mr. James, to send out any shareholder communications

12   about the financial condition of the company?

13       A.   I don't recall.  I know there were

14   communications.  Whether or not they directed me to do

15   that, I don't recall if it was specifically to me.

16       Q.   You were the CFO, right, you were the chief

17   financial officer?

18       A.   Yes.

19       Q.   You reported to the president and CEO of the

20   company?

21       A.   Yes.

22       Q.   Whoever that was at various points in time.  It

23   was Olivia Cheng at some point; right?

24       A.   Yes.

25       Q.   Then it was Michael Devlin at some point?
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    A.   That I don't know.

2    Q.   Then it was Christopher Wilson; right?

3    A.   Yes.

4    Q.   Do you recall any of the CEOs that you reported

5  to telling you to advise the shareholders of the

6  deteriorating condition of the company?

7    A.   Telling me as CFO, no.

8    Q.   How about telling you as a friend?

9    A.   No.  They wouldn't tell me to do that

10  communication.  Again, the communication would come from

11  the company.

12    Q.   But you knew that the financial condition of

13  the company was as it was?

14    A.   Yes.

15    Q.   If your mother had been an investor, you would

16  have wanted to tell her, right, that things weren't

17  good?

18        MS. BUCHANAN:  Objection, argumentative, lacks

19  foundation, incomplete hypothetical, calls for

20  speculation.

21    Q.   BY MR. VALLA:  Go ahead and answer.

22    A.   I would have continued to borrow money, so it

23  didn't matter.  It wasn't a public market for the shares

24  anyway, so it's not like it's a public traded company.

25  No, I probably -- I would have said things -- as long as

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1  we continue to get funding of loans from lenders, of

2  course, we were existing shareholders, so as long as

3  that continued to be a source of funds, then the company

4  could keep going.

5      Q.    Castel was one of the shareholders that put in

6  more funds in the form of a loan; right?

7      A.    Yes.

8      Q.    When that loan was made, the company made full

9  disclosure to Castel of the financial condition of the

10  company; right?

11     A.    Yes.

12     Q.    Did you participate in that disclosure?

13     A.    Yes.

14         MS. BUCHANAN:  Objection, asked and answered.

15     Q.    BY MR. VALLA:  Was that in writing?

16     A.    Yes.

17     Q.    It was not accompanied by audited financial

18  statements, was it?

19     A.    No.

20     Q.    As far as you know, was AIT ever audited --

21  strike that.

22         As far as you know, was AIT ever -- had AIT

23  ever -- I'm going to get this right at some point.

24  Strike that.

25         As far as you know, did AIT's financial

1  statements ever get audited by an outside accounting

2  firm?

3      A.   I believe we did early on, yes.

4      Q.   Why would you have done so early on?

5      A.   As a matter of practice.

6      Q.   Is that good practice?

7      A.   Yeah, standard business practice, but

8  eventually got to the point where the company is putting

9  a lot of funds into doing an audit and felt we were

10  accurate in our financial reporting.

11      Q.   Audits are expensive; right?

12      A.   Yes, they are.

13      Q.   And yet you just testified that you were

14  accurate in your financial reporting, right?

15      A.   I believe we were, yes.

16      Q.   I'm sure you were.  And isn't the purpose of an

17  audit to confirm the accuracy of your financial

18  reporting?

19      A.   No.  The purpose of an audit is to say that the

20  financial statements reasonably represent the financial

21  position and results of operations.

22      Q.   I agree with that.  That is exactly what an

23  audit letter says; right?

24      A.   Yes, that is what an audited opinion is.  It's

25  not a statement on accuracy.  It's a statement on

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    reasonableness.

2        Q.   Reasonableness and reasonably accurate, is that

3    right?

4        A.   Yeah.

5        Q.   But at some point, the company decided not to

6    get its financial statements audited anymore?

7        A.   Correct.

8        Q.   Was that your decision?

9        A.   No.

10       Q.   Whose decision was it?

11       A.   Board.

12       Q.   Were you present at the board meeting when that

13   decision was made?

14       A.   I don't recall.

15       Q.   You testified earlier that you participated in

16   board meetings as secretary and treasurer.  Did you

17   participate in all board meetings?

18       A.   Most.  I would say most.

19       Q.   It's likely, is it not, the board would have

20   told you about this, let's not spend money on auditors

21   decision, at a board meeting that you were present at?

22       A.   Yes.

23       Q.   You testified that you were secretary of the

24   company and so you kept the minutes of the board

25   meetings.  And if you were not at a board meeting, who

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
1   kept those minutes?
2        A.    In some -- when Pharos came, in some cases, Ana
3   Kovalkova would sometimes do it.  And certainly after I
4   left, I believe she was the one who kept minutes.
5        Q.    Do you remember the spelling of Ana's name?
6        A.    I believe it's K-o-v-a-l-k-o-v-a.
7        Q.    Kovalkova phonetically, okay.
8        A.    Yeah.
9        Q.    Did Ana work with Michael Devlin?
10       A.    Yes.
11       Q.    Do you know Mr. Devlin?
12       A.    Yes.
13       Q.    Do you know where he lives?
14       A.    Now, no.
15       Q.    Do you know where he used to live?
16       A.    Nashville.
17       Q.    Nashville, Tennessee?
18       A.    Correct.
19       Q.    Do you have any contact information for
20   Mr. Devlin?
21       A.    I do not.
22       Q.    I'm sorry?
23       A.    I do not.
24       Q.    No e-mail?
25       A.    The only e-mail I have from him is Pharos.
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    Only thing I am aware is he is no longer at Pharos.

2        Q.    Right.

3        A.    I'm assuming he has got some other contact

4    information that I'm not aware of.

5        Q.    As far as you know, is Mr. Devlin a U.S.

6    citizen?

7        A.    I couldn't tell you either way.

8        Q.    Did he speak English with an accent that didn't

9    seem like an American accent?

10        A.    He did not.

11        Q.    Is it possible that Mr. Devlin is a U.K.

12    citizen?  Have you ever heard anything about that?

13        A.    This is the first I have heard of it.

14        Q.    Maybe I'm making it up.

15        A.    I have never heard of that.  That's a new one,

16    okay.

17        Q.    Do you remember roughly when you met

18    Mr. Devlin?

19        A.    Yes.

20        Q.    What year?

21        A.    2004 or '05.

22        Q.    How was he introduced to you?

23        A.    He had a gentleman.  I believe his name was

24    Savage.  I can't remember his first name, and he

25    basically helped uncover small companies that Pharos may

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1   be interested in investing in.  And so we were

2   introduced by this, quote -- the freelance term we

3   called it is a finder.  Go out and find opportunities.

4       Q.   At the time that you met Mr. Devlin, he

5   represented Pharos spelled P-h-a-r-o-s, which, as far as

6   I understand and I believe your understanding, is a

7   private equity fund; is that right?

8       A.   Yes.

9       Q.   Pharos ended up investing in AIT?

10      A.   Yes.

11      Q.   When was that approximately that Pharos became

12  an AIT investor?

13      A.   The Castel came in at the same time as them, so

14  that was 2006 and 2008.

15      Q.   Pharos participated in the equity rounds in

16  2006 and 2008 that Pharos also participated in?

17      A.   Castel, yes.  Pharos led the round as you need

18  a lead and they led it.

19      Q.   And brought in Castel?

20      A.   Yes.

21      Q.   Did Devlin serve on the board of AIT?

22      A.   Yes.

23      Q.   Roughly during what period of time?

24      A.   Certainly in 2006 when they came in, they had

25  the right to two board seats, and I don't know if they

1    filled them both immediately, but certainly from 2006

2    until -- might have been a period where he might have

3    left the board right around 2013-14, but then I don't

4    know what happened again after I left.

5        Q.   You left in June of 2014.  Was Mr. Devlin still

6    on the board when you left in June of 2014?

7        A.   I do believe so.

8        Q.   You do not believe so?

9        A.   I do believe so.

10       Q.   I couldn't hear you.  I'm just deaf.  Sorry.

11            Did you meet in person with Mr. Devlin over a

12   long period of time that he was the director of AIT?

13       A.   Just he and me?

14       Q.   Well, I'm not suggesting anything untoward, but

15   did you have sort of face-to-face meetings with him and

16   others or by yourselves?

17       A.   No.  It was primarily through board meetings

18   and, yes, quite a few times, he was in attendance at the

19   board meeting.

20       Q.   What about outside of the board meetings?

21       A.   Nothing more formal than just dinners and

22   things like that.

23       Q.   So there would be some dinners around the board

24   meetings; is that right?

25       A.   Around board meetings, yeah.  We went to their

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    office in Nashville a couple of times.

2        Q.   To the office?

3        A.   Down to their office to make presentations, et

4    cetera.

5        Q.   In your opinion, is Mr. Devlin an honest

6    person?

7             MS. BUCHANAN:  Objection, calls for

8    speculation, lacks foundation.  You can answer.

9             THE WITNESS:  Yeah, I don't know.  I'm not

10   going to answer that.

11       Q.   BY MR. VALLA:  Well, I'm generally forgiving of

12   such things, but when you say you're not going to answer

13   it, does that mean that you're refusing to answer it?

14            MS. BUCHANAN:  What he said, Counsel, is I

15   don't know.

16            MR. VALLA:  That's not what he said.

17            MS. BUCHANAN:  The record will reflect that's

18   what he said.

19       Q.   BY MR. VALLA:  You are not willing to express

20   an opinion then, is that right, Mr. James?

21       A.   No opinion.  I don't know.  I don't know him

22   enough.

23       Q.   Do you know now that the Securities and

24   Exchange Commission has censured and fined Mr. Devlin?

25       A.   I did not know that.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1       Q.   Did you just hear it from me?

2       A.   I heard that the SEC was looking into him, but

3  I had not heard anything beyond that.

4       Q.   When did you hear that the SEC was looking into

5  him?

6       A.   Oh, boy.  I don't recall when.  About the time

7  that they contacted us to get some information on some

8  of his transactions with the company.

9       Q.   Who contacted you?  I'm sorry.

10      A.   The SEC.

11      Q.   So you heard from the SEC?

12      A.   Well, they contacted Olivia and she was asked

13  to try to gather a little bit of information, and I

14  tried to help where I could with gathering that.

15      Q.   Were you interviewed --

16      A.   No.

17      Q.   -- by either the Securities and Exchange

18  Commission or the Federal Bureau of Investigation?

19      A.   No.

20      Q.   Did you provide any written statements

21  accompanying any documents or independent of any

22  documents to either the Securities and Exchange

23  Commission or the Federal Bureau of Investigation?

24      A.   No.

25      Q.   Do you know if Ms. Cheng did?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1      A.    No, I do not know.

2      Q.    I will get a chance to ask her next week.

3            When did the SEC contact Ms. Cheng?

4      A.    I don't know specifically when.

5      Q.    Do you know generally when?

6      A.    Again, I don't recall.  It was just kind of a

7  passing.

8      Q.    Kind of a small thing, you know, the SEC

9  called.  It's the kind of thing you don't remember?

10     A.    It wasn't regarding us.  It was regarding him.

11           MS. BUCHANAN:  Objection, argumentative.

12           THE WITNESS:  It was regarding his business

13  activities with regard to Pharos.  He is an investment

14  banker.  He does a lot of stuff.

15     Q.    BY MR. VALLA:  You wouldn't even remember the

16  year that was?

17     A.    It was between 2016 and now.  It hasn't been

18  within the last two years, so between 2016 and 2017 or

19  '18, early '18.  It wasn't much of a conversation.  It

20  went in one ear and out the other.  I don't pay

21  attention to it.  It didn't involve me.  I'm like, okay,

22  he has some issues; that's it.

23     Q.    You testified that Ms. Cheng asked you to put

24  together some information relating to the SEC inquiry?

25     A.    Yeah.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1      Q.   In response to the SEC inquiry?

2      A.   Yeah.  It was one question about a document

3   just trying to get at a document in one -- in one of the

4   servers, yeah.

5      Q.   This took place when you were no longer the

6   CFO?

7      A.   Right.

8      Q.   She was the president of AIT?

9      A.   Prior to 2013.

10     Q.   I'm sorry.  In what capacity did she ask you to

11   pull together this information?

12     A.   If I knew where it might be located.

13     Q.   If somebody else had come along and asked you

14   for that information, I suspect you would not have

15   responded, but you responded to Ms. Cheng.  So I assume

16   she had some authority to ask you for that information;

17   is that right?

