Dirk O. Julander, Bar No. 132313
 doj@jbblaw.com
Catherine A. Close, Bar No. 198549
 cac@jbblaw.com
Tiffany W. Harlan, Bar No. 305244
 tiffany@jbblaw.com
JULANDER, BROWN & BOLLARD
9110 Irvine Center Drive
Irvine, California 92618
Telephone: (949) 477-2100
Facsimile: (949) 477-6355

Attorneys for Defendants
CHRISTOPHER A. WILSON and
ARF PARTNERS, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CASTEL S.A., a Luxembourg joint stock company (societe anonyme), | Case No. 2:19-cv-09336-DFM |
| Plaintiff, | |
| vs. | **DEFENDANT CHRISTOPHER A. WILSON'S CLOSING BRIEF** |
| CHRISTOPHER A. WILSON, an individual; PHAROS CAPITAL PARTNERS II, LP, a Delaware limited partnership; PHAROS CAPITAL PARTNERS II-A, LP, a Delaware limited partnership; OLIVIA HO CHENG, an individual; ARF PARTNERS, LLC, a Massachusetts limited liability company; AURORA HEALTHCARE US CORP, a Massachusetts corporation; STEVEN J. JAMES, an individual, | **Trial** Date:   May 22-30, 2023 **Closing Argument** Date:   August 4, 2023 Time:   10:00 a.m. Ctrm:   6B |
| Defendants. | *The Honorable Douglas F. McCormick* |

1

# <u>TABLE OF CONTENTS</u>

I. SUMMARY OF THE ARGUMENT ...................................................................... 6

II. SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL ........................ 7

   A.  From The Beginning Castel Had Notice Of The Jeopardy Its AIT Investments Were In And It Chose To Do Nothing .......................................... 7

   B. Castel Was Fully Informed With All Of The Other Shareholders Of AIT's Insolvency ............................................................................................. 10

   C. ARF Acted To Save AIT And Its Technology After Castel Refused To Be Part Of The ARF Fund .......................................................................... 14

   D.  Wilson And Cheng's Hard Work Produced An Opportunity For AIT's Unsecured Creditors To Recover A Portion Of Their Debt, An Opportunity Castel Refused ......................................................................... 15

III. CASTEL COMES INTO COURT AS BOTH A SHAREHOLDER AND CREDITOR. BECAUSE THE DUTIES FOR EACH ARE DIFFERENT AND INDEPENDENT, THIS COURT SHOULD CONSIDER EACH CLAIM UNDER EACH CAPACITY SEPARATELY. ...................................................... 21

IV. CASTEL, IN ITS CAPACITY AS A SHAREHOLDER, FAILED TO PROVE A BASIS FOR RELIEF AGAINST WILSON .......................................... 21

   A.  Wilson Is Not Liable For Fraud To Castel In Its Capacity As A *Shareholder* Because Castel's Fraud Claim Is Entirely Based On And Redundant To Its Breach Of Fiduciary Duty Claim ............................................................ 21

   B.  Castel Has Failed To Prove That Wilson Breached Any Fiduciary Duties To Castel As A *Shareholder* ..................................................................... 23

     1.  Wilson Did Not Breach any Fiduciary Duties to Castel as a *Shareholder* 23

     2.  Castel's Claim for Breach of Fiduciary Duty Also Fails Because Wilson's Actions are Protected by the Business Judgment Rule ............................. 26

     3.  Castel's Claim for Breach of Fiduciary Duty Also Fails Because Wilson's Actions Satisfy the Enhanced Scrutiny Standard ...................................... 29

     4.  Even if Castel Could Show that Wilson had an Actual Conflict, the APA Transaction was Entirely Fair ................................................................... 29

   C.  Castel Failed To Carry Its Burden Of Proving Reliance, Causation And Direct Damages As A *Shareholder* ............................................................. 31

     1.  To Recover More than Nominal Damages for Breach of the Duty of Disclosure, Castel Must Prove Reliance, Causation and Damages Beyond Speculation ................................................................................................ 31

     2.  The Loss of Castel's Investment in AIT Was Not Caused by Wilson's Conduct ...................................................................................................... 32

     3.  Castel is Not Entitled to Recover for Harm Suffered by AIT and All of its Combined Shareholders ............................................................................ 34



JULANDER BROWN
— & BOLLARD —

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JULANDER BROWN
—— & BOLLARD ——

**V. CASTEL, IN ITS CAPACITY AS A *CREDITOR*, HAS FAILED TO PROVE A BASIS FOR RELIEF AGAINST WILSON** ........................................................ 35

A.  Because Wilson Had No Fiduciary Duties To Castel In Its Capacity As A *Creditor,* Castel Cannot Prove Its Breach Of Fiduciary Duty Claim On This Basis ............................................................................................. 35

B. As a *Creditor*, Castel Knew all Material Facts and Was Invited to Gain Any Additional Knowledge That it Felt it Needed ................................. 36

C.  There Was No Intent To Defraud Castel In Its Claim As A *Creditor* ............ 40

D.  Castel Failed To Carry Its Burden Of Proving Reliance, Causation And Damages As A *Creditor*, Because Wilson's Conduct Did Not Cause Castel The Loss On Its Note ........................................................... 41

**VI. CONCLUSION** ............................................................................... 42

CHRISTOPHER A. WILSON'S CLOSING BRIEF

1

## <u>TABLE OF AUTHORITIES</u>

2
**Cases**.................................................................................................Page

3
*Albert v. Alex. Brown Management Services, Inc.*
   31 Del. J. Corp. L. 267 (Del. Ch., Aug. 26, 2005) ...............................................22
4
*Aronson v. Lewis*
   473 A.2d 805, 812 (1984)..................................................................27
5
*Asmussen v. Quaker City Corp.*
   156 A. 180 (Del. Ch. 1931)................................................................40
6
*Beard Research, Inc. v. Kates*
   8 A.3d 573, 601 (Del. Ch. 2010) .......................................................23
7
*Berg & Berg Enterprises, LLC v. Boyle*
   178 Cal.App.4th 1020, 1038 (2009) ...................................................35
8
*Bershad v. Curtiss–Wright Corp.*
   535 A.2d 840, 845 (Del. 1987) .........................................................33
9
*Brehm v. Eisner*
   746 A.2d 244, 253 (Del. 2000) .........................................................27
10
*Brookfield Asset Mgmt., Inc. v. Rosson*
   261 A.3d 1251, 1262 (Del. 2021).......................................................34
11
*Cede & Co. v. Technicolor, Inc.*
   634 A.2d 345, 361 (Del. 1993) .........................................................26
12
*Central Laborers' Pension Fund v. McAfee, Inc.*
   17 Cal.App.5th 292, 317-318 (2017) .................................................27
13
*Chen v. Howard-Anderson*
   87 A.3d 648, 673 (Del. Ch. 2014) .....................................................29
14
*Credit Lyonnais Bank Nederland N.V. v. Pathe Communications Corp.*
   1991 WL 277613, *34 (Del. Ch. Dec. 30, 1991); ...............................35
15
*Davis v. HSBC Bank Nevada, N.A.*
   691 F.3d 1152, 1163 (2012) .............................................................39
16
*Dohmen v. Goodman*
   234 A.3d 1161, 1168 (Del. 2020)..................................................31, 32
17
*eBay Domestic Holdings, Inc. v. Newmark*
   16 A.3d 1, 42 (Del. Ch. 2010) .........................................................30
18
*Feldman v. Cutaia*
   951 A.2d 727, 732 (Del. 2008) .........................................................34
19
*Firefighters' Pension Sys. of City of Kansas City, Missouri Tr. v. Presidio, Inc.*
   251 A.3d 212, 249 (Del. Ch. 2021) ...................................................29
20
*Gantler v. Stephens*
   965 A2d 695, 713, fn. 54 (Del. 2009)................................................27
21
*Hill v. Wrather*
   158 Cal.App.2d 818 (1958).).............................................................39
22
*In re ASHINC Corp.*
   640 B.R. 1, 50 (Bankr. D. Del. 2022) ...............................................31
23
*In re Dollar Thrifty S'holder Litig.*
   14 A.3d 573, 598 (Del. Ch. 2010) .....................................................28
24
*In re Invs. Bancorp, Inc. S'holder Litig.*
   177 A.3d 1208, 1217 (Del. 2017) .....................................................28
25
*In re Trados Inc. S'holder Litig.*
   73 A.3d 17, 76-78 (Del. Ch. 2013)..................................23, 29, 30, 33
26
*Kramer v. Western Pacific Indus., Inc.*
   546 A.2d 348, 353 (Del.1988)...........................................................35
27
*Laskowski v. Wallis*
   58 Del. 98, 101 (1964).....................................................................41

28

JULANDER BROWN
— & BOLLARD —

*Mercier v. Inter-Tel (Del.), Inc.*
  929 A.2d 786, 810 (Del. Ch. 2007) ........................................................29
*Mirkin v. Wasserman*
  5 Cal.4th 1082, 1093 (1993) ................................................................42
*Moran v. Household Int'l, Inc.*
  500 A2d 1346, 1356 (Del. 1985) ..........................................................27
*N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*
  930 A.2d 92, 103 (Del. 2007) ..............................................................22
*NACEPF v. Gheewalla*
  930 A.2d 92, 101, 103 (2007) ..............................................................35
*New Enter. Associates 14, L.P. v. Rich*
  292 A.3d 112, 163 (Del. Ch. 2023) ......................................................28
*Perez v. Gordon & Wong Law Grp., P.C.*
  No. 11-CV-03323-LHK, 2012 WL 1029425, at *11 (N.D. Cal. Mar. 26, 2012) .36
*Piscitelli v. Friedenberg*
  87 Cal.App.4th 953, 989 (2001) ...........................................................41
*Quadrant Structured Prod. Co., Ltd. v. Vertin*
  115 A.3d 535, 546-547 (Del. Ch. 2015) ...............................................22
*Regalado v. Callaghan*
  3 Cal.App.5th 582, 602 (2016) ............................................................41
*Reis v. Hazelett Strip-Casting Corp.*
  28 A.3d 442, 457 (Del. Ch. 2011) ........................................................26
*Rosenblatt v. Getty Oil Co.*
  493 A.2d 929, 940 (Del.1985) ..............................................................30
*Smith v. Van Gorkom*
  488 A2d 858, 873 (Del. 1985) ..............................................................27
*Sterling v. Mayflower Hotel Corp.*
  93 A.2d 107, 114 (Del.1952) ................................................................30
*Stream TV Networks, Inc. v. SeeCubic, Inc.*
  250 A.3d 1016, 1045–46 (Del. Ch. 2020) ............................................26
*Thornton v. Bernard Techs., Inc.*
  2009 WL 426179, at *3 (Del. Ch. Feb 20, 2009 ..................................35
*Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*
  845 A.2d 1031, 1033 (Del. 2004) .........................................................34
*Triton Const. Co., Inc. v. Eastern Shore Elec. Services, Inc.*
  2009 WL 1387115, at *20, aff'd (Del. 2010) 988 A.2d 938 (Del. Ch., May 18,
  2009, No. CIV. A. 3290-VCP) .............................................................22

**Statutes**
Del. Code Ann. tit. 8, § 144 (West) ...........................................................37

**Other Authorities**
2 Edward P. Welch, Andrew J. Turezyn, and Robert S. Saunders, Folk on the
  Delaware General Corporation Law § 327.2.1.2 (5th ed. 2008) ..........................35

JULANDER BROWN
— & BOLLARD —

CHRISTOPHER A. WILSON'S CLOSING BRIEF

1     Defendant CHRISTOPHER A. WILSON ("Wilson") respectfully submits his

2 Closing Brief with respect to the above-captioned action.

**I.    SUMMARY OF THE ARGUMENT**

4     Having lost its equity investment in AIT to insolvency and having lost its

5 opportunity to recover 40% of its debt investment to its decision to sue AIT,

6 Plaintiff CASTEL S.A. ("Castel") is now casting about to assign blame. In doing so,

7 Castel is rewriting history, creating conspiracies and adversaries where there were

8 none, and seeking to gain from the risk based investing and hard work of others after

9 having consciously chosen to abstain from its own risk or effort.

