Dirk O. Julander, Bar No. 132313
 doj@jbblaw.com
Catherine A. Close, Bar No. 198549
 cac@jbblaw.com
Tiffany W. Harlan, Bar No. 305244
 tiffany@jbblaw.com
JULANDER, BROWN & BOLLARD
9110 Irvine Center Drive
Irvine, California 92618
Telephone: (949) 477-2100
Facsimile: (949) 477-6355

Attorneys for Defendants
CHRISTOPHER A. WILSON and
ARF PARTNERS, LLC



# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CASTEL S.A., a Luxembourg joint stock company (societe anonyme), | Case No. 2:19-cv-09336-DFM |
| Plaintiff, | |
| vs. | **DEFENDANT ARF PARTNERS' CLOSING BRIEF** |
| CHRISTOPHER A. WILSON, an individual; PHAROS CAPITAL PARTNERS II, LP, a Delaware limited partnership; PHAROS CAPITAL PARTNERS II-A, LP, a Delaware limited partnership; OLIVIA HO CHENG, an individual; ARF PARTNERS, LLC, a Massachusetts limited liability company; AURORA HEALTHCARE US CORP, a Massachusetts corporation; STEVEN J. JAMES, an individual, | **Trial** Date:   May 22-30, 2023 |
| | **Closing Argument** Date:   August 4, 2023 Time:   10:00 a.m. Ctrm:   6B |
| Defendants. | *The Honorable Douglas F. McCormick* |

# **TABLE OF CONTENTS**

I.      SUMMARY OF THE ARGUMENT ................................................5

II.     SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL.................6

    A.     AIT Was Insolvent, and its Shares Worthless, Before ARF .......................6
    B.     ARF's Formation and Involvement ....................................................11
    C.     AIT Was Insolvent, and its Shares Worthless ....................................13

III.    ARF IS ENTITLED TO JUDGMENT ON CASTEL'S FRAUD CLAIM
        BECAUSE CASTEL HAS NOT MET ITS BURDEN OF PROOF
        ESTABLISHING DUTY, MATERIALITY, INTENT, AND
        DAMAGES ............................................................................16

    A.  Castel Failed to Prove ARF Owed Castel a Duty to Disclose ........................16
        1. Castel Failed to Prove ARF Owed a Fiduciary Duty of Disclosure .....17
        2. Castel Failed To Prove A Basis For Recovery In Fraud Based On The
           Breach Of A Contractual Duty To Disclose ........................................18
    B.  Castel Failed to Prove that ARF Induced Reliance or Had Intent to Defraud 19
    C.  Castel Failed to Prove Reliance, Causation and Damages on its Concealment
       Claim ...........................................................................................20
        1. No Concealment Caused the Loss of Castel's Investment Because AIT
           was Insolvent ..............................................................................21
        2. Castel Did Not Establish Beyond Speculation What Action it Would
           Have Taken Had it Known the Concealed Facts ...............................22
            (a)   Castel Failed to Establish that it Would Have Made a
                 Competing Offer……………………………………… ..22
            (b)   Castel Had No Legal Basis to Stop the APA
                 Transaction………………………………..………………23
        3. The Majority of Shareholders Approved the APA ..............................24

IV.     ARF IS ENTITLED TO JUDGMENT ON CASTEL'S BREACH OF
        CONTRACT CLAIM BECAUSE THE CONTRACTUAL
        OBLIGATIONS SIMPLY DO NOT EXIST AS ALLEGED AND
        CASTEL FAILED TO PROVE CAUSATION AND DAMAGES...........25

    A.     That ARF Breached A Contract By Failing To Consult With Castel Prior
        To Entering Into That Contract Is A Non Sequitur That Cannot Support A
        Claim For Relief .............................................................................25
    B.     Castel Failed to Prove that ARF Had a Duty under the Stockholder
        Agreement to Recuse Itself from Voting on the Sale of AIT's Assets .....25
    C.     Castel Failed Prove that ARF Owed Castel a Contractual Duty of
        Disclosure......................................................................................26

JULANDER BROWN
— & BOLLARD —

JBB

D.   Castel Failed to Prove Causation and Foreseeable Damages on its Contract Claim Against ARF..................................................................................28

**V.   CONCLUSION..................................................................................30**

JULANDER BROWN
— & BOLLARD —

ARF PARTNERS' CLOSING BRIEF

1

<u>**TABLE OF AUTHORITIES**</u>

2

**Cases**

3

*Bershad v. Curtiss-Wright Corp.*
535 A.2d 840, 845 ...................................................................................26

4

*Boschma v. Home Loan Center, Inc.*
198 Cal.App.4th 230, 248 (Cal. App. 2011) ...............................16, 19

5

*Davis v. HSBC Bank Nevada, N.A.*
691 F.3d 1152, 1163 (9th Cir. 2012) .....................................................20

6

*Diamond Fortress Techs., Inc. v. EverID, Inc.*
274 A.3d 287, 305 (Del. Super. 2022) ...................................................29

7

*Dohmen v. Goodman*
234 A.3d 1161, 1168 (Del. 2020) ...........................................................27

8

*Enzo Life Scis., Inc. v. Adipogen Corp.*
82 F. Supp. 3d 568, 607 (D. Del. 2015) ...............................................28

9

*Joseph T. Dashiell Builders v. Andrews*
C.A. 00L-05-001-RFS, 2002 WL 31819895, at *1 (Del. Super. Dec. 10, 2002)..29

10

*Laskowski v. Wallis*
58 Del. 98, 101 (1964) ...............................................................................28

11

*Leeds v. First Allied Connecticut Corp.*
Del. Ch., 521 A.2d 1095, 1101-02 (1986) ............................................25

12

*Los Angeles Memorial Coliseum Com. v. Insomniac, Inc.*
233 Cal.App.4th 803 (2015) .....................................................................18

13

*Mirkin v. Wasserman*
5 Cal.4th 1082, 1093 (1993) .....................................................................21

14

*Nicolet, Inc. v. Nutt*
525 A.2d 146, 149 (Del. 1987) ...............................................16, 19

15

*Norse Petroleum A/S v. LVO International, Inc.*
Del. Super., 389 A.2d 771, 773 (1978) .................................................25

16

*Piscitelli v. Friedenberg*
87 Cal.App.4th 953, 989 (2001) .............................................................21

17

*Rattagan v. Uber Technologies, Inc.*
19 F.4th 1188, 1191 (9th Cir. 2021) ......................................................18

18

*Regalado v. Callaghan*
3 Cal.App.5th 582, 602 (2016) ...............................................................21

19

*Robinson Helicopter Co. v. Dana Corp.*
34 Cal. 4th 979, 987 (2004) .....................................................................18

20

*VICI Racing, LLC v. T-Mobile USA, Inc.*
763 F.3d 273, 294 (3d Cir. 2014) ...........................................................28

21

*VICI Racing, LLC v. T-Mobile USA, Inc.*
87 F. Supp. 3d 697, 699 (D. Del. 2015) ...............................................29

22

*Weinstein Enters., Inc. v. Orloff*
870 A.2d 499, 507-08 (Del. 2005) .........................................................26

23

*Williams v. Geier*
671 A.2d 1368, 1380–81 (Del.1996) .....................................................26

24

*Williamson v. Gen. Dynamics Corp.*
208 F.3d 1144, 1156 n. 3 (9th Cir. 2000) ............................................20

25

26

**Other Authorities**
DEL. P.J.I. CIV. § 19.20 (2000),...............................................................28

27

28

Defendant ARF PARTNERS, LLC ("ARF") respectfully submits its Closing Brief.

