UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| CASTEL S.A., | Case No. CV 19-09336-DFM |
| Plaintiff, | Findings of Fact and Conclusions of Law |
| v. | |
| CHRISTOPHER A. WILSON et al., | |
| Defendants. | |

## I. INTRODUCTION AND BACKGROUND

Plaintiff Castel S.A. ("Castel"), a Luxembourg joint stock company, filed this action in 2019. See Dkt. 1. The Second Amended Complaint asserted claims against Defendants Christopher A. Wilson ("Wilson"), Olivia Ho Cheng ("Cheng"), ARF Partners, LLC ("ARF"), Steven J. James ("James"), and Michael Devlin ("Devlin"). See Dkt. 91 ("SAC") ¶¶ 2-6.

In February 2022, the Honorable Otis D. Wright, II, granted James's motion for summary judgment, granted in part Cheng and ARF's joint motion, and denied Wilson's motion. See Dkt. 176 ("MSJ Order"). In March 2022, Judge Wright granted Devlin's motion to dismiss. See Dkt. 180.

In December 2022, the parties consented to proceed before the undersigned Magistrate Judge. See Dkts. 192, 194. In April 2023, the parties submitted memoranda of contentions of fact and law. See Dkt. 203 ("Pl.'s

1

MCFL"); Dkt. 205, ("Defs.' MCFL"). Per the Final Pretrial Conference Order, the remaining Defendants are Wilson and ARF. See Dkt. 212 ("PCO") at 3.[1]

Castel asserts four claims arising out of the sale of the assets of Aurora Imaging Technology, Inc. ("AIT") in 2016 (the "Transaction"): (1) fraudulent deceit and concealment (against Wilson); (2) fraudulent deceit and concealment (against ARF); (3) breach of fiduciary duty (against Wilson); and (4) breach of contract (against ARF). See id. at 9-16. Castel asserts the first two claims under California law and the latter two claims under Delaware law. See id. Defendants assert the affirmative defenses of (1) Business Judgment Rule (as to all claims against Wilson); (2) limitation on liability (as to Wilson); and (3) failure to mitigate damages (as to all claims). See id. at 16-18.

The Court held a bench trial over several days in May 2022. See Dkts. 215-16, 223, 224, 226-27; see also Dkts. 228, 236-40, Trial Tr. Days 1-6 (hereinafter "1 Tr.", "2 Tr.", etc.). Each party filed a closing brief on July 28, 2023. See Dkt. 232 ("Wilson's CB"); Dkt. 233 ("ARF's CB"); Dkt. 234 ("Pl.'s CB"). The Court heard final arguments on August 4, 2023. See Dkt. 235.

The Court now issues the following findings of fact and conclusions of law under Federal Rule of Civil Procedure 52.[2]

## II.   FINDINGS OF FACT

### A.   Aurora Imaging Technology and Relevant Investors

1.     AIT was formed as a Delaware Corporation in 1999. AIT specialized in advanced imaging relating to the prevention, diagnosis, and

---

[1] Citations to page numbers refer to the CM/ECF pagination.

[2] To the extent that any findings are included in the Conclusions of Law section, they shall be deemed findings of fact, and to the extent that any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.

treatment of breast cancer. It developed, manufactured, and sold an FDA-approved MRI system designed for 3-D bilateral breast imaging. AIT had the authority to issue 50,000,000 shares of common stock and 35,000,000 shares of preferred stock, in several series. The types of stock AIT issued included Common, Series A Preferred ("Series A"), Series B Preferred ("Series B"), Series C Preferred ("Series C"), and Series D Preferred ("Series D"). See PCO, Admitted Facts ("AF") ¶¶ (a), (b), (c).

2.     Cheng and her husband owned 264,697 shares of Common stock, 185,814 shares of Series A stock, and 66,750 shares of Series B stock in AIT. See PCO, Stipulated Facts ("SF") ¶ (e); see also 3 Tr. at 298 (Cheng testifying that she was a shareholder and creditor of AIT).

3.     In 2012, Wilson became a shareholder of AIT when his father-in-law gifted Wilson 17,811 shares of common stock, 13,122 shares of Series A stock, and 625 shares of Series B stock. See SF ¶ (f).

4.     Pharos Capital Partners II-A, L.P., and Pharos Capital Partners II, L.P. (collectively "Pharos"), is a private equity firm that invests in healthcare companies. Generally, Pharos would invest in companies that met certain criteria, help grow the companies, and aim to exit them in four to seven years. In May 2006, Pharos purchased 5,050,505 shares of AIT Series C stock, and in July 2008, Pharos purchased 2,564,103 shares of Series D stock. Pharos cumulatively owned 83.3% of AIT's Series C stock and 83.3% of AIT's Series D stock. See AF ¶ (h); Dkt. 207, Deposition of Anna Kovalkova ("Kovalkova Depo.") at 16.

5.     Pharos was also an AIT creditor. Pharos lent AIT $3.3 million between 2011-2015 pursuant to several promissory notes. See AF ¶ (h).

6.     Castel is a joint stock company headquartered in Luxembourg. It is owned by two partners, Mattia Malacalza ("Malacalza") and a company named Hofima SpA. Malacalza is a member of Castel's board of directors and

President of the board. Castel invests in struggling companies to help them become profitable. Castel had invested in a company named Paramed, and a Paramed representative introduced Castel to AIT. Castel invested in AIT because AIT's breast imaging technology was synergic and complementary to the other businesses in which Castel had invested. See 1 Tr. at 29-32.

7.     On or around June 19, 2006, Castel purchased 1,010,101 shares of AIT's Series C stock in accordance with the Series C Preferred Stock Purchase Agreement between Castel and AIT. On or around July 15, 2008, Castel bought an additional 512,821 shares of AIT's Series D stock in accordance with the Series D Preferred Stock Purchase Agreement. In total, Castel owned 16.7% of AIT's Series C stock and 16.7% of its Series D stock, or almost 4% overall of AIT. See AF ¶¶ (d), (e), (f); Exs. 1, 3.

8.     Castel was also an AIT creditor. In March 2011, Castel lent AIT a total of $250,000 pursuant to a promissory note. See AF ¶ (g); Exs. 4, 59.

9.     As a condition to Castel's purchase of AIT's Series C stock, which occurred shortly after Pharos's purchase of Series C stock, Pharos and Castel entered into a Stockholders Agreement dated June 2006 (the "Stockholders Agreement"). Section 4 of the Agreement is titled "Consultation" and provides, in relevant part, "In respect to any matter that requires the approval of the holders of the Series C Stock as a separate class and does not require the separate consent of the Investor pursuant to Section 3 hereof, Pharos shall make reasonable efforts to consult with the Investor [Castel] before approving such matter." Malacalza testified that the purpose of Section 4 was to allow Castel to protect its Series C shares from becoming diluted. See Ex. 2; 1 Tr. at 36-37.

10.     Section 6 of the Stockholders Agreement is titled "Successors in Interest" and provides that, unless Pharos continued to own the majority of Series C shares following a transfer, the Agreement "shall be binding upon the

successors in interest to any Series C Stock held by any party to this Agreement and their successors and assigns. . . . [AIT] shall not permit the transfer of any Series C Stock on its books or issue new certificates representing any such Series C Stock unless and until the person(s) to whom such shares are to be transferred shall have executed a written agreement, substantially in the form of this Agreement, pursuant to which such person becomes a party to this Agreement and agrees to be bound by all the provisions hereof as if such person were a party hereunder." See Ex. 2; AF ¶ (i).

11.     Under the Stockholders Agreement, Castel was entitled to designate an observer to attend AIT's board of director meetings. After its Series C investment, a representative from Castel attended AIT board meetings until 2014. See AF ¶ (j); 1 Tr. at 45-49; 2 Tr. at 127-28; 3 Tr. at 338-40; 6 Tr. at 10-18; Exs. 2, 72, 73, 75.

12.     Dr. Wang was AIT's largest shareholder. He, along with his family, invested over $6 million in AIT. See 3 Tr. at 346-47.

13.     James became a shareholder of AIT in or around 2009 or 2010 after exercising stock options, valued at $75,000. See 6 Tr. at 18-19.

## B.     AIT's Leadership Transitions and Financial Decline

### 1.     Cheng's Tenure as CEO

14.     Cheng was the President and CEO of AIT from 2003 until her resignation in July 2013. See SF ¶ (d); Ex. 88. James was the CFO of AIT from 1999 until he resigned in June 2014. See Ex. 46; 6 Tr. at 20, 48-49.

15.     After Cheng became CEO, she helped AIT obtain FDA approvals for its MRI system. From there, AIT had three main sources of revenue: (1) sales of MRI machines to hospitals and clinics; (2) maintenance contracts, under which AIT would provide updates to the MRI machines it sold; and (3) revenue from clinics that it owned or partially owned or from leases of the machine to clinics in exchange for a portion of their revenue. See 3 Tr. at 333-

35; 6 Tr. at 20-21.

16.     When Cheng became CEO, AIT's annual revenue was approximately $1.6-1.7 million. After AIT obtained FDA approval and began selling its machines, its annual revenue grew to approximately $20 million by 2007 or 2008. However, after the 2008 financial crisis in the United States, AIT's revenues declined because hospitals stopped buying the MRI machines. See 3 Tr. at 335-36.

17.     Beginning in 2010, with the approval of AIT's board of directors, the company entered into negotiations for the sale of AIT to China Resources Corporation ("CRC"), a Chinese state-owned company interested in merging with AIT or purchasing the company for approximately $100 million. The negotiations with CRC lasted approximately two years. See SF ¶¶ (a), (b).

18.     During negotiations, the terms of the proposed transaction from CRC prevented AIT from raising equity capital. However, AIT required additional funds because the "U.S. market was already down significantly," and AIT's "export market [had] just started" and was not generating revenue quickly. To stay afloat, AIT borrowed money from its shareholders, including Pharos and Castel. See AF ¶ (g); Ex. 69 (letter of intention from CRC to AIT board indicating that AIT shall not "issue shares or options other than under the 2009 Equity Incentive Plan"); 3 Tr. at 336.

19.     On or around March 14, 2011, AIT signed a Secured Promissory Note ("Promissory Note"), whereby Castel lent AIT $250,000. The Promissory Note allowed Castel to perfect its security interest by filing the requisite financial statement(s) in any Uniform Commercial Code jurisdiction, but Castel did not do so. Thus, Castel's loan was unsecured.[3] See AF ¶ (g);

---

[3] As a result, Castel's security interest would generally be considered subordinate to a perfected security interest in bankruptcy proceedings. See U.C.C. § 9-322.

Exs. 4, 59; 2 Tr. at 124-25.

20.     On or around June 22, 2011, AIT signed a promissory note with Pharos providing for a total loan of $200,000. See Ex. 90 (Amended and Restated Note Purchase, Guaranty and Security Agreement between AIT, Aurora Breast MRI, LLC (an AIT affiliate), and Pharos, dated August 19, 2014) (summarizing promissory notes between AIT and Pharos).

21.     AIT was expected to provide audited financial statements to its shareholders. However, after 2010, AIT stopped auditing its financial statements. Cheng made this decision because AIT had limited resources and because the auditing process was expensive (costing at least $100,000). In addition, there was concern that auditors might place a "going concern" qualification on AIT's audited financial statements. This qualification signals that a company will likely go out of business within the next year, which would have made it difficult for AIT to raise additional funding, particularly from outside investors. See 3 Tr. at 229-32; 6 Tr. at 28-29, 78-81.

22.     In spring of 2012, CRC terminated the agreement and withdrew from the transaction. Because AIT had been prevented from raising equity capital during negotiations, and because the deal had fallen through, AIT faced financial difficulty and struggled to raise new money. Moreover, by this time, there were no substantial sales of MRI machines, and the company's main revenue was coming from its service contracts. The service contract revenue was also declining because the installed base shrank as the machines became older and were taken offline or removed. The lack of revenue affected AIT's ability to market the systems, maintain good equipment, or offer "major upgrades." See SF ¶ (c); 3 Tr. at 336-37; 5 Tr. at 572-73; 6 Tr. at 21; Kovalkova Depo. at 78-79.

23.     Further, there was contention between Cheng and other board members, especially those from AIT's large shareholders (including Pharos),

7

who were disappointed that the deal had fallen through. Cheng "couldn't withstand [that] pressure" and resigned. See 3 Tr. at 234-35; 6 Tr. at 19; see also 5 Tr. at 574 (Wilson testifying that he thought Cheng's resignation was voluntary but was the result of pressure from the board).

24.     After 2012, AIT stopped filing its tax returns. According to James, the returns were never prepared because AIT did not have the resources to pay him or other staff to prepare them; AIT's tax situation was complex, and the returns required significant time to prepare. See 6 Tr. at 24-26; see also 5 Tr. at 626-27 (Wilson describing AIT's tax delinquency).

25.     At some point during Cheng's tenure, she also decided not to renew AIT's director and officers' liability insurance policy. See 3 Tr. at 233-34; 5 Tr. at 682-83; see also Ex. 81.

26.     On July 30, 2013, Cheng sent an email to shareholders announcing her resignation. She wrote, "Recently, due to many reasons from global economic recession (more general) and downsizing of US healthcare expenditure (more particular) … to name a few, it has been more and more difficult to grow the company thus affecting a timely and profitable exit for shareholders." She also wrote, "On the forward looking, [AIT's] daily operation is in good hands of capable department heads who we entrust to build our company for years and [AIT] is now in near break-even operation." Cheng testified that by "break-even operation," she meant that AIT was near breaking even in terms of cash flow (i.e., that it would not need to borrow more money from shareholders) and did not mean that the company was on the verge of becoming profitable. See Ex. 88; 3 Tr. at 236-38.

27.     As AIT struggled after the deal with CRC fell through, Pharos continued to make loans to AIT. Between 2011-2014, Pharos loaned AIT over $3 million pursuant to various promissory notes. See Exs. 11, 90.

### 2. Devlin's Tenure as CEO

28.     In 2014, Devlin became AIT's President and CEO. Another Pharos representative, Anna Kovalkova, became the corporate Secretary and Treasurer. <u>See</u> SF ¶ (g); Ex. 89; 5 Tr. at 575; Kovalkova Depo. at 82-83.

29.     Devlin attempted to turn the company around. He recruited Michael Parilla ("Parilla"), an experienced operator and a former AIT sales director, to assist with the turnaround. He planned to revamp AIT's MRI machine and the sales process and looked for opportunities to sell the machines outside of the United States. He planned to update the software and graphic user interface technology for AIT's products and to enter into a distribution agreement with a partner that could help market and distribute the technology. Devlin's efforts were unsuccessful. He was unable to raise any money or find a distribution partner. At this point, AIT's competitors were offering superior products with better pricing, and turning around AIT would have "required a big overhaul" of AIT's technology, which AIT could not afford. <u>See</u> Ex. 96; 5 Tr. at 575-76; Kovalkova Depo. at 94-97, 100-05.

30.     In August 2014, Devlin contacted a representative at Castel, Marco Caneva, and offered to discuss Castel investing additional money in AIT. Specifically, Devlin referenced "documents" suggesting that Pharos would be "putting in money and taking control over [the] management and board" and said that he "would be open to [Castel] putting in $$ [money] on these terms," and said they could discuss this further in September. Malacalza testified that Castel never invested more money in AIT after its 2011 Promissory Note because AIT never issued additional shares or asked Castel for another loan. <u>See</u> Ex. 91; 2 Tr. at 136-37.

31.     In or around March 2015, Devlin and Kovalkova resigned. Kovalkova believed at that time that AIT was a going concern. <u>See</u> Ex. 54;

Kovalkova Depo. 97-99, 106-11.[4]

### 3.   Wilson's Appointment and Tenure as CEO

32.   In or around May 2015, AIT's executive officers and all other members of the board of directors resigned, except Wilson. Before their resignation, the AIT board of directors appointed Wilson as the interim President and CEO.[5] Wilson had volunteered for this position. His "mandate" was to file for bankruptcy and liquidate AIT. The board voted that Wilson be paid $250,000 for this work. Based on Devlin's recommendation, AIT retained Sevens & Lee to prepare a draft voluntary Chapter 7 bankruptcy petition and retained Lain Faulkner & Co. to assess what money AIT could receive if it liquidated its assets. See SF ¶¶ (h), (i); Ex. 97; 4 Tr. at 459-62; 5 Tr. at 599-601.

33.   Wilson was AIT's CEO from May 2015 until his resignation in June 2020. He operated AIT from California during his tenure as CEO. He was the sole officer and director of AIT while he was CEO. After Wilson became CEO, he initially believed that "there was still a way to salvage the company" and "turn it around" by raising new money, negotiating with creditors, and restarting the technology. See SF ¶¶ (u), (v), (w); 4 Tr. at 459-60.