18     A.   I don't know about authority.  She asked me and

19   I offered where it might be.

20     Q.   Because of your friendship or professional

21   relationship?

22     A.   To assist her in finding it so she didn't spend

23   so much time going through files.  She could have found

24   it herself, I'm sure.

25     Q.   Are you often in contact with Ms. Cheng?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1        A.    Yes.

 2        Q.    How often would you say?

 3        A.    Every other day.  I worked for Aurora

 4   Healthcare.

 5        Q.    Do you know if Mr. Devlin has served time in

 6   jail?

 7        A.    No.

 8        Q.    Before you got this call from Ms. Cheng asking

 9   you for your support to gather some information for the

10   SEC request, did you have any knowledge of Mr. Devlin's

11   fraudulent activities, criminal activities, anything of

12   that sort?

13             MS. BUCHANAN:  Objection, that misstates the

14   previous testimony.

15        Q.    BY MR. VALLA:  Go ahead, Mr. James.

16        A.    No, none.

17        Q.    You said no, none.  Is that your testimony?

18        A.    Correct.

19        Q.    I appreciate that.  I think it's a microphone

20   issue, Alison.  Maybe it's a distance from the

21   microphone issue.  Yes, sorry.  I apologize.

22             MS. BUCHANAN:  I think it's a distance from the

23   microphone issue.  I've got to get you right next to the

24   mic, Steve, and I'm going to ask you to enunciate a

25   little bit better.
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1              THE WITNESS:  Sorry.  Boston accent.
 2              MS. BUCHANAN:  Exactly.  Thank you.
 3         Q.   BY MR. VALLA:  Let's talk about ARF Partners
 4    for a second.  This is ARF Partners, LLC.  Are you
 5    familiar with that entity?
 6         A.   Yes.
 7         Q.   Is that entity existing today?
 8         A.   Yes.
 9         Q.   Do you work for ARF?
10         A.   No.
11         Q.   You are not employed by ARF?
12         A.   Correct.  I am not an employee.
13         Q.   Are you an officer of ARF?
14         A.   No.
15         Q.   Are you a consultant?
16         A.   I do a little bit, very, very little.
17         Q.   What do you do?
18         A.   I'm sorry.  Was there a question there?
19         Q.   Yes.  What do you do?
20         A.   The only thing I have done for the past two or
21    three years is primarily file their annual report with
22    the Massachusetts Secretary of State.  That's about a
23    half hour filing.  It doesn't take very much.
24         Q.   Do you prepare or file their tax returns?
25         A.   No.
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1      Q.   Do you know if they file tax returns?

2      A.   I couldn't tell you.  No, I don't know.

3      Q.   Do you know who the officers of ARF are?

4      A.   The only one I know is Olivia.

5      Q.   You say you file their annual report with the

6  Massachusetts Secretary of State.  So isn't that where

7  the officers are listed?

8      A.   Yes.

9      Q.   Is Olivia Cheng the only officer?

10     A.   I don't know.  I don't recall.  I do a lot of

11  annual reports for clients.  Unless they tell me there

12  is a change, it's just -- it's kind of a very

13  perfunctory thing to do automatic every year.

14     Q.   It's all a blur, right?

15     A.   Pay a hundred bucks and be done with it, yeah.

16          MS. BUCHANAN:  Steve, you have answered the

17  question.  You don't have to keep talking.

18     Q.   BY MR. VALLA:  I will represent to you that I

19  have the wrong document, but I will have the right one

20  in just a minute.  I have a screen shot from the

21  business entity division of the Massachusetts Secretary

22  of State for ARF Partners, and that screen shot lists

23  you as Steven J. James, 19 Cedar Drive, unit 1, North

24  Conway, New Jersey, 03860, as a signatory.

25          Do you know what that means?

1     A.   As a signatory?

2     Q.   That's right.  It says SOC signatory.

3     A.   No, it doesn't mean anything, SOC.

4     Q.   Does that address ring a bell with you?

5     A.   Yeah.  That used to be my address over at North

6 Conway up in the -- yes.

7     Q.   It also refers to you by the title, real

8 property.  Does that have any meaning for you?

9     A.   I didn't hear that.

10    Q.   The document I'm looking at refers to you by

11 the title, real property.  Does that have any meaning

12 for you?

13    A.   Real property?  That means real estate.  I

14 haven't the slightest idea, no.

15        MS. BUCHANAN:  Counsel, perhaps you can show

16 him the document.

17        MR. VALLA:  Maybe I will or maybe I won't.

18    Q.   It lists Olivia Ho Cheng as manager.  And does

19 that comport with your understanding since you filed

20 these documents with the Secretary of State?

21    A.   Yeah, LLC.  The proper title of an LLC is

22 manager and member.

23    Q.   Do you have any other roles for ARF besides

24 this annual filing work you do?

25    A.   No.

```
1       Q.   Do you know who owns ARF?

2       A.   I don't, no.

3       Q.   Who would know that?

4       A.   Olivia.

5       Q.   Do you know where ARF banks?

6       A.   I do not know that.

7       Q.   Does ARF pay you for your services in filing

8   the annual statement with the Massachusetts Secretary of

9   State?

10      A.   I might charge her for an hour or half an hour,

11  yes.

12      Q.   Do you get paid; do you know?

13      A.   I don't know if I got paid for that last year.

14  I think I just -- she wrote me a check, I believe.

15      Q.   She wrote you a check?

16      A.   Yes.

17      Q.   Would you have a copy of that check?

18      A.   I don't know.  It would be $75 maybe.

19      Q.   Right.

20      A.   Right, basically half an hour or an hour, not

21  even.

22      Q.   Do you know if it was a company check?

23      A.   I might not have even charged her, if I even

24  sent a bill for it.

25           MS. BUCHANAN:  Steve, just be careful, there is
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    no question pending.  Just listen to his questions and

2    just answer his questions.  If he is silent, you don't

3    have to fill the silence, okay.  Just wait for the next

4    question.

5         Q.   BY MR. VALLA:  Do you recall whether it's a

6    personal check or a company check that you got paid

7    with?

8         A.   I don't.

9         Q.   Is it small or big?

10        A.   The amount?

11        Q.   No, the size of the check.

12        A.   I don't know.

13        Q.   Do you know the bank?

14        A.   No.

15        Q.   Is it Bank of America?

16        A.   I don't know.

17        Q.   Can you find out?

18        A.   Bank account that they use?  I could if I have

19   a copy of a deposit, if I ever even billed her.  Like I

20   said, I don't know if I even invoiced her for that

21   little bit of work.

22        Q.   You may not have invoiced her for it?

23        A.   Yeah.

24        Q.   Mr. James, are you familiar with a company

25   called B.E. Pacific Capital Partners?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1        A.    No, I'm not.  Doesn't ring a bell, no.

 2            MR. VALLA:  It's a good time to take lunch.

 3    It's a quarter to 1:00 in California.  What I suggest is

 4    we come back at 1:30 and just take 45 minutes.  Is that

 5    all right with everyone?

 6            MS. BUCHANAN:  That's fine.

 7            MS. CLOSE:  Fine.

 8            MR. VALLA:  Off the record and thank you.

 9            (Lunch recess taken at 12:42 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1   AFTERNOON SESSION                              1:31 P.M.

 2          THE COURT:  Back on the record.

 3      Q.   Hello, Mr. James.

 4      A.   Hello.  I hope you enjoyed your lunch.

 5      Q.   I had a very light lunch.  I hope you had a

 6   snack.

 7      A.   I did.

 8      Q.   Mr. James, you are still under oath.  I remind

 9   you of that.  You know that, right?

10      A.   Yes.

11      Q.   I now wanted to ask you about a company called

12   Aurora Healthcare SBC.  It's a Cayman Islands company.

13   Are you familiar with that company?

14      A.   Vaguely.

15      Q.   Did you or do you have any role currently with

16   that company?

17      A.   No.

18      Q.   Did you ever have any role in that company?

19      A.   No.

20      Q.   Do you know who the officers of that company

21   are?

22      A.   I don't know.

23      Q.   What about board members?

24      A.   I don't know that either.

25      Q.   Would you know where that company banks?
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1        A.    No.

 2        Q.    Are you now or have you ever been a consultant

 3   to that company?

 4        A.    No.

 5        Q.    You have not been an employee of that company

 6   either, have you?

 7        A.    Correct.  No, I have not.

 8        Q.    What do you know about it?

 9        A.    The only thing I know is that the original

10   purchase documents were done between AIT and that

11   company and that ultimately that got changed.

12        Q.    What do you mean it got changed?

13        A.    It was never used, as far as I know.

14        Q.    Could you explain to me what you mean by it was

15   never used?

16        A.    I think it was set up and the intent was to use

17   it, but purchase of the assets and then not utilized as

18   a company.  The purchase actually ended up with Aurora

19   Healthcare U.S. Corp.

20        Q.    Do you know who set up Aurora Healthcare SBC?

21        A.    I don't know, no.

22        Q.    Do you have any documents in your possession

23   that relate to Aurora Healthcare SBC?

24        A.    Only the original signed asset purchase

25   agreement between AIT and that entity.  That again got
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    superseded by another contract between AIT and Aurora

2    Healthcare U.S. Corp.

3        Q.   Do you know who decided to do the deal

4    differently?

5        A.   No.

6            MS. BUCHANAN:  Steve, I want to interject.

7    Your audio sounds a little bit muddier than it did

8    before.  So I don't know if anyone else is experiencing

9    that.  Perhaps the issue is on my end, but you sound

10   very muffled.

11           THE WITNESS:  Okay.  Any better?

12           MS. BUCHANAN:  Yes, absolutely.

13           THE WITNESS:  Okay.  I moved the mic over a

14   little bit.

15           MS. BUCHANAN:  Thank you.

16       Q.   BY MR. VALLA:  You just testified that there

17   was a signed original asset purchase agreement involving

18   Aurora Healthcare SBC and you have a copy of that; is

19   that correct?

20       A.   Yes.

21       Q.   Do you know how that agreement was canceled?

22       A.   I think it was just -- my understanding, it was

23   just a new agreement done.

24       Q.   So the Cayman Islands company never executed on

25   the deal, as far as you know?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    A.   Correct.

2    Q.   Who ended up being the purchaser of the AIT

3    assets?

4    A.   Aurora Healthcare U.S. Corp.

5    Q.   Aurora Healthcare U.S. Corp. is a company

6    separate from AIT; is that right?

7    A.   Yes.

8    Q.   Completely different entities, right?

9    A.   Correct.

10   Q.   Where is that company based?

11   A.   Massachusetts.

12   Q.   Does it have an address?

13   A.   Yes.

14   Q.   What is it?

15   A.   8 Electronics Avenue in Danvers, Massachusetts,

16   01923.

17   Q.   What is at that location?  Is it a

18   manufacturing plant, an office?

19   A.   It's an office.  It's got some inventory.  We

20   maintain some inventory in the U.S. because we do have

21   some sites up in the U.S. up and running, a few staff

22   people, not many employees.

23   Q.   What is the business of that company?

24   A.   Own the technology.

25   Q.   I'm sorry, I didn't hear you.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    A.   Aurora Healthcare owns the technology that was

2    previously owned by AIT and they acquired some of the

3    assets that AIT owned.

4    Q.   What assets did it acquire by broad category?

5    A.   Production equipment, inventory, office

6    furniture, some computers, IP, intellectual property.

7    Q.   When you say intellectual property, what does

8    that consist of?

9    A.   Patents, trademarks, basically the technology

10   that's behind the medical device, the system.

11   Q.   Does Aurora Healthcare U.S. Corp. -- I will

12   just call it Aurora Healthcare from this point forward.

13   Does it manufacture anything?

14   A.   Yes.  It has the ability to manufacture the

15   Aurora MRI systems.

16   Q.   It actually manufactures that system?

17   A.   Right.  We haven't been manufacturing much in

18   the U.S., but there is primarily supporting, existing,

19   up and running sites in the U.S.

20   Q.   When you say you haven't manufactured much in

21   the U.S., have you manufactured some elsewhere?

22   A.   Yes, some of them.  We have placed a few

23   systems in Asia.

24   Q.   Where in Asia?

25   A.   That would be a better question to somebody

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    else.

2         MS. BUCHANAN:  If you don't know, just say I

3    don't know, Steve.

4         THE WITNESS:  I don't know specifically, no.

5    Q.   BY MR. VALLA:  You don't know?

6    A.   No.

7    Q.   What is your role at Aurora Healthcare?

8    A.   I am the CFO.

9    Q.   As the CFO, what are your duties?

10   A.   Similar to what they were at AIT.  I oversee

11   the financial activities of the company, get involved

12   again in negotiations with service sites, generally help

13   advise Olivia to the extent that she needs any of my

14   advice to be given, and I don't know if I'm secretary or

15   not.  I don't believe I am.  I do not maintain board

16   minutes, for instance.

17   Q.   Who does?

18   A.   Since most of our investors are out of Asia, I

19   believe it's -- I'm not sure who it is.  That would be a

20   question again to somebody else.

21   Q.   Who would I ask that question of?

22   A.   I would think Olivia would be aware of who

23   the -- who maintains minutes.

24   Q.   What is Ms. Cheng's role at Aurora Healthcare?

25   A.   She is CEO, yes, president.

1    Q.   I'm sorry.  Is she the CEO and president, you

2  said?

3    A.   Yes, I believe, yes.

4    Q.   When did you start as CFO at Aurora Healthcare?

5    A.   Late 2016.  Just before the purchase closed.

6    Q.   Before the purchase closed, you said?

7    A.   Yes, just around that same timeframe.

8    Q.   So you were at Aurora Healthcare when the

9  purchase closed?

10    A.   Yes.

11    Q.   At that same time, late 2016, were you

12  consulting to AIT?

13    A.   Some, yes.

14    Q.   So you were providing services to both

15  companies?

16    A.   Yes.

17    Q.   You continue to do so as far as Aurora

18  Healthcare is concerned?

19    A.   Yes.

20    Q.   Are you also a consultant to Aurora Healthcare

21  besides being CFO?

22    A.   The CFO position sometimes requires a lot of

23  time, sometimes does not.  So, yes, I am on a consulting

24  basis.

25    Q.   You are corporate officer, is that right,

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    you're a CFO?

2        A.    Yes.

3        Q.    Are you an employee of Aurora Healthcare?

4        A.    No.

5        Q.    Are you a consultant to Aurora Healthcare?

6        A.    Yes, I am.

7        Q.    Do you have a written consulting agreement?

8        A.    I do.

9        Q.    Do you have a copy of that consulting

10   agreement?

11       A.    I didn't hear that.

12       Q.    Do you have a copy of that consulting

13   agreement?

14       A.    Do I have a copy of it?  Yes.

15       Q.    Would you give us a copy?

16            MS. BUCHANAN:  You can give it through your

17   counsel.

18            MR. VALLA:  Through your counsel, of course.

19            MS. BUCHANAN:  Right.  I mean, subject to any

20   objections.

21            THE WITNESS:  Alison, I will defer to you, if

22   you think.

23            MS. BUCHANAN:  You can give a copy to me,

24   Steve, and then we can evaluate whether there are any

25   grounds to object and then produce it if it is

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    appropriate to do so.  I don't think it's proper to ask

2    you to commit to producing a document without the advice

3    of your counsel.  So you can just defer to me.  Just say

4    you will produce it to your counsel.

5              THE WITNESS:  Okay, I will send that to you.

6              MS. BUCHANAN:  Thank you.

7         Q.   BY MR. VALLA:  Besides your consulting

8    agreement with Aurora Healthcare, do you have any other

9    agreement with Aurora Healthcare?

10        A.   No.

11        Q.   Are you a shareholder of Aurora Healthcare?

12        A.   No.

13        Q.   Do you have stock options in Aurora Healthcare?

14        A.   I do.

15        Q.   Can you describe those options to me, please?

16        A.   Just a small number, 15,000 options.

17        Q.   Do you know what the strike price is?

18        A.   I believe those are the -- I believe it is ten

19   per share.

20        Q.   I'm sorry, Mr. James.

21        A.   I believe it's ten per share.  It represents a

22   very small percentage.

23        Q.   Did you say $10 per share?

24        A.   Yes.

25        Q.   What percentage is that of the capital stock of

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    the company; do you know?

2        A.   005.  So that's well under one percent.

3        Q.   .005 percent, understood.  Do those options

4    expire?

5        A.   Yes, in they have a ten-year life.

6             MS. BUCHANAN:  I'm having a really hard time

7    hearing you, Steve.  I'm so sorry.

8             THE WITNESS:  Okay.  The options have a

9    ten-year life.

10       Q.   BY MR. VALLA:  Do you know when they expire,

11   what year?

12       A.   2027 or '28.

13       Q.   A few years from now?

14       A.   A few years from now, yes.

15       Q.   Do you know who the other officers are of

16   Aurora Healthcare?

17       A.   Yes, certainly Olivia Cheng.

18       Q.   What office does she hold?

19       A.   She holds the office of CEO and president.

20       Q.   And then?

21       A.   There is a Lucy.  I'm sorry, I don't know her

22   last name, but I believe she is the secretary.

23       Q.   The corporate secretary, you mean?

24       A.   Yes.

25       Q.   Any other officers?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1      A.   No.

2      Q.   No vice-presidents?

3      A.   I don't know if they are official officers as

4   far as from a regulatory or state standpoint.

5           MR. VALLA:  Off the record for a minute.

6           (Recess taken from 1:47 to 1:48)

7           MR. VALLA:  Back on the record.

8      Q.   Mr. James, we are back on the record.  You are

9   still under oath.

10          I will represent to you that I have a copy of

11   the printout of the Aurora Healthcare website, and the

12   URL address for that website is Auroramri.com.  Does

13   that sound right?

14     A.   Yes.

15     Q.   Is that the same URL as AIT used?

16     A.   I'm not sure.

17     Q.   What is your e-mail address at Aurora

18   Healthcare?

19     A.   Sjames@Auroramri.com.

20     Q.   What was your e-mail address at AIT?

21     A.   Same one, sjames@Auroramri.com.

22     Q.   So you agree that it sounds like the URLs are

23   the same; is that right?

24     A.   Yes, sounds like it, yes.

25     Q.   The e-mail addresses are the same.  There is no