10     In 2015, Wilson and Cheng saw a potential opportunity to rescue value from

11 the AIT assets that bankruptcy could not provide. By working hard to negotiate

12 down AIT's existing debt and find new money, Wilson and Cheng believed they

13 could rescue a worthwhile technology and recover value for AIT's shareholders and

14 creditors. Despite his significant effort, Wilson was not able to find a buyer for the

15 company. Cheng, on the other hand, was successful in finding new investors, first in

16 ARF to stave off bankruptcy while attempting to find a buyer, and then in the new

17 investors in AHC who offered new capital for AIT's assets. At trial, Castel offered

18 no evidence that there was any other buyer available for the company or its assets.

19     It is incontrovertible that, without the money from new investors, the Pharos

20 debt would have been worth only a few hundred thousand dollars in bankruptcy. It

21 is only because ARF and then the new investors from AHC brought in new capital

22 that the secured debt was worth anything. And if ARF had not agreed to exchange

23 the secured debt for equity, the new investors would not have put the new capital in.

24     When ARF bought the Pharos debt, there was no guarantee that more money

25 would come into AIT; the money ARF put up was completely at risk. At that time,

26 the risk was so great, that the sophisticated, insider investor Pharos valued the

27 secured debt and equity at the low price it did. Castel has presented no evidence that

28 the ARF/Pharos transaction was anything other than an arm's length transaction.

1    Castel is now looking backwards, after Wilson and Cheng's hard work

2    brought in new capital, and arguing that the entirety of these transactions was meant

3    to cheat it. Castel could not possibly have made this argument in November 2015,

4    when ARF put its money at risk and there was no new capital on the horizon.

5    Essentially, all Castel is doing is unfairly trying to gain from Wilson and Cheng's

6    hard work and ARF's risky investment without having put up any of its own hard

7    work or putting its own capital at risk.

8    **II.    SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL**

9       **A.    From The Beginning Castel Had Notice Of The Jeopardy Its AIT**

10              **Investments Were In And It Chose To Do Nothing**

11   Though Aurora Imaging Technology, Inc. ("AIT") was never actually

12   "profitable," there was a time when it had great value to its investors and the world.

13   After becoming CEO of AIT in 2003, Olivia Cheng led the company in obtaining

14   FDA approval for its Dedicated Breast MRI Systems that it placed in clinics and

15   hospitals around the US. (Id. at ¶8; Trial Transcript ["TT"] 5/24, 333:14-335:6.)

16   After Cheng took the helm, annual revenues increased 10 times to approximately

17   $20 million by 2007. (TT 5/24, 335:10-21; Dkt. 210, ¶8.)

18   During this time of rising success, Castel invested, along with Pharos, in

19   AIT's Series C financing round. (Trial Exhibit ("Ex.") 1.) After its investment,

20   Castel's representatives participated in the company's board meetings. (TT 5/24,

21   338:8-22, 339:5-16, 339:17-340:9; TT 5/30, 9:24-10:17, 10:24-11:10, 12:17-14:3,

22   14:4-15:21, 16:10-18:9; Ex. 72, 73 & 75; Kovalkova Depo., 74:14-75:14, 133:9-

23   134:17.)

24   From its financial high point, the road to AIT's demise was slow and

25   predictable. Its demise began in 2012, after AIT's financial wellbeing became

26   dependent on the purchase transaction with China Resources Company ("CRC"),

27   which fell apart in early 2012. The CRC negotiations lasted approximately 2 years,

28   during which AIT could not raise capital because the terms of the transaction

JULANDER BROWN
— & BOLLARD —

1  prohibited it. (Dkt. 212, p. 6, Stip. Fact (b), (c); TT 5/24, 336:8-23.) During that time

2  AIT was forced to survive off of shareholder loans, including bridge loans. Castel

3  was well aware the company had run out of money because it was called on to loan

4  AIT money. (TT 5/24, 336:8-23.) During this time Castel made its $250,000 bridge

5  loan to AIT. (Ex. 4; Dkt. 212, p. 5, Admitted Fact (g).) This was the first and last

6  action taken by Castel to protect its equity investment in AIT. Thereafter, *Castel left*

7  *the financial viability of AIT and the work of protecting its investment to others*.

8      In the spring of 2012, CRC terminated the agreement and withdrew from the

9  transaction. (Dkt. 212, p. 6, Stip. Fact (c).) Castel had full knowledge of the

10  termination of the agreement through its Board representative, Marco Caneva. (See,

11  Ex. 75.) After the CRC transaction failed, AIT was left scrambling to raise money;

12  there were no substantial sales of MRI machines; the only revenue the company had

13  was from service and maintenance, and even that was declining because the

14  installed base was declining, as machines became worn out or replaced; no new

15  capital was raised; and there was no revenue from sales. The lack of cash affected

16  both the ability to maintain good equipment and the ability to market the systems.

17  (TT 5/26, 572:18-573:24; Kovalkova Depo., 78:12-79:9.)

18      Olivia Cheng was forced to resign as CEO in 2013 under pressure from the

19  other board members led by Michael Devlin of Pharos, who wanted to control the

20  company. (Dkt. 210, ¶12; TT 5/24, 234:23-235:13; TT 5/30, 19:13-24.) Pharos got

21  its way in 2014, when Devlin became the company's CEO and Anna Kovalkova of

22  Pharos became the Treasurer/Secretary. (TT 05/26, 575:14-16; Kovalkova Depo.,

23  82:16-83:11, Ex. 89.)

24      Unfortunately, even under Pharos' control, AIT continued to struggle

25  financially. By 2014, its competition was offering superior products with better

26  pricing, customers were unhappy because of issues with the systems, and the

27  technology required a major overhaul the company could not afford. (Kovalkova

28  Depo., 96:13-97:16, 100:3-101:4, 102:13-103:22; Ex. 96.) Although Devlin sought

JULANDER BROWN
& BOLLARD

distribution partners and a couple of companies started diligence, ultimately none were interested and Devlin was unable to raise additional funds. (TT 5/26, 575:14-576:21; Kovalkova Depo., 103:23-104:23, Ex. 96.)

During this critical time, ***Castel disengaged from AIT***. It no longer exercised its right to participate in AIT board meetings in 2014 and 2015. (TT 5/23, 127:17-128:13.) In August 2014, Devlin invited Castel to step up and make an additional investment. (See, Ex. 91 ["Pharos putting in money and taking control of management and board (as long as Wangs sign their "B" consent)....would be open to you guys putting in $$ on these terms....we can talk more in September [2014]."].) Castel informed itself and declined. (Ex. 91 [Caneva: "we have a mtg scheduled to go over the docs Anna sent us. I am also talking to Antonio Valla today to give him more color on the situation and recent developments at Aurora, so that he can better understand what was forwarded to him two weeks ago." (TT 5/23, 136:18-21.)

***Castel left others to care for its AIT investment***, particularly Pharos who made additional loans of $3.1 million after putting Devlin in as CEO. (Ex. 93, pp. 14-19 [Pharos loans with interest and expenses totaled $3,475,715.].) Devlin resigned as CEO in March 2015 and Kovalkova resigned shortly thereafter. (Kovalkova Depo., 97:17-23, 98:15-25.) After Devlin's resignation, Castel never reached out to find out what was happening with AIT because, according to Mattia Malacalza, that's "not Castel's way of doing things." (TT 5/23, 151:15-152:12.)

By May 2015, the company was in distress and would go out of business unless it could secure substantial investment money. (Kovalkova Depo., 99:1-24.) AIT was $20.46 million in debt and could not pay its debts as they came due; five lawsuits had been filed against the company; and the company was insolvent. (See, TT 5/26, 578:21-581:15, 582:3-586:17, 598:11-599:7; Kovalkova Depo., 106:17-107:3, 107:9-15; Ex. 92 [M. Parrilla Summary 5/14/15]; Ex. 54 ["Moreover, the Company's assets are insufficient to pay these liabilities and monthly revenue is

JULANDER BROWN
— & BOLLARD —

1 insufficient to pay the Company's debts as they become due."].) ***Castel never***
2 ***produced any evidence at trial to contradict the overwhelming evidence that AIT***
3 ***was insolvent by at least June 2015***.[1]

4 **B.    Castel Was Fully Informed With All Of The Other Shareholders**
5 **Of AIT's Insolvency**

6 Prior to Devlin's resignation from the board, Pharos loaned additional money
7 to AIT to hire bankruptcy counsel (Stevens & Lee) and a receiver (Lain Faulkner) to
8 prepare a Bankruptcy Petition and liquidate the company's assets. (Dkt. 211, ¶10;
9 TT 5/26, 588:24-589:19; 599:8-601:6; Ex. 93, 97.) Shortly thereafter, AIT's officers
10 and the Board of Directors resigned after voting to appoint Wilson as the interim
11 President and CEO to shepherd the company through the liquidation and winding up
12 process.[2] (Dkt. 211, ¶10; TT 5/26, 600:8-12.) For his service, the resigning board
13 voted that he receive $250,000, no matter how long it took. (TT 5/25, 461:21-
14 462:18.) Wilson, and Mike Parrilla, the accounting COO engaged to assist with the
15 liquidation, made a last effort to save the company from bankruptcy through a sale
16 of the company or its assets. (TT 5/25, 460:14-461:20; TT 5/26, 605:24-607:11.)