## II.   SUMMARY OF THE ARGUMENT

Having lost its equity investment in AIT to insolvency and having lost its opportunity to recover 40% of its debt investment to its decision to sue AIT, Plaintiff CASTEL S.A. ("Castel") is now casting about to assign blame. In doing so, Castel is rewriting history, creating conspiracies and adversaries where there were none, and seeking to gain from the risk based investing and hard work of others after having consciously chosen to abstain from its own risk or effort.

It is incontrovertible that, without the money from new investors, the Pharos debt would have been worth only a few hundred thousand dollars in bankruptcy. It was only because ARF and then the new investors from AHC offered to bring in new capital that the secured debt was worth anything. And if ARF had not agreed to exchange the secured debt for equity, the new investors would not have put the new capital in.

When ARF bought the Pharos debt, there was no guarantee that more money would come into AIT; the money ARF put up was completely at risk. At that time, the risk was so great that the sophisticated, insider investor Pharos valued the secured debt and equity at the low price it did. Castel has presented no evidence that the ARF/Pharos transaction was anything other than an arm's length transaction.

Castel is now looking backwards, after Wilson and Cheng's hard work brought in new capital, and arguing that the entirety of these transactions was meant to cheat it. Castel could not possibly have made this argument in November 2015, when ARF put its money at risk and there was no new capital on the horizon. Essentially, all Castel is doing is unfairly trying to gain from Wilson and Cheng's hard work and ARF's risky investment without having put up any of its own hard work or putting its own capital at risk.

/ / /

III.    **SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL**[1]

   A.    **AIT Was Insolvent, and its Shares Worthless, Before ARF**

Though Aurora Imaging Technology, Inc. ("AIT") was never actually "profitable," there was a time when it had great value to its investors and the world. After becoming CEO of AIT in 2003, Olivia Cheng led the company in obtaining FDA approval for its Dedicated Breast MRI Systems that it placed in clinics and hospitals around the US. (Dkt. 210, ¶8; Trial Transcript ["TT"] 5/24, 333:14-335:6.) After Cheng took the helm, annual revenues increased 10 times to approximately $20 million by 2007. (TT 5/24, 335:10-21; Dkt. 210, ¶8.)

In 2006, during this time of rising success, Castel purchased preferred stock, along with Pharos, in AIT's Series C financing round. (Trial Exhibit ["Ex."] 1.) In connection with this investment, Castel, Pharos, and AIT entered into the Series C Stockholder Agreement (the "Stockholder Agreement"), which contained provisions to protect Castel's investment. (Ex. 2.) The Stockholder Agreement included a consultation clause in paragraph 4, which according to Mattia Malacalza, "deals with having to speak to the minority shareholder in terms of dilution of the shares …." (TT 5/23, 36:23-37:1; TT, 5/24, 264:2-3 [Cheng testimony is the same].) In 2008, Castel again purchased preferred stock, along with Pharos, in AIT's Series D financing round. (Ex. 3.)

From its financial high point, the road to AIT's demise was slow and predictable. Its demise began in 2012, after AIT's financial wellbeing became dependent on the purchase transaction with China Resources Company ("CRC"), which fell apart in early 2012. The CRC negotiations lasted approximately 2 years, during which AIT could not raise capital because the terms of the transaction prohibited it. (Dkt. 212, p. 6, Stip. Fact (b), (c); TT 5/24, 336:8-23.) During that time AIT was forced to survive off of shareholder loans, including bridge loans. Castel

---

[1]    The Summary Of The Evidence Presented At Trial is substantially similar to the closing brief for Wilson filed concurrently herewith.

JULANDER BROWN
— & BOLLARD —

was well aware the company had run out of money because it was called on to loan AIT money. (TT 5/24, 336:8-23.) During this time Castel made its $250,000 bridge loan to AIT. (Ex. 4; Dkt. 212, p. 5, Admitted Fact (g).) This was the first and last action taken by Castel to protect its equity investment in AIT.

In the spring of 2012, CRC terminated the agreement and withdrew from the transaction. (Dkt. 212, p. 6, Stip. Fact (c).) Castel had full knowledge of the termination of the agreement through its Board representative, Marco Caneva. (See, Ex. 75.) After the CRC transaction failed, AIT was left scrambling to raise money; there were no substantial sales of MRI machines; the only revenue the company had was from service and maintenance, and even that was declining because the installed base was declining as machines became worn out or replaced; no new capital was raised; and there was no revenue from sales. The lack of cash affected both the ability to maintain good equipment and the ability to market the systems. (TT 5/26, 572:18-573:24; Kovalkova Depo., 78:12-79:9.)

Olivia Cheng was forced to resign as CEO in 2013 under pressure from the other board members led by Michael Devlin of Pharos, who wanted to control the company. (Dkt. 210, ¶12; TT 5/24, 234:23-235:13; TT 5/30, 19:13-24.) Pharos got its way in 2014, when Devlin became the company's CEO and Anna Kovalkova of Pharos became the Treasurer/Secretary. (TT 05/26, 575:14-16; Kovalkova Depo., 82:16-83:11, Ex. 89.)

Unfortunately, even under Pharos' control, AIT continued to struggle financially. By 2014, its competition was offering superior products with better pricing, customers were unhappy because of issues with the systems, and the technology required a major overhaul the company could not afford. (Kovalkova Depo., 96:13-97:16, 100:3-101:4, 102:13-103:22; Ex. 96.) Although Devlin sought distribution partners and a couple of companies started diligence, ultimately none were interested and Devlin was unable to raise additional funds. (TT 5/26, 575:14-576:21; Kovalkova Depo., 103:23-104:23, Ex. 96.)

1    During this critical time, Castel disengaged from AIT. It no longer exercised
2  its right to participate in the AIT board meetings in 2014 and 2015. (TT 5/23,
3  127:17-128:13.) In August 2014, Devlin invited Castel to step up and make an
4  additional investment. (See, Ex. 91 ["Pharos putting in money and taking control of
5  management and board (as long as Wangs sign their "B" consent)....would be open
6  to you guys putting in $$ on these terms....we can talk more in September
7  [2014]."].) Castel informed itself and declined. (Ex. 91 [Caneva: "we have a mtg
8  scheduled to go over the docs Anna sent us. I am also talking to Antonio Valla today
9  to give him more color on the situation and recent developments at Aurora, so that
10 he can better understand what was forwarded to him two weeks ago."]; TT 5/23,
11 136:18-21.)

12    Pharos made additional loans to AIT of $3.1 million after putting Devlin in as
13 CEO. (Ex. 93, 14-19 [Pharos loans with interest and expenses totaled $3,475,715.].)
14 Devlin resigned as CEO in March 2015 and Kovalkova resigned shortly thereafter.
15 (Kovalkova Depo., 97:17-23, 98:15-25.) After Devlin's resignation, Castel never
16 reached out to find out what was happening with AIT because, according to Mattia
17 Malacalza, that's "not Castel's way of doing things." (TT 5/23, 151:15-152:12.)