34.   On May 15, 2015, Pharos entered into a Forbearance Agreement with AIT. Wilson signed the Forbearance Agreement as a director of AIT. Under this agreement, Pharos agreed to refrain from exercising its rights to collect on its prior loans to AIT until June 5, 2015. Additionally, Pharos

---

[4] Malacalza testified that Castel was aware of Devlin's resignation and believed Devlin resigned due to AIT's lack of director and officer insurance. No one from Castel reached out to Devlin directly after his resignation to obtain additional information about AIT's financial situation. According to Malacalza, Castel does not "have preferred discussions or communications with the CEO"; rather, he believes it was Devlin's responsibility as CEO to describe the health of the company. See 2 Tr. at 151-52.

[5] Wilson was a director at AIT from 2012 to 2020. See 4 Tr. at 453, 459.

agreed to lend AIT an additional $200,000 to fund its ordinary expenses and to cover the costs of bankruptcy counsel and a receiver. With this, Pharos held a total senior secured debt of $3.3 million (the "Pharos Senior Secured Debt" or the "Pharos Position"). <u>See</u> Ex. 93; 5 Tr. at 588-89; <u>see also</u> Ex. 11 (clarifying amended loan amount of $200,000).

35.    At some point after Wilson became CEO, he received a report prepared by Parilla outlining the company's financial position. According to the report, AIT and its subsidiaries had over $20 million in debt. Wilson testified that the company was insolvent because it had liabilities in excess of its assets and was unable to pay its debts as they came due. Wilson also recalled that there had been five lawsuits filed against AIT, one of which had resulted in a judgment against AIT. By summer or fall of 2015, Wilson concluded that it would be difficult to "save" AIT. <u>See</u> Exs. 92, 94; 4 Tr. at 460; 5 Tr. at 578-86, 598-99.

36.    After that point, Wilson and Parrilla tried to sell the company or its assets. Wilson cold-called venture capital firms to see if they were interested, and Parrilla contacted his colleagues from the MRI industry. Wilson testified that he did not believe that bankruptcy and liquidation was in AIT's best interest because any value obtained from the company's assets would go first to a bankruptcy trustee, then to priority claims such as employment and taxes, and the remaining funds would go to the senior creditor (Pharos). Thus, there would be nothing left for shareholders or unsecured creditors. <u>See</u> 4 Tr. at 459; 5 Tr. at 601-07.

37.    On June 18, 2015, Wilson sent a letter to AIT's shareholders informing them of the company's condition. In that letter, Wilson advised shareholders that: the other board members had resigned, leaving Wilson as the sole director; AIT was down to 25 employees, many of whom were part time; AIT had not sold a new MRI unit since August 2013, and many of the

MRI centers in which it had an ownership were closing; AIT's revenue had not been sufficient to sustain research and development efforts, maintain a sales team, or perform fundamental business activities (including the preparation of financial statements); AIT had approximately $20.46 million in liabilities, most of which were past due or in default; AIT had already been sued by five creditors, three of which had obtained judgments against the company; and AIT's assets were insufficient to pay its liabilities and its monthly revenue was insufficient to pay its debts as they become due. See Ex. 54.

38.   Wilson explained in the letter that AIT's "senior secured creditor [Pharos] has indicated that it believes liquidation is the only option available and loaned additional cash to further the liquidation efforts," and that based on current analysis, upon liquidation of AIT, "the amount available for distribution to the creditors would not be sufficient to repay the senior secured loan. As a result, all other creditors would receive no repayment of any portion of their debt. Of course, shareholders would likewise receive no distributions and the shares of [AIT's] common and preferred stock would be worthless." Wilson also explained that to date, AIT had not decided to file for bankruptcy, "believing that we could wind down the affairs of [AIT] less expensively on an informal basis," but warned shareholders that "at any point" AIT might file a voluntary petition or be forced into federal bankruptcy court through an involuntary petition. He concluded by saying, "Mike [Parilla] and I continue to explore last minute efforts to sell all or any portion of [AIT's] business and assets. We believe that there is value in [AIT's] intellectual property and service business, but to date we have been unable to identify interested purchasers." Id.

39.   Wilson resigned as CEO of AIT on June 1, 2020, via a letter to Defendants' counsel. See Ex. 120; 5 Tr. at 553-54.

**C.    Cheng's Decision to "Rescue" AIT and Initial Outreach to Shareholders**

40.    After Cheng received Wilson's letter to shareholders in June 2015, she replied to him via email saying, "We deeply appreciate the updates albeit it is heart aching to know the company is in such dire situation." She then spoke with Wilson on the phone and asked him for "his patience to help rescue this technology." See Ex. 95; 3 Tr. at 346; see also 4 Tr. at 465 (Wilson testifying that Cheng was distressed and wanted to find a way to save AIT technology).

41.    After that call, Cheng spoke with Dr. Wang, who had contacted Cheng after receiving Wilson's letter and asked if she would consider returning as AIT's CEO. Cheng believed, based on her conversation with Dr. Wang, that AIT's shareholders still cared about "the technology and its future," so she began contacting shareholders that she believed had a "capacity or willingness to chip in." However, according to Cheng, "none of them said that [they had] additional money to put in" to AIT. See Ex. 95; 3 Tr. at 347-48, 353.

42.    As part of her efforts to contact shareholders, Cheng had a call with Davide, Mattia, and Marco Malacalza from Castel on or around August 31, 2015.[6] Like her communications with other shareholders, Cheng discussed the possibility of saving AIT's technology and finding a way to ensure a return on shareholders' investments. She followed up after the call via email and wrote, "Please ponder about this and as I stated, [AIT's] technology has made [a] contribution to the world and it would be a shame to end in such [a] tragic way." Cheng recalled that Davide had told her when they spoke that he would think about it, but he never followed up with her in response to this discussion. See Exs. 61, 99; 3 Tr. at 349-53.

---

[6] On that date, Cheng forwarded them Wilson's June 18 letter; Cheng testified that they told her they had not received the letter. See Ex. 61; see also 2 Tr. at 144 (Malacalza confirming that Castel received letter).

43.    In addition to reaching out to shareholders, Cheng also attempted to raise "new" money to help AIT. Cheng and Wilson traveled to Taiwan to speak with potential strategic partners from the medical technology industry. According to Cheng, these companies expressed interest but ultimately declined to invest because they were concerned, based on Wilson's June 2015 letter to shareholders, that AIT would file for bankruptcy. See 3 Tr. at 354.

44.    At some point before September 2015, Cheng transitioned from attempting to raise money for AIT to attempting to purchase its assets (i.e., the Transaction). Wilson supported this approach because he believed selling AIT's assets was in the best interest of the creditors because it was "the only way" that creditors other than Pharos (or whoever held the Pharos Senior Secured Debt) could redeem anything for their investments in AIT. See 4 Tr. at 476; 5 Tr. at 601-03, 648-49.

**D.    The Formation of ARF**

45.    On September 1, 2015, Cheng formed ARF, which stands for "Aurora Rescue Fund." James assisted with ARF's formation and was listed as the Resident Agent for ARF. At the time of formation, Cheng was the sole owner and manager of ARF. Later, additional investors were added as members of ARF and Cheng's ownership interest decreased to less than 20 percent. Cheng continues to be ARF's managing member. See SF ¶ (n); Ex. 15; 3 Tr. at 243-45, 357-58; 6 Tr. at 70-71.

46.    At some point, Cheng prepared a document outlining ARF's purpose and next steps. Cheng testified that this document was her "wish list" and plan outline, which she would use to speak to potential participants, investors, or strategic partners. She believed she would need to raise at least $10 million for this plan to succeed. See Ex. 43; 3 Tr. at 359-64.

47.    According to this document, ARF had a total capital amount of $1.5 million, which it would loan to AIT for purposes of settling debts with

AIT's creditors and supplementing AIT's working capital. From there, ARF would purchase AIT's assets for $15 million, establish a manufacturing facility in China to produce MRI systems, expand sales in Asia, and maintain a viable organization in the United States to service the existing client base and operate the clinics that AIT owned. See Ex. 43.

48.    The plan document notes that ARF was formed "by BE Pacific ('BE') as its Managing Member ('MM'). BE is a Taiwanese firm that is retained by [AIT] as its Financial Advisor (FA) to help [AIT] realize the plan of Transition." Cheng's testified that in writing this, she meant that she would rely on a representative of BE Pacific named Lucy Chang ("Chang"), who is Cheng's childhood friend and who is "very connected in the financial world of Asia, especially Taiwan," to introduce Cheng to potential investors. See Ex. 43; 3 Tr. at 215, 360-63.[7]

49.    Wilson knew about ARF before its formation and planned to use its loan to negotiate settlements with creditors. Cheng testified that she believed it was necessary for AIT to settle its debts with creditors because investors told her that they were unwilling to invest otherwise. Wilson and Cheng wanted to redeem Pharos's debt position because they were concerned that, since the forbearance period under the Forbearance Agreement had ended, Pharos could force AIT into bankruptcy by foreclosing on its secured debt. Although Pharos had never made any representations that it intended to foreclose and force AIT into bankruptcy, Wilson and Cheng wanted to eliminate Pharos's ability to do so. See 3 Tr. at 226-28, 362; 4 Tr. at 466-68;

---

[7] Cheng does not have an ownership interest in BE Pacific. Separately, Cheng and Chang are also 50/50 owners of an entity called BE Capital Partners USA, LLC ("BE Capital"). See 3 Tr. at 215-16, 218, 4 Tr. at 438.

5 Tr. at 608-09.[8]

50.     On July 30, 2015, Wilson sent a letter to Kneeland Youngblood, a Pharos executive, explaining that AIT was prepared to file for Chapter 7 bankruptcy but that Wilson believed he could attract investors and lenders to purchase AIT's assets if existing creditors settled their claims for reasonable amounts. Wilson offered to repay $500,000 for the Pharos's debt and equity interests in AIT (collectively the "Pharos Interest") and a release of claims. Wilson noted that he believed $500,000 was approximately what Pharos could expect to receive in bankruptcy. Youngblood declined the offer and indicated that Pharos would not accept less than $1 million. See Exs. 42, 98.

51.     Before Wilson sent the Youngblood letter, he sent a draft to Cheng for review. Wilson accepted Cheng's suggestions to revise the letter to talk about Pharos's "potential lender liability" and considered adding a deadline on the offer. See 4 at Tr. at 379, 470-73; see also 3 Tr. at 250-51 (Cheng testifying that she and Wilson worked together to "talk to Pharos" about redeeming the Pharos Interest).

**E.    Wilson's Initial Communications with Castel Re: Debt Settlement**

52.     On September 4, 2015, a few days after Cheng's call with Castel representatives, Castel's counsel, Antonio Valla ("Valla"), contacted Wilson via email regarding Wilson's June 2015 letter to AIT's shareholders. Valla noted that Castel had not received the letter until recently and asked to speak with Wilson. The two had a call at some point between September 4 and 10, 2015. Wilson wrote to Valla on September 10, attaching a draft bankruptcy

---

[8] The plan document indicated that "Wilson, on behalf of [AIT] as its Chairman and CEO, successfully negotiated with Pharos that with $600,000 . . . Pharos will transfer" its debt and equity interests. However, Wilson testified that this did not happen as Cheng wrote. See Ex. 43; 4 Tr. at 486.

petition for AIT. He told Valla that, according to AIT's attorneys and liquidation advisor, "in the event of bankruptcy the [AIT] payment of the trustee's fees, the secured creditor (Pharos) would receive several hundred thousand dollars and the remaining creditors would receive nothing. Of course, the shareholders would also receive nothing." He then offered to redeem Castel's Promissory Note and capital stock for $40,000, noting that this was "more than we have offered to most other unsecured creditors." See Ex. 55; see also 5 Tr. at 610 (Wilson describing discussions with Valla, noting that "every one of the creditors [he] talked to was unhappy about taking a settlement, so it was nothing unusual").

53.     Valla wrote back the same day asking, "Preliminarily, I would need to know what the waterfall would look like. What would Pharos get? What about other creditors? Further, who would the buyer be of the service business? Is the potential buyer related to any shareholders or creditors?" Ex. 55 at 2 (emphasis added).

54.     Wilson responded the same day saying, in relevant part, "The proposal is that a fund is formed to invest up to $1.0 million in [AIT] on the condition that we have settlement with all of the major creditors." Although Wilson was aware of ARF's formation and of Cheng's role in ARF at this point, Wilson did not identify ARF or Cheng's involvement in response to Valla's question. Instead, Wilson wrote, "The fund is not related to Aurora and the funds are coming from a group of investors in Taiwan and China. They are the potential buyers." He then offered to "pay Castel a little more if and when that sale occurs. Perhaps as much as another $25,000." See Ex. 55 at 1; 4 Tr. at 473-77; 5 Tr. at 688-90; see also 2 Tr. at 171 (Malacalza confirming that he knew from this email that buyer was a fund that was being formed). Wilson testified that he did not name the fund in this email because he did not "think it would have meant anything to anybody" because it was a "newly

formed fund." 4 Tr. at 475-76.

**F.**    **ARF's Acquisition of the Pharos Interest**

55.    At some point after Wilson's July 2015 exchange with Pharos in which Pharos rejected AIT's offer to redeem the Pharos Interest, Wilson and Cheng determined that Cheng would pursue the Pharos Interest instead. Wilson believed that Cheng would have better luck acquiring this as a third party, especially in light of advice he had received from AIT's bankruptcy counsel. Counsel had advised Wilson that AIT could not offer Pharos more than it would receive in bankruptcy (estimated as $600,000) or else the settlement could be deemed an improper preference and could be unwound; thus, AIT could not offer Pharos the $1 million it had requested. See 3 Tr. at 246-48; 4 Tr. at 467-68; 5 Tr. at 603; see also 4 Tr. at 379-80 (Cheng explaining that Pharos executives were more willing to sell the Pharos Interest to a third party because it would reduce their liability).

56.    According to Wilson, once Cheng began negotiating directly with Pharos, he was not involved in the negotiations. However, Cheng testified that Wilson and Cheng worked together to negotiate the price down. The degree of Wilson's involvement in these negotiations is unclear. See 4 Tr. at 421-22, 467-69; see also id. at 472-73 (Wilson confirming that he and Cheng were collaborating in connection with ARF's acquisition of Pharos Interest).

57.    In any event, Cheng was able to negotiate ARF's purchase price of the Pharos Interest down to $425,000. She testified that she was able to obtain a much lower price than Pharos had previously demanded because she has a good rapport with a senior executive at Pharos named Bob Crants. At Cheng's request, on October 19, 2015, Wilson communicated ARF's final offer of $425,000 to Pharos on Cheng's behalf while she was traveling internationally. After Wilson communicated this offer to Pharos's counsel, Pharos representatives corresponded internally and ultimately accepted the offer. See

Ex. 101; 4 Tr. at 378-82, 466-69.[9]

58.    Although Pharos and Castel had purchased AIT stock around the same time, and although Pharos and Castel had been in direct contact at least occasionally between 2011-2014, Pharos did not inform Castel that it had sold the Pharos Interest. AIT and ARF also did not inform Castel of the transaction; Castel did not become familiar with ARF until this litigation. See Exs. 71, 87, 91; 1 Tr. at 56; 2 Tr. at 150-51, 180.

59.    On or around November 25, 2015, ARF and Pharos entered into a Stock and Note Purchase Agreement and Assignment of Amended and Restated Note Purchase, Guaranty and Security Agreement (the ("Stock and Note Purchase Agreement"), whereby Pharos assigned the Pharos Interest to ARF. See SF ¶ (k); Ex. 11.[10]

60.    On or around November 25, 2015, Pharos, AIT, and ARF entered into a Novation Agreement. Under this Agreement, AIT acknowledged Pharos's transfer of the Pharos Interest to ARF, and the parties agreed to novate the Amended and Restated Note Purchase, Guaranty and Security Agreement such that Pharos was released from all obligations and liabilities

---

[9] Kovalkova testified during her deposition that by the time Devlin left AIT, Pharos had already determined that AIT was in a difficult financial situation, was beyond Pharos's ability to fund, and would require significant resources to "have a shot at a turnaround." Thus, Pharos had decided to "see what [it could] get as the best price to ultimately exit and sell all of the securities." Kovalkova Depo. at 124-26.

[10] In a section of the Stock and Note Purchase Agreement titled "Notices," the agreement provides for copies of all notices to be sent to Pharos, Pharos's counsel (Duane Morris), ARF, and Wilson. The section is structured such that Wilson appears to be listed as ARF's counsel. Wilson denied acting as ARF's counsel and testified that his contact information was likely listed in the Agreement because the transfer of Pharos's assets to ARF required AIT's consent. See Ex. 11; 4 Tr. at 457-58.

and ARF assumed all obligations and liabilities under that contract. The Novation Agreement does not specifically reference the Stockholders Agreement between Pharos and Castel. However, it does provide, "This Agreement shall constitute all actions, confirmations, consents and undertakings required from Transferor, Counterparty and Transferee under the Contract to give effect to the novation and transfer of Transferor's rights under the Contract and from the date hereof and on the terms hereof." See SF ¶ (j); Ex. 12 § 4(a).