```
 1    s.james; it's sjames?

 2        A.    It's the same e-mail address, yes.

 3        Q.    Very good.  There is a corporate officer or

 4    management page on the website that includes your photo

 5    and a biography of you.  I will read to you from that.

 6    It says, "Steve James, CPA, CFO, Aurora Healthcare."  It

 7    says, "Mr. James has served as executive vice-president,

 8    chief financial officer since 2003.  He joined the

 9    company as chief financial officer in 1999."

10              Is that statement true?

11        A.    No.

12        Q.    Why is it not true?

13        A.    Because there was a period where I was not

14    involved with the, quote, company as a technology.  In

15    2014 when I resigned, I wasn't in any of those roles.

16    It is not quite accurate with regard to Aurora

17    Healthcare because obviously the bulk of that time was

18    with Aurora Imaging Technology.

19        Q.    A different company, like you testified

20    earlier?

21        A.    Yes.

22        Q.    A separate company?

23        A.    I think the intent in that was to mean that I

24    have been involved with the technology for a long time.

25        Q.    With the technology, that's right.
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1     A.   Yes, with the business, if you will, not

2   necessarily the corporate, quote, formal corporate

3   entity.

4     Q.   Have you reviewed the website for Aurora

5   Healthcare?

6     A.   No.

7     Q.   You never have?

8     A.   No.

9     Q.   So you are not aware whether there are other

10  false statements on the website other than the one we

11  just reviewed?

12    A.   No.

13    Q.   Would it surprise you if there were?

14    A.   I can't answer that.  I don't know.

15    Q.   If I understand your testimony, Aurora

16  Healthcare Services in the United States has an

17  installed base of machinery; is that correct?

18    A.   Yes.

19    Q.   How large is that installed base?

20    A.   Currently, three sites.

21    Q.   Three machines in --

22    A.   Three machines, yes, still up and running.

23  There was more than that, but the rest have been shut

24  down.

25    Q.   When you say it was more than that, when was it

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1   more than that?

2       A.   At the point of acquisition and obviously prior

3   to that.

4       Q.   Which would have been late 2016, the point of

5   acquisition; right?

6       A.   Yes.

7       Q.   What happened to the other sites, the other

8   machines that were in existence in 2016?

9       A.   Eventually shut them down, what we call

10  decommissioned them.  Systems were starting to get

11  fairly old.

12      Q.   When you say we, do you mean Aurora Healthcare;

13  it owned those systems?

14      A.   No.  Most of those were sites that were owned

15  by those customers.  So they just decided to no longer

16  keep them in service and decommission them, which

17  usually means shut them down.  And whatever they did

18  with them, it's up to them.  It was their asset.

19      Q.   Does Aurora Healthcare receive service revenue

20  from the existing installed base?

21      A.   Yes.

22      Q.   So its revenue stream has decreased then over

23  the last five years?

24      A.   Yes.

25      Q.   What is that revenue stream now roughly?

1          MS. CLOSE:  I'm going to ask that this line of

2   questioning be designated as confidential because we are

3   talking about the company's revenues right now of an

4   ongoing company.

5          MR. VALLA:  That's fine.  If we are talking

6   about revenues, that's fine, no problem with the

7   confidentiality designation.

8          MS. BUCHANAN:  I will join and interpose that

9   Mr. James is not testifying as a 30(b)(6) witness for

10  Aurora Healthcare.  He is here today in his individual

11  capacity.

12         MR. VALLA:  I understand.  He is also the CFO

13  of that company, so I'm asking some very generic

14  questions about the business that he is CFO of.

15         (The following pages 145-150 were marked

16  confidential and bound separately)

17  ////

18  ////

19  ////

20  ////

21  ////

22  ////

23  ////

24  ////

25  ////

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1              (The preceding pages 145-150 were marked
 2    confidential and bound separately)
 3         Q.   BY MR. VALLA:  Who are the board members of
 4    Aurora Healthcare?
 5         A.   I couldn't name them.  Again, I don't attend
 6    the board meetings.  A lot of them are -- mostly they
 7    are investors and primarily a lot of them in Asia, just
 8    some U.S., but I don't attend the meeting.  So I don't
 9    know them personally.  I couldn't list them for you if I
10    tried.  Some of them I might know.
11              MS. BUCHANAN:  Steve, just to clarify here, his
12    question was who are the board members, and you said I
13    don't know and then you talked for like another
14    30 seconds.  So I don't know is the answer, and that's
15    all you have to say.
16              THE WITNESS:  Okay.
17         Q.   BY MR. VALLA:  You remember, Mr. James, that
18    you testified earlier today that you used to attend the
19    board meetings of AIT?
20         A.   Yes.
21         Q.   And that you were CFO at AIT when you attended
22    those meetings; is that right?
23         A.   Yes.
24         Q.   You are the CFO at Aurora Healthcare; right?
25         A.   Yes.
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1     Q.    One of the reasons you resigned in June of 2014

2  as CFO of AIT is they wouldn't let you attend the board

3  meetings anymore; is that right?

4     A.    They changed my role, yes.

5     Q.    One reason?

6     A.    Yes.

7     Q.    Now you're the CFO of another company and you

8  don't attend the board meetings, but you're staying with

9  that company?

10    A.    Yes.

11    Q.    Why is that?

12         MS. BUCHANAN:  Hold on.  I'm just going to

13 interpose an objection that that misstates his prior

14 testimony.  He testified previously that he attended the

15 AIT board meetings because he was the treasurer of AIT,

16 and he specifically testified just moments ago that he

17 is not the treasurer of Aurora Healthcare.

18    Q.    BY MR. VALLA:  So I asked him why.  Why,

19 Mr. James?

20    A.    Because a lot of board meetings are held in

21 Asia.  A lot of the board members are there.  And for

22 the most part, most of them are -- at those board

23 meetings, the language they speak is Chinese, which I do

24 not speak.  So having me in attendance and having me

25 attend the meetings and try to maintain minutes just

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1   wouldn't work.
 2        Q.   I understand.
 3        A.   It's just again where most of the business
 4   development and focus of the company has been Asia.  It
 5   doesn't make sense for me to be in that because I don't
 6   have the input that I would have if it was more of
 7   U.S.-based company.
 8        Q.   Who keeps the board minutes for Aurora
 9   Healthcare?
10        A.   I believe Lucy Cheng is her name.
11        Q.   The secretary?
12        A.   Secretary, yes.
13        Q.   Is she related to Olivia Cheng?
14        A.   Not that I know of.
15        Q.   Have you ever seen any of the board minutes?
16        A.   Some, yes.
17        Q.   Are they in English?
18        A.   Some of them are.  Some are both languages.
19        Q.   Side-by-side translations essentially?
20        A.   Correct.
21        Q.   In your experience, is it unusual for an
22   American company with U.S. headquarters to hold its
23   board meetings overseas in a language other than
24   English?
25             MS. BUCHANAN:  Calls for speculation, lacks
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1   foundation.