17 Wilson did not believe that bankruptcy and liquidation was in the best interest
18 of AIT because any value obtained for the company's assets would go first to the
19 Bankruptcy Trustee, then to priority claims such as employment and taxes, and the
20 last check would go to the senior secured creditor, Pharos. (TT 5/26, 601:4-602:15,
21 603:12-19.) There would be nothing left for the shareholders or unsecured creditors.
22 / / /

23 _____

24 [1]    Castel's only attempt to rebut the evidence of AIT's insolvency was to argue that the
financial statements showed the company was profitable in 2015. But, as explained, the "profit"
25 on the 2015 financial statement was the result of debt forgiveness as Wilson negotiated
settlements with trade creditors using the funds loaned by ARF. (TT 5/26, 595:9-597:25; Ex. 6, p.
26 3; TT 5/30, 66:8-67:1.)

27 [2]    Wilson joined the AIT Board of Directors in late 2012 or early 2013. (Dkt. 211, at ¶9.) At
that time, the CRC transaction had already fallen apart and the company was in serious financial
28 jeopardy. (TT 5/26, 572:18-573:24.)

JULANDER BROWN
— & BOLLARD —

(Id.) He believed AIT could be turned around by raising new money, negotiating with creditors, and restarting the technology. (TT 5/25, 459:22-460:5.)

To this end, Wilson and Parilla contacted companies that might be interested in the technology. (TT 5/25, 460:6-461:20.) Parilla had contacts in the MRI industry and reached out to GE, Siemens, Phillips, and others. (Id.) Wilson reached out to private equity firms that might be interested in investing. (Id.) But, it soon became clear that saving the company would be difficult. (Id.)

On June 18, 2015, Wilson sent a letter to **all** shareholders informing them of the company's condition and advising that:

- The other board members and officers resigned, leaving Wilson as the sole director tasked with liquidating the company;

- AIT was down to 25 employees, most of which were part time; AIT had not sold a new MRI unit since 2013;

- Many MRI centers (AIT's primary source of revenue) were closed or closing;

- AIT did not have sufficient revenue to sustain vital research and development, maintain a sales team, or even perform fundamental business activities such as the preparation of financial statements;

- The Company currently had approximately $20.46 million in liabilities, most of which are past due or in default;

- The Company had already been sued by five creditors, and three creditors have obtained judgments against the Company;

- The Company's assets were insufficient to pay its liabilities and monthly revenue was insufficient to pay the Company's debts as they become due;

- The Company's senior secured creditor indicated that it believes liquidation is the only option available and loaned additional cash to further the liquidation efforts;

- Upon any liquidation of the Company, the amount available for distribution to the creditors would not be sufficient to repay the senior secured loan. Thus, all other creditors would receive no repayment of any portion of their debt; and

/ / /

- Shareholders would receive no distributions and the shares of the Company common and preferred stock would be worthless.

(TT 5/26, pp. 604:16-6-5:7; Ex. 54; TT 5/23, pp. 143:20-144:22.) The letter concluded, "Mike and I continue to explore last minute efforts to sell all or any portion of the Company's business and assets. We believe that there is value in the Company's intellectual property and service business, but to date we have been unable to identify interested purchasers." (Ex. 54.)

*Castel received this letter, putting the Malacalzas and Castel expressly on notice that AIT was insolvent, the company's stock was worthless, and that Wilson intended to sell or liquidate the company.* (Ex. 61 ["As promised, attached is the letter we received from Chris Wilson …."]; TT 5/23, 144:7-12, 164:22-25, 168:14-24.) At trial, Castel produced no evidence that Wilson's statements made in his June 2015 letter were not accurate. (TT 5/23, TT 157:7-160:6-20.) After receiving Wilson's letter (Ex. 54) in 2015, Castel did not object to Wilson's proposal to wind down the company informally. (TT 5/23, 162:6-9.) The evidence demonstrates that, at the time Wilson agreed to serve as CEO and undertook any actions on behalf of the company, the equity investments of all investors were already worthless.

Wilson's letter moved Olivia Cheng into action to try to rescue the company. (TT 5/24, 346:4-21, 465:8-21; Ex. 95.) Cheng told the shareholders that the technology is still worth something and the company should not go into bankruptcy. (TT 5/24, 351:1-352:16; Ex. 61.) None were willing to contribute funds to the rescue effort. (TT 5/24, 353:19-23.) For its part, after a phone call with Cheng, *Castel promised to think about it and get back to her if they were interested in participating; but they never did*. (TT 5/24, 352:17-353:9.)

Cheng was forced to formulate a plan and raise "new" money to save the company. (TT 5/24, 356:12-357:21, 361:10-363:5; Ex. 43.) She believed that more than $10 million would be required to save the company. (TT 5/24, 363:6-364:5.)

/ / /

JULANDER BROWN
— & BOLLARD —

Cheng formed an LLC in September 2015 to fund the rescue effort called ARF Partners, which stood for "Aurora Rescue Fund." (Dkt. 210, ¶15; Ex. 15.) Though Cheng started as the only member, as money was raised her membership interest declined to approximately 13%. (Dkt. 210, ¶15; TT 5/24, 357:22-358:17.) The first order of business for ARF was to eliminate the senior secured creditor, Pharos, so that it could not foreclose or force bankruptcy. (TT 5/25, 466:1-468:11.) Wilson began negotiating with ARF's money to redeem Pharos's interest for AIT, but Pharos was asking for too much and Wilson was hamstrung because he was advised by bankruptcy counsel that could not pay Pharos more than it would receive in bankruptcy or it could be deemed an improper preference. (Id.; TT 5/24, 246:20-247:13.) The next option was for ARF to try to acquire Pharos' interest instead.

In September 2015, Castel's counsel, Antonio Valla, reached out to Wilson inquiring about Wilson's letter. (Ex. 55.) Wilson responded attaching the draft bankruptcy petition and schedules "indicating the debts and liabilities, and limited assets, of Aurora." (Id. at p. 2.) Wilson then offered to redeem Castel's interest in AIT and settle its debt for $40,000. (TT 5/26, 610:20-611:1, Ex. 55.)

Responding to Mr. Valla's request for information, Wilson advised that a fund was formed to invest up to $1 million in AIT on the condition that settlements are reached with all of the major creditors. (TT 5/25, 473:14-474:12; TT 5/23, 171:11-18; Ex. 55, p. 1.) Wilson explained that "The fund is not related to Aurora and the funds are coming from a group of investors in Taiwan and China. They are the potential buyers." (Ex. 55, p. 1.) Wilson did not mention the name of the fund because he did not "think it would have meant anything to anybody [since] [i]t was a newly-formed fund." (TT 5/25, 475:13-476:9.) *Castel never responded to Wilson's offer and did nothing further to protect its investment or inquire about the status of AIT for the next 12 months.* (TT 5/23, 174:5-21.)

/ / /

/ / /

C.    **ARF Acted To Save AIT And Its Technology After Castel Refused To Be Part Of The ARF Fund**

While Castel took a position of repose with respect to its AIT investment, ARF actively sought capital and a new business opportunity in AIT. With the approximately $1.5 million it raised, ARF purchased Pharos's debt and equity for $425,000.[3] (TT, 5/25, 378:22-379:15, 466:1-468:11; Ex. 11, 12, 103 & 123.) Wilson communicated ARF's final offer to Pharos since Cheng was travelling, but he was not otherwise involved in the negotiations between ARF and Pharos for ARF's purchase of Pharos's interest. (TT 5/25, 380:8-382:1, 468:12-469:1.) *Castel could have, but did not, risk its own money to purchase Pharos's position*. (TT 5/23, 179:10-15.)

ARF's purchase of Pharos's ownership and credit positions was an arm's length transaction. (TT 5/25, 382:3-383:2.) At trial, Castel produced no evidence and specifically no contractual terms prohibiting Pharos from selling its position to ARF, requiring Pharos or ARF to notify or consult with Castel, or requiring Castel's consent to this transaction. Had Castel accepted Cheng's invitation to invest in ARF, *Castel could have been part of this opportunity*. (Ex. 99 & 61.) *But Castel refused and now is unfairly trying to take advantage of ARF's investment risk without having risked anything itself*.

After securing Pharos's interest and protecting AIT's assets from foreclosure, ARF attempted to raise funds necessary to continue AIT's operations, estimated at more than $10 million. (TT 5/25, 386:3-387:3.) Within a year it became clear ARF would not be able to raise the funds for AIT because the new investors saw the debt on the company's books, understood that AIT was near bankruptcy, and were not willing to work within the company's share structure. (Id.; TT 5/24, 356:12-357:21.)

---

[3]    Pharos accepted $425,000 because of the dire financial situation, it was beyond Pharos' resources to fund the AIT's turnaround, and it was best to just exit if it had the chance. (Kovalkova Depo., 124:1-126:14; Ex. 101.)

CHRISTOPHER A. WILSON'S CLOSING BRIEF

After ARF failed to attract additional capital for investment in AIT, Cheng went out and raised new money from investors in the tech industry that wanted to get into the medical field. (TT 5/25, 387:23-389:6.) The new group of investors was willing to commit $8.5-$9 million cash to purchase AIT's assets. (TT 5/25, 387:23-389:6.) Besides Cheng, there were no common investors between ARF and the new investors. (TT 5/25, 387:23-388:12.)

### D. Wilson And Cheng's Hard Work Produced An Opportunity For AIT's Unsecured Creditors To Recover A Portion Of Their Debt, An Opportunity Castel Refused

The Asset Purchase Agreement ("APA") was negotiated between Wilson on behalf of AIT and Cheng on behalf of the new group of investors. (TT 5/25, 387:23-389:6.) The first draft of the Asset Purchase Agreement was prepared by the new investors' Taiwanese attorney, who had recommended the buyers form a Cayman Islands company to host the assets. (TT 5/25, 393:15-25; Ex. 24.) With this new group of investors, Cheng formed a new company, Aurora Healthcare, SPC, a Cayman Islands corporation. (Id.)

Later, these same new investors reincorporated as Aurora Healthcare US Corp, a Massachusetts corporation ("AHC"). (TT 5/25, 403:25-405:3 [The investors in the Cayman company are the exact same as the Massachusetts company.].) The investors reincorporated AHC as a Massachusetts corporation because it was easier to be a US corporation than a foreign corporation for financial bookkeeping and reporting on US operations. (TT 5/24, 273:18-274:10.) Cheng is a minority owner of AHC, owning less than 5% of the company's capital stock along with her husband. (Dkt. 210, ¶16.) Thus, Cheng did not exert control over either AIT or AHC.

In August or September, 2016, Cheng, on behalf of the new investors, began negotiating with Wilson for the purchase of AIT's assets. (Ex. 22-26; TT 5/25, 407:8-23 [Wilson did not make every change to the APA that Cheng requested]; TT 5/26, 648:21-649:7 [Wilson acted as he determined was in the best interest of AIT

1  and its creditors].) By early October 2016, AIT and the new investors had reached

2  an agreement in principle on the sale of AIT's assets for the sum of $8.5 million.