18    By May 2015, the company was in distress and would go out of business
19 unless it could secure substantial investment money. (Kovalkova Depo., 99:1-24.)
20 AIT was $20.46 million in debt and could not pay its debts as they came due; five
21 lawsuits had been filed against the company; and the company was insolvent. (See,
22 TT 5/26, 578:21-581:15, 582:3-586:17, 598:11-599:7; Ex. 92; Kovalkova Depo.,
23 106:17-107:3, 107:9-15; Ex. 54 ["Moreover, the Company's assets are insufficient
24 to pay these liabilities and monthly revenue is insufficient to pay the Company's
25 debts as they become due."].) Castel never produced any evidence at trial to
26 contradict the overwhelming evidence that AIT was insolvent by at least June 2015.[2]

27
28 [2]   Castel's only attempt to rebut the evidence of AIT's insolvency was to argue that the

Prior to Devlin's resignation from the board, Pharos loaned additional money to AIT to hire bankruptcy counsel (Stevens & Lee) and a receiver (Lain Faulkner) to prepare a Bankruptcy Petition and liquidate the company's assets. (Dkt. 211, ¶10; TT 5/26, 588:24-589:19; 599:8-601:6; Ex. 93, 97.) Shortly thereafter, AIT's officers and the Board of Directors resigned after voting to appoint Wilson as the interim President and CEO to shepherd the company through the liquidation and winding up process.[3] (Dkt. 211, ¶10; TT 5/26, 600:8-12.) Wilson, and Mike Parrilla, the accounting COO engaged to assist with the liquidation, made a last effort to save the company from bankruptcy through a sale of the company or its assets. (TT 5/25, 460:14-461:20; TT 5/26, 605:24-607:11.)

Wilson did not believe that bankruptcy and liquidation was in the best interest of AIT because any value obtained for the company's assets would go first to the Bankruptcy Trustee, then to priority claims such as employment and taxes, and the last check would go to the senior secured creditor, Pharos. (TT 5/26, 601:4-602:15, 603:12-19.) ***There would be nothing left for the shareholders or unsecured creditors.*** (Id.) He believed AIT could be turned around by raising new money, negotiating with creditors, and restarting the technology. (TT 5/25, 459:22-460:5.)

To this end, Wilson and Parilla contacted companies that might be interested in the technology. (TT 5/25, 460:6-461:20.) Parilla had contacts in the MRI industry and reached out to GE, Siemens, Phillips, and others. (Id.) Wilson reached out to private equity firms that might be interested in investing. (Id.) But, it soon became clear that saving the company would be difficult. (Id.)

/ / /

---

financial statements showed the company was profitable in 2015. But, as explained, the "profit" on the 2015 financial statement was the result of debt forgiveness as Wilson negotiated settlements with trade creditors using the funds loaned by ARF. (TT 5/26, 595:9-597:25; Ex. 6, p. 3; TT 5/30, 66:8-67:1.)

[3]     Wilson joined the AIT Board of Directors in late 2012 or early 2013. (Dkt. 211, at ¶9.) At that time, the CRC transaction had already fallen apart and the company was in serious financial jeopardy. (TT 5/26, 572:18-573:24.)

JULANDER BROWN
— & BOLLARD —

On June 18, 2015, Wilson sent a letter to **all** shareholders informing them of the company's condition and advising that:

- The other board members and officers resigned, leaving Wilson as the sole director tasked with liquidating the company;

- AIT was down to 25 employees, most of which were part time; AIT had not sold a new MRI unit since 2013;

- Many MRI centers (AIT's primary source of revenue) were closed or closing;

- AIT did not have sufficient revenue to sustain vital research and development efforts, maintain a sales team, or even perform fundamental business activities such as the preparation of financial statements;

- The Company currently had approximately $20.46 million in liabilities, most of which are past due or in default;

- The Company had already been sued by five creditors, and three creditors have obtained judgments against the Company;

- The Company's assets were insufficient to pay its liabilities and monthly revenue was insufficient to pay the Company's debts as they become due;

- The Company's senior secured creditor indicated that it believes liquidation is the only option available and loaned additional cash to further the liquidation efforts;

- Upon any liquidation of the Company, the amount available for distribution to the creditors would not be sufficient to repay the senior secured loan. Thus, **all other creditors would receive no repayment of any portion of their debt**; and

- **Shareholders would receive no distributions and the shares of the Company common and preferred stock would be worthless**.

(TT 5/26, 604:16-6-5:7; Ex. 54; TT 5/23, 143:20-144:22.) The letter concluded, "Mike and I continue to explore last minute efforts to sell all or any portion of the Company's business and assets. We believe that there is value in the Company's intellectual property and service business, but to date we have been unable to identify interested purchasers." (Ex. 54.)

Castel received this letter, putting the Malacalzas and Castel expressly on notice that AIT was insolvent, the company's stock was worthless, and that Wilson intended to sell or liquidate the company. (Ex. 61 ["As promised, attached is the letter we received from Chris Wilson …."]; TT 5/23, 144:7-12, 164:22-25, 168:14-24.) At trial, Castel produced no evidence that Wilson's statements made in his June 2015 letter were not accurate. (TT 5/23, 157:7-160:6-20.)

In September 2015, Castel's counsel, Antonio Valla, reached out to Wilson inquiring about Wilson's letter. (Ex. 55.) Wilson responded attaching the draft bankruptcy petition and schedules "indicating the debts and liabilities, and limited assets, of Aurora." (Id. at p. 2.) Wilson then offered to redeem Castel's interest in AIT and settle its debt for $40,000. (TT 5/26, 610:20-611:1, Ex. 55.)

Responding to Mr. Valla's request for information, Wilson advised that a fund was formed to invest up to $1 million in AIT on the condition that settlements are reached with all of the major creditors. (TT 5/25, 473:14-474:12; TT 5/23, 171:11-18; Ex. 55, p. 1.) Wilson explained that "The fund is not related to Aurora and the funds are coming from a group of investors in Taiwan and China. They are the potential buyers." (Ex. 55, p. 1.) Wilson did not mention the name of the fund because he did not "think it would have meant anything to anybody [since] [i]t was a newly-formed fund." (TT 5/25, 475:13-476:9.) Castel never responded to Wilson's offer.

### B.   ARF's Formation and Involvement

The fund Wilson referenced in his response to Mr. Valla was started by Olivia Cheng, who was moved into action to try to rescue the company by Wilson's letter. (TT 5/24, 346:4-21; Ex. 95; TT 5/24/23, 465:8-21.) In speaking with the shareholders, Cheng told them that the technology is still worth something and the company should not go into bankruptcy. (TT 5/24, 351:1-352:16; Ex. 61.) None were willing to contribute funds to the rescue effort. (TT 5/24/23, 353:19-23.) For its part, after a phone call with Cheng, Castel promised to think about it and get back

JULANDER BROWN
— & BOLLARD —

JULANDER BROWN
— & BOLLARD —

1   to her if they were interested in participating; but they never did. (TT 5/24, 352:17-
2   353:9.)

3       Cheng was forced to formulate a plan and raise "new" money to save the
4   company. (TT 5/24, 356:12-357:21, 361:10-363:5; Ex. 43.) She believed that more
5   than $10 million would be required to save the company. (TT 5/24, 363:6-364:5.)