61.     On or around the same date, Pharos, AIT, and Aurora Breast MRI, LLC, entered into a Settlement Agreement and Release of Claims (the "Settlement Agreement"). By and through the Settlement Agreement, AIT consented to the sale of the Pharos Interest pursuant to the Stock and Note Purchase Agreement. See SF ¶ (l); Ex. 13.

62.     On or around the same date, AIT entered into a Loan Agreement with ARF. The Loan Agreement provided that ARF would loan up to $1.5 million to AIT for the purpose of settling with creditors, subject to various funding conditions. AIT was to repay the loan by November 19, 2016, or by the date that AIT closed the sale of all or substantially all of its assets. In 2015-2016, AIT borrowed approximately $1.2 million from ARF. See Ex. 56; 5 Tr. at 669.

63.     The agreement also gave ARF an option to purchase all of AIT's assets for an amount between $10-15 million. Cheng testified that the plan originally was for ARF to purchase AIT's assets, and that this amount was what Cheng "hope[d]" AIT's assets were worth. The Loan Agreement also required AIT to "obtain irrevocable shareholder resolutions or other written authorization which approves or permits ARF or its nominee to acquire all of AIT's asset pursuant to the Option," but Wilson did not ever seek shareholder approval for ARF to exercise the Option. See Ex. 56; 3 Tr. at 256; 4 Tr. at 482.

**G.**   **Negotiation of the Transaction**

64.   After ARF issued its line of credit to AIT, Cheng attempted to raise more money to loan AIT. However, her efforts were unsuccessful; she believes this was because new investors were unwilling to put money into AIT when they saw how much debt was on its books. However, she found investors from the technology industry who were interested in getting into the medical field and were "willing to start from a clean slate." Cheng therefore decided to form a new entity with that group of investors and negotiate for the purchase of AIT's assets. By the end of 2016, Cheng had commitments of $8.5 to $9 million from this new investor group. See 4 Tr. at 386-89; see also 3 Tr. at 356-57 (Cheng explaining that she was willing to work within structure of AIT to turn company around but found new investors were not).

65.   Based on advice by an attorney in Taiwan, Cheng and the group of investors initially formed a Cayman Islands company, Aurora Healthcare SPC ("Aurora SPC"), to host the assets. The same attorney prepared an early draft of the Asset Purchase Agreement (the "Aurora SPC APA"). See 3 Tr. at 273-74; 3 at Tr. at 393; Ex. 24.

66.   Cheng, on behalf of Aurora SPC, negotiated the terms of the Transaction with Wilson. Cheng advocated for terms more favorable to herself and the other investors in Aurora SPC, including an offset from the total purchase price to account the Pharos Senior Secured Debt held by ARF. Wilson did not accept all of Cheng's terms, but he felt he was "walking kind of a fine line" because she, through ARF, held the Pharos Senior Secured Debt and "reminded [him] that she could simply exercise all the rights as" the holder of this debt. Wilson "pushed back, but [he] couldn't push back so hard that [Cheng] took her ball and went home." He was concerned that the other investors in Aurora SPC might tell Cheng to foreclose on AIT's assets instead.

See Exs. 23-26; 4 Tr. at 507, 513; 5 Tr. at 616-17.[11]

67.    Cheng and Chang's entity, BE Capital, had acted as a broker to procure the ARF loan to AIT. According to Cheng, BE Capital "was the one that [was] responsible for raising all the money" used to facilitate the Transaction. Wilson testified that BE Capital was contractually entitled to a commission on the ARF loan, as well as a commission on the cash received at the closing of the Transaction. See Exs. 14, 29; 3 Tr. at 216, 304-05; 4 Tr. at 506-07, 512; 5 Tr. at 687-88.

68.    By early October 2016, AIT and Aurora SPC had reached an agreement in principle on the sale of AIT's assets for a total purchase price of $8.5 million. Cheng felt this "wasn't [the] best price" given AIT's "distressed situation" but was willing to accept this price in order "to save the technology and satisfy the creditors, as much as we can." While the purchase price remained the same, AIT (Wilson) and Aurora Healthcare SPC (Cheng) continued to negotiate the terms or payment—in particular, they negotiated the total amount of cash due at closing and the amount of the purchase price that would be offset in exchange for waiver of ARF's rights in connection with the Pharos Senior Secured Debt and its loan to AIT. See Ex. 26; 4 Tr. at 399-402, 513; 5 Tr. at 618-20.[12]

69.    Later, on November 4, 2016, Cheng and the investors at Aurora SPC reincorporated as Aurora Healthcare US Corp., a Massachusetts

---

[11] Early in the negotiations, Cheng proposed a total purchase price of $12 million, paid in installments over several years. See Ex. 24. Wilson testified that he felt AIT could not agree to this because "we would never get creditors to agree to long term installment payments." He believed creditors would prefer to receive payment immediately even if it meant they had to "take a haircut." See 5 Tr. at 624-25.

[12] During negotiations, AIT did not receive any other offer for the purchase of its assets. See Exs. 5, 37; 5 Tr. at 624.

corporation ("AHC"). Cheng testified that she and the investors did this because it was easier to be a U.S. corporation than a foreign corporation for purposes of financial bookkeeping and reporting on U.S. operations. AHC became the actual buyer of AIT's assets. Cheng was and is the CEO of AHC. See SF ¶¶ (m), (r), (s); 3 Tr. at 273-74; 4 Tr. at 375, 403-04.[13]

70.     Wilson and Cheng both engaged James as a consultant in the time leading up to the Transaction. Wilson, via AIT, retained James at some point during the summer of 2015 to help review AIT's consolidated financial statements and help the company catch up on tax compliance.[14] Sometime in late 2015, Cheng, through ARF, retained James to assist with ARF's formation and to provide limited accounting and tax services. In October or November 2016, Cheng also retained James to provide accounting and advisor services to AHC "that a CFO would typically do for a company," including helping set up the books, getting a federal ID number, and filing with the Massachusetts secretary of state. Cheng considered James her "right-hand man" because of his knowledge and experience as a CPA and as AIT's former CFO. Cheng also knew when she retained James that he was working for AIT. See Ex. 20; 3 Tr. at 242, 320-21; 4 Tr. at 429; 5 Tr. at 626-27; 6 Tr. at 23-24, 30, 70-74, 83.

71.     On September 23, 2016, while the Transaction negotiations were ongoing, Wilson emailed Cheng the following message: "Olivia, one question. When we first discussed the transaction, you planned to grant some of ARF's interest to management, including me. Is that still the plan?" Cheng responded,

---

[13] Cheng and her husband are also minority owners of AHC. See Dkt. 210, Declaration of Olivia Ho Cheng ¶ 16.

[14] James agreed to work for AIT even though he had a pending employment claim. James testified that he felt by then that the claim could be resolved. See 6 Tr. at 58-59; see also Ex. 113C (settlement agreement).

"It is still the plan[.]" Ex. 22.

72.    Cheng provided various explanations as to what "the plan" referenced in this email was. During her deposition in September 2021, Cheng testified that there was a plan to give Wilson an interest in ARF, and thereby an interest in AHC, but that Wilson had declined to do so because he thought it may be a conflict of interest. During trial, Cheng testified that she wanted him to work as her attorney in the future. When asked if she was planning to "give [Wilson] a piece of this transaction somehow," Cheng replied that she "had such gratitude for him that we will be willing to do something." She later testified that the "plan" was to include Wilson as part of the management team as legal counsel sometime in the future and grant him stock options.[15] See Dkt. 218, Deposition of Olivia Ho Cheng (ARF Representative) ("ARF Depo. Tr.") at 77-79; 3 Tr. at 294-97; 4 Tr. at 389-91.

73.    Wilson testified that the "plan" referenced in the email was that he would become general counsel of the buyer entity after the Transaction closed. He explained that he declined this offer because he felt it would "look funny to have an agreement with the buyer while [he] was still representing AIT[.]" He denied working for ARF or AHC after the Transaction closed. See 5 Tr. at 673-75.

74.    After AIT and Aurora SPC had reached an agreement in principle on the Transaction, Wilson decided to seek an appraisal of AIT. Wilson considered this valuation akin to a fairness opinion; he wanted to confirm that the agreed purchase price was fair. Wilson consulted James, and James suggested retaining Orchard Partners to perform the valuation because it had performed financial services for AIT in the past. Wilson agreed, and AIT hired

---

[15] When asked to reconcile her trial testimony with her prior deposition testimony, Cheng's explanation was equivocal as to whether she had offered Wilson an interest in ARF or AHC. See 4 Tr. at 424-27.

Orchard Partners and paid it $7,000 to perform the appraisal. James assisted with providing relevant information to Orchard Partners from AIT. <u>See</u> Exs. 32, 109, 110; 4 Tr. at 529-32; 5 Tr. at 623-28; 6 Tr. at 32-34; <u>see also</u> 3 Tr. at 270-72 (Cheng testifying that appraisal was used to support negotiated Transaction price).

75.     Apart from confirming that the buyer would be able to pay at closing, Wilson performed minimal due diligence on AHC. He testified that he did not care who the buyer was as long as they paid cash at closing. <u>See</u> 4 Tr. at 522, 526.

76.     Based on the agreement in principle between AIT and Aurora SPC, Wilson believed AIT would receive about $4.5 million in cash at closing. Proceeding under that assumption, Wilson assessed how to distribute these funds to AIT's creditors. He calculated what cash would be left over after paying creditors who had entered into settlement agreements and after paying AIT's trade payables. From there, he divided creditors based on how he believed they would be classified in bankruptcy proceedings and attempted to treat creditors in each class "approximately equal" to one another. Based on this assessment, he determined that Castel and certain other unsecured creditors should receive 40% of the principal amount of their loans to AIT. <u>See</u> 5 Tr. at 629-33.

**H.     <u>Wilson's Representations to Castel Re: Transaction</u>**

77.     Beginning in or around mid-October 2016, Wilson began the process of collecting AIT shareholder consents for the Transaction. <u>See</u> Exs. 5, 37; 5 Tr. at 633.

78.     On October 20, 2016, Wilson contacted Valla via email and provided a settlement offer for Castel's Promissory Note. He wrote in his message:

[AIT] has struggled to avoid bankruptcy but is now at the point

25

> where we must either sell the company or file for bankruptcy. We
> have received only one offer to purchase the assets of the business
> for $8,500,000, which we are going to accept, subject to the approval
> of shareholders. The purchase price is insufficient to pay the existing
> debts of [AIT]. As a result, the proceeds of the sale will be
> distributed pro rata to all debtors, subject to their signing a
> settlement agreement and mutual release. The distribution rate for
> all unsecured creditors is exactly 40% of the original principal
> amount of each obligation. Castel loaned [AIT] $250,000. As a
> result, we are able to pay $100,000 to Castel to settle this debt.

Wilson explained that if Castel did not accept this settlement amount, then "that $100,000 will be allocated among the other creditors and Castel can feel free to pursue its claims against Aurora. However, we anticipate dissolving the company shortly after distributing the cash." Ex. 5 at 1.

79.    Wilson attached three documents to this message. First, he attached an Action by Written Consent and consent forms for each AIT shareholder. The document identified the buyer as "Aurora Healthcare SPC, a Cayman Islands company limited by shares and registered as a segregated portfolio company" and indicated that the purchase price would be $8.5 million. It included a clause that AIT's officers would execute the APA "with such modifications or amendments made thereto as may be approved" by AIT's officer(s). Wilson described this as a "boilerplate clause that . . . corporate attorneys put in their consents, recognizing that documents change near the closing." See Ex. 5 at 4-8; 5 Tr. at 634-35.[16]

80.    Second, Wilson attached a draft of the Aurora SPC APA. The draft Aurora SPC APA identified Cheng as the chairperson of Aurora SPC. See id. at 50. The draft APA provided for a sale price of $8.5 million, broken

---

[16] The attached consent forms included forms corresponding with the Series C and D stock that ARF had acquired from Pharos. However, those consent forms continued to refer to Pharos as the owner of those shares. See Ex. 5 at 26-27.

down into three payment categories: an amount that would offset the Pharos Senior Secured Debt; an amount payable in cash at closing, and an amount paid to an assignee(s) of AIT in Chinese Yuan and delivered in China. The amounts for each category were left blank; Wilson testified that this was because negotiation of these terms was ongoing. See Ex. 5 at 40; 5 Tr. at 636.

81.     Third, Wilson attached a list of his estimates for how the proceeds from the Transaction would be distributed. The list indicated that AIT would have $8,590,000 available at closing and that creditors would be paid as follows:

| Pharos Senior Secured Notes | $ (3,000,000) |
| ARF Loan Repayment and sales commission | $ (1,300,000) |
| Chia Pei and Janan | $ (2,250,000) |
| Ken and Olivia Cheng | $ (120,000) |
| King and Joy Wong | $ (320,000) |
| Allen Chao | $ (160,000) |
| Castel | $ (100,000) |
| Pharos Unsecured Loans | $ (700,000) |

Ex. 5 at 51.

82.     On October 26, 2016, Castel contacted Wilson directly to follow up on the message sent to its counsel. Castel wrote, in relevant part:

> We received and reviewed the email and attachments with the final request you sent to Mr. Antonio Valla on October 20, 2016. We note that your email does not contain the material information reasonably necessary for Castel to make an informed decision with regard to your request and, in any case, to make an informed decision in order "to pursue its (Castel's) claims against [AIT]". Castel is entitled to receive any and all material information with respect to your proposed transaction that a reasonable person would want to have in order to make a rational decision. This includes both financial and non-financial information, as well as information regarding the proposed buyer of Aurora's business.

Ex. 6 at 1.

83.     Wilson replied the same day saying:

> Sirs, I am happy to provide any information you want to receive. I have attached unaudited financial statements for the past five years as well as a list of the payments expected to be made promptly after closing. As you will see from the financials, [AIT] currently has liabilities far in excess of its current assets. We had negotiated forbearance agreements with creditors holding more than $12,000,000 of past due loans, but the forbearance period ended in September. As [a] result such creditors could commence immediate foreclosure proceedings. The current owner of the senior secured debt originally issued to Pharos could have acquired all of the asset of the company by commencing legal proceedings, which would have left nothing for any of the unsecured creditors. While the current offer is less than we hoped, it is the only offer we have that returns any amounts to the unsecured creditors.

> If you have specific documentation you would like to see, please let me know. We can also make all of the company records available to you at the company offices in Danvers, Massachusetts.

Apart from referencing a "current owner" of the Pharos Senior Secured Debt and including a line labeled "ARF Loan Repayment and sales commission," in an attachment, Wilson did not explain that ARF (headed by Cheng) had acquired Pharos's debt position. He also did not provide any information about the buyer or its relationship to ARF or Cheng. See Ex. 6.

84.    Wilson attached to his message a document titled "Consolidated Statements of Operations: Estimated." This document was two pages in length and included certain financial information for AIT for years 2010 through 2015; there was no information included for 2016 such as "step" or "interim" financials. The document indicated that the 2010 financials were audited but that the 2011 through 2015 financials were not. Wilson testified that these were the only financial statements that he had available (apart from "reams and boxes" of more detailed financial information in storage in Massachusetts). See

28

Ex. 6 at 3-4; 4 Tr. at 514-16.[17]

85.     Like in Wilson's message to Valla on October 20, 2016, Wilson attached a list of his estimates for how the proceeds from the Transaction would be distributed. The list was the same as the one Wilson sent previously, except that the line in the previous versions that said "ARF Loan Repayment and sales commission / $(1,300,000)" was now broken into two lines: $800,000 for "Sales Commission" and $500,000 for "ARF Loan Repayment." Ex. 6 at 5.

86.     Wilson testified that he did not take issue with the nature of Castel's request but took issue with the scope of their request because "financial and nonfinancial information is all-inclusive" and because Castel had not narrowed down its request. Malacalza testified that Castel would have expected to receive AIT's audited financial statements and financial information about the buyer in response to its request. See 1 Tr. at 79-80; 5 Tr. at 640-44.

87.     Castel was not satisfied with the information Wilson provided; it felt that the information provided was inadequate to allow Castel to make an informed decision in connection with the Transaction and in connection with AIT's settlement offer. Castel questioned the accuracy of the unaudited financial information and Castel had never heard of the buyer indicated in the draft APA (Aurora SPC). Castel also felt it did not have sufficient information to understand the breakdown of the payment of proceeds. In particular, the

---

[17] The document showed that AIT had generated a profit in 2015. See Ex. 6 at 3. However, Wilson explained that this "profit" was the result of debt forgiveness in the form of settlements that he had negotiated using funds loaned by ARF; this debt forgiveness was accounted for as income in the financial statement. See 5 Tr. at 595-97, see also 6 Tr. at 66-67 (James confirming the same).

document did not explain who would receive the sales commission, and the documents suggested that Pharos was still the owner of its debt position. However, Castel did not directly respond to Wilson's email. See 1 Tr. at 60-65, 78-80, 93; 2 Tr. at 185-89.