2          MR. VALLA:  I called for his experience.  I'm

3   not asking him to speculate.  Listen to the question.

4          MS. BUCHANAN:  I'm just making an objection for

5   the record.  You don't have to argue with me.  He can

6   still answer.

7      Q.   BY MR. VALLA:  Mr. James, please answer in your

8   experience.

9      A.   I don't have a lot of experience in companies

10  that have a U.S. base but have primary focus on a market

11  overseas, so I couldn't answer that question.  I don't

12  know.

13     Q.   That's fine.  Not a big deal kind of question.

14          I don't know if there is someone else on the

15  line.

16          MS. BUCHANAN:  Your box is lit up, Antonio, so

17  the noise is coming from your mic.

18          MR. VALLA:  Really?  There is no one here

19  except me.  Sorry about that then.

20     Q.   In your role as CFO of Aurora Healthcare, do

21  you prepare financial statements?

22     A.   Yes.

23     Q.   Are these financial statements audited?

24     A.   No.

25     Q.   Have they ever been audited?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1        A.   No.

 2        Q.   I believe you testified already, but correct me

 3   if I'm wrong, that you prepare and file tax returns for

 4   Aurora Healthcare as well?

 5        A.   Yes.

 6        Q.   That's in your role as a consultant, I suppose;

 7   is that right?

 8        A.   Consultant and CFO would be both responsible

 9   for tax compliance as well.

10        Q.   You charge for your service as CFO?

11        A.   Yes.

12        Q.   By the hour?

13        A.   Yes.

14        Q.   And your consulting services also by the hour?

15        A.   Yes.

16        Q.   Do you know how much you charge Aurora

17   Healthcare annually for your services?

18        A.   It varies anywhere between 70 and 100,000 per

19   year.

20        Q.   Did you say between 70 and 100,000 per year?

21        A.   Correct.

22        Q.   Who do you report to?

23        A.   Olivia Cheng.

24        Q.   Do you report to anyone else?

25        A.   No.
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    Q.   How frequently are you in contact with her?

2    A.   Almost daily, certainly every other day.

3    Q.   This has been going on for years, this contact?

4    A.   Yes.

5    Q.   One reason I asked you that is I'm puzzled

6    because your attorneys have produced in discovery to us

7    literally a handful of e-mails involving your

8    communications with Ms. Cheng, and I have to believe

9    there are more.  Do you e-mail frequently with

10   Ms. Cheng?

11   A.   Yes.

12   Q.   Did you e-mail frequently with her when she was

13   at AIT and you were at AIT?

14   A.   Back in 2013, yes.

15   Q.   Did you also e-mail with her when you were a

16   consultant with AIT but she was no longer the CEO of the

17   company after 2014?

18   A.   I'm sorry.  After June 2014, you mean?

19   Q.   Correct.

20   A.   Did I e-mail her about -- just e-mail her?  No.

21   No, not really.  For a period there I did not, no.

22   Q.   You had no contact with her for some period of

23   time?

24   A.   Correct.

25   Q.   From when to when approximately?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1        A.    From the time she left in 2013 until when I
 2   started back up doing some work and doing some
 3   consulting work for Aurora getting ready for the
 4   potential purchase.
 5        Q.    That would have been 2016?
 6        A.    2016, yeah.  So it would be about two or
 7   three years that there wasn't.
 8        Q.    Did Ms. Cheng get in touch with you about that
 9   potential purchase?
10        A.    Yes.
11        Q.    Were you aware of it otherwise?
12        A.    No.
13        Q.    What did she tell you when she got in touch
14   with you?
15        A.    Just that she was trying to put together a
16   group of investors to keep the technology going.
17        Q.    I'm sorry.  Could you repeat that.  We had
18   audio issues again.
19        A.    Just that she was trying to put together a
20   group of investors to buy the assets and keep the
21   technology alive.
22        Q.    When did you meet Christopher Wilson; do you
23   know?
24        A.    First time I met him?
25        Q.    Yes.
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1      A.   I don't recall when I first met.

2      Q.   Would it have been while you were still an

3  employee of AIT?

4      A.   I believe Chris was on the board at that point.

5  So, yes, likely it was.

6      Q.   Who had appointed Mr. Wilson to the board?

7      A.   I don't recall who appointed him.  Generally it

8  would be a board vote or -- I'm sorry, shareholder vote.

9      Q.   I'm sorry, I didn't hear your answer again.

10     A.   I don't know exactly how Chris came on the

11 board.  I don't recall.

12     Q.   You do not know who appointed him or who

13 sponsored him for appointment or anything like that?

14     A.   I don't recall.

15     Q.   In your view, was Mr. Wilson a good CEO at AIT?

16          MS. BUCHANAN:  Objection, vague.  You can

17 answer.

18          THE WITNESS:  I was not there when Mr. Wilson

19 was CEO.

20     Q.   BY MR. VALLA:  So you did not have any

21 interface with him when he was CEO?

22     A.   Just as a consultant later on.

23     Q.   You were not an employee any longer but you

24 became a consultant later?

25     A.   Correct.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    Q.   So did you interface with him as a consultant?

2    A.   Yes, just a few matters that I was involved

3  with as a consultant.

4    Q.   Did you think he was a good CEO?

5    A.   Appeared so, yes.

6    Q.   In your capacity as a consultant for AIT, did

7  you exchange e-mails with Mr. Wilson?

8    A.   I don't know if I had any.  I don't know if I

9  had any.  I don't know.  Except for sending him my

10  invoice.

11    Q.   How did you communicate with him, if not by

12  e-mail?

13    A.   Phone calls went through the controller, Sarah

14  Jones.

15    Q.   How frequently would you speak with him by

16  telephone?

17    A.   Not very.  Once a month, once every other

18  month.  It wouldn't be frequent.  I wouldn't have a lot

19  of reason to have that discussion with him.

20    Q.   Did you ever advise him in your professional

21  capacity that AIT had an obligation to file tax returns?

22    A.   He was aware of that, yes.  Yes, I made him --

23  yes, he was aware of that.

24    Q.   Was he aware of that independently of your

25  advice or did you make him aware of that?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1      A.   He was aware of that independent.

2      Q.   What you're saying then -- I don't want to put

3 words in your mouth.  Are you saying that the CEO of AIT

4 knew that there was an obligation to file tax returns

5 and knew that tax returns had not been filed?

6           MS. BUCHANAN:  Objection, compound.

7      Q.   BY MR. VALLA:  You can answer.

8      A.   We knew they had to be filed and we also knew

9 that there wasn't the resource to file them.

10     Q.   Did you know that they weren't filed?

11     A.   Yes, we all -- yes, they were not filed.

12     Q.   Due to lack of resources is what you said;

13 right?

14     A.   Yes.

15     Q.   To your knowledge -- to your professional

16 knowledge, when you consulted for AIT, was there ever an

17 approach to the U.S. Internal Revenue Service to seek

18 some kind of a payment plan or some kind of a delay in

19 filing requirements for those returns?

20     A.   No.

21     Q.   You testified earlier that AIT for a number of

22 years did not file tax returns, either at the federal or

23 the state level.  What about local taxes?

24     A.   There wouldn't be any local taxes to speak of.

25     Q.   No gross receipts tax?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1        A.    No.

 2        Q.    Personal property tax?

 3        A.    No.

 4        Q.    Payroll tax?

 5        A.    No.  Massachusetts has a manufacturing exempt

 6   provision for real estate tax.  So they do that, I

 7   guess, to encourage manufacturers.

 8        Q.    There were no other tax obligations that the

 9   company would have been in default on; right?

10        A.    No, and just -- Alison probably will stop me,

11   but just to be clear, there was no tax due.

12        Q.    Right, but there was a filing requirement?

13        A.    There was a filing requirement, but there would

14   be no tax due.  Obviously losses are forever.

15        Q.    I'm sorry.

16        A.    Substantial tax losses, so there wouldn't be

17   any tax due on a company that has a non-operating

18   license.

19              MS. BUCHANAN:  Steve, there is no question

20   pending.

21              THE WITNESS:  I appreciate that, but I'm just

22   trying to clarify.

23              MS. BUCHANAN:  I understand that, but we will

24   have an opportunity to put our position forward, and

25   your obligation today is just to answer the questions
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1   that Mr. Value asks you.

2       Q.   BY MR. VALLA:  I understand your testimony,

3   Mr. James.

4       A.   Okay.

5       Q.   I believe your testimony is that there was an

6   obligation to file, that filings were not made, that

7   Mr. Wilson knew of that and that you advised him so.  Is

8   that true?

9       A.   Yes.

10          MS. BUCHANAN:  The testimony speaks for itself.

11      Q.   BY MR. VALLA:  Besides yourself in your

12  function as CFO of AIT and later on yourself in your

13  function as a consult for AIT, was there any other

14  accounting firm involved in performing services for AIT?

15      A.   I can't answer that.  I don't know.

16      Q.   Had there been one, you would have been the one

17  paying them; right?

18      A.   No, I didn't pay -- after I left, I never paid

19  any bills.

20      Q.   Let me break that up.  During the period of

21  time that you were CFO of AIT, was there an accounting

22  firm involved in performing services for AIT?

23      A.   No.

24      Q.   It was all handled in-house by your office; is

25  that right?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    A.   Yes.  We handled -- yes.

2    Q.   Yet at some point, you testified -- I'm not

3    trying to trick you here.  I just want to clarify the

4    record.  You testified that the financial statements of

5    AIT had been audited.  Were they not audited by an

6    accounting firm?

7    A.   Very early on in early 2000s, yes, there was an

8    audit but not the day-to-day accounting.  I consider an

9    audit the accounting.

10   Q.   The only accounting services or auditing

11   services, CPA-type services provided outside of the

12   company were the audit services provided in the early

13   2000s?

14   A.   Yes.

15   Q.   Do you remember what firm performed those

16   services?

17   A.   It was BDO Siedman.

18   Q.   Do you recall who the partner in charge was at

19   BDO?

20   A.   Yeah, Len Pepe, P-e-p-e.

21   Q.   Where I came from, it's pepe, which means

22   pepper, but neither here nor there.

23        What method of accounting were the books of AIT

24   kept on?

25   A.   U.S. GAP.

1    Q.   U.S. GAP and therefore accrual; right?

2    A.   Correct.

3    Q.   Did you testify earlier that AIT banked with

4    Bank of America?

5    A.   We did.

6    Q.   And it was the only bank, is that right?

7    A.   There was a small account with East West Bank.

8    Held a small amount just in case we wanted another bank

9    in case Bank of America couldn't do something we needed.

10   Q.   East West Bank is the U.S. branch of a

11   Taiwanese bank, is it not?

12   A.   I believe so.

13   Q.   You testified earlier that you had check

14   signing authority on the Bank of America account; is

15   that right?

16   A.   Yes.

17   Q.   Did you also have check signing authority on

18   the East West Bank account?

19   A.   No.

20   Q.   Who did?

21   A.   Just Olivia.  We didn't use it.  It was kind of

22   a backup.

23   Q.   As you sit here today, Mr. James, do you

24   believe that the financial statements of AIT that you

25   had involvement with, that you produced, et cetera, over

1  the years that you were CFO were substantially accurate?

2      A.   I believe they were reasonably accurate.

3      Q.   I understand your reticence in saying that they

4  were exactly accurate.  I wouldn't say that either.  But

5  when you say substantially accurate, do you have

6  something in mind that leads you to use that term as

7  opposed to just your own caution?

8          MS. BUCHANAN:  Just to correct the record, he

9  said reasonably, not substantially.

10     Q.   BY MR. VALLA:  Do you have anything in mind

11  that leads you to say reasonably rather than simply

12  accurate?

13     A.   No, no reason.

14     Q.   It's just caution on your part?

15     A.   They're financial statements.  They're open to

16  interpretation.

17     Q.   You are not aware of any misstatements in those

18  financial statements, are you?

19     A.   No.

20     Q.   Had you been aware of any misstatements, you

21  would have corrected those misstatements?