3  (Ex. 26 [including Wilson's redlined version of the APA]; TT 5/25, 399:23-402:9.)

4  After the parties reached an agreement in principle on the purchase, there were

5  various versions of the APA, but the purchase price never changed from $8.5

6  million. (*Cf* Ex. 26, p. 8 & Ex. 10, p. 5.) The offer to purchase AIT's assets from the

7  new investors was the only offer AIT received for the purchase of its assets after

8  almost a year and a half of trying. (Ex. 37; TT 5/26, 624:9-625:18.)

9       The transaction always contemplated a credit for the senior secured debt held

10  by ARF in exchange for equity conversion in the buyer. (TT 5/26, 618:22-620:15.)

11  To facilitate the APA transaction, ARF agreed to exchange the secured debt (in the

12  agreed amount of $3 million) for equity in the buyer and BE Capital agreed to

13  exchange the commission it was owed (in the agreed amount of $1 million) for

14  equity in the buyer. (Ex. 14, p. 2, ¶2; TT 5/26, 659:4-660:15.) In exchange for the

15  senior secured debt and the BE Capital commission being retired without payment,

16  AIT waived $4 million of the purchase price. (Ex. 14, p. 2-3, ¶¶3 & 4.) Without this

17  exchange for equity in the buyer, the APA could not have closed and the unsecured

18  creditors would have received nothing. (TT, 5/26, 661:8-662:20.) The $4 million

19  credit was far less than the nearly $4 million owed on the Pharos senior debt, the

20  approximately $1 million owed to BE Capital as commission and the loan and

21  additional cash advances made by ARF at the closing. (TT 5/25, 506:1-507:16.)

22       To confirm that the purchase price agreed to between the parties was

23  consistent with "fair market value," on October 7, 2016, AIT retained and paid for

24  the services of Orchard Partners to appraise the assets to be sold. (Ex. 109 & 110;

25  TT 5/25, 531:6-532:3.) During the appraisal process, the initial valuation came in

26  below the parties' contract price of $8.5 million. (Ex. 31.) In response, Cheng

27  expressed her belief that the value was too low and provided to Steve James

28  information that certain of the appraiser's assumptions were incorrect and that the

JULANDER BROWN
— & BOLLARD —

value should be higher. (Ex. 32 & 33; TT 5/25, 440:22-442:15.) At no time did Cheng, or anyone on behalf of the buyer, specify a number for the valuation to the appraiser. (TT 5/25, 402:10-403:16.)

On behalf of AIT, Wilson's intention in getting the appraisal was to confirm that the purchase price he was agreeing to was fair. (TT 5/26, 623:20-624:1.) AIT was not concerned about the appraisal value and Wilson was not involved in providing the appraiser with additional information that could influence a higher appraised value. (TT 5/26, 625:19-626:18.) The final appraised value of the AIT assets was between $6,181,000 and $9,652,000. (Ex. 7.)

Having obtained an agreement in principle, in mid-October, Wilson began the process of obtaining shareholder consent for the transaction. (See Exs. 5 & 37; TT 5/26, 633:2-23.) As with the other AIT shareholders, Wilson asked Castel for its consent to the APA transaction in an email on October 20, 2016. (Ex. 5 ["Aurora has struggled to avoid bankruptcy but is now at the point where we must either sell the company or file for bankruptcy. We have received only one offer to purchase the assets of the business for $8,500,000, which we are going to accept, subject to the approval of shareholders."]; TT 5/26, 632:23-634:6.)

To obtain their consent, Wilson sent to each of the shareholders, including Castel, a draft APA reflecting all of the material terms of the agreement. (Ex. 5, p. 37-50; TT 5/26, 633:24-634:6.) This draft APA identified the Cayman Islands company as the buyer and indicated that Oliva Cheng was the authorized signatory of the buyer. (Ex. 5, p. 50 [WIL000099].) Castel was provided this information concurrently with all other shareholders. The shareholders, including Castel, were also sent the "Action By Written Consent In Lieu Of A Special Meeting Of Stockholders Of Aurora Imaging Technology, Inc." (the "Consent") setting out the material terms of the agreement and authorizing AIT to enter into the APA. (Ex. 5, p. 4-8; TT 5/26, 633:2-23.) The Consent expressly authorized the officers of the corporation to modify or amend the APA and its exhibits. (Ex. 5, p. 5 & 6 ["the

JULANDER BROWN
— & BOLLARD —

officers of the Corporation are, and each of them hereby is, authorized and directed in the name and on behalf of the Corporation to execute and deliver the Asset Purchase Agreement, with such modifications or amendments made thereto as may be approved by such officers or officer of the Corporation"]; TT 5/26, 634:7-635:13.)

Accordingly, and because the negotiations regarding the consideration breakdown were ongoing, that portion of the Draft APA was necessarily left blank. (TT 5/26, 636:2-14; Ex. 5, Draft APA, ¶3.1.) And although the APA was later modified to reflect AHC as the entity that would be purchasing the assets, Wilson did not obtain a new consent from the shareholders because he did not believe that the specific entity chosen by the buying investors was material to the transaction. (TT 5/26, 638:25-640:3 [The change was not material enough to get new consents because both entities are newly-formed. There was no history of operations and no assets. They were owned/managed by the same people. Also, it was a cash transaction and there were no continuing obligations of the buyer after the closing. It did not matter to AIT if the buyer was a Mass. Corp. or a Cayman Corp.].)

AIT also sought to settle the claims of the unsecured creditors with the proceeds from the sale. Wilson offered to pay Castel $100,000 in settlement of its $250,000 unsecured loan to AIT. (Ex. 5; TT 5/26, 629:1-632:22.)

As with all of AIT's shareholders, Wilson informed Castel that the shares had become worthless and, as a result, there would be no distributions to any of the shareholders. (Ex. 5 ["Of course, the shares [have] become worthless and no distributions will be made to any shareholder relative to their stock."].) Consistent with this, no money was ever distributed to any of AIT's shareholders for their stock. (TT, 5/26, 672:20-673:4.)

On October 26, 2015, Wilson received an email from two of Castel's directors, requesting "all material information" regarding the transaction, both

/ / /

"financial and nonfinancial."[4] (TT 5/26, 640:4-642:10; Ex. 6.) Wilson had no problem providing Castel with any documents or information it needed, but the vague request encompassed everything – more than 20 million pages of paperwork. (Id.) Wilson provided Castel with what he believed was material – AIT's financial statements from 2010-2015 and a list of the anticipated payments to be made after closing. He explained, "[w]e had negotiated forbearance agreements with creditors holding more than $12,000,000 of past due loans, but the forbearance period ended in September. As result, such creditors could commence immediate foreclosure proceedings. The current owner of the senior secured debt originally issued to Pharos could have acquired all of the assets of the company by commencing legal proceedings, which would have left nothing for any of the unsecured creditors." (Ex. 6; TT 5/25, pp. 513:25-516:2.) Wilson also offered to provide Castel with any specific documentation it would like to see and offered to make the company's records available to Castel for inspection. (Id.) ***Wilson heard nothing further from Castel regarding the sufficiency of the information he sent and believed Castel's request was satisfied.*** (TT 5/26, 643:15-644:16; TT 5/23 185:4-189:2 [incl., "Q. If that information was not sufficient for Castel to make its decision, settle and vote to approve the APA, why didn't Castel ever, ever send back another single request for information to Mr. Wilson? A. You can't underestimate that Castel was asking for information. This is not the information that Castel was requesting"].)

The voting for shareholder approval of the APA started in mid-October and ended around November 14th. (TT 5/26, 655:20-23.) In response to AIT's request for shareholder approval, a majority of the company's shareholders approved the transaction, including the necessary majorities from each of the classes of stock. (TT

///

///

---

[4] Castel's email also referenced "inaccurate and misleading" information but, even after Malacalza's testimony, there is no indication in the record of what that comment was referring to. (Ex. 6; TT 5/26, 642:11-643:14.)

1  5/26, 650:7-651:9.)[5] As a result of the voting, Wilson concluded that AIT had the

2  requisite majorities to close the transaction on November 18, 2016. (TT 5/26,

3  655:11-19; 5/25, 534:14-535:2.)

4       However, the largest single asset of the company was the BBDC clinic in

5  Massachusetts, valued at $1.2 million, that could not be transferred to the buyer

6  because AIT could not get government approval for the transfer before the APA

7  closed. (TT 5/25, 534:14-535:2.) Wilson and Cheng negotiated a holdback of $1.2

8  million pending the approval. When the approval never came, the buyer did not

9  have to pay the additional consideration. AIT thus received $3.3 million in cash

10  from the transaction. (TT 5/25, 532:18-534:4.) ***The only unsecured creditors who***

11  ***were impacted by the $1.2 million holdback were Dr. Wang and King and Joy***

12  ***Wong*** who agreed to forgo payment of this sum on the 40% of their unsecured debt.

13  (TT 5/25, 526:25-528:17.)

14       Every creditor that settled was paid by AIT. All settling creditors were paid

15  directly by AIT with the exception of Dr. Wang, who was paid $500,000 indirectly

16  from China on behalf of AIT. No other creditor got paid outside of this process,

17  except for trade payables which had been settled before the transaction closed. (TT

18  5/26, 664:24-672:14.) ***If Castel had agreed to accept the offer of $100,000, AIT***

19  ***had the funds to pay Castel through 2017.*** (TT 5/26, 571:11-15.) ***Rather than***

20  ***accepting the offer, Castel opted to sue AIT*** and ultimately obtained a judgment

21  against the company for the full amount of its note, plus interest and attorneys' fees.

22  (Ex. 119.)

23  / / /

24  / / /

25

26  [5]    For all classes together, AIT needed a majority and 53% of all shareholder voted in favor
of the transaction. For Series B shareholders, AIT needed a 66% majority of the class voting

27  separately and got 77% approving the transaction. For the series C and D shareholders, AIT
needed a majority of the class voting separately and got 83% of the vote for both approving the

28  transaction. (TT 5/26, 653:23-654:25.)

JULANDER BROWN
— & BOLLARD —

III. **CASTEL COMES INTO COURT AS BOTH A SHAREHOLDER AND CREDITOR. BECAUSE THE DUTIES FOR EACH ARE DIFFERENT AND INDEPENDENT, THIS COURT SHOULD CONSIDER EACH CLAIM UNDER EACH CAPACITY SEPARATELY.**

Castel comes to this Court in two distinct capacities, as a shareholder and as a creditor of AIT. Because Delaware law applies to directors' and officers' different and independent duties to shareholders and to creditors, the remedies Castel seeks on its claims are also different according to which of these capacities it is suing under.[6] Here, Castel is suing Wilson in his capacity as a director and officer of AIT for fraud and breach of fiduciary duty. (Dkt. 203, pp. 7-9, 12-14.) As shown hereafter, Castel has failed to prove its claims against Wilson in either capacity, such that judgment should be entered in favor of Wilson.