6       Cheng formed an LLC in September 2015 to fund the rescue effort called
7   ARF Partners, which stood for "Aurora Rescue Fund." (Dkt. 210, ¶15; Ex. 15.)
8   Though Cheng started as the only member, as money was raised her membership
9   interest declined to approximately 13%. (Dkt. 210, ¶15; TT 5/24, 357:22-358:17.)
10  The first order of business for ARF was to eliminate the senior secured creditor,
11  Pharos, so that it could not foreclose or force bankruptcy. (TT 5/25, 466:1-468:11.)

12      ARF actively sought capital and a new business opportunity in AIT. With the
13  approximately $1.5 million it raised, ARF purchased Pharos's debt and equity for
14  $425,000.[4] (TT, 5/25, 378:22-379:15, 466:1-468:11; Ex. 11, 12, 103 & 123.)

15      ARF's purchase of Pharos's ownership and credit positions was an arm's
16  length transaction. (TT 5/25, 382:3-383:2.) At trial, Castel produced no evidence
17  and specifically no contractual terms prohibiting Pharos from selling its position to
18  ARF, requiring Pharos or ARF to notify or consult with Castel, or requiring Castel's
19  consent to this transaction. Had Castel accepted Cheng's invitation to invest in ARF,
20  Castel could have been part of this opportunity. (Ex. 99 & 61.)

21      After securing Pharos' interest and protecting AIT's assets from foreclosure,
22  ARF attempted to raise the funds necessary to continue AIT's operations, estimated
23  at more than $10 million. (TT 5/25, 386:3-387:3.) ***Within a year it became clear***
24  ***ARF would not be able to raise the funds for AIT because the new investors saw***
25  ***the debt on the company's books, understood that AIT was near bankruptcy, and***

26

27  [4]    Pharos accepted $425,000 because of the dire financial situation, it was beyond Pharos'
28  resources to fund the AIT's turnaround, and it was best to just exit if it had the chance.
    (Kovalkova Depo., 124:1-126:14; Ex. 101.)

1  ***were not willing to work within the company's share structure***. (Id.; TT 5/24,
2  356:12-357:21.)

3       After ARF failed to attract additional capital for investment in AIT, Cheng
4  went out and raised new money from investors in the tech industry that wanted to
5  get into the medical field. (TT 5/25, 387:23-389:6.) The new group of investors was
6  willing to commit $8.5-$9 million cash to purchase AIT's assets. (TT 5/25, 387:23-
7  389:6.) Besides Cheng, there were no common investors between ARF and the new
8  investors. (TT 5/25, 387:23-388:12.)

9       **C.    AIT Was Insolvent, and its Shares Worthless**

10       The Asset Purchase Agreement ("APA") was negotiated between Wilson on
11  behalf of AIT and Cheng on behalf of the new group of investors. (TT 5/25, 387:23-
12  389:6.) ***ARF was never a party to the APA***. The first draft of the APA was prepared
13  by the new investors' Taiwanese attorney, who had recommended the buyers form a
14  Cayman Islands company to host the assets. (TT 5/25, 393:15-25; Ex. 24.) With this
15  new group of investors, Cheng formed a new company, Aurora Healthcare, SPC, a
16  Cayman Islands corporation. (Id.)

17       Later, these same new investors reincorporated as Aurora Healthcare US
18  Corp, a Massachusetts corporation ("AHC"). (TT 5/25, 403:25-405:3 [The investors
19  in the Cayman company are the exact same as the Massachusetts company.].) The
20  investors reincorporated AHC as a Massachusetts corporation because it was easier
21  to be a US corporation than a foreign corporation for financial bookkeeping and
22  reporting on US operations. (TT 5/24, 273:18-274:10.) Cheng is a minority owner of
23  AHC, owning less than 5% of the company's capital stock along with her husband.
24  (Dkt. 210, ¶16.)

25       In August or September, 2016, Cheng, on behalf of the new investors, began
26  negotiating with Wilson for the purchase of AIT's assets. (Ex. 22-26; TT 5/25,
27  407:8-23.) By early October 2016, AIT and the new investors had reached an
28  agreement in principle on the sale of AIT's assets for the sum of $8.5 million. (Ex.

26; TT 5/25, 399:23-402:9.) After the parties reached an agreement in principle on the purchase, there were various versions of the APA, but the purchase price never changed from $8.5 million. (*Cf* Ex. 26, p. 8 & Ex. 10, p. 5.) ***The offer to purchase AIT's assets from the new investors was the only offer AIT received for the purchase of its assets after almost a year and a half of trying***. (Ex. 37; TT 5/26, 624:9-625:18.)

The transaction always contemplated a credit for the senior secured debt held by ARF in exchange for equity conversion in the buyer. (TT 5/26, 618:22-620:15.) To facilitate the APA transaction, ARF agreed to exchange the secured debt (in the agreed amount of $3 million) for equity in the buyer and BE Capital agreed to exchange the commission it was owed (in the agreed amount of $1 million) for equity in the buyer. (Ex. 14, p. 2, ¶2; TT 5/26, 659:4-660:15.) In exchange for the senior secured debt and the BE Capital commission being retired without payment, AIT waived $4 million of the purchase price. (Ex. 14, p. 2-3, ¶¶3 & 4.) Without this exchange for equity in the buyer, the APA could not have closed and the unsecured creditors would have received nothing. (TT, 5/26, 661:8-662:20.)

Having obtained an agreement in principle, in mid-October, Wilson began the process of obtaining shareholder consent for the transaction. (See Exs. 5 & 37; TT 5/26, 633:2-23.) As with the other AIT shareholders, Wilson asked Castel for its consent to the APA transaction in an email on October 20, 2016. (Ex. 5 ["Aurora has struggled to avoid bankruptcy but is now at the point where we must either sell the company or file for bankruptcy. We have received only one offer to purchase the assets of the business for $8,500,000, which we are going to accept, subject to the approval of shareholders."]; TT 5/26, 632:23-634:6.)

To obtain their consent, Wilson sent to each of the shareholders, including Castel, a draft APA reflecting all of the material terms of the agreement. (Ex. 5, p. 37-50; TT 5/26, 633:24-634:6.) This draft APA identified the Cayman Islands company as the buyer and indicated that Oliva Cheng was the authorized signatory

of the buyer. (Ex. 5, p. 50 [WIL000099].) Castel was provided this information concurrently with all other shareholders. The shareholders, including Castel, were also sent the "Action By Written Consent In Lieu Of A Special Meeting Of Stockholders Of Aurora Imaging Technology, Inc." (the "Consent") setting out the material terms of the agreement and authorizing AIT to enter into the APA. (Ex. 5, p. 4-8; TT 5/26, 633:2-23.) The Consent expressly authorized the officers of the corporation to modify or amend the APA and its exhibits. (Ex. 5, pp. 5 & 6 ["the officers of the Corporation are, and each of them hereby is, authorized and directed in the name and on behalf of the Corporation to execute and deliver the Asset Purchase Agreement, with such modifications or amendments made thereto as may be approved by such officers or officer of the Corporation"]; TT 5/26, 634:7-635:13.)

Accordingly, and because the negotiations regarding the consideration breakdown were ongoing, that portion of the Draft APA was necessarily left blank. (TT 5/26, 636:2-14; Ex. 5, Draft APA, ¶3.1.) And although the APA was later modified to reflect AHC as the entity that would be purchasing the assets, Wilson did not obtain a new consent from the shareholders because he did not believe that the specific entity chosen by the buying investors was material to the transaction. (TT 5/26, 638:25-640:3 [The change was not material enough to get new consents because both entities are newly-formed. There was no history of operations and no assets. They were owned/managed by the same people. Also, it was a cash transaction and there were no continuing obligations of the buyer after the closing. It did not matter to AIT if the buyer was a Mass. Corp. or a Cayman Corp.].)