## I.   The Transaction, Its Execution, and Use of Proceeds

88.   Wilson retained his law firm in 2016 to review documents and to gather shareholder consents in connection with the Transaction. Shareholder voting took place between approximately October 1 and November 14, 2016. See 4 Tr. at 455-56; 5 Tr. at 655.[18]

89.   To authorize the sale of AIT's assets to AHC, AIT was required to obtain majority shareholder consent from each of three different groups of shareholders: Series C shareholders, Series D shareholders, and a combined majority from the remaining shareholders. See SF ¶ (o).

90.   Based on the draft APA Wilson sent, the majority of AIT's shareholders consented to the Transaction.[19] Understanding that AIT had obtained the necessary votes, Wilson proceeded to close the Transaction. See Ex. 8; 5 Tr. at 650-65.

91.   Under the Stockholders Agreement, Pharos would have been obligated to "make reasonable efforts to consult with [Castel] before" voting in favor of the Transaction. ARF, with its equity interest in AIT's Series C and Series D stock acquired from Pharos, voted in favor of the transaction, giving

---

[18] Wilson's firm had previously acted as outside counsel for AIT for certain transactions in 2012. See 4 Tr. at 454-55.

[19] The vote breakdown was: 77% for Series B shareholders, 83% for Series C and D shareholders, and a total of 53% for all shareholders. Castel did not vote in favor of the Transaction. See 2 Tr. at 193; 5 Tr. at 654.

AIT the majority votes that it needed in each of those categories.[20] Cheng became aware of the Stockholders Agreement when ARF bought the Pharos Interest. However, ARF did not consult with or otherwise communicate with Castel before voting in favor of the transaction. Cheng testified that she did not believe ARF was obligated to consult with Castel under the Stockholders Agreement because, as she understood it, the purpose of this term was to ensure that Pharos consulted with Castel before purchasing additional Series C stock. See Ex. 2; Ex. 8; 3 Tr. at 260-65.

92.     On October 31, 2016, Wilson and Cheng executed the Aurora SPC APA, providing for the sale and transfer of assets and liabilities of AIT to Aurora SPC for $8.5 million. However, although the Aurora SPC APA was executed, Aurora SPC never actually purchased AIT's assets. See SF ¶ (q); 4 Tr. at 520.

93.     The Aurora SPC APA included the following payment terms:

    3.1     US $4,300,000 of the amount that would otherwise be due and payable to Buyer, as the holder of the senior secured debt of Seller to Pharos Capital Partners, L.P. and its affiliates, shall be cancelled and deemed repaid in full; and

    3.2     US $3,200,000 shall be payable in cash at the Closing; and

    3.3     US $500,000 shall be payable to one or more assignees of Seller within 4 months from the Closing.

    3.4     US $500,000 shall be paid to one or more assignees of Seller in Chinese Yuan and delivered in The People's Republic of China.

Ex. 9 § 3.

94.     On November 10, 2016, after the Aurora SPC APA was executed,

---

[20] Moreover, ARF's shareholder consent forms still referred to Pharos as the owner of ARF's stocks. Cheng signed those consent forms on behalf of ARF Partners LLC. See Ex. 8 at 18-19.

James sent Wilson and Cheng a draft of the appraisal report from Orchard Partners. James explained, "The [first] draft had a value of $4.3M. The problem with this of course is that it suggests that $8.5M is $4.2M too high. Joel [Orchard Partners] and I have been going back and forth on adjustments and changed many of his assumptions and his latest pass came up with a range value of $5.7M to $9.1M with a hard number of $6.6M as his base number." James testified that he provided this draft and information to both Wilson and Cheng because he "believed that both of them would want to know this information." James also testified that he had corrected Orchard Partners's assumptions in order to help obtain a more accurate valuation and that "ideally the valuation would come somewhere . . . in that purchase price area, so that it shows each side negotiated what would be a reasonable price." See Ex. 30; 6 Tr. at 35-38.

95.    On November 11, 2016, Cheng replied, saying "I have reviewed the report more carefully and I think the value is on the low side." She then provided feedback about the assumptions underlying the valuation. James communicated Cheng's feedback to Orchard Partners. See Ex. 31; 4 Tr. at 440-42; 6 Tr. at 38-40.[21]

96.    Orchard Partners finalized its appraisal report on or around November 14, 2016 (with an appraisal date November 3, 2016). The report indicated that the value of the assets to be purchased was between $6,181,000 and $9,652,000. See Ex. 7; 4 Tr. at 529-30; see also SF ¶ (p); Ex. 33 (November 14, 2016, email from James to Cheng and Wilson discussing finalizing report).

97.    At some point in mid-November 2016, Wilson and Cheng executed an Asset Purchase Agreement for the sale and transfer of AIT's assets

---

[21] Cheng did not have any direct communications with Orchard Partners regarding the appraisal. See 4 Tr. at 402-03.

and liabilities to AHC for $8,500,000 (hereinafter referred to as the "Final APA"). The Final APA is backdated to October 31, 2016. Wilson explained that he "wanted to keep that date" the same as in the Aurora SPC APA because the closing had been expected to take place in November and other closing documents were dated on or around November 15, 2016.[22] Although the buyer entity had changed, Wilson did not seek new shareholder approvals of the Transaction. He testified that he did not do so because he believed the change was not material, particularly because (1) both entities were newly formed, had no history of operations and no assets, (2) both entities were managed by the same group of people, and (3) AIT had no ongoing obligations to the buyer after the closing date. See Ex. 10; 4 Tr. at 509-10, 525-26; 5 Tr. at 638-40, 656-57; see also 1 Tr. at 82-83 (Malacalza testifying that Castel did not learn that the true buyer was AHC until this litigation).

98.     The Final APA still provided for a purchase price of $8.5 million but included the following payment terms:

3.1     US $4,000,000 of the amount that would otherwise be due and payable to Buyer, as the holder of the senior secured debt of Seller to Pharos Capital Partners, L.P. and its affiliates, shall be cancelled and deemed repaid in full; and

3.2     US $2,800,000 shall be payable in cash at the Closing; and

3.3     US $500,000 shall be paid to one or more assignees of Seller in Chinese Yuan and delivered in The People's Republic of China.

3.4     US $1,200,000 shall be paid to after AIT obtained DOH approval to transfer ownership of clinics (BBDC, Umass).

Ex. 10 § 3.

99.     The offset amount of $4 million referenced in Section 3.1 of the

---

[22] When asked why he did not date it the day it was actually signed, Wilson responded "[W]e could have. Maybe we should have. I don't really know." 5 Tr. at 656.

Final APA was negotiated based on the following debts owed by AIT: the Pharos Senior Secured Debt; the $1.5 million line of credit made available to AIT by ARF; and a sales commission owed to BE Capital. See 4 Tr. at 450-51, 506-12.

100.   BBDC and UMass, referenced in Section 3.4 of the Final APA, were two clinics owned or partially owned by AIT. By the time of the Transaction, BBDC was AIT's largest single asset. Under the Final APA, AHC would not be required to pay $1.2 million of the $8.5 million purchase price until AIT obtained the necessary approvals from the Massachusetts Department of Health to transfer its ownership interests in the clinics to AHC. Wilson testified that this holdback only affected two of AIT's creditors, Dr. Wang and the Wongs, who agreed to accept less than 40% repayment of their unsecured debt until the approvals came through. The updated payment terms in the Final APA were not disclosed to Castel or other shareholders. See Ex. 10; 3 Tr. at 283-87; 4 Tr. at 527-28, 532-34.; 5 Tr. at 637-38.[23]

101.   On November 15, 2016, AIT, Aurora SPC, ARF, and BE Capital entered into a Waiver, Acknowledgement and Agreement – Buyer Equity Conversion ("Waiver") in connection with the Transaction. Under the terms of the Waiver, (1) ARF agreed to forgive its loan to AIT and waive its rights to collect on the Pharos Senior Secured Debt in exchange for equity in the buyer; and (2) BE Capital agreed to waive its rights to collect on the commission it was owed by AIT in exchange for equity in the buyer.[24] Although the ultimate

---

[23] Even after the Transaction closed, Cheng contacted Wilson asking him to change the payment terms in the Final APA. See Ex. 27. However, no evidence was presented suggesting the payment terms were changed further.

[24] The Waiver indicates that "BE Capital would enter into a settlement agreement under which it would receive $1 million." Ex. 14 at 1. Wilson testified that AIT and BE Capital "kind of had a dispute about how much that

buyer of AIT's assets was AHC, the Waiver defined the buyer as Aurora SPC. Wilson testified that it was necessary to make the Pharos Position "go away" in order for the Transaction to close because the buyer, AHC, did not hold the Pharos Position, and "[n]o buyer is going to buy and leave the senior debt out there hanging over them in default." See SF ¶ (t); Exs. 9, 14; 4 Tr. at 437-38, 535-36; 5 Tr. at 657-62.

102.   On or around November 15, 2016, Wilson signed a Seller's Secretary's Certificate, certifying that AIT had entered into an Asset Purchase Agreement with Aurora SPC. Wilson did not sign a revised Seller's Secretary's Certificate reflecting the Final APA with AHC. See Ex. 40; 5 Tr. at 546-48.

103.   On or around December 19, 2016, Wilson sent a letter to shareholders announcing the closing of the Transaction. In the letter, Wilson apologized to shareholders for AIT being sold at a "very low" price. Wilson did not attach a copy of the Final APA or provide any further information about the Transaction closing or the use of the proceeds. Wilson also did not name AHC in the letter. See Ex. 115; 1 at Tr. 91-92; 5 Tr. at 561-62.

104.   AIT paid all creditors that settled with the company,[25] except for Dr. Wang, who was paid $500,000 indirectly in Chinese Yuan by AHC under the terms of the Final APA. AIT paid the following amounts to certain unsecured creditors:

---

commission should be," that the amount to be paid was reduced to $300,000 in certain documents estimating the breakdown of payments from the Transaction proceeds, and that AIT ultimately paid BE capital only $100,000 as sales commission. See Ex. 29; 5 Tr. at 669, 687-88.

[25] The parties have been unable to locate a final record of the disbursement of funds following the Transaction. See 4 Tr. at 443; 5 Tr. at 551-52, 556; see also 5 Tr. at 664 (Wilson explaining that he relied on AIT controller Sarah Jones to make wire transfers and keep financial records in connection with closing and that Wilson did not draft a closing statements).

- <u>Chang</u>: Chang loaned AIT $165,000 at some point in 2016 and received repayment of $150,000 for this unsecured loan.

- <u>Olivia and Ken Cheng</u>: AIT agreed to pay the Chengs a total of $500,000 based on the following considerations: an unspecified amount of severance payment that Cheng/Wilson believed Cheng was "entitled to receive" after her resignation in 2013; $300,000 in unsecured loans; and $200,000 in unsecured loans acquired from Pharos. Under the terms of a settlement agreement between AIT and the Chengs, AIT would pay $300,000 initially and the remaining $200,000 upon the closing and transfer of the BBDC. Wilson and Cheng testified that AIT ultimately only paid the Chengs $300,000.

- <u>James</u>: In a settlement agreement dated November 2015, AIT agreed to pay James $75,000 in total (including an initial payment of $25,000 and payments of the remaining $50,000 in installments each month until paid in full) based on employment claims James may have had against AIT. <u>See</u> Ex. 113C. Wilson testified that AIT paid James $25,000 in November 2016 after the Transaction based on this settlement agreement.

- <u>BE Capital</u>: In addition to the equity in the buyer that BE Capital received pursuant to the Waiver, BE Capital also received a sales commission of $100,000 in cash at the close of the Transaction.

<u>See</u> Exs. 29; 113, 113A-C; 3 Tr. at 304-07; 4 Tr. at 416-17, 437-38, 499; 5 Tr. at 664-72.[26]

---

[26] AIT also spent $50,000 of the Transaction proceeds on closing costs for one of its subsidiaries, Aurora Asia. Because AHC had contacts in Taiwan who could help with the closing, AIT paid the $50,000 to AHC. <u>See</u> Ex. 28; 3 Tr. at 302-05; 4 Tr. at 412-13, 437; 5 Tr. at 582.

105.   With regard to the transfer of AIT's interest in the BBDC clinic, one of the clinics referenced in Section 3.4 of the Final APA, AIT was unable to obtain the requisite government approvals because said approval required the consent of the doctor at the clinic, Dr. Elsie Levin. Dr. Levin never consented to the transfer. As a result, AHC was not required to pay $1.2 million of the $8.5 million purchase price. Instead, AIT received only $3.3 million in cash from the Transaction (including $500,000 paid to a creditor in China). See 4 Tr. at 490, 523-24; 5 Tr. at 637-38.

106.   Wilson received $250,000 in compensation from AIT after the close of the Transaction—the full amount that the prior board of directors had voted to pay him for his work winding down AIT. In addition to this compensation, Wilson also collected intermittent payments from AIT in lieu of a set salary. See 4 Tr. at 462-464.

107.   No shareholders received any compensation for their shares of AIT stock from the Transaction. See 5 Tr. at 672-73.

108.   Castel received no payment from the Transaction. AIT kept $100,000 earmarked for Castel for months after the Transaction closed but eventually spent it. Wilson did not notify Castel of the money reserved for them because they "already had [his] offer" and "could have accepted it at any time" before the funds were spent. See 1 Tr. at 86; 4 Tr. at 528; 5 Tr. at 571, 638, 679-80.

109.   Malacalza testified that had Castel received adequate information about the Transaction before it closed, Castel would have considered buying AIT for a competitive price. Castel had more than $8.5 million in cash available, and it had "other affiliates that work in the field of . . . medical imaging." Malacalza testified that Castel might have paid more than $8.5 for AIT "depend[ing] on the documentation that would have been provided." See

37

1 Tr. at 93-95.[27]

**J.     Castel's Effort to Collect on its Promissory Note**

110.    On May 26, 2017, Castel contacted Wilson and demanded repayment of the 2011 Promissory Note. Wilson did not respond to Castel's demand. See 5 Tr. at 680-81.

111.    In June 2017, Castel filed a civil action against AIT in the Central District of California (Castel S.A. v. Aurora Imaging Technology, Inc., No. CV 17-4198-DMG-KS (C.D. Cal. filed June 6, 2017)). See SF ¶ (x); Ex. 119.

112.    On January 18, 2018, Castel secured a judgment against AIT in that case for the full amount of the Promissory Note plus accrued interest. See Ex. 119 ("Judgment").

113.    The same day, Wilson emailed Cheng and James saying:

> Just a reminder that in the next few weeks we will have to stipulate to a judgment for Castel, or be ready to defend a motion for summary judgment that we have almost no chance of winning. However, once we stipulate, Castel can start pursuing assets to satisfy their claims.

> One thought—what if we offer to assign Dr. Wang our interest in BBDC, subject to any required consents, in lieu of the cash we owe him. If he agrees, then we could honestly say to Castel that we have no real significant assets left. Of course, all available cash from BBDC would then go to Dr. Wang, but I think we are almost at the point where we can file the tax returns and shut down the company.

James replied saying, in relevant part:

> Guess I thought this was already in the works to be done? Yes this should be done right away for both BBDC and AIC. However,

---

[27] Malacalza also testified that "in light of the documents that were produced during litigation, [Castel] would have undoubtedly been able to stop [the Transaction from] taking place," but did not offer further explanation as to how Castel would have been able to do so. See 1 Tr. at 95-96; see also 2 Tr. at 195-97.

seems like as long as BBDC and AIC are around and can't be transferred, then AIT will have to as well. We can still get caught up.

Ex. 35.[28]

114.   Wilson appeared for a judgment debtor examination in that case on July 31, 2019. During the examination, he explained what had happened with AIT's membership interest in the BBDC clinic. He testified that around March or April 2018, the minority owner of the BBDC asset, Dr. Levin, sued AIT for breach of fiduciary duties and breach of its obligations under the operating agreement that AIT had in place, and that Dr. Levin won a default judgment because AIT did not have funds to defend itself in the case. As a result of the default judgment, AIT lost its management and membership interest in the LLC (though it remained an 80% owner). Wilson explained that AIT had a receivable on its books for the BBDC asset that he believed may be valued at $400,000-$500,000, but that BBDC did not have the money to pay that receivable. Wilson also explained that he "didn't think [the receivable] was real" because it was not actually collectable and rather was just a "formula . . . in [AIT's] books." See Dkt. 221-1, Transcript of Judgment Debtor Examination of Christopher A. Wilson ("Debtor Exam. Tr.") at 38, 47-48.

115.   Wilson provided a similar explanation about what happened to the BBDC asset during trial. See 4 Tr. at 523-24; 5 Tr. at 577-78, 637-38.