22     A.   Yes.

23     Q.   And you would have notified the board?

24     A.   Yes.

25     Q.   And you would have notified the CEO?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1        A.    Yes.

2        Q.    And you would have notified the shareholders?

3        A.    I would not have notified the shareholders.

4    That would not be my role.

5        Q.    Because you didn't communicate with the

6    shareholders; right?

7        A.    No.

8        Q.    I'm going to direct your attention now to the

9    years 2015 and 2016.  You testified previously that

10   Pharos, the venture capital fund that Mr. Devlin worked

11   for, had invested in the -- AIT made an equity

12   investment, in fact, two equity investments, 2006 and

13   2008; is that right?

14       A.    Yes.

15       Q.    And also had lent funds to AIT; is that right?

16       A.    Yes.

17       Q.    Do you remember approximately how much Pharos

18   lent to AIT?

19       A.    I don't have the amount.  I don't recall, no.

20       Q.    Would it have been millions?

21       A.    Yes.

22       Q.    Would it surprise you if the total amount

23   invested or lent by Pharos to AIT exceeded 20 million?

24       A.    That would not surprise me, no.

25       Q.    It's a lot of money, right?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1      A.   Yes.

2      Q.   Are you aware that Pharos sold its interest in

3  the AIT, meaning both the equity and the debt, to ARF?

4      A.   I wasn't aware of the equity.  I was aware of

5  the debt.

6      Q.   So your understanding is that Pharos sold its

7  debt to ARF?

8      A.   Yes.

9      Q.   How are you aware of that?

10      A.   Because it was part of the consideration in the

11  asset purchase because of the -- due to the forgiveness

12  of that debt.

13      Q.   Did you know about the sale of the debt or

14  equity and debt, whatever it was, to ARF at the time

15  that it took place?

16      A.   No.

17      Q.   When did you learn of it?

18      A.   When I first -- when I saw the asset purchase

19  agreement documents with Aurora Healthcare.

20      Q.   Did you see actually when you saw the estate

21  purchase agreement documents with Aurora Healthcare SBC,

22  the Cayman Islands company?

23      A.   I don't recall.

24      Q.   You testified at first there was an agreement

25  signed, of which you have a copy with the Cayman Islands

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    company, and that got -- somehow got transferred or

2    restructured or something and then Aurora Healthcare

3    actually bought the assets.  I assume you would have

4    seen the Cayman deal before you saw the other deal?

5        A.    I did.  I had the document.  I haven't looked

6    at it since the deal actually closed, and then I had to

7    use the document to come up with the actual opening

8    balance sheet, if you will, for the new company.

9        Q.    The new company being Aurora Healthcare U.S.?

10       A.    Correct.

11       Q.    That makes sense.  Do you know who was told

12   about the sale of the Pharos interest to ARF at the time

13   that it took place?

14       A.    No.

15       Q.    You don't know?

16       A.    No, I don't know.

17       Q.    Sorry, I didn't hear the answer.

18       A.    I said no.  I said no.  Sorry.

19       Q.    I didn't hear the answer, and then I was

20   waiting for you to answer, and I thought that's taking a

21   long time.

22             So you didn't know when it happened.  Is that

23   correct to state that you learned about it when you saw

24   the purchase documents much later on?

25       A.    Yes.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1      Q.   Do you know whether Castel was told about it?

2      A.   I do not know.

3      Q.   Do you know whether any of the other investors

4   in AIT were told about it?

5      A.   I do not.

6      Q.   Do you know whether Ms. Olivia Cheng knew about

7   it?

8      A.   Yes.

9      Q.   How would she have known?

10     A.   Because she was the major investor in ARF.

11     Q.   She was ARF, right?

12     A.   Right.

13     Q.   Okay.

14          MS. CLOSE:   I think they cut off part of his

15   last answer.

16          MR. VALLA:   The last answer was yes.

17          MS. CLOSE:   Before that, she was the something

18   in ARF.

19          MS. BUCHANAN:   Major investor.

20          THE WITNESS:   Major investor.

21          MS. CLOSE:   I didn't hear that.

22          MS. BUCHANAN:   Is that what you have, Peggy?

23          (Record read as follows by the Court Reporter:

24          "Answer:   Because she was the major investor

25          in ARF.")

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1      Q.   BY MR. VALLA:  Do you know how much ARF paid

2   for the Pharos assets?

3      A.   I don't, no.

4      Q.   Would it surprise you to know that it was

5   $425,000?

6      A.   It wouldn't -- I don't know.  I have no --

7      Q.   It wouldn't surprise you?

8      A.   I have no idea.

9      Q.   You testified that it was about $20 million in

10  debt, possibly more, we don't know, but possibly more

11  than $20 million in debt.  $425,000 purchase price

12  would --

13     A.   It was not 20 million in debt.

14     Q.   What was it then, please?

15     A.   A lot of that was shares.

16     Q.   The debt and equity together were about

17  $20 million?

18     A.   Yes, now what you're saying is correct.

19     Q.   If I were to say that the equity and debt

20  together were approximately $20 million and that debt

21  and equity -- I will represent to you that debt and

22  equity were sold, both the debt and equity, to ARF for

23  $425,000.  Would you then be surprised?

24     A.   I don't know what you mean by surprised.  No,

25  given the alternatives, no.  Pharos, as my firm, I

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    assume they negotiated the best deal they could and

2    Olivia did the best deal she could.

3         Q.   Do you know that when Pharos sold the debt and

4    equity to ARF, AIT consented to that transaction?

5         A.   No, I do not know that.

6         Q.   Because you were not CFO anymore in 2015?

7         A.   Correct.

8         Q.   As a consultant, you didn't have any

9    documentation or information on that transaction, did

10   you?

11        A.   No, I did not.

12        Q.   Not even for tax return purposes, right,

13   because it would not have been required?

14        A.   No.

15        Q.   Do you know whether AIT received any

16   consideration for consenting to that transaction?

17        A.   I do not.

18        Q.   At the time that ARF bought the debt and equity

19   from Pharos, were you CFO of ARF?

20        A.   No.

21        Q.   The flow of the transaction, as I learned from

22   your testimony, is that at some point in 2015, Pharos

23   sells its debt and equity position in AIT to ARF, which

24   purchases it, and you had no involvement in that

25   transaction and, indeed, you had no knowledge of that

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    transaction until you learned of it by looking at deal

2    documents downstream; is that right?

3         A.   Yes.

4         Q.   The deal documents downstream that you looked

5    at consisted of the purchase by Aurora Healthcare of

6    AIT's business, its assets; is that right?

7         A.   Yes.

8         Q.   You testified that while that deal was

9    initially set up to go through a Cayman Islands company,

10   it was subsequently executed not by the Cayman Islands

11   company but by Aurora Healthcare U.S. Corp.; is that

12   right?

13        A.   Yes.

14        Q.   Do you know when that took place?

15        A.   The closing of asset purchase?

16        Q.   Yes, sir.

17        A.   November 6th, 2016.

18        Q.   You know that date exactly because it was a big

19   deal; right?

20        A.   Gave you all the documents filed with the

21   company since inception, yes.

22        Q.   Do you know what the price that was paid for

23   the assets was?

24        A.   Yes.

25        Q.   What was that price?

```
 1        A.    8.5 million.

 2        Q.    Are you familiar with the concept of a business

 3   valuation?

 4        A.    Yes.

 5        Q.    What is a business valuation?

 6        A.    It could be a number of things, but it's

 7   generally an appraisal of a company based on a bunch of

 8   factors, including assets and financial forecasts, value

 9   of its technology, value of its hard assets, et cetera.

10        Q.    I'm sorry.  I still had audio problems with

11   your answer.  I apologize.

12        A.    It's just a valuation.  It's an appraisal of

13   what one person estimates the value of the company based

14   on a number of factors, including forecast, the existing

15   assets that may be within that, obviously technology

16   rights.  It's very subjective.

17        Q.    Was a valuation of the business of AIT

18   performed prior to the sale; do you know?

19        A.    Yes, we had an appraisal done.

20        Q.    When you say we had an appraisal done, who had

21   it done?

22        A.    Well, AIT had an appraisal done.

23        Q.    Oh, AIT had an appraisal done, because you were

24   not with AIT anymore, were you?

25        A.    No, but I helped with that appraisal trying to
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1   get all the information off to those people.

2       Q.   Because you had the AIT books?

3       A.   Because I had the history of what had gone on

4   there, and I could help guide that staff on what the

5   appraiser needed, what information to be able to do the

6   appraisal.

7       Q.   So you worked with the appraiser?  I mean, I

8   don't know if it was a man or a woman or a company.  Who

9   was the appraiser?

10      A.   It was a company named Orchard Partners based

11  outside of Boston.

12      Q.   Who retained them?  Was it AIT?

13      A.   AIT.

14      Q.   When you say outside of Boston, Orchard

15  Partners, do you remember the city?

16      A.   Yes, they are based in Wellesley, Mass.

17      Q.   They are Chinese owned, aren't they?

18      A.   No.  His name is Joel Dobson.

19      Q.   Doesn't sound Chinese to me.

20      A.   No.

21      Q.   What kind of information did Orchard Partners

22  ask of you in order to perform the appraisal?

23      A.   List of the assets being transferred, list of

24  all the trademarks and patents, an estimate of what

25  revenue could get generated over a period of time.  That

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    was it.

2        Q.   You provided everything they requested?

3        A.   Well, not me but -- the Aurora staff, the AIT

4    staff, but I helped direct it so they knew what to give.

5        Q.   Just to get this straight, you worked with the

6    AIT staff to provide the information to the appraisers

7    that the appraisers were asking for?

8        A.   Yes.

9        Q.   When you were doing so, you were, however,

10   engaged professionally by ARF; is that right?

11       A.   No.

12       Q.   You were engaged professionally by Aurora

13   Healthcare; is that right?

14       A.   Doing some startup work but not much.

15       Q.   You were consulting to Aurora Healthcare?

16       A.   Yes, I helped them set up the entity in

17   anticipation of the purchase and formed the entity with

18   the State of Massachusetts, federal ID number, basic

19   information.

20       Q.   This was a collaborative effort.  You helped

21   them.  It was not a contentious effort.  You helped them

22   put --

23       A.   However, I could help and provide.  It wasn't

24   the kind of making any judgments or anything.  It was

25   just raw data being provided.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1     Q.   Did Aurora Healthcare pay you for your

2  services?

3     A.   Yes.

4          MS. BUCHANAN:  When you say services, sorry,

5  I'm just confused, Counsel.  When you say services, are

6  you talking about the startup work, setting up the

7  entity, getting the tax ID number or are you talking

8  about providing information to Orchard Partners?

9          MR. VALLA:  Both.

10         THE WITNESS:  No.  Orchard Partners, that work

11 was not Aurora Healthcare.  That was AIT.

12    Q.   BY MR. VALLA:  Oh, I'm sorry.  Aurora

13 Healthcare paid you for your services in setting up

14 entity, getting them started up; is that right?

15    A.   Yes.

16    Q.   AIT paid you essentially more or less at the

17 same time to help with the appraisers; is that right?

18    A.   Yes.

19    Q.   So you were billing two entities separately for

20 your time?

21    A.   Yes.

22    Q.   But you were consulting to both

23 contemporaneously; right?

24    A.   Yes.

25    Q.   And talking to Olivia Cheng as you did all of

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1   this; right?

 2       A.   Yes.

 3       Q.   And e-mailing with her as you did all of this?

 4       A.   Likely, yes.

 5       Q.   Do you have a cell phone number, Mr. James?

 6       A.   I do.

 7       Q.   Could you tell me that number, please?

 8       A.   978 204-5240.

 9       Q.   Has that been your number for some years or is

10   that a recent number?

11       A.   That has been my number for a long time.

12       Q.   Who is your carrier?

13       A.   Now I'm with Spectrum.

14       Q.   When you say now you're with Spectrum, were you

15   with someone else prior?

16       A.   Yes.  Prior to that, I was with Verizon.

17       Q.   When did you switch from Verizon to Spectrum?

18       A.   A year and a half ago.

19       Q.   Is Spectrum a local northeast carrier?  I'm

20   just not familiar with it.

21       A.   They are the local cable company, but they also

22   provide cell phone services.  They have that capability

23   now.

24       Q.   Orchard Partners performed a valuation and they

25   came up with a valuation.  And do you recall what that
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1   valuation was?

2       A.    Yeah, usually like a valuation came up with a

3   range.

4       Q.    Do you recall what that range was?

5       A.    I don't.  I know that the purchase price was

6   within the range.

7       Q.    Was it at the top end of the range?

8       A.    No.  It was in the middle of the range.

9       Q.    Do you have a copy of that valuation?

10      A.    Yes.

11      Q.    We'll ask counsel to provide it to us.

12            MS. CLOSE:  It has been produced already in

13   discovery.

14            MR. VALLA:  Has it really?  I should have read

15   it.

16            MS. BUCHANAN:  I think the problem, Counsel, is

17   that you're asking Steve, who is not a 30(b)(6), so the

18   documents are probably produced by the entity itself

19   rather than by Steve in his personal capacity.

20            MR. VALLA:  I appreciate your guidance.  Thank

21   you.

22      Q.    Had the business of AIT ever been subject to a

23   valuation previously, similar to the one that was done

24   in order to sell it to Olivia?

25      A.    No.