IV. **CASTEL, IN ITS CAPACITY AS A SHAREHOLDER, FAILED TO PROVE A BASIS FOR RELIEF AGAINST WILSON**

A. **Wilson Is Not Liable For Fraud To Castel In Its Capacity As A _Shareholder_ Because Castel's Fraud Claim Is Entirely Based On And Redundant To Its Breach Of Fiduciary Duty Claim**

In this action, Castel asserts that Wilson committed common law fraud by "intentionally failing to disclose certain facts to Castel." (Dkt. 203, §II(A), p. 7.) The undisclosed facts identified by Castel consist of: the sale of Pharos' instruments; the "Sham Buyer" (a reference to AHC US being the ultimate purchaser of AIT's assets); the personal benefits Wilson received; Cheng's involvement "on all sides of the transaction;" the failure to perform due diligence into the buyer; that some creditors were offered more money; that the "Real Agreement" was "backdated;" the differences in terms between the "Sham

---

[6] That under the internal affairs doctrine this Court should apply Delaware law to the claims against Wilson is discussed at length in Defendants Christopher A. Wilson And ARF Partners, LLC's Amended Proposed Contentions Of Fact And Law And Trial Brief. (Dkt. 205, p. 18.)

JULANDER BROWN
— & BOLLARD —

Agreement" and the "Real Agreement;" the identity of the "Real Buyer;" and that "he signed agreements related to the sale of AIT's assets which he knew contained false information." (Id. at pp. 7-9.)

Castel cites to Wilson's fiduciary relationship with Castel as the source of his duty to disclose the foregoing concealed facts. (Id. at p. 7.) Notably, Wilson only owed fiduciary duties to Castel as a **shareholder**, not a creditor because, as set forth below, directors of insolvent corporations do not owe fiduciary duties to creditors. (*Quadrant Structured Prod. Co., Ltd. v. Vertin,* 115 A.3d 535, 546-547 (Del. Ch. 2015); *N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla,* 930 A.2d 92, 103 (Del. 2007).)

For its breach of fiduciary duty claim, Castel asserts that Wilson breached his fiduciary duties to Castel by: approving the sale of assets (both to the "Sham Buyer" and the "Real Buyer"); **failing to conduct due diligence;** failing to "investigate the relationship between ARF, the Sham Buyer, and the Real Buyer as well as other related entities controlled by Cheng;" **failing to disclose material changes in the price and use of proceeds; failing to disclose the identity of the "Real Buyer;"** not acting in good faith; **gaining a personal benefit from the sale;** preferring certain creditors of the same class; and **being "influenced" by ARF and Cheng**. (Id. at pp. 12-13.)

The fraud claim is no more than a reframing of the breach of fiduciary duty claim. Under the fraud claim, Castel claims that Wilson failed to disclose to it the very conduct on which its breach of fiduciary claim is based. (See *Triton Const. Co., Inc. v. Eastern Shore Elec. Services, Inc.*, 2009 WL 1387115, at *20, aff'd (Del. 2010) 988 A.2d 938 (Del. Ch., May 18, 2009, No. CIV. A. 3290-VCP) [rejecting a fraud claim that was premised on the same facts as those underlying a fiduciary duty claim because "liability on a claim for fraud arising out of the same facts" could not entitle the plaintiff to any new relief]; *Albert v. Alex. Brown Management Services, Inc.,* 31 Del. J. Corp. L. 267 (Del. Ch., Aug. 26, 2005) [rejecting a claim for fraud

JULANDER BROWN
— & BOLLARD —

1 where the allegations underlying the fraud claim rehashed a breach of fiduciary duty

2 claim].) Because the fraud claim does not support an independent claim for relief,

3 the Court should decline to treat it as such and enter judgment on the claim for

4 Wilson.

5      That Castel also failed to prove its fraud in its capacity as a creditor is

6 discussed infra at Section V(B) and (C) below. The basis for denying that claim is

7 also applicable to Castel's claim as a shareholder, but will not be repeated here.

8     **B.**   **<u>Castel Has Failed To Prove That Wilson Breached Any Fiduciary</u>**

9        **<u>Duties To Castel As A *Shareholder*</u>**

10      The Court has already determined that Delaware law applies to Castel's claim

11 for breach of fiduciary duty based on the internal affairs doctrine. (Dkt. 176, pp. 21-

12 22.) Under Delaware law, a claim for breach of fiduciary duty requires Castel to

13 prove two elements:

14     (1) that a fiduciary duty existed, and

15     (2) that the defendant breached that duty.

16 (*Beard Research, Inc. v. Kates,* 8 A.3d 573, 601 (Del. Ch. 2010).) Castel's breach of

17 fiduciary duty claim arises from Wilson's conduct related to the APA transaction.

18 (Dkt. 91, ¶148.)

19        **1.**   **Wilson Did Not Breach any Fiduciary Duties to Castel as a**

20           **_Shareholder_**

21      Under Delaware law, where the company is insolvent, a corporate director

22 does not breach his duty to shareholders by agreeing to a transaction in which the

23 shareholders receive nothing for their equity because the stock had no economic

24 value before the transaction. (*In re Trados Inc. S'holder Litig.,* 73 A.3d 17, 76-78

25 (Del. Ch. 2013).) In *Trados*, an interested board approved a merger transaction that

26 benefited the preferred shareholders but left the common shareholders with nothing.

27 The plaintiff contended that instead of selling the company, the Board had a

28 fiduciary duty to continue operating independently in an effort to generate value for

JULANDER BROWN
— & BOLLARD —

the common stock. Rejecting the challenge by the common shareholders and applying the strict "entire fairness" rule of review, the Delaware Chancery Court entered judgement for the defendant directors finding that, under Trados's business plan, the common stock had no economic value before the Merger, making it fair for its holders to receive in the Merger the substantial equivalent of what they had before. (*Id.* at 20, 78.)

As discussed above, the evidence that AIT was insolvent in 2015 and 2016 is overwhelming and uncontested. (See *infra*, at §II(A).) After the CRC transaction failed in 2012, the company was in very serious financial jeopardy. (TT 5/26, 572:18-573:24.) Attempts to revive the company failed. (TT 5/26, 575:17-576:21.) A bankruptcy attorney and receiver were hired to liquidate the company's assets. (Dkt. 211, ¶10; TT 5/26, 578:6-20, 588:24-589:19; 599:8-601:6; Ex. 93 & 97.) When Wilson took over at the request of the resigning board, AIT was $20.46 million in debt, was not paying its debts as they came due or interest on its loans, and had several lawsuits filed against it. (TT 5/26, 578:21-586:17, 598:11-600:21; Ex. 92 & 97; Kovalkova Depo., 106:17-107:3, 107:9-15.) The senior secured creditor (Pharos) determined that liquidation was the only course of action and even loaned $175,000 to fund the liquidation, agreeing only to forbear on pursuing foreclosure for two weeks, which was a concern. (TT 5/26, 586:18-590:8; Ex. 93.) In 2016 after ARF's effort to revive the company in 2015 failed, AIT remained insolvent. (TT 5/25, 418:21-419:14; TT 5/26, 594:19-595:8; TT 5/30, 67:10-17.)

The evidence also established that the value of Castel's shares – indeed all of the shareholders' shares – was zero prior to the asset purchase transaction and zero after the asset purchase transaction. (TT 5/26, 592:3-593:25 [shareholder equity was always negative since 2012]; 594:19-595:8 [$8.5 million would not have returned any value to the shareholders because the debt far exceeded the cash offered]; 672:20-673:4 [no shareholder received anything for their equity].) One of the strongest indications that Castel's equity was worthless is reflected by Pharos' sale

JULANDER BROWN
& BOLLARD

of its debt and equity to ARF. Value is best determined by the price agreed between a willing buyer and a willing seller in an arm's-length transaction. The ARF purchase from Pharos was such an arm's-length transaction. (TT 5/25, 382:3-383:2; Kovalkova Depo., pp. 124:4-126:11; Ex. 101.) The purchase agreement for the Pharos debt and equity very specifically identifies each and every note being purchased by ARF (Ex. 11, pp. 1-2), but then only generally acknowledges that ARF was also purchasing all shares owned by Pharos, without indicating the number of shares purchased or the amount paid. (Id. at p. 2 ["Seller also holds equity interests in AIT comprised of the following: Series C Preferred, Series D Preferred and Common Stock Warrants."].) This is despite the fact that Pharos' invested more than $18 million for the stock. (Ex. 65 & 68.) Moreover, the evidence at trial suggested that, in bankruptcy, Pharos would only recover $600,000 for its secured debt. (TT 5/25, 467:13-468:11, 508:17-509:2.) The purchase price for the notes and equity was a mere $425,000. (Ex. 11.) This transaction indicates that Pharos, whose employees had been in control of AIT for two critical years, placed an independent valuation of the AIT stock in 2015 at zero dollars.

Castel presented no evidence to dispute the facts underlying the conclusion that AIT was insolvent at least from May 2015 and that its shares had no value.[7]

Wilson and others tried unsuccessfully to revive some value for the shareholders. Unfortunately, they did not succeed. With negative shareholder equity exceeding $17 million, and no one, including Castel, to step up and invest sufficient capital in the company to overcome that deficit, reviving the company for the shareholders was out of reach. As a result, the shares of AIT stock had no economic value and Wilson could not breach fiduciary duties to the shareholders, including of

---

[7] Castel's only attempt to do so was to argue that the company never actually filed for bankruptcy and that the financial statements showed that the company was profitable in 2015. But, as explained, the "profit" on the 2015 financial statement was the result of debt forgiveness as Wilson negotiated settlements with trade creditors in 2015 using the funds loaned by ARF. (TT 5/26, 595:9-597:25; Ex. 6; TT 5/30, 66:8-67:1.)

JULANDER BROWN
— & BOLLARD —

course Castel, in connection with the APA that returned no value to any of the shareholders. Accordingly, Castel could not and did not prove its claim for breach of fiduciary duty for the loss of its equity interest in AIT and judgement on this claim should be entered in favor of Wilson.

### 2. Castel's Claim for Breach of Fiduciary Duty Also Fails Because Wilson's Actions are Protected by the Business Judgment Rule

"Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness." (*Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011).) "Which standard of review applies will depend initially on whether the board members (i) were disinterested and independent (the business judgment rule), (ii) faced potential conflicts of interest because of the decisional dynamics present in particular recurring and recognizable situations (enhanced scrutiny), or (iii) confronted actual conflicts of interest such that the directors making the decision did not comprise a disinterested and independent board majority (entire fairness)." (*Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1045–46 (Del. Ch. 2020).)