AIT also sought to settle the claims of the unsecured creditors with the proceeds from the sale. Wilson offered to pay Castel $100,000 in settlement of its $250,000 unsecured loan to AIT. (Ex. 5; TT 5/26, 629:1-632:22.)

As with all of AIT's shareholders, *Wilson informed Castel that the shares had become worthless and, as a result, there would be no distributions to any of*

JULANDER BROWN
— & BOLLARD —

*the shareholders*. (Ex. 5 ["Of course, the shares [have] become worthless and no distributions will be made to any shareholder relative to their stock."].) Consistent with this, *no money was ever distributed to any of AIT's shareholders for their stock*. (TT, 5/26, 672:20-673:4.)

The voting for shareholder approval of the APA started in mid-October and ended around November 14th. (TT 5/26, 655:20-23.) In response to AIT's request for shareholder approval, a majority of the company's shareholders approved the transaction, including the necessary majorities from each of the classes of stock. (TT 5/26, 650:7-651:9.)[5] As a result of the voting, Wilson concluded that AIT had the requisite majorities to close the transaction on November 18, 2016. (TT 5/26, 655:11-19; 5/25, 534:14-535:2.)

Understandably, Castel is unhappy about its lost investment and equity in AIT, and in its scramble to place blame, mistakenly pointed to ARF. But Castel offered no evidence that anything ARF did or did not do had any impact on the value of Castel's shares in AIT.

## IV. ARF IS ENTITLED TO JUDGMENT ON CASTEL'S FRAUD CLAIM BECAUSE CASTEL HAS NOT MET ITS BURDEN OF PROOF ESTABLISHING DUTY, MATERIALITY, INTENT, AND DAMAGES

### A. Castel Failed to Prove ARF Owed Castel a Duty to Disclose

In order to prove fraud based on concealment or non-disclosure, a plaintiff must prove that the defendant owed the plaintiff a duty of disclosure. (*Boschma v. Home Loan Center, Inc.*, 198 Cal.App.4th 230, 248 (Cal. App. 2011); *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987).) At trial, Castel failed to satisfy its burden of proving that ARF owed Castel a duty of disclosure.

---

[5] For all classes together, AIT needed a majority and 53% of all shareholder voted in favor of the transaction. For Series B shareholders, AIT needed a 66% majority of the class voting separately and got 77% approving the transaction. For the series C and D shareholders, AIT needed a majority of the class voting separately and got 83% of the vote for both approving the transaction. (TT 5/26, 653:23-654:25.)

Castel alleges two sources of a duty of disclosure: First, Castel claims ARF and it "were in a fiduciary relationship based on ARF's status as a majority and/or controlling shareholder of AIT of each of series C and series D stock;" second, Castel argues that "ARF also owed a contractual duty of disclosure to Castel based on its obligations under the Series C and Series D Stockholder Agreements." (Dkt. 203, p. 10, Claim 2, Element 1 & Supp. Evid. (a) & (b).) Indeed, ARF and Castel had common ownership of AIT preferred stock (Ex. 1 & 3 [Castel's stock purchases], Ex. 11 [ARF's stock purchase]), and the Stockholder Agreement (Ex. 2), does govern the relationship between the Series C preferred stockholders.[6] However, these agreements only establish a *commercial* relationship between the parties and do not establish a basis for fraud.

## 1.  Castel Failed to Prove ARF Owed a Fiduciary Duty of Disclosure

Three times this Court has rejected the claim that ARF owes Castel fiduciary duties. Castel initially pled a cause of action for breach of fiduciary duty against ARF, which was dismissed *without leave to amend* in the Court's Order Granting in Part and Denying in Part Defendants' Motion to Dismiss. (Dkt. 73, p. 28.) In that same order, the Court repeated that ARF did not owe Castel a fiduciary duty with respect to Castel's fraud claim against ARF. (Id. at pp. 17, 24-26.) Then, for the third time, in its Order on Motion for Summary Judgment, the Court found "[t]he parties agree[d] that, as a minority shareholder in AIT, ARF did not owe any fiduciary duties to its fellow shareholder Castel." (Dkt. 176, p. 15.) Therefore, Castel's claim for fraud cannot be premised on a *fiduciary* duty to disclose.[7]

---

[6]     There is no evidence of a "Stockholder Agreement" for the Series D preferred stock.

[7]     In its Opposition to ARF's Motion for Summary Judgment, Castel argued that even in the absence of a fiduciary relationship, "the duty to disclose generally presupposes a relationship grounded in 'some sort of transaction between the parties. [Citations.] Thus, a duty to disclose may arise from the relationship between seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual agreement. [Citation.]" (*Los*

JULANDER BROWN
— & BOLLARD —

### 2.   Castel Failed To Prove A Basis For Recovery In Fraud Based On The Breach Of A Contractual Duty To Disclose

"The economic loss rule limits a party to a contract to recover in contract for purely economic loss due to disappointed expectations, rather than in tort, unless he can demonstrate harm above and beyond a broken contractual promise." (*Rattagan v. Uber Technologies, Inc*., 19 F.4th 1188, 1191 (9th Cir. 2021) (internal quotation marks omitted) [citing *Robinson Helicopter Co. v. Dana Corp*., 34 Cal. 4th 979, 987 (2004)].) California Courts are split regarding the breadth of its application to fraud claims, and the issue of whether the doctrine applies to fraudulent concealment claims has recently been certified to the California Supreme Court (See, *Rattagan, supra*, 19 F.4th at 1192-1193.)

Unlike fraud claims involving affirmative misrepresentations for which independent tort duties arguably apply, here there is no distinction between Castel's fraudulent concealment claim against ARF and its breach of contract claim. Like its fraud claim (Dkt. 203, p. 11, Claim 2 (b)-(i)), Castel specifically alleges for its breach of contract claim that ARF breached Section 4 of the Shareholder Agreement by failing to consult with Castel prior to voting to approve the asset purchase transaction. (Dkt. 203, pp. 14-15, Claim 4 (e)-(g).) Like its fraud claim (Dkt. 203, pp. 11-12, Claim 2 (l)-(m)), Castel alleges for its breach of contract claim that had it been consulted, it would have taken the same actions. (Dkt. 203, pp. 14-15, Claim 4 (k).) And like its fraud claim (Dkt. 203, p. 11, Claim 2 (n)), Castel suffered "damages including the loss of the value of its shares and well as other residual damages." (Dkt. 203, p. 17, Claim 4 (l).) The alleged concealment is based solely on the alleged breach of contract—failing to consult. Because the operative allegations

---

*Angeles Memorial Coliseum Com. v. Insomniac, Inc*. 233 Cal.App.4th 803 (2015).) Of course, this rule does not apply here where there was no transaction between ARF and Castel wherein ARF induced action by Castel. Furthermore, ARF had no communications with Castel. Having had no communications, there was no chance for ARF to make any partial representations or to actively conceal anything from Castel. Notably, this argument is omitted from Plaintiff's Memo of Contentions, Dkt. 203.

and damages are substantially the same, Castel is merely seeking duplicative relief by its fraud claim and attempting to obtain tort remedies based on conduct that would amount to no more than a breach of contract.