116.   With respect to Wilson's January 2018 email, he testified in this case that he had proposed transferring the BBDC interest to Dr. Wang in January 2018 in order to "satisfy a larger creditor" than Castel. He said he

---

[28] As part of the Action by Written Consent, AIT resolved to dissolve "as soon as reasonably practicable" after the Transaction was completed. However, Wilson did not dissolve AIT before resigning as CEO and, to his knowledge, AIT has not been dissolved. See Ex. 5 at 7; 4 Tr. at 523-25.

personally would "rather satisfy Dr. Wang than Castel" because Dr. Wang had loaned more money to AIT and because he felt that AIT "kind of mistreated Dr. Wang" by asking him to "bear the substantial part of the burden for the holdback" in connection with the BBDC clinic. However, he admitted that Dr. Wang's claim against AIT had never resulted in a judgment like Castel's claim. He also admitted to having "some personal animosity toward Castel" by this time. See 5 Tr. at 564-71, 577-78, 637-38.

117.   To date, Castel has been unable to collect any payment from AIT to satisfy the Judgment. It also never recovered any money in connection with its investment in or loan to AIT. See Dkt. 208, Declaration of Mattia Malacalza ¶ 9; 1 Tr. at 34-35; 2 Tr. at 198.

## III.   CONCLUSIONS OF LAW

Castel describes Defendants' conduct as an "illicit scheme[]" and a "concerted effort" to deprive Castel of its investment in AIT. See Pl.'s CB. at 6. From the evidence presented at trial, the Court cannot agree with this characterization. The trial evidence did reveal that the Transaction was carried out without full transparency to Castel and other shareholders. But the evidence also showed that Castel was aware of AIT's financial decline in the years leading up to the Transaction and became aware of Cheng's interest in rescuing AIT before or around the time that the Transaction negotiations began. In short, Castel has not established that Defendants engaged in a scheme to defraud Castel.

The Court addresses Castel's causes of action below. The Court concludes that Castel is entitled to nominal damages of $1 on its claim that ARF breached the Stockholders Agreement. Additionally, that Castel has established a claim of fraudulent concealment against Wilson and should be awarded $100,000. Castel's other claims fail.

**A.**   <u>Breach of Written Contract (ARF)</u>

118.   Castel asserts a claim against ARF for breach of the Stockholders Agreement. <u>See</u> Pl.'s CB at 30-31.[29] To prevail on a breach of contract claim under Delaware law, a plaintiff must prove: (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a resulting damage to the plaintiff. <u>See</u> <u>H-M Wexford LLC v. Encorp, Inc.</u>, 832 A.2d 129, 140 (Del. Ch. 2003) (citation omitted).

119.   "When interpreting a contract, the role of a court is to effectuate the parties' intent. In doing so, we are constrained by a combination of the parties' words and the plain meaning of those words where no special meaning is intended." <u>Lorillard Tobacco Co. v. Am. Legacy Found.</u>, 903 A.2d 728, 739 (Del. 2006). "The Court will interpret clear and unambiguous terms according to their ordinary meaning." <u>GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.</u>, 36 A.3d 776, 780 (Del. 2012) (citations omitted). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." <u>Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.</u>, 616 A.2d 1192, 1196 (Del. 1992) (citation omitted).

**1.**   **ARF Assumed Pharos's Obligations under the Stockholders Agreement**

120.   Under the Stockholders Agreement, Pharos would have been

---

[29] Castel also claims that ARF breached a Series D Stockholders Agreement. <u>See</u> Pl.'s MCFL at 14; Pl.'s CB at 30. A copy of this agreement was never produced at trial, and Castel did not present any evidence demonstrating the existence and terms of this agreement. Accordingly, to the extent Castel asserts its breach of contract claim based on breach of this agreement, this claim fails.

obligated to "make reasonable efforts to consult with [Castel] before approving" the Transaction. <u>See</u> Ex. 2 § 4. As an initial matter, the Court must determine whether ARF became bound by the Stockholders Agreement after it purchased Pharos's Series C stock. <u>See</u> MSJ Order at 18 (concluding that "whether ARF was bound by the [Stockholders] Agreement presents a genuine issue of material fact"). The Court concludes that it did.

121.   ARF purchased Pharos's Series C and Series D stock interests on November 25, 2015. <u>See</u> Ex. 11. In doing so, ARF became a "successor in interest" to Pharos's Series C stock. Section 6 of the Stockholders Agreement provides that "the provisions of this Agreement <u>shall be binding upon the</u> <u>successors in interest to any Series C Stock held by any party to this Agreement</u> <u>and their successors and assigns</u>." Ex. 2 § 6 (emphasis added).

122.   Moreover, under Section 6 of the Stockholders Agreement, AIT was not permitted to allow ARF to purchase Pharos's Series C stock unless ARF executed a written agreement in which it became bound by the Stockholders Agreement. <u>See</u> Ex. 2 § 6 ("[T]he Company <u>shall not permit the</u> <u>transfer of any of the Series C Stock on its books or issue new certificates</u> <u>representing any such Series C Stock unless and until</u> the person(s) to whom such shares are to be transferred shall have executed a written agreement, substantially in the form of this Agreement, pursuant to which such person becomes a party to this Agreement and agrees to be bound by all the provisions hereof as if such person were a party hereunder.") (emphasis added). While ARF did not execute a separate written agreement as required under the Stockholders Agreement, AIT nevertheless consented to ARF's purchase of Pharos's Series C stock. <u>See</u> Ex. 12 § 3(a).

123.   In consenting to the sale, AIT signed the Novation Agreement, which includes a term providing, "This Agreement shall constitute all actions, confirmations, consents and undertakings required from Transferor,

Counterparty and Transferee under the Contract to give effect to the novation and transfer of Transferor's rights under the Contract and from the date hereof and on the terms hereof." Ex. 12 § 4(a).

124.   The Novation Agreement also references the Stock and Note Purchase Agreement, which required as an express condition of the sale that Pharos deliver the Stockholders Agreement to ARF. See Ex. 11 at 2 ¶ 2 ("Seller shall promptly deliver to Purchase, . . . (iii) any stock certificates representing the Stock (and including that certain Stockholders Agreement by and among [AIT], Seller and Castel S.A., dated as of June 19, 2006), and accompanied by stock assignments separate from the certificate duly executed by the appropriate Seller") (emphasis added). Cheng also testified that she was aware of the Stockholders Agreement, including the consultation provision set forth in Section 4. See 3 Tr. at 260-65.

125.   The Court construes these contracts to effectuate the intention of the parties. Based on the trial evidence, Pharos, AIT, and ARF intended to legally transfer ownership of Pharos's stock, including its Series C stock, to ARF. See, e.g., Exs. 2, 11, 12; 3 Tr. at 224-26, 4 Tr. at 466-68. "[A]mbiguously worded contracts should not be interpreted to render them illegal and unenforceable where the wording lends itself to a logically acceptable construction that renders them legal and enforceable." Walsh v. Schlecht, 429 U.S. 401, 408 (1977). Because AIT could not have authorized the transfer of Pharos's shares without ARF's agreement to be bound by the Stockholders Agreement, because the Stock and Note Purchase Agreement specifically references the Stockholders Agreement, and because the Notation Agreement provides that the agreement constitutes "all actions, confirmations, consents and undertakings required from" the parties to proceed with the transfer, the most reasonable construction of these contracts mandates a finding that ARF agreed to be bound by the Stockholders Agreement.

43

126.   Defendants argue in their MCFL that ARF is not a party to, and did not assume any obligations under, the Stockholders Agreement. Specifically, Defendants argue that because ARF never "executed a written agreement, substantially in the form of [the Stockholders Agreement], pursuant to which [it became] a party" to the Stockholders Agreement, it is not bound by the Agreement. See Ex. 2 § 6. ARF also argues that (i) although the Stock and Note Purchase Agreement provided for Pharos's delivery of the Stockholders Agreement, "ARF did not agree in that contract to assume the obligations of that agreement"; and that (ii) the Novation Agreement "has nothing . . . to do with the Series C Stockholder Agreement and Pharos's obligation to consult with Castel." See Defs.' MCFL at 39-40, 51.[30] These arguments are not persuasive. Under ARF's interpretation of these contracts, AIT should never have consented to the transfer of Pharos's Series C stock to ARF. See Ex. 2 § 6. Moreover, adopting ARF's interpretation of these contracts would effectively penalize Castel for AIT and ARF's failure to execute this transfer properly under the terms of the Stockholders Agreement. Accordingly, in purchasing the Pharos Interest, ARF assumed all obligations under the Stockholders Agreement.

**2.    ARF's Breach of the Stockholders Agreement Was Merely Technical**

127.   Under Section 4 of the Stockholders Agreement, ARF was obligated to "make reasonable efforts to consult with [Castel]" before voting in favor of the Transaction. Ex. 2 § 4. Cheng was aware of the Stockholders Agreement, including the consultation requirement under Section 4. Despite this, ARF did not communicate with Castel before voting in favor of the

---

[30] ARF did not reassert this argument in its closing brief. See ARF's CB at 25-30.

Transaction. <u>See</u> 3 Tr. at 260-65.

128.   Castel effectively argues that ARF's obligation to "consult with" Castel amounted to an obligation to disclose all known material information about the Transaction. <u>See</u> Pl.'s CB. at 30-31. Castel's argument, however, does not comport with the ordinary meaning of the terms set forth in the Stockholders Agreement.

129.   At trial, neither party presented evidence to suggest that Section 4 of the Stockholders Agreement was ambiguous. The Court therefore interprets this provision based on its plain meaning. To "consult" is generally defined as: to "take counsel together, deliberate, confer." <u>Consult</u> (def. 1), OXFORD ENGLISH DICTIONARY ONLINE (2023), https://www.oed.com/dictionary/ consult_v?tab=meaning_and_use#8407698 (last accessed Sept. 6, 2023); <u>see also</u> <u>Consult</u> (intransitive verb def. 2), MERRIAM WEBSTER DICTIONARY ONLINE (2023), https://www.merriam-webster.com/dictionary/consult (last accessed Sept. 6, 2023) ("to deliberate together").

130.   Considering the plain meaning of Section 4, the Court can reasonably conclude that before voting in favor of the Transaction, ARF was required to discuss the Transaction to some extent with Castel and to inform Castel of how it planned to vote. Because ARF failed to contact Castel <u>at all</u> before voting in favor of the Transaction, it necessarily breached the Stockholders Agreement. Had ARF complied with its obligation to consult with Castel, the Court can reasonably infer that Castel would have learned of ARF's existence and likely would have learned that Cheng was ARF's managing member. As to the additional information Castel lists in its closing brief, (e.g., the "true identity of the buyer of AIT," the "discount the buyer received on the purchase price of AIT," "[i]nformation about the supposed appraisal of AIT," etc. (Pl.'s CB at 30-31)), however, Castel fails to prove that ARF's duty to consult with Castel required sharing this information. Castel

presented no evidence at trial to support such a broad interpretation of the term "consult."[31] Thus, Castel has not shown that ARF's breach amounted to more than a technical one.

### 3. Castel Has Not Proven Damages

131.   To recover in a breach of contract claim, the plaintiff must also prove that the defendant's breach resulted in damage to the plaintiff. See H-M Wexford, 832 A.2d at 140; Breach of Contract Defined, Del. P.J.I. Civ. § 19.20 (2000).

132.   "Recovery is limited to those damages that arise naturally from the breach or that were reasonably foreseeable at the time the contract was made." Tackett v. State Farm Fire & Cas. Ins. Co., 653 A.2d 254, 265 (Del. 1995) (citation omitted). Damages may not be speculative or conjectural. See Laskowski v. Wallis, 58 Del. 98, 101 (1964).

133.   Here, Castel claims that ARF's failure to disclose material information about the Transaction caused Castel to lose its entire investment in AIT and the opportunity to take various actions in connection with the Transaction. See Pl.'s CB at 31. Based on this, Castel seeks damages totaling $2 million (the value of its Series C stock investment). See id. at 37. But although ARF breached the Stockholders Agreement by failing to consult with Castel, it is unclear from the trial evidence what damage, if any, this breach caused to Castel. First, with respect to Castel's equity investment in AIT, the trial evidence showed that AIT was insolvent even before ARF was formed and before ARF acquired Pharos's Series C stock. See Exs. 54, 92; 5 Tr. at 578-

---

[31] Moreover, Malacalza testified that the main purpose of the provision was to allow Castel to protect its Series C stock from becoming diluted. See 1 Tr. at 36-37 ("This is a paragraph that deals with having to speak to the minority shareholder in terms of dilution of the shares and making sure that that person or people are aware of these transactions of these shares . . . .").

86, 598-99. Accordingly, Castel has not proven that its lost Series C equity investment arose naturally from, or was a reasonably foreseeable result of, ARF's breach of the Stockholders Agreement.

134.   Second, while Castel argues that ARF's breach of the Stockholders Agreement caused it to lose the chance to take various other actions, including accepting the $100,000 settlement offer from AIT, investigating the Transaction, purchasing AIT, recapitalizing AIT, or taking "other action," see Pl.'s CB at 31, Castel has not presented sufficient evidence to show that these damages arose from ARF's breach of the Stockholders Agreement because, as discussed above, ARF was not contractually obligated to provide Castel with the information it claims it would have needed to take these other courses of action. For example, Malacalza testified that for Castel to decide to purchase AIT, it would have required additional financial documentation. See 1 Tr. at 93-95. Malacalza also testified that had Castel received "full information" about the Transaction, it would have "stopped" it from occurring. See 1 Tr. at 96. But Castel offered no further testimony or evidence to suggest how it legally could have "stopped" the Transaction. See 2 Tr. at 195-97. There was no evidence presented to suggest, for example, that Castel could have stopped ARF or any other shareholder from voting in favor of the Transaction.[32]

135.   Thus, the trial evidence fails to prove that Castel suffered damages resulting from ARF's breach of the Stockholders Agreement. That said, Delaware courts generally award nominal damages in cases where a breach of contract has occurred and the plaintiff cannot prove damages. See Norman v. Elkin, 860 F.3d 111, 128 (3d Cir. 2017); see also Ivize of Milwaukee, LLC v. Complex Litig. Support, LLC, No. 3158, 2009 WL 1111179, at *12 (Del. Ch.

---

[32] As ARF correctly points out, the Stockholders Agreement did not require ARF to obtain Castel's consent before voting in favor of the Transaction. See ARF's CB at 28; see also Ex. 2 at §§ 3-4.

Apr. 27, 2009) (citation omitted) ("Even if compensatory damages cannot or have not been demonstrated, the breach of a contractual obligation often warrants an award of nominal damages."). Nominal damages are typically "assessed in a trivial amount" and are "not given as an equivalent for the wrong, but rather merely in recognition of a technical injury and by way of declaring the rights of the plaintiff." <u>Ivize of Milwaukee</u>, 2009 WL 1111179, at *12 (citations omitted). Accordingly, the Court holds that Castel is entitled to nominal damages in the amount of one dollar.

**B.    Fraudulent Deceit and Concealment (ARF)**

136.    Castel asserts a fraudulent concealment claim against ARF under California law. <u>See</u> Pl.'s CB at 21-23. The elements of such a claim are: "(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." <u>Davis v. HSBC Bank Nevada, N.A.</u>, 691 F.3d 1152, 1163 (9th Cir. 2012) (quoting <u>Mktg. W., Inc. v. Sanyo Fisher (USA) Corp.</u>, 6 Cal. App. 4th 603, 612-13 (1992)).

137.    As an initial matter, Castel suggests in its closing brief that ARF's purchase of the Pharos Position prior to the Transaction was itself nefarious. <u>See</u> Pl.'s CB at 9-10. This argument is not convincing.

a.    First, while Castel claims that Cheng pursued the Pharos Position so that AIT would have enough shareholder votes to approve the Transaction, ARF's purchase of the Pharos Position did not make it a controlling shareholder and thus would not have been sufficient to ensure the Transaction vote passed. <u>See</u> SF ¶ (o).

48

b.     Second, although Wilson and Cheng collaborated to some degree in connection with ARF's purchase of the Pharos Interest, it is clear from the trial evidence that (i) AIT would have faced difficulty selling its assets to a buyer unless it eliminated the liability that came with the Pharos Senior Secured Debt (because whoever held the debt could foreclose on AIT's assets); and (ii) AIT would have faced difficulty purchasing the Pharos Interest itself. See 3 Tr. at 226-28, 362; 4 Tr. at 379-80, 466-68.

c.     Third, Pharos and ARF had differing interests with respect to the Pharos Position, and Castel presented no evidence at trial to show that the purchase was not an arm's length transaction. See 2 Tr. at 179-81; 4 Tr. at 382 (Cheng testifying that Pharos had "their own interest, which is protect their liability – reduce their liability and protect their integrity of the funds. For us [ARF], we wanted to rescue the technology"). Although Cheng was able to negotiate for the purchase of the Pharos Position at a much lower price than Pharos had demanded from AIT ($425,000 versus $1 million), she explained that this was due to her personal relationship with Bob Crants and her status as a third-party buyer. See 4 Tr. at 381 ("So I called [Crants] about this and saying, This is third party's money. It will reduce their liability, if they sell it to us, but I know we have very short time frame. This is what we can offer.").