```
 1        Q.    Never?

 2              MS. CLOSE:  I'm going to object.

 3        Q.    BY MR. VALLA:  To your knowledge?

 4        A.    No.  A similar appraisal, no.

 5              MS. CLOSE:  May I get in a late objection to

 6   the question.

 7              MR. VALLA:  Better late than never, Counsel.

 8              MS. CLOSE:  Well, I tried, but you guys talked

 9   right over me.

10              MR. VALLA:  You're all good.

11              MS. CLOSE:  I object to the characterization

12   that it was sold to Olivia.

13              MR. VALLA:  Right, of course.

14              MS. CLOSE:  That's a fact not in evidence.

15              MR. VALLA:  I would never dream of saying that.

16   It was sold to Aurora Healthcare U.S., not to Ms. Cheng,

17   indeed.  Not the same thing.  All right.

18        Q.    No prior independent valuation, right,

19   Mr. James?

20        A.    Correct.

21        Q.    Tell me something; AIT went to market and

22   schlep a bunch of securities to a bunch of folks,

23   including my client in 2006 and 2008.  They didn't

24   perform a valuation to do those offerings?

25        A.    Not on behalf of the company.  They did it on
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    behalf of themselves to determine what they --

2        Q.   In other words, the buyers, the investors

3    figured out how much the company was worth on their own;

4    right?

5        A.   And on their own behalf.

6        Q.   And on their own behalf, right, but based on

7    information provided by the company, right, because

8    there is no public information otherwise?

9        A.   That's correct.

10       Q.   Do you know what the company valuation was in

11   2006 when Castel first invested?

12       A.   I don't recall.

13       Q.   Would it surprise you if I told you it was

14   $130 million?

15       A.   No, it would not.

16       Q.   It would not surprise you that it was

17   $130 million in 2006.  Would it surprise you that it was

18   even higher in 2008 when Castel invested a second time?

19       A.   No, it would not.

20       Q.   What happened between, say, 2008 and 2016 when

21   Orchard Partners comes up with approximately $8 million

22   valuation?

23       A.   The financial results deteriorated.  The

24   revenue dropped.  The number of system sales decreased,

25   so number of new installations decreased.  The overall

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    size of the company and valuation of what the potential

2    market was changed dramatically.

3        Q.   The financial statements of the company that

4    you had a hand in preparing for a period of time that

5    you were with the company reflected this deteriorating

6    conditions?

7        A.   Reflected the drops in revenue.

8        Q.   Were those financial statements accompanied by

9    notes?  Do you know what I mean by notes?

10       A.   Yes, I do.  No, they were not.  They were not

11   formal audited.

12       Q.   You could have put notes on them even if they

13   were not audited; right?

14       A.   Could.

15       Q.   Professionally speaking, I mean, you could

16   have?

17       A.   You could, yes.

18       Q.   But you didn't, right?  Did you?

19       A.   No, we did not.

20       Q.   Why not?

21       A.   A lot of work.  We didn't have that much staff

22   to be able to prepare footnotes and all of the very

23   intense amount of work that's done with that.

24       Q.   I understand that.  We all work hard.  I'm not

25   questioning that in the least.  However, you knew,

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    didn't you, that the financial statements would be

2    shared with the investors, with the shareholders; is

3    that right?

4        A.   Yes.

5        Q.   Did you not think that they would want to see

6    annotated financial statements; they would want to

7    understand what was going on rather than just the raw

8    numbers?

9            MS. BUCHANAN:  Calls for speculation, lacks

10   foundation, incomplete hypothetical.

11           MR. VALLA:  Mr. James.

12           MS. BUCHANAN:  You can answer if you

13   understand.

14           THE WITNESS:  I mean, we gave them what we had,

15   you know.  We had those -- we had the financial

16   statements and that's what we provided.

17       Q.   BY MR. VALLA:  If you had been an investor,

18   would you have wanted to receive more complete financial

19   statements with notes, for example?

20           MS. BUCHANAN:  Objection, incomplete

21   hypothetical, lacks foundation, calls for speculation.

22       Q.   BY MR. VALLA:  Would you?

23       A.   It depends.  I think the statements would be

24   self-explanatory by themselves in terms of what was

25   happening.  You can see revenue drop without a footnote.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    Q.   Could you see why revenue dropped without a

2    footnote?

3    A.   Yes.  Could I?  Revenue dropped because revenue

4    dropped.  Business isn't there.

5    Q.   Could you see the reason for the drop in

6    revenue without a footnote?

7    A.   The footnotes wouldn't explain your drops in

8    revenue.  The notes explain very specific conditions of

9    what's on the balance sheet and so forth.  It doesn't

10   say here's what's happening.  It's not an annual report.

11   Footnotes would be very factual in nature.

12   Q.   You are a CPA, of course.  Do you know -- I

13   apologize for asking.  But do you know what a going

14   concern qualification is?

15   A.   Yes.

16   Q.   Could you explain that to me?

17   A.   Yes.  In U.S. terms, it is the company --

18   whether or not the company has the ability to stay as a

19   going concern entity, basically stay in business, and

20   typically that test is a one year out test.

21   Q.   When you say that test is a one year out test,

22   it seeks to measure or to project revenues and expenses

23   to see whether basically there is enough cash to sustain

24   business?

25   A.   Yes, so it doesn't have accessibility to other

1    resources to be able to, again, last that long.  There

2    would have to be -- it doesn't have to be net income.

3    It can be other things that show that you can carry it

4    for a year.

5        Q.   I agree with you.  It could be, for instance,

6    more loans that the company takes on --

7        A.   Exactly.

8        Q.   -- or less problematically, more equity

9    investments that the company receives; is that right?

10       A.   Yes, or it even could be a plan to show that

11   you are going to trim costs.

12       Q.   Correct.  It could be on the inflow or on the

13   outflow?

14       A.   Correct.

15            MS. BUCHANAN:  Counsel, is now a good time for

16   a break?

17            MR. VALLA:  Well, since I have no question

18   pending, sure.  How long would you like to take?

19            MS. BUCHANAN:  It's not urgent.  It's just that

20   we have been going for over an hour.

21            MR. VALLA:  No problem.  Do you want to take

22   ten minutes?

23            MS. BUCHANAN:  Yes, that would be great.  Thank

24   you.

25            MR. VALLA:  Let's come back at a little after

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    3:00 o'clock California time.

2              (Recess taken from 2:52 to 3:06)

3              MR. VALLA:  Back on the record.

4         Q.   Mr. James, welcome back to what will probably

5    be the last bit of your deposition today.

6         A.   Okay.

7         Q.   You are still under oath.  You know that,

8    right?

9         A.   Yes, I do.

10        Q.   Sorry for repeating that, but it got drilled

11   into me as a young lawyer and I haven't let go of that

12   one.

13             We were talking -- when we took our break, we

14   were talking about the valuation of the business that

15   was performed by Orchard Partners of Wellesley,

16   Massachusetts, back in 2016.  And I was about to ask you

17   whether you think it was an independent valuation.

18        A.   Yes.

19        Q.   Do you know what I mean by that?

20        A.   I'm not following you, no.

21        Q.   Thank you for answering that question, but I

22   will consider it as if you didn't because I don't want

23   you to answer any questions that you don't understand,

24   because I want to take your answers for their value, and

25   they have no value if you don't understand the question.

1              By an independent valuation, I mean a valuation

2      that was performed by a true third party.  Does that

3      make sense now?

4          A.   Yeah, yes.

5          Q.   As far as you know, did Orchard Partners have a

6      preexisting relationship with either the buyer or the

7      seller of the assets?

8          A.   No.

9          Q.   Do you know how they were selected?

10         A.   I believe we had used them once before because

11     they had been recommended by the audit firm back in the

12     early 2000s.

13         Q.   You used Orchard Partners once before.  What

14     did you use them for?

15         A.   They did just an analysis when we were being

16     audited.  There is accounting for what is called stock

17     option accounting where you have to calculate a value.

18     It used to be when you had stock options in companies or

19     convertible debt and so forth.  You did not do anything.

20     You just showed them in a footnote.

21              Well, common changed that many years ago to

22     where now you have to actually record an expense, which

23     is based on some valuations.  It is a very convoluted

24     calculation, but you're basically expected to value the

25     options.  And so we used them once in a while when we

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1   granted stock options to come up with an equivalent

2   market value for the shares.

3        Q.   When you say we, do you mean AIT?

4        A.   Yes, AIT.

5        Q.   Has Aurora Healthcare worked for them -- worked

6   with them?

7        A.   No.

8        Q.   Since the acquisition?

9        A.   No.

10       Q.   Not even for their stock option accounting,

11  which I guess --

12       A.   No.

13       Q.   -- performing because you have options in that

14  company; right?

15       A.   Yes.  We are doing that, but we don't use that

16  firm.

17       Q.   Looking back to the transaction in 2016, and by

18  that I mean the one that you told me closed on

19  November 6th, 2016, meaning the sale of the assets of

20  AIT by AIT to Aurora Healthcare, you testified that the

21  purchase price was eight and a half million and you also

22  testified that that was essentially a midpoint,

23  somewhere in between the range indicated in the

24  appraisal; is that correct?

25       A.   Yes.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    Q.   Was eight and a half million paid to AIT?

2    A.   Yes -- no.  I'm sorry.  1.2 was held back

3 contingent on consent on, as you mentioned earlier, that

4 clinic called BBDC, and ultimately that did not get

5 consented.  And so that purchase agreement got amended

6 to drop the purchase price because BBDC could not get

7 transferred as an asset.

8    Q.   Let me get my notes on that.  I think you

9 testified earlier in your deposition that BBDC was a

10 Boston-based clinic 80 percent owned by AIT.

11    A.   Yes.

12    Q.   So from your testimony just now, I assume, and

13 I'm going to ask you to confirm, that one of the assets

14 that was going to be transferred in the transaction was

15 the 80 percent interest held by AIT in BBDC?

16    A.   Correct.

17    Q.   There was a holdback on the purchase price,

18 meaning a portion of the purchase price equal to

19 1.2 million was not paid over to the seller pending the

20 transfer of that 80 percent interest; is that right?

21    A.   Yes.

22    Q.   Ultimately that 80 percent interest was not

23 transferred; is that right?

24    A.   Correct.

25    Q.   It remains an asset of AIT to this day, as far

1    as you know, which you may not know, but it wasn't

2    transferred in that transaction, so it may still be an

3    asset in AIT today?

4         A.   As far as I know, correct.  All I know is it

5    was not transferred.

6         Q.   So of the 8.5 million that was agreed being the

7    purchase price, 7.3 million were actually paid, meaning

8    8.5 minus the 1.2 holdback; is that true?

9         A.   Yes.

10        Q.   I will make a note of that.  Based on what you

11   just testified to, does this all mean that the value of

12   the BBDC 80 percent interest was appraised to be

13   1.2 million?

14        A.   I don't know what it was appraised at, but

15   that's what was negotiated as the holdback.

16        Q.   The parties somehow agreed that if AIT was

17   unable to transfer the 80 percent, AIT would get $1.2

18   million less for whatever reason?

19        A.   Whatever, yes.

20        Q.   And that's what actually happened, as far as

21   you know; right?

22        A.   As far as I know, that is what happened.

23        Q.   That is what happened.  Sorry.

24        A.   It did not transfer.

25        Q.   Do you know why it wasn't transferred with the

189

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    rest of the assets?