The decisions made by Wilson – both in his capacity as an officer and director – are protected under Delaware's Business Judgment Rule.[8] The Business Judgment Rule operates as both a procedural guide for litigants and a substantive rule of law. As a substantive rule of law, it creates a "presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the

/ / /

---

[8]      Castel has previously argued that the Business Judgment Rule is inapplicable because it only applies to directors, and Wilson was an officer and director during the alleged transactions. However, under Delaware law, the Business Judgment Rule protects both corporate officers and directors. (*Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 361 (Del. 1993), decision modified on reargument, 636 A.2d 956 (Del. 1994) ["[T]he business judgment rule attaches to protect corporate officers and directors and the decisions they make…"].)

JULANDER BROWN
— & BOLLARD —

company. [Citations.] Absent an abuse of discretion, that judgment will be respected by the courts. The burden is on the party challenging the decision to establish facts rebutting the presumption. [Citation.]" (*Aronson v. Lewis,* 473 A.2d 805, 812 (1984), overruled on other grounds by *Brehm v. Eisner,* 746 A.2d 244, 253 (Del. 2000).)

In contrast to California law, under Delaware law directors lose Business Judgment Rule protection only if grossly negligent in failing to inform themselves – mere negligence is not sufficient. (See *Central Laborers' Pension Fund v. McAfee, Inc.,* 17 Cal.App.5th 292, 317-318 (2017) (applying Delaware law); *Smith v. Van Gorkom,* 488 A2d 858, 873 (Del. 1985); and *Moran v. Household Int'l, Inc.,* 500 A2d 1346, 1356 (Del. 1985), overruled on other grounds by *Gantler v. Stephens,* 965 A2d 695, 713, fn. 54 (Del. 2009).)

Castel failed to meet its burden of proof of showing that Wilson was grossly negligent in approving the APA transaction. It introduced no evidence of the applicable standard of care or Wilson's failure to satisfy it. Instead, the evidence established that: AIT was insolvent (TT 5/26, 598:11-599:7, Ex. 92 & 97); creditor lawsuits were piling up (TT 5/26, 584:15-585:25); unsecured creditors would receive nothing in bankruptcy (TT 5/26, 603:12-19); efforts to borrow money to revive the company were unsuccessful (TT 5/25, 386:3-387:3); and the APA was the only offer received that would return anything to the company's unsecured creditors. (TT 5/26, 624:9-625:18.)

Wilson performed due diligence in connection with the transaction. As discussed above, he knew AIT's liabilities and the value of its assets, and he further confirmed buyer's ability to complete the purchase. (TT 5/26, 649:8-650:6.) Wilson also obtained an appraisal of the assets to ensure that purchase price was fair and reasonable. (TT 5/26, 623:20-624:1; Ex. 7.)

At the end of the day, Wilson maximized the corporate assets that might otherwise be used to pay creditors' claims by obtaining an offer on the high side of

the appraised value and closing a sale that satisfied the senior secured debt and provided $3.3 million in cash to pay unsecured creditors. The negotiated sale resulted in a sales price far above what Lain Faulkner had anticipated would be generated by the Chapter 7 liquidation. (TT 5/26, 601:13-602:15.) Because his decision to approve the asset purchase transaction was "rational in the sense of being one logical approach to advancing the corporation's objectives," there was no breach of fiduciary duty in connection with the asset purchase transaction. (*In re Dollar Thrifty S'holder Litig.,* 14 A.3d 573, 598 (Del. Ch. 2010).)

Castel will try to avoid the application of the Business Judgment Rule by arguing that Wilson engaged in self-dealing with respect to the transaction. But the evidence established that neither Wilson nor his family members received anything for their equity interest in AIT. (TT 5/26, 672:20-673:4.) Wilson's $250,000 compensation was not self-determined – it was voted on and approved by the resigning board and was not dependent on a successful transaction. (TT 5/25, 461:21-462:18.) Thus, the fact that he received employment compensation does not take the decisions out of the presumptive protection of the Business Judgment Rule or warrant a higher standard of review. (*In re Invs. Bancorp, Inc. S'holder Litig.,* 177 A.3d 1208, 1217 (Del. 2017); *New Enter. Associates 14, L.P. v. Rich,* 292 A.3d 112, 163 (Del. Ch. 2023) [Directors are "interested" when they determine their own compensation].) In fact, Wilson ended up paying $800/month out of his own pocket after the closing to ensure that AIT complied with its HIPAA obligations. (TT 5/26, 676:20-677:14.) Although Wilson and Cheng discussed Wilson's possible engagement as a manager or general counsel for the buyer, Wilson declined the engagement before sending out the shareholder consents for the APA and never received any interest in either ARF or AHC. (TT 5/26, 673:5-675:6; Ex. 22.) Thus, there was no evidence of self-dealing that would overcome the application of the Business Judgment Rule and neither Castel nor the Court should substitute its judgment for Wilson's with respect to the transaction.

JULANDER BROWN
— & BOLLARD —

3. **Castel's Claim for Breach of Fiduciary Duty Also Fails Because Wilson's Actions Satisfy the Enhanced Scrutiny Standard**

If, for any reason, the Court determines that Wilson had a potential conflict of interest, the transaction satisfies the enhanced scrutiny standard of review. Enhanced scrutiny requires a director to show that his "motivations were proper and not selfish" and that his "actions were reasonable in relation to their legitimate objective." (*In re Trados Inc. S'holder Litig.,* supra, 73 A.3d 17, 43; *Firefighters' Pension Sys. of City of Kansas City, Missouri Tr. v. Presidio, Inc.,* 251 A.3d 212, 249 (Del. Ch. 2021) *Mercier v. Inter-Tel (Del.), Inc.,* 929 A.2d 786, 810 (Del. Ch. 2007).) To do this, a director must demonstrate that: (1) he had reasonable grounds to base his decision; and (2) his response was reasonable in light of the circumstances. (*Chen v. Howard-Anderson,* 87 A.3d 648, 673 (Del. Ch. 2014).)

Wilson's approval of the asset purchase transaction satisfies both prongs. He had reasonable grounds to base his decision because AIT was insolvent, shareholder equity was zero, and the asset purchase transaction was the only way that the company could return any funds to its aggrieved creditors which would not otherwise be available to them in bankruptcy. He received only one offer to purchase the assets of the company after notifying all of the shareholders that he was attempting to sell the company and reaching out to other potential buyers and venture capital firms. He first attempted to revive the company with the funds loaned from ARF but it was clear that much more would be needed. Under the dire circumstances he faced, his decision to sell the assets, enter into the APA, and settle with the company's creditors was more than reasonable.

4. **Even if Castel Could Show that Wilson had an Actual Conflict, the APA Transaction was Entirely Fair**

Even if Castel could demonstrate an actual conflict of interest, and it cannot, Wilson still did not breach his fiduciary duties because the transaction was "entirely

29

fair," being the product of both (1) fair dealing and (2) fair price, with price being the paramount consideration. (*eBay Domestic Holdings, Inc. v. Newmark,* 16 A.3d 1, 42 (Del. Ch. 2010).) The Delaware Supreme Court has characterized the proper "test of fairness" as whether "the minority stockholder shall receive the substantial equivalent in value of what he had before." (*Sterling v. Mayflower Hotel Corp.,* 93 A.2d 107, 114 (Del.1952); accord *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 940 (Del.1985).) As discussed above, where the stock has no economic value (*infra* at §IV(B)(1)), a director cannot breach his fiduciary duty by agreeing to a transaction in which the shareholder receives nothing for their equity. (*In re Trados,* supra, 73 A.3d at 76.) The evidence established that the value of Castel's shares was zero prior to the asset purchase transaction and zero after the asset purchase transaction. The APA transaction was therefore necessarily fair to Castel.

As further support for the fairness of the transaction, Wilson engaged Orchard Partners to appraise the assets that were the subject of the APA. (TT 5/26, 623:20-624:1; Ex. 7, 109 & 110.) That appraisal determined that the $8.5 million purchase price was within the appraised value range of $6,181,000 - $9,652,000. (Ex. 7.) Again, Castel presented no evidence to establish that assets were worth more than the buyer paid. It only complained that the original valuation opinion was *increased* based on information provided by the buyer – which resulted in a benefit to AIT. (TT 5/30, 35:1-36:22, 37:1-40:9; Ex. 30 & 31.)

Thus, even under the higher standard urged by Castel, Wilson did not breach his fiduciary duty because the transaction was entirely fair and judgement on this claim should be entered in favor of Wilson.

/ / /

/ / /

C.   **Castel Failed To Carry Its Burden Of Proving Reliance, Causation And Direct Damages As A *Shareholder***

1.   **To Recover More than Nominal Damages for Breach of the Duty of Disclosure, Castel Must Prove Reliance, Causation and Damages Beyond Speculation**

With respect to fiduciary duties in connection with communications with shareholders, a director's disclosure obligations and the remedies available to the shareholder depend on the context of the communication. (*Dohmen v. Goodman*, 234 A.3d 1161, 1168 (Del. 2020).) Where the communication relates to a request for shareholder action, the director must disclose all material facts within their control bearing on the request. (*Id*.) If he does not, the shareholder is entitled to nominal damages unless the shareholder can prove reliance, causation, and actual, compensatory damages.[9] (*Id.* at 1175 ["...to recover compensatory damages, an investor who proves a breach of the fiduciary duty of disclosure must prove reliance, causation, and damages."].) And compensatory damages may not be based on speculation or conjecture. (*In re ASHINC Corp.*, 640 B.R. 1, 50 (Bankr. D. Del. 2022) ["Courts will refuse to award damages that are based on mere speculation or conjecture. Speculative damages entitle a plaintiff to no relief. ... If a plaintiff seeks more than nominal damages, proof must replace hypothetical estimates." (Internal citations omitted)].)

By contrast, when a director's communication to a shareholder does not relate to a request for shareholder action, the fiduciary duty of disclosure does not apply

---

[9]   Nominal damages are "merely in recognition of a technical injury and by way of declaring the rights of the plaintiff. Nominal damages are usually assessed in a trivial amount, selected simply for the purpose of declaring an infraction of the Plaintiff's rights and the commission of a wrong." (See *Enzo Life Scis., Inc. v. Adipogen Corp.,* 82 F. Supp. 3d 568, 607 (D. Del. 2015) [Awarding $1 and $10 on breach of contract claim]; see also, *Macrophage Therapeutics, Inc. v. Goldberg,* WL 2582967, at *22 (Del. Ch. June 23, 2021) [Awarding $1.00 as nominal damages for breach of fiduciary duty.]; *Ravenswood Inv. Co., L.P. v. Est. of Winmill,* 2018 WL 1410860, at *25 (Del. Ch. Mar. 21, 2018) [Same].)