The logic behind the economic loss rule – allowing parties to reliably allocate risks and costs during bargaining since they will not be able to recover economic damages in tort – is particularly applicable here and Castel should not be entitled to recover in tort for conduct that amounts to only a breach of contract.

Even if the Court finds that the economic loss rule should not apply to this case, Castel has failed to prove that ARF owed Castel a contractual duty of disclosure, the basis for fraud, as opposed to a contractual duty to consult. (See discussion *infra*, at §IV(C).)

**B.** **Castel Failed to Prove that ARF Induced Reliance or Had Intent to Defraud**

Intent to defraud or induce reliance on the part of the Defendant is required to prove fraud. (*Boschma v. Home Loan Center, Inc.*, 198 Cal.App.4th 230, 248 (Cal. App. 2011); *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987).) Castel failed to offer any evidence that ARF induced any kind of reliance by Castel by failing to disclose certain facts, or that ARF intended to defraud Castel.

Lacking from Castel's presentation at trial was evidence that it had been induced by ARF in any way. Rather, Castel's claim is exactly the opposite, that ARF failed to consult with it in connection with ARF's vote consenting to the APA. Having claimed that ARF failed to communicate with it, Castel would have no basis to claim that ARF induced reliance on Castel's part.

As to intent, not only has Castel offered no evidence of ARF's intent to defraud Castel, but Ms. Cheng actually testified as to why, as ARF's representative, she did not consult with Castel regarding the sale of AIT's assets. Cheng believed ARF only had an obligation to consult with Castel regarding actions which would dilute Castel's shares in AIT, so that Castel would "always be included into the

future investment." (TT, 5/24, 264:2-3.) This was exactly Mattia Malacalza's understanding of the consultation obligation: "This is a paragraph that deals with having to speak to the minority shareholder in terms of dilution of the shares and making sure that that person or people are aware of these transactions of these shares, …." (TT, 5/23, 36:23-37:1.) The asset purchase transaction at issue was not related to the purchase of additional preferred stock that could dilute Castel. The transaction at issue was the APA and the sale of AIT's assets. ARF had a unilateral right to vote its shares in favor of that transaction, regardless of any response after a consultation with Castel. Cheng therefore believed consultation was not necessary.

The best evidence of Cheng's actual intent was revealed in her testimony that, in 2015, she in fact tried to include Castel in the Aurora Rescue Fund. Cheng testified that she "did reach out to Davide [Malacalza]" and that "Mattia [Malacalza] was on the phone. (TT, 5/24, 260:13-17.) This is completely inconsistent with an intent to defraud or harm Castel in connection with any transaction related to the Aurora Rescue Fund. The following year, at the time of the APA transaction, Cheng did not reach out to Castel again "because I had known Davide, I know if they're interested they will get back to us. That's what their practice was. So if they don't that means they're not interested." (TT, 5/24, 265:20-23.)

Without evidence ARF intended to defraud, or induced reliance by Castel, judgement should be entered in favor of ARF on Castel's fraud claim.

C.    **Castel Failed to Prove Reliance, Causation and Damages on its Concealment Claim**

To prevail on its claim for fraudulent concealment, Castel had the burden of proving that it suffered damages caused by ARF's concealment and that it would have acted differently had it known of the true facts. (*Davis v. HSBC Bank Nevada, N.A.,* 691 F.3d 1152, 1163 (9th Cir. 2012); *Williamson v. Gen. Dynamics Corp.,* 208 F.3d 1144, 1156 n. 3 (9th Cir. 2000).) Concerning damages, "it is fundamental that damages which are speculative, remote, imaginary, contingent, or merely possible

cannot serve as a legal basis for recovery." (*Piscitelli v. Friedenberg,* 87 Cal.App.4th 953, 989 (2001), citing *Regalado v. Callaghan,* 3 Cal.App.5th 582, 602 (2016).) Thus, speculation as to what Castel might have done is not evidence of reliance which requires that Castel prove that, "had the omitted information been disclosed [it] would have been aware of it and behaved differently." (*Mirkin v. Wasserman,* 5 Cal.4th 1082, 1093 (1993).)

Though Castel was deliberately vague about what specific relief it is seeking in this action (TT 5/26, 694:13-695:3), the concealments alleged even if proven did not cause the loss of Castel's debt or its investment in AIT, and Castel failed to establish beyond speculation what it would have done differently had the omitted information been disclosed.

### 1.    No Concealment Caused the Loss of Castel's Investment Because AIT was Insolvent

In 2015 when the board resigned and bankruptcy schedules were prepared, AIT was insolvent and AIT's shares were worth nothing. Shareholder equity was negative[8]; AIT was $17.5 million in debt and could not pay its debts as they came due; and five lawsuits had already been filed against the company. (See, TT 5/26, 578:21-581:15, 582:3-586:17, 598:11-599:7; Exs. 92 & 97; Kovalkova Depo., pp. 99:1-24, 106:17-107:3, 107:9-15.) At trial, Castel presented no evidence to refute the statements contained in Chris Wilson's June 18, 2015 letter that established fact by fact that AIT was insolvent. (TT 5/23, 157:7-158:19, 159:15-160:20; Ex. 54.)

Because the unrefuted evidence established that Castel's stock was worth nothing prior to any claimed concealment, any nondisclosure on the part of ARF did not ***cause*** the loss of Castel's investment.

/ / /

/ / /

---

[8]    In fact, shareholder equity had been in the negative since 2012. (TT 5/26, 593:19-25.)

JULANDER BROWN — & BOLLARD —

JULANDER BROWN
— & BOLLARD —

JBB

**2.    Castel Did Not Establish Beyond Speculation What Action it Would Have Taken Had it Known the Concealed Facts**

In Castel's Memorandum of Contentions of Fact and Law, Castel lists specific things it could have done differently to protect its interests in AIT if Castel had known the allegedly concealed facts. (Dkt. 203, p. 11, ¶(l).) At trial, the only two things Malacalza testified Castel could have done differently was to either make a competing offer or stop the vote. (TT 5/22, 93:17-94:8, 95:22-96:8.) Malacalza failed to testify, however, that Castel would have taken any of these actions had the omitted information been disclosed.

(a)    **Castel Failed to Establish that it Would Have Made a Competing Offer**

Castel postulated at trial that, had it known the omitted facts, it "could" have made a competitive offer. (TT 5/22, 93:17-94:8.) But Castel knew for more than a year prior to the closing that AIT was $20 million in debt and headed toward bankruptcy, that shareholder equity was negative, and that Wilson was looking to sell the company. (Ex. 54.) At trial Malacalza failed to explain why Castel did nothing to at least signal its interest in purchasing AIT after learning that Wilson was trying to sell the company in June 2015. (TT 5/23, 144:7-12, 162:10-163:9, 164:22-25; Ex. 54.) The best evidence of what Castel would have done is what it actually did do – nothing.

At trial Mattia Malacalza was unable to say whether Castel would have made an offer high enough to return any value for AIT's shares. (TT 5/22, 94:9-24 ["Q. More than 15 million? A. Well, it depends on the documentation that would have been provided."].) At the time of the asset purchase in 2016, only a purchase price of over $17 million would have returned any value to the shareholders. Castel has been in possession of the discovery in this action, including all of the company's books and records and the Orchard Partners information, since January 2021. Castel should have been able to prove at trial that it would have actually made a

1  competitive offer based on that information, and the amount of that offer. But it did

2  not.