### 1.     ARF Did Not Owe a Duty of Disclosure to Castel

138.   Turning to the elements of the claim, Castel asserts that ARF had a duty to disclose information to Castel on two bases: (1) ARF's position as a "majority and/or controlling shareholder of AIT of each of series C and series D stock"; and (2) ARF's contractual obligations under the Stockholders Agreement. See Pl.'s MCFL at 10; Pl.'s CB at 21-22. The information Castel alleges that ARF failed to disclose is largely the same as the information Castel claims ARF was obligated to disclose under the Stockholders Agreement, except that Castel claims that ARF was also required to inform Castel about

49

the "equity benefit promised to Wilson in exchange for his assistance to ARF." Pl.'s CB at 22; see also id. at 30-31.

139.   "There are 'four circumstances in which nondisclosure or concealment may constitute actionable fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts.'" LiMandri v. Judkins, 52 Cal. App. 4th 326, 336 (1997) (citation omitted). "[W]here material facts are known to one party and not to the other, failure to disclose them is not actionable fraud unless there is some relationship between the parties which gives rise to a duty to disclose such known facts." Id. at 337 (citation omitted). "[S]uch a relationship can only come into being as a result of some sort of transaction between the parties." Id.

140.   "In transactions which do not involve fiduciary or confidential relations, a cause of action for non-disclosure of material facts may arise in at least three instances: (1) the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead; (2) the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff; (3) the defendant actively conceals discovery from the plaintiff." Bigler-Engler v. Breg, Inc., 7 Cal. App. 5th 276, 311 (2017) (quoting Warner Constr. Corp. v. City of Los Angeles, 2 Cal. 3d 285, 294 (1970)).

141.   With respect to Castel's argument that ARF owed Castel a duty to disclose based on ARF's shareholder status, this argument is not properly before this Court. The parties agreed at the summary judgment stage that ARF did not owe any fiduciary duties to Castel by virtue of its shareholder status

because ARF is only a minority shareholder of AIT. <u>See</u> Dkt. 186 at 15-16; <u>see also</u> Dkt. 73 at 24-26 (Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, concluding that ARF did not owe Castel a fiduciary duty). Castel offers no legal authority to support resuscitating this argument, and the Court rejects Castel's attempt to rehash this claim.[33]

142.    With respect to ARF's obligations under the Stockholders Agreement, Castel has not proven that ARF owed it a duty to disclose all material facts about the Transaction. Relying on <u>LiMandri</u>, Castel argues a duty to disclose arises where the parties enter into "any kind of contractual agreement," including the Stockholders Agreement. Pl.'s CB at 21 (citation omitted). In <u>LiMandri</u>, the court explained that "[a]s a matter of common sense," a relationship giving rise to a duty to disclose "can only come into being as a result of some sort of transaction between the parties." 52 Cal. App. 4th at 337. The court then provided examples of such relationships: "Thus, a duty to disclose may arise from the relationship between seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of agreement. All of these relationships are created by <u>transactions between parties</u> from which a duty to disclose facts <u>material to the transaction</u> arises under certain circumstances." <u>Id.</u> (internal citation omitted) (emphasis added).

143.    Applying the reasoning in <u>LiMandri</u>, to the extent that the Stockholders Agreement gave rise to a duty to disclose, ARF would have been required to disclose facts material to a transaction <u>between Castel and ARF</u>. Here, no evidence was presented of a direct transaction between Castel and ARF. Accordingly, the mere existence of the contract between the parties did

---

[33] To the extent that Castel argues that ARF owed a duty to disclose because it had an interest in the Transaction, Castel similarly presents no evidence or legal basis to support this argument. <u>See</u> Pl.'s CB at 21-22.

not create a duty for ARF to disclose material facts about the Transaction. Rather, the scope of ARF's obligation in connection with the Transaction was limited to what is written in the contract—it was required to "consult with" Castel before voting. See Ex. 2 § 4. As discussed above, while ARF's compliance with this obligation would necessarily have resulted in Castel receiving more information about ARF (and, perhaps, about the Transaction) than it received, ARF was not obligated to disclose the scope of information that Castel claims.[34]

### 2. Castel Has Not Proven Reliance or Causation

144. Castel claims that had it received all information about the Transaction that it claims ARF was required to disclose, it "would have acted differently" by: "pursuing/negotiating to purchase AIT itself"; "ensuring ARF recuse itself from the vote as an interested shareholder"; or "ma[king an] informed decision to accept the $100,000 settlement offer" from AIT. Pl.'s CB at 23. Again, ARF was not obligated to provide Castel with full information about the Transaction, and considering ARF's actual obligations under the Stockholders Agreement, the evidence presented at trial is insufficient to show that ARF's failure to comply with those obligations prevented Castel from taking any of the actions listed above.

145. First, it is not clear whether Castel would have attempted to purchase AIT following a consultation with ARF. At most, Malacalza testified that Castel had the funds to purchase AIT for $8.5 million and might have paid more "depend[ing] on the documentation that would have been provided." See

---

[34] ARF argues that Castel's fraudulent concealment claim is duplicative of its breach of contract claim and should be barred under the economic loss rule. See ARF's CB at 18-19. Because the Court concludes that Castel failed to prove the elements of a fraudulent concealment claim against ARF, it does not reach this issue.

1 Tr. at 93-95. Malacalza also testified, however, that the financial information Castel received before the Transaction was insufficient for it to understand AIT's value. See 1 Tr. at 78-80, 93; 2 Tr. at 185-89. Moreover, the trial evidence showed that Castel was aware of AIT's declining financial position up to and during 2015. See, e.g., Exs. 54, 72-73, 75; 3 Tr. at 349-53.

146.   Second, Castel offered no evidence or legal basis to show that it could have forced ARF to recuse itself from voting in favor of the Transaction. As ARF correctly notes, the Stockholders Agreement does not require ARF to recuse itself from voting on an action in which it has an interest. See ARF's CB at 25-26. Under Delaware law, shareholders "have a right to control and vote their shares in their own interest. . . . It is not objectionable that their motives may be for personal profit, . . . so long as they violate no duty owed to other shareholders." Bershad v. Curtiss-Wright Corp., 535 A.2d 840, 845 (Del. 1987) (citations omitted). While a controlling shareholder generally owes fiduciary duties to other shareholders, ARF was not AIT's controlling shareholder. See Weinstein Enterprises, Inc. v. Orloff, 870 A.2d 499, 507 (Del. 2005) (explaining that control generally only "exists when a stockholder owns, directly or indirectly, more than half of a corporation's voting power").

147.   Third, it is not clear from the evidence presented that ARF's consultation with Castel would have led Castel to make an informed decision to accept the $100,000 settlement from AIT. Malacalza testified that the information Castel received prior to the Transaction was insufficient to allow it to make an informed decision about AIT's settlement offer. See 1 Tr. at 78-80, 93.[35] As discussed further below, Wilson was obligated to disclose material

---

[35] The information Wilson provided to Castel on October 26, 2016 included unaudited consolidated financial statements and an estimated breakdown of how Transaction proceeds would be used. See Ex. 6. The evidence presented at trial fails to show that ARF would have been required to

facts about the Transaction to Castel and to make a full and fair disclosure about the settlement offer (which he did not do). But because ARF was not obligated to provide as much information about the Transaction as Wilson was, the Court cannot conclude that ARF's failure to consult with Castel necessarily prevented Castel from making an informed decision about the settlement offer.

148.   Thus, the Court cannot conclude that Castel would have acted differently had ARF consulted with it. Because Castel has not proven the elements of a fraudulent concealment claim against ARF, this claim fails.

## C.   <u>Breach of Fiduciary Duty (Wilson)</u>

149.   Castel asserts a breach of fiduciary duty claim against Wilson under Delaware law. <u>See</u> Pl's CB at 23-30. The "elements of a breach of fiduciary duty claim are (1) that the fiduciary duty exists and (2) that the fiduciary breached that duty." <u>York Lingings v. Roach</u>, No. 16622, 1999 WL 608850, at *2 (Del. Ch. July 28, 1999).

150.   "Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness." <u>Reis v. Hazelett Strip-Casting Corp.</u>, 28 A.3d 442, 457 (Del. Ch. 2011). "[T]he standard of review depends initially on whether the board members (i) were disinterested and independent (the business judgment rule), (ii) faced potential conflicts of interest because of the decisional dynamics present in particular recurring and recognizable situations (enhanced scrutiny), or (iii) confronted actual conflicts of interest such that the directors making the decision did not comprise a disinterested and independent board majority (entire fairness)." <u>In re Trados Inc. S'holder Litig.</u>, 73 A.3d 17, 36 (Del. Ch.

---

provide more detailed information than this while consulting with Castel about the Transaction.

2013).

151.   Delaware's default standard of review is the business judgment rule. See id. at 43. The rule presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Id. (citation omitted). "Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty." Id.

152.   Entire fairness, Delaware's most onerous standard, applies when the board acts under an actual conflict of interest. See id. at 44. "Once entire fairness applies, the defendants must establish 'to the court's satisfaction that the transaction was the product of both fair dealing and fair price.'" Cinerama, Inc. v. Technicolor, Inc., 663 A.2d 1156, 1163 (Del. 1995) (internal quotation marks omitted). "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs." Gesoff v. IIC Indus., Inc., 902 A.2d 1130, 1145 (Del. Ch. 2006).

153.   Here, Castel asserts its claim against Wilson in both Castel's capacities as a shareholder and creditor of AIT. See Pl.'s CB at 28. Wilson argues that Castel's claims must be analyzed separately based on each of Castel's capacities. See Wilson's CB at 21. With respect to a breach of fiduciary duty claim, the Court agrees.

### 1.   Castel Lacks Standing To Assert Its Claim As a Creditor

154.   Under Delaware law, "[i]t is well established that the directors owe their fiduciary obligations to the corporation and its shareholders. While shareholders rely on directors acting as fiduciaries to protect their interests, creditors are afforded protection through contractual agreements, fraud and fraudulent conveyance law, implied covenants of good faith and fair dealing, bankruptcy law, general commercial law and other sources of creditor rights."

N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla, 930 A.2d 92, 99 (Del. 2007) (internal citations omitted).

155.  "When a corporation is <u>solvent</u>, [fiduciary] duties may be enforced by its shareholders, who have standing to bring <u>derivative</u> actions on behalf of the corporation because they are the ultimate beneficiaries of the corporation's growth and increased value. When a corporation is <u>insolvent</u>, however, its creditors take the place of the shareholders as the residual beneficiaries of any increase in value." <u>Id.</u> at 101. When a company is insolvent, creditors obtain "standing to maintain derivative claims against directors on behalf of corporation for breaches of fiduciary duties." <u>Id.</u> Creditors do not, however, have standing to maintain <u>direct</u> claims against directors for breaches of fiduciary duties. <u>See id.</u> at 103 (emphasis added). Rather, "[c]reditors may . . . protect their interest by bringing . . . any <u>other</u> direct nonfiduciary claim . . . that may be available for individual creditors." <u>Id.</u>

156.  Here, Castel asserts a direct claim against Wilson based on his alleged breach of fiduciary duty to Castel as a creditor. <u>See</u> Pl.'s MCFL at 12; Pl.'s CB at 28; <u>see also</u> Dkt. 73 at 23-24 (confirming that Castel's claim is direct rather than derivative). Under Delaware law, Castel lacks standing to assert this claim. <u>See</u> <u>Gheewalla</u>, 930 A.2d at 103.

### 2.  The Transaction Satisfied the Entire Fairness Test

157.  With respect to Castel's claim brought as a shareholder, Wilson owed fiduciary duties to Castel based on his role as AIT's CEO and director. <u>See</u> AF ¶¶ (d), (e), (f); SF ¶¶ (u), (w).

158.  Castel claims that Wilson breached his duty of loyalty by (1) "failing to inform Castel of his expected equity interest in ARF and future position with AHC"; (2) "deliberately misrepresent[ing] and/or avoid[ing] Castel's requests for information"; and (3) taking a "$250,000 payment from the [Transaction] proceeds and at least $130,000 additional annual

56

compensation." Pl.'s CB at 28-29. Castel also claims that Wilson breached his duty of care based on his actions while negotiating and executing the Transaction. See id. at 29. Castel claims that because of Wilson's breach, Castel lost its entire investment in AIT. See id.

159.   With respect to the Transaction, Wilson was the only board member of AIT, and the evidence demonstrated that Wilson was neither disinterested nor independent. First, after Wilson's efforts to reclaim the Pharos Interest for AIT failed, he helped Cheng/ARF purchase the Pharos Interest at a much lower price. Despite helping Cheng do so, Wilson did not take steps to prevent Cheng from leveraging this debt against AIT during Transaction negotiations; on the contrary, he testified that his ability to "push back" during negotiations was limited because Cheng had the option to foreclose. See 4 Tr. at 507, 513; 5 Tr. at 616-17. Second, Wilson and Cheng discussed Wilson receiving an equity interest in ARF over the course of the Transaction negotiations, and while Wilson denies ever accepting Cheng's offer, the evidence shows that Wilson likely had a personal interest in the Transaction during negotiations. See Ex. 22; ARF Depo. Tr. at 77-79; 3 Tr. at 294-97; 4 Tr. at 389-91, 424-27; 5 Tr. at 673-75. Third, the evidence shows that Wilson received from the Transaction a payout of the full $250,000 approved by the outgoing board when he became CEO; whether Wilson would have received that payment without the Transaction is unclear. Accordingly, the Court examines the Transaction under the entire fairness standard; Wilson carries the burden of proving that the Transaction was objectively fair to AIT's shareholders. See Trados, 73 A.3d at 36, 44; Technicolor, 663 A.2d at 1163.

160.   "The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect

of fairness relates to the economic and financial considerations of the proposed" transaction. Weinberger v. UOP, Inc., 457 A.2d 701, 711 (Del. 1983). "Evidence of fair dealing has significant probative value to demonstrate the fairness of the price obtained. The paramount consideration, however, is whether the price was a fair one." Americas Mining Corp. v. Theriault, 51 A.3d 1213, 1244 (Del. 2012).

161.   Here, Wilson's conduct in connection with the Transaction was problematic. Wilson was not fully independent in negotiating the Transaction terms, and he had a personal interest in the Transaction during negotiations. As discussed further below, Wilson's disclosures to shareholders when soliciting their consents also fell short of what would be expected of a fiduciary. Nevertheless, in considering both the fairness of Wilson's dealings and the fairness of the price, the Court concludes that the Transaction satisfied the entire fairness test.

a.   Fair Dealing

162.   Wilson's fiduciary duties required him to "disclose fully and fairly all material information within [his] control" when he sought shareholder approval for the Transaction. Stroud v. Grace, 606 A.2d 75, 84 (Del. 1992); see also New Enter. Assocs. 14, L.P. v. Rich, 292 A.3d 112, 144 (Del. Ch. 2023) ("When directors submit to the stockholders a transaction that requires stockholder approval (such as a merger, sale of assets, or charter amendment) or which requires a stockholder investment decision . . . , the directors have a duty to provide the stockholders with all material information reasonably available to them."). "[T]he materiality standard . . . requires disclosure of all facts which would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Stroud, 606 A.2d at 84 (quoting Rosenblatt v. Getty Oil Co., 493 A.2d 929 (Del. 1985) (internal quotation marks omitted)).

163.   Here, the trial evidence showed that Wilson failed to provide full and fair information about the Transaction to Castel. Wilson was required to disclose, at minimum: information about the buyer (e.g., its name, the nature of its business, and financial information showing it could actually pay the purchase price); some explanation as to why Wilson had agreed to the Transaction terms; and Wilson's personal interests in the Transaction (including the fact that he would receive $250,000 in compensation after the Transaction closed). See Nagy v. Bistricer, 770 A.2d 43, 48, 59-60 (Del. Ch. 2000) (concluding directors of privately held corporation breached duty to disclose material facts to shareholders in connection with acquisition by another company, noting that disclosure document (i) did not provide any financial information about the buyer or seller; (ii) did not describe the process by which the merger agreement had been negotiated; (iii) did not explain why the board had agreed to the merger; and (iv) did not disclose the directors' interest in the buyer); see also Cygnus Opportunity Fund, LLC v. Washington Prime Grp., LLC, No. 2022-0718, 2023 WL 5113279, at *11 (Del. Ch. Aug. 9, 2023) (concluding board made misleading partial disclosures where it explained what squeeze-out merger was but did not "disclose any information that would explain how the Company made this decision or why it was an appropriate course of action").

164.   When Wilson contacted Castel to solicit its vote in the Transaction, he said only that AIT "has struggled to avoid bankruptcy but is not at the point where we must either sell the company or file for bankruptcy" and that it had "received only one offer to purchase the assets of the business for $8,500,000, which we are going to accept . . . ." Ex. 5.