2        A.   Yeah.  I think at that point, they could not

3    obtain the consent from Dr. Levin, and she required --

4    the transfer of that ownership required her consent.

5        Q.   I see.  The minority partner had some kind of

6    consent right.  She didn't give her consent, and so the

7    asset wasn't transferred and the price was reduced; is

8    that right?

9        A.   That's correct.

10        Q.   Was the $7.3 million net of the 1.2 holdback,

11    was that actually paid to AIT?

12        A.   No.  Some of that was forgiveness of debt.

13        Q.   Do you recall how much of that was forgiveness

14    of debt?

15        A.   I don't.

16        Q.   Would it surprise you if I told you it was

17    4.3 million approximately?

18        A.   It would not.

19        Q.   If I'm doing my math right, better my

20    arithmetic, which is sort of third grade, the

21    7.3 million net of the 1.2 million became 3 million even

22    after 4.3 million of canceled indebtedness is taken into

23    account.  In other words, the cash received at closing

24    by the seller of the assets, AIT, was in fact

25    approximately $3 million; is that right?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    A.    Yes.

2    Q.    The debt canceled in this transaction the four

3  point -- what I have stated to you was $4.3 million in

4  debt canceled in this transaction, that was the Pharos

5  debt, wasn't it?

6         MS. BUCHANAN:  Objection, calls for

7  speculation, lacks foundation.

8    Q.    BY MR. VALLA:  Do you know if it was?

9    A.    I'm going to answer that.  I don't know.

10   Q.    You do not know if it was the Pharos debt that

11  got canceled?

12   A.    No.

13   Q.    At this point in time, which is the closing of

14  the sale in November 2016, you have not been for a long

15  time the CFO of AIT, but you are a consultant and the

16  CFO of Aurora Healthcare, the buyer; is that right?

17   A.    Correct.

18   Q.    In your role as CFO and consultant of Aurora

19  Healthcare, did you receive a copy of the purchase

20  agreement and related deal documents for the assets?

21        MS. BUCHANAN:  Objection, vague as to time.

22        MR. VALLA:  November 2016.

23        THE WITNESS:  Yes, I would have seen a final

24  draft, yeah.

25   Q.    BY MR. VALLA:  In fact, on the closing date,

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    which you said was November 6th, 2016, you would have

2    seen all the closing documents or did you see all the

3    closing documents?

4         A.   What do you mean by all the closing documents?

5    There's a lot of --

6         Q.   Asset purchase agreement.

7         A.   Lots of exhibits.

8         Q.   All the exhibits.

9         A.   I didn't see them all gathered in one place,

10   no.

11        Q.   Did you receive them at some point?

12        A.   Yes.

13        Q.   In their totality?

14        A.   Yes.

15        Q.   Because you had to open the books of Aurora

16   Healthcare, book those assets in, any liabilities that

17   got assumed, and then you had your balance.  You had

18   your chart of accounts and you have to fill it out;

19   right?

20        A.   Yes.

21        Q.   At some point, presumably on November 6th,

22   2016, you paid over $3 million to the seller?

23        A.   Yes.  Not me but, yes, Aurora Healthcare.

24        Q.   You, on behalf of Aurora Healthcare, paid over

25   $3 million to the seller; is that right?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1      A.   Yes.

2      Q.   How did you make that payment?

3      A.   I don't recall how we made it.  Likely wire.

4      Q.   Most likely a bank wire transfer.  I don't

5   think you carried $3 million in cash, did you?

6      A.   Huh-uh.

7      Q.   Who authorized you to make that payment?

8      A.   That would have been Olivia.

9      Q.   Do you have anything in writing from her

10  authorizing you to make that payment?

11     A.   I don't recall if I got an e-mail or we talked

12  and had a final version of a signed purchase and sale.

13     Q.   But you feel comfortable that you were acting

14  on someone else's authority to pay this money over;

15  right?

16     A.   Yes.

17     Q.   When you paid the money -- by that I mean the

18  $3 million net purchase price to the seller -- how much

19  money was there in the Aurora Healthcare bank account?

20         MS. CLOSE:  I want to make sure that this

21  information is designated as confidential because we're

22  getting into Aurora Healthcare's financial information.

23         MR. VALLA:  Agreed.

24         THE WITNESS:  I don't know how -- I don't know

25  how much.  I don't know that answer.  I don't know how

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    much was funded prior to the acquisition and how much

2    was following it.

3        Q.   BY MR. VALLA:   There was at least $3 million

4    because you sent this over; right?

5        A.   Yes.

6        Q.   Part of the consideration in this deal was

7    cancellation of indebtedness.   We already established

8    you didn't have much involvement in that, but who agreed

9    to cancel the indebtedness?

10       A.   I don't know.

11       Q.   Because this is what I'm thinking, Mr. James;

12   you received the deal documents, including the asset

13   purchase agreement.   You are a smart man.   You and I

14   have done a lot of deals and stuff.   You saw a purchase

15   price for 8.5 million.   You saw there was a holdback,

16   and then you saw the payment terms and you saw that

17   there was cancellation of indebtedness.   So you didn't

18   have to wire 7.3 million.   You had to wire 3 million,

19   and you wired 3 million.   Right?

20       A.   Yes.

21       Q.   Do you recall who canceled that indebtedness?

22            MS. CLOSE:   Calls for speculation.

23            MR. VALLA:   No, hardly.   I asked him if he

24   recalls.

25            THE WITNESS:   It was canceled by the contract.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1   The contract canceled it.

2       Q.   BY MR. VALLA:   Do you remember who signed the

3   contract for Aurora Healthcare?

4       A.   Olivia.

5       Q.   By herself?

6       A.   Yes.

7       Q.   Do you have that contract, a copy of that

8   contract?

9       A.   Asset purchase agreement?

10      Q.   Yes, sir.

11      A.   I would think that is -- that's part of the

12  documents of AIT as well.  You should have that.  If you

13  have the appraisal, you have the purchase agreement.

14          MS. BUCHANAN:   The question is for you

15  personally, Steve, as an individual whether you have

16  that document.  Not whether Aurora Healthcare has it or

17  whether AIT has it but whether you personally have it.

18          THE WITNESS:   I mean, I have access to it

19  because I am CFO of AHC.  So, yes, I have it.  Do I

20  personally have it?  I'm not following.

21          MS. BUCHANAN:   You don't have it in your

22  personal capacity?

23          THE WITNESS:   No, I do not, not in my personal

24  capacity.

25      Q.   BY MR. VALLA:   But it is within your control.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    You have access to it; right?

2         A.   Yes.

3         Q.   We're going to request a copy of that, because

4    it is your testimony that the earlier contract, the one

5    with the Cayman Islands company, came to nothing.  So

6    that's not the operative contract, is it?  It's the one

7    with Aurora Healthcare that's operative?

8              MS. CLOSE:  I believe both have already been

9    produced in discovery.

10             MR. VALLA:  I'm asking a question.

11             THE WITNESS:  I don't know what documents you

12   have but, yes, that's the operative document that I

13   worked from.

14        Q.   BY MR. VALLA:  The one with Aurora Healthcare

15   is the operative document?

16        A.   Correct.

17        Q.   Do you know, Mr. James, who was notified of the

18   sale of the assets before that sale happened?

19        A.   I don't.

20        Q.   Do you know whether my client, Castel S.A., was

21   notified?

22        A.   I don't.  No, I don't specifically know, no.

23        Q.   Did you have any communication about notifying

24   any party of the sale of the assets?

25        A.   No.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    Q.   By communication, I mean in writing or by

2    telephone.

3    A.   No.

4    Q.   I think it's fair then for me to assume that

5    you also don't have any documentation relating to anyone

6    consenting to the sale of the assets?

7    A.   No, I do not.

8    Q.   To your knowledge, Mr. James, did anybody

9    object to the sale of the assets?

10   A.   Again, not that I am aware of, no.

11   Q.   When the assets were acquired by Aurora

12   Healthcare, were any liabilities also assumed?

13   A.   No.

14   Q.   I will represent to you that in many, perhaps

15   most, asset purchase transactions, some liabilities are

16   also typically assumed because they are inherent to the

17   assets being purchased.  But you think none were assumed

18   here; is that right?

19        MS. BUCHANAN:  I will object to the foundation

20   of the question, but you can answer the second part of

21   the question.  I think you already have, actually.

22        THE WITNESS:  The asset purchase agreement had

23   no liabilities assumed.

24   Q.   BY MR. VALLA:  Do you know, Mr. James, whether

25   any party other than Aurora Healthcare offered to buy

1   the assets?

2      A.   I do not know, no.

3      Q.   To your knowledge, was the company put up for

4   sale or put up to bid?

5      A.   That I don't know.

6      Q.   To your knowledge, was the company assets

7   offered for sale to the current investors?

8      A.   I do not know.

9      Q.   Do you know whether, in addition to the Orchard

10  Partners' appraisers, the company retained any

11  investment bankers to sell its assets to the highest

12  bidder?

13         MS. BUCHANAN:  Objection, vague.  When you say

14  the company, are you talking about AIT, Counsel?

15         MR. VALLA:  Well, in this case, I am, yes.

16  With this question, I am.

17         MS. BUCHANAN:  Instead of pronouns, it would be

18  more helpful to use the actual names.

19         MR. VALLA:  You're right, it would be helpful.

20  Easy to get him confused.

21     Q.   Mr. James, do you want to answer?

22     A.   You have to repeat the question.  I'm sorry.

23         MR. VALLA:  Madam Court Reporter, would you

24  please repeat the question.

25              (Record read as follows by the Court Reporter:

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1          "Question:  Do you know whether, in addition to

2          the Orchard Partners' appraisers, the company

3          retained any investment bankers to sell its

4          assets to the highest bidder?")

5          THE WITNESS:  The answer is, no, I do not know.

6     Q.   BY MR. VALLA:  Do you know whether Aurora

7    Healthcare was represented by investment bankers in the

8    asset purchase transaction?

9     A.   I do not know.

10     Q.   At the time that the transaction closed,

11    shortly after, meaning after November 6, 2016, you were

12    providing some consulting services to AIT; right?

13     A.   Yes.

14     Q.   With your Aurora Healthcare hat on, you wired

15    $3 million to AIT, right, to pay for the assets?

16     A.   Yes.

17     Q.   Then with your AIT hat on, you saw those

18    $3 million come in?

19     A.   I didn't have access to the bank accounts, so

20    no.

21     Q.   At that point, you did not have access to the

22    bank accounts?

23     A.   Correct.

24     Q.   You were not a bank signatory at that time?

25     A.   That's correct.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1      Q.   Do you know how the $3 million were spent by

2  AIT?

3      A.   No, I do not.

4      Q.   Did you have any involvement in deciding how

5  they would be spent?

6      A.   I did not.

7      Q.   Do you know whether Olivia Cheng did?

8      A.   Again, I have no idea.  No, I do not.

9      Q.   Would Chris Wilson know about that?

10         MS. BUCHANAN:  Calls for speculation.

11         THE WITNESS:  Yes, likely he should know.  He

12  was the CEO.

13     Q.   BY MR. VALLA:  When you wired the $3 million

14  net purchase price to AIT, did you call anyone to tell

15  them, hey, it's done; it hit the wire?

16     A.   I don't know how I informed them that the wire

17  was done.

18     Q.   Did you inform anyone on the seller side, on

19  the AIT side, hey, watch out for it; it's coming?

20     A.   I think they already knew it was coming.  No, I

21  did not, not that I recall.

22     Q.   How did they know it was coming?

23     A.   Because the transaction was signed.

24     Q.   You know, of course, there is a difference

25  between signing a deal and executing a deal; right?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1              MS. BUCHANAN:  Objection, argumentative.

 2              MR. VALLA:  I'm not arguing.

 3      Q.   There is a difference, isn't there?

 4      A.   There is, but I assumed they knew it was coming

 5  because Olivia requested that I go ahead and do what the

 6  transfers were.  So I assumed that they knew that it was

 7  coming.

 8      Q.   You assumed that Olivia told them; right?

 9      A.   I assumed somewhere along the way, there was a

10  communication that the funds were being sent.

11      Q.   One reason you know that there is a difference

12  between signing a deal and executing on a deal is that

13  the Cayman Islands company had actually signed a deal

14  but never executed on it, did it?

15      A.   Correct.

16              MR. VALLA:  Let's take a ten-minute break.  I

17  think I'm almost done.