JULANDER BROWN & BOLLARD

1  but the director must still deal honestly with the shareholders. (*Dohmen,* supra, 234

2  A.3d at pp. 1168-1169.) In this circumstance, for liability to attach the director

3  "must have knowingly disclosed false information." (*Id.* at p. 1169.) And, even if

4  proven, the per se damages rule does not apply and the shareholder must prove its

5  reliance, causation, and actual, non-speculative, damages. (*Id.* at pp. 1172-1175

6  [Analyzing cases and determining that nominal damages are unavailable where

7  shareholder action is not requested and that reliance, causation and damages must be

8  proven].)

9       Here, Castel has not proven reliance, causation, and damages suffered directly

10  by Castel independent of the company and all of the collective shareholders.

11       **2.      The Loss of Castel's Investment in AIT Was Not Caused by**

12              **Wilson's Conduct**

13       As discussed above, when Wilson took over as AIT's sole officer/director, the

14  company was already insolvent and AIT's shares were worth nothing. (See, TT

15  5/26, 578:21-581:15, 582:3-586:17, 598:11-599:7; Ex. 92; Kovalkova Depo.,

16  106:17-107:3, 107:9-15.) In fact, shareholder equity was negative ever since Wilson

17  joined the Board of Directors in 2012. (TT 5/26, 593:19-25.) Wilson did not cause

18  AIT's insolvency and Castel does not claim otherwise. The reasons Castel lost the

19  value of its investment were because AIT was insolvent, the senior secured creditor

20  would have obtained all of AIT's assets either through foreclosure or bankruptcy,

21  and a majority of AIT's shareholders approved the asset purchase transaction.

22       At trial Malacalza was unable to say whether Castel would have made an

23  offer high enough to return any value for AIT's shares. (TT 5/22, 94:9-24 ["Q. More

24  than 15 million? A. Well, it depends on the documentation that would have been

25  provided."].) At the time of the asset purchase in 2016, only a purchase price of over

26  $17 million would have returned any value to the shareholders. Castel has been in

27  possession of the discovery in this action, including all of the company's books and

28  records and the Orchard Partners information, since January 2021. Castel should

JULANDER BROWN
— & BOLLARD —

1   have been able to prove at trial that it would have actually made a competitive offer

2   based on that information, and the amount of that offer. But it did not. Malacalza

3   also failed to explain why Castel made no offer to purchase the company after

4   learning that Wilson was trying to sell the company in June 2015. (TT 5/23, 144:7-

5   12, 162:10-163:9, 164:22-25; Ex. 54.)

6        Castel's "competitive offer" theory is further undermined by Malacalza's

7   testimony that "Castel can only buy companies, if these companies provide the

8   following: Audited financial statements for all years relevant; otherwise, it's not able

9   to do so." (5/23, 163:23-164:4.) AIT had not audited its financial statements since

10   2010 because it simply could not afford to do so and it could not risk a going

11   concern qualification from the auditors. (TT 5/30, 28:21-29:21.) Thus, the evidence

12   shows that Castel would not have, and could not have, made a competitive offer.

13        Castel also speculated that, had it known the allegedly undisclosed facts, it

14   could have somehow stopped the asset purchase from happening. (TT 5/22, 95:22-

15   96:8.) Castel never explained how it would have or could have stopped the

16   transaction. To the extent that Castel argues that it could have somehow prevented

17   ARF from purchasing Pharos' interest or voting its shares, Castel is mistaken. Castel

18   had no right at law, under any contract, or in equity to prevent ARF from purchasing

19   Pharos' debt and shares. And stockholders in Delaware corporations have a right to

20   control and vote their shares, even in their own interest, and doing so is not unfair

21   dealing. (*In re Trados,* supra, 73 A.3d at 65; *Bershad v. Curtiss–Wright Corp.,* 535

22   A.2d 840, 845 (Del. 1987).)

23        Because the value of Castel's equity was zero before Wilson's conduct at

24   issue in the case, and the value of its equity was zero after the conduct, and because

25   a majority of the shareholders approved the APA transaction, nothing Wilson did or

26   failed to do, disclosed or failed to disclose, caused a loss in value of Castel's shares.

27   / / /

28   / / /

JULANDER BROWN
— & BOLLARD —

### 3. Castel is Not Entitled to Recover for Harm Suffered by AIT and All of its Combined Shareholders

Even if Castel could somehow establish that Wilson caused a loss to the value of AIT's stock, and it cannot, such a claim would be a derivative, not a direct, claim. "If the corporation alone, rather than the individual stockholder, suffered the alleged harm, the corporation alone is entitled to recover, and the claim in question is derivative." (*Feldman v. Cutaia,* 951 A.2d 727, 732 (Del. 2008) (citations omitted).) It is only where a shareholder suffers harm independent of any injury to the corporation and all shareholders that the shareholder is entitled to individualized recovery. (*Id*.) Here, Castel brings its claims in this action directly, not derivatively on behalf of AIT. When challenged about the nature of its claims at the outset of this action, Castel was adamant that it was bringing only direct, not derivative, claims for harm it directly suffered, independent of the other shareholders. (Dkt. 67, p. 16, fn. 1.) Accepting Castel's position, the Court denied the Motion to Dismiss on this issue. (Dkt. 73, p. 24.)

Now that the evidence is in, the Court must independently examine the nature of each claimed wrong and the potential relief to determine whether the claim is truly individual to Castel, apart from the company and its shareholders. In assessing whether a claim is direct or derivative, the Court must ascertain (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually). (*Tooley v. Donaldson, Lufkin, & Jenrette, Inc.,* 845 A.2d 1031, 1033 (Del. 2004).) To the extent that the injury flows to the corporation and all shareholders, Castel's claims fail because any recovery goes to the corporation. (*Brookfield Asset Mgmt., Inc. v. Rosson,* 261 A.3d 1251, 1262 (Del. 2021).)

Claims of mismanagement, self-dealing, and corporate waste are generally held to constitute derivative claims. (See, 2 Edward P. Welch, Andrew J. Turezyn, and Robert S. Saunders, Folk on the Delaware General Corporation Law § 327.2.1.2

(5th ed. 2008) ["Allegations of mismanagement on the part of directors generally have been held to state derivative claims."]; *Kramer v. Western Pacific Indus., Inc.,* 546 A.2d 348, 353 (Del.1988) [corporate waste claims are historically derivative]; *Thornton v. Bernard Techs., Inc.,* 2009 WL 426179, at *3 (Del. Ch. Feb 20, 2009) [when a director engages in self-dealing or commits waste, he takes from the corporate treasury and any recovery would flow back into the corporate treasury].)

If, as Castel contends, Wilson lied to the shareholders regarding the terms of the APA, concealed facts in connection with the shareholder vote, failed to conduct appropriate diligence, was improperly influenced in his decision making, signed false and "backdated" documents, and personally benefitted from the asset purchase transaction, *none of which is supported by the evidence*, injury resulting from such conduct would be suffered by all of AIT's shareholders, not by Castel independent of the corporation and its combined shareholders. Because Castel is not entitled to recover those damages in this direct action, it has failed to prove its claim for damages and judgement should be entered in favor of Wilson.

## V.    CASTEL, IN ITS CAPACITY AS A *CREDITOR*, HAS FAILED TO PROVE A BASIS FOR RELIEF AGAINST WILSON

### A.    Because Wilson Had No Fiduciary Duties To Castel In Its Capacity As A *Creditor,* Castel Cannot Prove Its Breach Of Fiduciary Duty Claim On This Basis

Under Delaware law, creditors cannot bring direct claims for breaches of fiduciary duties against directors of corporations that are insolvent. (*Credit Lyonnais Bank Nederland N.V. v. Pathe Communications Corp.,* 1991 WL 277613, *34 (Del. Ch. Dec. 30, 1991); *Berg & Berg Enterprises, LLC v. Boyle,* 178 Cal.App.4th 1020, 1038 (2009); *NACEPF v. Gheewalla,* 930 A.2d 92, 101, 103 (2007).)

The uncontroverted evidence presented at trial established that, from the time Chris Wilson took over the company through the APA transaction, AIT was insolvent and its shares of stock had no value. (See *infra* at §II(A).) Because AIT

JULANDER BROWN
— & BOLLARD —

was insolvent, Castel lacks standing to assert a direct claim for breach of fiduciary duty as a creditor against Wilson for the loss of its loan, the failure to collect on its Judgment, or its failure to accept its settlement offer. (See *Perez v. Gordon & Wong Law Grp., P.C.,* No. 11-CV-03323-LHK, 2012 WL 1029425, at *11 (N.D. Cal. Mar. 26, 2012) [Lack of standing is not an affirmative defense; it is a jurisdictional requirement.].) As creditor, Castel is asserting only direct claims in this action. (Dkt. 67, p. 16, fn. 1; Dkt. 73, p. 24.)

**B.** **As a _Creditor_, Castel Knew all Material Facts and Was Invited to Gain Any Additional Knowledge That it Felt it Needed**

In mid-2015, upon receiving Wilson's June 18, 2015 letter, Castel knew that: AIT was in dire financial difficulty and could not continue operations without the infusion of a significant amount of capital; it had approximately $20.46 million in liabilities, most of which are past due or in default; it had been sued by five creditors; its assets were insufficient to pay its liabilities and monthly revenue was insufficient to pay the debts as they become due; the senior secured creditor was pushing for liquidation and loaned additional cash to further the liquidation efforts; if the company were liquidated the amount available for distribution to the creditors would not be sufficient to repay the senior secured loan, no other creditors would get paid, and shareholders would receive nothing for their shares. (TT 5/26, pp. 604:16-6-5:7; Ex. 54; TT 5/23, 143:20-144:22.) Importantly, Castel also knew that the company and its assets were up for sale when Wilson advised Castel that he was attempting to find a buyer for the company or the technology but has been unsuccessful. (TT 5/23, 164:22-25; Ex. 54.)

Shortly thereafter, in August 2015, Castel knew that Cheng was attempting to organize the major shareholders to raise funds to rescue the company and it was specifically invited to be part of the effort. (TT 5/24, 347:21-348:6, 349:8-350:7; 351:1-352:16; Ex. 61.) Although Castel promised to think about it and get back to her if it was interested in participating, it never did. (TT 5/24, 352:17-353:9.)