3      Castel's "competitive offer" theory is further undermined by Malacalza's

4  testimony that "Castel can only buy companies, if these companies provide the

5  following: Audited financial statements for all years relevant; otherwise, it's not

6  able to do so." (TT 5/23, 163:23-164:4.) The evidence established that AIT had not

7  obtained audited financial statements since 2010 because it simply could not afford

8  them and could not risk a going concern qualification from the auditors. (TT 5/30,

9  28:21-29:21.) Thus, based on the evidence, Castel would not have, and could not

10  have, made any competitive offer to purchase AIT.

11          (b)      **Castel Had No Legal Basis to Stop the APA**

12                   **Transaction**

13      At trial, Castel speculated that, had it known the allegedly undisclosed facts, it

14  could have somehow stopped the asset purchase from happening. (TT 5/22, 95:22-

15  96:8.) Castel never explained how it would have or could have stopped the

16  transaction. But, in its Memorandum of Contentions, Castel claimed that it would

17  have prevented ARF from approving the sale pursuant to Section 5 of the Series C

18  and Series D Stockholder's Agreements." (Dkt. 203, p. 12). Castel misinterprets

19  both the agreement and the applicable law.

20      Section 5 of the Series C Stockholder Agreement (Ex. 2), on which Castel

21  relies to claim it had a right to enjoin ARF from approving the APA transaction,

22  provides:

23              It is agreed and understood that monetary damages would

24              not adequately compensate an injured party for the breach

25              of this Agreement by any party, that this Agreement shall

26              be specifically enforceable and that any breach or

27              threatened breach of this Agreement shall be the proper

28              subject of a temporary or permanent injunction or

JULANDER BROWN
— & BOLLARD —

JULANDER BROWN
— & BOLLARD —

restraining order without a requirement of posting bond.
Further, each party hereto waives any claim or defence
[*sic*] that there is an adequate remedy at law for such
breach or threatened breach.

(Ex. 2, § 5).

The relief set out in Section 5, first requires a breach of an obligation that could be specifically enforceable. While Section 3 does have provisions requiring Castel's consent that could potentially be specifically enforceable, Castel's consent is not required for the sale of AIT's assets. (Ex. 2 [Section 3 does not include Article IVB, Section 3(b), Clause (iv), which provides that a majority of Series C stock vote is required for the sale of AIT's assets].) And while Section 4 does require Pharos (ARF) to "make reasonable efforts to consult" on matters such as the sale of assets, because the right to vote is unilateral requiring only consultation and not consent, there could be no irreparable injury to enjoin a failure to consult.

Moreover, as discussed above, Castel could not legally prevent ARF from voting in favor of the asset purchase transaction. ARF was entitled to vote its shares, even if in its own favor. (See, *infra*, §IV(B).) Castel's consent was not required, and Castel's right to seek an injunction did not arise until there was a breach or threatened breach. Therefore, even if ARF was required by a court to consult with Castel regarding the asset purchase transaction, Castel could not have stopped ARF from voting to approve it under the law or the Stockholder Agreement. Thus, Castel has no legal basis to claim that it could have stopped the APA transaction.

### 3.    The Majority of Shareholders Approved the APA

As required by the Certificate of Incorporation, the required majority of AIT's shareholders in all required categories voted in favor of the asset purchase transaction. (TT 5/26, 650:7-651:9, 653:23-654:25; Ex. 64; Ex. 8.) No amount of additional or different disclosures made by ARF to Castel could have altered that outcome. As a result, even if ARF had a duty to disclose something it did not, and

even if the facts were somehow material, the asset purchase transaction would have closed. Thus, ARF's nondisclosure did not damage Castel.

## V.   ARF IS ENTITLED TO JUDGMENT ON CASTEL'S BREACH OF CONTRACT CLAIM BECAUSE THE CONTRACTUAL OBLIGATIONS SIMPLY DO NOT EXIST AS ALLEGED AND CASTEL FAILED TO PROVE CAUSATION AND DAMAGES

Castel alleges that ARF breached the Stockholder Agreement "by failing to notify or consult with Castel regarding the sale of AIT's C and D shares to ARF," "by failing to recuse itself from the sale to the Real Buyer [AHC] as it was an interested party to the transaction," and "by consenting to the sale of AIT's assets while it was acting as an interested party on both sides of the sale between AIT and the Real Buyer [AHC], without first notifying or consulting with Castel." (Dkt. 203, p. 15-16, Supp. Evid. (g)-(i).). Castel failed to prove up each of these claimed breaches.

### A.   That ARF Breached A Contract By Failing To Consult With Castel Prior To Entering Into That Contract Is A Non Sequitur That Cannot Support A Claim For Relief

For Castel to prove a breach of contract, Castel must first prove the existence of the contract. (*Leeds v. First Allied Connecticut Corp*., Del. Ch., 521 A.2d 1095, 1101-02 (1986); *Norse Petroleum A/S v. LVO International, Inc*., Del. Super., 389 A.2d 771, 773 (1978) [The elements for Breach of Contract are: "(1) the contract,…"].) Before ARF entered into the Stockholder Agreement (Ex. 2), it was under no contractual obligation to consult regarding its decision to enter into that agreement. Castel's claim to the contrary is simply not legally cognizable.

### B.   Castel Failed to Prove that ARF Had a Duty under the Stockholder Agreement to Recuse Itself from Voting on the Sale of AIT's Assets

The Stockholder Agreement does not impose an obligation on Pharos (or ARF) to recuse itself from voting on an action in which it has an interest. (Ex. 2.)

JULANDER BROWN
— & BOLLARD —

The provisions in the Stockholder Agreement protecting Castel are found in Section 2 (observer rights), Section 3 (protections against certain amendments to the Certificate of Incorporation of the Company; mandatory conversion obligations; and a right of first refusal for new equity financing), and Section 4 (consultation). The Stockholder Agreement does not contain any provision requiring recusal from voting, it does not allow oral modification and is intended to be the sole agreement of the parties as it relates to its subject matter. (Ex. 2, §§8.4 & 8.5.)

In addition to there being no contractual duty for ARF to recuse itself from voting, there is no law requiring that an interested shareholder recuse itself from voting its shares. (See, e.g., *Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 507-08 (Del. 2005) [non-controlling shareholders may vote as they please, only controlling shareholders are subjected to fiduciary duties]; *Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 845 ["Stockholders in Delaware corporations have a right to control and vote their shares in their own interest."]; see also *Williams v. Geier,* 671 A.2d 1368, 1380–81 (Del.1996) ["Stockholders (even a controlling stockholder bloc) may properly vote in their own economic interest[.]]").)

Castel thus failed to demonstrate that ARF was contractually obligated to recuse itself from voting on the APA transaction.

## C. <u>Castel Failed Prove that ARF Owed Castel a Contractual Duty of Disclosure</u>

The Stockholder Agreement also does not impose an obligation on Pharos (or ARF) to disclose to Castel. (Ex. 2.) As noted previously, the Stockholder Agreement does impose a duty of "Consultation," which provides: "In respect to any matter that requires the approval of the holders of the Series C Stock as a separate class and does not require the separate consent of the Investor pursuant to Section 3 hereof, Pharos shall make reasonable efforts to consult with the Investor before approving such matter."