165.   Wilson's disclosures fell short of his obligations in several ways. First, apart from naming Aurora SPC in the shareholder consents and the draft APA and listing Cheng as the chairperson of Aurora SPC, Wilson did not

inform shareholders about the buyer at all. See Ex. 5. A shareholder reasonably would have expected to receive information sufficient to allow it to understand who the buyer was before agreeing to sell AIT's assets to that entity. Wilson testified that he did not care who the buyer was, that the buyer "could have been Joe Blow," could have been "Vladimir Putin," and "[c]ould have paid [AIT] in crypto." 5 Tr. at 522. But this is precisely the type of foundational information that "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Stroud, 606 A.2d at 84 (citation omitted).[36] Even when Castel contacted Wilson to demand more information and specifically asked for "information regarding the proposed buyer of Aurora's business," Wilson failed to provide any information or even mention the buyer in his response. See Ex. 6.

---

[36] Castel argues that the changes made to the Final APA compared to the Aurora SPC APA amounted to a "bait-and-switch" for AIT shareholders. See Pl.'s CB at 11-13. Castel highlights that the name of the buyer changed and that the payment terms changed such that AIT received less cash at closing. See id. at 11-12. With respect to the payment terms, because AIT's shares would have been worthless at the purchase price of $8.5 million, the Court cannot conclude that the breakdown of the payment terms was material for AIT's shareholders. See Exs. 54, 92; 5 Tr. at 578-86, 598-99. With respect to the buyer name, while changing the name in the Final APA certainly amounted to a departure from best practices, the Court finds that this change was not material because, as Wilson explained, both Aurora SPC and AHC were newly formed entities with no history of operations and no assets, both were made up of the same people, and AIT would not have any ongoing obligations to either entity after closing. See 4 Tr. at 509-10, 525-26; 5 Tr. at 638-40, 656-57.

That said, regardless of the buyer's actual name and place of incorporation, Wilson was required to provide AIT's shareholders with sufficient information about the buyer to allow them to make an informed decision about the Transaction. He did not do so.

166.   Second, Wilson offered no explanation as to why he had agreed to the Transaction terms as provided in the draft APA. This is especially problematic because, as discussed above, Wilson lacked independence in negotiating the Transaction terms. Wilson testified that his ability to "push back" during negotiations was limited because Cheng held the Pharos Position and could ultimately choose to foreclose on AIT's assets. See 4 Tr. at 507, 513; 5 Tr. at 616-17. Wilson had helped Cheng facilitate ARF's purchase of the Pharos Position (over $3 million in debt) for only $425,000, and despite this, he seemingly allowed Cheng to leverage that debt to force AIT to agree to an offset of the purchase price for the Pharos Position that was worth over six times what ARF had paid for it ($425,000 versus $3 million of the offset attributed to the Pharos Position). See Ex. 101; 4 Tr. at 378-82, 421-22, 468-69. Further, while Wilson testified that he wanted an appraisal of AIT's assets to confirm whether the negotiated purchase price was fair, he solicited shareholder approval before the appraisal was complete and never shared the results of the appraisal with AIT's shareholders. See Exs. 5, 7, 37; 4 Tr. at 529-32; 5 Tr. at 623-24.

167.   Third, Wilson did not disclose to shareholders his own interest in the Transaction. He at no time mentioned that the Transaction would result in his receipt of the full $250,000 approved by AIT's board. See Exs. 5, 37. Nor did he acknowledge the "plan" (in place until at least late September 2016) that Wilson would receive an unspecified equity interest in the buyer entity. See Ex. 22. Although Wilson insists that he ultimately declined Cheng's offer to serve as counsel for the buyer, this "plan" could have influenced the Transaction negotiations, and Wilson made no disclosure to shareholders about his potential personal interests in the Transaction.

168.   That AIT was at risk of bankruptcy due to its insolvency did not absolve Wilson of his responsibility to disclose material information about the

61

Transaction to AIT's shareholders to allow them to make an informed decision about whether to approve the Transaction. In sum, Wilson's conduct did not constitute fair dealing to AIT's shareholders.

        b.     <u>Fair Price</u>

169.   Based on Wilson's inadequate representations to shareholders, AIT obtained the requisite shareholder votes to sell its assets at a price of $8.5 million. <u>See</u> Ex. 10. Wilson argues that the Transaction was entirely fair because the purchase price fell within the appraised value of AIT's assets and because AIT's shares were worth zero before and after the Transaction. <u>See</u> Wilson's CB at 29-30.

170.   Here, the Delaware Court of Chancery's opinion in <u>Trados</u> is helpful. In that case, shareholders of a company's common stock sued the board of directors, claiming the directors had breached their duty of loyalty by approving a merger that resulted in common stockholders receiving nothing for their shares. <u>See</u> <u>Trados</u>, 73 A.3d at 33-34. Venture capital funds had invested in the company as preferred shareholders and had representatives serving on the company's board. <u>See</u> <u>id.</u> at 20-24. When the company's business failed to satisfy its venture capital backers, the board adopted a management incentive plan that would compensate management for achieving a sale (even if the sale yielded nothing for common shareholders). <u>See</u> <u>id.</u> at 20, 26-29. The board ultimately approved and obtained shareholder consent for a merger that resulted in compensation to management under the management incentive plan and payout to preferred shareholders, but that left nothing for common shareholders. <u>See</u> <u>id.</u> at 31-33.

171.   The court analyzed the merger under the entire fairness standard and found that the directors had not engaged in fair dealing with respect to the common stockholders. <u>See</u> <u>id.</u> at 56. However, based on an expert valuation of the company's discounted cash flow (which was less than the merger

proceeds), the court found that the common stock had no economic value before the merger. See id. at 72-74, 76. Given this, the court concluded that despite the lack of fair dealing by the board of directors, the merger nonetheless satisfied the entire fairness test. The court explained, "the proper 'test of fairness' [is] whether 'the minority stockholder shall receive the substantial equivalent in value of what he had before.'" Id. at 76 (citing Sterling v. Mayflower Hotel Corp., 93 A.2d 107, 114 (Del. 1952)). Thus, because the company's "common stock had no economic value before the Merger, then the common stockholders received the substantial equivalent in value of what they had before, and the Merger satisfies the test of fairness." Id.

172.   The same logic applies here. While the trial evidence suggests that Wilson's actions in connection with the Transaction were not entirely fair to shareholders, Defendants also presented evidence to show that AIT's financial situation was dire after the deal with CRC fell through, that AIT was insolvent by at least June 2015, and that despite Wilson's efforts in 2015, he could not find a buyer other than the entities affiliated with Cheng (ARF/Aurora SPC/AHC). See, e.g., Exs. 54, 92, 96. No evidence presented at trial suggested that AIT's business would have turned around had it remained operational. On the contrary, the evidence showed that had AIT not found a buyer, it would have likely filed for bankruptcy, which would have resulted in zero return to shareholders. See, e.g., Ex. 54; 5 Tr. at 649, 672-73.

173.   Further, the Orchard Partners appraisal report (the only valuation of AIT's assets presented at trial) indicated that the value of those assets was between $6,181,000 and $9,652,000. See Ex. 7. Castel challenges the reliability of this report given its timing in connection with the Transaction and given James and Cheng's involvement in the appraisal process, arguing that the valuation was nothing more than a "fig leaf." See, e.g., Pl.'s CB at 12-13; Tr. at

70-76.[37] But regardless of the issues surrounding the appraisal report, no evidence was presented at trial to show that AIT's assets were worth more than indicated in the report. Importantly, there was no evidence presented to demonstrate that AIT would have been able to sell its assets at a price high enough to result in a return to shareholders.

174.   Before the Transaction negotiations began, the highest (and only) purchase offer AIT had received was the purchase option in the ARF Loan Agreement where ARF could purchase AIT's assets for $10-15 million. See Ex. 43. Wilson testified that even with a $15 million purchase price, the sale would have resulted in returns to shareholders only if Wilson "could negotiate creditors down substantially" to reduce AIT's debts, which exceeded $15 million. See 4 Tr. at 483-84; see also Ex. 92 (summarizing AIT's assets and liabilities as of May 2015).[38] Although Malacalza testified that Castel had the means to purchase AIT at a price above $15 million, he also testified that whether Castel would have done so "depend[ed] on the documentation that would have been provided." See 1 Tr. at 93-95. Based on Malacalza's testimony, Castel would have needed financial documentation that AIT did not have (and which it had limited funds to obtain), including (i) audited financial statements and (ii) an appraisal prepared over the course of three to six months that would have cost AIT $300,000-$500,000. See, e.g., id. at 71-

---

[37] The Court observes, moreover, that the trial evidence showed that when Cheng and James provided feedback on an initial draft valuation, their feedback only caused the appraisal value to increase. See 6 Tr. at 35-40.

[38] Wilson wrote a letter to the Cheng family in 2016 where he mentioned that AIT had previously "expected a purchase price around 15.0 million which would have paid all of our creditors and left a few million dollars for the shareholders." Ex. 36. Wilson testified that this statement was "too optimistic" given AIT's debts, which he recalled being "still in excess of 17 million" at that point. See 4 Tr. at 483-84.

72. Because AIT had received no offers above $15 million, and because Castel's offer of more than $15 million was hypothetical and contingent on financial documentation that AIT did not have, the Court cannot conclude from the evidence presented that AIT could have sold its assets at a price that would have resulted in a return to shareholders.

175.   Accordingly, while Wilson's conduct in connection with the Transaction was not fair to shareholders, considering AIT's financial state before the Transaction, the Court concludes that the Transaction was ultimately fair to shareholders. Castel is therefore not entitled to judgment on its breach of fiduciary duty claim.

### D.   Fraudulent Deceit and Concealment (Wilson)

176.   Castel asserts a fraudulent concealment claim against Wilson under California law. See Pl.'s MCFL at 7; Pl.'s CB at 18-23. Wilson argues that this claim falls within the internal affairs doctrine and is therefore governed by Delaware law. See Defs.' MCFL at 25-26; Wilson's CB at 21 n.6. Wilson is correct.

177.   California has adopted the "internal affairs doctrine," which provides that matters concerning the internal affairs of a corporation are governed by the laws of the state of incorporation. See Cal. Corp. Code § 2116; Davis & Cox v. Summa Corp., 751 F.2d 1507, 1527 (9th Cir. 1985); see also Edgar v. MITE Corp., 457 U.S. 624, 645 (1982) (explaining that only one state should have the authority to regulate a corporation's internal affairs, including "matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders"). Such internal affairs include, for example, "the issuance of corporate shares, . . . mergers, consolidations and reorganizations and the reclassification of shares." Symington v. Guillen, No. 15-09809, 2016 WL 7486603, at *9 (C.D. Cal. June 30, 2016). They also include "corporate functions which implicate the rights of creditors," such as

mergers. <u>Allstate Ins. Co. v. Countrywide Fin. Corp.</u>, 824 F. Supp. 2d 1164, 1172 (C.D. Cal. 2011) (citing Restatement (Second) of Conflict of Laws § 302 (1971)).

178.   Here, Castel's claim against Wilson is based entirely on his conduct in connection with the Transaction. <u>See</u> Pl.'s CB at 18 (arguing that Wilson exploited his position as CEO and director of AIT by misrepresenting material facts about the Transaction). Thus, the internal affairs doctrine applies. As it is undisputed that AIT is a Delaware corporation, <u>see</u> AF ¶ (a), Delaware law governs this claim.

179.   Under Delaware law, to establish a claim for fraudulent concealment, a plaintiff must prove the following elements: (1) deliberate concealment by the defendant of a material past or present fact, or silence in the face of a duty to speak; (2) that the defendant acted with scienter; (3) an intent to induce plaintiff's reliance upon the concealment; (4) causation; and (5) damages resulting from the concealment. <u>See</u> <u>Nicolet, Inc. v. Nutt</u>, 525 A.2d 146, 149 (Del. 1987)).

180.   In its closing brief, Castel divides this cause of action into two claims: a claim based on Wilson's conduct before the Transaction and a claim based on his conduct after the Transaction. <u>See</u> Pl.'s CB at 18-23. The Court addresses each claim in turn.

### 1.   Wilson's Conduct Before the Transaction

181.   Castel contends that Wilson, as CEO and director, "was a fiduciary and in a position of vital trust to AIT's shareholders, including Castel" and exploited that position by concealing and misrepresenting material facts "that any shareholder would find important when voting on selling a company," and, by doing so, "fraudulently sold AIT to Cheng and the Inner

Circle without any regard to the interest of Castel." Pl.'s CB at 18.[39]

182.   As with Castel's breach of fiduciary duty claims, Castel relies on its status both as an AIT shareholder and creditor to assert its fraudulent concealment claim. See id. Wilson argues that Castel's fraud claim must be analyzed separately based on these two roles. See Wilson's CB at 21. Wilson also argues that Castel's fraud claim based on its role as a shareholder does not support an independent claim for relief because it is duplicative of its breach of fiduciary duty claim. See id. at 22-23; see also Def's MCFL. Castel does not address this argument in its closing brief.

183.   Delaware law supports the proposition that where a plaintiff merely "recast[s] claims for a breach of fiduciary duty under the heading of constructive fraud," those claims are duplicative and subject to dismissal. Carsanaro v. Bloodhound Techs., Inc., 65 A.3d 618, 643 (Del. Ch. 2013), rev'd on other grounds, 817 A.2d 149 (Del. 2002); see also Parfi Holding AB v. Mirror Image Internet, Inc., 794 A.2d 1211, 1237 (Del. Ch. 2001), rev'd on other grounds, 817 A.2d 149 (Del. 2002) ("[I]t makes no sense to me to hold that every consciously unfair self-dealing transaction involves an implied false representation of fact directed to the corporation or its stockholders, giving rise to a claim for common law fraud."). Here, the evidence cited to show that Wilson concealed or misrepresented material information to Castel is largely the same evidence cited to show that Wilson breached his fiduciary duty owed to Castel. Compare Pl's CB at 18-19, with id. at 28-29. Regardless, Castel has not proven that its suffered harm as a shareholder. As discussed above, Castel's shares in AIT were valued at zero before and after the Transaction, and any

---

[39] Castel defines the "Inner Circle" as a "web of people and companies, including Defendants, who are all intimately intertwined and assisted with and benefited from Defendants' actions," including Wilson, Cheng, Chang, James, ARF, BE Capital, and AHC. See id. at 6-8.

evidence presented to suggest that those shares could have been worth more than zero was speculative.

184.   Accordingly, the Court considers Castel's fraudulent concealment claim based on its role as a creditor.

      a.   Deliberate Concealment or Silence In the Face of A Duty to Speak and Scienter

185.   To prevail on its fraudulent concealment claim, Castel must first prove that Wilson either falsely represented or omitted facts that he had a duty to disclose to Castel. See Nicolet, 525 A.2d at 149. In its closing brief, Castel asserts a long list of facts that it argues were material facts that Wilson concealed or misrepresented. See Pl.'s CB at 18-19. Castel claims that Wilson was obligated to disclose this information because as CEO and director of AIT, he owed a fiduciary duty to Castel. See id. at 18.

186.   Defendant argues that Wilson did not owe Castel a fiduciary duty as a creditor and thus was not obligated to disclose the claimed concealed facts to Castel. See Wilson's CB at 21-23, 35-36. Wilson is correct that under Delaware law, directors of an insolvent firm "do not owe any particular duties to creditors." Quadrant Structured Prod. Co., Ltd. v. Vertin, 115 A.3d 535, 546 (Del. Ch. 2015). However, Castel can establish the first element of its claim in two other ways. First, where Wilson chose to reply to questions raised by Castel about the Transaction, Wilson had a duty "to make a full and fair disclosure as to the matters about which [he] assume[d] to speak." Corp. Prop. Assocs. 14 Inc. v. CHR Holding Corp., C.A. No. 3231, 2008 WL 963048, at *7 (Del. Ch. Apr. 10, 2008). Second, where Wilson actively concealed material facts, Castel need not show that Wilson had a pre-existing duty to speak. See Transdigm Inc. v. Alcoa Glob. Fasteners, Inc., C.A. No. 7135, 2013 WL 2326881, at *6 (Del. Ch. May 29, 2013) (citation omitted). Further, the scienter element may be established through evidence showing that Wilson

knew that his statements were misleading or concealed material information. See Stephenson v. Capano Dev., Inc., 462 A.2d 1069, 1074 (Del. 1983) (describing scienter element in context of common law fraud claim); see also Nicolet, 525 A.2d at 149 (finding complaint pled scienter element by alleging that defendants "knowingly and willfully" conspired in scheme). Here, the Court finds the first element is satisfied.