18              (Recess taken from 3:31 to 3:40)

19              MR. VALLA:  Back on the record.

20      Q.   Mr. James, you are still under oath.  You

21  understand that?

22      A.   Yes.

23      Q.   Very good.  Mr. James, let me show you a

24  document.  It should be up on everyone's screen right

25  now.  Can everybody see it?
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1        A.    Yes.
 2              MS. BUCHANAN:  Yes.
 3              MR. VALLA:  Madam Court Reporter, we are going
 4   to mark this as Plaintiff's Exhibit 2.
 5                   (Document of 52 pages marked for
 6                    identification as Plaintiff's Exhibit 2)
 7        Q.    BY MR. VALLA:  I will represent to you that
 8   this is a compilation of documents that was produced by
 9   your counsel to us, and part of this, as you see, is
10   correspondence and part of it appears to be billing
11   records of yours.
12              Let me get to those.  Can everybody see the
13   first page of the billing records?  It's Bates stamped
14   James_00019.  Mr. James, can you see that page?
15        A.    I can.
16        Q.    You see that the page seems to be composed of a
17   column of dates, a second column of activity, and then
18   some additional columns which bear what appear to be
19   company names?
20        A.    Correct.
21        Q.    Are these your billing records, Mr. James?
22        A.    They are.
23        Q.    Let me make it a little bit bigger.  When you
24   look at the company names at the top of that page that I
25   earlier indicated to you, you see there is a column for
```

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    Aurora Healthcare?

2         A.   Yes.

3         Q.   That would be Aurora Healthcare U.S.?

4         A.   Yes.

5         Q.   And then there is a separate column for Aurora

6    Health Intelligence?

7         A.   Yes.

8         Q.   And that would be the company that you

9    described was going to get into the A.I. business and

10   reading imaging; is that correct?

11        A.   Yes.

12        Q.   That's a subsidiary of Aurora Healthcare; is

13   that right?

14        A.   Yes.

15        Q.   Then there is a column for ARF Partners?

16        A.   Yes.

17        Q.   Which you testified are still your clients but

18   you do limited work for; is that right?

19        A.   Correct.

20        Q.   As to Aurora Healthcare, the column seems to

21   have the most entries.  They are highlighted in yellow.

22   I don't think this is our highlight, but they are

23   highlighted in yellow.  And they seem to indicate the

24   number of hours perhaps?

25        A.   Yes.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    Q.   That you spent on services, is that what the

2    numbers are about?

3    A.   Yes, that's correct.

4    Q.   And is there a rate at which you multiply those

5    hours to come to your fees?

6    A.   It's up there, 125 per hour.

7    Q.   So you charge Aurora Healthcare 125 and you

8    charge Aurora Intelligence 125 and you charge ARF

9    Partners 150?

10   A.   Yes.  I haven't done any work for Aurora Health

11   and ARF in a while.  It's just carryover columns.

12   Q.   You charge different rates to different

13   clients.  There is nothing unusual about that; right?

14   A.   Uh-huh, correct.

15   Q.   You will see that part of this document, this

16   page, is redacted, meaning it's illegible and was

17   stricken out.  Do you agree with that that you can't see

18   parts of it?

19   A.   Yes, I see that.

20   Q.   Did you do that redacting?

21   A.   I did not.

22         MS. BUCHANAN:  Those are by our office,

23   Counsel.

24         MR. VALLA:  Okay.

25   Q.   My question is the following:  You have

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    testified that you haven't done much work for ARF

2    Partners?

3        A.   Correct.

4        Q.   Except perhaps for an hour or so in filing

5    their annual statement every year in Massachusetts; is

6    that right?

7        A.   Yes.

8        Q.   Do you see the first redaction?  It's probably

9    dated right around February 17th, 2021.

10       A.   Yes.

11       Q.   Do you see how that redaction reaches over to

12   the ARF Partners column?

13       A.   Yes.

14       Q.   In your memory -- I don't want to know what the

15   content of it is.  I don't know what the redaction is

16   about, but is that a time entry for ARF Partners

17   because, otherwise, why would it be redacted into the

18   ARF Partners column?

19       A.   I don't know that.  I don't know.  You're

20   going -- I would have to consult with counsel.

21       Q.   I don't want you to do that in front of me and

22   neither does she.  Same question applies to the next

23   redacted entry on that page, do you see how it reaches

24   across all the columns to ARF Partners?

25       A.   Yes.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    Q.   Looking at a subsequent page, could you see the

2    page I have up right now?

3    A.   I can.

4    Q.   Do you see that the columns are different in

5    that page than the prior page we looked at?

6    A.   Yes.

7    Q.   So we have a column for Aurora Healthcare, a

8    column for Aurora, a column for Aurora Health

9    Intelligence, a column for ARF Partners, and a column

10   for B.E. Equity.  Is that right?

11   A.   Yes.

12   Q.   What is B.E. Equity, Mr. James?

13   A.   That is another entity that was put together

14   that is an investor in Aurora Healthcare.

15   Q.   Remember I asked you earlier in your deposition

16   about B.E. Pacific Capital Partners?

17   A.   Yes.

18   Q.   You told me you didn't know about it.  Could

19   that be B.E. Equity?  Is it the same?

20   A.   I don't know if it's the same.  I haven't heard

21   that name of Pacific Healthcare Partners.  That is not

22   the name I know.

23   Q.   Do you know what B.E. stands for, if it stands

24   for anything?

25   A.   I don't know.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    Q.   Do you know whether the ARF in ARF stands for

2    anything?

3    A.   I believe that was Aurora Rescue Fund.

4    Q.   Aurora Rescue Fund, okay.

5         You see on this page that I'm showing you now,

6    we have more redactions, all of them reaching across

7    into ARF Partners and B.E. Equity.

8    A.   And beyond.

9    Q.   And some of them beyond, is that right?

10   A.   All of them.

11   Q.   I'm showing you now a page in the same

12   document.

13        MS. BUCHANAN:  Can you identify it by Bates

14   label, Counsel?

15        MR. VALLA:  I will do my best to find a Bates

16   label, but there doesn't seem to be one, but I will

17   describe it.  It's easy to find because for the first

18   time in this document, we find a whole new column over

19   on the left side that says health credit, and then there

20   are entries for -- periodic entries each in the amount

21   of $504.75, and the reference on the left-hand side --

22        MS. BUCHANAN: All right.  Sorry.  For the

23   record, that is Bates labeled James_00030.

24        MR. VALLA:  That's good.  Thanks for your help.

25   Q.   Mr. James, you see on the left-hand side of the

1  page where it says fix fee service?

2     A.   Yes.

3     Q.   Then there are some dates that seem to be

4  roughly two weeks apart from each other?

5     A.   Yes.

6     Q.   Then it says Aurora Healthcare and then it says

7  health credit and then there's an amount which again is

8  a repetitive amount of $504.75.  What is that amount?

9     A.   Well, Aurora permitted me to participate in

10  their health insurance plan.  And so that is me

11  reimbursing them through my billings as a deduction on

12  my bills so that I could be on the group program rather

13  than buying an individual program, which is a little bit

14  cheaper and a better plan.

15     Q.   Sounds like a good idea certainly health-wise.

16  Is the Aurora Healthcare plan a company plan for its

17  employees then?

18     A.   Yes.

19     Q.   Which I think you testified earlier there are

20  four or five?

21     A.   Correct.

22     Q.   Has Aurora permitted you to participate in that

23  plan?

24     A.   Yes.

25     Q.   To your knowledge, has Aurora disclosed to its

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1    insurer that you are not an employee?

2        A.    No, because I became an employee just for this

3    healthcare insurance.

4        Q.    So you are an employee of Aurora Healthcare?

5        A.    For that amount, just for the insurance

6    purposes.

7        Q.    Let me understand that.  You are a consultant

8    to Aurora and you bill them for your consulting services

9    on an hourly fee basis; is that right?

10       A.    Yes.

11       Q.    You are also an employee of Aurora, and Aurora

12   pays for your employment by paying for your insurance?

13       A.    No.  Aurora pays the insurance and I reimburse

14   Aurora for the insurance.

15       Q.    So Aurora has declared to its insurance company

16   that you are an employee, so you are entitled to

17   participate in a group plan?

18       A.    Yes.

19       Q.    And you reimburse them for the cost of that

20   plan?

21       A.    Yes.

22       Q.    In other words, if you didn't have this

23   opportunity to purchase insurance through Aurora, you

24   would have to purchase it individually and it would be

25   more expensive to you; right?

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1      A.   More expensive and probably have to go on with

2    a health exchange.  I couldn't buy a program like this.

3    This is a better health program.

4      Q.   Is this income to you, Mr. James?

5      A.   Yes, it is, and then I have some of that

6    expense for credit on my tax return, yes.  There is --

7    it is income and then it is an expense.

8      Q.   Aurora issues you a W-2 each year?

9      A.   Yes, for this exact amount, yes.  It stopped in

10   January 2021, so it is no longer the case.

11     Q.   Now you are in a different health insurance

12   plan?

13     A.   Yes.

14     Q.   Is that an individual plan?

15     A.   I am actually on Medicare.

16     Q.   I see.

17     A.   And my wife had -- not that it matters, but she

18   had a kidney transplant, so she was required to go on

19   Medicare.  So I ended up opting to go on Medicare as

20   well.

21     Q.   I'm sorry she suffered through that.

22     A.   That is all right.  She's doing good.

23          MR. VALLA:  Counsel, we're going to need to

24   meet and confer on all the redactions on the documents.

25   We didn't get a privilege log or anything like that.

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

1          MS. BUCHANAN:  We are happy to do so.

2          MR. VALLA:  Very well.  I am finished and,

3    Mr. James, I thank you for your patience and the long

4    hours and your testimony today.

5          THE WITNESS:  Okay.  Thank you.

6          MR. VALLA:  I tender the witness to counsel, in

7    case they have any questions.

8          MS. CLOSE:  I have no questions of this

9    witness.  I would like to order a transcript.

10         MR. VALLA:  How about you, Ms. Buchanan?

11         MS. BUCHANAN:  Yes, of course.

12         MR. VALLA:  I mean, do you have any questions

13   of your own witness?

14         MS. BUCHANAN:  Oh, no, I do not.  Thank you.

15         MR. VALLA:  It's rare, but it happens.

16         MS. BUCHANAN:  I know, I have seen it.

17         MR. VALLA:  We will be in touch about our own

18   transcript.  We will definitely order.

19         (Time is 3:56 p.m., end of deposition)

20

21

22

23

24

25

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

DEPOSITION OFFICER'S CERTIFICATE

UNITED STATES DISTRICT COURT )
)
CENTRAL DISTRICT OF CALIFORNIA )

I, PEGGY TSUJIMOTO, CSR, hereby certify:

I am a duly qualified Certified Shorthand Reporter in the State of California, holder of Certificate Number 5229 issued by the Court Reporters Board of California and which is in full force and effect (Fed. R. Civ. P. 28(a).

I am authorized to administer oaths or affirmations pursuant to California Code of Civil Procedure, Section 2093(b); and prior to being examined, the deponent was first duly sworn by me. (Fed. R. Civ. P. 28(a), 30(f)(1)).

I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in this action. (Fed. R. Civ. P. 28).

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition and the foregoing transcript is a true record of the testimony given by the deponent. (Fed. R. Civ. P. 30(f)(1)).

Before completion of the deposition, review of the transcript [   ] was [ x ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto. (Fed. R. Civ. P. 30(e)).

Dated:  June 7, 2021

_____

PEGGY TSUJIMOTO, CSR
State of California
CSR License No. 5229

212

DEPOSITION OF STEVEN J. JAMES
May 21, 2021

```
 1              DISPOSITION OF TRANSCRIPT REVIEW

 2     Case:  Castel v. Wilson, et al.
       Deposition of:  STEVEN J. JAMES
 3     Date Taken:  May 21, 2021

 4          I certify that the witness was given the

 5     statutory allowable time within which to read and sign

 6     the deposition, and that:

 7

 8     _____    The witness failed to appear for such

 9                 reading and signing.

10     _____    A correction letter has been submitted and is
                   attached to the transcript.
11
       _____    The witness has waived review/signature
12
                   on the record.
13
       _____    The time for reading and signing has expired.
14
       _____    The witness has reviewed and signed the
15                 transcript and has made no changes.

16     _____    Other:

17

18
                           ---------------------------------
19                         PEGGY TSUJIMOTO, CSR 5229

20                         Date_____

21

22

23

24

25
```