1    Within two weeks of Castel's conversation with Cheng, Wilson was in
2  contact with Castel's attorney by phone and email, informing him that a fund was
3  formed to invest money into AIT if settlements are reached with the major creditors,
4  and offering to redeem Castel's interest in AIT and settle its debt for $40,000. (TT
5  5/26, 610:20-611:1; Ex. 55.) In his email to Mr. Valla, Wilson did not use the name
6  "ARF Partners," instead referring to ARF as a newly-formed fund (which it was at
7  the time) because Wilson did not think the name of the fund would mean anything
8  to anyone – it was just a newly-formed fund. (TT 5/25, 475:13-476:9.) And Castel
9  understood from the email that a fund was being formed. (TT 5/23, 171:11-18; Ex.
10  55.) Mr. Wilson also indicated that the fund was "unrelated" to AIT. (Ex. 55.)
11  Though unartfully phrased, Wilson was trying to convey to Mr. Valla that ARF is
12  not an affiliate of AIT, that is, that ARF was not under the control of AIT and AIT
13  was not under the control of ARF. (TT 5/26, 688:23-690:15.) The only commonality
14  was Cheng who was a shareholder of both, but a minority shareholder of AIT that
15  could not exert any control over AIT.[10] Castel never responded and never provided
16  any evidence at trial of what it would have done differently had it known that Cheng
17  was a member of the fund and the fund's name was ARF Partners. And the fact that
18  Cheng had invited Castel to participate only eleven days before undermines Castel's
19  claim of ignorance of her involvement.

20    Chronologically, the next alleged nondisclosure was the fact that Pharos sold
21  its interest to ARF in November 2015. Castel has not identified any duty on the part
22  of Wilson to disclose this fact to Castel or any other creditor. The sale of Pharos'
23  interest did not require a vote of shareholders and did not impact the other creditors
24  – it was an arms-length transaction between Pharos and ARF. (TT 5/25, 382:3-
25  / / /

26  _____

27  [10]   Under Delaware General Corporate Law, related-party transactions refer to transactions
between a corporation and one or more of its directors or officers or entities they control or have a
28  financial interest in. (Del. Code Ann. tit. 8, § 144 (West).) Cheng does not fall within the category
of a related-party because she was not an officer or director of AIT at the time of the transactions.

JULANDER BROWN
— & BOLLARD —

383:6.) Wilson was not involved in the negotiations between the parties. (TT 5/25, 378:22-379:15, 380:8-382:1, 468:12-469:1.) And there is no evidence of what Castel would have done differently had it known of the transaction.

The remaining allegedly concealed facts involve the asset purchase transaction in 2016. When Wilson sent the Consent and the Draft APA to Castel and the other shareholders in October 2016, Castel knew that Olivia Cheng was involved with the buyer, and was actually its "Chairman." (See Ex. 5, p. 50.) Castel also knew that the Draft APA was just that, a draft. (Ex. 5, p. 4 ["... substantially in the form attached hereto as Exhibit A (the "Asset Purchase Agreement") ..."].) The Consent expressly recognized that the APA could change near closing and gave Wilson the ability to negotiate those changes and execute the agreement with the same shareholders' approval. (TT 5/26, 634:7-635:13; Ex. 5, pp. 5-6.)

Because the negotiations regarding the consideration breakdown were ongoing, that portion of the Draft APA was left blank on the version the shareholders received, notifying Castel of the fact that that payment breakdown would necessarily be modified in the final APA. (TT 5/26, 636:2-14; Ex. 5, p. 4, ¶3.) In connection with providing Castel's consent to Mr. Valla, Wilson also offered Castel $100,000 to settle its debt, which was consistent with the amounts being offered to the other unsecured creditors (40% of the face amount of their debt). (TT 5/26, p. 629:1-632:22; Ex. 5, p. 1.)

Shortly thereafter, Wilson received the email from two of Castel's directors, vaguely requesting "all material information" regarding the transaction, both "financial and nonfinancial." (TT 5/26, pp. 640:4-642:10; Ex. 6.) Wilson did his best to determine what would be material to Castel and provided six years of the company's financial statements and a list of the anticipated payments to be made after closing. (Ex. 6; TT 5/25, 513:25-516:2.) Wilson also offered to provide Castel with any specific documentation it would like to see and offered to make all of the company's records available for inspection. (Id.) Castel never responded or

1  otherwise indicated that the information was insufficient, and Castel never returned

2  its signed Consent.

3      Fraudulent concealment requires that "the defendant must have concealed or

4  suppressed a material fact." (*Davis v. HSBC Bank Nevada, N.A.,* 691 F.3d 1152,

5  1163 (2012); *Hill v. Wrather,* 158 Cal.App.2d 818 (1958).) For the reasons

6  discussed above, a US corporation rather than a Cayman Islands corporation was the

7  ultimate buyer of the assets. Castel has never explained, and cannot reasonably

8  explain how the change in jurisdiction of the buyer somehow impacted its decision

9  to accept the $100,000 settlement (or any other decision) or affected the cash

10  purchase of the assets. The evidence established that this change in the APA was

11  immaterial since, either way, the buying entity was a newly-formed corporation with

12  the same owners and the same funds available for the purchase in this cash

13  transaction. (TT 5/25, 520:3-522:16; 5/26, 638:25-640:3.)

14      Castel also never explained at trial how the differences in the consideration

15  breakdown between the Draft APA and the final APA would have altered its

16  decision to accept the $100,000 settlement (or any other decision). The $1.2 million

17  holdback was earmarked for other creditors, Dr. Wang and King and Joy Wong,

18  who agreed to defer part of their settlement payment until the money came in. (TT

19  5/25, pp. 526:25-528:17.) Thus, the holdback had no impact on the amount available

20  for other unsecured creditors, the $100,000 offer made to Castel, or Castel's refusal

21  to accept it. (Id.; TT 5/26, 636:24-638:24) Likewise, neither the decrease in cash

22  paid at closing nor the debt forgiveness gained by AIT would have changed the offer

23  to Castel of 40% of its debt. (5/26, 660:22-661:15.) The fact that $500,000 of the

24  cash paid at closing was being paid directly from the buyer to AIT's Chinese

25  creditors in Chinese Yuan had no impact on the terms of the APA or the offer made

26  to Castel. (TT 5/25, 487:11-23; TT 5/26, 671:12-14.)

27      Wilson did not have an undisclosed financial interest in the transaction. Castel

28  relies on Exhibit 22 in arguing that Wilson was offered a position with the buyer in

JULANDER BROWN
— & BOLLARD —

September 2016. The evidence showed that Mr. Wilson declined the position prior to sending out the shareholder consents because he recognized that he could not do it while he was representing AIT. (TT 5/26, 673:5-675:1.) Wilson never received any interest in ARF or AHC and has never worked for ARF or AHC in any professional capacity. (Id.; 5/26, 675:2-6.) And Wilson's employment compensation was not tied to the APA transaction, which was not even contemplated at the time the resigning board members authorized the payment. (TT 5/25, 461:21-462:18; TT 5/26, 669:22-671:3.) And, like every other shareholder, Wilson and his family received nothing for their equity interest in AIT. (TT 5/26, 672:20-673:4.)

Finally, though not legally required to do so[11], Wilson tried to treat creditors in like classes the same when making and negotiating the settlement offers. (TT 5/26, pp. 629:22-632:22.) Some unsecured creditors that had additional claims (such as employment claims, commissions, or "new money" loans) were paid more than the 40% that was offered to the unsecured creditors because they were in different classes. (See, TT 5/26, 668:3-25 [Re: Lucy Chang]; TT 5/24, 312:1-314:25 [Re: Olivia and Ken Cheng]; TT 5/25, 416:8-418:16 [Re: Olivia Cheng].)

## C.  There Was No Intent To Defraud Castel In Its Claim As A *Creditor*

Fraudulent concealment requires Castel to prove that Wilson "intentionally concealed or suppressed the fact with the intent to defraud the plaintiff." (*Davis, supra,* 691 F.3d at 1163.) Wilson did not intentionally conceal any facts from Castel and never intended to defraud Castel. He attempted to respond to Castel's requests as best he understood them, provided Castel with the only financial statements the company had, and offered to provide whatever specific information or documents Castel wanted. (TT 5/25, 513:25-516:2, 518:3-7; TT 5/26, 591:1-592:2; Ex. 6.)

/ / /

---

[11]  See, *Asmussen v. Quaker City Corp.,* 156 A. 180 (Del. Ch. 1931) (establishing the general rule that discrimination in priority between creditors of equal priority by insolvent companies is usually permitted).

### D. Castel Failed To Carry Its Burden Of Proving Reliance, Causation And Damages As A *Creditor*, Because Wilson's Conduct Did Not Cause Castel The Loss On Its Note

Wilson's conduct, even if proven, did not cause Castel to lose recovery on its debt. Castel did not recover on its debt because a majority of AIT's shareholders approved the APA transaction and Castel refused to participate in the proceeds of that transaction. Castel made its choice to wait until all of the purchase money was paid out to the settling creditors before pursuing a judgment against the insolvent corporation. (TT 5/23, 162:6-91 [Castel did not object to the informal winding down], 98:5-7 [Instead of accepting the $100,000 offer, Castel sued AIT], 198:8-22 [Castel obtained a judgment]; TT 5/26, 629:1-21 [$100,000 offer to Castel]; 672:15-19 [If Castel had settled, it would have received the payment]; Ex. 5 &119.)

No different or additional disclosures made by Wilson to Castel would have garnered any more money to settle with Castel. Castel did not take any action or forbear from taking any action that could have resulted in more value than it would have received from accepting its share of the proceeds because a majority of AIT's shareholders approved the transaction eliminating any other alternative course of action and Castel had no right to stop the vote or prevent ARF from voting its shares. Thus, any claim that Castel would have or could have done anything to alter the outcome is pure speculation.

Under either Delaware or California law, damages which are "speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery." (*Piscitelli v. Friedenberg,* 87 Cal.App.4th 953, 989 (2001), citing *Regalado v. Callaghan,* 3 Cal.App.5th 582, 602 (2016); *Laskowski v. Wallis,* 58 Del. 98, 101 (1964) ["The law does not permit a recovery of damages which is merely speculative or conjectural."].) Speculation as to what Castel could have done is not evidence of reliance which requires that Castel prove, "had the omitted information been disclosed [it] would have been aware of it and behaved differently." (*Mirkin v.*

JULANDER BROWN
— & BOLLARD —

*Wasserman,* 5 Cal.4th 1082, 1093 (1993).) The best evidence of what Castel would have done is what it actually did for a year after receiving notice that AIT was insolvent and headed to informal liquidation—it did nothing.

## VI.    CONCLUSION

For the reasons set forth herein, and based on the evidence presented at trial in this action, Defendant CHRISTOPHER WILSON respectfully requests that Judgment be entered in his favor in this action.


DATED:  July 28, 2023                JULANDER, BROWN & BOLLARD


By:  ___/s/ Dirk O. Julander___
Dirk O. Julander
Attorneys for Defendants CHRISTOPHER
A. WILSON and ARF PARTNERS, LLC

1

**<u>CERTIFICATE OF SERVICE</u>**

2      I hereby certify that on this 28th day of July, 2023, I electronically filed the

3  foregoing paper(s) with the Clerk of the Court using the ECF system which will

4  send notification to all parties of record or persons requiring notice.

5

6                                              */s/ Dirk O. Julander*

7                                                Dirk O. Julander

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CHRISTOPHER A. WILSON'S CLOSING BRIEF