/ / /

JULANDER BROWN — & BOLLARD —

Although it is not expressed, it is implied that in bilateral matters that "require the separate consent of the Investor pursuant to Section 3," Delaware law would require disclosure for any request for shareholder action. (See, e.g., *Dohmen v. Goodman,* 234 A.3d 1161, 1168 (Del. 2020) [Where the communication relates to a request for shareholder action, a director must disclose all material facts bearing on the request.].) However, the Section 4 provision requiring "Consultation" expressly excludes such matters and puts no other restriction on Pharos's right to vote, other than the stated "reasonable effort to consult." The subject matter of Section 4 then, involves the unilateral right of Pharos to vote with the obligation to seek input, but not consent, from Castel. Therefore, Section 4 does not implicate the right to disclosure otherwise attendant in bilateral actions requiring consent. The requirement to consult is not the same as the requirement to disclose.

In the context for which this provision was intended, the obligation to consult but not disclose is sensible. Cheng and Malacalza concur that the Section 4 consultation provision was agreed to by the parties to allow Castel to avoid dilution of its equity position. (TT 5/23, 36:23-37:1 [Malacalza: "deals with having to speak to the minority shareholder in terms of dilution of the shares"]; TT, 5/24, 264:2-3 & TT 5/24, 262:17-264:9 [Cheng's testimony is the same].) This went along with Castel's right of first refusal in Section 3.3 in purchasing new equity financing issued by AIT. If Pharos were allowed to vote to approve new equity financing through preferred stock without first consulting Castel, Castel could be harmed, having its equity position diluted. Pharos had the right to vote in that respect unilaterally, any way it wished, but Castel would be on notice of the action and would be able to protect its equity position from dilution. This is exactly what Castel did when it purchased the Series D preferred stock in 2008. (Ex. 3.) It would be unthinkable that Pharos would be required to disclose to Castel the basis for its decision to invest further in the AIT preferred stock. Consultation is not same as disclosure.

JULANDER BROWN
— & BOLLARD —

The sale of AIT's assets did require the vote of a majority of the Series C shareholders, but it did not require Castel's consent, or any other action by it. As such, Pharos (ARF) had the right to unilaterally vote to approve (or not) such a transaction, without inducing Castel to action or seeking its consent. Pharos (ARF) therefore was under no duty of disclosure relative to a vote on the sale of the assets of the company.

In direct contrast to Section 3's obligation to obtain Castel's written consent, amounting to bilateral action by the parties, the Section 4 duty to consult amounts to a duty to inform or notify Castel of Pharos's (ARF's) unilateral decision. Castel has offered no legal basis to require Pharos (ARF), under a contractual agreement to consult, to disclose any information absent an inducement to action. As such, that ARF did not consult with Castel prior to voting to approve the APA transaction could only amount to a technical breach of the Stockholder Agreement not justifying an award of anything more than nominal damages. (See *Enzo Life Scis., Inc. v. Adipogen Corp.*, 82 F. Supp. 3d 568, 607 (D. Del. 2015) [Awarding $1 and $10 on breach of contract claim].)

### D. Castel Failed to Prove Causation and Foreseeable Damages on its Contract Claim Against ARF

A claim for breach of contract under Delaware law also requires proof of damages caused by the defendant's breach. (DEL. P.J.I. CIV. § 19.20 (2000), Breach of Contract Defined.) Contract damages "are designed to place the injured party in an action for breach of contract in the same place as he would have been if the contract had been performed. Such damages should not act as a windfall." (Id.) Importantly, such damages may not be speculative or conjectural. (*VICI Racing, LLC v. T-Mobile USA, Inc.,* 763 F.3d 273, 294 (3d Cir. 2014); *Laskowski v. Wallis,* 58 Del. 98, 101 (1964) ["The law does not permit a recovery of damages which is merely speculative or conjectural."].)

/ / /

1    Delaware also applies the rule in *Hadley v. Baxendale* to permit damages that

2    are reasonable and foreseeable following a breach of contract. (*Joseph T. Dashiell*

3    *Builders v. Andrews, C.A.* 00L-05-001-RFS, 2002 WL 31819895, at *1 (Del. Super.

4    Dec. 10, 2002).) The damages must "arise naturally from the breach" or have been

5    reasonably foreseeable at the time the contract was made. (*VICI Racing, LLC v. T-*

6    *Mobile USA, Inc.,* 87 F. Supp. 3d 697, 699 (D. Del. 2015); *Diamond Fortress*

7    *Techs., Inc. v. EverID, Inc.*, 274 A.3d 287, 305 (Del. Super. 2022).)

8    The Stockholder's Agreement was entered into in June 2006, two years

9    before Castel even made its second investment in 2008. (Ex. 2.) Section 4 requiring

10   that the parties consult with respect to any matter that requires the approval of the

11   holders of the Series C Stock as a separate class was understood by *both* parties to

12   protect Castel from any dilution of its equity position. (TT 5/22, 36:10-37:6; TT

13   5/24, 262:17-264:9.) Foreseeable damages resulting from a breach of Section 4

14   would be any harm Castel suffered that directly resulted from a dilution of its Series

15   C stock.

16   In 2006, it was not foreseeable that AIT would become insolvent and on the

17   verge of bankruptcy/liquidation ten years later, that no other investors would be

18   willing to invest or loan additional funds, that the shareholder's equity (including

19   the Series C shares) would be totally worthless, and that the company would be

20   forced to sell its assets just to partially satisfy its creditors. Yet it is in this setting in

21   2016 that Castel argues the agreement was breached because ARF did not "make

22   reasonable efforts to consult" with Castel in October 2016 prior to voting its shares

23   in favor of the APA transaction.

24   Even if ARF had a contractual obligation under the Shareholder Agreement to

25   consult with Castel prior to approving the asset purchase, Castel did not suffer any

26   foreseeable damages caused by ARF's failure to consult. For the reasons discussed

27   above with respect to the concealment claim, no amount of consultation would have

28   altered the outcome. Castel lost its investment in AIT because AIT was insolvent,

1  and Castel lost its debt position because it elected not to participate in the proceeds

2  of the only offer that the company received to purchase its assets. Castel could not

3  have legally prevented ARF from voting in favor of the transaction and the required

4  majority of shareholders voted in favor. Castel had one option available to it – settle

5  and receive $100,000 of the purchase money. And Castel never testified that it

6  would have taken the settlement if ARF had actually consulted. In fact, the evidence

7  suggests otherwise.

## VI.   CONCLUSION

For the reasons set forth herein, and based on the evidence presented at trial in this action, Defendant ARF PARTNERS, LLC respectfully requests that Judgment be entered in its favor in its action.

DATED:  July 28, 2023                    JULANDER, BROWN & BOLLARD

By:   _/s/ Dirk O. Julander_
Dirk O. Julander
Attorneys for Defendants CHRISTOPHER
A. WILSON and ARF PARTNERS, LLC

ARF PARTNERS' CLOSING BRIEF

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 28th day of July, 2023, I electronically filed the foregoing paper(s) with the Clerk of the Court using the ECF system which will send notification to all parties of record or persons requiring notice.

*/s/ Dirk O. Julander*
Dirk O. Julander

ARF PARTNERS' CLOSING BRIEF