187.   First, in September 2015, Wilson made an initial offer to Castel, through Valla, to repurchase Castel's notes and stock for only $40,000. Valla asked Wilson, "[W]ho would the buyer be of the service business?" and "Is the potential buyer related to any shareholders or creditors?" Ex. 55. In reply, Wilson said, "The fund is not related to [AIT] and the funds are coming from a group of investors in Taiwan and China. They are the potential buyers." Id. At this point, Wilson was fully aware that Cheng was spearheading the effort to form a fund to purchase AIT's assets, and he knew that Cheng was related to AIT given her shareholder status and former role as CEO. Despite this, he told Castel the opposite, thereby actively concealing a material fact about the fate of AIT's assets and of Castel's investment in AIT.[40]

188.   Next, when Wilson contacted Valla in October 2016 to solicit Castel's vote in the Transaction and offer to settle AIT's debt to Castel for $100,000, he represented that AIT would sell its assets for $8.5 million and that the proceeds of the Transaction would be "distributed pro rata to all debtors," with "all unsecured creditors" receiving "exactly 40% of the original principal amount of each obligation." Ex. 5. While Wilson attached an estimated

---

[40] In response to the Court's questioning about this communication, Wilson maintained that he does not see "ARF as an affiliate of AIT." See 5 Tr. at 689-90. Given the broad wording of Valla's question ("Is the potential buyer related to any shareholders or creditors?"), the Court finds this explanation not credible.

breakdown of the Transaction proceeds, the document did not specify who was an unsecured creditor or other type of creditor such that Castel could verify that unsecured creditors would receive 40% of their loan principal as Wilson represented. See id.

189.   As written, Wilson's email, draft APA, and breakdown chart suggested that AIT owed Pharos $3 million for the Pharos Position and that AIT would receive up to $5.5 million in cash at closing ($8.5 million minus a $3 million offset for the Pharos Position), with some amount set aside to pay creditors in China. See id. In reality, Wilson knew that he had agreed to an offset of the purchase price that was several times more than ARF had actually paid for the Pharos Position ($3 million versus $425,000) and expected that AIT would only receive approximately $4.5 million in cash at closing. See 4 Tr. at 450-51, 506-12; 5 Tr. at 631. Wilson and Cheng gave various reasons at trial to justify such a high offset amount. In any event, however, no accurate account was ever provided to Castel about how much cash AIT would actually receive from the Transaction and how it would be distributed among creditors. This information was material to Castel as a creditor because without such information, Castel had no means to determine whether the $100,000 settlement offer was a fair offer. See Exs. 5-6.

190.   Moreover, the trial evidence revealed that Wilson's statement about unsecured creditors each receiving 40% of their loans was inaccurate. In fact, the evidence shows that some unsecured creditors were treated preferentially. For example, Lucy Chang received $150,000 as repayment for her unsecured loan of $165,000 in 2016 (over 90% repayment). See Ex. 113A. Wilson justified treating Chang differently based on the timing of her loan: "She put in money at the very last minute. It was kind of the last money in before – even after ARF. I mean, she put in money kind of as we needed it. . . . I viewed her in the nature of a debtor-in possession. We weren't a debtor-in-

possession, but it was money coming in at the very last minute." 5 Tr. at 668. With respect to Cheng and her husband, although they loaned a total of $300,000 to AIT, they received repayment of $300,000. See Ex. 113B. Wilson agreed to pay Cheng more because he believed she "had an argument" that her resignation from AIT could have entitled her to a claim for severance pay. 5 Tr. at 684-86.[41] By deciding to speak to Castel about how the Transaction proceeds would be distributed among unsecured creditors as part of AIT's settlement offer, Wilson assumed an obligation to make a full and fair disclosure of this information. Because he stated that each unsecured creditor would receive "exactly 40%" of its principal loan amount without mentioning the various other considerations and exceptions that would render this statement inaccurate, Wilson failed to make a full and fair disclosure.[42]

### b. Intent to Deceive

191. To prove its fraudulent concealment claim, Castel must also show that Wilson acted with intent to induce Castel's reliance on the misrepresentation or concealment. See Nicolet, 525 A.2d at 149. Wilson's intent to deceive Castel can be inferred from circumstantial evidence presented at trial.

---

[41] Wilson acknowledged that he did not "do[] much research" and did not consult with an employment attorney about Cheng's argument, which the Court views as rather weak. See id. A more disinterested CEO would have likely been less persuaded that Cheng had valid claims arising from her voluntary resignation over three years earlier.

[42] Wilson argues that he was not obligated under Delaware law to treat all unsecured creditors equally. See Wilson's CB at 40. This argument is misplaced. The issue is not that Wilson failed to comply with applicable law in determining payment amounts but rather that Wilson represented to Castel that each unsecured creditor would receive "exactly 40%" of its principal loan amount in the context of asking Castel to enter into a settlement agreement with AIT. See Ex. 5.

192.   First, from the time that Wilson and Cheng "first discussed" the Transaction until at least September 2016, there was a "plan" in place whereby Cheng would "grant some of ARF's interest" to Wilson. See Ex. 22. Wilson was also aware Cheng had resigned as CEO of AIT based on pressure she felt from AIT's former board members, who were frustrated with her when the CRC transaction fell through. See 5 Tr. at 574. Thus, when Wilson represented to Castel in September 2015 that the future buyer of AIT's assets was "not related" to AIT, see Ex. 55, he would have had an incentive to blur details about the Transaction, such as the extent of Cheng's involvement.

193.   Second, Wilson's intent to conceal information from Castel about the buyer and about the Transaction terms can be inferred from his repeated failure to respond to Castel's questions. After not answering Valla's question accurately in September 2015, Wilson similarly avoided providing information about the buyer and the Transaction terms when he solicited Castel's vote as a shareholder and offered the $100,000 settlement. See Ex. 5. As discussed above, Wilson's fiduciary duties to shareholders required him to provide enough information about the Transaction and the buyer to allow shareholders to make an informed decision before voting for the Transaction, but his disclosures to Castel fell short of this obligation. Even after Castel specifically requested financial information about the buyer, Wilson's reply failed to mention the buyer or respond to Castel's request. See Ex. 6.

194.   Importantly, moreover, Wilson misrepresented or concealed information in the context of attempting to negotiate a settlement with Castel for significantly less than Castel was owed for its Promissory Note. Given Wilson's personal interest in the Transaction over the course of negotiations, and given his repeated incomplete or misleading communications to Castel, the Court can reasonably infer that Wilson intended to induce Castel into accepting his settlement offers.

72

c.    Causation

195.    Castel must also prove that Wilson's misrepresentation or concealment of facts caused Castel harm. See Nicolet, 525 A.2d at 149. By the time Wilson offered Castel $100,000 to settle with AIT, he indicated that the Transaction would likely close less than one month later. Indeed, Wilson executed the Aurora SPC APA less than two weeks after his initial message to Castel and only five days after his follow-up response to Castel on October 26, 2016. See Exs. 5-6, 9. This time pressure, coupled with Wilson's consistent lack of transparency and misleading statements to Castel, suggests that Castel was stuck with a take-it-or-leave-it offer of 40% of its loan, without the means to assess whether the offer was fair before AIT closed the Transaction.

196.    Defendants argue that Castel knew all it needed to know to make an informed decision in response to Wilson's $100,000 settlement offer and that Wilson attempted to respond to Castel's requests for additional information as he understood them. See Wilson's CB at 36-40. This argument is not persuasive. First, while the trial evidence suggests that Castel knew or should have known by late 2015 that Cheng was interested in raising funds to rescue AIT, see Ex. 61, 99; 3 Tr. at 349-53, it does not follow that Castel could reasonably have anticipated all of the events leading up to the Transaction or the ultimate terms of the Transaction, including how the $100,000 settlement offer was formulated.[43]

197.    Second, while Castel could have been more specific in its demand

---

[43] Further, that Wilson offered Castel significantly different settlement offers between 2015-2016 further suggests that Castel was kept in the dark about the Transaction and thus prevented from understanding what would constitute a fair settlement amount. Compare Ex. 55 (Wilson initially offering $40,000 and "perhaps" $25,000 more for Castel's Promissory Note and stocks) with Ex. 5 (offering $100,000 for the Promissory Note).

73

for information, the burden was not on Castel to request all material information about the Transaction, and in any event, Wilson failed to provide any information about the buyer despite Castel's specific request for "information regarding the proposed buyer" of AIT. <u>See</u> Ex. 6. In his reply, Wilson provided unaudited financial information but offered nothing to show who the buyer was, what the actual amount of cash available at closing would be, or how those funds would be distributed among creditors, including Castel. <u>See</u> Ex. 6. While Wilson included a generic offer "to provide any information you want to receive," and to "make all of the company records available to [Castel] at the company offices" in Massachusetts he had also previously indicated that the Transaction would close days later on November 15, 2016. <u>See</u> Ex. 5. Moreover, rather than provide Castel with more information about the buyer, Wilson's reply warned Castel that the "current owner" of the Pharos Position could "commence immediate foreclosure proceedings," and insisted that the Transaction was "the only offer we have that returns any amounts to the unsecured creditors." Ex. 6.

198.   Considering these emails and the trial evidence, Wilson prioritized pushing the Transaction through over ensuring that Castel was given full and fair information about the Transaction. Accordingly, the Court concludes that Wilson's concealment or misrepresentations deprived Castel of necessary information to negotiate a fair settlement with AIT and thereby caused harm to Castel.

### 2.   Wilson's Conduct After the Transaction

199.   Castel explains in its closing brief, "During this litigation and at trial, Castel learned for the first time that Wilson intended to fraudulently dispose of the only remaining valuable asset in AIT on the very day Castel obtained a Judgment in this Court, against AIT." Pl.'s CB at 20. Castel contends that Wilson concealed and misrepresented material facts by

knowingly attempting to "dispose of the only remaining valuable asset in AIT," the BBDC asset, which Wilson testified was AIT's most valuable asset at the time of the Transaction. See id. Castel asserts that Wilson's testimony about his preference to pay Dr. Wang over Castel showed personal animosity towards Castel and thus intent to deceive. See id. Castel argues that had Wilson disclosed what he knew about the BBDC asset, Castel would have pursued the asset; instead, Castel believed it no longer existed because Wilson testified that "he transferred it to Elsie Levin," the clinic owner. See id. at 21.

200.   While Castel asserts this claim now, this claim was never alleged in the SAC or at any point during this case. Castel argues that this issue was tried by implied consent of the parties under Federal Rule of Civil Procedure 15(b). See id. at 20 n.2. A party asserting trial by implied consent "must demonstrate that [the adverse party] understood evidence had been introduced to prove [the new issue], and that [the new issue] had been directly addressed, not merely inferentially raised by incidental evidence." LaLonde v. Davis, 879 F.2d 665, 667 (9th Cir. 1989).

201.   Castel does not point to any trial evidence to suggest that Defendants implicitly consented to trying fraud claims against Wilson based on his conduct after the Transaction. Accordingly, Castel has failed to show that this issue was pled or tried by implied consent.[44] Moreover, even if Castel

---

[44] Castel indicated during closing arguments that it sought leave from Judge Wright to amend the pleadings to add this claim. From a review of the filings in this case, after Castel filed the operative SAC, it did not move to amend the pleadings further. At most, in Castel's opposition to James's motion for summary judgment, Castel asserted that if the Court found Castel's complaint deficient, it should be granted leave to amend; Judge Wright rejected this argument. See Dkt. 122 at 24-25; MSJ Order at 11 n.6. Thus, the Court is not convinced that Defendants were even on notice of this claim, let alone consented to trying it.

had demonstrated that this issue was tried by implied consent, the evidence at trial failed to show deliberate concealment of a material fact by Wilson in connection with the BBDC asset. During closing arguments, Castel argued that Wilson did not disclose the existence of the BBDC asset to Castel in the course of the litigation in <u>Castel S.A. v. Aurora Imaging Technology, Inc.</u> But Castel presented no evidence at trial to support this claim.[45]

202.   Moreover, Castel presented no evidence to show that AIT transferred its interest in the BBDC asset to Dr. Wang or otherwise took steps to prevent Castel from collecting on the Judgment. To the extent that Castel argues that Wilson was obligated to notify Castel when the BBDC transfer approvals did not come through in order to allow Castel to attempt to collect its Judgment through the BBDC asset, Castel offers no factual or legal support for such argument.

203.   At most, the evidence presented shows that Wilson became hostile to Castel at some point after Castel sued AIT, that he preferred to satisfy larger AIT creditors over Castel, and that he was willing to take steps to pay a larger creditor instead of Castel despite Castel being the creditor that had obtained a Judgment. <u>See</u> Ex. 35; 5 Tr. at 565-70. The evidence does not, however, form the basis for a separate claim for fraudulent concealment.

---

[45] While Castel lodged a copy of the transcript from Wilson's judgment debtor examination, the transcript does not support Castel's claim. On the contrary, the transcript shows that Castel specifically asked Wilson about this asset during the examination, and that Wilson provided an explanation about what happened to this asset that is consistent with his testimony in this case (i.e., that AIT never obtained the necessary approvals to transfer the BBDC asset to AHC and that AIT had lost is management rights in BBDC after Dr. Levin obtained a judgment against it). <u>Compare</u> Debtor Exam. Tr. at 38, 47-48 <u>with</u> 4 Tr. at 523-24; 5 Tr. at 577-78, 637-38.

### 3. Damages

204. Having concluded that Castel has proven the first four elements of its fraudulent concealment claim with respect to Wilson's conduct before the Transaction, the remaining question is the amount of Castel's damages.

205. Castel argues that Wilson should be liable for Castel's entire lost equity investment in the Series C and D shares, $850,000 (its estimate for the amount of the Transaction proceeds that were distributed to what Castel claims is an "Inner Circle" of creditors, i.e., Wilson, Cheng, Chang, James, ARF, BE Capital, and AHC). See Pl.'s CB at 35-36. The Court disagrees.

206. As discussed above, because AIT was insolvent by at least June 2015, see, e.g., Exs. 56, 92, Castel failed to prove that the loss of its equity investment in AIT was the result of any concealment or misrepresentation by Wilson in 2015-2016. With respect to the $850,000 of "Inner Circle" distributions, Castel offers no explanation to suggest why it would be entitled to the entire amount distributed to these individuals and entities, nor any legal authority to support such a damages theory. Castel also offers no further analysis of what it would have received if Wilson treated all unsecured creditors equally.

207. Instead, the Court finds that Castel's compensatory damages is equal to $100,000. Although Castel argues that had Wilson provided full and fair information about the Transaction, it could have taken actions such as offering to purchase AIT as a whole, recapitalizing AIT, or taking "other action," see Pl.'s CB at 19, during trial, Castel failed to present evidence showing how it would have acted apart from accepting the $100,000 settlement offer. While Castel could have offered to purchase AIT, there was no evidence introduced at trial to suggest that Castel had ever made such an offer or signaled an interest in doing so. See, e.g., 1 Tr. at 93-95 (Malacalza testifying that Castel had the funds to purchase AIT for $8.5 million and might have paid

more "depend[ing] on the documentation that would have been provided"). As discussed above, Castel offers no legal basis on which it could have stopped the Transaction. While theoretically, if armed with more information about the Transaction, Castel could have argued with Wilson for different Transaction payment terms or a different settlement amount, Castel presented no evidence at trial suggesting whether or how it would have done so;[46] the Court cannot assess a damages figure based purely on speculation. Thus, $100,000 represents the best estimate of Castel's actual damages.

208.   Castel also seeks punitive damages in an amount the Court deems appropriate. See Pl.'s CB at 36. Punitive damages are recoverable under Delaware law "where the defendant's conduct exhibits a wanton or wilful disregard for the rights of plaintiff." Cloroben Chem. Corp. v. Comegys, 464 A.2d 887, 891 (Del. 1983) (citation omitted) "For defendant's conduct to be found wilful or wanton the conduct must reflect a 'conscious indifference' or 'I don't care' attitude." Id. (citation omitted).

209.   Here, the trial certainly revealed numerous ways in which Wilson carried out the Transaction irresponsibly. That said, the evidence presented at trial is not sufficient to show that Wilson acted with conscious indifference to Castel's rights. While Wilson consistently provided misleading and incomplete information to Castel in attempting to settle with Castel on its loan, Wilson also invited Castel to request additional information; Castel opted not to respond to Wilson's message and did not demand repayment of the Promissory Note until months later in May 2017. See 5 Tr. at 680-81. Moreover, while Wilson admitted some animosity toward Castel after it sued AIT, there was no evidence presented to show that such hostility existed before

---

[46] Moreover, because Castel failed to perfect its security interest in the Promissory Note, it was one of several unsecured creditors of AIT, and its options for collecting on that debt were necessarily limited. See 2 Tr. at 124-25.

or during the Transaction. The Court therefore declines to award punitive damages.

## IV.   CONCLUSION

For the reasons stated above, the Court enters its findings of fact and conclusions of law as stated herein. Plaintiff shall file a proposed judgment within seven (7) days. Defendants shall file any objections to the proposed judgment within seven (7) days. If no objections are received within seven (7) days, the judgment will be entered immediately, and Federal Rule of Civil Procedure 52(b) will apply upon entry of judgment.

Date: September 27, 2023

DOUGLAS F. McCORMICK
United States Magistrate Judge